**UNITED STATES BANKRUPTCY COURT
FOR THE WESTERN DISTRICT OF MISSOURI
KANSAS CITY DIVISION**

In re:

DCA Outdoor, Inc., *et al.*[1],

Debtors.

Case No.   25-50053-11
Chapter 11
Jointly Administered

**THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS' PRELIMINARY
OBJECTION TO THE FINAL FEE APPLICATION OF FOCUS MANAGEMENT
GROUP USA INC. & JUANITA SCHWARTZKOPF AS CHIEF RESTRUCTURING
OFFICER TO THE DEBTORS FOR THE FINAL PERIOD OF FEBRUARY 25, 2025,
THROUGH SEPTEMBER 30, 2025**

The Official Committee of Unsecured Creditors ("**Committee**"), for its Preliminary

Objection to the Final Fee Application of Juanita Schwartzkopf as Chief Restructuring Officer

("**CRO**") and Focus Management Group USA Inc. (collectively with the CRO, "**FMG**") to the

Debtors for services rendered from February 25, 2025, through September 30, 2025 ("**Fee

Application**"), states:

**INTRODUCTION**

The Debtors entered chapter 11 after years of warnings, missed opportunities, and self-

interested decision-making by the Debtors' founder, chief executive, and equity holder—Tory

Schwope. Multiple financial officers and independent advisors told Mr. Schwope the same thing:

the Debtors' business model was unsustainable, the enterprise had to be right-sized, and

---

[1] The other Debtors in these Chapter 11 cases are as follows, with the last four digits of their respective EINs: Anna
Evergreen, LLC (2226); Brehob Nurseries, LLC (3791); Colonial Farms, LLC (3736); Colonial Gardens
Developments, LLC (2413); Colonial Gardens, LLC (9612); DCA Land Holding Company, LLC (4280); DCA Land
Illinois, LLC (1397); DCA Land Indiana, LLC (4848); DCA Land Kansas, LLC (8049); DCA Land Kentucky, LLC
(4280); DCA Land Missouri, LLC (6728); DCA Land Oregon, LLC (6830); KAT Nurseries, LLC (4682); PlantRight
Supply, LLC (3464); Schwope Brothers Tree Farm, LLC (6725); Schwope Brothers West Coast, LLC (2354); Utopian
Plants Indiana, LLC (8385); Utopian Transport, LLC (3456); Utopian Trees, Inc. (3868). (Together with DCA
Outdoor, Inc., the "**Debtors**").

meaningful asset sales and operational restructuring was necessary to preserve value. Mr. Schwope rejected that advice, removed the professionals who delivered it, and continued operating the Debtors in a manner that deepened the their financial distress.

The Debtors' primary secured lenders, Frontier Farm Credit, FLCA, Frontier Farm Credit, PCA (together, "**Frontier**"), eventually concluded that Mr. Schwope was incapable of implementing necessary change and began preparations for installing a neutral, independent party through a receivership. Mr. Schwope responded by filing these free-fall chapter 11 cases without a financial advisor, without a credible exit strategy, and without any willingness to relinquish an ounce of control. The Debtors only retained FMG as a concession to Frontier for the use of cash collateral and receiving a DIP loan. FMG was supposed to serve as an independent fiduciary check to stabilize the Debtors, scrutinize their finances, test management's assumptions, and guide the estates toward a viable exit from bankruptcy.

That did not happen. Instead, FMG improperly deferred to Mr. Schwope and his cronies, including Debtors' former counsel. FMG failed to independently analyze the Debtors' most critical financial issues, permitted unreliable inventory accounting and missed budgets to persist, made no meaningful progress toward a confirmable plan or sale process, and failed to identify or stop insider transactions that diverted estate value to non-Debtor affiliates and insiders. FMG's work did not provide the independent restructuring discipline the estates desperately needed. FMG functioned as a rubber stamp that protected the Schwope status quo that had caused the Debtors' collapse.

Under Sections 327, 328, and 330 of the Bankruptcy Code, professionals must remain disinterested and provide services that are both necessary and beneficial to the estate. FMG did neither. Because it represented interests adverse to the estates and breached its fiduciary duties of loyalty, care, and good faith, it is not entitled to compensation.

2

## BACKGROUND

1. In the years leading up to the Debtors' bankruptcy filings, Mr. Schwope fired multiple financial officers and two independent financial advisors who each told him what he did not want to hear: that the Debtors' business model was unsustainable and he had to substantially change the enterprise to survive.

2. After multiple loan amendments, emergency bridge financing, and numerous opportunities for Mr. Schwope to implement necessary change, Frontier realized Mr. Schwope was unwilling to right-size the Debtors. Thus, they began preparations for the appointment of a receiver in late 2024 and early 2025 to do exactly what financial advisors had long advised Mr. Schwope that he had to do: start selling assets and downsize operations.

3. Undeterred, Mr. Schwope engaged Lewis Rice to prepare and file these free-fall cases, without a financial adviser and without any semblance of an exit plan.

4. On February 25, 2025, the Debtors hired Ms. Schwartzkopf as CRO and FMG as financial advisor as a concession to Frontier for use of cash collateral and Frontier providing debtor-in-possession financing. FMG's role was clear: stabilize the Debtors and be a neutral, independent check on Mr. Schwope's demonstrated self-interest.

5. FMG instead worked to protect Mr. Schwope's interests. For example, evidence suggests that FMG knew very early on that Mr. Schwope had vastly overstated the Debtors' inventory values, and that if parties learned the truth, it would be the "kiss of death" for Mr. Schwope's continued control. Specifically, the truth would reveal that Frontier was deeply undersecured, the Debtors could not provide adequate protection to use cash collateral, and the Debtors had no reasonable prospect for a refinancing or reorganization without substantial asset sales. This is confirmed by Lewis Rice admonishing Ms. Schwartzkopf as follows in response to

KC 25538594.8

Frontier's repeated requests for access to the Debtors' financial information for real estate and inventory appraisals:



*See* Ex. C. In a further reply to this email, Mr. Parres continues, stating "[w]e have stabilized but we are not moving towards anything good other than feeding Farm Credit information that is going to kill us if the [appraisal] numbers are what I was told they would be. My stomach is hurting this is not what we started this fight for." *Id.*

### **JURISDICTION**

6. The Court has jurisdiction over this contested matter pursuant to 28 U.S.C. §§ 1334(a), (b); 28 U.S.C. §§ 157(a), (b)(1); and 28 U.S.C. § 151.

7. This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A).

## **REQUESTED RELIEF**

8.      The Court should deny the Fee Application in its entirety because the Court has not entered a final retention order for FMG.

9.      In the alternative, the Court should deny the Fee Application in its entirety because FMG represents or holds an interest adverse to the estates.

10.     In the alternative, the Court should deny the Fee Application in its entirety based on FMG breaching its heightened fiduciary duties of care, loyalty, and good faith to the Debtors and their estates.

11.     In the alternative, the Court should substantially reduce the amount awarded.[2]

## **LEGAL STANDARDS**

12.     A professional seeking compensation under Section 330 of the Bankruptcy Code bears the heavy burden of proving entitlement to all fees and expenses requested. *In re Kula*, 213 B.R. 729, 736 (8th Cir. B.A.P. 1997). "This burden is not to be taken lightly given that every dollar expended on legal fees results in a dollar less that is available for distribution to the creditors." *In re Dille*, No. 18-42994, 2021 WL 864201, at *2 (Bankr. W.D. Mo. Mar. 8, 2021) (citing *In re Ulrich*, 517 B.R. 77, 80 (Bankr. E.D. Mich. 2014) (citations omitted)).

13.     Section 330(a) sets forth the basic standards for compensation of professional fees. The Court may award "reasonable compensation for actual, necessary services rendered," and can reimburse the professional for "actual and necessary expenses incurred." 11. U.S.C. § 330(a)(1(A). The Court has wide discretion to award "less than the amount of compensation that is requested." *Id.* § 330(a)(2).

---

[2] To the extent that the Court is inclined to award any fees or expenses, such award should be without prejudice to the resolution of all affirmative claims that exist against FMG, including without limitation without prejudice to any potential preclusion doctrines that might apply.

KC 25538594.8

14.    A Court cannot award compensation for services that were duplicative, not "reasonably likely to benefit the debtor's estate," or not "necessary to the administration of the case" at the time they were rendered. *Id.* § 330(a)(4)(A). If requested compensation is not *per se* prohibited under section (a)(4), the Court looks to the following non-exclusive factors to evaluate the request:

> In determining the amount of reasonable compensation to be awarded to . . . [a] professional person, the court shall consider the nature, the extent, and the value of such services, taking into account all relevant factors, including –
>
> (A)   the time spent on such services;
>
> (B)   the rates charged for such services;
>
> (C)   whether the services were necessary to the administration of, or beneficial at the time at which the service was rendered toward the completion of a case under this title;
>
> (D)   whether the services were performed within a reasonable amount of time commensurate with the complexity, importance, and nature of the problem, issue, or task addressed;
>
> (E)   with respect to a professional person, whether the person is board certified or otherwise has demonstrated skill and experience in the bankruptcy field; and
>
> (F)   whether the compensation is reasonable based on the customary compensation charged by comparably skilled practitioners in cases other than cases under this title.

*Id.* § 330(a)(3)(A).

15.    Section 328 authorizes the Court to deny compensation to professionals hired under Section 327 if, "at any time during such professional person's employment under section 327 . . . such professional person is not a disinterested person, or represents or holds an interest adverse to the interests of the estate with respect to the matter on which such professional person is employed." *Id.* § 328(c).

6

16.    Relevant here, Section 101(14) defines a "disinterested" person as someone who "does not have an interest materially adverse to the interest of the estate or of any class of creditors or equity security holders, by reason of any direct or indirect relationship to, connection with, or interest in, the debtor, or for any other reason."

17.    The term "adverse interest" is not defined in the Bankruptcy Code, and whether a professional is "disinterested" or whether there is an interest "adverse" to the estates is determined on a case-by-case basis. *In re Caldor, Inc. NY*, 193 B.R. 165, 170–71 (Bankr. S.D.N.Y. 1996). In analyzing whether a professional has an adverse interest to the estate, courts consider whether the representation would create "either a meaningful incentive to act contrary to the best interest of the [represented party]" or a "reasonable perception of one." *Id.* (internal citations omitted). In other words, here, "if it is plausible that the representation of [Tory Schwope and his non-debtor affiliates] will cause [FMG] to act differently than they would have without that . . . representation, then they have a conflict and an interest adverse to the [Debtors]." *Id.* (citing *In re Leslie Fay Companies, Inc.*, 175 B.R. 525, 533 (Bankr. S.D.N.Y.1994)).

18.    Professionals hired under Section 327 owe fiduciary duties to the Debtor and the bankruptcy estate. *See In re Angelika Films 57th, Inc.*, 227 B.R. 29, 39 (Bankr. S.D.N.Y. 1998), *aff'd*, 246 B.R. 176 (S.D.N.Y. 2000) ("What is clear is that undivided loyalty is central to disinterestedness. . . . [the] requirements of § 327 serve the important policy of ensuring that all professionals . . . tender undivided loyalty and provide untainted advice and assistance in furtherance of their fiduciary responsibilities."). A professional breaches their fiduciary duty when they do not act in good faith, and do not employ strategies reasonably designed to maximize the estate. *In re Easterday Ranches, Inc.*, 647 B.R. 236, 249 (Bankr. E.D. Wash. 2022). A professional's breach of their fiduciary duties can preclude an award of fees. *In re Saint Vincents*

KC 25538594.8

*Cath. Med. Centers of New York*, No. 05 B 14945 (ASH), 2007 WL 2492787, at \*13 (Bankr.

S.D.N.Y. Aug. 29, 2007)).

19.    Professionals for debtors-in-possession owe a "***heightened duty of care*** 'to ensure

[the] integrity of the bankruptcy process where, by definition, a debtor in possession is not

disinterested, [and professionals] for a debtor in possession must be disinterested, free of any

adverse entanglements which could cloud its judgment respecting what is best for the estate.'" *In*

*re Count Liberty, LLC*, 370 B.R. 259, 279–83 (Bankr. C.D. Cal. 2007) (citing *JLM, Inc.*, 210 B.R.

19, 26 (B.A.P. 2d Cir. 1997) (emphasis added). Estate professionals owe independent duties to the

estates and cannot simply be "a mouthpiece for [the] client." *Id.* Rather, professionals for debtors-

in-possession:

> must be proactive, *i.e.,* prepared to render unsolicited . . . advice
> regarding preventative or corrective action that may be necessary
> for the debtor in possession to properly discharge its fiduciary
> obligations. *See, e.g., In re Berg,* 268 B.R. 250, 262 (Bankr. D.
> Mont. 2001) (opining that debtor in possession's [professional]
> "must instruct the debtor on appropriate conduct and must develop
> client control"); *In re Whitney Place Partners,* 147 B.R. 619, 620–
> 21 (Bankr. N. D. Ga. 1992) (stating that the debtor's [professional]
> "must take conceptual control of the case and provide guidance for
> management of the debtor, not only to discern what measures are
> necessary to achieve a successful reorganization, but to assure that,
> in so doing, compliance with the Bankruptcy Code and Rules is
> sought rather than avoided"); *Wilde Horse,* 136 B.R. [830,] 840
> [Bankr. C.D. Ca. 1991] (observing that "the duty to advise the client
> goes beyond responding [to] the client's requests for advice"); *Sky*
> *Valley,* 135 B.R. [925,] 939 [Bankr. N. D. Ga. 1992] (observing that
> a [professional's] "duty as fiduciary of the estate requires an active
> concern for the interests of the estate and its beneficiaries"). The
> [professional] must render "candid advice," so the client can "make
> informed decisions regarding the representation." [Professionals]
> cannot remain "a passive observer, silently sitting by in the face of
> a client's legally unacceptable decision." *FDIC v. Wise,* 758 F.
> Supp. 1414, 1419 (D. Colo. 1991).

KC 25538594.8

*Id.* at 281–83.

20. Professionals breach these heightened duties when they elevate the interest of a debtor's principal over the interest of the estates. *See Angelika Films*, 227 B.R. at 39 (citing *In re Rancourt*, 207 B.R. 338, 360 (Bank. D.N.H. 1997)) ("When representing the debtor-in-possession, its [professional] has a duty to look to the interests of the estate and not to the interests of its principals."). *In re Food Mgmt. Grp., LLC*, 380 B.R. 677, 712 (Bankr. S.D.N.Y. 2008) ("The principals and the debtor in possession have such an adverse interest for conflict purposes when [a professional] begins to advocate for or represent the principals' interests in ways that are at the expense of the estate."); *In re Greene*, 138 B.R. 403, 409 (Bankr. S.D.N.Y. 1992) (finding [professional's] resistance to conversion from Chapter 11 was a delaying action intended not to benefit the estate but to benefit the individuals); *Bergrin v. Eerie World Entm't, L.L.C.*, No. 03 Civ. 4501, 2003 WL 22861948, at *2 (S.D.N.Y. Dec. 2, 2003) (finding professional for a Chapter 11 debtor owes a fiduciary duty of loyalty and care to his client, the debtor in possession, and the estate, but not to the debtor's principals). Courts do not award compensation for work conducted for the benefit of the debtor's principals. *In re Food Mgmt. Grp., LLC,* 380 B.R at 712. While much of the case law deals with counsel's fiduciary obligations, this is a distinction without a difference for other estate professionals retained by debtors-in-possession.

21. When professionals breach their fiduciary duties, the Court has "wide discretion in fixing a remedy[.]" *In re Food Mgmt. Grp., LLC*, 380 B.R. 677, 713 (Bankr. S.D.N.Y. 2008) (citing *In re Leslie Fay Cos.*, 175 B.R. at 538–539). The available remedies range from sanctions or the refusal, reduction, or disgorgement of fees, or the pursuit of a direct action. *Id.*[3]

---

[3] The Committee has requested Court approval of a stipulation granting the Committee standing to, among other things, bring a direct action for damages caused by FMG's actions, and the Committee reserves all rights accordingly.

9

## ARGUMENT

The Court should deny the Fee Application for multiple, independent reasons. First, it is procedurally deficient because the Court has not approved FMG's retention on a final basis. Second, the preliminary record shows that FMG represented or held interests adverse to the estates, was not disinterested, and breached their fiduciary duties of loyalty, care, and good faith. At minimum, FMG seeks compensation for work that did not benefit the estates and, in many instances, served only Mr. Schwope's desire to preserve control to the great detriment and harm of the estates. The Court should deny the Fee Application in its entirety, order disgorgement of amounts already paid, or substantially reduce any allowed compensation.

**I.      The Court should find that the Fee Application is procedurally defective because the Court has not approved FMG's retention on a final basis.**

22.      A professional is only entitled to compensation under Section 330 if they have been retained under Sections 327 or 1103 of the Bankruptcy Code.

23.      Here, the Court approved FMG's retention pursuant to an *interim* order entered on March 3, 2025 [Doc. 62].

24.      The Court has not entered an order approving FMG's retention on a final basis.

25.      Black's Law Dictionary defines "interim" as something that is "done, made, or occurring for an intervening time; temporary or provisional." INTERIM, Black's Law Dictionary (12th ed. 2024). Black's Law Dictionary further defines "interim order" as "[a] temporary court decree that remains in effect for a specified time or until a specified event occurs." ORDER, Black's Law Dictionary (12th ed. 2024).

26.      By contrast, Black's Law Dictionary defines a "final order" with reference to "final judgment", which is defined in relevant part as "[a] court's last action that settles the rights of the

10

parties and disposes of all issues in controversy." JUDGMENT, Black's Law Dictionary (12th ed. 2024).

27. A final retention order takes something that was "temporary or provisional", and solidifies retention under the Bankruptcy Code, confirming that the professional is, among other things, disinterested. Without a final retention order, a professional is not entitled to final approval of fees and expenses under Section 330.

28. The Court has not entered an order on FMG's retention that is the Court's "last action that settles the rights of the parties and disposes of all issues in controversy."

29. The Committee does not believe that the Court should enter a final order on FMG's retention application because, as detailed herein, there are significant questions regarding FMG's disinterestedness, among other issues relevant to FMG's eligibility to be retained under Section 327 and allowance of compensation under Section 330 of the Bankruptcy Code.

30. Moreover, the Committed does not believe that the Court should enter a final order on FMG's retention application as a procedural matter because Debtors have already terminated FMG and the Committee understands the Debtors will not request entry of a final order on FMG's retention.

**II.      The Court should deny the Fee Application in its entirety pursuant to Section 328(c).**

31. FMG represented interests adverse to the estates, holds an interest adverse to the Debtors, and is not "disinterested" under Section 101(14), disqualifying it from any compensation under Section 330.

**A.      FMG represented interests adverse to the estates.**

32. FMG treated Mr. Schwope, not the estates, as its client. In representing Mr. Schwope, FMG represented an interest adverse to the estates, so no final order of employment can

11

be entered, and no fees should be allowed. *See* Section 328(c). Section III herein details the preliminary evidence of FMG impermissibly deferring to, and representing, the interests of Mr. Schwope in breach of their duty of loyalty to the estates.

33.     Evidence also indicates that FMG had conflicts of interest in simultaneously representing Mr. Schwope's wholly owned non-debtor affiliate, Valley Hill Tree Farm, LLC ("**VHTF**"). In both the Second Application and First Application, FMG references VHTF as a "Debtor" and therefore its client. This is not merely a typo. It is evidence that FMG viewed and treated Mr. Schwope as its client, and by extension, all his entities, including his non-debtor affiliates.

34.     This is further corroborated by FMG's attempts to source initial debtor-in-possession financing, where FMG included VHTF as a proposed DIP borrower, and included its assets in solicitation from prospective DIP lenders. This was not disclosed in FMG's retention application [Doc. 38], Ms. Schwartzkopf's declaration [Doc. 39], or otherwise supplemented as required by the Bankruptcy Code and Bankruptcy Rules.

35.     The Debtors allege in *DCA Outdoor, Inc. v. Valley Hill Tree Farm, LLC,* Case No. 26-05001, that, post-petition, Mr. Schwope transferred nearly $9 million of inventory from the Debtors to his non-debtor affiliate, VHTF. FMG knew, or reasonably should have known, that this transfer was fraudulent, or at a minimum, that it should have been disclosed to parties in interest.

36.     FMG's time records appear to confirm that it was aware of the shifting of inventory from the Debtors to VHTF and appeared to have acted in concert with insiders to effectuate this transfer. *See e.g.*, Sam Williams time entry on March 31, 2025 ("Discussions, emails, and call with S. Schwope and J. Schwartzkopf regarding email request to transfer customer receipt from SBTF to Valley Hill."); Juanita Schwartzkopf time entry on April 1, 2025 ("Valley Hill Tree Farm related

KC 25538594.8

discussions."). The Committee understands that VHTF then subsequently sold over $1 million of inventory that belonged to the Debtors.

37.    Because FMG, in representing the interests of Mr. Schwope and VHTF, represented interests adverse to the estates, the Court should decline to enter a final order of employment and should also disallow the Fee Application in its entirety.

**B.    FMG holds an interest adverse to the estates because its actions are directly at issue and FMG is not "disinterested."**

38.    The Court should also deny the entirety of the Fee Application because FMG holds an interest adverse to the estates. FMG's conduct has put its fiduciary obligations and client loyalties directly at issue.

39.    As explained further below, FMG breached its fiduciary duties of good faith, loyalty, and care to the estates by representing non-debtor affiliate VHTF and representing Mr. Schwope in his individual capacity.

40.    FMG may also hold interests adverse to the estates because it is potentially liable for aiding and abetting claims related to Mr. Schwope's own breaches of fiduciary duties to the estates. The Committee continues to investigate these matters and will supplement the record accordingly.

41.    While the Committee continues to develop the record, it appears FMG fundamentally failed to discharge its fiduciary duties to the Debtors. As a result, FMG holds a material adverse interest against the Debtors and is therefore not "disinterested" and not entitled to any compensation or reimbursement of expenses. *See* Section 328(c).

KC 25538594.8

**III.    The Court should deny the Fee Application because FMG breached fiduciary obligations to the estates.**

42.    Even at this preliminary stage, enough evidence exists to permit the Court to deny in its entirety, or substantially reduce, the amounts requested in the Fee Application based on FMG's breach of their fiduciary duties.

43.    Ms. Schwartzkopf as CRO and FMG as financial advisor to the Debtors owed the estates fiduciary duties. *See In re Angelika Films 57th, Inc.*, 227 B.R. 29, 39 (Bankr. S.D.N.Y. 1998) ("What is clear is that undivided loyalty is central to disinterestedness. . . . [the] requirements of § 327 serve the important policy of ensuring that all professionals . . . tender undivided loyalty and provide untainted advice and assistance in furtherance of their fiduciary responsibilities."). The CRO understood that her role required "coordination of an overall strategy" with the ultimate goal of getting "the highest recovery . . . for all the creditors, secured first, then unsecured, and equity." Ex. A, J. Schwartzkopf Aug. 6, 2025 Dep. at 10:1-15.

44.    The CRO was aware of her duties and responsibilities. Aside from her many years of experience, the FMG engagement letter further set out minimum expectations. The number one item under "Executive Management" in the FMG engagement letter states that "[t]he CRO, in consultation with the Board of Directors and senior management of [the Debtors], will make all major decisions in managing the financial operations of the [Debtors]." Ex. B, FMG Agreement for Consulting Services.

45.    The CRO was also responsible for communicating the Debtors' financial condition to the Debtors and their creditors, identifying liquidity needs, and monitoring the Debtors' performance against budget. The CRO and FMG, however, failed to exercise their independent power and judgment in providing advice and services to the Debtors.

14

KC 25538594.8

46.     The CRO and FMG breached their duties of loyalty by impermissibly deferring to Mr. Schwope and Debtors' counsel and failing to work toward a confirmable plan and exit. The CRO and FMG beached their duties of care and good faith to the estates by (1) failing to understand and review the Debtors' financial history; (2) failing to conduct independent testing and analysis of Debtors' inventory accounting; (3) failing to submit accurate and attainable budget forecasts; and (4) failing to identify transfers to insiders and other improper estate financial transactions.

### A.     FMG breached the duty of loyalty to the estates.

47.     When the interests of the Debtors' estates and the Debtors' principal conflicted, FMG owed the estates a duty of loyalty. Time after time, however, FMG flouted those duties by putting Mr. Schwope's interests ahead of the estates', deferring to Mr. Schwope to conduct complex financial analyses (despite having no education or certification to do so), and deferring to the Debtors' counsel about when to speak to other interested parties.

48.     As CRO, Ms. Schwartzkopf had blocking power—she and Mr. Schwope had to agree on strategy and business decisions, and if they did not, she had to bring it to the attention of Frontier. Ex. A, J. Schwartzkopf Aug. 6, 2025 Dep. at 11:1-11. Throughout her entire engagement, however, the CRO never once raised any concerns with Frontier and testified that she never had to use her blocking power because there were no areas of disagreement with Mr. Schwope. *Id.* at 11:10-22. But contemporaneous email correspondence demonstrates that even when there were disagreements, the CRO and FMG impermissibly deferred to Mr. Schwope and deferred to his financial modeling instead of conducting independent analysis.

49.     For example, the CRO completely deferred to Mr. Schwope in connection with the Farm Market Layer Adjustment ("**FML**"). This complex accounting mechanism for measuring the value of growing crop inventory was a major element of the Debtors' inventory valuation and

KC 25538594.8

critical to understanding how the Debtors calculated other financial measures, such as their borrowing base with Frontier. When asked at her deposition who would know the most about the adjustment and how the Debtors used it, the CRO repeatedly deferred to Mr. Schwope. Ex. A, J. Schwartzkopf Aug. 6, 2025 Dep. at 45:18-46:11 ("Q: [W]ho ultimately had the intricate knowledge of putting that together and making those determinations? A: I believe it would have been Tory Schwope, Samantha Schwope, and Mike Scott."); *Id.* at 60:22-25 ("And then Tory looked at it, too. And you will be surprised at how knowledgeable Tory is on understanding this.")

50. The CRO testified that FMG did no independent testing and analysis of the inventory reporting inputs. Ex. A, J. Schwartzkopf Aug. 6, 2025 Dep. at 61:1-7 ("Q: When you talked to Samantha Schwope about the June 2025 FML adjustment, did you ask her specifically how they were determining which portions of the capitalized WIP pool got expensed? A: ***I did not make her recreate her work for me, no.***" (emphasis added)); *Id.* at 63:2-8 ("Q: Did you – so as it pertains to the numbers . . .[in] columns A through D, and through about row 26, did you or anybody on your team conduct an analysis as to how those numbers were arrived at? A: ***No, we didn't do any testing.***" (emphasis added)); *Id.* at 70:6-71:5 ("A: Did anybody at Focus dig any deeper than you have in terms of which specific production costs the production entities capitalized into WIP for June 2025? A: ***The process that the company used for this calculation hasn't changed and we haven't asked them to change it.*** Again, I'd defer to the experts, I talked to the accounting firm, and the people at the company who would be able to really walk you through the details. Q: My question is this: Has anybody at Focus conducted a deeper dive analysis to determine which production costs the production entity capitalized into WIP in the June 2025 FML calculation? A: . . . ***No***." (emphasis added)); *Id.* at 77:1-10 ("Q: Have you personally conducted any analysis as to the operating expenses that the production entities capitalize as part of their FML

16

adjustment? A: *no*. Q: Do you know if anybody at Focus has conducted any analysis as to the operating expenses capitalized by the production entities as part of this adjustment? A: *I don't believe so*." (emphasis added)).

51. The CRO and FMG impermissibly deferred to, and took direction from, Debtors' counsel, Lewis Rice, instead of effectuating their independent fiduciary duties. For instance, on April 9, 2025, Larry Parres of Lewis Rice emailed Ms. Schwartzkopf about Frontier's appraisers' access to the data room:

> Juanitta, isn't this what you didn't want to happen—why haven't you talked them off this ledge. ***Seems to me I need to get you to be Juanitta I know and lose this lady that things [sic] Farm Credit is our friend—they are not.*** You called this long ago and this is the kiss of death if I recall your words. Why is Ryan heading down this path—I feel like they are playing us to get through the spring season and we are playing along. We need to push back if I recall what you told me. Let's talk. . . . I do not like where this is headed."

Ex. C, ECACTRL00253209 (emphasis added).[4]

52. Regarding a planned call with the United States Trustee's Office, Mr. Parres ordered Ms. Schwartzkopf to "speak as little as possible" to which she capitulated and advised, "Plan not to talk unless directly spoken to." Ex. D, ECACTRL00237860. Agreeing to stay silent in conversations with the bankruptcy system's watchdog to avoid disclosing information is not only a disservice to the Debtors, but it is also conduct that is grossly below the level of care and diligence that a reasonable chief restructuring officer would exercise under these circumstances.

---

[4] This example is illustrative of the dynamic between Lewis Rice and FMG and is not ultimately surprising given the lengths to which Lewis Rice and Mr. Schwope went to prevent the appointment of a CRO. For example, in discussing Frontier's position that a CRO must be appointed before it would provide DIP financing, Mr. Parres wrote: "DEAL BREAKER—WE ARE NOT GOING TO PUT A CRO IN PLACE—NOT HAPPENING SO REMOVE IT COMPLETELY." *See* Ex. E. Lewis Rice said that putting a CRO in place was a "non-starter" and explained to Tory that "if they get that, then you will have no control to do anything." *See* Ex. F. When Frontier insisted that a CRO must be put in place, the parties ultimately agreed to the appointment of the CRO, Juanita Schwartzkopf, who would have "blocking powers."

17

53. Contemporaneous email correspondence illustrates this was always about Mr. Schwope's desires—not what was best for the Debtors. Even though the CRO and FMG's primary role was to stabilize and maximize the value of the estates, they did not begin seriously considering a sale timeline until after Fronter and the Committee raised concerns. Even then, after the estates struggled in bankruptcy for six months, Mr. Schwope refused to engage in any sales discussions. On June 18, 2025, Ms. Schwartzkopf wrote, "I am concerned the Tory is not at all in agreement with a November 1 sale process start. We all need to discuss." Ex. G, ECACTRL00245215. The same day, in a comment to her hearing testimony prepared by Lewis Rice, she writes, "TORY SAYS HE WILL NOT COMMIT TO A SALES PROCESS STARTING ON NOVEMBER 1. HE WOULD WANT TO CONTINUE TO OPERATE THE BUSINESS THROUGH SPRING 2026 IN BK AND LOOK FOR A BYER IN THE SUMMER OF 2026." Ex. H, ECACTRL00250268. The next day, in reference to a November 1, 2025 sale date, she reiterates, "Tory definitely does not want a commitment to a date." Ex. I, ECACTRL00249234. Then talking about the outline of her testimony she says, "I tried to soften the discussion in this version *but the date is really against Tory's wishes*." *Id.* (emphasis added). In short, Ms. Schwartzkopf was more concerned about managing and maintaining Mr. Schwope's self-interested "wishes" than she was in discharging her duties consistent with the best interests of the Debtors.

54. FMG breached the duty of loyalty to the estates by improperly deferring to Debtors' principal and Debtors' counsel and, even when disputes arose, failed to use any blocking power or raise concerns with the Court, the Committee, Frontier, or any other constituency.

**B.    FMG breached their duties of care and good faith to the estates.**

55. FMG breached their fiduciary duties of care and good faith to the estates by (1) failing to understand and review the Debtors' financial history; (2) failing to conduct

18

independent testing and analysis of Debtors' use of the FML for inventory accounting; (3) failing to make any progress toward a confirmable plan; (4) failing to submit accurate and attainable budget forecasts; and (5) failing to identify transfers to insiders and other improper estate financial transactions.

### 1. *FMG did not understand nor review Debtors' financial history.*

56. The CRO did not believe that she was required to understand the history of the Debtors' financials, or what prior financial advice had been up until the bankruptcy filing. But by ignoring the nature of the business and recent financial history, the CRO and FMG were unable to exercise their duties of care and good faith to the estates.

57. Despite acknowledging that it could be a "badge of fraud," the CRO did not discuss with the Debtors' principal the company's recent turnover of CFOs and financial advisors. Ex. A, J. Schwartzkopf Aug. 6, 2025 Dep. at 15:15-16:1 ("Q: When you first started working with the Debtors, did you have any discussions with the Debtors about the turnover of their CFOs in the five years prior to filing for bankruptcy? A: I was aware that there was turnover at the CFO level, but I didn't have a lot of discussion about it because it was in the past[.]"); *id.* at 39:5-9 (When asked about prior CFO Todd Pitman, "I wasn't going back and trying to figure out what happened in the past, I was trying to look to the future, so I have never spoken to him."); *id.* at 179:2-13 (when asked about her understanding of Steeplechase's work, "since it was in the past, it didn't seem to have an impact on the current situation.").

58. Further, no one at FMG conducted an analysis as to the profitability of the Debtor entities. Ms. Schwartzkopf testified, "We didn't go back and look at past performance. We are looking at 2025 and 2026 right now." Ex. A, J. Schwartzkopf Aug. 6, 2025 Dep. at 19:12-19.

19

59. Because it was the primary duty of the CRO and FMG to maximize the value of the estates, it was incumbent upon them to understand the financial history, understand recent financial advice and context, and then make independent assessments that would guide the Debtors toward an exit from bankruptcy. Their failure to do this was a breach of their duty of care to the estates.

### 2. *FMG failed to conduct independent testing and analysis of Debtors' inventory accounting.*

60. FMG also breached their fiduciary duties of care and good faith to the estates by failing to conduct independent testing and analysis of the Debtors' inventory accounting. The record is replete with examples of the CRO's lack of understanding of the FML calculations and improper deference to the Debtors for these critical analyses, which impacted the inventory valuation by tens of millions of dollars:

- Q: Did Focus conduct any independent analysis as to the inventory deemed ready for sale as part of the June 2025 FML adjustment? A: No. (Ex. A, J. Schwartzkopf Aug. 6, 2025 Dep. at 53:18-21).

- Q: And do you know if anybody from Focus has determined whether, as it pertains to the capitalization of costs of production, whether the company – the Debtor entities on the production side are following this guidance in this Exhibit 32 memo? A: We have not asked the company to change its accounting methodology[.] (*Id.* at 55:22-18).

- Q: What is your understanding of how the production entities value their inventory on their production entities' financial statements? . . .A: They have a very complex process that they go through, that the entities go through, and then their accounting firm verifies that process. *I'm not trying to be an expert on farm market layer and I would defer to, you know, the people who are much more experienced and exposed to it."* (*Id.* at 37:18-38:13 (emphasis added)).

- Q: So do you have any understanding as to this particular spreadsheet what capitalizable production costs refers to? A: *I would want you to talk to the parties who are experts at this, not me*. I am only going to confuse the situation, and I want you to talk to the parties who are expert at this, not me. (*Id.* at 64:10-17 (emphasis added)).

- Q: So would that mean that no inventory was sold from Schwope Brothers Tree Farms in 2024? A*: This is related to the farm market layer adjustment. Again you*

*have to talk to the people who are the experts on this*, I am not. . . I'm not comfortable saying yes or no to that because I don't know enough about this topic." (*Id.* at 81:7-24 (emphasis added)).

- And, Ms. Schwartzkopf testified that Focus did not review or verify the information in the Debtors' borrowing base certificates. (*Id.* 160:16-21).

61.     Understanding of the FML calculation and how it impacted the value of the Debtors' inventory was critical to understanding the value of the companies, the financial health of the Debtors, and the potential options for restructuring. It was a breach of the fiduciary duties of care and good faith for FMG to not take an active role to understand the inputs and effects of this calculation.

### 3.     *FMG made no progress toward a confirmable plan.*

62.     Ms. Schwartzkopf testified that a primary responsibility of FMG was to maximize the value of the estate for the creditors, and agreed that "to do that, [she] would need to understand . . . the value of the assets of the Debtors." Ex. A, J. Schwartzkopf Aug. 6, 2025 Dep. at 45:18-46:11. Despite this acknowledgment, she did not understand the value of the Debtors' assets and made no effort to value the companies as a whole or conduct liquidation analyses for a sale process.

63.     As evidenced in the Fee Application, in the first interim period, FMG spent 1.7% of its time on "asset analysis and recovery," .007% of its time on "asset disposition," and spent .04% of its time on "plan and disclosure statements, " despite such analysis and valuation being critical to the cash collateral and DIP issues and necessary to move the Debtors toward a confirmable plan. In the second interim period, FMG again spent essentially no time on asset analysis and recovery: .02% of FMG time allocated to "asset analysis and recovery," and 0.0% of

21

KC 25538594.8

time spend on "asset disposition." [See generally Docs. 286 and 444, First and Second Interim Fee Applications, respectively]..

64.     At the time of her deposition in August 2025, nearly six months after retention, the CRO had still not taken the first steps to formulate an exit plan for the Debtors. Ex. A J. Schwartzkopf Aug. 6, 2025, Dep. at 162:6-163:16 ("Q: In connection with your role as a CRO of the Debtors, have you taken any steps to formulate an exit plan for the Debtors from bankruptcy? A: . . the first step of what we think that we need to do, is to have numbers that people can look [at] that we think that we can achieve. Q: Okay. In terms of the steps you've taken through the end of 2025 to try to formulate an exit plan, specifically what steps are those? A: First step is getting the numbers together . . . second step is getting a data room organized with the types of information that a new lender would want to be looking at."). At best, this is a plan to later develop a plan.

65.     By August 2025, the CRO and FMG had not conducted any valuations, had not assessed fair market value of the entities, had no idea what the companies were worth, and had not conducted a liquidation valuation. Ex. A, J. Schwartzkopf Aug. 6, 2025 Dep. at 172:16-173:1 ("Q: In connection with potential sale of the distribution entities, are you aware of any valuations that have occurred to those distribution entities? A: No. No. Q: Does Focus have any sense as to what they're worth? A: I don't, right? We can talk about valuation a lot of ways. But at this point, I don't have a number that I would tell you."); Id. at 173:7-16 ("Q: Have you conducted any assessment as to the fair market value of the entities? A: No. Q: Do you know if anyone has? A: Not that I'm aware of[.]"); Id. at 178:4-13 ("Q: [H]ave the Debtors at this point, to your knowledge,

KC 25538594.8

conducted a liquidation value of their assets. A: No, we have not. Q: And I assume Focus has not done that either? A: We have not.").

66.    Instead of conducting these analyses, FMG relied on the Debtors' valuations and numbers. See Ex. J, ECACTRL00246000 (Aug. 29, 2025 email from DCA employee to Mr. Parres, "Attached please find the land valuation for an exhibit. I used the 3X book value to value the land, Tory can you confirm that these numbers seem reasonable and can be used for a trial exhibit?" (emphasis added)).

67.    When Mr. Schwope wanted to take advantage of bankruptcy protections without any changes to his control or the companies' structure, FMG was required to protect the interests of the estates.  Ex. B, FMG Consulting Agreement. This failure to execute the tasks for which they were engaged, and failure to "maximize the estate" constitute breaches of fiduciary duty which must be considered in connection with the Fee Application. *In re Easterday Ranches*, 647 B.R. at 247, 249.

### *4.   FMG failed to submit accurate and attainable budget forecasts*

68.    FMG also breached their fiduciary duties of care and good faith to the estates by failing to submit accurate financial reporting and attainable 13-week budgets throughout their engagement.

69.    As detailed more fully in the Committee's and Frontier's Motion to Direct Appointment of a Chapter 11 Trustee [Doc. 348, the "**Trustee Motion**"], even with the CRO and FMG as financial advisors Debtors often filed their monthly operating reports late and with errors, requiring the repeated filing of amended reports and disclosures. [*Id.* at ¶ 84].

70.    Several reporting errors were significant. In a weekly report for May 2025, Debtors inadvertently omitted all cash receipts for four entities amounting to an $800,000 reporting error

KC 25538594.8

that went unnoticed for almost two weeks. [*Id.* at ¶ 84]. Other required reporting was incorrect or delayed, with another significant error requiring Debtors to restate their June 2024 balance sheet and year-to-date income statement. [*Id.* at ¶¶ 85-86].

71.    In yet another egregious example, on August 15, 2025, FMG notified the parties that it had discovered an error in the June 2025 FML calculation that required a change in the journal entry. This came to light after the parties used the 2025 FML calculations as exhibits in depositions of the Debtors' employees and officers. [*Id.* at ¶¶ 88-92]. This is further illustrative of FMG's failure to understand and stabilize basic financial tracking and reporting. Samantha Schwope ran the FML calculations, with data from Mr. Schwope, with no review by anyone else at the Debtors, including its VP of finance, and with no assistance from the CRO and FMG. [*Id.*]. With the Debtors' history of inaccurate financial reporting and controls, the CRO and FMG breached their fiduciary duties of care and good faith to the estates by acting as a rubber stamp and failing to take any active role in the calculation and reporting of the value of the Debtors' largest asset—its inventory.

### 5.    *FMG failed to identify insider transactions and Mr. Schwope's fraud on the estates.*

72.    FMG breached their fiduciary duties of care to the estates by failing to identify fraudulent transactions. As detailed above, FMG allowed Mr. Schwope to transfer millions of dollars of inventory from the Debtors to Mr. Schwope's entity, VHTF. FMG also allowed various, undisclosed insider transactions to Mr. Schwope and his relatives.

## IV.    Alternatively, the Court should substantially reduce the awarded amount for the services that did not benefit the estates.

73.    A Court cannot award compensation for services that were unnecessarily duplicative, not "reasonably likely to benefit the debtor's estate," or not "necessary to the

administration of the case" at the time they were rendered. *Id.* § 330(a)(4)(A). Here, the Fee Application should be reduced because the majority of the work performed by FMG was not beneficial to the estates. Further investigation through discovery will allow the Committee to identify other areas of work that did not benefit the estates and for which compensation is improper.

**A.     FMG should not be reimbursed for work that did not benefit the estates.**

74.     The CRO and FMG's failure to engage in understanding the Debtors' inventory accounting constituted a breach of fiduciary duty and led to an engagement that failed to maximize the value of the estates. This reality is highlighted by the testimony of Mr. Torpy, a Frontier representative specializing in troubled assets and assigned to Debtors' loans:

> Q: And [Ms. Schwartzkopf] had worked personally with you on one of those previous representations prior to this bankruptcy case, correct?
>
> A: She had.
>
> Q: And do you find Ms. Schwartzkopf to be an honest person?
>
> A: Now or then?
>
> Q: Whatever you say, sir. It's your testimony.
>
> A: Juanita's testimony in this case had led me to lose confidence in her – in her.
>
> Q: The question was, sir, do you find her to be an honest person?
>
> A: No. No longer.
>
> Q: Do you want to give the court an example of something that you think that she was dishonest with in this case?
>
> A: **I'm completely dismayed by Focus Management's assessment of the practices regarding inventory accounting at the debtor entities.** Specifically, I expected to get a work product related to inventory and best practices regarding inventory costing, inventory management, gross margins by product, gross margin by SKU, gross margin by location, et cetera, things of that nature is what I expected to receive, which would be very similar to the engagement where Focus worked on behalf of the other borrower we had. **So, when Juanita expressed that she wasn't effectively interested or informed in doing that kind of analysis on that case where inventory is so, so critical, it gave me great puzzlement. And I'm still completely dismayed over why the practices of accounting for inventory, which is clearly way overstated, wasn't more of a focus of the engagement** is why I have –that's why I have lost confidence in – their work product.

25

[Doc. 409 at 144-145, Transcript from September 10, 2025, Hearing on Motion to Appoint Ch. 11

Trustee (emphasis added).

75.     As further evidence of FMG's work that did not benefit the estates, FMG spent over

25% of billed time in the First Interim Period and 28.7% of billed time in the Second Interim

Period on 13-week cash flows, budgets that were often delayed, incorrect, missed, and with inputs

blindly accepted from Mr. Schwope. *See* generally Docs. 286 and 444, First and Second Interim

Fee Applications, respectively.

76.     FMG also spent 27.8% of billed time in First Interim Period on "Business Analysis

and "Business Development" categories, and 19.1% on the same in the Second Interim Period, but

none of this time was used to understand the Debtors' financial history, the FML adjustment input

data, or valuation of the Debtor entities. *Id.*

77.     Additional reductions are warranted to account for the multiple vague entries that

do not include a verb indicating what type of work was performed, precluding the interested parties

from assessing whether it was beneficial to the estates. For example:

| Timekeeper | Date | Cost | Entry | Citation |
|---|---|---|---|---|
| J. Schwartzkopf | 2/27/25 | $2,535 | Court hearing. First Day Motions. | Doc. 286 at 21 |
| Z. Turbett | 2/26/25 | $175 | Continued work on analysis for legal team | Doc. 286 at 22 |
| J. Schwartzkopf | 3/7/25 | $130 | 401k funding questions | Doc. 286 at 29 |
| J. Schwartzkopf | 3/7/25 | $195 | Disbursement questions | Doc. 286 at 29 |
| J. Schwartzkopf | 3/11/25 | $260 | Final review and sign off | Doc. 286 at 30 |
| J. Schwartzkopf | 3/20/25 | $325 | Inventory transfer prices | Doc. 286 at 30 |
| J. Schwartzkopf | 3/25/25 | $325 | Roll forward discussions | Doc. 286 at 30 |
| J. Schwartzkopf | 3/28/25 | $325 | Audit fees and budget related | Doc. 286 at 31 |
| J. Schwartzkopf | 3/31/25 | $650 | Commission related meeting. | Doc. 286 at 31 |
| J. Schwartzkopf | 3/31/25 | $650 | Commission related meeting. | Doc. 286 at 31 |
| J. Schwartzkopf | 3/18/25 | $325 | Flood insurance related issues | Doc. 286 at 54 |
| J. Schwartzkopf | 3/18/25 | $325 | Flood insurance related issues | Doc. 286 at 54 |
| J. Schwartzkopf | 3/20/25 | $390 | Flood insurance discussions | Doc. 286 at 54 |
| J. Schwartzkopf | 4/3/25 | $390 | Credit car payment issues | Doc. 286 at 76 |
| J. Schwartzkopf | 4/23/25 | $32 | Disbursement questions | Doc. 286 at 77 |

26

| J. Schwartzkopf | 4/16/25 | $325 | Forecast review | Doc. 286 at 104 |
|---|---|---|---|---|
| J. Schwartzkopf | 4/21 | $195 | March MORs | Doc. 286 at 109 |
| J. Schwartzkopf | 7/8/25 | $520 | Audit discussion | Doc. 444 at 34 |
| J. Schwartzkopf | 7/11/25 | $325 | Sales miss related discussions. | Doc. 444 at 34 |
| J. Schwartzkopf | 7/22/25 | $195 | Follow up for latest forecast | Doc. 444 at 34 |
| J. Schwartzkopf | 8/14/25 | $325 | Responses to emails and questions | Doc. 444 at 84 |
| J. Schwartzkopf | 9/2/25 | $325 | Questions on cash flow | Doc. 444 at 106 |
| J. Schwartzkopf | 9/11/25 | $325 | Cash flow questions | Doc. 444 at 106 |

78.     As demonstrated herein, the Court has multiple independent avenues to reduce the Fee Application for work that did not benefit the estates when it was rendered.

**B.     Any award should be reduced for compensable services that are reasonable.**

79.     Even if the Court finds that certain services were necessary to the administration of the estate and beneficial to the estate, the Court should apply substantial reductions to the requested award based on the time spent and amounts charged. As explained above, FMG spent excessive time on maintaining the current structure of the Debtor entities, instead of working toward a realistic exit plan. Thus, for any portion of these fees that the Court intends to allow, it should still consider substantial reductions based on the excessive time spent on tasks and rates charged by the multiple senior advisors staffed on the case. *See generally*, 11 U.S.C. § 330(a).

## CONCLUSION

80.   As demonstrated above, even at this preliminary stage, FMG has not met their heavy burden of proving entitlement to all fees and expenses requested. *In re Kula*, 213 B.R. 729, 736 (8th Cir. B.A.P. 1997). Procedurally, the Fee Application should be denied because there is no final retention order and the Court should not enter one. Substantively, the Fee Application should be denied in its entirety because FMG represented and held interests adverse to the estate. In addition, the evidence will demonstrate the Court should deny the Fee Application because FMG breached fiduciary duties owed to the Debtors' estates. In the further alternative, if any fees are warranted, the Court should substantially reduce the amount awarded.

27

Dated: May 14, 2026

Respectfully submitted,

**SPENCER FANE LLP**

*/s/ Zachary R.G. Fairlie*
Zachary R.G. Fairlie    MO #68057
Mike Seitz            MO #69337
Anna G. Schuler        MO #73537
1000 Walnut Street, Suite 1400
Kansas City, MO 64106
(816) 474-8100 – Telephone
(816) 474-3216 – Facsimile
Email: zfairlie@spencerfane.com
        mseitz@spencerfane.com
        aschuler@spencerfane.com

*Counsel for the Official Committee of Unsecured*
*Creditors of DCA Outdoor, Inc., et al.*

## CERTIFICATE OF SERVICE

I hereby certify that on this day of the 14th of May 2026, the forgoing was filed electronically using CM/ECF and a true and correct copy of the above and foregoing as served on all parties receiving electronic notice.

*/s/ Zachary R.G. Fairlie*
Zachary R.G. Fairlie

28

KC 25538594.8