# EXHIBIT A

UNITED STATES BANKRUPTCY COURT
WESTERN DISTRICT OF MISSOURI
KANSAS CITY DIVISION


----------


IN RE DCA OUTDOOR, INC.

ET AL.,                          Case No. 25-50053

          Debtor.


----------




THE ORAL DEPOSITION of JUANITA SCHWARTZKOPF,
produced, sworn and examined pursuant to Notice
and Subpoena, on Wednesday, August 6, 2025,
beginning at 7:57 a.m., at the offices of Kutak
Rock, 2405 Grand, Suite 600, Kansas City,
Missouri, before me,

                R. PATRICK TATE
             CERTIFIED COURT REPORTER
            HERITAGE REPORTING SERVICE

a Certified Court Reporter, in a certain cause
now pending In the United States Bankruptcy
Court for the Western District of Missouri,
Kansas City Division, Missouri, at Kansas City,
wherein the parties are as hereinbefore
indicated.




----------

A    The way it was set up in the work
authorization is that Tory and I, Tory
Schwope, and I have to agree on strategy
decisions, business decisions. If we don't
agree, then we have to find a way to agree
or I believe we have to bring it to the
attention of the lender. I'd have to look
back at the specific wording of the work
authorization.

Q    Do you know if you would have the ability
to block a decision that Tory or anybody at
the Debtors was making if you did not agree
with it?

A    Yes.

Q    Since you have become the chief
restructuring officer for the Debtors, have
you exercised any blocking authority?

A    I have not needed to.

Q    Have you had a situation where you and
Mr. Schwope have disagreed on some business
decisions?

A    Not that I recall. I mean, Tory,
Mr. Schwope is very involved in his
business and he talks with me very
frequently.

Q   And then I see just someone on the fee statement that's Michael Donald, is that correct -- or Doland, I'm sorry.

A   Michael Doland.

Q   Okay.

A   Yes.  He's our COO, so he is sometimes working on different administrative aspects.

Q   Do all members of this team, do they all report to you?

A   Yes.  Oh, excuse me, not Mike Doland.

Q   I think you said you're a certified fraud examiner; is that correct?

A   It is.

Q   When you first started working with the Debtors, did you have any discussions with the Debtors about the turnover of their CFOs in the five years prior to filing for bankruptcy?

A   I was aware that there was turnover at the CFO level, but I didn't have a lot of discussion about it because it was in the past and I'm trying to focus on where we were at as of the filing date, and then how to deal with a plan of reorganization or

whatever the exit might be.

Q   Based on your kind of understanding from your certified fraud examiner days or exams, kind of large turnover or high turnover of positions such as a CFO would be at least a potential badge of fraud or a red flag?

A   I wouldn't say a badge of fraud, I think that's really overstating.  There are oftentimes -- you know, what people talk about is red flags and you do look at turnover of any staff, not just CFO, but any staff turnover, as something that you would want to explore.

Q   In terms of your role as maximizing ultimately the recovery, you know, for all creditors of the Debtors, did you do any kind of analysis as to whether there's any fraudulent activity with the Debtors?

A   A little bit.  I think that when I first became involved with DCA, there was a lot of discussion about inventory valuation and a lot of discussion about intercompany transactions.

And so I did do some testing or

A    That's my understanding.

Q    Prior to that, they had used a more regional firm; is that right?

A    I think they used BizCap, and I wouldn't call that a regional firm.  I think of that as a company that does a lot of different things and isn't necessarily focused on accounting.

Q    Do you know if -- have you heard of the firm Mayer Hoffman McCann?

A    No.

Q    As part of your review or analysis with regard to the Debtors' financial situation, have you or anybody on your team conducted an analysis as to the profitability of the Debtor entities?

A    We didn't go back and look at past performance.  We are looking at 2025 and 2026 right now.

Q    As part of that analysis and review that has been conducted so far, you know, in terms of what you're looking at, are you -- have you determined whether you're able to determine profitability by product that is held by the Debtors?

Q  So is it fair to say just based on your testimony related to your operating performance matrix, that's not something you have considered utilizing within the Debtors' entities?

A  It is not.

Q  Okay.  Let's talk now or turn to talk about the valuation of inventory on the Debtors' financial statements for the production entities.

A  Okay.

Q  When I say "the production entities," do you understand those to be the entities within the Debtors that grow the actual trees?

A  Yes.

Q  Let's talk about the valuation of inventory of the production entities.  What is your understanding of how the production entities value their inventory on their production entities' financial statements?

A  Starts out with cost to -- the costs incurred during the period, and then looks at -- starts way at the beginning, or at the end, if you will, at the sale pricing,

works all the way back to make sure that the value is reasonable for the age of the tree or shrub.

Q  How is that documented within the Debtors, the production entities?

A  They have a very complex process that they go through, that the entities go through, and then their accounting firm verifies that process.

I'm not trying to be an expert on farm market layer and I would defer to, you know, the people who are much more experienced and exposed to it.

Q  Who would that be?

A  The accounting firm for sure.

Q  Who's that?

A  Bergan.

Q  Okay.  And who else understands, from your perspective, the farm market layer adjustment?

A  I think Mike Scott, I think Tory Schwope, and I think Samantha Schwope.

Q  Okay.  Have you heard of somebody called Todd Pitman?

A  Only from the court hearing the other day

when you were talking about scheduling
depositions, and he was brought up as a
prior CFO.

Q   You hadn't heard that name before that?

A   In passing.  But, like I said, I wasn't
going back and trying to figure out what
happened in the past, I was trying to look
to the future, so I have never spoken to
him.

Q   Okay.  Do you know when the production
entities implemented the use of the FML
adjustment in valuing their inventory on
the production level side?

A   My understanding is that this discussion on
inventory valuation occurred in 2020.

Q   Okay.  And do you have any understanding as
to the impact of utilizing the FML
adjustment, the impact that it had back in
2020 to the value of inventory?

A   My recollection of the memo that I think
everybody has is that that impact was about
20 or 25 million.

Q   And do you know back in 2020, based on your
review of the FML adjustment the Debtors
utilized, do you know who implemented that

we're seeing in terms of sales of the product and the farm market layers possibly rolling off.

And I did have conversations with our team, the Focus Management Group team, with Mike Scott, with Samantha. Also had discussions with Ampleo and with Dundon so that everybody could get -- could become as comfortable as possible with understanding the process that DCA goes through to arrive at this adjustment.

This would be the first time since bankruptcy that this adjustment was done so I know there were a lot of eyes on it, and we tried to give everybody who needed access or wanted access, access to the information.

Q   Okay. Couple of questions on that. I know that you said your primary goal or one of your goals as CRO is to maximize value for creditors. Do you agree?

A   Yes.

Q   And you would agree that to do that, you would need to understand essentially the value of the assets of the Debtors?

A   Yes.

Q   And then talking a little bit about you indicated there were a lot of eyes on the FML adjustment, a lot of eyes on the 2025 FML adjustment. Who ultimately, to your knowledge, for the June 2025 FML adjustment, who ultimately had the intricate knowledge of putting that together and making those determinations?

A   I believe it would have been Tory Schwope, Samantha Schwope, and Mike Scott.

Q   Do you know what Mike Scott's role was in preparing the June 2025 FML adjustment?

A   Review of the numbers that the internal team had come up with, and just doublechecking and making sure that it was what he expected.

Q   Do you know who made the decisions for the June 2025 FML adjustment as to the cost that would be capitalized into it?

A   So what you're asking is the values that they assign that would have resulted in what transactions occurred related to inventory cost of goods sold?

Q   Yes. I had to think through that. Yes,

A    Yes.

Q    So the inventories that are deemed ready

     for sale are valued at NRV and the

     remainder are the capitalized production

     costs; is that correct?

A    Yes.

Q    Do you know how the production entities

     determine the level of inventory that is

     ready for sale?

A    I know that there is a lot of discussion

     between Tory Schwope and the different

     division managers.  DCA refers to them as

     branch managers, but the people that report

     to Tory are regularly discussing prior to

     each season, and then prior to the

     semi-annual adjustments, they're looking at

     the inventory, the size, the salability.

Q    Did Focus conduct any independent analysis

     as to the inventory deemed ready for sale

     as part of the June 2025 FML adjustment?

A    No.

Q    If you continue back on Exhibit 32, let's

     go to the third page of Exhibit 32.

A    Is this the page?

Q    It is the page that starts out with "Since

market layer adjustment, the production
entities are capitalized in all of their
costs of production?

A Anytime you use the word like "all," I
imagine that there's always an exception.

I would say that the company
follows this written guide -- this written
explanation, and the accounting firm does
the testing and looks at doublechecking
their work.

Q And do you know if anybody from Focus has
determined whether, as it pertains to the
capitalization of costs of production,
whether the company -- the Debtor entities
on the production side are following this
guidance in this Exhibit 32 memo?

A We have not asked the company to change its
accounting methodology, and this -- it
appears that two consecutive people
believed that this is the -- that this is
the explanation of how it's done so I would
say that this is how they're doing it.

Q When the Debtor -- the production entities
capitalize costs of production, whether
it's all or a portion of, into their WIP,

understanding as to how, for the June 2025,
let's just take that as the example,
spreadsheet, the company was relieving the
WIP pools from the last five or six years?

A It's all in the spreadsheets. I've seen --

Q So if I show you the spreadsheet, you'll be
able to answer that question?

A I don't think so, because I think that that
is a very specific question that is going
to be best answered by the people that
we've talked about earlier and by the
accounting firm.

Q Have you asked Samantha Schwope any of
these questions?

A Sure, we talk about the valuation. When I
saw the numbers, I asked her to walk me
through, tell me if anything in it
concerned her.

I've had the same kind of
conversation with Mike Scott, and they all
thought that it made sense.

And then Tory looked at it, too.
And you will be surprised at how
knowledgeable Tory is on understanding
this.

Q When you talked to Samantha Schwope about the June 2025 FML adjustment, did you ask her specifically how they were determining which portions of the capitalized WIP pool got expensed?

A I did not make her recreate her work for me, no.

Q Did you ask her any questions at all about the capitalization of WIP and the relieving of that WIP or the expensing of that WIP each year?

A We just looked at it in terms of how this pertained to prior years, how it related to it, and did a general test of reasonableness on it.

(Deposition Exhibit 21 identified.)

Q (By Ms. Buter) We have handed you a laptop that has what has previously been marked as Exhibit 21. It is a document titled -- an Excel spreadsheet titled, SBTF 06/20/25 FML Worksheet Update, and it is a June 2025 FML calculation for Schwope Brothers Tree Farm as of 6/30/2025. Do you see that?

A I do.

Q   Do you -- have you seen this document before?

A   I have seen this document, yes.

Q   Is this a document that you would have talked to Samantha Schwope, Mike Scott and Tory Schwope about?

A   Not Tory but Mike and Samantha I spoke with, and they showed me this. And then there were some comparisons that I also saw between each of the six months.

Q   Okay. Let's start with the top left-hand side of Exhibit 21. There is a reference in row six to gross inventory at sales price. Do you see that?

A   I do.

Q   Do you have any understanding as to how that number was arrived at?

A   I am not the right person to talk to about those kinds of details in source data. I would really suggest that you talk to the -- excuse me -- to Samantha especially --

Q   Okay.

A   -- about that, and Mike Scott certainly supports Samantha but I think Samantha

would be very knowledgeable on that.

Q  Did you -- so as it pertains to the numbers what I would call in the top left-hand side, so columns A through D, and through about row 26, did you or anybody on your team conduct any analysis as to how those numbers were arrived at?

A  No, we didn't do any testing.

Q  Okay.  Let's go over to the right-hand side of this Exhibit 21, starting in around rows -- or row G -- I'm sorry, column G.

A  Okay.

Q  Okay.  And row eight, column G, there's a reference to capitalizable production costs.  Do you see that?

A  Yes, with a footnote five.

Q  Yes.  What do you understand capitalized production costs to mean?

A  It says capitalizable.

Q  I'm sorry, I should rephrase that, capitalizable production costs.

A  I just was making that clarification because capitalized would mean that it had already been done, and capitalizable means that it's the amount that -- that we're

looking at. Footnote five probably

provides some additional guidance on this,

but...

Q Footnote five states -- it's kind of small

here, but it states: Based on current

product lines being farmed at this

location, there should only be five years

of production costs included in the FML

calculation.

A Okay.

Q So do you have any understanding as to this

particular spreadsheet what capitalizable

production costs refers to?

A I would want you to talk to the parties who

are expert at this, not me. I am only

going to confuse the situation, and I want

you to talk to the experts.

But this is the methodology that

has been consistently applied that the

accounting firm has passed on, therefore

I'm not trying to reinvent the wheel.

Q Okay. So that's fine, and I will, and we

have, and we will talk to others who are

involved in this. But just asking you as

the deponent today, in your role as CRO of

answer is going to be the same, do you know whether inbound freight and outbound freight, that are referenced in line 150 and 151, were capitalized into WIP?

A    I don't know.

Q    You don't know.  Did anybody at Focus dig any deeper than you have in terms of which specific production costs the production entities capitalized into WIP for June 2025?

A    The process that the company has used for this calculation hasn't changed and we haven't asked them to change it.

Again, I'd refer to the experts, I'd talk to the accounting firm and the people at the company who would be able to really walk you through the details.

Q    My question is this:  Has anybody at Focus conducted a deeper dive analysis to determine which production costs the production entity capitalized into WIP in the June 2025 FML calculation?

MR. GOERISCH:  Object to the form of the question.  You can answer.

A    I thought I said no at the beginning but

maybe I didn't.

Q (By Ms. Buter) And if you did, I missed it.

A Sorry.

Q But the answer is no?

A No.

Q Do you have any understanding as to what harvest and load costs refer to in connection with this Exhibit 21?

A I'm sorry --

MR. GOERISCH: You were referring to previous -- there you go.

A Row 113?

Q (By Ms. Buter) Yes.

A Well, it looks like it includes, for that department, it includes freight, a small amount. It's mostly labor, fuel, supplies, taxes and 401(k) and health insurance.

Q Beyond what is listed in the spreadsheet in Exhibit 21, do you have any general understanding as to what harvest and load costs would be in connection with a tree farm?

A I think that they are the general costs to harvest and put the harvested items on trucks for freight.

Q  of production, have you personally conducted any analysis as to the operating expenses that the production entities capitalize as part of their FML adjustment?

A  No.

Q  Do you know if anybody at Focus has conducted any analysis as to the operating expenses capitalized by the production entities as part of this adjustment?

A  I don't believe so.

Q  If WIP is capitalized as a part of -- let's just say as part of this FML adjustment, are you able to tell me the impact that capitalizing that WIP has on the value of the inventory?

A  So capitalizing the WIP would mean that you are debiting an inventory account -- right? -- and crediting an expense account, correct?  So it would increase inventory and decrease cost of goods sold.

Q  And so it would increase the value of the inventory that is listed; is that correct?

A  Yes.

          MS. BUTER:  We can take a short break.  We've been going about an hour

Q    tell whether any inventory at all was relieved by Schwope Brothers Tree Farms in 2024?

A    In 2024?

Q    And 2024 is in row -- column O.

A    It does not look like it.

Q    So would that mean that no inventory was sold from Schwope Brothers Tree Farms in 2024?

A    This is related to the farm market layer adjustment.  Again, you have to talk to the people who are the experts on this, I am not.

Q    I understand.  And you have said that many times and we're still looking for that expert.  But if you look at column O for -- just looking at this document alone, does it appear to you that any inventory was relieved in 2024 as reflected in -- solely reflected in the spreadsheet you're looking at?

A    I'm not comfortable saying yes or no to that because I don't know enough about this topic.

Q    Certainly in the column O for 2024, and if

A    I do not.

Q    You said you have reviewed this one; is
     that correct?

A    I've reviewed the format.  Every lender has
     a slightly different borrowing base format,
     and even a lender has a different borrowing
     base format for each borrower, so one of
     the things that I like to do initially when
     I am looking at borrowing bases is just
     kind of get a general sense for what's
     being reported and what the file looks like
     that goes to the lender.

            So I didn't -- I have not seen
     the June 30, 2025 completed document until
     you gave it to me.

Q    Okay.  Have you -- do you -- does anybody
     at Focus take any steps to approve or
     verify the information contained in the
     borrowing base certificates prepared by the
     Debtors?

A    We have not.

Q    Do you know if there is an issue with the
     calculations in the June 2025 borrowing
     base certificate?

A    I do not know if there is one.

Q Have you talked to Sam -- has Sam Williams talked with you at all about a potential issue with the June 2025 borrowing base certificate?

A He didn't specifically refer to June 30, 2025, but he told me that it appeared that Samantha had made a mistake when she submitted a document and he said it was a borrowing base certificate.

Q You personally have not conducted any follow-up analysis on that?

A I just heard that yesterday night.

Q Did you talk with Sam Williams yesterday about his deposition?

A Just to ask if you guys were nice or not, and he said that you were horrible and I said, Good, that's what I expected.

Q I'm certain he did not say that.

A No, he didn't talk about it except that he -- it only lasted until noon and I was hopeful that mine would, too.

MS. BUTER: Okay. Well, on that note, let's take a break, and I'm not going to commit to a time but we will take a break.

(Brief recess.)

MR. GOERISCH:  Another 20-plus-minute break, so that's just something that will be taken into account when we discuss if we need to continue.

Q  (By Ms. Buter)  Okay.  And in connection with your role as a CRO of the Debtors, have you taken any steps to formulate an exit plan for the Debtors from bankruptcy?

A  You know, we've talked about 2025 through the end of the year, calendar year, but then we've also been talking about what does 2026 look like, what does it look like both to the start of the spring selling season and then what does it look like in total.  So that's the first step of what we think that we need to do, is to have numbers that people can look that we think that we can achieve.

Q  Okay.  In terms of the steps you've taken through the end of 2025 to try to formulate an exit plan, specifically what steps are those?

A  First step is getting the numbers put together.

Q And let's stop there, what do you mean by getting numbers put together?

A Updating the forecast for what we think is going to happen now for the remainder of 2025, and then for sure through April 1st of 2026, but also a view into what a potential new lender or other exit strategy might look at for what the 2026 year would look like.

So the first step, from my perspective, is getting those numbers put together.

The second step is getting a data room organized with the types of information that a new lender would want to be looking at. So working to make sure that -- we don't believe in waiting until the end and then trying to do things all at the same time, so we're trying to work multiple steps on this.

So the forecast and the -- and the data room, and then kind of formulating what the task would be, thinking in terms of what -- so what's a normal working capital need for this company, and then

I will rely on the wizardry of counsel to help me come up with alternative ideas, and I know that the Dundon team and the unsecured creditors are also thinking about ideas, and I think Ampleo is also, you know, trying to come up with some solutions.

So we're trying to keep communication lines open, at least between the financial advisors on what things they're seeing and thinking about, and we are trying to tell them what we're seeing and thinking about. I don't think anything that I said here is going to be a surprise to Dundon or to Ampleo.

Q Have you -- in connection with potential sale of the distribution entities, are you aware of any valuations that have occurred of those distribution entities?

A No. No.

Q Does Focus have any sense as to what they're worth?

A I don't, right? We can talk about valuation lots of different ways. But at this point, I don't have a number that I

would tell you.

Q    I think earlier in your testimony you said valuation really comes down to fair market value, what a willing buyer and willing seller are willing to agree to?

A    The market will speak.

Q    Have you conducted any assessment as to the fair market value of the distribution entities?

A    No.

Q    Have you conducted any analysis or valuation as to the fair market value of any of the Debtors' assets?

A    No.

Q    Do you know if anyone has?

A    Not that I'm aware of, except I know you guys are doing -- not you guys, but I know that Frontier has hired appraisal -- appraisers for the real estate and for the inventory and that would be an outside party valuation; might not be a real, you know, sale transaction kind of valuation, but it would be a data point to consider.

Q    Have you talked with Tory about the possibility of selling all of the Debtors'

Q   And presumably no term sheets or anything

yet then either?

A   Presumably, yes, you are correct.

Q   Going back to any kind of valuations that

have been conducted, have the Debtors at

this point, to your knowledge, conducted a

liquidation value of their assets?

A   No, we have not.

Q   And I assume Focus has not done that

either?

A   We have not.

Q   Are you familiar with Steeplechase's

relationship with the Debtors?

A   Vaguely.  I understand that Steeplechase

worked for DCA prior to the bankruptcy.  I

remember seeing an email that Tory had

forwarded to me after the bankruptcy filing

that contained I think a memo and a final

bill.

Q   Do you remember what the memo was?

A   I think it -- it's been several months

since I've looked at it.  I recall it being

just kind of a summary of what they had

done and what they thought.

Q   And what was your understanding of what

they had done for the Debtors?

A    I really couldn't tell.  I know I felt like I was confused.  I didn't know what their scope of work was.  I didn't know if they were hired to be a financial advisor, if they were hired to sell the company, hired to find refinancing, I was not clear, and that was all happening at the same time, you know, I was just getting up to speed on the things that I needed to get up to speed on.  And since it was in the past, it didn't seem to have an impact on the current situation.

Q    If Steeplechase had taken at least some steps to market the company, would that have interested you in terms of what type of term sheets or information came out of that?

A    Sure, if they had that.  I'm not aware that they received any term sheets.  Tory didn't tell me that they had.

Q    Okay.

A    And I don't think -- you know, just my vague recollection of the document, didn't -- I didn't think that there were