**UNITED STATES BANKRUPTCY COURT**
**FOR THE WESTERN DISTRICT OF MISSOURI**
**KANSAS CITY**

| | | |
|---|---|---|
| **In re:** | ) | |
| | ) | |
| **DCA OUTDOOR, INC.,** ***et al.*****,** | ) | **Case No. 25-50053-can11** |
| | ) | |
| **Debtors.** | ) | |

**UNITED STATES TRUSTEE'S SUGGESTIONS IN SUPPORT OF HIS MOTION FOR SUMMARY JUDGMENT**

Jerry L. Jensen, the Acting United States Trustee for Region 13 (the "UST"), files these suggestions in support of his motion for summary judgment under Fed. R. Bankr. P. 9014(c), Fed. R. Bankr. P. 7056, and Fed. R. Civ. P. 56.

## TABLE OF CONTENTS


**INTRODUCTION** **3**

**STATEMENT OF UNDISPUTED FACTS** **3**

*The Bankruptcy Cases* **3**

*The 2024 Forbearance Agreement Representation* **7**

*The 2025 Bankruptcy Case Representation Agreement* **10**

*Lewis Rice Firm Structure and Conflicts Check* **10**

*The Bankruptcy Retainer* **12**

*Relevant Facts Regarding Valley Hill Tree Farms* **13**

*Relevant Facts Concerning Tory's Lease Transactions with the Estates* **15**

*Subsequent Conversations between Parres and Samantha and Tory Schwope* **16**

**ARGUMENT** **16**

**Legal Standards Governing Summary Judgment** **16**

**Lewis Rice Failed to Disclose an Adverse Interest that Precluded Employment Under Section 327(a)** **17**

*Lewis Rice Failed to Disclose Significant Connections* **18**

*Lewis Rice Was Disqualified under Section 327(a)* **32**

*Undisputed Evidence of Additional Misconduct* **36**

**All Fees Must Be Disallowed** **40**

**CONCLUSION** **41**

**CERTIFICATE OF SERVICE** **43**

## INTRODUCTION

Above all others, Lewis Rice must be denied all fees in this case for one simple reason: It was prohibited by law from being employed in this chapter 11 proceeding from the outset. Lewis Rice represented interests adverse to the estate, and any competent chapter 11 debtors' lawyer should have known that. Instead, Lewis Rice and its attorneys turned a willfully blind eye to a whole host of red flags in their rush to get these cases filed and, ultimately, to get paid $1.5 million in fees. As a result, Lewis Rice made both affirmative false statements and significant omissions of fact within the firm's knowledge in support of its application to be employed. The conduct of Lewis Rice, Mr. Parres, and Mr. Hall was egregious given the well-settled case law obligating bankruptcy lawyers to disclose all relevant transactions and fees. Even putting aside the evidence of additional misconduct by Mr. Parres, Lewis Rice should not be permitted to profit from violating the law, and the harsh sanction of denying the fee application in total is appropriate.

## STATEMENT OF UNDISPUTED FACTS[1]

### A. *The Bankruptcy Cases*

1. On February 20, 2025, DCA Outdoor, Inc. ("DCA Outdoor") filed a voluntary bankruptcy petition under chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the Western District of Missouri, No. 25-50053-can11. ECF Doc. No. 1.[2]

---

[1] The UST recognizes the local rules specify that the statement of undisputed facts should be "concise." *See* W.D. Mo. Bankr. L.R. 9013-1(H)(1). The UST recognizes his statement of facts is quite lengthy but notes the facts of this chapter 11 representation are complex.

[2] Unless otherwise specified, all ECF docket references are to documents filed in the lead case of DCA Outdoors, Inc., No. 25-50053-can11.

2. DCA Outdoor attached to its voluntary petition an Exhibit 1 listing 20 affiliated entities for which bankruptcy cases would be filed. ECF Doc. No. 1 at 5.
3. On February 21, 2025, 19 of those affiliated entities filed chapter 11 bankruptcy petitions.[3]
4. Valley Hill Tree Farms, LLC ("Valley Hill") was listed as an affiliated entity on Exhibit 1 but did not file a bankruptcy petition. ECF Doc. No. 1 at 5.
5. On February 20, 2025, DCA Outdoor filed a List of Equity Security Holders, which stated that Tory Schwope ("Tory")[4] held a 99 percent interest in DCA Outdoor. ECF Doc. No. 5.
6. Tory also holds a 99 percent interest in Valley Hill. *See* Exhibit A, Statement of Financial Affairs, ECF Doc. No. 28 at 9 in Case No. 26-40404.
7. On February 25, 2025, the Court entered an order granting joint administration of all 20 cases. ECF Doc. No. 53.
8. On February 24, 2025, Debtors filed an Application to Employ Lewis Rice LLC ("Lewis Rice") as counsel for the Debtors ("Employment Application"). ECF Doc. No. 29.
9. In the Employment Application, Lewis Rice claimed that it was a "disinterested person" under 11 U.S.C. § 101(14) and § 1107(b), that it represented no adverse interests to the

[3] Those affiliates are: Anna Evergreen, LLC (25-50055-11); Brehob Nurseries, LLC (25-50056-11); Colonial Farms LLC (25-50058-11); Colonial Gardens Dev. LLC (25-50059-11); Colonial Gardens LLC (25-50060-11); DCA Land Holding Co. (25-50061-11); DCA Land Illinois LLC (25-50062-11); DCA Land Indiana LLC (25-50063-11); DCA Land Kansas LLC (25-50064-11); DCA Land Kentucky LLC (25-50065-11); DCA Land Missouri LLC (25-50066-11); DCA Land Oregon (2550067-11); KAT Nurseries, LLC (25-50067-11); PlantRight Supply LLC (25-50069-11); Schwope Brothers Tree Farms, LLC (25-50070-11); Schwope Brothers West Coast, LLC (25-50071-11); Utopian Plants Indiana, LLC (25-50072-11); Utopian Transport, LLC (25-50073-11); Utopian Trees, Inc (25-50074-11) (collectively with DCA Outdoor, Inc., the "Debtors").

[4] The DCA entities were family-owned businesses, and there are multiple parties with the last name Schwope involved in these cases. The UST has identified the Schwope family members by their first names to avoid confusion.

estates, and that it had no connection to the Debtors, its creditors, or related parties in the case. ECF Doc. No. 29 at 5, para. 17.

10. On February 26, 2025, Lewis Rice attorney Larry Parres filed a Declaration affirming the same (the "Parres Affidavit"). ECF Doc. No. 37 at 49.

11. In the Parres Affidavit, Mr. Parres declared "[s]ince February 1, 2025, [Lewis Rice] has been engaged by Debtors to render professional legal services and advice with respect to, among other things, Debtors' ongoing efforts to restructure its business and existing financial obligations with its current secured creditor Frontier Farm Credit. ***Prior to February 1, 2025, [Lewis Rice] did very little, if any, legal work for the Debtors***." (Internal citations omitted) (emphasis added). ECF Doc. No. 37 at 2, at para. 2.

12. Frontier Farm Credit refers to Frontier Farm Credit, FLCA and Frontier Farm Credit, PCA (collectively "Frontier"), Debtors' largest secured creditor. ECF Doc. No. 141, Schedule D, at 6.

13. Mr. Parres declared that Lewis Rice did not, to the best of his knowledge, have any connection with the Debtors, its affiliates, or any other significant party in interest. ECF Doc. No. 37 at 4, at para. 9.

14. Mr. Parres unequivocally stated that Lewis Rice had never represented Tory. ECF Doc. No. 37 at 4, at para. 10.

15. Attached to the Parres Affidavit was an exhibit representing that Lewis Rice had no connection to Debtors, its creditors, shareholders, or related parties aside from Ameren Illinois. ECF Doc. No. 37 at 10.

16. Mr. Parres was the primary attorney responsible for representing the Debtors in these cases. ECF Doc. No. 37 at 2, at para. 4.

17. Nowhere in the Parres Affidavit or the Employment Application did Lewis Rice disclose that it had previously represented both Tory and Valley Hill. ECF Doc. Nos. 37 and 29.
18. On February 26, 2025, Debtors filed an application to employ Focus Management Group USA, Inc. ("Focus") and Juanita Schwartzkopf ("Schwartzkopf"). ECF Doc. No. 38.
19. Debtors requested that Schwartzkopf serve as Chief Restructuring Officer ("CRO"). ECF Doc. No. 38 at 2.
20. On March 3, 2025, the Court granted Debtors' application to employ Focus and appointed Schwartzkopf as CRO for the Debtors. ECF Doc. No. 62.
21. On March 10, 2025, the UST appointed an Official Committee of Unsecured Creditors (the "Committee"). ECF Doc. No. 80.
22. On March 21, 2025, the Court entered its order authorizing the employment of Lewis Rice. ECF Doc. No. 106.
23. On July 10, 2025, Lewis Rice filed its Initial Interim Application for Compensation (the "First Fee Application") seeking authorization to pay attorney's fees of $819,829.80 and expenses of $43,987.33. ECF Doc. No. 287.
24. The Court granted the First Fee Application on August 4, 2025. ECF Doc. No. 336.
25. On August 25, 2025, Frontier and the Committee filed a Joint Motion for Appointment of Chapter 11 Trustee. ECF Doc. No. 348.
26. Debtors filed an objection to the Joint Motion for Appointment of Chapter 11 Trustee on September 8, 2025, and the matter was set for evidentiary hearing on September 10, 2025.[5] ECF Doc. Nos. 371 and 358.

---

[5] The matter was initially set for hearing on August 27, 2025, but was continued to September 10. ECF Nos. 355 and 358.

27. A stipulated order was entered on September 11, 2025, authorizing the appointment of Brent King ("King") as the Chief Executive Officer and new Chief Restructuring Officer. ECF Doc. No. 388.

28. On October 16, 2025, the Debtors sought to employ Colin N. Gotham as additional counsel, and Gotham continues in that capacity. ECF Doc. No. 433.

29. On November 19, 2025, Lewis Rice moved to withdraw as counsel for Debtors, and that motion was granted the following day. ECF Doc. Nos. 454 and 455.

30. On November 4, 2025, Lewis Rice filed a Second Interim Application for Compensation (the "Second Fee Application") seeking authorization to pay attorney's fees of $672,499.35 and expenses of $17,775.90. ECF Doc. No. 443.

31. On January 7, 2026, Lewis Rice filed a Motion to Treat the Second Fee Application as a Final Application. ECF Doc. No. 502.

32. The Final Application contains billing entries of Lewis Rice attorneys, including Larry Parres and John Hall, through and including November of 2025, well after Mr. King was appointed. ECF Doc. No. 502-1.

33. The Committee, the UST, Frontier, and Debtors all objected to the Second Fee Application. ECF Doc. Nos. 628, 632, 633, and 635.

*B. The 2024 Forbearance Agreement Representation*

34. On December 19, 2024, Tory signed an engagement letter (the "2024 Engagement Agreement") with Lewis Rice whereby the firm would represent Debtors, Tory, and Valley

Hill (collectively the "2024 Clients"). *See* Exhibit B, 2024 Engagement Agreement; Exhibit F, Hall I Depo. Tr. 44:2–45:4; 193:18–194:6.[6]

35. The 2024 Engagement Agreement specifically identified "Tory Levi Schwope, individually" as a party represented by Lewis Rice. Exhibit B at 2.

36. The purpose of this representation was "loan restructuring and renegotiation of those certain loan documents described as 4th Amended Restated Credit Agreement, First Amendment to Fourth Amended and Restated Credit Agreement, Second Amendment to Fourth Amended and Restated Credit Agreement, and Third Amended to Fourth Amended and Restated Credit Agreement with lenders [Frontier]." (the "Forbearance Agreement Representation"). Exhibit B at 4.

37. The terms of the 2024 Engagement Agreement stated that "[i]n the absence of a termination or withdraw [sic], our relationship with you will be concluded when we have completed the services we are engaged to perform. In addition and without limiting the preceding sentence, you agree that our attorney-client relationship will terminate automatically (and without separate notice) in the event we have performed no work for you or on your behalf for six (6) consecutive months, unless we notify you to the contrary." Exhibit B at 8.

38. Lewis Rice attorney Louis Wade was the attorney primarily tasked with representing the 2024 Clients. Exhibit B at 2.

[6] Although W.D. Mo. Bankr. L.R. 9013-1(H)(3) indicates that where facts are contained in deposition testimony an "excerpt" should be provided, the UST believes that it is necessary and appropriate to attach the full transcripts of Mr. Hall and Mr. Parres' testimony as permitted by Fed. R. Civ. P. 7056(c)(1). The citations to these transcripts are extensive, and the UST anticipates that multiple other parties, including Lewis Rice, will cite to other parts of the transcripts. Further, much of the testimony requires context such that it would be difficult or impossible to excerpt the testimony, and the UST notes that Fed. R. Civ. P. 56(c)(3) permits but does not require the Court to consider such testimony and materials that are not directly cited.

39. Mr. Wade assisted the 2024 Clients in negotiating and executing a forbearance agreement with Frontier (the "Forbearance Agreement"), which Tory signed on January 14, 2025. *See* Exhibit C, Forbearance Agreement.
40. Tory was a party to the Forbearance Agreement as a co-debtor on the loan facility.
41. Mr. Wade billed the 2024 Clients under Client Number 15384 and Matter Number 59597. *See* Exhibit D, 2024 Invoice.
42. According to the 2024 Invoice, Mr. Wade had begun speaking with Mr. Parres regarding the 2024 Clients as early as December 30, 2024, before Tory executed the Forbearance Agreement. Exhibit D at 2.
43. Mr. Wade also emailed Mr. Parres about the 2024 Clients on January 29, 2025. Exhibit D at 5.
44. On January 31, 2025, Mr. Wade exchanged emails and had a conference call with both Mr. Parres and Tory. Exhibit D at 5.
45. On February 7, 2025, Mr. Wade exchanged another email with Mr. Parres. Exhibit D at 8.
46. Mr. Wade also corresponded with Lewis Rice attorney John Hall ("Mr. Hall") regarding the 2024 Clients. Exhibit D at 8.
47. Mr. Hall, in addition to Mr. Parres, represented Debtors in the bankruptcy cases. ECF Doc. No. 45.
48. The last time Mr. Wade billed the 2024 Clients was on February 20, 2025—the same day that the DCA Outdoors case was filed. Exhibit D at 8; ECF Doc. No. 1.
49. Lewis Rice never sent Tory a termination letter indicating that the firm's representation of Tory as an individual had concluded. Exhibit F, Hall I Depo. Tr. 194:7–194:13.

50. Accordingly, Mr. Wade's representation of the Debtors and Tory under the 2024 Engagement Agreement continued through the filing of the bankruptcy cases.

51. Lewis Rice billed the Debtors and Tory for $8,547.50 in pre-petition services under the 2024 Engagement Agreement, of which $1,200 was billed for services rendered after the signing of the Forbearance Agreement but before the bankruptcy cases were filed. Exhibit D.

52. None of the fees billed under the 2024 Engagement Agreement were disclosed on Lewis Rice's Rule 2016(b) compensation disclosures.

*C.* *The 2025 Bankruptcy Case Representation Agreement*

53. On February 5, 2025, Tory signed a separate engagement letter authorizing Lewis Rice to provide bankruptcy specific services (the "2025 Engagement Agreement"). *See* Exhibit E, 2025 Engagement Agreement.

54. Although the opening paragraph of the 2025 Engagement Agreement refers to a client list as Exhibit A, there was no client list attached, and no such client list exists. Exhibit E; *See* Exhibit F, Hall I Depo. Tr. 73:15–74:12; 76:9–15.

*D.* *Lewis Rice Firm Structure and Conflicts Check*

55. Lewis Rice keeps offices in St. Louis and Kansas City. Exhibit F, Hall I Depo. Tr. 43:11–13.

56. Although Lewis Rice maintains two separate offices, it is one firm. Exhibit F, Hall I Depo. Tr. 198:9–199:5.

57. Both the Kansas City and St. Louis offices utilize a single conflicts check system. Exhibit F, Hall I Depo. Tr. 200:10–17.

58. When the conflicts check for the bankruptcy engagement was run by Lewis Rice, Tory was identified as a "potential adverse party" by Lewis Rice. Exhibit F, Hall I Depo. Tr. 201:6–202:11; Exhibit I, Deposition Exhibit 45, at 3.
59. Lewis Rice was not aware of any conflict check being with respect to Valley Hill. Exhibit F, Hall I Depo. Tr. 202:12–15.
60. Lewis Rice did not obtain any conflict waivers associated with the bankruptcy cases. Exhibit F, Hall I Depo. Tr. 96:8–24.
61. Mr. Parres understood that Lewis Rice's method of running conflicts checks involved sending an email to every attorney at Lewis Rice, who would then respond regarding any potential conflicts. Exhibit H, Parres Depo. Tr. 34:9–16; 294:2–294:9.
62. The responses are then sent to attorney Steve Durbin, who checks them against the conflicts "base." Exhibit H, Parres Depo. Tr. 34:17–22.
63. However, Mr. Parres could not recall whether he or his assistant ever sent the conflicts email in relation to these cases and the 2025 Engagement Agreement. Exhibit H, Parres Depo. Tr. 295:6–295:9.
64. Lewis Rice has not provided any evidence that a conflicts check email was sent for the bankruptcy engagmeent.
65. Mr. Parres could not recall and did not know if he followed Lewis Rice's conflicts check procedure in this case; rather, he testified "I sure hope it was." Exhibit H, Parres Depo. Tr. 295:20–295:23.
66. Mr. Parres acknowledged receiving an email on January 29, 2025, from Mr. Wade containing Mr. Wade's original conflict check with updates listing Tory as having an

interest adverse to the Debtors. Exhibit H, Parres Depo. Tr. 43:4–44:25; *see also* Exhibit M, Deposition Exhibit 90.

67. Mr. Parres responded by asking Mr. Durbin on February 12, 2025: "am I to understand that none of these creditors on this conflict check are clients of the firm and we have zero conflicts." Exhibit M.

68. Mr. Parres could not confirm, and no evidence has been provided to the parties, that Mr. Durbin ever completed the conflicts check or responded to this email. Exhibit H, Parres Depo. Tr. 296:7–296:19.

69. Despite knowing that Mr. Wade represented at least some of the Debtor entities in connection with negotiations with Frontier, Mr. Parres never asked to review the 2024 Engagement Agreement or any of the documents underlying Mr. Wade's prior representation, including the Forbearance Agreement. Exhibit H, Parres Depo. Tr. 296:20–298:9.

70. Despite learning that Tory was a co-borrower with Debtors, Mr. Parres never discussed or acknowledged any potential conflict with anyone at Lewis Rice. Exhibit H, Parres Depo. Tr. 53:1–17.

*E. <u>The Bankruptcy Retainer</u>*

71. Lewis Rice was paid a $200,000.00 retainer by check (the "Retainer") for its representation of Debtors in these bankruptcy cases. Exhibit F, Hall I Depo. Tr. 206:21–207:1.

72. The Retainer came from the bank account of KAT Nurseries on or about February 12, 2025. Exhibit F, Hall I Depo. Tr. 207:19–21; ECF Doc. No. 18 in Case No. 25-50068, Statement of Financial Affairs, at 28, ln. 11.

73. The required Bankruptcy Rule 2016(b) Disclosure of Compensation filed by Lewis Rice in the KAT Nurseries case did not list the $200,000 payment. ECF Doc. No. 7 in Case No. 25-50068 (the "KAT 2016(b) Statement").

74. Rather, the KAT 2016(b) Statement referred to Lewis Rice's yet unfiled Employment Application. *Cf.* ECF Doc. No. 7 in Case No. 25-50068 to ECF Doc. No. 29.

75. The Employment Application did not specify which entity paid Lewis Rice's retainer but instead referred to the Debtors generically. ECF Doc. No. 29 at 9, para. 27.

76. Lewis Rice never investigated or inquired about the source of the funds to pay the retainer. Exhibit F, Hall I Depo. Tr. 208:2–9, 210:4–7.

77. Thus, Lewis Rice itself never disclosed the entity that made the payment to the firm, and that disclosure was not made until the Statement of Financial Affairs for KAT Nurseries was filed.

*F. Relevant Facts Regarding Valley Hill Tree Farms*

78. Lewis Rice was aware of Valley Hill Tree Farms, LLC because Tory had an ownership interest in Valley Hill. Exhibit F, Hall I Depo. Tr. 65:14–16.

79. Lewis Rice understood that Valley Hill was a "supplier to the debtors of tree inventory…." Exhibit F, Hall I Depo. Tr. 65:20–21.

80. Mr. Hall and Lewis Rice were aware of an alleged lease between Valley Hill and DCA Land Kentucky. Exhibit F, Hall I Depo. Tr. 66:4–20; 152:13–23.

81. However, the copy of the lease in Lewis Rice's possession was not signed. Exhibit F, Hall I Depo. Tr. 66:10–11; 154:22–24.

82. Mr. Parres admitted that any lease between Valley Hill and debtor DCA Land Kentucky was an insider lease. Exhibit H, Parres Depo. Tr. 159:19–23.

83. However, the Schedules for DCA Land Kentucky do not disclose the alleged Valley Hill lease. ECF Doc. No. 21 in Case No. 25-50065, Schedule G, at 7.

84. Initially, Lewis Rice believed that Valley Hill would be commencing a chapter 11 case because Lewis Rice believed that Valley Hill was a co-debtor on the Frontier loans. Exhibit H, Parres Depo. Tr. 31:1:31:23.

85. During the evening of February 20, 2025, Lewis Rice determined that Valley Hill was not a borrower under the Frontier loans. Exhibit H, Parres Depo. Tr. 53:18–53:21.

86. As a result, Tory "instructed" Lewis Rice not to file a bankruptcy case for Valley Hill, after discussing the matter with Lewis Rice. Exhibit H, Parres Depo. Tr. 55:18–56:12.

87. After Mr. King was appointed the CRO of the estates and Tory was terminated, Tory caused Valley Hill to assert that a valid lease existed with respect to DCA Land Kentucky and to assert claims against the estate regarding the ownership of the crop planted on the property owned by DCA Land Kentucky. ECF Doc. No. 1-11 in Adv. No. 26-5001 (*DCA Outdoor, Inc., et al. v. Valley Tree Farm, LLC*), letter from counsel for Valley Hill Tree Farm to counsel to Mr. King and the Debtors asserting various claims.

88. Lewis Rice, acting on Mr. Parres's instruction, provided a copy of the unsigned lease in its possession to Tory on October 2, 2025, even though at that time Tory was no longer affiliated with the Debtors, and without seeking Mr. King's approval. Exhibit F, Hall I Depo. Tr. 164:5–165:19.

89. At the time of the transmittal of the lease to Tory, Lewis Rice was still employed by the Debtors' estates and was working under Mr. King's direction.

G. *Relevant Facts Concerning Tory's Lease Transactions with the Estates*

90. The "X-Farm" was a parcel of land attached to Tory's personal residence that was leased to debtor Schwope Brothers Tree Farm, LLC ("SBTF"). Exhibit H, Parres Depo. Tr. 173:8–11; ECF Doc. No. 18-1 in Case No. 25-50070 (identifying pre-paid rent to Tory Schwope on the X-Farm).

91. However, Lewis Rice and the Debtors failed to disclose the X-Farm lease itself on SBTF's Schedule G. ECF Doc. No. 18-5 in Case No. 25-50070; *see also* Exhibit N.

92. Payments made to Tory under the leases was a benefit to Tory as an insider coming from the Debtor Estates. Exhibit H, Parres Depo. Tr. 273:15–276:9.

93. The Schedules show that Tory received a pre-payment of rent. ECF Doc. No. 18-1 in Case No. 25-50070 (identifying pre-paid rent to Tory Schwope on the X-Farm).

94. In the schedules in his personal chapter 7 bankruptcy case, Tory later asserted a claim for damage by SBTF to his real estate resulting from SBTF's operations under the lease. ECF Doc. No. 29 in Case No. 26-40404, Schedule A/B, at 7, ln. 33.

95. On July 25, 2025, Samantha Schwope, corporate controller of the Debtors and Tory's sister-in-law, sent an email to Mr. Parres and Mr. Hall asking for advice regarding an undocumented equipment lease arrangement between Tory and Schwope Brothers West Coast. Exhibit L, Deposition Exhibit 88, at 3; Exhibit G, Hall II Depo. 505:20–507:7; Exhibit H, Parres Depo. Tr. 284:4–25.

96. The email stated that Tory had personally leased John Deere and Kubota equipment that was being used by Schwope Brothers West Coast and that Tory wanted to be paid by the Debtors. Exhibit L, Deposition Exhibit 88, at 3; Exhibit H, Parres Depo Tr. 285:15–25.

97. Mr. Parres advised Samantha to "Document the lease – date it as of the date it was put in place and if its pre-petition the better." Exhibit L, Deposition Exhibit 88, at 1.

H. *Subsequent Conversations between Parres and Samantha and Tory Schwope*

98. On September 18, 2025, Mr. Parres engaged in a text conversation with Samantha after Mr. King had removed Tory. Exhibit J, Deposition Exhibit 35, at 181–84.

99. During the conversation, Mr. Parres twice asked Samantha to delete certain emails and text messages, and to have Tory delete them as well. Exhibit H, Tr. 147:7–11, 148:5–11.

100. Parres continued to text and communicate with Tory after King terminated him as CEO of the Debtors. Exhibit H, Parres Deposition Tr. 173:20–174:9; Exhibit J at 244–66.

## ARGUMENT

### I. Legal Standards Governing Summary Judgment

Fed. R. Civ. P. 56(a), made applicable to this proceeding by Fed. R. Bankr. P. 9014(c) and Fed. R. Bankr. P. 7056, states that summary judgment is appropriate if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *Lange v. Inova Capital Funding, LLC (In re Qualia Clinical Serv., Inc.)*, 441 B.R. 325, 328-329 (B.A.P. 8th Cir. 2011). The court must view the evidence in the light most favorable to the nonmoving party. *Ludwig v. Anderson*, 54 F.3d 465, 470 (8th Cir. 1995). However, so long as the motion is properly supported, the nonmoving party must show more than a simple denial, for it "has an affirmative burden to designate specific facts creating a triable controversy" and must "present evidence sufficient to create a general issue of material fact …." *Garden v. Central Nebraska Housing Corp.*, 719 F.3d 899, 906 (8th Cir. 2013) (internal quotation marks and citations omitted).

**II. Lewis Rice Failed to Disclose an Adverse Interest that Precluded Employment Under Section 327(a)**

Lewis Rice's Rule 2014 disclosures in the Parres Affidavit submitted in support of the Employment Application were false and misleading. Lewis Rice did not just omit information; the affidavit made objectively false affirmative statements in support of the application. Although Lewis Rice presumably asserts that the false statements in the application and affidavit were inadvertent rather than intentionally false, the undisputed record demonstrates that the firm was, at a minimum, grossly and willfully negligent in making the required disclosures of significant connections required by the bankruptcy rules, and the firm acted with reckless disregard for the truth of those assertions. The law is replete with cases where compensation has been denied solely based on willfully negligently deficient disclosures, even without an express intent to deceive the court. *See In re National Distribs. Warehouse Co., Inc.*, 148 B.R. 558, 562–63 (Bankr. E.D. Ark. 1992) (citing *In re Marine Power & Equip. Co., Inc.*, 67 B.R. 643 (Bankr. W.D. Wash. 1986)); *In re Hathaway Ranch P'ship*, 116 B.R. 208, 219 (Bankr. C.D. Cal. 1990) (finding unfamiliarity with the Bankruptcy Code is no excuse for lack of compliance with its provisions, and negligent failure to disclose facts required in connection with an application to employ does not relieve counsel of the consequences of complete disgorgement as a result of their failure).

The false statements in this case were not trivial; rather, they reveal that Lewis Rice represented numerous adverse interests prohibited by Section 327(a). Thus, the court has multiple reasons to deny compensation as a matter of law because Lewis Rice failed to disclose these adverse interests, and because Lewis Rice was prohibited from being employed as Debtor's counsel in this case by statute. Thus, the Court must deny the application in full and order the return of all fees previously paid.

*A. Lewis Rice Failed to Disclose Significant Connections*

It is beyond dispute that Lewis Rice had an obligation to comply with Fed. R. Bankr. P. 2014(a) in connection with its proposed retention application and representation of the Debtors. These disclosures are mandatory, not permissive, and the court has the discretion to deny an employment application or the award of all fees (including pre-petition fees in a chapter 11 case) as an appropriate sanction if counsel fails to meet these disclosure requirements. *In re Miller Auto. Grp., Inc.*, 521 B.R. 323, 332 (Bankr. W.D. Mo. 2014), *aff'd,* 536 B.R. 828 (B.A.P. 8th Cir. 2015).

"The selected attorney has the burden of establishing he or she is qualified under section 327(a) to represent the debtor in possession through its disclosure under Rule 2014(a) and accompanying affidavits." *In re Sandpoint Cattle Co., LLC*, 556 B.R. 408, 420 (Bankr. D. Neb. 2016) (citing *In re Huntco, Inc.*, 288 B.R. 229, 232 (Bankr. E.D. Mo. 2002)). Rule 2014(a) plainly requires proposed counsel to accurately disclose both the proposed arrangement for compensation and any connections between counsel and the debtor, creditors, the UST, or any other party at interest. *Sandpoint Cattle Co.,* 556 B.R. at 420. It is well settled that the negligent or inadvertent failure to disclose is not a defense, because the duty to disclose is absolute. *In re Smitty's Truck Stop, Inc.*, 210 B.R. 844, 848 (B.A.P. 10th Cir. 1997) (quoting *In re Park-Helena Corp.*, 63 F.3d 877, 881 (9th Cir. 1995)).

The disclosure requirement of Rule 2014 "assists the court in ensuring that the attorney has no conflicts of interest and is disinterested, as required by 11 U.S.C. § 327(a)." *Park-Helena Corp.*, 63 F.3d 877 at 881. "All facts that *may* be pertinent to a court's determination of whether an attorney is disinterested or holds an adverse interest to the estate must be disclosed." *In re Hathaway*, 116 B.R. at 219. The duty to disclose under Rule 2014(a) is a continuing obligation

and continues throughout the case. *In re West Delta Oil Co., Inc.*, 432 F.3d 347, 355 (5th Cir. 2005). "Counsel who fail to disclose timely and completely their connections proceed at their own risk because failure to disclose is sufficient grounds to revoke an employment order and deny compensation." *In re Crivello*, 134 F.3d 831, 836 (7th Cir. 1998); *see also In re Pierce*, 809 F.2d 1356, 1363 (8th Cir. 1987).

The undisputed facts demonstrate that in December 2024, Tory Schwope engaged attorney Louis Wade, a partner in the Kansas City office of Lewis Rice, to represent him and his companies, including the Debtors and Valley Hill, in attempts to stave off efforts to collect on over $90 million worth of debt owed to Frontier Farm Credit that was then in default. These loans were secured by most of the Debtors' assets. Tory was co-debtor under the loan facilities, and there is no dispute that he was personally liable for the Frontier debts.

Lewis Rice entered into the 2024 Engagement Agreement, under which it was engaged to "advise client regarding loan restructuring and renegotiation of those certain loan documents described as 4th Amended and Restated Credit Agreement, First Amendment to Fourth Amended an [sic] Restated Credit Agreement, Second Amendment to Fourth Amended and Restated Credit Agreement, and Third Amendment to Fourth Amended and Restated Credit Agreement with lenders Frontier Farm Credit, FLCA and Frontier Farm Credit, PCA." The "client" was identified not just as the Debtors but also expressly included Tory and Valley Hill. Tory signed the 2024 Engagement Agreement on December 19, 2024, on behalf of the entities and "Tory Levi Schwope, an individual." Also listed as a client was Valley Hill Tree Farm, LLC. It is striking that this initial engagement letter was signed just over two months before the Debtors ultimately commenced the chapter 11 proceedings now pending before this Court.

Over the next month, Mr. Wade proceeded to negotiate with Frontier Farm Credit, which culminated in the signing of a Forbearance Agreement on January 14, 2025. Between the execution of the 2024 Engagement Agreement and the Forbearance Agreement, Lewis Rice billed for about 20 hours of services, in the amount of $7,347.50.[7] Both Tory and the Debtors are named parties to the Forbearance Agreement and acknowledge that they are indebted to Frontier under the loan facilities.

Further, Lewis Rice's own billing statements indicate that Mr. Parres was involved in these matters before the execution of the forbearance agreement. On December 30, 2024, Mr. Wade billed 0.2 hours for a telephone conference with Mr. Parres, and Mr. Wade later shared an email from Mike Griffin, a DCA employee, with Mr. Parres on the same date. Thus Mr. Parres was involved, at least minimally, with the representation of Tory and the Debtors even before the execution of the Forbearance Agreement on January 14, 2025.

However, Lewis Rice's representation of Tory and the Debtors did not end at the signing of the Forbearance Agreement.[8] Lewis Rice's contemporaneous billing records demonstrate that

[7] In addition to the failure to disclose the representation of Tory in the Rule 2014(a) disclosures, Lewis Rice failed to disclose the additional fees billed by Mr. Wade in their obligatory Section 329 and Rule 2016(b) disclosures as discussed below.

[8] The UST is aware that Lewis Rice and their counsel have engaged Robert E. Eggmann as an expert witness and that Mr. Eggmann has opined that the 2024 Engagement Agreement was completed at the time the Forbearance Agreement was executed. The UST respects Mr. Eggmann and has previously appointed him as a trustee in matters in the Eastern District of Missouri. Mr. Eggmann's report does not indicate what facts he relied on in reaching this conclusion. Mr. Eggmann's conclusion on this point and many others in his report is not admissible evidence because it constitutes an opinion on a question of law reserved solely for this Court. *Southern Pine Helicopters, Inc. v. Phoenix Aviation Managers, Inc.*, 320 F.3d 838, 841 (8th Cir. 2003) (suggesting "battle of experts" on whether and which FAA regulations apply was improper). Even if it were admissible, an expert opinion should be disregarded where it is objectively factually incorrect. Based on the undisputed record here, the UST cannot square Mr. Eggmann's conclusion with the objective facts in this case.

two weeks after signing the Forbearance Agreement, on January 29, 2025, Tory contacted Mr. Wade regarding a likely default of the forbearance agreement and additional terms that Frontier was seeking to impose, including the appointment of a Chief Restructuring Officer and a potential DIP Financing term sheet should the Debtors file for chapter 11. The records demonstrate that Mr. Wade immediately contacted Mr. Parres to communicate this information. Mr. Wade followed up with Mr. Parres on January 30, 2025, and again on January 31, 2025, regarding the DCA matter, all of which was billed under the 2024 Engagement Agreement.

The contemporaneous time records further show that Mr. Wade participated in a 30-minute telephone call with Mr. Parres and Tory on January 31, 2025. Mr. Parres testified that he recalled discussing the DCA matters with an attorney in Lewis Rice's Kansas City office named "Lou"[9] and that they discussed that "there was an opportunity to represent some companies in a Chapter 11 bankruptcy."[10] On February 20, 2025 (the day the DCA Outdoors chapter 11 case was filed), Mr. Wade billed time for reviewing follow-up emails from Tory and John Hall regarding the impending threat by Frontier to file for an emergency receivership. Again, Mr. Wade billed for all these services under the 2024 Engagement Agreement. Thus, the billing records and the testimonial evidence of Lewis Rice partners conclusively demonstrate that the Lewis Rice engagement was one continuous engagement.

Tory did not execute the 2025 Engagement Agreement, discussing the bankruptcy-specific services to be provided by Lewis Rice, until February 5, 2025, well after Mr. Parres and Mr. Wade discussed the engagement and Mr. Wade continuously billed for services. This

[9] At his deposition, Mr. Parres could not recall Mr. Wade's last name, but there is no apparent dispute that Mr. Parres spoke with Mr. Wade. Exhibit H, Parres Depo. Tr. 21:2–21:5.

[10] Exhibit H, Parres Depo. Tr. 20:23–20:24.

agreement specified that Tory was signing the agreement "as majority and controlling member/shareholder for each of the Companies." It was addressed to "Mr. Tory Schwope."

Tory executed the document via Docusign, an electronic document signature program. The 2025 Engagement Agreement does not clearly specify who Lewis Rice's client for the engagement is; rather, the agreement merely states that Lewis Rice will "provide legal services for **you** in connection with the preparation and filing of bankruptcy cases **for each of your** companies listed on Exhibit A attached hereto ("Companies")" (emphasis added). This language strongly suggests that Mr. Parres and the bankruptcy practice group identified Tory as the client.[11]

However, even if the meaning of the language in the agreement is disputed, it cannot be disputed that the 2025 Engagement Agreement signed by Tory does not contain Exhibit A,[12] and Lewis Rice has not located or produced an Exhibit A to the 2025 Engagement Agreement to any party in this case.[13] This is consistent with Mr. Hall's Rule 30(b)(6) testimony on behalf of Lewis Rice, that "my investigation has not found an Exhibit A and as such, we do not - - I don't know of the existence of Exhibit A."[14] Regarding Exhibit A, Mr. Parres testified that "There

---

[11] Mr. Hall testified that the "you" and "your" referred to as "Tory Schwope as CEO and the decisionmaker for each of the companies and the companies." Exhibit F, Hall I Depo. Tr. 73:20–73:22. It is difficult for the UST to square this interpretation with the plain meaning of the words used in the agreement itself. Nevertheless, the Court need not reach a conclusion on this fact because even if Mr. Hall's testimony is a correct reading of the agreement, it does not preclude summary judgment because of the scope and nature of the non-disclosures in this case.

[12] Samantha Schwope emailed the executed 2025 Engagement Agreement to Lewis Rice on February 5, 2025. *See* Exhibit O, Deposition Exhibit 36. The email shows it was sent to Mr. Wade, Mr. Parres, and Mr. Hall and does not contain an Exhibit A to the engagement letter.

[13] Counsel for Lewis Rice confirmed as much on the record on the October 29, 2026, discovery conference with the Court.

[14] Exhibit F, Hall I Depo. Tr. 76:13–76:18.

were drafts of an Exhibit A, but Exhibit A was continuously changing because we were led to believe by parties that certain parties were borrowers under the loan agreement, and we found out that they were not. So they became non-clients at that point…. Exhibit A was continuously changing. There were other parties, as well as Valley Hill, that were taken off that list."[15]

Mr. Parres's testimony can be read only to mean that he believed both that a client could become a "non-client," which somehow meant they never were a client, and that a firm could continuously update its client list attached to engagement agreement, even if the engagement agreement was already signed by the client—essentially, that a lawyer may revise history. Neither of these explanations appear to comport with the Missouri Rules of Professional Conduct, which instead focus on whether a person or entity "seeks and receives legal advice and assistance from an attorney who intends to undertake to provide legal advice and assistance to the prospective client in a particular matter." *State ex rel. Thompson v. Dueker*, 346 S.W.3d 390, 394 (Mo. Ct. App. 2011). Under this definition, the nature of the contacts within the relationship are key, not the formalities. *Id.* Further, this explanation from Mr. Parres may inform the parties and the Court as to why Mr. Parres made the wholly and plainly inadequate disclosures in this case.

On January 20, 2025, DCA Outdoor filed its chapter 11 petition. In doing so, DCA Outdoor disclosed several related affiliated cases it believed would be filed, including a case for Valley Hill. However, it is undisputed that Valley Hill never filed (even though it was identified as an affiliated debtor) because Lewis Rice discovered between January 20 and January 21 that Valley Hill was not obligated to Frontier under the loan documents or the Forbearance Agreement.

---

[15] Exhibit H, Parres Depo. Tr. 31:3–31:8 and 31:17–31:19.

The 2024 Engagement Agreement also engaged Lewis Rice to represent Valley Hill. Further, the undisputed facts clearly show that Lewis Rice represented Valley Hill under the 2025 Engagement Agreement (despite the absence of Schedule A) because Lewis Rice discussed with Tory on the evening of February 20, 2025, whether Valley Hill should commence a chapter 11 case after it was determined that Valley Hill was not a borrower under the Frontier loan facilities.[16] Mr. Parres admitted that Tory made the decision not to file a chapter 11 for Valley Hill after Lewis Rice provided all of the correct information to allow Tory to make the decision.[17] Thus, the undisputed facts show that Mr. Parres and Lewis Rice clearly represented Tory and Valley Hill in the process of determining whether Valley Hill should commence a bankruptcy case, which made Valley Hill a client of Lewis Rice as a matter of law as well as common sense.

On February 24, 2025, Lewis Rice filed its application to be employed as counsel to the Debtors. ECF Doc. No. 29. Lewis Rice disclosed that Mr. Parres would be filing an affidavit and that "except as disclosed in the Parres affidavit…. Neither LR nor any attorney at the firm holds or represents and interest adverse to Debtors' estate." *Id.* at para. 18. Further, Lewis Rice stated that it "will conduct an ongoing review of its files to ensure that no conflicts or other disqualifying circumstances exist or arise. If any new facts or relationships are discovered, LR will supplement its disclosure to the Court." *Id.* at para. 19. The UST notes that this language is inconsistent with the requirement of Rule 2014(a) that Lewis Rice disclose all connections, not just conflicts or other disqualifying circumstances.

---

[16] Exhibit H, Parres Depo. Tr. 55:18–56:12. Likewise, Mr. Parres understood that Lewis Rice represented Valley Hill's interests when Lewis Rice attorney Steven Drapekin reviewed the Frontier loan documents and determined that Valley Hill was not a borrower. *Id.* at 60:3-62:5.

[17] *Id.*

Although the Employment Application indicated the Parres Affidavit would be filed contemporaneously with the Application, it was not filed until two days later, on February 26, 2025. ECF Doc. No. 37. Incredibly, the Parres Affidavit omits Lewis Rice's prior representation of Tory, as well as its representation of Valley Hill during the forbearance negotiations conducted through Mr. Wade and through at least its decision not to commence a chapter 11 case of its own on February 20, 2025. In fact, the Parres Affidavit unequivocally and falsely declared that Lewis Rice had never represented Tory Schwope. *Id.* at para. 10. It is now clear that these were significant and material undisclosed connections, which, for reasons discussed later, demonstrated that Lewis Rice represented a concurrent adverse interest prohibited by Section 327(a) of the Bankruptcy Code.

The undisputed evidence makes clear that the firm operated with a reckless disregard for the truth, akin to willfulness, which on its own, justifies a complete denial of fees in this case. Neither Mr. Parres nor Mr. Hall, the two Lewis Rice partners leading the bankruptcy representation of the Debtors, requested or reviewed the 2024 Engagement Agreement to determine the scope of the engagement, or even whom Lewis Rice represented under that engagement. Mr. Hall testified he had not seen the 2024 Engagement Agreement before his deposition on September 22, 2026, despite the fact that he was testifying both individually and as Lewis Rice's Rule 30(b)(6) corporate representative.[18] Mr. Parres testified that he did not review

[18] Exhibit F, Hall I Depo. Tr. 45:10–45:13. The UST finds this testimony extremely problematic, because the corporate notice of deposition specifically listed as a topic the "inception, scope and terms of the Engagement" of Lewis Rice, with "Engagement" being defined to include "any pre-petition representation concerning restructuring of the Frontier Farm Credit loan." Thus, the 2024 Engagement Agreement was the most relevant document concerning the "inception" of the "Engagement" under any reasonable reading of the notice. The fact that the corporate representative had not seen this document, even in deposition preparation, suggests that he was not prepared properly for the deposition and reeks of bad faith.

the 2024 Engagement Agreement until just before his deposition on this fee dispute in September 2026.[19]

Further, both Mr. Parres and Mr. Hall struggled during their depositions to articulate a correct understanding of the disclosure requirements of Rule 2014(a) in the context of their employment as counsel for a chapter 11 debtor. Mr. Parres indicated he had not memorized Rule 2014, and he would not agree or disagree that connections between Lewis Rice and Mr. Schwope would need to be disclosed to comply with the rule.[20] As the corporate representative, Mr. Hall testified that he did not believe that any connections with Mr. Schwope needed to be disclosed because such a disclosure was not "material"[21] and Tory's interests were not averse to the estate.[22] Mr. Hall further testified that he could not "tell you that I know the specific language as we sit here" in Rule 2014(a) that was applicable.[23] Mr. Hall also asserted that any connections between Tory and the estate were "very slim."[24]

This testimony demonstrates that Mr. Hall and Mr. Parres were willfully blind to their disclosure requirements. Rule 2014(a) plainly and unequivocally requires the disclosure of all connections, and the representation of Tory's individual interests with respect to the principal

---

[19] Exhibit H, Parres Depo. Tr. 182:24-183:5.

[20] Exhibit H, Parres Depo. Tr. 187:6-188:8. For example, Mr. Parres testified that "When you use the word connection, I again, don't know exactly what you're referred to." Given that Rule 2014(a) requires the disclosure of connections, an experienced Chapter 11 attorney should be able to articulate a correct definition of this word.

[21] Exhibit F, Hall I Depo. Tr.48:3-48:12.

[22] Exhibit G, Hall II Depo. Tr. 504:11-504:20.

[23] *Id.* at 504:17:504:20.

[24] *Id.* at 504:25-505:8.

creditor in this case was not a "very slim" connection. Mr. Hall further admitted that the firm's conflicts check identified Tory as a party to whom the Debtors were likely adverse.[25] No reasonable person who is competent in chapter 11 bankruptcy could ever believe that the representation of Tory individually was a "very slim" connection. Nor was Lewis Rice entitled to determine, on its own, whether the connection represented an adverse interest. That assertion has been uniformly rejected by federal courts for over 30 years. "Professionals cannot pick and choose which connections are irrelevant or trivial." *U.S. v. Gellene*, 182 F.3d 578, 588 (7th Cir. 1999) (quoting *In re EWC, Inc.*, 138 B.R. 276, 280 (Bankr. W.D. Okla. 1992)) (internal quotations omitted).

Even if this view of the disclosure obligation was not legally erroneous, it should have been plainly obvious at several points during the case that Tory had material dealings with the debtor entities that put their interests into potential conflict. Putting aside that they were jointly liable to the Debtors' largest creditor for about $96 million, the schedules reveal multiple transactions that would cause a reasonable chapter 11 practitioner to understand that the interests of Tory and the Debtors may not be aligned. For example, the schedules for debtor entity Schwope Brothers Tree Farms reveal that this entity prepaid rent to Tory on a lease for property that was part of Tory's homestead commonly called the "X-Farm" just before the commencement of the chapter 11 cases. *See* ECF Doc. No. 18-1, Schedule 8.1 (page 35 of 61) filed in Case No. 25-50070 (identifying $96,509.00 payment to Tory).[26] The fact that Tory was leasing property to a Debtor entity, and was prepaid during a time which the Debtors were in default with respect to their largest secured creditor, raises plainly obvious issues regarding

[25] Exhibit F, Hall I Depo. Tr. 52:2-52:22.
[26] Notably, although the advance rent payment is disclosed in the Schedules, the lease itself is not.

whether these payments were proper.[27] Further, a review of the Schwope Brothers Tree Farm monthly operating reports reveal additional payments to Tory on this lease, calling into question whether Tory was overpaid by the estates.

Additionally, the record reveals that during Lewis Rice's representation of the Debtors, Samantha Schwope (who was then controller of the DCA entities) contacted Mr. Hall and Mr. Parres on July 25, 2025, and revealed that some time before, she had informed Lewis Rice that Tory had leased certain equipment in his personal name that was being used in the DCA businesses. Samantha indicated that Tory wanted the companies to make the lease payments that he was legally liable on. Samantha further revealed that the Debtors had not documented these transactions and proposed three courses of action to pay Tory:

> "1. I write a lease and SBWC leases the equipment from Tory (con-this may appear that Tory is trying to profit from the company)
>
> 2. We submit the bill to FMG for direct payment (con-the bill is under Tory's name)
>
> 3. Tory pays the bill and gets reimbursed by the company (con-Tory has to front the money, but this seems to be the cleanest from my perspective)."[28]

Mr. Parres advised Samantha to "Document a lease – date it as of the date it was put in place and if its pre-petition the better."[29] During his deposition, Mr. Hall admitted that this transaction "could make him [Tory] adverse" to the estate.[30] It is highly concerning that Mr. Parres advised

---

[27] Further, Tory asserted a claim against Schwope Brothers Tree Farm in an "unknown" amount for "Damage to drive on 12517 Harris Road by tenant Swope (sic) Brothers Tree Farms LLC." *See* ECF Doc. 29 at 7, Case No. 26-40404 (Bankr. W.D. Mo.). Tory testified this damage occurred during construction of the improvements on the property and likely exceeds $10,000.

[28] Exhibit L, Deposition Exhibit 88.

[29] *Id.*

[30] Exhibit G, Hall II Depo. Tr. 508:23–509:7.

the Debtor on this transaction at all given Lewis Rice's prior representation of Tory, and the advice he gave the Debtors appears to favor Tory and disadvantage the Debtors by creating documentation that did not exist, to the Debtors' detriment.

Of course, even if relying on a misunderstanding of Rule 2014(a) was somehow a defense, it does not excuse the fact that Mr. Parres made an affirmative false statement in the Parres Affidavit and Lewis Rice made affirmative false statements in the Employment Application. Mr. Parres did not simply declare that Lewis Rice had no other connections; he affirmatively stated that Lewis Rice has not represented Tory. That was a material misstatement of a fact that Mr. Parres knew or should have known was untrue through a reasonable investigation because the facts demonstrate that Lewis Rice was obviously aware of its prior representation of Tory. *See Gellene,* 182 F.3d at 588 (upholding criminal conviction for false statement made in a Rule 2014(a) affidavit). The record is clear that Mr. Parres made no investigation into this fact because a simple review of the 2024 Engagement Agreement or a more robust conversation with Mr. Wade would have revealed this fact.

Further, Lewis Rice implied in the Employment Application that it was not retained by the Debtors until February 1, 2025, by making further misleading statements. For example, the application states that

> On February 1, 2025, LR was asked by Debtors to give it professional legal services and advice with respect to, among other things, the defaults declared under its loan documents with Frontier Farm Credit ("Farm Credit") and Debtors' efforts to preserve its business and jobs, and restructure its business and existing financial obligations. LR has assisted Debtors to prepare for and evaluate various restructuring alternatives since February 1, 2025 and has performed extensive legal work for Debtors and acquired extensive knowledge of Debtors and their business, capital structure, financing documents and other material agreements." ECF Doc. No. 29 at para. 11.

However, this statement was at the very least misleading because Lewis Rice was first employed by the Debtors and Tory no later than December 19, 2024, over 40 days earlier. This statement

was material because if Lewis Rice had disclosed that it had been working for the Debtors for a longer period of time, the UST would have requested to see the pre-petition billing records consistent with his duty to review Lewis Rice's pre-petition engagement under Section 329(a), and would have likely discovered the adverse interests that have since been revealed.

Lewis Rice has wholly failed to explain how or why these misstatements were made, because it is unclear exactly when or how the alleged conflicts check was performed. Although Mr. Parres signed the affidavit, he could not affirmatively testify in this case that the conflicts check was completed. Instead, when asked by the UST's counsel if the firm's conflict check process was followed in this case, Mr. Parres testified: "As I sit here, I don't know. I sure hope it was."[31] Despite a lengthy discussion at Mr. Hall's deposition regarding Lewis Rice's conflict search, he was unable to point to any document or report demonstrating that the conflict search had been run and provided to Mr. Parres. Thus, there is simply no evidence that Mr. Parres completed the conflict check before signing and filing his affidavit. Further, Lewis Rice never amended its employment application or the Parres Affidavit once it became aware of the potential or actual conflicts with Tory caused by the various lease transactions and payments, especially once it learned of the various lease transactions. More problematic, it appears Mr. Parres was aware of, but never investigated, the scope of Lewis Rice's pre-petition representation of the Debtors by Mr. Wade.

Lastly on the disclosure issue, the Rule 2014(a) disclosures are not the only misleading and false disclosures made in this case. Lewis Rice also failed to comply with Section 329 and Rule 2016 by correctly disclosing the pre-petition compensation paid in this case. The record reflects that Lewis Rice filed a Rule 2016(b) disclosure in each case stating that it received no

[31] Exhibit H, Parres Depo. Tr. 295:20-295:23.

pre-petition compensation and instead referred the reader to the application to employ. For its part, the Employment Application declared that "Debtors have paid LR an initial retainer in the amount of $200,000.00, for professional services rendered or to be rendered and charges and disbursements incurred or to be incurred by LR on behalf of Debtors in connection with this case." ECF Doc. No. 29 at para 27. That retainer was not disclosed in the Rule 2016(b) statements. Further, the disclosure did not state which of the Debtors made this payment. As it turns out, KAT Nurseries, LLC disclosed on April 7, 2025 (a month and half later) in the Statements of Financial Affairs that it was the debtor who made the payment. ECF Doc. No. 18, Case No. 25-50068, Statement of Financial Affairs, at 28, ln. 11. These disclosures failed to comply with the requirement that Lewis Rice, not the Debtors, disclose the source of the retainer with specificity. *In re Miller Auto. Grp., Inc.*, 521 B.R. 323, 331 (Bankr. W.D. Mo. 2014) (denying fee award and rejecting counsel's argument that disclosures in the SOFA were sufficient where disclosures were not made in the Rule 2014(a) and Rule 2016(b) statements). Further, it does not appear that Lewis Rice ever disclosed the fees it billed under the 2024 Engagement Agreement, which likewise were subject to disclosure under Section 329. *In re Zepecki*, 277 F.3d 1041, 1046 (8th Cir. 2002) (concluding that representation of Debtor in connection with a sale of land was in close proximity to the bankruptcy and represented the Debtor's largest asset, and thus the representation was "in connection with or in contemplation of the possibility or imminence of a bankruptcy proceeding").

Given these facts, Lewis Rice was, at a minimum, grossly negligent in failing to disclose all the required connections and facts related to its employment. On this record, the Court must conclude that full disgorgement is warranted because this is not the case where the non-disclosure was the result of an unfortunate mistake or inadvertence despite clear attempts to

comply with the Rules. Rather, it was the result of a clear failure of counsel and the firm to manifest a culture of compliance with their legal obligations.

*B. Lewis Rice Was Disqualified under Section 327(a)*

In relevant part, Section 327(a) of the Bankruptcy Code permits the Debtor, with court approval, to employ "attorneys . . . that do not hold or represent an interest adverse to estate, and that are disinterested persons . . ." Thus, "there are essentially two conditions for an attorney's employment: the attorney must be 'disinterested,' and the attorney cannot hold or represent an interest adverse to the estate." *In re M & M Mktg., LLC*, 426 B.R. 796, 801-02 (B.A.P. 8th Cir. 2020).

*M & M Mktg.* is instructive on what it means to "represent" a party who holds an adverse interest. In that case, the Bankruptcy Appellate Panel of the Eighth Circuit was called on to decide whether an attorney for the petitioning creditors in an involuntary case could subsequently be retained to represent the trustee under Section 327. *Id.* at 800. Judge Venters, writing for the Court, adopted the following longstanding explanation of what it means to represent an adverse interest:

> To hold an interest adverse to the estate means: (1) to possess or assert any economic interest that would tend to lessen the value of the bankruptcy estate or that would create either an actual or potential dispute in which the estate is a rival claimant; or (2) to possess a predisposition under circumstances that render such a bias against the estate. To represent an adverse interest means to serve as agent or attorney for any individual or entity holding such an adverse interest.

*Id.* at 802–03 (internal quotations and citations omitted). Accordingly, the Bankruptcy Appellate Panel concluded that where the petitioning creditors were the recipients of potentially avoidable transfers, and counsel represented those creditors, counsel could not be employed. *Id.* at 803. The Court explained that where Section 327(a) applies, the

review of conflicts is not limited to a specific matter; rather, it applies generally to all potential adverse interests of the estate. *Id.*

None of the legal concepts involved in this analysis are new or untested such that their application to this case should be in doubt among qualified bankruptcy professionals. Courts in this circuit have long recognized that Section 327(a) imposes a more stringent standard of disqualification than the Rules of Professional Conduct. *Matter of Sauer*, 191 B.R. 402 (Bankr. D. Neb. 1995). Almost from the beginning of practice under the modern Bankruptcy Code, courts have recognized that the joint representation of a principal and his corporation who are jointly liable or have significant transactions between them is a quintessential adverse interest prohibited by Section 327(a). *In re Lee*, 94 B.R. 172, 178 (Bankr. C.D. Cal. 1988); *In re Star Broad., Inc.*, 81 B.R. 835, 841 (Bankr. D.N.J. 1988); *In re Hoffman*, 53 B.R. 564 (Bankr. W.D. Ark. 1985). These rules exist to "maintain the integrity of the bankruptcy process and . . . to assure that counsel devotes undivided loyalty to the client." *In re Diamond Mortg. Corp. of Ill.*, 135 B.R. 78, 90 (Bankr. N.D. Ill. 1990) (internal quotations and citations omitted).

Here, Tory was a co-obligor with the Debtors on $96 million of debt. Lewis Rice represented both the Debtors and Tory in negotiating with the secured creditor during the pre-petition period. That was the primary purpose for which Mr. Wade was retained, and the factual record demonstrates that Lewis Rice took actions wholly inconsistent with a belief that the engagement ended upon the execution of the Forbearance Agreement on January 14, 2025. Mr. Wade and Mr. Parres emailed and spoke just over two weeks later, and it was not until five days after that when Tory executed the separate 2025 Engagement Agreement focused on bankruptcy.

Tory was also a counterparty to leases, both written and unwritten, with at least two debtor entities, Schwope Brothers Tree Farms (on the X-Farm lease) and Schwope Brothers

West Coast (on the equipment leases discussed between Samantha, Mr. Hall and Mr. Parres). The disclosures in Schwope Brothers Tree Farms' schedules that Tory had received a rent prepayment should have tipped off any experienced bankruptcy lawyer that further investigation of this transaction was necessary, both to determine whether such prepayment was permissible and whether it placed the interests of Tory, as an insider creditor, ahead of other creditors. Lewis Rice could not complete this investigation because of its clear conflict of interest. In fact, there is no evidence Lewis Rice did anything to investigate these transactions beyond partially disclosing them.

Further, Valley Hill certainly had the potential to be adverse to the Debtors that did file, and the facts later showed that it was in fact adverse with respect to several transactions. Mr. Parres admitted in his deposition that there was certainly potential for Valley Hill to become adverse to the estates.[32] Mr. Parres further admitted that Valley Hill had relationships with the Debtors.[33] Even more problematic, Mr. Parres admitted he did nothing, beyond preparing the schedules in this case, to investigate the extent of the relationships between Valley Hill and the Debtors.[34] Mr. Parres admitted he later learned that the Debtors obtained inventory from Valley Hill and that there were leases between Valley Hill and certain entities, including DCA Land

[32] Exhibit H, Parres Depo. Tr. 57:12–58:3.

[33] *Id.* at 62:20–63:7.

[34] *Id.* at 63:4–64:6. Mr. Parres asserted that he did not investigate these transactions because he was "specifically told by Frontier not to spend any money regarding anything to with Valley Hill." Putting aside whether that occurred and assuming it did, the UST fails to see how a competent chapter 11 counsel could reasonably believe that he was absolved from determining whether he had a potential or actual conflict of interest because of the directions of a secured creditor.

Kentucky, LLC.[35] Further, the Debtors' schedules are replete with the disclosures of significant intercompany transfers between Debtor entities, yet it appears no one at Lewis Rice sought to determine whether these intercompany transfers might create adverse interests for one or more the estates.

Thus, the Court should have little difficulty concluding that at the time these chapter 11 cases were filed, Lewis Rice represented a concurrent adverse interest that gave rise to at least the potential for a conflict of interest. This is not a difficult case. Rather, Tory's connections with the Debtors were so intertwined that it would be impossible for competent counsel to represent their interests simultaneously. Further, at the time that Lewis Rice advised Tory regarding Valley Hill, it should have obvious that there was a potential conflict of interest in Lewis Rice's representation of both Valley Hill and the Debtors' estates.[36] However, it appears none of the lawyers at Lewis Rice, including Mr. Parres and Mr. Hall, seriously considered what potential conflicts might arise (especially once it was decided that Valley Hill should not file), and whether that prohibited their representation of some or all of the Debtors or required some sort of alternative remedy, such as the engagement of conflicts counsel.

Once these conflicts became actual conflicts, such as when Lewis Rice had to deal with Tory's leases (both written and unwritten), again no one at Lewis Rice considered they might be

[35] *Id.* at 64:14-65:6.

[36] This adverse interest existed regardless of whether Mr. Parres and Mr. Hall were aware of the 2024 Engagement Agreement and that Tory was a named client of the firm. All the facts necessary to determine that this adverse interest existed were uniquely in the possession of Mr. Parres and Mr. Hall. However, this is not to suggest that Mr. Parres and Mr. Hall can be excused for not knowing that Tory was a client, because the firm had actual knowledge and Mr. Parres and Mr. Hall made themselves willfully blind to these facts given that had a reasonable duty to investigate, which they wholly failed to accomplish.

conflicted as to how to advise the Debtor, nor did they make any supplemental disclosures. In fact, the advice Mr. Parres and Mr. Hall ultimately gave to Samantha regarding the unwritten leases appears under any reasonable construction to manifest this conflict and was detrimental to the estates: "Document a lease – date it as of the date it was put in place and if its pre-petition the better."[37] At the very least, Mr. Parres and Mr. Hall should have immediately recognized that they were conflicted and should have advised the Debtor to consider engaging conflicts counsel. Instead, they gave prohibited advice that could have harmed the estate.

Here, the undisputed facts make clear that Lewis Rice represented interests adverse to the estate that prohibited their employment as a matter of law under Section 327(a) of the Bankruptcy Code. These interests were significant given the nature of the transactions, including the fact that there is a significant question about whether Lewis Rice placed Tory's interests above those of the estates, especially when it came to lease payments to him. Importantly, Lewis Rice actually gave legal advice on questions for which the firm had a material conflict of interest. The Court simply cannot allow Lewis Rice to benefit from violating the law in such a blatant and willful manner.

*C. Undisputed Evidence of Additional Misconduct*

Additionally, there is additional undisputed evidence of serious misconduct by Lewis Rice and Mr. Parres during the case. Most notably, after Mr. King was appointed as the new Chief Restructuring Officer on September 11, 2025, Mr. King terminated Tory's employment with the Debtors but retained Samantha as an employee to assist him with the restructuring. During this time, Lewis Rice had not been terminated by Mr. King or the Debtors and remained

[37] Exhibit L (Deposition Exhibit 88).

counsel of record in these cases until November 19, 2025, when Lewis Rice sought leave to withdraw as counsel. ECF Doc. No. 454. Even though Mr. King had displaced Tory as the Debtors' responsible person, Mr. Parres and others at Lewis Rice continued to communicate with Tory and Samantha without copying Mr. King while the firm continued to provide services to the Debtors through Mr. King, including reviewing the Valley Hill leases.[38]

For example, in discovery on this fee matter, the UST learned that Mr. Parres texted Samantha on September 18, 2025. At the beginning of the conversation Samantha recognized the potential impropriety of this communication, writing "I thought we weren't allowed to talk?? If you're allowed let's chat tomorrow."[39] Mr. Parres responded: "On cell only. Im walking on eggs."[40] Samantha responded: "I get it – if you have a minute tomorrow I could really use some advice. I'm ok but I'm definitely in in limbo right now."[41]

Incredibly, Mr. Parres responded to Samantha with a request to delete records and evidence: "I truly care about your family. This isn't right. **Please delete my texts from this week.** Tory didn't pay me on 8-29 for reasons I don't know but I'm out a half million dollars. I have to be careful. I have to get paid. That's a huge number. **Please make sure Tory is deleting my text messages too.** Please."[42] (emphasis added). After this, Mr. Parres and Samantha turned their discussion to Valley Hill. Mr. Parres asked: "How does he materialize Valley Farms or

---

[38] Exhibit F, Hall I Depo. Tr. at 156:7–156:16 (describing work performed by Lewis Rice for Mr. King after his appointment as the CRO).

[39] Exhibit J, Deposition Exhibit 35,at LEP 181.

[40] *Id.*

[41] *Id.* at 182.

[42] *Id.*

impossible?" Samantha responded: "I don't think he does. I think he loses valley hill to frontier unless he can make a deal."[43]

After which Mr. Parres asked Samantha: "Can he [Tory] sell inventory quickly off valley hill. If so, he needs to."[44] He then sent the following two text messages: "He needs to concentrate on liquidating assets and protecting them."[45] "Needs to start with valley hill. Quickly. Quickly. Quickly."[46] To which Samantha replied: "How does [sic] protect them? Put them in a trust?"[47] Mr. Parres responded: "In his wife's name."[48]

To a bankruptcy professional there is only one reasonable construction of this conversation: Mr. Parres was providing legal advice for Tory to fraudulently transfer Valley Hill or its assets to his wife. Even if there is some other reasonable inference that could be drawn, the mere fact that Mr. Parres, who was still counsel of record to these chapter 11 bankruptcy estates, even engaged in this conversation was wholly improper and violated a whole host of ethical duties that manifested a clear conflict of interest. Worse yet, Mr. Parres later reiterated his request that Samantha and Tory Schwope destroy evidence, writing "Good night. Please delete emails starting this week. Leave old ones."[49]

For his part, Mr. Parres explained his texts requesting the deletion of communications

---

[43] *Id.* 183.

[44] *Id.* at 184.

[45] *Id.*

[46] *Id.*

[47] *Id.*

[48] *Id.*

[49] *Id.*

this way: "I didn't want to become locker room fodder for the two individuals that ran both of those."[50] Mr. Parres further explained that "one of the things that I asked to be deleted was a picture of me and my wife on my birthday, and I was in a pair of pink shorts. And that's not something that Larry Parres often wears."[51] Even if Mr. Parres's explanation was credible (which the court must generally assume at summary judgment),[52] this is a poor excuse for a lawyer to advise his clients to destroy evidence (not once, but twice) in a federal proceeding. Further, Mr. Parres qualified his answer, noting that the messages were just one of the things that he asked to be deleted.

Thus, Mr. Parres admits that he counseled Samantha and Tory to destroy records. Simply put, asking anyone to delete communications and to potentially fraudulently transfer assets during a bankruptcy case is a grave and serious offense for any reason, which the Court must consider in determining whether to award fees to Lewis Rice and Mr. Parres. Certainly, these are communications demonstrating that Mr. Parres often put the interests of the Schwope family above the Debtors' interests.

Further, Lewis Rice provided Tory with a copy of the Valley Hill lease with debtor DCA Land Kentucky at a time when the validity of the lease was potentially in dispute and numerous

---

[50] Exhibit H, Parres Depo. Tr. 148:12-148:21

[51] *Id.*

[52] Mr. Parres's explanation is self-serving, is not supported by any other evidence, and does not explain his request that Samantha advise Tory to delete his communications as well. There is no evidence that the picture in question was ever sent to Tory, given that Mr. Parres has produced all of his texts with Tory and Samantha. *Cf.* Exhibit J, Deposition Exhibit 35, at LEP 181 with Exhibit J, Deposition Exhibit 35, at LEP 244. Most notably, however, Mr. Parres did provide Tory advice on how to communicate with various parties during that week which would be potentially unethical: "Quit using your DCA email. They are watching it. Let's talk later but you need a personal attorney."

parties had noted that the leases provided to date were potentially unsigned. Lewis Rice, acting on Mr. Parres's instruction, provided a copy of the lease in its possession to Tory on October 2, 2025, even though at that time Tory was no longer affiliated with the Debtors, and without seeking the approval of Mr. King.[53] In fact, later proceedings demonstrate an active dispute as to what entity owned the trees planted in Kentucky, and ultimately, after Tory's removal, the estates agreed to pay Tory's individual chapter 7 Trustee to settle claims regarding this lease. ECF Doc. No. 803. The provision of this lease to Tory was wholly improper given that Mr. King, and not Tory, was the client representative at the time.

## III. All Fees Must Be Disallowed

Thus, on this record, the only significant question left is whether the Court should disallow all fees, a pure question of law. Section 328(c) of the Bankruptcy Code specifically permits this court to "deny allowance of compensation for services and reimbursement of expenses of a professional person employed under section 327 . . . if, at any time during such professional person's employment under section 327 . . . such professional . . . represents or holds an interest adverse to the interest of the estate with respect to the matter on which such professional person is employed." The UST recognizes that Section 328(c) is discretionary and does not compel or require the disgorgement of fees. *In re Sauer*, 222 B.R. 604, 608–610 (B.A.P. 8th Cir. 1998). There may be circumstances where complete disallowance is inappropriate, such as where counsel disclosed all the facts timely and the conflict occurred later in the representation. *Id; see also Gray v. English*, 30 F.3d 1319. 1324–25 (10th Cir. 1994) (affirming partial disallowance where conflict occurred at a defined moment).

However, this does not mean that the Court can never disallow compensation earned

[53] Exhibit F, Hall I Depo. Tr. 164:5-165:19.

before the manifestation, and certainly courts are entitled to "lean strongly toward denial of fees" because such a result "best serves the deterrence purpose of the rule." *Gray*, 30 F.3d at 1324. Relying on *Gray*, where significant non-disclosures are involved, the Tenth Circuit has recently said that "[full disgorgement] should be the default sanction, and there must be sound reasons for anything less." *In re Stewart*, 970 F.3d 1255, 1267 (10th Cir. 2020). Although the Eighth Circuit itself has not directly stated this rule, Bankruptcy Courts within the Eighth Circuit have routinely denied all compensation under circumstances similar to this case. *In re Pierce*, 809 F.2d 1356 (8th Cir. 1987) (affirming total denial of compensation where attorney held an adverse interest prohibited by Section 327(a)); *see also In re Miller Auto. Grp., Inc.*, 521 B.R. 323, 335–37 (Bankr. W.D. Mo. 2014), *aff'd*, 536 B.R. 828 (B.A.P. 8th Cir. 2015) (denying all compensation, ordering full disgorgement, and suspending attorney who made significant misrepresentations in compensation disclosures and employment application and likely had a conflict); *In re Satnam Lodging, LLC*, 2013 WL 3776326 *7 (Bankr. W.D. Mo. July 16, 2013) (full disgorgement of fees warranted for failures to disclose under Rules 2014 and 2016); *In re Black Hills Greyhound Racing Ass'n*, 154 B.R. 285, 294–96 (Bankr. D.S.D. 1993) (denying all compensation where counsel failed to disclose connections that rendered employment impermissible under Section 327(a)); *In re Rose Way. Inc.*, 1990 WL 10593985 *4 (Bankr. S.D. Iowa March 21, 1990) (same). Thus, the facts place this case comfortably within those similarly situated cases where courts have denied all compensation.

## CONCLUSION

Lewis Rice's actions were egregious. The firm failed to disclose its pre-petition representation of the Debtors' principal in negotiations with the major secured creditor in these cases on the same debt. It failed to disclose that it also represented an eventual non-debtor

affiliate, Valley Hill tree farm, both in determining whether it was liable for these debts and whether it should commence its own chapter 11 case. Both the principal and Valley Hill had significant transactions with the Debtors' estates under various leases and other agreements, which Lewis Rice knew or should have known were likely to become adverse under the facts of these cases. When push came to shove, the evidence showed that Lewis Rice and its attorneys often favored the principal and took actions to the detriment of the estates. Finally, and most egregiously, the partner leading the representation advised representatives of the Debtor, including the principal, to delete communications that might be relevant in determining what occurred after the principal was displaced from management.

This conduct cannot be condoned. There can be no factual dispute about what happened. All that is left is just after-the-fact rationalizations. The facts speak for themselves, and they warrant the harshest sanctions possible: complete denial of Lewis Rice's fee application in accordance with Section 328(c).

Respectfully submitted,

Jerry L. Jensen
ACTING UNITED STATES TRUSTEE

BY: /s/ Adam E. Miller

Jill D. Parsons MO #49835
Assistant United States Trustee

Adam E. Miller, MO Bar #65429
Josephine A. Ellerman, MO Bar #73692
Trial Attorneys
Office of the United States Trustee
Charles Evans Whittaker Courthouse
400 East 9th Street, Room 3440
Kansas City, MO 64106
(816) 512-1940
Adam.E.Miller@usdoj.gov

**CERTIFICATE OF SERVICE**

I hereby certify that on this 3rd day of November 2026 in compliance with Fed. R. Civ. P. 5, as made applicable to this proceeding by Fed. R. Bankr. P. 9014 and 7005, a copy of the foregoing was served electronically by ECF notification to all parties requesting notice thereon.

/s/ Adam E. Miller
Adam E. Miller

.