UNITED STATES BANKRUPTCY COURT

FOR THE WESTERN DISTRICT OF MISSOURI

KANSAS CITY DIVISION

________________________________

In Re: Case No.

DCA OUTDOOR, INC., et al., 25-50053-11

Debtors.

________________________________

VIDEOTAPED DEPOSITION OF JOHN HALL IN THEIR INDIVIDUAL CAPACITY AND AS 30(B)(6) CORPORATE REPRESENTATIVE FOR LEWIS RICE LLC

DATE: Tuesday, September 22, 2026

TIME: 9:05 a.m.

LOCATION: Shook, Hardy and Bacon, LLP
2555 Grand Boulevard
Kansas City, MO 64108

REPORTED BY: Kathleen Behrens

JOB NO.: 8450788

A P P E A R A N C E S

ON BEHALF OF DEBTORS DCA OUTDOOR, INC.:

COLIN GOTHAM, ESQUIRE
Evans & Mullinix, P.A.
7225 Renner Road, Suite 200
Shawnee, KS 66217
cgotham@emlawkc.com
(913) 962-8700

ON BEHALF OF OFFICIAL COMMITTEE OF UNSECURED CREDITORS:

ZACHARY R.G. FAIRLIE, ESQUIRE
ANNA SCHULER, ESQUIRE
MARK COLE, ESQUIRE
Spencer Fane LLP
1000 Walnut Street
Kansas City, MO 64106
zfairlie@spencerfane.com
aschuler@spencerfane.com
mcole@spencerfane.com
(972) 324-0300
(816) 474-8100
(913) 327-5108

A P P E A R A N C E S (Cont'd)

ON BEHALF OF FRONTIER FARM CREDIT, FLCA, AND FRONTIER FARM CREDIT, PCA:

VICTORIA BUTER, ESQUIRE
LISA PETERS, ESQUIRE
Kutak Rock, LLP
1650 Farnam Street, The Omaha Building
Omaha, NE 68102-2103
vicki.buter@kutakrock.com
lisa.peters@kutakrock.com
(402) 346-6000
(402) 661-8609

ON BEHALF OF FOCUS MANAGEMENT GROUP:

TIM DAVIS, ESQUIRE
Bryan Cave Leighton Paisner, LLP
1200 Main Street, Suite 3800
Kansas City, MO 64105
tim.davis@bclplaw.com
(816) 374-3200

A P P E A R A N C E S (Cont'd)

ON BEHALF OF LEWIS RICE LLC AND JOHN HALL:
RUSSELL SHANKLIN, ESQUIRE
Shook, Hardy and Bacon, LLP
2555 Grand Avenue
Kansas City, MO 64108
rshanklin@shb.com
(816) 474-6550

ON BEHALF OF U.S. TRUSTEE PROGRAM:
ADAM MILLER, ESQUIRE
Office of the U.S. Trustee
Charles Whittaker U.S. Courthouse
400 East Ninth Street
Kansas City, MO 64106
adam.e.miller@usdoj.gov
(816) 512-1957

ALSO PRESENT:
Andrew Parry, Videographer
Brent King, CTP Managing Director GlassRatner
Josie Ellerman, U.S. Trustee Program
Ryan Tory, Corporate Representative

# I N D E X


| EXAMINATION: | PAGE |
|---|---|
| By Mr. Cole | 12 |
| By Ms. Buter | 192 |


## E X H I B I T S


| NO. | DESCRIPTION | PAGE |
|---|---|---|
| Exhibit 34 | Notice of Deposition of Lewis Rice LLC's Rule 30(b)(6) Designee(s) | 12 |
| Exhibit 35 | Text Messages From John Hall's Phone, LEP01 - 0287 | 40 |
| Exhibit 36 | Email From Samantha Schwope to Mike Scott, Tory Schwope, Louis Wade, Larry Parres - Lewis Rice LLC Engagement Letter | 72 |
| Exhibit 37 | Email Chain - Steven Drapekin to John Hall, 5/7/25 | 126 |
| Exhibit 38 | Email From Larry Parres to John Hall - Strategic Alternatives Discussion Materials, 8/13/25 | 131 |
| Exhibit 39 | Email Chain From Larry Parres to John Hall - Third Interim Cash Collateral Order, 3/13/25 | 137 |

E X H I B I T S (Cont'd)


| NO. | DESCRIPTION | PAGE |
|---|---|---|
| Exhibit 40 | Official Form 206A/B - Schedule A/B: Assets - Real and Personal Property - DCA Land Kentucky | 152 |
| Exhibit 41 | Email From John Hall to Erlene Krigel and Larry Parres - Colonial Gardents, LLC; Colonial Gardens Development, LLC; Colonial Gardens Farms, LLC | 167 |
| Exhibit 42 | Application for Order Under 11 U.S.C Section 327(a) and 329 Authorizing Employment and Retention of Lewis Rice, LLC | 196 |
| Exhibit 43 | Declaration of Larry Parres Supporting Application | 196 |
| Exhibit 44 | Lewis Rice Engagement Letter, 12/16/24 | 197 |
| Exhibit 45 | Email Chain From Larry Parres to Stephen Durbin - Updated Conflict Check, 2/12/25 | 201 |
| Exhibit 46 | Email Chain From John Hall to Tory Schwope - Receivership, 2/20/25 | 211 |
| Exhibit 47 | Email Chain From Tory Schwope to Larry Parres, 2/14/25 | 221 |

E X H I B I T S (Cont'd)


| NO. | DESCRIPTION | PAGE |
|---|---|---|
| Exhibit 48 | Email From John Hall to Lisa Peters - DCA Outdoor - Comments to DIP Term Sheet, 2/18/25 | 225 |
| Exhibit 49 | Email From Lisa Peters - DCA Outdoor - Markup to DIP Loan Term Sheet, 2/20/25 | 227 |
| Exhibit 50 | Email Chain Between John Hall, Larry Parres, and Employees of DCA | 229 |
| Exhibit 51 | Email Chain Between John Hall, Larry Parres, and Employees of DCA, 2/20/25 | 231 |
| Exhibit 52 | Email Between Lisa Peters and John Hall and Other Attorneys, 2/19/25 | 233 |
| Exhibit 53 | Emai From Tory Schwope - Summit DCA Term Sheet Draft to Larry Parres and John Hall | 239 |
| Exhibit 54 | Email From Larry Parres to Tory Schwope - DCA Outdoor Plan Process, 2/24/25 | 240 |

E X H I B I T S (Cont'd)


| NO. | DESCRIPTION | PAGE |
|---|---|---|
| Exhibit 55 | Cover Email From Tory Schwope to John Hall and Larry Parres, 2/20/25 | 258 |
| Exhibit 56 | Email From Mike Scott to Larry Parres - Proposed Restructuring Plan, 2/20/25 | 267 |
| Exhibit 57 | Email Chain From Larry Parres to Tory Schwope - DCA Outdoor | 269 |
| Exhibit 58 | Email From Larry Parres to Samantha Schwope - DCA Order Interim Monthly Compensation, 3/24/25 | 278 |
| Exhibit 59 | Response Email From Larry Parres to Juanita Schwartzkopf - Hilco's Information Request, 4/9/25 | 284 |
| Exhibit 60 | Email From Larry Parres to Juanita Schwartzkopf - DCA Outdoor, Inc. Data Room and Diligence, 4/9/25 | 286 |
| Exhibit 61 | Email From Juanita Schwartzkopf to Larry Parres - Response, 4/9/25 | 289 |
| Exhibit 62 | Email From Lisa Peters to Larry Parres - DCA Outdoor - DIP/CC Objection 408 Not Admissible, 4/21/25 | 293 |

QUESTIONS INSTRUCTED NOT TO ANSWER

| PAGE | LINE |
|---|---|
| 29 | 20 |
| 184 | 1 |
| 184 | 25 |

P R O C E E D I N G S

THE VIDEOGRAPHER: We are on the record. This is the videotaped deposition of John Hall. The date is September 22, 2026, and the time is 9:05 a.m. Case is In Re: DCA Outdoor, Inc., et al., Case number is 25-50053-11.

Parties, please state their name and who they represent.

MR. COLE: Mark Cole of Spencer Fane on behalf of the Committee of Unsecured Creditors.

MS. SCHULER: Anna Schuler, Spencer Fane, on behalf of the Committee of Unsecured Creditors.

MR. FAIRLIE: Zach Fairlie, Spencer Fane, on behalf of the Committee of Unsecured Creditors.

MS. BUTER: Vicki Buter, Kutak Rock, on behalf of the Frontier Farm Credit entity. Also joining me is Lisa Peters from Kutak Rock and Ryan Tory, corporate representative.

MR. MILLER: Adam Miller and Josie Ellerman for the United States Trustee.

MR. DAVIS: Hi, good morning. This is Tim Davis for Focus Management Group.

MR. GOTHAM: Colin Gotham for DCA

Outdoor, Inc. and then Brent King also appears as the chief restructuring officer.

MR. SHANKLIN: Russell Shanklin here on behalf of Lewis Rice and the witness.

THE REPORTER: Good morning. My name is Kathleen Behrens. I'm the reporter assigned by Veritext to take the record of this proceeding. I'm a notary authorized to take acknowledgments and administer oaths in Missouri.

Absent an objection on the record before the witness is sworn, all parties and the witness understand and agree that any certified transcript produced from the recording of this proceeding:

- is intended for all uses permitted under applicable procedural and evidentiary rules and laws in the same manner as a deposition recorded by stenographic means; and
- shall constitute written stipulation of such.

Hearing no objection, I will now swear in the witness.

Will you please raise your right hand.

//

WHEREUPON,

JOHN HALL,

called as a witness and having been first duly sworn to tell the truth, the whole truth, and nothing but the truth, was examined and testified as follows:

THE REPORTER: Thank you.
You may proceed.

EXAMINATION

BY MR. COLE:

Q Mr. Hall, good morning. You have in front of you Deposition Exhibit Number 34.

(Exhibit 34 was marked for identification.)

That is the notice of deposition of Lewis Rice LLC's Rule 30(b)(6) Designee. Do you see that?

A I do.

Q Have you seen that document before?

A I have.

Q Okay. Are you familiar with it?

A I am.

Q Do you understand that you are being -- you have been designated as Lewis Rice's corporate representative to testify on all of the 29 topics contained in Exhibit 34?

MR. SHANKLIN: While Mr. Hall is

looking at that, I did notice one thing in the notice. I think we had negotiated the relevant period to be January 1, 2025, and ending on October 31, 2005, [sic] but for certain topics, and it looked like that wasn't updated and I just wanted to make sure that we were still in accord on that.

MR. COLE: Yeah. Yes.

THE WITNESS: Yes, I'm familiar with this.

BY MR. COLE:

Q Okay. And do you understand that you've been designated to provide the corporate representative testimony on behalf of Lewis Rice on all 29 topics?

A Yes.

Q Do you understand that your testimony is binding on Lewis Rice on all those topics?

A Yes.

Q You've also been noticed to provide an individual deposition today. Are you aware of that?

A Yes.

Q Okay. We are going to proceed under both deposition notices, the corporate representative and individual deposition notice at the same time. What that means is I will ask you questions and if your

testimony will differ depending on whether you're testifying on behalf of Lewis Rice or as an individual, please let me know and we'll record that on the record. Okay?
A Okay.
Q And your counsel, I'm sure, will assist you in determining that as well. Okay?
A Okay.
Q Okay. Lewis Rice has filed two fee applications in this case. Are you aware of that?
A That sounds correct, yes.
Q Have you reviewed -- did you review those before coming here to testify today?
A Not specifically in connection with this deposition, but I have reviewed them within the last month.
Q Are you aware how much in fees are sought through those fee applications?
A Well, there's -- there was a first interim application and then there was a -- a second interim application that was converted to a final application. So in the aggregate, if -- if that's the question, the aggregate amount is something less than 2 million, but in that range.
Q Okay. Does somewhere around $1.5 million

seem accurate?
A That sounds right, yes.
Q Okay. Does Lewis Rice currently hold a retainer?
A There is a balance of a retainer that is still being held, yes.
Q Are you aware what the balance on that retainer is?
A I believe it's around 97,000 -- I'm sorry, about 102,000 and change.
Q Okay. Do you know who signed the fee applications on behalf of Lewis Rice?
A I believe they were filed under Larry Parres's signature.
Q Okay. Who at Lewis Rice reviewed the time entries before the applications were filed?
A Larry Parres and I would've reviewed those. There may have been others that were involved in the case that were also asked to review their time entries.
Q When you say you John Hall reviewed them, did you review all of the time entries?
A I believe I did.
Q Are you aware whether Mr. Parres reviewed all of the time entries?

MR. SHANKLIN: Objection. Could you point me to the topic that we're on?

MR. COLE: I think it's covered within 4, 18. I mean, technically, 23, 25. You might get it in 27 and then, you know, if you don't believe that this is covered within any topic, I guess we can, you know, go on his personal knowledge here. But we are talking about Lewis Rice's fee application.

MR. SHANKLIN: Yeah, I don't think it falls within any of the topics that I see. I think the question was whether Larry Parres reviewed.

But certainly, Mr. Hall, if you have any personal information, you may answer.

THE WITNESS: Yeah. Based on my personal recollection, I believe Larry Parres reviewed the time entries for -- on the fee application.

BY MR. COLE:

Q Do you know if any corrections were made to the time entries before the fee applications were filed?

MR. SHANKLIN: Same objection.

THE WITNESS: Yeah, I made some clarifying corrections to my time entries to provide further details on the time entries.

//

BY MR. COLE:
Q Could you give me an example of what a clarifying entry it would be?
A If I indicated something to the effect of, review documents, then I would look to add the specific documents or general categories of documents that I would review.
Q Were any time entries deleted from your time sheets and so no fees were requested for those time entries?
MR. SHANKLIN: Same objection as to scope.
You may answer if you have personal knowledge.
THE WITNESS: Yeah, I don't recall any specific deletion of time, but it's -- yeah, I don't recall anything specific on that.
BY MR. COLE:
Q Were the fee applications accurate when they were filed by Lewis Rice?
MR. SHANKLIN: Same objections.
THE WITNESS: Based on my review, they were accurate.
BY MR. COLE:
Q Do you believe they're still accurate today?

MR. SHANKLIN: Same objections.
THE WITNESS: Yes.
BY MR. COLE:
Q As of today, is Lewis Rice seeking allowance of the full fees requested in those fee applications?
MR. SHANKLIN: Objection.
THE WITNESS: Well, the applications speak for themselves. The -- with it being a final application, then the application is seeking approval of all fees in the case.
BY MR. COLE:
Q Does Lewis Rice intend to withdraw or reduce any of those -- any of the fees sought in those fee applications?
MR. SHANKLIN: Same objection.
THE WITNESS: Yeah, we have not discussed that, but there is no intention that I'm aware of to withdraw any fee request.
BY MR. COLE:
Q Before testifying today, have you reviewed transcripts of any of the depositions taken in this matter?
A I have not.
Q Have you spoken with anybody who's been deposed in this matter before coming here today?

A I've spoken to them but not about their depositions.
Q And the "them" who you speak of, who is that?
A Scott Moore and Steve Drapekin. We talked about some transition or client matters unrelated to DCA.
Q Was that conversation a part of your preparation to testify today or was it related to a different issue?
A Oh, a different issue. Well, we work on several cases together, Mr. Drapekin and I, and so we talked about those cases and Scott Moore had a client referral.
Q Did Lewis Rice designate a lead attorney -- well, strike that. Let me back up a little bit.
I may refer to today "this matter" or "these matters" or "the bankruptcy." If I do so, I want to make sure we're speaking the same language. And so if I do so, will you understand that I'm talking about the DCA bankruptcy that you are here on today to testify that's contained within the notice?
A Yes, but if I have any concern about that, I will let you know.
Q Please do. Yeah. If it's confusing in any

way or your answer will differ, just let me know and I'll either rephrase or we'll try to clarify. Okay?
A Okay.
Q Did Lewis Rice designate a lead attorney on these matters?
A There's no formal designation of a lead attorney, but Larry Parres was the lead attorney on the DCA bankruptcy matters.
Q And how would you define "lead attorney"?
A The attorney responsible for the client contact and -- and directing the manner in which the case proceeds.
Q You worked with Larry on these bankruptcies; correct?
A I did.
Q Okay. Did you seek his approval for all filings in the case?
A He was involved in any filing in the case, yes.
Q It's a little bit different from my question. Did -- well, and maybe I'll ask a different question. Did Mr. Parres approve every filing in the case?
A I think that's fair.
Q Okay. Did you, John Hall, approve every

filing in the case?
A No.
Q Were there filings of which you did not approve to be filed? And by that, I mean you would not have filed them with your signature on it.
A No. There were filings that I was not involved in that were filed that I did not review.
Q With Mr. Parres being the lead attorney, was he responsible for supervising other Lewis Rice attorneys working on these cases?
A Yes.
Q Were you, John Hall, responsible for supervising other attorneys working on these cases?
A Some attorneys.
Q What attorneys?
A Some of the associates involved in preparing motions.
Q Anybody else?
A No.
Q Was Mr. Moore, Scott Moore, responsible for supervising any attorneys who worked on these cases?
A I don't believe so.
Q The other individual you mentioned was Mr. Drapekin. Are you aware if Mr. Drapekin was responsible for supervising others who've worked on

this case?
A Again, I'd be answering in my personal capacity. He worked with one finance associate with respect to some term sheets, so he worked with them. I don't know that I would characterize it as supervising him.
Q Okay. Does Lewis Rice stand behind all the work that was included in the invoices submitted in the fee applications?
A Yes.
Q Is there any conduct by any Lewis Rice attorney in this case that the firm believes was improper?
MR. SHANKLIN: Objection. Form.
THE WITNESS: Could you restate that question?
BY MR. COLE:
Q Yeah. Is there any conduct by Lewis Rice attorney in this case that the firm believes was improper?
MR. SHANKLIN: Same objection.
THE WITNESS: There were concerns about some communications.
BY MR. COLE:
Q What communications?

A Communications between Larry Parres and debtor representatives.
Q When did those concerns come to light?
MR. SHANKLIN: Objection.
BY MR. COLE:
Q I'll ask a better question. When did Lewis Rice become aware of those communications that you're referencing?
MR. SHANKLIN: Objection to the extent that it calls for privileged material related to any work done by the general counsel.
Apart from that, you may answer.
THE WITNESS: In connection with the production and response to discovery requests made in the case, the communications became knowledge to the firm.
BY MR. COLE:
Q Are you talking about Mr. Parres's text messages?
A Yes.
Q Any other communications?
A I believe it was primarily text messages.
Q Okay. And just as a general time frame, was that sometime in July of this year?
MR. SHANKLIN: Same objection.

THE WITNESS: I believe the firm -- I think it was later than that, maybe in August.
BY MR. COLE:
Q Okay. And I'm not looking for a specific date. I understand you may not have a specific date, but to the best of your knowledge, the firm became aware of those text messages in August of 2026?
A It -- again, that -- that's not anything I investigated as part of the 30(b)(6) topics, so I'm -- I'm responding my personal recollection. It was maybe mid-July to late July, possibly early August.
Q In Exhibit 34, you'll turn to topic 27. Are you there with me? Oh, sorry.
A I am.
Q And then I also want to direct your attention to topic 19 as well.
A Okay.
Q Okay. So one of the topics that was noticed for Lewis Rice's testimony today was Lewis Rice's -- was topic 19, "Lewis Rice's communications with debtors and FMG via text message or other messaging applications including without limitation WhatsApp." Do you see that?
A I do.
Q Okay. And as part of being prepared to

testify today, what did you do to prepare to testify on that particular topic?
A I spoke with our general counsel regarding the text messages that were downloaded from phones and I did review some text messages, my text messages.
Q Okay. And was that all you did to prepare for topic 19?
A I investigated whether there were any other messaging applications beyond phone text messages that would ever -- were ever used to communicate with FMG and the debtors.
Q How did you conduct that investigation?
A I asked our general counsel whether anything like that was reflected in the IT download.
Q What is the name of your general counsel?
A Tom Berra.
Q How do you spell that last name?
A B-E-R-R-A.
Q And in response to your question as to whether or not there were other messaging applications including without limitation of WhatsApp, what did Mr. Berra tell you?
MR. SHANKLIN: Objection. Calls for privileged communication.
I think you can testify as to what you

learned through your investigation. I don't think you can specifically what Mr. Berra told you.
BY MR. COLE:
Q Well, let me ask this. Did you have, before speaking with Mr. Berra on topic 19, did you have any independent knowledge as to whether or not Lewis Rice used messaging applications including WhatsApp?
A I know that I did not, and I also had -- I didn't ask Larry Parres specifically on that, but I understand that no other messaging applications beyond text messages were used by any Lewis Rice attorneys.
Q And where specifically do you get that understanding?
A From the -- the request by -- to produce our phones and the -- to respond to the request for text messages and other messaging information. And it's my understanding that only text messages were produced as part of that response.
Q Who provided you that understanding?
A I --
MR. SHANKLIN: Objection to the extent it calls for privileged information.
If it's not privileged, you can answer.
THE WITNESS: Yeah, I -- I believe it would've come from our general counsel on that.

BY MR. COLE:
Q Okay. So the information you're providing in response to topic 19 is based on information provided to you by Lewis Rice's general counsel, Mr. Berra?
MR. SHANKLIN: Objection. Form. Misstates the testimony.
THE WITNESS: Yes. Any information I received about what was being produced came from Mr. Berra.
BY MR. COLE:
Q And I understand the production aspect. That's an action that's done by your lawyers in this case to produce that information. This asks a little bit more as to what actually exists. Do you understand that?
MR. SHANKLIN: Objection. Form.
THE WITNESS: I don't.
BY MR. COLE:
Q Okay. So this topic is Lewis Rice's communications with debtors and FMG via text messages. Let's stop there. You know that Lewis Rice communicated with debtors via text message; accurate?
A Yes.
Q Okay. Did you gain that understanding from

Mr. Berra?
A Well, also, I had text messages with some FMG parties.
Q How did you learn that Mr. Parres had text messages with any of the debtors?
A There were text messages, as I recall, some text messages on which I was a party with Mr. Parres and Mr. Parres also told me that he -- so to qualify my response, Mr. Parres also told me that he had text messages with the debtors.
Q When did he tell you that?
A Well, some, again, some text messages. There were some that I was on, but beyond that, it would've been in the July time frame when the messages were being downloaded, produced.
Q Same question for FMG. What did you do to determine how Lewis Rice communicated -- or sorry, whether Lewis Rice communicated with FMG via text messages?
A It -- same thing. It -- it would -- it was discussions with our IT and counsel as to what text messages between any Lewis Rice and FMG parties existed.
Q So I'm going to ask you a little bit more specific on this topic. Did Larry Parres communicate

with any of the debtors via a message application other than text messages?
A Not that I'm aware of.
Q Okay. What did you do to, before coming here today to testify, what did you do to prepare to determine whether or not Mr. Parres used a messaging application to communicate with debtors other than text messages?
MR. SHANKLIN: Objection. Asked and answered.
THE WITNESS: Yeah, I spoke with our general counsel about the production of messages in response to the requests.
BY MR. COLE:
Q Did you ask your general counsel whether Mr. Parres used messaging applications other than text messages to communicate with the debtors?
MR. SHANKLIN: Objection. Calls for privileged information.
Instruct you not to answer.
MR. COLE: So just to clarify on the record, the witness has testified multiple times now how he's spoken with the general counsel to gain information in order to respond to number 19.
The information that he's received and

is relying upon to testify here today is not privileged 'cause it's not information he otherwise had.

To the extent that you want to claim privilege and instruct, that's fine. We can handle that later. But I just want to put that on the record that if the witness is relying on any information provided by the general counsel in order to testify on these topics, there is no privilege to that.

MR. SHANKLIN: I think you can ask him what he learned. That question was a specific question and answer as between counsel and I think that that's off limits, but I've got no problem with you asking him what he's learned and who he learned it from.

MR. COLE: But you're going to object to the specific question and answer that underlies what he learned?

MR. SHANKLIN: Yes.

BY MR. COLE:

Q Okay. What did you learn about Mr. Parres's use of messaging applications other than text messages to communicate with the debtors from Mr. Berra?

A I don't know that we had a specific discussion on that topic. My investigation on this

was to find out what was being produced in response to this request, to the document request, and I learned that it was all text messages.

Q Okay. So can you say one way or the other today whether Mr. Parres used a messaging application other than WhatsApp to communicate with the debtors?

MR. SHANKLIN: Objection. Form. You said, other than WhatsApp?

MR. COLE: I'll rephrase if I said that.

BY MR. COLE:

Q Can you testify one way or the other whether Mr. Parres used a messaging application other than text messages to communicate with the debtors?

A Only to the extent that I know we -- we, Lewis Rice, responded with all messages that -- that we could find and locate and they were all text messages.

Q You're aware that Mr. Parres communicated with the debtors via email; right?

A Yes.

Q Do you know if Mr. Parres used any email address other than his Lewis Rice email to communicate with debtors?

A I did not investigate that specifically in

connection with the -- the 30(b)(6), but I'm not aware of any emails outside of the Lewis Rice email communication.

Q Did you investigate whether any Lewis Rice attorney communicated with the debtors using non-Lewis Rice email?

MR. SHANKLIN: Objection. Scope of the deposition notice.

You may answer if you have personal knowledge.

THE WITNESS: Yeah, I did not investigate as part of the 30(b)(6). My only understanding would be my personal recollection and personal understanding, and that is that there were no other communications outside of Lewis Rice email communications.

BY MR. COLE:

Q Have you reviewed the text messages between Lewis Rice attorneys and the debtors?

MR. SHANKLIN: Objection. Form.

THE WITNESS: I've reviewed some of them.

BY MR. COLE:

Q And which ones?

A I've -- I've seen, I believe the text

messages between Larry Parres and debtors' representatives and then any text messages that I was on between Mr. Parres and debtors' representatives. Believe that was the -- I believe that's it.
Q When was the last time you spoke with Mr. Parres?
A We had a -- I spoke to him with my counsel on last Friday in preparation for learning information for my 30(b)(6) investigation.
Q And you asked Mr. Parres questions and he provided answers?
A I did not ask him specific questions. The questions were being asked by various counsel and discussion topics on these topics were discussed and so the questions were not coming from me, but they were coming from others.
Q Do you know, do you recall on what topics you sought Mr. Parres's input?
A Almost all of them. I can't tell you specifically which ones, but I believe all -- all of them.
Q Okay. You testified earlier that you had reviewed texts between Mr. Parres and the debtors' reps. What reps from the debtors?
A It would've been Samantha Schwope, Tory

Schwope. Jessica DeGregorio I believe was on some. That's all I can recall.

Q Do you remember when you reviewed those text messages?

A Not specifically, but within the last month.

Q When you say "within the last month," within the month of September?

MR. SHANKLIN: Objection. Form.

THE WITNESS: I'd say within the last 30 to 45 days.

BY MR. COLE:

Q Did you review those text messages in preparation to testify as the corporate representative or in another capacity?

A In connection with -- I -- I did review them in connection with the 30(b)(6) corporate representative representation. I believe I also saw them earlier before I was designated in connection with the production or gathering information for production in response to discovery.

Q I believe you testified earlier that there were some concerning aspects of those text messages; is that accurate?

A The firm had some concern, yes, concerns about some text messages.

Q What were those concerns?
MR. SHANKLIN: Objection. Beyond the scope.
If you have specific information, you may answer in your personal knowledge.
THE WITNESS: Yeah, my personal knowledge and understanding is that some text messages didn't meet standards that Lewis Rice expects of its communications.
BY MR. COLE:
Q And what are those standards?
A The -- the standards of -- that Lewis Rice has set and communicated and discussed with its attorneys about communicating with clients by text message.
Q The standards of professional conduct?
MR. SHANKLIN: Objection. Calls for a legal conclusion. Calls for improper opinion testimony. Outside the scope of the designated topics.
You may answer from your personal knowledge.
THE WITNESS: Yeah, no personal knowledge of any determination or discussion about rules of professional conduct.

BY MR. COLE:

Q Is there a specific policy at Lewis Rice that those communications violate?

MR. SHANKLIN: Objection. Outside the scope.

If you have personal knowledge, you may answer.

THE WITNESS: There are standards expected of Lewis Rice attorneys.

BY MR. COLE:

Q What are those standards?

MR. SHANKLIN: Objection. Form. Outside the scope.

If you have personal knowledge, you may answer.

THE WITNESS: Yeah, it -- it's not a specific policy. It's expectations that the firm and management expects of its attorneys.

BY MR. COLE:

Q And I'd like to understand what those expectations were that raised the concern in those text messages.

MR. SHANKLIN: Objection.

BY MR. COLE:

Q What was that? What were some of the

standards that those text messages raised concerns about?
MR. SHANKLIN: Objection. Scope. Objection. Asked and answered.
You may answer if you know.
THE WITNESS: Yeah, I did not investigate anything like that in connection with the 30(b)(6) corporate rep designation. As a general matter, Lewis Rice does not want communications between, you know, lawyers and clients.
BY MR. COLE:
Q Would that include communications between lawyers and former clients?
MR. SHANKLIN: Objection. Same objections.
THE WITNESS: I don't believe there's any formal policy expectation on that front, if there's communication with former clients that may become future clients, again, I don't know that there would be a expectation one way or the other on that.
BY MR. COLE:
Q The standards that Lewis Rice was concerned about, did those concern conflicts of interest?
MR. SHANKLIN: Objection. Outside the scope. Calls for a legal conclusion.

You may answer if you know.
THE WITNESS: Yeah, I -- I don't know and I -- yeah, I don't know on that.
BY MR. COLE:
Q Following the first time you became aware of the text messages involving Mr. Parres that you've been speaking about, did Lewis Rice conduct an investigation regarding his conduct?
A No.
Q Did Lewis Rice conduct an investigation regarding Mr. Parres's conduct at any time relating to these cases?
A No.
Q Outside of your counsel, who have you spoken with about Mr. Parres's text messages?
MR. SHANKLIN: Objection. Form.
THE WITNESS: My general counsel at Lewis Rice.
BY MR. COLE:
Q Anybody else?
A No.
Q Did you have a conversation with Mr. Parres about his communications?
MR. SHANKLIN: Objection. Form. You said communications. Did you mean --

MR. COLE: I'll make that clear.
BY MR. COLE:
Q Did you have a conversation with Mr. Parres about the text messages you've referenced?
A I had a conversation about him producing the text messages.
Q What was that conversation? How did you produce these text messages?
A He told me that he had them downloaded and produced.
Q That was about how they were collected from his phone?
A Yes.
Q Did you have a conversation with him about the content of those text messages?
A Not specifically about any specific text messages.
Q What about in general? Did you ask him, why did you send these text messages?
A I did not.
Q Okay. Did he tell you why he sent the text messages?
A He did not.
Q Handing you Exhibit 35.
//

(Exhibit 35 was marked for identification.)

These are the text messages that have been produced to us involving -- well, from Larry Parres's phone. They aren't bound, so we'll have to try to keep them together, but they are Bates labeled. Do you see that it begins with Bates LEP 1?

A I do.

Q And it ends, if you want to look, with Bates number LEP 287. Do you see that?

A I do.

Q When you reviewed Mr. Parres's text messages that you were referencing earlier, was it in a similar form to this?

A Similar, but -- generally similar.

Q And it's difficult because at the top, you can see on the right-hand side, you'll see Mr. Parres's probably email address there and his phone number; right?

A I see his email address and yes, I see a phone number.

Q And then on the left-hand side, on all of these, there's either phone numbers or names. I'm just trying to orient you.

A Yeah.

Q You see that?
A I see messages and phone numbers and some names and some in the left-hand upper corner.
Q When you reviewed Mr. Parres's text messages for the first time somewhere in the last 30 to 45 days, did you review an amount that looks like this or was it a smaller amount?
MR. SHANKLIN: Objection. Form.
THE WITNESS: Probably a smaller amount if I recall, but not by a significantly smaller amount.
BY MR. COLE:
Q Did you ask to review his text messages?
A No.
Q Okay. They were provided to you by somebody?
A Yes. Yes.
Q The set of text messages that you received, after reviewing those, did you ask to see more?
A No.
Q After reviewing the set of text messages that you reviewed 30 to 45 days ago, have you reviewed Mr. Parres's text messages since that time?
A No.
Q Did you, before coming here today, did you

review the text messages of any other Lewis Rice attorney besides Mr. Parres?

MR. SHANKLIN: Objection. Asked and answered.

THE WITNESS: My -- the text messages on which I was a party, I reviewed those.

BY MR. COLE:

Q Was that in a similar form that you see in Exhibit 35?

A I think I just reviewed them on my phone.

Q You just went back to the text message app on your phone and looked through ones that you had?

A Correct.

Q Okay. Did you search for particular recipients of those text messages to review?

A No.

Q How did you decide which texts to review?

A I, by timing, I would try to remember who I may have had text messages with and so I'd find their name and then look for any text messages with them in my contacts.

Q When did you -- when did -- strike that.

When did Lewis Rice first start representing the debtors in this matter?

MR. SHANKLIN: Objection. Form.

THE WITNESS: And since we agree that "this" matter means the bankruptcy case, the formal representation was when the bankruptcy court approved our -- our application, but Lewis Rice was engaged by the debtor parties in early February of 2025 to assist in and work out discussions. Lewis Rice St. Louis was engaged in early February 2025.

BY MR. COLE:

Q You said "Lewis Rice St. Louis." Is that different from Lewis Rice LLC?

A There's a -- we have two offices, Lewis Rice Kansas City, and Lewis Rice St. Louis. So sometimes we think of them as separate offices.

Q Is it just like a colloquial reference as opposed to an official corporate distinction?

A They are separate corporate entities, but all under an -- an umbrella.

Q So when we speak of Lewis Rice being engaged to represent any of the debtor entities, do you make a distinction between Lewis Rice, the umbrella and Lewis Rice St. Louis?

A No. But you had asked about representing them in this matter. And -- and we had agreed that "this matter" means the bankruptcy case.

Q Does your answer differ if I asked if it's

Lewis Rice Kansas City?
A Yes. Lewis Rice Kansas City had also been engaged in December of '24 to assist the debtors in discussions with Frontier Farm Credit.
Q How did you learn about that December 2024 engagement?
A Well, I spoke with Louis Wade, who is the attorney in our Kansas City office who had the engagement with the DCA companies to negotiate with Frontier.
Q When did that engagement begin?
A In December of 2024, mid-December of 2024.
Q What clients engaged Lewis Rice to provide those services in December of 2024?
A Whatever the engagement letter stated. My investigation review indicated that it was DCA Outdoor and all of its affiliates, and I believe Tory Schwope was also included in that because Tory Schwope is a co-borrower under that facility.
Q When you say "DC Outdoor and all of its affiliates," do you have a list of those entities that you can provide me now or is it just by memory?
A Oh, I couldn't provide you the complete list. There were 20 plus of those.
Q Was Valley Hill Tree Farm on that list of

affiliates?
A I believe that they were on that list because the DCA parties understood Valley Hill at that time to be a borrower under the Frontier facility.
Q What about Rio Verde? Does that name sound familiar?
A I remember that name. I can't tell you for sure whether that was included in that December 2024 engagement.
Q Before coming here today to testify, did you look at that engagement letter?
A I -- I have not seen the engagement letter. I spoke with Louis Wade about that engagement letter.
Q What did you ask Mr. Wade?
A I didn't ask him anything specifically. It was a part of a discussion of which I was a part and which we discussed that engagement.
Q Okay. What questions were asked of Mr. Wade?
A When did the engagement begin and what were -- what was your understanding of the engagement.
Q What was his response to the question of when the engagement began?
A December of 2024.
Q Aside from Mr. Wade telling you that the

engagement began in December of 2024, did you undertake any investigation to determine more specifically when that began?
A I learned from our counsel that there --
MR. SHANKLIN: Don't -- privileged.
BY MR. COLE:
Q So the answer is yes, potentially from a conversation with counsel?
A Yes.
Q Okay. Aside from your conversation with counsel, did you undertake any other invest -- aside from your -- strike that.
Aside from your discussion with counsel and Mr. Wade, did you undertake any investigation to determine when that engagement began --
A No.
Q -- in December of 2024?
A No.
Q What was the scope of that engagement?
A My understanding is that it was to represent DCA and the co-borrowers in a forbearance agreement that Frontier was seeking.
Q And Lewis Rice provided those services?
A They reviewed the forbearance agreement and offered comments to the forbearance agreement.

Q Outside of the -- well, let's talk about these in two categories. There's a representation of the debtors that begins in February of 2025 that you testified about; right?
A Correct.
Q There's a representation involving the debtors that began in December of 2024; right?
A They were debtors under the credit facility at that time, yes.
Q Did Lewis Rice St. Louis, Kansas City, any other group represent any of the debtors at any other point in time?
A No.
Q Did Lewis Rice, including St. Louis or Kansas City, represent Tory Schwope in any other point in time?
A No.
Q You referenced earlier you made a distinction between when Lewis Rice was engaged by the debtors and when they sought approval to be retained by the bankruptcy court. Do you recall that?
A Yes.
Q When Lewis Rice sought approval to be retained by the bankruptcy court, was there a disclosure that Mr. Schwope was a Lewis Rice client?

A I don't recall specifically what was in the application to that effect.
Q If Lewis Rice -- if Mr. Schwope was a client, Lewis Rice should disclose that to the bankruptcy court. You'd agree with that; right?
MR. SHANKLIN: Objection. Calls for -- opinion testimony calls for a legal conclusion. Outside the scope of the topics.
You may answer if you know.
THE WITNESS: If it's material to the representation, then a disclosure to that effect would sometimes be applicable.
BY MR. COLE:
Q Mr. Schwope was either the 99 percent or 100 percent owner of the debtor entities; is that right?
A He owned 99 percent of some of the debtor entities and a hundred percent of some of the other debtor entities.
Q Lewis Rice viewed him as the primary principal of the debtors; is that right?
MR. SHANKLIN: Objection. Beyond the scope.
You may answer if you know.
THE WITNESS: Because Mr. Schwope was the owner and primary decision-maker, he was the party

through which we could communicate with the debtors.
BY MR. COLE:
Q Mr. Schwope was also the beneficial owner of non-debtor entities that were affiliated with the debtors; right?
MR. SHANKLIN: Objection. Beyond the scope.
You may answer if you have personal knowledge.
THE WITNESS: Yeah, I believe there was -- there were at least one or two other entities affiliated with the DCA entities of which Mr. Schwope was an owner or majority owner.
BY MR. COLE:
Q One of those is Valley Hill Tree Farms; right?
A Correct.
Q Another was Rio Verde?
MR. SHANKLIN: Objection. Beyond the scope.
You may answer your personal knowledge.
THE WITNESS: Yeah, I don't recall on Rio Verde. I do recall on Valley Hill.
BY MR. COLE:
Q What was the second one?

A I don't know.
Q You don't know what the second entity was?
A I said there were one or two other that --
Q At any point in time, did Lewis Rice disclose to the bankruptcy court that it had represented Valley Hill Tree Farm as a client?
MR. SHANKLIN: Objection. Beyond the scope.
You may answer if you have personal knowledge.
THE WITNESS: No. There were carryover footnotes in pleadings that were scrivener's errors that suggested that the Valley Hill was a debtor, but they were never a bankruptcy debtor.
BY MR. COLE:
Q And my question was more about Lewis Rice's representation of Valley Hill Tree Farm as a client. Valley Hill Tree Farm was a Lewis Rice client; correct?
A In -- only in connection with the belief that Valley Hill was a borrower from Frontier. And so Valley Hill was included in an engagement letter along with the 20 some-odd other borrower entities.
Q And are you referencing the December 2024 engagement letter?

A Yes.
Q Okay. When did Lewis Rice end the engagement with Valley Hill Tree Farm?
A I -- I don't know.
Q There was never an official -- never a disengagement letter?
MR. SHANKLIN: Objection. Beyond the scope.
You may answer if you have personal knowledge.
THE WITNESS: Yeah, I've not investigated that and I do not know.
BY MR. COLE:
Q Okay. When did -- well, strike that.
Did Lewis Rice ever disengage from its representation of Tory Schwope?
MR. SHANKLIN: Same objection. Form.
THE WITNESS: Mr. Schwope, the representation was, again, as part of him being a co-borrower under the loan in that December 2024 engagement. I don't know if there was any formal disengagement with respect to Tory Schwope, but he was not a client when we undertook the bankruptcy representation.
//

BY MR. COLE:

Q What investigation have you done to determine whether or not Tory Schwope was a client when Lewis Rice undertook the bankruptcy investigation?

A There was a conflicts check that was run by our office. It identified Tory Schwope as a adverse or a -- a party. I don't know if it was identified as adverse, but because his interests were aligned with the debtors, that was not determined to be any kind of conflict.

Q So Lewis Rice identified Mr. Schwope as a current client when it ran the conflicts check to take on the bankruptcy matter?

MR. SHANKLIN: Objection. Form. Misstates the testimony.

THE WITNESS: Yeah, I don't -- I don't think that was of the -- the input. Tory Schwope is a party involved with the debtors, and when we run conflicts checks, we check against all associated parties, including owners and parties affiliated with the potential client.

BY MR. COLE:

Q Does Lewis Rice's conflict check system identify or does it generate a report?

MR. SHANKLIN: Objection. Beyond the scope.
You may answer to your personal knowledge.
MR. COLE: Well, hold on. That is a topic in the notice.
MR. SHANKLIN: Okay.
MR. COLE: It's number 2, "Lewis Rice conflicts check related to the engagement, steps taken to address any potential or actual conflicts."
MR. SHANKLIN: Yeah, but your question was about the conflict system generally. So I don't think that's reasonably specific.
But, again, if you have personal knowledge, you may answer.
THE WITNESS: Yes, there is a conflict or a -- a report that is generated.
BY MR. COLE:
Q Was a report generated when Lewis Rice performed a conflicts check related to this engagement?
A I can't specifically say yes or no. It certainly would've been in accord with standard practice.
Q How do you know that?

A Because all conflicts checks are run through a conflicts check system in the office.
Q Did you ask anybody about the specific conflicts check that was run related to this engagement?
A I searched to see if I could find any conflict check email confirmation.
Q When you say you searched, what did you search?
A The email -- emails that we have with respect to DCA.
Q Did you go on your firm-issued laptop and search your email for this?
A I think it was on my -- I don't use desk or laptops as much as some, so I was, I think, in the office.
Q Okay. So you used a desktop, not a laptop. Is that what you're saying?
A Yes.
Q Okay. What specifically did you search?
A Emails around the time of the engagement.
Q How did you access these emails?
A There's emails of -- we -- we have a whole file of all DCA emails.
Q Is it in the Lewis Rice internal file

management system like iManage?
A No, it was just emails that -- that are saved in a email cabinet.
Q In an electronic email cabinet?
A Yes.
Q Okay. Did you go to Outlook to access this email cabinet?
A Yes.
Q Is that where you go to view your email every day?
A Yes.
Q Okay. Where'd you go specifically to look for this? It was in a specific file that's in your email?
A There's a cabinet for DCA emails.
Q Is that something that you set up on your computer?
A I set up cabinets, yes.
Q Okay. And do you drag and drop emails over to this cabinet?
A Yes.
Q So you reviewed emails that were in a DCA Outdoor cabinet that you yourself had personally dragged over there at some point in time?
A Well, there's -- there are emails that --

yes, not necessarily emails that -- that came to me, but they could have -- they came to me, but they were -- came to multiple parties.

Q Do other people put emails in that cabinet that you're referencing?

A Not in my personal cabinet.

Q Okay. So this is your personal email cabinet?

A Yes.

Q Outside of looking for emails in your personal email cabinet, did you undertake any steps to determine how Lewis Rice conducted a conflict check related to this engagement?

A Yeah. Spoke with Larry Parres about the conflicts check.

Q When did you speak with Mr. Parres about the conflicts check?

A I know we spoke with it this past Friday.

Q What did Mr. Parres tell you about the conflicts check?

A That he ran a conflicts check, that our conflicts attorney should have received the report and provided that, a -- a report to Mr. Parres.

Q Did Mr. Parres tell you that he recalled receiving a conflicts check report?

A I don't recall that specific discussion.
Q Did you ask Mr. Parres whether any specific entity appeared on that conflicts check?
A No.
Q Beyond Mr. Parres describing what generally happens in a conflicts check, did he give you any specific information about what happened in this particular instance?
MR. SHANKLIN: Objection. Misstates the testimony.
THE WITNESS: Yeah. Could you state that again?
BY MR. COLE:
Q Yeah, you said that the conflicts -- you said that Mr. Parres told you that the Lewis Rice conflicts attorney should have sent him information about the conflict. Did he?
A Oh, I don't know.
Q So suffice to say, you don't know what information did or would have appeared on a Lewis Rice conflict check performed for this engagement that we're talking about here today?
MR. SHANKLIN: Objection. Form.
THE WITNESS: No, it -- it -- the conflicts check would've included all the potential

debtors in the case and parties related to the debtors in the case.
BY MR. COLE:
Q You're using your past experience as to what would normally appear on conflicts checks information to provide that testimony; correct?
A And my recollection of the conflicts check that was sent because it goes to all attorneys in this case.
Q That's a conflict check you've not laid eyes on; right?
A No, I have seen that. I -- I recall seeing that.
Q You recall back in early 2025 seeing something?
A Early -- yes.
Q Okay. But you've not found that email that you recall seeing; correct?
A I can't --
MR. SHANKLIN: Objection. Form.
THE WITNESS: I can't say that I've gone back and looked at that in the last 30 days.
BY MR. COLE:
Q Well, you testified earlier that you went back and you looked in this electronic cabinet that's

within your email to look for the conflicts check email that you would normally expect to receive, and you did not find that email; is that accurate?
A No. I was looking for any emails around that -- that window of time. Conflicts emails typically I delete because that's the end of the review, so.
Q Does Lewis Rice have a conflicts check system?
A Yes.
Q The system that you can log into and review conflicts checks?
MR. SHANKLIN: Objection. Scope.
You may answer if you have personal knowledge.
THE WITNESS: Yeah, I'm not aware of any system that we can log into and review conflicts or past conflicts or anything like that. There may well be one that exists. I don't know how to access it.
BY MR. COLE:
Q So outside of your personal recollection of receiving something related to a conflict check in this engagement and speaking with Mr. Parres, did you undertake any investigation to determine what

conflicts check was run before being engaged in February of 2025?

A Yeah. Spoke with Louis Wade about his conflicts check and I've seen the email conflict check. I've seen email to the effect of what Mr. Wade was running conflicts check on.

Q And you're speaking of Mr. Wade's conflict check that would've been related to the Lewis Rice engagement in December of 2024?

A Yes.

Q Okay. I'm asking about the Lewis Rice engagement in February of 2025. Outside of your memory of seeing an email and your conversation with Mr. Parres, did you undertake any investigation to determine what specific conflicts check was run before agreeing to that engagement?

A No. No further specific investigation of the exact conflict email that was run.

Q So can you testify today about the specific individuals or entities that appeared on that conflicts check?

MR. SHANKLIN: Objection. Beyond the scope.

You may answer.

THE WITNESS: Yeah, I've -- I can't

recite you all 20 some-odd parties, 20 plus, that may have appeared on any conflicts check. I know that all the potential debtors were included in that conflicts check.

BY MR. COLE:

Q You know that 'cause that would be standard practice?

A I know that 'cause I recall that conflicts check being run because I had to assist in getting that list of -- of parties together to give to an assistant to run that conflicts check.

Q Did Mr. Schwope appear on that conflict check?

A I believe so because, again, any party affiliated with a debtor is typically included in a conflicts check.

Q And I'm asking now for your, John Hall's personal recollection. Do you recall seeing Mr. Schwope's name on that conflicts check?

A I can't say for sure.

Q Okay. So when you're giving me the testimony about whether it appeared, you're basing that on what has typically happened in the past; right?

A Yes.

Q Okay. Did Valley Hill Tree Farm appear on that conflicts check?
A I'm -- I'm confident that it did.
Q Okay. But you don't know that it did; right?
MR. SHANKLIN: Objection.
Same caveat. You can testify as to your personal knowledge.
THE WITNESS: Yeah, my personal, I can't recall personally what -- whether Valley Hill was on that 'cause I can't specifically recite to you all the parties that were on that conflicts email.
BY MR. COLE:
Q Before coming here today, have you asked anybody about whether Valley Hill Tree Farm appeared on a conflicts check that was run before the February 2025 engagement?
MR. SHANKLIN: Beyond the scope.
You may answer.
THE WITNESS: Yeah, I did not personally ask anybody about that.
BY MR. COLE:
Q Who at Lewis Rice was responsible for clearing any potential conflicts that were identified on a conflicts report related to the February 2025

engagement?
A We have a conflicts partner that will identify potential conflicts, so he will initially highlight any potential conflicts.
Q What conflicts did that conflicts partner highlight with regard to the February 2025 engagement?
MR. SHANKLIN: Objection. Beyond the scope.
You may answer.
MR. COLE: For the record, it's not beyond the scope. Topic 2 is "Lewis Rice's conflicts check relating to the engagement and the steps taken to address any potential or actual conflicts." It is within the scope.
THE WITNESS: Yeah, I, based on my investigation, if I'm recalling, Tory Schwope was identified as a potential conflict, but that his interests were aligned with the debtors.
BY MR. COLE:
Q Were Mr. Schwope's interests always aligned with the debtors?
A That would -- I would --
MR. SHANKLIN: Objection. Form. Calls for a legal conclusion.
You may answer.

THE WITNESS: What -- you mean from 15 years ago, 20 years ago?
BY MR. COLE:
Q Let's start in February of 2025 --
MR. SHANKLIN: Same objection.
BY MR. COLE:
Q -- until December of 2025. Were Mr. Schwope's interests always aligned with the debtors?
MR. SHANKLIN: Sorry. Same objection.
THE WITNESS: During our representation, yeah, I believe they were.
BY MR. COLE:
Q Did Mr. Schwope have an interest in any entities that had interest adverse to the debtors?
A Depends on what you mean by "adverse," but I'm not aware of any interests that Mr. Schwope had that were adverse to the debtors.
Q Were there entities -- strike that.
Were there entities affiliated with the debtors who had interests adverse to the debtors?
MR. SHANKLIN: Objection. Calls for legal conclusion.
Is that on a -- are you asking a specific topic?
MR. COLE: Yes. I think it's related

to a bunch of them.
BY MR. COLE:
Q Let me be more specific. Mr. Hall, you're aware of Valley Hill Tree Farm; right?
A I've heard the name, yes.
Q Yeah. You're aware of that entity, aren't you?
A Yes.
Q I mean, you provided hundreds of hours of services, you know, regarding this bankruptcy and Valley Hill Tree Farm was a known entity throughout that bankruptcy; right?
MR. SHANKLIN: Objection. Compound.
THE WITNESS: They were a -- a known entity because Mr. Schwope had an ownership interest in Valley Hill.
BY MR. COLE:
Q And what was the affiliation between Valley Hill Tree Farm and any of the debtors?
A Valley Hill was a supplier to the debtors of tree inventory or sold trees to the debtors.
Q You're aware there was a dispute as to whether or not there was a lease between Valley Hill Tree Farm and one of the debtors?
MR. SHANKLIN: Objection. Form.

THE WITNESS: I'm not aware of any dispute about whether there was a lease.

BY MR. COLE:

Q Do you believe there was a lease?

MR. SHANKLIN: Objection. Calls for legal conclusion. Calls for opinion testimony.

THE WITNESS: I've seen a -- a copy of a lease, yes.

BY MR. COLE:

Q Was that lease signed?

A I don't recall. I don't believe so. It was in a data room that we had assembled with all other leases and documents and information.

Q So you're aware of a draft unsigned lease involving Valley Hill Tree Farms and what debtor entity?

A It would've been one of the DCA Land companies. I don't recall which one.

Q The DCA Land Kentucky Sound familiar?

A That could be.

Q If that lease were invalid, you would agree with me that that would be beneficial to the debtor DCA Land Kentucky; right?

MR. SHANKLIN: Objection. Calls for speculation. Calls for legal conclusion. Calls for

expert opinion.
You may answer.
THE WITNESS: Yeah, I don't know. Without knowing the terms of the lease and the purpose of the lease, I -- I couldn't answer that.
BY MR. COLE:
Q As part of your services in these bankruptcy cases, did you make any effort to determine whether the terms of a lease between Valley Hill Tree Farm and a debtor entity were enforceable?
MR. SHANKLIN: Objection. Same objections.
You can answer.
THE WITNESS: Yeah, I did not investigate that in connection with the corporate rep and I was not involved with that, the -- the lease aspect.
BY MR. COLE:
Q Were you involved in any conversations among the Lewis Rice attorneys during which a potential lease involving Valley Hill Tree Farm was discussed?
A Yes.
Q Who was involved in those discussions?
A Larry Parres.
Q And you?

A Yes.
Q What was discussed?
A Larry told me that -- that Tory Schwope had requested a copy of a lease in connection with assumption assignment of leases.
Q When did that conversation take place?
A I -- I don't recall specifically. I want to say sometime in October of 2025.
Q Before October of 2025, had the concept of a Valley Hill Tree Farm lease been discussed among the Lewis Rice attorneys?
A No.
MR. COLE: Probably a good time to take a break.
THE VIDEOGRAPHER: The time is 10:28 a.m. We're off record.
(Off the record.)
BY MR. COLE:
Q Did Mr. Parres ever ask you to delete any text messages?
A No.
Q Have you deleted any text messages involving Mr. Parres from your phone?
A No.
Q Okay. Do you regularly delete any text

messages from your phone?
A No.
Q Are you aware of Mr. Parres asking others to delete their text messages?
A Yes.
Q When?
MR. SHANKLIN: Objection to form.
BY MR. COLE:
Q Provide -- give me the instances in which you're aware of Mr. Parres asking others to delete their text messages.
A In reviewing the text messages that I saw from Mr. Parres in this case, I saw a text message to that effect.
Q Was that text sent while Lewis Rice was still retained as counsel for the debtors?
A I believe so.
Q Is that one of the concerns of which you were speaking about earlier in your deposition?
MR. SHANKLIN: Objection. Beyond the scope.
If you have personal knowledge, you may answer.
Form too.
THE WITNESS: Yeah, I don't -- I don't

have personal knowledge of any specific concerns.
BY MR. COLE:
Q Where are you getting the knowledge of concerns regarding Mr. Parres's text messages if you don't have personal knowledge of those concerns?
MR. SHANKLIN: Objection. Form.
THE WITNESS: From our general counsel.
BY MR. COLE:
Q When you reviewed Mr. Parres's text messages, did it raise concerns for yourself?
A Yes, that's fair to say.
Q So you do have personal concerns relating to some of Mr. Parres's text messages?
A That's fair.
Q What concerns do you have regarding Mr. Parres's text messages?
MR. SHANKLIN: Objection. Beyond the scope.
You may answer to your personal knowledge.
THE WITNESS: Some texts to that effect I would not agree with.
BY MR. COLE:
Q What specifically wouldn't you agree with?
MR. SHANKLIN: Same objection.

THE WITNESS: Anything regarding deletion of information.
BY MR. COLE:
Q What else?
MR. SHANKLIN: Same objection.
THE WITNESS: I don't have personal knowledge of other concerns as we sit here.
BY MR. COLE:
Q So as you sat down and reviewed Mr. Parres's text messages, the one concern you came away with was his request for people to delete text messages?
A That was a concern, yes.
Q Okay. Were there other concerns that you had?
A Just the general volume of communications.
Q What do you mean by "the general volume of communications"?
A Just normally when I communicate with clients, I like to communicate by email.
Q So you mean the volume of text communications with clients?
A Yes.
Q Okay. You've listed your concerns being communications about deleting messages and the general volume. Were there other concerns that you had after

reviewing Mr. Parres's text messages?
MR. SHANKLIN: Same objection.
THE WITNESS: I don't have any specific recollection of the nature of the text messages that I can recall having concerns about.
BY MR. COLE:
Q Aside from your counsel, have you expressed those concerns to anyone else?
A No.
Q Okay. You have in front of you Exhibit 36.
(Exhibit 36 was marked for identification.)
That's an email from Samantha Schwope dated February 5, 2025. Do you see that?
A I do.
Q Okay. There are many people listed on the to line, but you are included in that list; right?
A Yes.
Q And this is an email sending a signed engagement letter to Lewis Rice; correct?
A Yes.
Q And the engagement letter is attached to the email; right?
A It's attached here, yes.
Q And do you see that there's a listed

attachment on the email, Lewis Rice LLC Engagement Executed?
A I do see that under the attachment heading.
Q Let's turn to the engagement letter. Have you reviewed this engagement letter before testifying here today?
A Yes.
Q Okay. In the -- and this engagement letter is dated February 4, 2025; correct?
A Yes.
Q Do you see in the first paragraph where it talks about, it starts, "The purpose of this engagement letter"? Do you see that?
A I do.
Q Okay. And it talks about that "the scope is to provide legal services for you in connection with the preparation filing of bankruptcy cases for each of your companies listed on Exhibit A"; right?
A Yes.
Q Who's the "you" and "your"?
A Tory Schwope as CEO and the decision-maker for each of the companies and the companies.
Q It references and Exhibit A. I'll represent to you there is no Exhibit A attached to this document. Have you undertaken any investigation to

locate the Exhibit A?
A When -- when I saw this letter, yes. I tried to find and see if there was an Exhibit A.
Q What did you do to try to find the Exhibit A?
A Search our file on this, and also asked Larry Parres about it.
Q When you say searched your file, describe to me what file that is and how you searched it.
A The -- the electronic file that we have of -- of DCA and my emails since I was a recipient of this letter.
Q The electronic file you referenced, is that the client file?
A Yes, the one that we had produced.
Q The one that Lewis Rice retains as well?
MR. SHANKLIN: Objection. Form.
THE WITNESS: There is -- yeah, there are emails that are -- are still available to us.
BY MR. COLE:
Q How did you access that file again?
A In the cabinet that I have of emails, the -- the online email cabinet.
Q Is that different from your personal email cabinet?

A No, same thing.
Q Okay. So the file, the electronic file that you're referencing is the same email cabinet that we talked about earlier today?
A Yes.
Q Does Lewis Rice maintain a client file?
MR. SHANKLIN: Objection. Form.
THE WITNESS: Yes, as in all cases, we maintain a client file.
BY MR. COLE:
Q Did you search that client file for Exhibit A?
A I don't have personal recollection of searching beyond the email files that I have.
Q So before coming here to testify today about the existence of Exhibit A, you didn't look at Lewis Rice's client file; correct?
MR. SHANKLIN: Objection. Form.
THE WITNESS: Well, the emails that I have are part of the client file, so I disagree with that.
BY MR. COLE:
Q So you looked at part of the client file. Is that your testimony?
A Of what I understood to be in the client

file.
Q Does the file you looked at include communications with other Lewis Rice attorneys that you're not on?
A Yes, there are some to that effect.
Q Are all of them in there?
A I don't know. I don't -- can't say for sure.
Q So you've conducted an investigation before coming here today. And can you testify one way or the other whether exhibit A to the engagement letter exists?
A I could testify that my investigation has not found an Exhibit A and as such, we do not -- I do not know of the existence of Exhibit A.
Q Since you've looked through the engagement letter, you know that it doesn't list any specific company; right?
A The email that is part of this exhibit refers to DCA Outdoor specifically, and it refers to Lewis Rice LLC specifically.
Q And the email you're talking about is Mr. Schwope's email @dcaoutdoor.com?
A Well --
MR. SHANKLIN: Objection. Form.

THE WITNESS: Yes. And each of the emails of the respective parties to the email.

BY MR. COLE:

Q What do you mean by "each of the respective parties"?

A There are multiple parties listed, Mike Scott, mike@dcaoutdoor.com. So the dcaoutdoor.com is referred to in Exhibit 36.

Q You're talking about the cover email; right?

A Correct.

Q Okay. I'm asking about the engagement letter.

A Yeah, on the engagement letter itself, the only -- there is a -- a email heading at -- at the top of the letter to tory@dcaoutdoor.com.

Q And this is an engagement letter addressed to Mr. Tory Schwope; correct?

MR. SHANKLIN: Objection. Form.

THE WITNESS: It's --

MR. COLE: Well, what's wrong with my question?

MR. SHANKLIN: I mean, it misstates his prior testimony about who the letter was directed to.

MR. COLE: I'm not asking about his prior testimony. I'm asking if it was addressed to

Mr. Tory Schwope.
BY MR. COLE:
Q Is this letter addressed to Mr. Tory Schwope?
MR. SHANKLIN: Form.
THE WITNESS: Yes, @dcaoutdoor.com.
BY MR. COLE:
Q You're trying to make a distinction with how it's sent? Is that the distinction you're making here?
MR. SHANKLIN: Form.
BY MR. COLE:
Q I'm trying to understand because I see Mr. Tory Schwope and it says, "Dear Mr. Schwope," and I think it's a pretty simple question. Is this letter addressed to Mr. Tory Schwope?
MR. SHANKLIN: Form.
THE WITNESS: It is listed -- Mr. Tory Schwope is listed as a party to the letter @dcaoutdoor.com and the letter says, "Dear Mr. Schwope."
BY MR. COLE:
Q Aside from Mr. Schwope, who else is this letter addressed to?
A The -- Mr. Schwope's companies.

Q Where?
A In the opening paragraph.
Q Point specifically to me where this email is addressed to Mr. Schwope's companies.
A The email?
Q I'm sorry, point to me specifically where the letter is addressed to Mr. Schwope's companies.
A It says, "The purpose of this engagement letter is to provide a written record of the agreement which we have reached to provide legal services for you in connection with the preparation filing of bankruptcy cases for each of your companies listed in Exhibit A attached hereto," the companies.
Q So the companies, we don't know what companies those are 'cause we don't have Exhibit A; is that right?
MR. SHANKLIN: Objection. Form. Argumentative.
THE WITNESS: Well, we do know the companies because we know which companies we were approved by the court to represent based on this engagement letter, which was included with our application to be retained to represent the debtors.
BY MR. COLE:
Q Did you ask -- I think you said you asked

Mr. Parres about the existence of Exhibit A; right?
A I recall having a discussion to that effect about Exhibit A and whether it was created.
Q When was that discussion?
A I don't personally recall when that would've been.
Q Was it in preparation for your deposition today?
A Not as -- as -- no.
Q Was it while Lewis Rice was still retained as counsel for the debtors?
A No.
Q So it was after Lewis Rice was terminated as counsel for the debtors?
A Yes.
Q Okay. Do you know whether it was -- what year you had that conversation with Mr. Parres?
A 2026.
Q Why did you have that conversation with Mr. Parres?
A When objections were filed to our fee application and we reviewed the -- the objections, then the engagement letter was one of the things that we reviewed.
Q And in reviewing that, you determined you

couldn't find Exhibit A; that fair?
A I looked at the letter and was trying to understand whether there was an Exhibit A.
Q And in doing so, you talked to Mr. Parres; right?
A I believe that is correct.
Q Okay. And what did Mr. Parres tell you?
A I don't personally recall what he said.
Q Under the "nature of representation," do you see that header?
A I do.
Q Okay. It says "you," and again, the "you: is Mr. Schwope; right?
A "You," as I read this and as our engagement letters typically do, is the companies including the executive of the companies.
Q This letter references both, "you," Tory Schwope and his companies, though; right?
MR. SHANKLIN: Objection. Form.
THE WITNESS: There are references to "you" and there are references to the companies. That's correct.
BY MR. COLE:
Q And under "nature of representation," it says, "You have asked us on behalf of you and each of

the companies." Do you see that?
A I do.
Q So on behalf of "you," being Tory Schwope; right?
MR. SHANKLIN: Objection. Form.
THE WITNESS: Tory Schwope as CEO and owner of the companies.
BY MR. COLE:
Q Was Lewis Rice acting on behalf of Tory Schwope as CEO?
A No.
Q Okay. Did Lewis Rice -- were there ever discussions at Lewis Rice about Mr. Schwope filing personal bankruptcy?
A Yes.
Q When do you recall those conversations taking place?
A Early in the representation.
Q Who was involved in those conversations?
A Larry Parres, Tory Schwope. And I recall some discussion early because Tory was a co-borrower.
Q And because he was a co-borrower, he had personal exposure?
MR. SHANKLIN: Objection. Calls for opinion testimony, legal conclusion. Outside the

scope.
You may answer to your personal knowledge.
THE WITNESS: Yes, we advised him that he needed his own counsel to deal with any issues as a co-borrower.
BY MR. COLE:
Q When did Lewis Rice advise Mr. Schwope that he needed his own counsel?
A I've seen written communications to that effect, and I also recall those discussions right at the inception of the representation before and after the filing of the bankruptcy cases.
Q I think you said that those conversations involved Mr. Parres, you, and Mr. Schwope; is that accurate?
A Yes.
Q Was anybody else involved in those communications?
A Not that I personally recall.
Q Was this a face-to-face meeting that you had with Mr. Schwope?
MR. SHANKLIN: Objection. Form.
THE WITNESS: There were those discussions, as I recall, both by phone and in

in-person meetings.
BY MR. COLE:
Q The in-person meetings, were there multiple at which Mr. Schwope's need for personal counsel was discussed?
A I don't personally recall how many of the personal meetings that that was discussed.
Q How many do you recall?
A At least one.
Q Okay. When did that one take place?
A I -- I don't personally recall the specific time for that personal meeting. Likely at the first in-person meeting.
Q Before the bankruptcies were filed?
A I don't personally recall whether we met in person prior to the bankruptcy cases being filed or afterwards.
Q Is it fair to say that it was somewhere around the time of the bankruptcy cases being filed?
A I think that's fair.
Q That was a meeting involving you, Mr. Parres, and Mr. Schwope?
A The personal meetings often had multiple parties beyond that there, so I -- I can't say specifically who was involved and who was there at

that meeting.
Q And I'm specifically talking about the meeting where you say Mr. Schwope was advised that he needed individual counsel who was there for that part of the meeting.
A I don't personally recall specifically who would've been there.
Q Did you, John Hall, advise Mr. Schwope that he needed personal counsel?
A I don't personally recall giving that direction to him.
Q Okay. Did you give any direction to him regarding the potential need for personal counsel?
A No.
Q What do you recall Mr. Parres saying, if anything, to Mr. Schwope about his need for personal counsel?
MR. SHANKLIN: I don't want to delay you. Will you point the personal counsel issue on the topic here?
MR. COLE: I'm just asking about his memory right now. It may be a topic and we can get to that, but I'm asking about his recollection.
MR. SHANKLIN: And so I'll object to scope.

To the extent that you have knowledge of what Mr. Parres said, you may answer.

THE WITNESS: Larry would tell Tory, you need personal -- you need your own representation. Some things I can recall the emails saying, "Please seek counsel immediately."

BY MR. COLE:

Q And in case it's helpful, so the first exhibit we marked, which was Exhibit 34, is the topics today. Topic number 7 is "Lewis Rice's communications with Tory Schwope advising him that they did not represent him individually and/or advising him to retain personal counsel." Do you see that?

A I do.

Q Okay. And you were aware of that topic before testifying here today; right?

A Yes.

Q Okay. So are you prepared to testify as to Lewis Rice's knowledge regarding any advice to Tory Schwope to retain personal counsel?

A Yes.

Q You've listed one in-person meeting involving Tory Schwope; correct? I'll redo that.

You've listed one in-person meeting involving Tory Schwope at which Lewis Rice advised him

to obtain personal counsel; is that right?
MR. SHANKLIN: Form.
THE WITNESS: Yes.
BY MR. COLE:
Q Okay. Were there any other in-person meetings at which Lewis Rice advised Mr. Schwope to obtain personal counsel?
A There may have been. But in reviewing time records and talking with Mr. Parres, I don't know if there was any other specific direction to that effect in in-person meetings. It was -- there were many instances of phone discussions to that effect.
Q Okay. Come back to the meetings. You spoke about some things you had looked at. You've mentioned time records; is that correct?
A Yes.
Q Did you look at time records in order to provide testimony in response to topic number 7?
A I looked at time records in an effort to respond to all of the topics.
Q When did you look at those time records?
A Within the last two weeks.
Q And then you say you all -- you spoke with Mr. Parres?
A Yes.

Q Specifically about topic 7?
A Yes.
Q Did you undertake any additional efforts to prepare to respond to topic 7?
A I reviewed all emails that I -- I physically could review. There were several thousands of emails.
Q Were those emails located in the electronic cabinet ion your computer that we've talked about before?
A Yes. And there was also a cabinet that was prepared as part of the production of emails in the case, and so I reviewed that cabinet.
Q Okay. So specifically on topic number 7, let me separate these out, fid you review emails in your personal email cabinet on your Lewis Rice computer?
A In addition to the production cabinets.
Q And then that was going to be my next question. And you also reviewed emails that were produced in this matter; correct?
A Correct.
Q Okay. So you've listed time records, emails, and a conversation with Mr. Parres. Was there anything else you did to prepare to respond to -- to prepare to testify in response to topic number 7?

A No.
Q In your conversations with Mr. Parres, did he identify any meeting other than the one in-person meeting that you referenced earlier at which Mr. Schwope was advised to obtain personal counsel?
A He just mentioned that there were many, many, many times that he told Tory Schwope that Lewis Rice could not represent Tory Schwope.
Q And that's Mr. Parres telling you that in your conversation with him to prepare for topic number 7?
A Yes.
Q Did Lewis Rice advise Mr. Schwope in writing about his need to retain personal counsel?
A Yes.
Q When was that?
A I specifically recall an email on July 22, 2026, that said, "Please seek counsel immediately."
Q Before July 22, 2026, did Lewis Rice advise Mr. Schwope in writing to retain personal counsel?
A Based on my discussions with Mr. Parres, my understanding is that -- that he did. I can't specifically cite to a specific written representation.
Q And let me back up because I think you and I

were maybe confused on a year, but I don't know whether you said it or I said it, but the date I said I know was July 22, 2026.

A Yeah, it --

Q So was that July 22, 2025?

A That's correct.

Q Okay. And so that's an email you specifically recall where Mr. Schwope was advised to please seek counsel?

A Yes.

Q Okay. Was there something that occurred around July 22, 2025, that prompted Lewis Rice's advice to Mr. Schwope to seek personal counsel?

A That was an email from Larry Parres to Tory Schwope. So I don't personally know the genesis of that email.

Q Did you and Mr. Parres have any discussions around that point in time about Mr. Schoop's need to seek personal counsel?

A We had conversations about that before filing of the bankruptcy cases and then throughout the debtors, representation of the debtors.

Q Did you ever express to Mr. Parres that Mr. Parres should tell Mr. Schwope he needs to seek personal counsel?

A I don't personally recall directing that. We had many conversations about Tory Schwope needing to have personal representation because Lewis Rice could not represent him and did not represent him.
Q After the bankruptcy matter is filed -- well, strike that.
From the time that Lewis Rice is engaged in February of 2025 up until the email that you're referencing in July 22, 2025, are you aware of Mr. Schwope retaining personal counsel?
A I'm not personally aware whether he did or did not.
Q Did Lewis Rice ever communicate to Mr. Schwope that they could not talk to him about specific topics because he needed to retain personal counsel?
A Again, I think that -- that I didn't investigate anything about that in connection with corporate representative. I don't personally recall anything to that effect.
Q Was there a time when Lewis Rice communicated with a representative of the debtor other than Mr. Schwope because of a concern that Mr. Schwope needed personal counsel?
MR. SHANKLIN: Objection. Form.
THE WITNESS: Yeah, I'm not -- I'm not

sure I understand. Can you state that again?
BY MR. COLE:
Q Was there ever a time during the pendency of the bankruptcy case where Lewis Rice communicated with a representative of the debtors other than Mr. Schwope because of a concern that Mr. Schwope needed personal counsel?
A I don't personally recall any communication like that.
Q What initially prompted the conversation with Mr. Schwope that he needed personal counsel?
A From the inception knowing that Mr. Schwope was a co-borrower under the loans and that Lewis Rice was only representing the -- the debtor company entities that were borrowers, the expectation was that Mr. Schwope would be sued as a co-borrower under these loans and that he was not protected by the automatic stay and therefore, we could not represent him in his personal capacity and that he should consider separate counsel.
Q Did Mr. Schwope express to Lewis Rice that he had a desire to retain control of the debtor entities?
A He -- he didn't say -- no, not in that sense.

Q So he didn't say those words?
A Correct.
Q Did he convey that intention to Lewis Rice?
MR. SHANKLIN: Objection. Form.
THE WITNESS: He conveyed the importance that he had to the value of the companies and the value that he provided to the companies based on his relationships with customers and other parties.
BY MR. COLE:
Q And the value that he provided was in part related to his control of those companies; is that fair?
A No.
Q So it had nothing to do with Tory Schwope's ability to control any aspects of the debtor entities?
MR. SHANKLIN: Objection. Form.
THE WITNESS: My sense is that it was based on his association and affiliation with the debtor companies that he was confident that if he were not associated with the companies, then the companies would suffer extreme loss in value.
BY MR. COLE:
Q You're aware that Mr. Schwope was opposed to the appointment of chief restructuring officer; right?
A He opposed Frontier's demand for a chief

restructuring officer.
Q Did an entity other than Frontier make a demand for a chief restructuring officer?
A No, we, in discussions and negotiations with Frontier, proposed a chief restructuring officer that Mr. Schwope agreed with.
Q Was Mr. Schwope advised that -- strike that.
Did Lewis Rice advise Mr. Schwope that he should agree to the appointment of a chief restructuring officer?
A We advised -- yes.
Q When did Lewis Rice advise Mr. Schwope that he should agree to a chief restructuring officer?
A It was in -- as part of the DIP negotiations and the effort to -- to have Juanita Schwartzkopf appointed as chief restructuring officer.
Q Did Mr. Schwope resist that recommendation?
MR. SHANKLIN: Objection. Form.
THE WITNESS: I don't personally recall the initial discussions, but he agreed with that proposal.
BY MR. COLE:
Q You say "that proposal." What proposal is that?
A The proposal for Ms. Schwartzkopf to be

appointed as chief restructuring officer.
Q Did Mr. Schwope -- strike that.
Did Lewis Rice obtain a conflict waiver from Mr. Schwope relating to Lewis Rice's representation of the debtors in this matter?
MR. SHANKLIN: Objection. Form.
THE WITNESS: I'm not personally aware of any conflict waiver and in my review of documents, I've not seen a conflict waiver.
BY MR. COLE:
Q Are you aware of any conversations with Mr. Schwope at which it was discussed that a conflict waiver might be required?
MR. SHANKLIN: Objection. Form.
THE WITNESS: I'm not personally -- I don't personally recall any discussion to that effect.
BY MR. COLE:
Q Did Lewis Rice get a conflict waiver from any individual or entity relating to its representation of the debtors in this case?
MR. SHANKLIN: Same objection.
THE WITNESS: I did not ask Louis Wade that question. So I can't speak to whether Louis Wade in Kansas City got any conflict waiver. I'm not personally aware of any conflict waiver that our St.

Louis office obtained.
BY MR. COLE:
Q Do you view the engagement relating to the bankruptcy proceedings as a St. Louis engagement?
MR. SHANKLIN: Objection. Form.
THE WITNESS: Yes.
BY MR. COLE:
Q So you conducted your investigation in order to locate or identify if there were any waivers associated with Lewis Rice's representation of the debtors and the bankruptcy proceedings, and you found none?
A I didn't specifically search for conflict waivers, so my answer is just based on my personal recollection.
Q So you're not aware of any conflict waivers existing relating to Lewis Rice's representation of the debtors in the bankruptcy proceedings?
A Yeah, I'm not --
MR. SHANKLIN: Objection. Asked and answered.
You can answer.
THE WITNESS: I'm not personally aware of any conflict waivers.
//

BY MR. COLE:
Q Did you express to anyone at Lewis Rice the need to have a conflict waiver relating to these bankruptcy proceedings?
A I personally did not.
Q Okay. Did you -- are you aware of anybody at Lewis Rice expressing the need to have a conflict waiver relating to these bankruptcy proceedings?
A No.
Q Did Mr. Schwope ever mention to you the concept of an Everde deal?
A No.
Q Do you have an understanding of what an Everde deal means?
A No.
Q Have you ever heard of the word "Everde"?
A Only in the discovery request that we had received here.
Q So before receiving the discovery request, you had never heard the word "Everde"?
A I don't know if I've -- I can't personally say whether I've ever heard the word "Everde."
Q Okay. And maybe I'm pronouncing it wrong. E-V-E-R-D-E. We're on the same page?
A I think so.

Q Okay. You still have the notice in front of you?
A Yes.
Q Okay. You look at topic 8 for me.
A Yes.
Q At the end there, you know, this is talking about Lewis Rice's knowledge. You understand that; right?
A Right.
Q And it's speaking of "Lewis Rice's knowledge of Tory Schwope's stated desire to," and it lists several things; correct?
A Correct.
Q One of those is his interest in purchasing the debtors' assets from bankruptcy via an Everde deal?
A Yes.
Q Okay. What did you do to prepare to provide Lewis Rice's testimony on topic 8 as it relates to the Everde deal?
A Yeah, I spoke with Mr. Parres about that and reviewed all my time records and reviewed, again, the email, the various email cabinets.
Q Did Mr. Parres -- well, what did Mr. Parres tell you?

A Mr. Parres thought that that might refer to a bankruptcy case in which Frontier Farm Credit had been involved.
Q Were you aware of such a bankruptcy case?
A No.
Q You, John Hall?
A No. Oh, but let me qualify that. Tory had mentioned bankruptcy cases in which he was aware that a nursery company had reorganized.
Q So you said that Mr. Parres thought that that might refer to a bankruptcy case. Did Mr. Parres state that he had a discussion relating to that case with Mr. Schwope?
A I don't think he stated that he had a conversation, but that Mr. Parres believed it referred to a bankruptcy case in which Farm Credit was involved with a nursery company.
Q Did you ask Mr. Parres about any statement from Tory Schwope regarding an interest in purchasing the debtors' assets out of bankruptcy?
A We talked generally about that concept.
Q When was the first time you talked with Mr. Parres about that concept?
A Prior to the filing of the bankruptcy cases.
Q Approximately how many times did that

concept come up during the pendency of the bankruptcy cases?
A Regularly, given that Mr. Schwope is an owner and a natural bidder at a bankruptcy sale for any assets.
Q What steps, if any, were taken to explore Mr. Schwope's ability to buy debtors' assets out of bankruptcy?
MR. SHANKLIN: Objection. Beyond the scope.
You may answer if you have personal knowledge.
THE WITNESS: Yeah, no -- no personal knowledge of -- of that.
BY MR. COLE:
Q Did you have a conversation with Mr. Schwope about his ability to purchase debtors' assets out of bankruptcy?
A No.
Q Okay. Did anybody at Lewis Rice have a conversation about his ability to purchase debtors' assets out of bankruptcy?
A I'm not personally aware of any such discussion.
Q Mr. Schwope's ability to -- strike that.

One of the options to exit bankruptcy could have involved Mr. Schwope purchasing debtors' assets. Is that fair to say?
A I mean, there are many options and avenues that a exit from bankruptcy could take and a sale of assets is always one of the options.
Q Okay. And given that a sale of assets is always one of the options, you need two parties to that, so you need to find a buyer; fair to say?
A Any sale requires a -- a seller and a buyer.
Q Okay. So as part of a potential bankruptcy exit plan, did you discuss with Mr. Schwope his ability to purchase assets at a bankruptcy?
A No.
Q Did you have conversations with any potential buyer as part of a plan to exit bankruptcy?
A When you say "you," you mean Lewis Rice?
Q Yes.
A No, we had no discussions with any buyers 'cause we had not gotten to a plan sale process.
Q Did Lewis Rice have conversations with Mr. Schwope about appointing a governing board over any of the debtors?
A By -- based on my investigation and review of discussions amongst parties, yes.

Q And when did those discussions first take place?
A Based on my review, they were in August of 2025.
Q Did Lewis Rice advise Mr. Schwope that a governing board should be appointed?
A Based on my review and discussions with the parties, yes.
Q What led Lewis Rice to advise Mr. Schwope that a governing board should be appointed in August of 2025?
A Well, to clarify, it -- it wasn't to have a governing board appointed in August of 2025. It was to consider a plan framework in which a governing board could potentially be appointed.
Q So you're saying as part of a bankruptcy or a Chapter 11 plan proposed to the court?
A No.
Q Pre-plan, is that what you're saying?
A Plan negotiations with the parties.
Q Lewis Rice raising the possibility of establishing a governing board, was that in response to a communication from anybody else involved in the bankruptcy?
A Based on my review and recollection, I

believe it was the Committee who proposed the possibility of a governing board.
Q And before that was proposed by the Committee, Lewis Rice had not had a discussion with Mr. Schwope about appointing or establishing a governing board?
A We had discussions with the debtors about a -- a plan structure, but I am not personally aware of any discussions in -- those discussions that involved a new governing board
Q In representing the debtors in these bankruptcy proceedings, did you review the governing documents for the debtor entities?
A I personally did not.
Q Do you know who, if anybody, at Lewis Rice did?
A Yes.
MR. SHANKLIN: Objection. Beyond the scope.
You may answer.
BY MR. COLE:
Q Who reviewed those governing documents?
A My recollection is that Simeon Brown in our office did,
Q Are you aware whether any of those governing

documents call for a board of directors?
MR. SHANKLIN: Same objection.
THE WITNESS: Yeah, I did not investigate that as part of the corporate representative aspect. I don't personally recall or have any knowledge of that.
BY MR. COLE:
Q Outside of Simeon Brown, was there anybody else at Lewis Rice who reviewed the governing documents for the debtor entities?
MR. SHANKLIN: Same objection.
THE WITNESS: Again, I didn't personally investigate that as part of the corporate representative aspect. I -- I don't personally recall who would've done it, but somebody would've had to have done it as part of the authorization of the debtors to file bankruptcy.
And there were discussions and issues raised at that time about the authority and correcting that authority or having the proper parties sign off on that. So there were reviews at that time of the filing of the bankruptcy case.
BY MR. COLE:
Q So it's your understanding that Lewis Rice had access to and reviewed the governing documents for

the debtor entities before the bankruptcy case was filed?
A Yes.
Q Mr. Hall, how many Chapter 11 bankruptcy proceedings have you been involved in, in which you've represented debtors?
A I can't tell you the specific number. Are you asking --
MR. SHANKLIN: Yeah. Are you asking him personally?
MR. COLE: Yeah.
BY MR. COLE:
Q I tried to make that clear by saying your name, but I'm not asking you for Lewis Rice's. Just asking you personally, how many Chapter 11 cases have you been involved in where you've represented debtors?
A I can't tell you a specific number.
Q Okay. Can you give me a range?
A My best guess would be 10 to 20.
Q In those 10 to 20 cases, where does the bankruptcy proceedings we're talking about today rank in terms of size?
A It's the largest.
Q How do you place a value on the size of the bankruptcy? What do you personally refer to?

A Generally the asset size.
Q The number of assets in or the value of the assets involved?
A Yes.
Q Okay. And what value do you place on the assets involved in these bankruptcy proceedings?
A The information we had was in the $185 million range.
Q Given that, that's the largest of the Chapter 11's you've worked on, on behalf of debtors, what's the next closest?
A I don't personally recall as we sit here today 'cause I -- I don't have a specific recollection of the asset sizes of all of them.
Q But you have experience in somewhere in the realm of 10 to 20 cases representing debtors in Chapter 11 bankruptcy proceedings; correct?
A I think that's fair.
Q Okay. And you understand that as counsel for debtors in Chapter 11 proceedings, you owe duties to various parties; right?
MR. SHANKLIN: Objection. Calls for legal testimony and legal conclusion.
You may answer.
THE WITNESS: No.

BY MR. COLE:
Q You have no understanding of the duties that you owe in a Chapter 11 bankruptcy proceeding? Is that your testimony?
MR. SHANKLIN: Same objection.
THE WITNESS: As counsel, we have a duty only to the debtor.
BY MR. COLE:
Q As counsel, do you have a duty to the court?
MR. SHANKLIN: Same objection.
THE WITNESS: We have a duty, not a fiduciary duty.
BY MR. COLE:
Q As counsel, do you have a duty to the bankruptcy estate?
MR. SHANKLIN: Same objections and the scope.
THE WITNESS: There's no fiduciary duty of debtors' counsel to the bankruptcy estate.
BY MR. COLE:
Q In any instances?
MR. SHANKLIN: Same objections.
THE WITNESS: Yes.
BY MR. COLE:
Q Do you owe a -- do you as counsel in a

Chapter 11 proceeding for debtors owe a duty to the US Trustee?
MR. SHANKLIN: Same objections.
THE WITNESS: We have an obligation to work with them and be communicative with them. If that -- I'm not sure if that's a duty.
BY MR. COLE:
Q Do you have a duty to be truthful?
MR. SHANKLIN: Same objections.
THE WITNESS: Counsel always has a -- a duty to be truthful.
BY MR. COLE:
Q Do you agree that one of your duties as counsel in a Chapter 11 bankruptcy proceeding is to protect the assets of the bankruptcy estate?
MR. SHANKLIN: Same objection.
THE WITNESS: As counsel to the debtor?
BY MR. COLE:
Q Yes.
A The duty to -- no, I don't understand that, that is a duty that debtors' counsel has.
Q As counsel in a Chapter 11 bankruptcy proceeding involving more than one debtor -- well, let me back up. You'll agree with me that there are multiple debtors involved in these Chapter 11

bankruptcy proceedings; right?
A Yes.
Q As counsel to the debtors in a Chapter 11 bankruptcy proceeding, you agree that you owe duties to each individual debtor; correct?
MR. SHANKLIN: Same objections.
THE WITNESS: Yes. There is the duty to each debtor.
BY MR. COLE:
Q If a conflict arose between your duties to the various debtors, that is something as counsel you would need to address. Would you agree with me?
MR. SHANKLIN: Same objection. Calls for speculation.
You may answer.
THE WITNESS: Depending on the nature and materiality of that, of any conflict and whether that would rise to the conflict of a disqualifying conflict, yes, then there would be an obligation to take action with respect to that.
BY MR. COLE:
Q If a potential conflict among the debtors arose, you would have an obligation to undertake an examination to determine whether it was a real conflict; is that fair?

MR. SHANKLIN: Same objections.
THE WITNESS: Yes.
BY MR. COLE:
Q And part of the exercise you would go through is sort of is what you listed earlier, to determine whether or not the conflict is material and would lead to a potential disqualification?
A Yes.
Q Okay. Are there other factors that you would consider in undergoing that examination?
MR. SHANKLIN: Same objections.
THE WITNESS: There would have to be a discussion with our conflicts counsel to determine whether or not that was a conflict and whether or not any action would need to be taken.
BY MR. COLE:
Q During the pendency of the bankruptcy proceedings, did Lewis Rice have a conversation with conflicts counsel at any point in time?
MR. SHANKLIN: Objection. Scope.
You may answer if you have knowledge.
THE WITNESS: Yeah, I don't personally recall whether there was any discussion with our conflicts counsel, which is our general counsel.
//

BY MR. COLE:
Q And so we talked about this topic earlier today about Lewis Rice's conflicts. Do you recall that?
MR. SHANKLIN: Objection. Form.
THE WITNESS: Generally, yes.
BY MR. COLE:
Q Okay. You know that Lewis Rice's conflicts or potential conflicts is a topic?
A Yes. Yes.
Q Did you undertake any effort before coming to testify today to determine whether or not a potential conflict arose during the pendency of Lewis Rice's representation of the debtors in these proceedings?
MR. SHANKLIN: Objection. Form.
THE WITNESS: I would've known about any investigation to that effect.
BY MR. COLE:
Q And what I'm trying to -- we talked about earlier, the beginning of the process in onboarding a client, but you understand as a lawyer that conflicts can develop over time; right?
MR. SHANKLIN: Objection. Calls for opinion testimony and conclusion.

You may answer.
THE WITNESS: I'm aware of the concept.
BY MR. COLE:
Q Okay. And if a potential conflict arises during the pendency of a representation, as a lawyer, that's something that you must investigate?
MR. SHANKLIN: Same objections. Calls for speculation.
You may answer.
THE WITNESS: It calls for conversation or discussion with our general counsel.
BY MR. COLE:
Q Is when you say -- you referenced "conflicts counsel earlier." Is that another name for your general counsel or are those two different people?
A Same person.
Q And I think it's your testimony that you don't -- that -- well, strike that.
Is it your testimony that there was no potential conflict that arose during Lewis Rice's representation of the debtors relating to the bankruptcy proceedings?
MR. SHANKLIN: Same objection.
THE WITNESS: That's correct.
//

BY MR. COLE:
Q Did Lewis Rice draft a proposed bankruptcy plan?
A There was a disclosure statement which included elements of a plan that was drafted.
Q When was that disclosure statement filed?
A It was not filed.
Q When was it prepared?
A Based on my review, it was in May of 2025.
Q This is a draft disclosure statement?
A Yes.
Q Were you, John Hall, personally involved in the preparation of that?
A Yes.
Q Who else was involved in the preparation of that draft disclosure statement?
A Simeon Brown.
Q Anybody else?
A Larry Parres.
Q Anybody else?
A I think that's it.
Q Was the draft disclosure statement ever presented to the client?
A I did not investigate that as part of this -- these topics. I don't personally recall it

being presented to the client because the client had already provided the information that was going to be inputted into the historical information in the disclosure statement.
Q In preparing to provide testimony today, did you look at this draft disclosure statement?
A Yes.
Q Where was it stored?
A In our document management program.
Q So part of the client file?
A Yes.
MR. SHANKLIN: Objection. Form.
BY MR. COLE:
Q Are you aware -- well, let me back up. I think you said you do not believe that that draft document was provided to any of the debtor entities?
A I don't personally have knowledge of it being provided to the debtor entities.
Q Was it provided to anyone outside of Lewis Rice?
A I don't have personal knowledge of it being provided to anybody outside of Lewis Rice.
Q Do you know whether it's been produced in these proceedings?
A I don't know specifically, but given that

it's my understanding that the entire file has been produced, that it would be included in that.
Q What's the title of the document?
A I -- I believe Disclosure Statement.
Q Is it put together in the form of a pleading?
A It's -- it has a caption of the debtor cases on it. It's not exactly a pleading.
Q How many pages is it?
A I don't have a specific recollection of the number of pages. My range would be in the 10-to-15 page range.
Q You referenced May of 2025. Is that when you believe that that document was first prepared?
A The -- the draft on the document management system, I believe, was prepared in that time. I believe there was work done on it prior to that time.
Q That work would've been done in a way that are you saying was not saved to the document management system?
A Yeah. Discussions, reviewing earlier filings in the case, analyzing that in the context of what would need to go into a disclosure statement.
Q What was the plan in this disclosure statement to exit bankruptcy?

MR. SHANKLIN: Objection. Form.
THE WITNESS: Oh, the -- the plan elements were only outlined in the disclosure statement because we had not gotten sign-off or approval from any parties as to the plan elements.
BY MR. COLE:
Q And what portions of the elements were outlined?
A It -- it was very general things like, you know, feasibility, anything -- the specifics, I can't recall in particular the plan elements, but there's a whole section on plan description.
Q The plan description is where you would provide an explanation of what steps would be taken to, let's go first step, satisfy creditors?
A The disclosure statement describes the plan generally and describes different aspects of a plan.
Q Did the document you're talking about contemplate a reorganization of the debtors?
A Again, the specifics provisions of the plan were description of the plan and the disclosure statement were open-ended because the structure of the reorganization had not yet been determined or agreed upon by parties.
Q Did the document you're referencing discuss

refinancing of any loans?
A My personal recollection is that there was not that level of detail in the disclosure statement because we had not gotten to plan specifics with the parties.
Q That document that you referenced is dated in May of 2025?
A I don't know that it's dated.
Q And that was going to -- I was going to clarify that. It's dated that way on your system, that's what you're saying; right?
A Yes.
Q Okay. Did you add -- did Lewis Rice add any content to that plan after May of 2025?
MR. SHANKLIN: Objection. Form.
THE WITNESS: It's not a plan, it's a disclosure statement.
BY MR. COLE:
Q That contains a plan or not a plan, I guess; right?
A It contains a description of the plan.
Q Did Lewis Rice add to the description of the plan in that document after May of 2025?
A I don't personally recall the progression of -- of that disclosure statement. I -- I don't know

the timing of what modifications were made to the -- to the disclosure statement.
Q Were modifications made?
A Again, I don't know what modifications may have been made to it.
Q Were you have been involved in that process?
A Not necessarily.
Q Who would've been involved in that process?
A Larry Parres, Simeon Brown.
MR. SHANKLIN: Mark, I don't want to interrupt. It's afternoon. Can you get to a stopping spot?
MR. COLE: We can stop now. Yeah.
THE VIDEOGRAPHER: The time is 12:02 p.m. We're off record.
(Off the record.)
THE VIDEOGRAPHER: The time is 12:59 p.m. We're on record.
BY MR. COLE:
Q Mr. Hall, you referenced in your testimony earlier that in preparation for your testimony today, you had a meeting with Larry Parres; is that right?
A Yes.
Q Okay. Who was present at that meeting?
A My counsel here, counsel for Mr. Parres,

and -- and yeah, Mr. Parres, counsel for Mr. Parres, me and our counsel. I think that's it.
Q And when you say "our counsel," do you mean Mr. Shanklin?
A Yeah. And Mr. Ruskamp.
Q And then counsel for Mr. Parres, is that Bruce Moothart? Does that sound familiar?
A Yes. That -- that's correct.
Q So to the best of your recollection, it was those individuals that were involved in that meeting?
A Yeah, my short-term memory is sometimes challenged, but yes, that -- that's my recollection.
Q Okay. And remind me when that meeting took place.
A This past Friday. Yeah, Friday afternoon.
Q So today's Tuesday. The Friday that was, like, four days ago?
A Correct.
Q Okay. I won't get the date right, so I won't ask you.
A Yeah.
Q We were speaking before the break about Lewis Rice's -- any efforts by Lewis Rice to draft a bankruptcy plan. You referenced a disclosure, a draft disclosure statement. Do you recall that?

A Yes.
Q Aside from that draft disclosure statement, were there any other efforts by Lewis Rice to draft a bankruptcy plan?
A Yes.
Q What were those?
A Preparing term provisions, more or less a term sheet of a plan.
Q Anything else?
A In terms of drafting a plan?
Q Yes.
A No draft of a plan. It was the term -- terms of a plan that were proposed to the Committee and Frontier and the appointment of the -- the Trustee motion and subsequent appointment of a new CRO interrupted that process.
Q Okay. When you say the presentation of those terms, was this on something you might refer to as a term sheet?
A I don't think it had a title of term sheet. It was an outline of deal points in a plan.
Q What were those deal points?
A I did review those. It was a full page of them, so I can't recite them specifically. But it was essentially a -- a concept or it included concepts of

a 60-day period in which the debtors would seek new financing, new equity investor, or a new -- a new debt that would satisfy Frontier and to determine what would be necessary to satisfy Frontier.

We asked for or proposed that -- that Frontier escrow the amount that they would accept to satisfy their -- their debt so that the debtors would know what equity debt financing they should seek and not have the goalposts moved. So that was essentially one aspect of a plan.

And then if that those targets were not met, then the sort of secondary concept or plan B concept was for the debtors and the Committee and Frontier to each appoint a -- a member of a governing board of directors and potentially move to a partial or wholesale sale process.

Q So in this concept of a plan, you had a 60-day window; is that right?

A There was a 60-day concept in -- in that.

Q And was the concept that the debtors would have to perform based on certain metrics within that 60-day window?

A No.

Q Okay. So help me understand. You said if targets were not met?

A Target amounts of new equity, new debt, new financing that could be obtained to satisfy Frontier. So if Frontier was willing to accept whatever number that they would agree and to escrow.

If it was 90 million or 80 million or 10 million or whatever, then we would be able to advise the debtors, this is what you need to -- well, we wouldn't know that number, but the debtors could go out and do their best to try to raise whatever they could. And then if they end up meeting that number, then that -- that concept or that plan process would -- would work.

Q When was this concept proposed?

A Based on my review, it was mid-August of 2025.

Q So part of this proposal was that the debtors would try to go and find third-party financing; right?

A That was one of the possibilities.

Q Right. That was one of these targets was for the debtors to go find third-party financing by a specific date. I'll stop there. Is that fair?

A That was one option to meet the target.

Q What was another option to meet the target?

A Find new investors to meet the target.

Q Okay. So need to find money to come into the organization one way or another, whether that's through financing or equity?

A That's fair.

Q Okay. Debt or equity, those are your two options; right?

A I believe that was the -- those were the proposed outlined terms of the initial -- of the sort of plan A process.

Q Had Lewis Rice on behalf of the debtors sought to identify potential sources of funds, be it debt or equity, before August of 2025?

A Focus Management was seeking that.

Q Were they successful in finding partners?

A Focus Management identified various potential lenders, including potential DIP lenders that could convert to exit financing and long-term financing under a plan.

Q But none of those -- well, strike that.

None of those potential options became realities; right?

A We had filed a motion to approve replacement DIP financing, but the Trustee motion and CRO appointment interrupted that process.

Q Did you just say you found a motion to

approve?
A Filed.
Q Filed. Okay. You mentioned that one of the terms in this concept of a plan you had was for Frontier to escrow an amount to satisfy its debt. Did I hear you right?
A That was the general concepts, yes.
Q So how would -- Frontier was owed money in this process; correct?
A Yes.
Q Okay. Under this concept, how would Frontier escrow money in that instance?
A Yeah, it wasn't escrowing money. What it was escrowing, the dollar amount that would -- that Frontier would accept as -- as sufficient to approve a plan going forward.
So in other words, if -- if they're owed 95 million, but they would accept, again, make up numbers, we never got to that point, but hey, if -- if you can go out and find new debt or equity financing sufficient to pay us 60 million, then -- then we can work -- work -- we can live with this plan.
And so what we -- what the debtors needed was assurance that there was a number out there and so it wasn't escrowing money, it was really just

escrowing this information, the -- the dollar amount. So that if the debtors were successful in going and finding, doing the best they can, finding a number, then -- then they could come back. We could open up the box and say, okay, we've got this much in financing, here's Frontier's number, those match. Now we have a -- have a process.

Q Frontier had a secured loan, I think you mentioned, of approximately $95 million, plus or minus; right?

A That -- right.

Q Okay. So essentially, as part of this plan, you were asking Frontier to tell you what amount below that $95 million they would accept?

A Well, whatever amount they wanted to put in. It didn't have to be below or anything.

Q You mentioned $60 million and I know you just, you know, were making up that number.

A I was.

Q Did you find third-party financing for $60 million?

A Again, Focus was doing any searches for financing. This concept that -- in -- in planned terms was circulated in mid-August of 2025 and within, I believe, ten days of that being circulated, there

was a -- a Trustee motion filed. So then all efforts had to be addressed to the Trustee motion. So it was a very limited window of time.

Q Mr. Hall, you have Exhibit 37 in front of you, and that's an email string dated May 6th and 7th of 2025 Bates numbered LR 75272 through 73.

(Exhibit 37 was marked for identification.)

Do you see that?

A I do.

Q Okay. Are you familiar with this email?

A I can't personally say that I recall seeing this recently. I see that I'm on part of the email string.

Q Okay. The email string originates with an email from Simeon Brown to Steven Drapekin. Do you see that?

A I do.

Q Okay. And then Mr. Drapekin forwards it to you. You see that?

A I do.

Q And then there's a response from you; correct?

A Correct.

Q So the original email here with Simeon

Brown, he says he "updated Larry as well, but the strategic partnerships relate to a plan A for the reorganization to divest." You see that there?
A Yes.
Q Okay. And there's more to that. There's also a mention of a plan B. Steven Drapekin asked you if you've ever heard of this, and you say you've "never heard of that plan strategy"; right?
A That's what my -- my email says, yes. No, hadn't heard of that plan strategy.
Q Okay. Were you aware of a strategy that's similar to the one outlined in Mr. Brown's email?
MR. SHANKLIN: Objection. Vague as to time.
THE WITNESS: Based on my email here, I was not aware of that plan strategy as of May 7, 2025.
BY MR. COLE:
Q Okay. So as of May 7th, is it fair to say then that you were unaware of a plan for the reorganization to divest the distribution arm of the business through a 363 sale?
A I -- I recall discussions about sales of different aspects of the debtors' businesses, distribution, retail production. Those were discussed from the very beginning of the case. So this

specific -- specific concept, I wasn't aware of this specific plan strategy.

Q And that strategy, the, you know, divestiture of the distribution arm, that's something that Steeplechase proposed before the bankruptcies were ever filed?

MR. SHANKLIN: Objection.

BY MR. COLE:

Q Is that right?

MR. SHANKLIN: Sorry. Objection. Scope.

You may answer if you know.

THE WITNESS: I don't have a personal recollection of anything that Steeplechase proposed.

BY MR. COLE:

Q Were you aware at any point in time during your, John Hall's, representation of the debtors in these bankruptcy proceedings that Steeplechase had made proposals regarding the debtors' entities?

A I recall that Steeplechase had been engaged. I can't recall specific proposals or whether specific proposals had been made.

Q Were you aware during the pendency of the bankruptcy of the terms of those specific proposals?

A Again, I don't have a personal recollection

as to any of the terms of any Steeplechase proposals. Just that Steeplechase had been engaged and prepared a -- a summary and information.

Q Part of the plan A that's mentioned in Exhibit 37 is to a possibility of bringing in a capital partner wherein Tory would retain a minority interest. Do you see that?

A I see that referenced.

Q If Mr. Schwope was going to retain an equity interest in the debtors following a reorganization, is that an issue that could present a potential conflict?

MR. SHANKLIN: Objection. Calls for opinion testimony. Calls for a legal conclusion.

You may answer.

THE WITNESS: No, it require -- it would require an injection of new value by Mr. Schwope to -- to a plan process.

BY MR. COLE:

Q If part of the negotiations involve the level of interest or ownership that Mr. Schwope was to maintain through reorganization, does that present a potential conflict of interest with the debtor entities?

MR. SHANKLIN: Same objections.

THE WITNESS: I don't believe so.

BY MR. COLE:
Q Then you see in Mr. Brown's email, he references plan B, if those discussions don't go anywhere, would be to just downsize, tighten the belt, and refinance the business. Do you see that there?
A I do.
Q Are you aware of either plan A or plan B being presented to Frontier?
A I didn't review any -- any delivery of this being presented to Frontier. My review of anything being presented to Frontier as part of a plan was the August information that we talked about.
Q Was there any discussion at Lewis Rice to refrain from presenting a plan like this?
A Again, from my personal recollection, no, I'm not aware of any discussion to refrain from providing any planned discussions to any party.
Q If somebody had -- well, strike that.
There is a mention of a strategic partnership here that Mr. Brown says he updated Larry on; right?
A Yes.
Q Okay. And so it sounds like you, John Hall, are not aware of those discussions?
MR. SHANKLIN: Objection. Form.

THE WITNESS: Again, all I can state is that I, as of May 7, 2025, had not heard of this particular plan strategy.
BY MR. COLE:
Q And do you recall at any point after May 7, 2025, when this particular plan strategy was discussed?
A I don't have any personal recollection of that.
Q Do you know as the Lewis Rice corporate representative whether a plan strategy similar to the one in Exhibit 37 was in fact discussed?
A In my review as corporate representative to find out about planned discussions and anything to that effect, I was not aware of any further discussions about -- along these lines.
Q I've handed you Exhibit 38, which is an -- well, the top email is an email dated August 13, 2025, from Larry Parres to you and Juanita Schwartzkopf.
(Exhibit 38 was marked for identification.)
Do you see that?
A Yes.
Q And Mr. Parres is forwarding an email from Zach Fairlie that's dated the same date. Do you see

that?
A Yes.
Q Okay. Attached to this email is a proposal; right?
A It's a strategic alternative discussion materials document.
Q Okay. Do you recall receiving this?
A I can't specifically recall receiving this, but I recall receiving plan discussion documents.
Q Okay. Do you want to take a minute to review it? I know it's a little hard to read, but I just want to make sure you're familiar with it.
A Yeah. It's very difficult to read.
Q Yeah. Okay. Sir, I'm going to replace that exhibit. We've got one that's easier to read here. I know it's hard. It's, like, tiny, so I'm going to take that back from you. I'm going to do my best to peel the sticker off. I think that'll make it easier.
A I've generally looked at this.
Q Does your review refresh your recollection on receiving this document?
A I recall receiving something from Dundon. I can't say that I specifically recall the individual terms and provisions of what was in here.
Q If you'll turn to, and there's no Bates

numbers here, but slide 4, you see where it says "illustrated milestones"?

A Yes.

Q That's essentially a timeline of milestones to work toward a confirmable plan; right?

A It says, "Parties and interests can agree to work toward a confirmable plan by first quarter of 2026," and then has some bullet points.

Q Okay. One of those bullet points is appointment of an independent board director; right?

A I see that.

Q Okay. One of those bullet points is a motion to retain a broker for retail?

A Yes.

Q Okay. And looking through this, this contemplates a retail sale; correct?

A There is a bullet point for motion to approve bid and auction procedures for retail.

Q Now, would you --

A And then --

Q Sorry, go ahead.

A And then there's a bullet point for motion to approve retail transaction and a bullet point for closing of retail transaction.

Q Do you take that to mean it's a procedure to

sell the retail business?
A That -- that -- I take it to mean that there would be a process to sell one or more parts of the retail parts of the debtors.
Q Okay. This was sent to you by Mr. Parres; right?
A Yes, he forwarded that.
Q And what was his response as he put in his email to you?
A What was his response to what?
Q What was his reaction to the proposal as he wrote in his email to you?
A Well, I don't know what his response was to the proposal. All I know is what he said in his email.
Q What did he say?
A His email reads, "Ouch. No clue. No response. Please do not mention to anyone that we received this."
Q Did you take that to be Larry Parres asking you not to tell anybody that you received this proposal?
A No.
Q How did you interpret his words, "Please do not mention to anyone that we received this"?

A To not tell anyone that we received this proposal.
Q Did you follow his direction?
A To the best of my recollection, yes.
Q Are you aware if any of the debtor entities were made aware of this proposal?
MR. SHANKLIN: Objection. Scope.
You may answer.
THE WITNESS: I don't personally recall one way or the other.
BY MR. COLE:
Q Did you ever tell Mr. Parres in response, no, if we receive a settlement proposal, we need to convey it to the client?
A I don't personally recall having that kind of specific conversation.
Q Is it your understanding that's a part of a lawyer's obligation if they receive a settlement proposal?
MR. SHANKLIN: Objection. Calls for opinion testimony. Calls for a legal conclusion. Calls for speculation.
You may answer.
THE WITNESS: As a general matter, if there is a settlement proposal in litigation to

resolve a matter, then an attorney discusses that with a client. I don't view this as a settlement proposal. That is something that would resolve all of the issues in the case.

BY MR. COLE:

Q If it led to a confirmable plan, would it resolve all the issues in the case?

MR. SHANKLIN: Objection. Calls for speculation.

You may answer.

THE WITNESS: No. The plan can sometimes just be the beginning of some challenges.

BY MR. COLE:

Q Based on your understanding of this proposal, what would this plan not resolve?

MR. SHANKLIN: Objection. Scope.

You may answer.

THE WITNESS: That's a -- a lot of questions. I -- I'd have to -- whether this amounts to a confirmable plan is a -- is a significant analysis that I'm not equipped to sit here and go through and answer that as to whether or not this would amount to a confirmable plan, whether all the provisions in here would meet the standards for confirmation of a plan.

BY MR. COLE:
Q Is it your understanding that DCA Outdoor was a fiduciary in this Chapter 11 case?
MR. SHANKLIN: Objection. Calls for legal conclusion. Calls for opinion testimony.
You may answer.
THE WITNESS: Whether DCA Outdoor was?
BY MR. COLE:
Q Yes.
A A debtor generally has duties to its creditors and interested parties, equity holders in a reorganization process.
Q It's fair to say that the debtors owe a fiduciary duty to the bankruptcy estate?
MR. SHANKLIN: Same objections.
THE WITNESS: Yeah. Debtors owe a fiduciary duty to their bankruptcy estate.
BY MR. COLE:
Q Mr. Hall, you have Exhibit 39 in front of you.
(Exhibit 39 was marked for identification.)
You can flip through it. I will tell you it's a long and meandering email string and was produced in a way that's difficult to read once you

get to the middle of it because of how the emails are put together.
The questions I'm going to ask you are about the emails that are really on the first two pages of this exhibit. But feel free to flip through if you want to orient yourself.
A Okay. Okay. I've read through it.
Q So focusing on first your email that begins at the bottom of page 1 that you sent on March 13, 2025, at 8:13 a.m. Do you see that?
A On page -- on the first page?
Q It starts at the bottom of the first page, carries onto the second page.
A Oh, yes.
Q And in general, you're discussing in here third interim cash collateral order; right?
A That's -- that's what it appears to be, yes.
Q Okay. Your email on March 13th that is sent to Larry Parres, you highlight -- well, I should ask this. Is that your highlighting?
A I don't specifically recall highlighting that, but if it was in this email, then it seems to be that way.
Q Okay. The highlighted language indicates that -- well, I'll step back. You're relaying a

demand that Frontier sent to you. That's what you're saying; right?
A I'm relaying language that Frontier wanted to have in the cash collateral order.
Q Okay. And part of that language was a restriction to prevent any money being paid to Rio Verde Plantas, Rio Verde Holdings, LLC, Valley Hill Tree Farm, and various other entities; right?
A Yes.
Q And you send that on to Mr. Parres. He responds, "We cannot agree to this"; is that right?
A That's part of his response. His first line is, "We cannot agree to this."
Q Okay. The next part of his response is, "The reason it takes so long to approve a budget is that Frontier is going through every line item."
A Yes.
Q It was Frontier's money; right?
MR. SHANKLIN: Objection. Form.
THE WITNESS: No, it's the debtors' money subject to Frontier's security interest.
BY MR. COLE:
Q You respond to Mr. Parres on the same day, March 13th. And I want to ask you about a sentence here that begins on the second line on the right side.

You say, "There are also real concerns about buying from Rio versus buying the same from another vendor." Do you see that?
A I do.
Q What were your concerns?
A Well, I don't specifically recall what those concerns would be.
Q Rio is referencing a non-debtor entity; correct?
MR. SHANKLIN: Objection. Form.
THE WITNESS: I can't specifically recall the list of debtors and non-debtors. Based on this line of emails, Rio Verde Plantas and Rio Verde Holdings, LLC were not debtors.
BY MR. COLE:
Q And we talked earlier about, you know, your preparation to testify about who Lewis Rice's clients were, which included the debtors. Were Rio Verde Plantas or Rio Verde Holdings clients of Lewis Rice?
A Based on my recollection, they were not.
Q Okay. So you're expressing in your email on March 13th real concerns about paying money to Rio; correct?
MR. SHANKLIN: Objection. Form. Misstates the document.

THE WITNESS: I'm expressing concerns about buying from Rio.
BY MR. COLE:
Q Part of the buying process is paying money. Do you agree with that?
A Buying can -- can involve various types of promises, promises to pay, delivery of money, delivery of other considerations. So it could be various parts of a transaction.
Q Did your concern, as you expressed in this email, involve paying money to Rio?
A Again, I -- I don't recall my specific concerns. All I can tell you is what the email says.
Q And the email says that you wrote there are also real concerns; right? Is that correct?
A Yes.
Q And in fact, you repeat that a sentence later where you say, "There's real concern there"; right?
A I see that.
Q Okay. But sitting here today, you don't remember what your real concern was?
A No. From March of 2025, no, I can't recall anything specifically about that.
Q Okay. And you say in the next paragraph,

"I'll talk to Tory, but we may have to live with this.: Do you see that?
A I see that.
Q Do you have a recollection of talking to Tory?
A We talked so many times that I can't recall a specific discussion about this specific email or issue.
Q Do you have -- did you or anyone else at Lewis Rice speak with Mr. Schwope about buying inventory from Rio?
A I don't have any specific recollection of that discussion.
Q Would one of the potential concerns be that if a debtor entity used money to buy inventory from Rio, that Mr. Schwope would benefit from that transaction personally?
MR. SHANKLIN: Objection. Calls for speculation.
You may answer.
THE WITNESS: I don't recall any specific concern to that effect.
BY MR. COLE:
Q Was a concern to that effect ever discussed by Lewis Rice?

A I don't recall any specific discussion to that effect.
Q You understand that Juanita Schwartzkopf at Focus Management Group was installed as the chief restructuring officer in this bankruptcy case; right?
A She was the first chief restructuring officer, yes.
Q And what did Lewis Rice understand to be her power in the bankruptcy proceeding?
A Well, her role would be, as defined in the, I believe it was in the DIP order and the understanding was that she would serve as chief restructuring officer and that she would have the ability to block or veto any decision made by Tory Schwope as chief executive officer if she disagreed with that decision.
Q What decisions were routed through Ms. Schwartzkopf for her to make a determination as to whether or not she should exercise her blocking power?
A I don't know or specifically recall any specific decisions or the range of decisions. I know she primarily was looking at financial management, financial budget preparation, weekly financial reporting, generally financial decisions and -- and budget preparation.

Q Did Lewis Rice communicate with Focus Management Group about the threshold level at which Ms. Schwartzkopf should be able to exercise a blocking power?

MR. SHANKLIN: Objection. Form.

THE WITNESS: I seem to recall that -- that to avoid grinding everything to a complete halt, that there was some threshold amount, maybe $5,000 or $10,000, decisions in that range would have to go through Juanita Schwartzkopf.

BY MR. COLE:

Q Who made the determination to set a threshold at $5- or $10,000?

A I don't have any specific knowledge of that.

Q How was that communicated to Focus Management Group?

A I don't have specific knowledge of how that was communicated.

Q In preparation for your deposition today, did you ask anybody how that threshold was communicated to Focus Management Group?

MR. SHANKLIN: Objection. Beyond the scope.

You may answer if you know.

MR. COLE: And just to respond, it's

directly within the scope of topic 11, which is "Lewis Rice's communications with FMG regarding their role in the bankruptcy case and the use of the negotiated blocking power."

BY MR. COLE:

Q So please provide your testimony on behalf of Lewis Rice.

MR. SHANKLIN: Well, I think your question was about communicating regarding a specific threshold, and again, the topic has to be stated with -- it has to be reasonably specific such that he can prepare himself. It sounds like he didn't understand that topic as being reasonably specific to prepare himself on that issue.

But you may answer.

THE WITNESS: Yeah, as part of the corporate representative, I did not specifically seek information on that. In my review of all emails, I recall an email from Larry Parres to Juanita and I believe to Tory on which I would've been copied, something to the effect of, let's agree that decisions below a threshold amount or above a threshold amount, I should say, are subject to review by Juanita Schwartzkopf.

//

BY MR. COLE:
Q So it was Lewis Rice's proposal that transactions below that threshold amount would not need to be seen by Ms. Schwartzkopf?
A I think that was proposed to Ms. Schwartzkopf for her consideration.
Q Okay. Was that plan implemented?
A I don't have any specific knowledge of whether it was or was not.
Q Who did you talk to in preparation for providing testimony on topic 11?
A Larry Parres. Yeah, Larry Parres.
Q What did you ask Mr. Parres regarding Lewis Rice's communications with FMG regarding the role in the bankruptcy case?
A We talked about Ms. Schwartzkopf's blocking power and whether she used the blocking power, whether she needed to use the blocking power, the disputes that arose between Ms. Schwartzkopf and the debtors' management, how those disputes would typically be resolved because Ms. Schwartzkopf would threaten to use the blocking power. So it was generally in the nature of the blocking power and how the blocking power was used.
Q Start with the first thing you mentioned

there. You talked about Ms. Schwartzkopf's use of the blocking power. Do you have a recollection of Ms. Schwartzkopf using her blocking power?
A I have recollection of her threatening to use the blocking power.
Q Okay. But not actually using it?
A Correct.
Q So let's get to the threats to use. On what instances did Ms. Schwartzkopf threaten to use her blocking power?
A My understanding was that it was primarily with budget items and with various proposals on spending within the budget. It -- it was financial management issues.
Q Did Lewis Rice document the instances in which Ms. Schwartzkopf threatened to use her blocking power?
A I didn't review that aspect of it in -- in my preparation, but in my personal recollection is that I don't recall any specific documentation of instances in which she threatened to use the blocking power.
Q Okay. You said proposals -- well, you mentioned two things, budgets and proposals on spending within the budget. Let's start with budgets.

In what ways did Ms. Schwartzkopf threaten to use her blocking power on budgets?
A I don't have specific recollection of that. My -- I believe there were -- there were questions about how much to include in the budget for anticipated receipts by the debtors, and Ms. Schwartzkopf raised comments about the level of receipts that the debtors should expect to receive going forward.
Q Is that in reference to what might be like forecasted sales?
A No.
Q So when you say "potential receipts," what are you referencing?
A Anticipated income payments receipts by the debtor for a specific period of time.
Q So the anticipated income by the debtor, if you're not talking about sales, what are you talking about?
A Collections of receivables, recovery of any other amounts owed to the debtors.
Q Does that include sales or not include sales?
A The sales are a component of -- of that, but it depends on what time frame you're talking about.

You know, if you're forecasting receipts, it's tied to some forecast of sales, but it's also tied to collection of existing receivables.

Q And Ms. Schwartzkopf threats to use her blocking power, was that because the proposal from the debtors as to the level of potential receipts was higher than she thought it should be?

MR. SHANKLIN: Objection. Form.

THE WITNESS: I don't recall specifically which direction it was -- it was going on that, whether Ms. Schwartzkopf thought it should be higher or lower.

BY MR. COLE:

Q Okay. Does it make sense to you that she would exercise a blocking power to say, no, your receipts should actually reflect a higher number?

A I can't speculate as to what she would be using her discretion as to whether it should be more. If -- if sales and receivables and other income should be more than she would, I certainly would expect her to say no, we need to have an as accurate a forecast as we can come up with.

Q On how many instances did she threaten exercise her blocking power regarding budgets?

A I don't have any specific recollection of

that.
Q Did your conversations with Mr. Parres, or in your conversations with Mr. Parres, did you ask how many times Ms. Schwartzkopf threatened to use her blocking power regarding budgets?
A I didn't ask a specific -- ask for a specific number. We asked whether he recalled Ms. Schwartzkopf using that.
Q The other category you mentioned is proposals on spending within the budget. On what instances did Ms. Schwartzkopf threaten to use her blocking power on proposals on spending within the budget?
A Yeah, I -- I can't specifically recall any specific times or dates or amounts.
Q Are you testifying that she did threaten to do that or not?
A She threatened to use the blocking power in various financial decisions or considerations by the debtors, whether it was always in, you know, budget, it was mainly in budget and financial reporting. So if -- if I said, you know, spending within the budget, I would consider that just be a budget issue.
Q Did Lewis Rice prepare draft bankruptcy filings for Valley Hill Tree Farm?

A The -- in -- in my review, there -- there was a draft petition page prepared by an assistant.
Q Can you describe that a little bit more for me? What do you mean by a "draft petition page"?
A The petition for filing a bankruptcy case is a short two- or three-page document with the name of the debtor, name of counsel, address of the debtor on it. It's very simple petition that -- that an assistant at Lewis Rice could input and did input the name of Valley Hill onto that petition page.
Q And was that petition filed?
A No.
Q Why not?
A Because Valley Hill was not a borrower under the Frontier facility.
Q Who at Lewis Rice made that determination?
A Well, Steve Drapekin identified that Valley Hill had been omitted by Frontier as a borrower.
Q Was that after it was initially thought that a petition would be filed on behalf of Valley Hill?
MR. SHANKLIN: Objection. Form.
THE WITNESS: Yes. The -- yes.
BY MR. COLE:
Q Mr. Hall, I've handed you Exhibit 40.
//

(Exhibit 40 was marked for
identification.)
You recognize that to be the schedule for DCA Land Kentucky, LLC?
A That's what it appears to be, yes.
Q And it appears to be, this was the version that was filed in the bankruptcy proceedings on April 7, 2025. Do you see that at the top?
A I see that stamp.
Q And that that's a stamp from the court; right?
A Yes.
Q Okay. Are you familiar with DCA Land Kentucky?
A I'm familiar with them being a debtor.
Q You are also familiar with them being the entity that owns the land on which a purported lease was said to exist with Valley Hill Tree Farms?
MR. SHANKLIN: Objection. Form.
THE WITNESS: In my review and preparation for this, I -- I saw that lease and saw that -- that those were the parties to that lease, yes.
BY MR. COLE:
Q If you'll turn -- well, one of -- you would

agree with me that one of the purposes of the schedule is to disclose any executory contracts; right?
A There is a section for executory contracts. I think it's Schedule G.
Q Schedule G appears on page 7 of the document?
A Yes.
Q And you see the question there, "Does the debtor have any executory contracts or unexpired leases"?
A Yes.
Q And what box is checked?
A The box "no."
Q Okay. So this would appear to indicate that DCA Land Kentucky does not have a lease with Valley Hill Tree Farm; correct?
MR. SHANKLIN: Objection. Form.
THE WITNESS: That was the, looks to me, the indication at this time, the Valley Hill Tree Farm information was on line 71.
BY MR. COLE:
Q And what page is that on?
A Page 3.
Q What specific information are you referencing?

A There's a section for notes receivable. It's Valley Hill Tree Farm, $15,925.98.
Q So there was an acknowledgement that Valley Hill Tree Farm owed almost $16,000 to DCA Land Kentucky?
A That's what this line 71 suggests.
Q When did Lewis Rice become aware that Tory Schwope was claiming there was a lease between Valley Hill Tree Farm and DCA Land Kentucky?
MR. SHANKLIN: Objection. Form.
THE WITNESS: There was no specific understanding of that lease. We had a data room that housed all the leases and information that had been provided by the debtors.
BY MR. COLE:
Q When did Lewis Rice become aware that there -- well, strike that.
You testified earlier that you, in preparation for your deposition testimony today, that you reviewed a lease; right?
A Yes.
Q And we talked about that earlier. It was an unsigned lease; right?
A The lease that I saw was unsigned, yes.
Q Okay. When did Lewis Rice become aware of

that document?
A I can't -- in -- in my preparation for this, I didn't specifically identify or seek when Lewis Rice would've become aware of that lease.
Q If you were to ask any individual at Lewis Rice as to an awareness of when that lease came into existence, who would you talk to?
MR. SHANKLIN: Objection. Calls for speculation.
THE WITNESS: Probably Scott Moore.
BY MR. COLE:
Q So do you still have Exhibit 34 in front of you? It's the deposition topics.
A Yes.
Q Okay. Turn then with me to page 5 there, topic 17.
A Yes,
Q That's "Lewis Rice's knowledge of any lease between DC Land Kentucky and Valley Hill Tree Farm." Do you see that?
A Yes.
Q Okay. So what is Lewis Rice's knowledge of any lease between DCA Land Kentucky and Valley Tree Farm?
A Lewis Rice did not have any knowledge of

that lease.
Q At any point -- and is that your testimony that Lewis Rice did not have any knowledge of that lease during the entirety of Lewis Rice's representation of the debtors?
A No.
Q Okay. When did that change?
A There -- as part of our directive from Mr. King to assist in the assumption or rejection of leases, we were handling review of leases, determining what leases needed to be assumed or rejected, and to submit that to Mr. King's approval. As part of that process, Mr. Schwope asked, I believe, Larry Parres in October of 2025 for a copy of the Valley Hill lease, and we reviewed the data room for such a lease, found that lease.
Q When you say you reviewed the data room, how did you access -- well, strike that.
Who is the "we" who reviewed the data room?
A I didn't ask that specific question. Scott Moore handled much of the data.
Q Did you review the data room?
A No.
Q At any point during Lewis Rice's representation of the debtors, did you, John Hall,

review documents in the data room?
A I don't have any specific recollection of going into the data room.
Q Of course, Lewis Rice was aware that Tory Schwope owned Valley Hill Tree Farm; right?
A Yeah. Based -- yes.
Q And that's true throughout the entirety of Lewis Rice's representation of the debtors in the bankruptcy proceedings?
A Yes.
Q Did anyone at Lewis Rice discuss whether to challenge the claim that there was a lease between Valley Hill Tree Farm and DCA Land Kentucky?
MR. SHANKLIN: Objection. Beyond the scope.
You may answer.
THE WITNESS: Yeah, I -- I did not investigate that as part of the topics, and I'm -- I don't have any personal recollection of any discussion to that effect.
BY MR. COLE:
Q Would you agree with me that without the existence of a lease, there'd be a dispute as to who owned the trees on DCA Land Kentucky's property?
MR. SHANKLIN: Objection. Calls for

speculation.
You may answer.
THE WITNESS: No, a -- a lease does not determine ownership.
BY MR. COLE:
Q Who owned the trees on DCA Land Kentucky's real estate?
MR. SHANKLIN: Objection. Beyond the scope.
THE WITNESS: Yeah, I did not investigate that and I don't have any specific knowledge of that.
BY MR. COLE:
Q Did that come up at any point during your representation of the debtors in these cases?
MR. SHANKLIN: Same objection.
THE WITNESS: There were discussions about how to handle debtors' purchases of inventory from our purchases of trees from all parties, including Valley Hill, because Frontier wanted to make sure that no cash collateral or DIP financing proceeds were flowing to Valley Hill.
So there were specific discussions about how to make sure that Valley Hill transactions were specifically accounted for, identified, and

disclosed to the parties.
BY MR. COLE:
Q What was Valley Hill Tree Farm selling to debtor entities?
MR. SHANKLIN: Objection. Beyond the scope.
You may answer.
THE WITNESS: Yeah, I did not investigate that. My recollection is that they sold trees, shrubs to the debtors.
BY MR. COLE:
Q As part of your representation of the debtors in these cases, you understood that Valley Hill Tree Farms sold trees and other plants to debtor entities; accurate?
A Yes.
Q And without a lease regarding the property owned by DCA Land Kentucky, there would be a dispute as whether Valley Hill Tree Farm owned those trees that they were purporting to sell, wouldn't there be?
MR. SHANKLIN: Objection. Form. Calls for speculation.
THE WITNESS: Yeah, I -- again, the -- a -- a lease doesn't determine who owns what is on particular property. It -- it can determine who has

rights to growing inventory, things of that nature, but it's not determinative one way or the other.
BY MR. COLE:
Q Did the draft lease that you found that was unsigned between Valley Hill Tree Farm and DCA Land Kentucky speak to the ownership of plants or other -- or plants or trees on DCA Land Kentucky's property?
A Well, I don't remember the specific terms of the lease. I can't speak to that. I did see the lease. I did review the lease. I can't recall the specific terms as to that effect.
Q If Valley Hill Tree Farms was selling inventory that they didn't own, that would've been inventory that was actually owned by DCA Land Kentucky; isn't that accurate?
MR. SHANKLIN: Objection to form. Calls for speculation. Calls for a legal conclusion. Calls for opinion testimony.
You may answer.
THE WITNESS: If Valley Hill was selling inventory that it didn't own?
BY MR. COLE:
Q I'll back up. Maybe we'll take this step by step. You understand that Valley Hill Tree Farms was selling plant grown on land that was owned by DCA Land

Kentucky; right?
A That's my understanding of the lease, yes.
Q And those sales from Valley Hill Tree Farms were to debtor entities; correct?
MR. SHANKLIN: Objection to form.
THE WITNESS: Valley Hill sold to debtor entities. I don't know if Valley Hill sold to non-debtor entities.
BY MR. COLE:
Q Okay. Fair point. Some of the sales were to debtor entities; correct?
A That's my understanding.
Q So as part of Lewis Rice's representation during these bankruptcy proceedings, did you ever make a determination as who owned the trees on DCA Land Kentucky's property?
MR. SHANKLIN: Objection. Calls for a legal conclusion. Outside the scope.
You may answer.
THE WITNESS: Yeah, I didn't investigate that as part of my preparation, and I don't specifically recall being involved in any determination to that effect.
BY MR. COLE:
Q Do you recall that issue ever coming up

during your representation of the debtors in these bankruptcy proceedings?

MR. SHANKLIN: Outside the scope.

You may answer.

THE WITNESS: Yeah. My only specific recollection was that Valley Hill transactions, sales to the debtor, and any payments by the debtor to Valley Hill had to be separately accounted for, segregated, reported to the parties, and that Focus Management set up a process for doing that.

BY MR. COLE:

Q You mentioned that the unsigned lease that you saw stated that Valley Hill Tree Farms owned the trees on DCA Land Kentucky's property; right?

MR. SHANKLIN: Objection. Form.

THE WITNESS: Yeah, I -- again, I don't recall the specific terms of the lease.

BY MR. COLE:

Q No, yeah. But you testified earlier that that lease said that Valley Hill Tree Farms owned the trees that were grown on DCA Land Kentucky's land.

A I believe that is correct.

Q Okay. If that lease did not exist, DCA Land Kentucky owns those trees; right?

MR. SHANKLIN: Objection. Calls for

legal conclusion. Calls for opinion testimony. Calls for speculation. Outside the scope. Asked and answered.
You may answer.
THE WITNESS: Yeah, I -- I don't know that it would mean that DCA Land Kentucky owned them. There could have been another party that might own them.
BY MR. COLE:
Q Somebody else might own them?
A That's conceivable.
Q Okay. And you don't have a recollection of investigating that issue while you represented the debtors?
MR. SHANKLIN: Outside the scope.
You may answer.
THE WITNESS: Yeah, I didn't investigate that and I was not involved in any investigation to that effect.
BY MR. COLE:
Q Were you involved in any conversations where that topic was discussed?
A I don't have specific knowledge of any discussion that I was involved in to that effect.
Q You still have Exhibit 34 in front of you,

the topics?
A Yes.
Q You on the page with topic 16?
A Yes.
Q Okay. And that's the topic about Lewis Rice's transmission of the unexecuted lease between DCA Land Kentucky and Valley Hill Tree Farm to Tory Schwope on or about October 2, 2025. Do you see that?
A Yes.
Q Okay. What did you do to prepare to testify on that topic?
A In the discussions with, excuse me, with Louis Wright -- I'm sorry, with Larry Parres on Friday, we discussed the request and transmission of the lease.
Q Okay. And what did Mr. Parres tell you?
A He said that Tory Schwope had requested a copy of the lease in connection with the assumption or rejection or assignment of the lease, that Mr. Parres asked Scott Moore of our office to transmit that lease to Mr. Schwope, and that -- that Mr. Schwope subsequently contacted Mr. Parres and said, never mind, I don't need that lease. But that Scott Moore had already transmitted the lease.
Q Do you know how Mr. Schwope contacted Mr.

Parres to indicate that he no longer needed the lease?
A Mr. Parres, I'm trying to recall, indicated that it was either an email or a phone call from Mr. Schwope that said that, never mind, I don't need that.
Q Did you look for an email that would represent what Mr. Parres described to you?
A Yes.
Q Did you find one?
A No.
Q At the time Lewis Rice transmitted the unexecuted lease between DCA Land Kentucky to Valley Hill Tree and Valley Hill Tree Farm to Tory Schwope, Tory Schwope was no longer employed with the debtors; right?
A Let's see. That was October 2nd. Ye, that's my understanding.
Q That he had been terminated approximately two weeks earlier?
A I think that's right.
Q And following Mr. Schwope's termination, do you recall receiving an instruction not to communicate with Mr. Schwope?
MR. SHANKLIN: Objection to form.
THE WITNESS: Yeah, I -- I believe and -- and I think we discussed this, that Larry

Parres had said, you know, do not discuss or communicate with Tory Schwope.
BY MR. COLE:
Q Did you follow that instruction?
MR. SHANKLIN: Objection to form.
THE WITNESS: Are you asking in corporate --
BY MR. COLE:
Q I'm asking you, personally.
A Personally. Yes, I never spoke to Mr. Schwope or contacted him.
Q In your capacity as corporate representative, did Lewis Rice follow that instruction?
A Outside of sending that lease, yes, I believe that's the case. Although Mr. Parres, I did learn, had some text messages with Mr. Schwope, I believe, outside of that window.
Q You indicated that Mr. Schwope -- sorry, you indicated that Mr. Parres told you that he received a communication from Mr. Schwope that he no longer needed the lease?
A That's what Mr. Parres said, yes.
Q Did Mr. Parres indicate that he relayed that communication to Scott Moore?

A I believe he said that he talked to Scott Moore to that effect, but that Scott had already sent the lease.
Q Did Mr. Parres indicate that -- strike that.
MR. SHANKLIN: Mark, we've been going about an hour and a half. Do you --
MR. COLE: Yeah. Now is fine.
THE VIDEOGRAPHER: The time is 2:27 p.m. We're off the record.
(Off the record.)
THE VIDEOGRAPHER: Time is 2:50 p.m. We're on the record.
BY MR. COLE:
Q Handing you Exhibit 41.
(Exhibit 41 was marked for identification.)
You see that's an email string dated March 13, 2025?
A Yes.
Q It originates with an email from Erlene Krigel to you and Mr. Parres; right?
A Yes. Yes.
Q And then there's a response from you on the same day at 8:56 p.m.?
A Yes.

Q And Ms. -- well, is that Ms. Krigel?
A Yes. Yeah.
Q In her email to you on March 13th, she's reaching out to you to express interest in a potential purchase of Colonial Gardens, LLC and two other entities she lists; right?
A Yes.
Q And those are debtor entities in the bankruptcy proceedings?
A Yes.
Q You respond to her and say, "The debtors are not currently pursuing any sale discussions"; right?
A That's what it says, yes.
Q Did you pass along Ms. Krigel's interest in purchasing those three entities to the debtor entities?
A I can't specifically recall discussions on that front.
Q Why were the debtors not currently pursuing any sale discussions?
A Because the -- we were still trying to determine a sale, a -- a plan process and which direction a plan would take, whether it would be a reorganization of all entities, whether it would be a sale of some or more than some of the debtors.

Q Is there a reason given that you're pursuing options that you wouldn't want to pursue a potential buyer for three of the debtors?
MR. SHANKLIN: Objection as to time.
THE WITNESS: If such a sale would not be in the best interest of the debtors as part of their reorganization.
BY MR. COLE:
Q And did you make a determination at this point in March of 2025 that a sale of these three entities would not be in the debtors' best interest?
A No, I don't think we made any decision about that.
Q In response, you reject the request to discuss a potential acquisition and you move on?
MR. SHANKLIN: Objection. Form.
THE WITNESS: Yeah, we -- we don't reject that. I just advise that at that moment, the debtors weren't pursuing sale discussions.
BY MR. COLE:
Q Did you ever reach out to Ms. Krigel regarding the interest in acquiring those entities after March 13, 2025?
MR. SHANKLIN: Objection. Scope.
You may answer.

THE WITNESS: Yeah, in -- in just reviewing the file, I recall that Ms. Krigel did reach out subsequently, but I can't recall whether there was any further discussions and whether that was before or after the time that we were representing the debtors she may have entered into the case. I -- I can't recall specifically.

BY MR. COLE:

Q To the best of your recollection, was a potential acquisition as proposed by Ms. Krigel ever pursued by the debtors?

A No.

Q Let's turn back to the deposition notice topic 18. Do you have that in front of you?

A I do.

Q And this topic relates to Lewis Rice's staffing of the engagement. Do you see that?

A Yes.

Q Okay. And what did you do to prepare to respond to this deposition topic?

A I discussed with Larry Parres and reviewed time records of all parties involved in the fee applications.

Q Okay. How many lawyers were assigned to the engagement?

A Well, the -- the -- at different times, I -- I don't recall the specific numbers, but I want to say that in the range of eight to ten lawyers billed time to this -- to this case.
Q How many of those eight to ten lawyers were partners?
A In -- in my review, I did not specifically break that down, but I can think of at least four.
Q How many of the lawyers assigned to the engagement were associates?
A The balance.
Q Any of counsel?
A Scott Morris. Well, Scott Morris is currently retired. He was not retired at the time, so no. No of counsel.
Q Were all of the lawyers assigned to this case in St. Louis?
A Yes.
Q Does it make a difference in Lewis Rice for purposes of revenue attribution where the lawyer and what office the lawyer sits?
MR. SHANKLIN: Objection. Beyond the scope.
You may answer if you have personal knowledge.

THE WITNESS: Yeah, I -- I don't understand that to be part of these topics. My understanding is that there -- there is an allocation between offices depending on origination and also who does the work.

BY MR. COLE:

Q Right. In your experience -- well, how long have you been at Lewis Rice?

A Twenty-eight years.

Q How long have you been a partner?

A Twenty years.

Q Okay. So in your 20 years as a partner at Lewis Rice, is it a standard practice to staff engagements primarily with attorneys in the same office?

A Yes.

Q Is that a policy of any kind?

A Not a specific policy.

Q It's just a general practice across the firm?

A It's, yeah, kind of a natural result of working within the -- the different office, you know, the St. Louis office, the Kansas City office.

Q Does it have -- is it related in any way to the fees being associated with a lawyer tied to the

office in which they sit?
MR. SHANKLIN: Objection. Scope.
BY MR. COLE:
Q Does that question make sense?
A I'd appreciate if you'd restate it.
Q Sure. We've talked about the Kansas City office and the St. Louis office. If a Kansas City attorney were assigned to these bankruptcy proceedings, would the Kansas City office get credit of some kind for that?
MR. SHANKLIN: Objection. Scope.
You may answer if you know.
THE WITNESS: Yeah, my -- my personal understanding is that there would be some credit for doing some work there.
BY MR. COLE:
Q Did you review the total number of hours that Lewis Rice billed on the engagement?
A Not for this. Not -- not as part of my preparation here. I reviewed the fee applications, but I -- I didn't specifically note the hours.
Q Who at Lewis Rice decided what attorneys would provide services on this engagement?
A Larry Parres had the overall direction. He delegated to me getting certain associates involved

with drafting motions, reviewing documents, things of that nature. So I -- I would interact with those associates.

Q Does Lewis Rice have a policy of assigning work to the most junior attorney possible in order to be more efficient?

A Is this on a topic or is this you asking me?

Q Well, I'm asking about staffing policies.

A In our standard provision of our engagement letters is that we will staff it in the most efficient way possible.

Q And that that would include using people with a lower hourly rate where possible?

A If it meets with the duty at -- at hand and -- and serving the client properly, yes.

Q Do you know approximately how many associates in the St. Louis office have experience in bankruptcy proceedings?

MR. SHANKLIN: Objection. Scope.

You may answer.

THE WITNESS: Yeah, I'd have to think about that. I could maybe give you a range.

BY MR. COLE:

Q That's okay. With your experience at Lewis Rice, was the staffing of this engagement more

partner-heavy than you typically experience in a Chapter 11 case?

A With this being the largest case, there would be more partners on this, but proportionately, I'd say it's about the same as what we've had in other Chapter 11 cases.

Q And remind me of how many associates were staffed on this matter?

A In the neighborhood of six.

Q Was Simeon Brown an associate?

A Yes.

Q Okay. Who else?

A Patrick Ganninger. Let's see. Derick Albers, I believe, worked on it. I'm not sure if he was a associate or partner at the time. I'm trying to remember who else. My -- my recollection now of the fee application is escaping me. Can't remember. Skylar Petitt maybe had some time in -- on it and maybe -- I think I talked -- there was somebody else that I worked with on the initial motions. I don't know if it was Patrick Thornton or another associate.

Q Out of those five that you listed for me, do you know if any of them have experience in Chapter 11 cases?

A They've worked on other Chapter 11 cases.

Q With you?
A Yes.
Q With Mr. Parres?
A I don't know as to Mr. Parres.
Q Were you the primary person responsible for interfacing with the associates?
MR. SHANKLIN: Objection. Form.
THE WITNESS: No, just with some of them on the matters that I was handling.
BY MR. COLE:
Q Would those associates also interface with Mr. Parres?
MR. SHANKLIN: Objection. Form.
THE WITNESS: I think that there were some discussions at times, yeah.
BY MR. COLE:
Q Sounds like not that much, though?
A But probably not that much.
Q Okay. Who did they primarily interface with?
A Probably me.
Q Okay. And so did the sort of order of assignment, if you will, fall generally from Mr. Parres to you and then out to either other partners or associates?

A Yeah. I mean, Mr. Parres would talk to Scott Moore about things that I was not involved with, talk to Steve Drapekin about other aspects that I was not involved with. So it wasn't directly to me and then out. It would be to me, it would be to Scott Moore, it would be to Steve Drapekin, and then out.
Q You guys divided some responsibility amongst all of you; right?
A That's correct.
Q What were your particular areas of responsibility?
A Mainly DIP motions, cash collateral motions, orders on all of those, first day motions. Outside of the applications, the weekly, you know, meetings with -- with Focus and with the debtors, reviewing financials, reviewing budgets, working on discovery responses, discovery objections, and then all the -- all the -- well, all the discovery and motions and objections filed by the Committee and Frontier, the -- the Trustee motion preparation response, the fee application objection and response.
Q When there were objections filed to Lewis Rice's interim fee application, you were involved in preparing the response to that?
A I don't -- there -- I don't recall an

objection to the first interim fee application 'cause that was approved.
Q The second interim, and I didn't specify, the objection that was filed relating to Lewis Rice's fee application, whether that be the second one or otherwise, were you involved in preparing that objection? I'm sorry --
A I was involved in preparing the response.
Q You were involved in preparing the response to that objection?
A Yes.
Q Okay. Who was primarily responsible for preparing that response?
A I was the primary drafter of that.
Q Okay. Is it fair to say that you were sort of the day-to-day guy in this bankruptcy proceeding, sort of managing the day-to-day aspects of moving this along?
A No.
Q Okay. Who would that be?
A Larry Parres.
Q I want to ask you about Lewis Rice's communications with the law firm of Brown & Ruprecht. That's -- it's topic 20 on here. What communications did Lewis Rice have with Brown & Ruprecht?

A Yeah. Based on my discussions with Mr. Parres, there were two phone calls between Larry Parres and the Frank Wendt.
Q And what was discussed on those phone calls?
A Mr. Wendt requested, did copies of the filed schedules in the DCA and affiliated debtors' cases and inquired as to whether Frontier Farm Credit was asserting an interest in Valley Hill assets, and he asked about an insurance policy, I believe a Cincinnati insurance policy.
Q When did these two phone conversations take place?
A We did discuss that, and I believe it was in October of 2025.
Q Both of the conversations took place then?
A Yes.
Q So you said that Mr. Wendt asked about copies of filed schedules. Did Lewis Rice provide copies to him?
A I looked and I could not find any email communication delivering those from Larry Parres to Frank Wendt.
Q Did Mr. Parres indicate whether or not he had provided those schedules?
A When he -- he didn't -- he -- he said that

he had not -- he did not provide those, I believe, because they were publicly available.

Q You say that you said that Mr. Wendt inquired whether Frontier had an interest in Valley Hill assets? Did I hear you correct?

MR. SHANKLIN: Objection. Form.

THE WITNESS: Yeah. The -- the question as I understand from my review was whether Frontier asserted an interest, such as a security interest, in assets of Valley Hill.

BY MR. COLE:

Q And what information did Mr. Parres provide in response to that?

A I could not find any written communication from Mr. Parres to Mr. Wendt to that effect. And in our discussions about this, Mr. Parres indicated only that -- that Valley Hill was not a borrower from Frontier and as such did not understand that Frontier could assert an interest in Valley Hill.

Q And then the insurance policy you mentioned, was that provided to Mr. Wendt?

A I -- my understanding from Larry Parres is he did not and didn't really know anything about this Cincinnati insurance policy.

Q So can you confirm that Lewis Rice did not

provide any privileged information to Mr. Wendt?
MR. SHANKLIN: Objection. Form.
THE WITNESS: Based on my search and my discussions and my review of the emails, that's correct.
BY MR. COLE:
Q And it sounds like also based on your search and an investigation, that Lewis Rice provided no documents to Mr. Wendt; is that accurate?
A I -- I searched for Mr. Parres sending anything to Mr. Wendt and I couldn't find anything. I can't -- you know, searching to see if there was anything else out there between anybody else and Mr. Wendt, I -- I don't recall seeing anything to that effect, but I -- I don't want to say one way or another that somebody else may have sent something to Mr. Wendt. I've tried to find out. I haven't seen anything to that effect.
Q When you say you "tried to find out," did you look at the emails that are in your personal cabinet on your computer?
A Well, the -- the -- my personal cabinet, and just to clarify, I -- the -- we do have cabinets for, you know, all the emails that have been produced in the case in response to the request. So I've got a

cabinet for kind of all the ones that I've had in the case and then a cabinet for all the ones that have been produced in the case, which to my understanding is all the emails in the case.
Q And you flipped through all of those to figure out whether or not there were communications with Mr. Wendt?
MR. SHANKLIN: Objection. Form.
THE WITNESS: Yes. So in -- in that time frame that we were -- that Mr. Parres indicated the -- the call was.
BY MR. COLE:
Q So approximately October of 2025?
A Yeah, whatever that -- yeah, in that range. Yeah.
Q When you say "in that range," do you mean there -- are there time times before and times after that?
A Yeah, like a week before, a week after type range.
Q Did you ask Mr. Parres whether or not he provided any privileged information to Mr. Wendt?
A I didn't ask about privileged information.
Q What about client information? Did you ask him whether he provided client information to Mr.

Wendt?

MR. SHANKLIN: Objection to form.

THE WITNESS: Yeah, I -- I did not ask that specific question. I asked about the communications that he had with Mr. Wendt and the -- the full scope of what he indicated was what I just mentioned.

Now, I do -- Mr. Parres may -- I -- I think he did indicate that he may have asked Steve Drapekin to send the Frontier loan documents. I could not find any record of that, but it's possible that he asked Mr. Drapekin to provide whatever loan documents, but again, those had already been filed in the case, so he may have directed him to just review the record of the bankruptcy case.

BY MR. COLE:

Q Is it your understanding that that request was made in the context of whether or not Frontier was asserting an interest in Valley Hill's assets?

A Yes. Yes.

Q Has Lewis Rice provided any notice to a professional liability or malpractice insurer regarding the conduct by any Lewis Rice attorney relating to this engagement?

MR. SHANKLIN: I'm going to object

based on privilege and instruct the witness not to answer.

MR. COLE: So that was a topic that was here. I'm pretty sure that wasn't objected to before coming here today. Maybe I'm wrong.

MR. SHANKLIN: Yeah, it was. We made clear in the discussions that we intended to object upon privilege to that.

MS. SCHULER: To the extent it was privileged?

MR. SHANKLIN: Yeah. And it is privileged. Any communication with the malpractice insurer is privileged.

MR. COLE: Okay. So are you instructing him not to answer as to whether or not a notice was provided?

MR. SHANKLIN: Yes.

BY MR. COLE:

Q Okay. And are you following that instruction?

A I am.

MR. COLE: Okay. And so are you going to instruct him not to answer regarding the date of when a notice was provided?

MR. SHANKLIN: Well, I would instruct

him not to answer whether a notice has been provided or not. So if there's a question about the date, then I would also instruct him not to answer.

BY MR. COLE:

Q Are you going to follow that instruction?

A Yes.

MR. COLE: So fair to say that any question regarding any notice by Lewis Rice to a professional liability and malpractice insurer, you're going to instruct the witness not to answer on the basis of what privilege?

MR. SHANKLIN: Well, it's work product, it's insured and privilege -- insured, insurer privilege. To the extent he would have any knowledge of it, it would be through conversations with counsel. So it'd be attorney-client.

MR. FAIRLIE: I don't know that we know that. I mean, you're testifying for him here.

MR. SHANKLIN: He just asked me what privilege I'm asserting, Zach, and you are not involved in this deposition.

MR. FAIRLIE: I'm asking a simple question.

MR. SHANKLIN: You don't get to ask questions in this deposition.

MR. FAIRLIE: Relax.
MR. SHANKLIN: Not on the record.
MR. FAIRLIE: Relax.
MR. COLE: And so just to make sure, the fact that a notice has or has not been provided is something you're claiming privilege on and instructing the witness not to answer?
MR. SHANKLIN: Yes.
BY MR. COLE:
Q Okay. Did Lewis Rice conduct an investigation regarding any Lewis Rice attorney's conduct relating to the engagement?
MR. SHANKLIN: Objection to the extent it's beyond the scope as to -- never mind.
THE WITNESS: I believe it was asked before, but no, no investigation into conduct has been conducted.
BY MR. COLE:
Q Okay. Have you, John Hall, recommended that an investigation take place?
A So you're asking not on one of these topics? Just in my personal capacity?
Q Yes.
A No, I have not.
Q Okay. Are you aware of any other attorney

at Lewis Rice making a recommendation that an investigation occur into the conduct of any Lewis Rice attorney's conduct relating to the engagement?
A No.
Q Back to topic number 26, briefly, are you aware of whether Lewis Rice has a professional liability or malpractice insurance policy?
A Yes.
Q Okay. Are you aware of the details of that policy?
A No.
Q Okay. Such as, do you know the policy limits?
A I do not.
Q Okay. What are the reasons for Larry Parres's departure from Lewis Rice?
A Larry resigned.
Q On what day?
A August 6, 2026.
Q Was he asked to resign?
A Yes.
Q By whom?
A Our general counsel.
Q Who made the decision to ask him to resign?
MR. SHANKLIN: Objection to the extent

it's beyond the topic.
You may answer if you know.
THE WITNESS: Yeah. And my -- my personal understanding is that it was the managing partner and general counsel.
BY MR. COLE:
Q Why did the managing partner and general counsel ask Mr. Parres to resign?
A Based on my review and what our general counsel has advised me is that Mr. Parres's communications did not meet the standards that Lewis Rice expects of its attorneys.
Q When did they have that conversation with Mr. Parres?
A I believe August 5 and/or 6.
Q Was Mr. Parres told that if he did not resign, then a procedure would be initiated to remove him from the membership?
A That's my understanding.
Q Did Mr. Parres sign any kind of agreement with Lewis Rice upon his departure?
MR. SHANKLIN: Objection to the extent it's beyond the scope of the topic.
You may answer if you know.
THE WITNESS: Yeah, I didn't

investigate that. My understanding is that there was a -- just a written resignation notice from Mr. Parres to the management.

BY MR. COLE:

Q Was that notice provided on August 6th?

A That's my understanding, yes.

Q Was it effective the same day?

A I believe it was effective immediately, yes.

Q Was Mr. Parres required to turn over all Lewis Rice property?

MR. SHANKLIN: Objection to the extent it's beyond the topic.

You may answer if you know.

THE WITNESS: Yeah, I did not investigate that, but any procedures would be governed by our operating agreement in terms of a resignation.

BY MR. COLE:

Q Is there one operating agreement for the firm or is there one for St. Louis and one for Kansas City?

MR. SHANKLIN: Scope.

You may answer if you know.

THE WITNESS: Yeah, I -- I don't know if there are separate operating agreements. Let me correct. We -- we do have a St. Louis operating

agreement because there -- when there's modifications each year, then we sign and that -- those are St. Louis signatures. So there's separate operating agreements between St. Louis and Kansas City.

BY MR. COLE:

Q Okay. When Mr. Parres departed Lewis Rice, was Mr. Parres required to turn over all of his communications relating to this matter?

MR. SHANKLIN: Objection. Beyond the scope.

You can answer if you know.

THE WITNESS: Yeah, I did not investigate that. My understanding is that he had already turned over all communications.

BY MR. COLE:

Q And those communications we talked about earlier include text messages; right?

A Yes.

Q Do they include personal email?

MR. SHANKLIN: Objection. Beyond the scope.

You may answer if you know.

THE WITNESS: I -- I don't know for sure, but I have talked to Mr. Parres about using any email outside of Lewis Rice email and he did not.

MR. COLE: All right. I may be done, if you can give me -- can we -- I know we just took one, but can we take a break here? Okay.

THE VIDEOGRAPHER: The time is 3:28 p.m. We're off the record.

(Off the record.)

THE VIDEOGRAPHER: Time is 3:44 p.m. We're on the record.

BY MR. COLE:

Q Mr. Hall, you testified earlier that Mr. Parres was asked to resign because of his communications. Do you recall that?

A Yes.

Q Was he asked to resign because of his communications in this matter?

MR. SHANKLIN: Objection. Form.

THE WITNESS: Yes.

BY MR. COLE:

Q And I'll be a little bit more clear. Was Mr. Parres asked to resign because of his communications relating to this case?

MR. SHANKLIN: Objection. Form.

THE WITNESS: Yes.

BY MR. COLE:

Q And specifically, were those communications

with Tory Schwope?

MR. SHANKLIN: Form.

THE WITNESS: No.

BY MR. COLE:

Q Who were those communications with?

A Samantha Schwope and Tory Schwope.

Q Samantha Schwope, Tory Schwope. Anybody else?

A I don't believe so.

MR. COLE: Those are all the questions I have. Thank you.

EXAMINATION

BY MS. BUTER:

Q Good afternoon, Mr. Hall.

A Hi, Vicki.

Q I'm going to start where Mr. Cole left off and then I'm going to kind of work my way through some topics we haven't touched on yet. And I have some other questions regarding topics we have, but I will do my best not to be repetitive.

With regard to the resignation of Mr. Parres, when he, if you know, when he was asked to resign, do you know what his reaction was?

A To -- forgive the redundancy, but resignation. He was resigned to the fact.

Q Okay. And you indicated that he resigned or was asked to resign because his communications did not meet Lewis Rice's standards. Do you have any specific examples of those communications?
A No, no specific examples.
Q Is Lewis Rice, if you know, still seeking fees for Mr. Parres's work conducted in the DCA Outdoor matters since his resignation?
MR. SHANKLIN: I'm going to object just to scope. You did say if you know, but I just want to make sure the record's clear.
You can answer.
THE WITNESS: Yeah. Yeah, the personal understanding is yes, Lewis Rice is not modifying their fee application, if that's the -- the -- answers the question.
BY MS. BUTER:
Q I am going to go back to talk to you a little bit about the engagement of Lewis Rice in this matter. And I believe you testified earlier that Tory Schwope was a client as an individual of Lewis Rice dating back to about December of 2024; is that correct?
MR. SHANKLIN: Objection. Form.
THE WITNESS: Only in connection with

his being a co-borrower with the other 20 some-odd co-borrowers.
BY MS. BUTER:
Q But he was listed as a Lewis Rice client; correct?
A Yes.
Q And forgive me if Mr. Cole asked this question. Are you aware of any written communication to Mr. Schwope indicating that that representation of him personally was ending?
A I investigated and we discussed that we don't believe there was any specific written communication to that effect.
Q You've been at Lewis Rice, I think for approximately 25 years; is that correct?
A Twenty-eight, yes.
Q And have you been working in the bankruptcy and insolvency area your entire career?
A Yes.
Q You're familiar with the, generally speaking, the bankruptcy statutes?
A Yes.
Q Okay. And you're familiar specifically with the statutory provisions that address the employment of counsel for debtors in bankruptcy?

A Yes.
Q Would it be correct, just generally, and I'm going to refer you, if you know the statutory codes, it's 11 USC Section 327(a) provides that a debtor in possession may employ counsel if that attorney does not hold or represent an interest adverse to the estate; is that correct?
MR. SHANKLIN: Outside the scope.
You may answer if you know.
THE WITNESS: My recollection is that's a correct recitation of the statute.
BY MS. BUTER:
Q And the counsel has to be a, I think a disinterested person; is that fair?
MR. SHANKLIN: Same objection.
THE WITNESS: That's -- that is correct.
BY MS. BUTER:
Q Okay. And there is a Federal Rule of Bankruptcy Procedure 2014, a disclosure obligation by counsel; is that correct?
A Yes.
Q Okay. And there are certain things that have to be provided or disclosed in connection with counsel's approval to be retained by a debtor; is that

fair?
A Yes.
Q I believe when you were asked earlier whether Lewis Rice disclosed its relationship with Tory Schwope as a client, you indicated you weren't sure; is that correct? Is my recollection correct?
MR. SHANKLIN: Objection to form.
THE WITNESS: I believe that is correct.
BY MS. BUTER:
Q I am going to hand you what I'm marking as Exhibit 42 and 43.
(Exhibit 42 and Exhibit 43 were marked for identification.)
Exhibit 42 is an application for an order under 11 USC Section 327(a) authorizing the employment and retention of Lewis Rice; is that correct?
A Yes.
Q And Exhibit 43 is a declaration of Larry Parres in support of that application under Section 327(a); is that correct?
A Yes.
Q Did you have any role in preparing either of these documents?
A I don't recall specifically on this, but

it's -- it's possible.
Q Okay. And I'll let you take a moment to look through both of them. My question is going to be whether in either of these documents it was disclosed that Tory Schwope had been a client individually of Lewis Rice.
MR. SHANKLIN: Objection to form.
THE WITNESS: Yeah, I don't see any indication of prior representation of Tory Schwope.
BY MS. BUTER:
Q Is there any disclosure in either Exhibit 42 or Exhibit 43 that you saw relating to the prior representation of the debtor entities?
A No, I did not see anything to that effect.
Q I am going to hand you what I've marked as Exhibit 44.
(Exhibit 44 was marked for identification.)
Just to close the loop on the prior engagement, Exhibit 44 appears to be a Lewis Rice engagement letter dated December 16, 2024; is that correct?
A Yeah. Lewis Rice, yeah, Kansas City office. Louis Wade engagement letter.
Q And if you go to the second-to-last page of

Exhibit 44, was this signed by DCA Outdoor and by Tory Schwope?
A Yes.
Q And if you look at the first page of Exhibit 44, the email or engagement letter indicates, "Thank you for electing Lewis Rice to represent," and then it states, "Tory Levi Schwope individually"; correct?
A Yes.
Q And you mentioned this came from Lewis Rice Kansas City, but I think we confirmed earlier that, from an entity perspective, Lewis Rice is one law firm, it just has two offices, St. Louis and Kansas City; is that correct?
MR. SHANKLIN: Objection. Form. Misstates testimony.
THE WITNESS: That's essentially correct.
BY MS. BUTER:
Q Is there something incorrect about it?
A Separate -- Lewis Rice St. Louis and Lewis Rice Kansas City are separate. They operate under separate operating agreements, separate entities, and separate revenues, expenses in each -- or in each office. Kansas City office has its own revenues and expenses. St. Louis has its own revenues, expenses.

Q Does Lewis Rice represent itself or market itself as one firm?

MR. SHANKLIN: Objection. Form.

THE WITNESS: I think that's fair to say, yes.

BY MS. BUTER:

Q If you look at the first page of Exhibit 44 and you look in the re line of this engagement letter, it simply says, "Engagement of Lewis Rice LLC"; is that correct?

A Yes.

Q It does not specify Lewis Rice KC; correct?

A No, the -- the heading of the letter does, but not that re line.

Q Where does it say it in the heading?

A Lewis Rice 1010 Walnut, Suite 500, Kansas City, Missouri.

Q You're just referring to the address?

A Correct.

Q Okay. And Lewis Rice Kansas City, is it a completely separate entity from Lewis Rice St. Louis?

MR. SHANKLIN: Objection. Beyond the scope of the topics.

You may answer if you know.

//

BY MS. BUTER:

Q If you know.

A Again, separate -- well, I -- I should say I -- I don't know the specifics of that. We have different email address. You know, you can see Lewis Rice KC is in their email address. We don't have that in the St. Louis address. As far as separate entities, my understanding is that they are -- well, I don't know specifically.

Q Do you know if Lewis Rice Kansas City and Lewis Rice St. Louis share a conflict system for the purposes of checking potential client conflicts?

MR. SHANKLIN: Scope.

You can answer if you know.

BY MS. BUTER:

Q If you know.

A Yes.

Q And you had indicated previously that you believe a conflicts check was run for Tory Schwope; correct?

A Yes.

Q And ultimately, it was determined, I think through conflicts counsel that, at least by Lewis Rice, that Tory's interests were not adverse to the interests of the debtors; is that correct?

A That's correct.
Q I'm going to show you or hand you what we're going to mark as Exhibit 45.
(Exhibit 45 was marked for identification.)
Exhibit 45 is an email chain. It starts on the last page, December 6, 2024. And on the first page appears to run through February 12th, perhaps of 2025.
A I see those dates.
Q Okay. And on this email chain on the very last page, December 6th, there is a potential client conflicts check run. Do you see that?
A Yes.
Q And it lists the potential clients as Schwope Brothers, Tory Schwope, possibly other entities with "Schwope" in the name -- Nurseries and DCA Outdoor; correct?
A Yes.
Q Okay. And then if you go then move to the first page of Exhibit 45, there is an update requested from Louis Wade on January 29, 2025; is that correct?
A I see, yeah, Louis Wade's email saying, "Updating conflict check," yes.
Q Okay. And then he writes, "Additional

adverse parties"; correct?
A Correct.
Q And then there's a list of additional adverse parties that he wants conflict check run on; is that fair?
A Yes.
Q If you go to the top of the third page of Exhibit 45, Bates stamp 603 in the bottom right-hand corner, the third adverse party down on that page that he lists is Tory Schwope; is that correct?
A Yes.
Q Anywhere on this email chain do you see a conflict check being run for Valley Hill Tree Farm?
A I don't see a Valley Hill Tree Farm in that list.
Q Based on your experience, personal experience working in bankruptcy and insolvency, and based on your experience in representing debtors, do you believe that the client relationship with Tory Schwope should have been disclosed in the application for retention of Lewis Rice?
MR. SHANKLIN: Objection. Calls for legal conclusion.
You may answer.
THE WITNESS: Given that -- that his

interests were aligned with the debtors, I think it's a close question. So always, our approach is always, you know, to make as much disclosure as possible. So if -- in -- in a close call, normally, we would make that disclosure.

BY MS. BUTER:

Q Do you know why it was not made here?

A I do not.

Q And ultimately, do you know who made the decision about who disclosed information, what we marked as Exhibits 42 and 43?

A I do not.

Q And ultimately, Lewis Rice was retained based on the application and the affidavit that I provided you filed in this bankruptcy that is Exhibit 42 and 43; correct?

A Lewis Rice was retained and I believe it was in response to the application and affidavit that we filed in the case.

Q To your knowledge, did Lewis Rice ever supplement or update the disclosures that were provided to the court regarding the factors at issue in Exhibit 42 and 43?

A Is that on -- on one of the scope questions or are you asking my personal --

Q I'm asking your personal.
A I don't recall any supplement.
Q When this case was first filed, the debtors in this case were what's known as debtors in possession; correct?
A Yes.
Q And is it a fair statement that under Section 1107 that debtors in possession, when they're operating as debtors in possession in bankruptcy, have the rights, powers, and functions and duties of a trustee, essentially?
MR. SHANKLIN: Objection. Scope.
You may answer.
THE WITNESS: My recollection of 1107 provides as much, yes.
BY MS. BUTER:
Q And a trustee who would serve in a Chapter 11 bankruptcy owes fiduciary duties to the debtors' estate; correct?
MR. SHANKLIN: Same objection.
THE WITNESS: Yeah. The trustee would owe fiduciary duties to the bankruptcy estate, yes.
BY MS. BUTER:
Q And so in turn, a debtor in possession who is fulfilling the role of the trustee during that time

period would also have that same fiduciary duty? Is that your understanding based on your bankruptcy experience?

MR. SHANKLIN: Same objection.

THE WITNESS: Yes, the debtor does.

BY MS. BUTER:

Q And when a law firm is retained under Section 327(a), that law firm's retention is specifically tied to carrying out the trustee's duties; is that correct?

MR. SHANKLIN: Same objection.

THE WITNESS: It's tied to carrying out the duties of the debtor or the trustee as directed by the debtor or the trustee.

BY MS. BUTER:

Q And, again, those duties in this case for the debtor in possession in this particular matter would include that fiduciary duty that's owed to the estate; correct?

MR. SHANKLIN: Same objection.

THE WITNESS: Yes.

BY MS. BUTER:

Q Did Lewis Rice at any time advise Mr. Tory Schwope that his decisions as the debtor in possession's principal must serve the estate and all

its creditors and not just his personal interest?
A We had many conversations about the duty to maximize value for the estate, including creditors, equity holders, and other stakeholders in the estate.
Q Did you have any of those conversations with Mr. Schwope?
A Is this on one of the specific topics?
MR. SHANKLIN: I think she just asked whether you did.
BY MS. BUTER:
Q I did, but since you asked, I'm going to take a look here. I'll let you know. No, not specifically. I'll ask in your personal capacity.
A I don't specifically recall having any of those discussions. I recall being present when those discussions between Mr. Parres and Mr. Schwope were had.
Q So was Mr. Parres who advised Mr. Schwope of that?
A Yes.
Q Prior to the filing of the bankruptcy for the debtors, did Lewis Rice receive a retainer from the debtors?
A Yes.
Q And was that in the amount of 200,000?

A Yes.
Q If I say that, that was wired or received by Lewis Rice by February 12, 2025, does that sound correct to you?
A No.
Q Okay. When do you recall it coming in?
A On February 12th by a check.
Q By check. Did Lewis Rice deposit that retainer shortly after receiving it?
A My, in reviewing this, my understanding is it wasn't immediately after, but it was prior to the filing. I could not determine the exact date of the negotiation.
Q And it was prior to the filing because prior to filing bankruptcy, Lewis Rice applied approximately $97,000 worth of pre-petition fees to that retainer; is that correct?
A Yeah. The bankruptcy-related fees, correct.
Q Do you know which bank account, the debtors' bank account the retainer was sent from?
A I believe it was Kat, K-A-T, Outdoor.
Q At any time since Lewis Rice began representing the debtors, did Lewis Rice learn that the bank account from which the retainer was drawn had a $0 balance at the start of February of 2025?

A No.
Q At any time during Lewis Rice's representation of the debtors, did Lewis Rice come to understand that the $200,000 was deposited just a day before it was released or sent to Lewis Rice?
A No.
Q Do you happen to know the source of the funds that the retainer came from?
A No.
Q Do you know whether the funds that were deposited in the bank account that wrote the check to Lewis Rice represented a payment from one of the debtors' customers?
A We understood that at some point during the bankruptcy case, Focus Management was told that there -- that one of the debtor entities had sold or pre-sold some trees that were used to pay employees, operating expenses, retainer, other expenses.
Q Prior to the debtors filing for bankruptcy, had Lewis Rice reviewed the loan documents between the various debtors and Frontier Farm Credit?
A Yes.
Q Did Lewis Rice or was Lewis Rice aware that Frontier Farm Credit had a first priority security interest in all the debtors' accounts receivable?

A Steve Drapekin reviewed those and my understanding is yes, we understood that there was a first priority security interest in the various debtors' assets.
Q And that was understood by Lewis Rice prior to the filing of bankruptcy for the debtors?
A Yes.
Q And did Lewis Rice have any understanding prior to the filing of bankruptcy as to the status of the loan or loans between Frontier and the debtors?
MR. SHANKLIN: Objection. Form.
THE WITNESS: Yes.
BY MS. BUTER:
Q What was your -- what was Lewis Rice's understanding?
A That there was a forbearance in place between Frontier and the debtor entities and that there were asserted defaults under the forbearance.
Q So in my language, tell me if I'm correct, the debtors had been in default with Frontier Farm Credit. There was a forbearance agreement that was entered into; is that correct?
A Yes.
Q Do you know whether that forbearance agreement had been terminated by Frontier as of

February 12, 2025?
A No, I did not investigate the status of that and I don't recall.
Q Do you know if anyone at Lewis Rice made any inquiry into the source of the retainer funds before accepting them?
A Nobody inquired into the source of funds.
Q Do you know if anybody at Lewis Rice asked the debtors or Frontier whether those funds were subject to any pre-existing lien?
A No, nobody asked about that.
Q Do you know if anyone at Lewis Rice asked whether Frontier Farm Credit's consent was required prior to using those funds to pay the retainer?
MR. SHANKLIN: Objection. Vague, ambiguous.
You can answer.
THE WITNESS: No, I'm not aware of any inquiry to that effect.
BY MS. BUTER:
Q Did you have any understanding prior to the filing of the bankruptcy that any accounts receivable that were received by the debtors were supposed to go to the revolving line of credit, paying off the revolving line of credit?

MR. SHANKLIN: Objection. Asked for a legal conclusion.
THE WITNESS: Yeah, I -- I did not investigate that in my specific -- I don't have any specific recollection or understanding of the operation of the loan documents.
BY MS. BUTER:
Q I am going to hand you what I'm marking as Exhibit 46.
(Exhibit 46 was marked for identification.)
Exhibit 46 is an email exchange and the top email is from you to Tory Schwope, Louis Wade, and Larry Parres; is that correct?
A Yes.
Q And it's dated February 20, 2025?
A Yes.
Q And in the first line of your email, you state, "I don't believe we have all the loan documents. Can you have those sent to us as soon as possible"; is that correct?
A Yes.
Q Do you happen to know whether Steve Drapekin had all the loan documents prior to February 20, 2025?
A I don't know specifically when we got them,

whether it was on February 20th or February 21.
Q Going back to the representation of Mr. Schwope, and I'm going to refer to after Lewis Rice was engaged in connection with these bankruptcies, so in the February of 2025 time period, at any time after that, did Lewis Rice provide any legal advice to Mr. Schwope about his personal financial exposure arising from the debtors' insolvency or bankruptcy?
A No.
Q Did anyone from Lewis Rice advise Mr. Schwope about his personal guarantee -- I'm sorry, about his co-borrower status with Frontier?
A I'm -- I recall it being mentioned that he was a co-borrower, something that he knew already, so that was discussed. It wasn't advice to him.
Q And Lewis Rice did not have any concern that the status of Tory Schwope as a co-borrower could create a conflict with the interest of the debtors or the debtors' estate?
MR. SHANKLIN: Objection. Form.
You may answer.
THE WITNESS: No, there was no concern. We advised Tory that he needed to get his own counsel because he was responsible as a co-borrower.
//

BY MS. BUTER:
Q Did Lewis Rice give Tory Schwope any legal advice whatsoever?
MR. SHANKLIN: Objection. Form.
THE WITNESS: We gave advice to him in his capacity as CEO and decision-maker for the debtors 'cause that's the only way we could communicate with the debtors.
BY MS. BUTER:
Q When you say that's the "only way you could communicate with the debtors," was there anybody else of the debtors who was authorized to bind or speak on behalf of the debtors?
A I didn't investigate that, but my understanding that -- was that Tory was the one who could bind the debtors. Juanita Schwartzkopf was given CRO authority, but Tory retained CEO authority.
Q Did Lewis Rice ever become aware of a situation where somebody else employed by the debtors disagreed with any action that Mr. Schwope took during the course of the bankruptcy?
MR. SHANKLIN: Objection. Beyond the scope.
You may answer if you know.
THE WITNESS: Yeah, I'm not familiar

with anything to that effect.
BY MS. BUTER:
Q During the time period that Juanita was the chief restructuring officer, did she have the ability to bind the debtors, if you know?
MR. SHANKLIN: Objection. Calls for legal conclusion.
THE WITNESS: Yeah, the terms of her engagement were set by her retention in the case. I don't know the specifics of that.
BY MS. BUTER:
Q Did you personally ever have any discussions with Samantha Schwope about the direction of the debtors' bankruptcy?
A I'm not sure what you mean by "the direction of the bankruptcy case."
Q Sure. I'll ask some follow-up questions. Did you personally ever have any discussions with Samantha Schwope regarding a chief restructuring officer being placed of the debtors?
A Is this one of the topic questions?
Q This I'm asking personally.
A Yeah, I don't recall anything to that effect.
Q Do you ever recall discussing with Ms.

Samantha Schwope whether she believed a trustee should be appointed of the debtors?
A I think she -- she was involved in discussions about the effort to appoint a trustee and how detrimental that would be to the value of the debtors.
Q Do you ever recall having any discussions with Samantha Schwope abide her opinion regarding restructuring or a sale of any of the debtor entities?
A Not specifically. I don't have any personal recollection of that.
Q You indicated earlier in your testimony that you had had discussions, Lewis Rice had had discussions with Mr. Schwope about the value he brought to the debtor entities; is that correct?
A Yes.
Q Did Lewis Rice independently conduct any investigation as to Tory's statements that he brought value to the debtor entities?
A Focus Management was preparing the financial information and we had the audit reports that had been prepared up to that time. And so the valuations were based on the audit report and the financial information we had at that time.
Q And just to be clear, I don't think the 2023

audit had been completed; correct?
A That's correct.
Q Okay. So you had 2022 audit?
A Yes.
Q Okay. And setting aside financial value just for right now, did you do any investigation generally as to what Tory Schwope brought to the table with regard to the data entities, if anything?
MR. SHANKLIN: Objection. Scope. Vague.
You may answer.
THE WITNESS: Yeah, I'm not -- I don't have any specific knowledge of some investigation to that effect.
BY MS. BUTER:
Q What steps did Lewis Rice take upon its engagement in this case to evaluate whether Tory Schwope should remain in control of the debtors?
A Review -- we reviewed financial information. We talked with Tory. We did reviews of, if I'm recalling, industry, to see what -- what Schwope Brothers Tree Farm's reputation was in the industry. General searches, internet searches.
Q Did you talk to any other employees with the debtors to determine, make a determination that it was

in the best interest of the debtors for Tory Schwope to remain in charge?
A We spoke with and met with other employees, yes, employees of the debtors.
Q About that topic, whether Tory Schwope should remain in control?
A I -- I don't recall specific questions to that effect, but it was clear that they knew the importance of Tory to the operation.
Q You said you reviewed financial information in making that determination. What financial information did Lewis Rice review in connection with determining that Tory should remain in control?
A Of the audits and -- and then throughout the case or the financial information that we received.
Q We'll talk about this a little later in connection with one of the other topics, but did Lewis Rice at any time during which you were engaged by the debtors ever reach the conclusion that the values stated on the debtors' books and records were overstated?
A I'm not aware of any determination to that effect. There was at one time, let me correct that, that I think Larry Parres thought that receivables had been overstated by some amount, but that Focus

Management corrected that understanding and disputed that. I think it was a -- a million or a $2 million discrepancy that Larry thought was out there and that Juanita Schwartzkopf corrected.

Q Okay. Other than that, you're not aware of any time the Lewis Rice made a determination or reached a conclusion that the values of the debtors' assets were overstated?

A I was not involved in -- in the discussions about sort of the accounting systems and background and how -- what determinations were made with respect to that. So I don't have any personal knowledge as to whether or not those resulted in any changes or determinations or anything about valuation. I was aware that there were discussions about certain expenses being included, not being included, but I -- that was beyond my scope.

Q You were asked a little bit earlier about topic 11, which is communications with Focus Management Group regarding their role and their blocking power, and I just have a few follow-up questions on that topic. Did, to your knowledge, did Lewis Rice and Focus Management Group coordinate regarding cash collateral issues in this case?

A Yes.

Q Did Lewis Rice and Focus develop joint strategies regarding the cash collateral orders throughout this case?

A Focus Management would provide us information and proposed budgets and we would review those, discuss those with Focus Management, and then come to conclusions about what we wanted to pursue with respect to cash collateral and the cash collateral motions.

Q In connection with opposing the motion to appoint a Chapter 11 trustee, did Lewis Rice and Focus Management Group coordinate?

A We discussed the response to the trustee motion and Lewis Rice asked for financial information from Focus Management that we would use to support opposing the appointment of a trustee and showing the loss and value that would result.

Q Did Focus Management Group support the decision of the debtors to oppose the appointment of a Chapter 11 trustee?

MR. SHANKLIN: Objection. Form.

THE WITNESS: I -- I don't know. I don't know.

BY MS. BUTER:

Q Would it have been significant to Lewis Rice

in giving advice to the debtors if Focus Management Group did not support opposing that motion?

MR. SHANKLIN: Objection. Calls for speculation.

You may answer.

THE WITNESS: It could be, but the information they gave us showed operating positive and they continued to support that conclusion.

BY MS. BUTER:

Q I am going to switch to a new topic and start discussing with you what is designated as topic 15, which is Lewis Rice's knowledge and assistance with the DIP financing that was obtained or sought to be obtained in this matter. Can you -- at a high level, do you understand what DIP financing is?

A Yes.

Q What's DIP financing?

A It is financing obtained by a debtor during a bankruptcy case to fund the expenses of a debtor during the bankruptcy case.

Q And what's a priming lien?

A A -- a priming lien is a, in the DIP context, would be a -- a lien -- a -- a loan that would obtain priority over the existing pre-petition lender to the debtor, lien priority.

Q I am handing you what I've marked as Exhibit 47.
(Exhibit 47 was marked for identification.)
Exhibit 47 is an email chain that starts between Lisa Peters and Larry Parres and then Larry forwards, Mr. Parres forwards that to Tory and Mike Scott and CCs you and then Mr. Schwope responds. Do you see that?
A Yes.
Q And it is dated February 13th and February 14th; is that correct?
A Yes.
Q And if you look at page 2 of Exhibit 47, there is an email from Ms. Peters to Mr. Parres; correct?
A Yes.
Q And Ms. Peters is counsel for Frontier Farm Credit; correct?
A Yes.
Q And in her email to Mr. Parres, Ms. Peters passed along the draft debtor in possession financing term sheet that had previously been provided; is that correct?
A Previously been provided to?

Q Steeplechase?
A Yes.
Q And if you go to the first page of Exhibit 47, Mr. Parres forwards that to Mr. Schwope and Mr. Scott and has a draft email back to Ms. Peters; is that correct?
A That's what it says.
Q Okay. The first item Mr. Parres proposes to send back to Ms. Peters is that "the debtors will agree to hire Steeplechase as its financial advisors if Farm Credit desires, but we will not put them in as a CRO with control of the debtors." Do you see that?
A I do.
Q And at least initially when the DIP financing was being negotiated, the debtors opposed the appointment of any CRO; is that fair?
A Opposed any CRO with authority to make all decisions for the debtors.
Q And who made the decision to oppose the appointment of a CRO with control of the debtors?
A The debtors.
Q And when you say "the debtors," who of the debtors?
A Tory Schwope primarily.
Q Was there anybody else you were aware of who

made that decision for the debtors?
A I'm not aware of anybody else making that decision since Tory had the decision-making authority for the debtors.
Q Did Lewis Rice challenge Mr. Schwope's determination that a CRO with control over the debtors should not be appointed?
MR. SHANKLIN: Objection to form.
THE WITNESS: I think there were discussions about what structure any type of management would take going forward, but there were not -- there was not -- Lewis Rice did not conclude that Tory should be out of management.
BY MS. BUTER:
Q The second point that Mr. Parres sends to Mr. Schwope as a proposed email back to Ms. Peters is, "The debtors will not be pursuing a sale process in the Chapter 11, but rather will work with all creditors toward a reorganization that will benefit all creditors and employees, which may include the sale of certain businesses or assets." Do you see that?
A Yes.
Q So prior to filing for bankruptcy, Chapter 11 bankruptcy on February 14th, who had made the

decision that a sale process would not be on the table as part of the Chapter 11 bankruptcy options?
A I think as of February 14th, that the debtors had made a -- a decision that maximizing value would not be -- would not arise from a sale of all operations of the debtors.
Q And do you know how the debtors reached that decision?
A I do not.
Q Did Lewis Rice conduct any evaluation as to how the debtors reached the decision that a sale process would not maximize value?
MR. SHANKLIN: Objection. Beyond the scope.
You may answer if you know.
THE WITNESS: Yeah, I believe that Larry Parres had had extensive meetings with Tory, reviewed the financial information, reviewed information about the debtors.
BY MS. BUTER:
Q And then at the top of Exhibit 47, Mr. Schwope responds to Mr. Parres and you're CC'd and says, "I agree with your response, Larry. Please send."
A I see that.

Q Going to hand you what I've marked as Exhibit 48.
(Exhibit 48 was marked for identification.)
Exhibit 48 at the top is an email from you to Ms. Peters dated February 18, 2025, attaching comments to the DIP term sheet; is that correct?
A Yes.
Q Excuse me. Before we look at the comments to the DIP term sheet, at the bottom of the first page of Exhibit 48, Ms. Peters writes to Mr. Parres and CCs you and states that she's following up on the status of the DIP loan term sheet markup and a proposed 13-week cash forecast. Do you see that?
A Yes.
Q And Ms. Peters informs Lewis Rice that Frontier is not going to negotiate a form of cash collateral order without first reviewing the 13-week cash forecast; is that correct?
A That's what it says.
Q And you respond and you, like I say, you attach the comments to the DIP term sheet and you indicate, "The company's working on the 13-week budget"; is that correct?
A Yes.

Q Who at Lewis Rice was responsible for making these comments to the DIP term sheet? And the red line, if it's convenient for you, is the second document that is attached to Exhibit 48.
A Yeah. My recollection is that Steve Drapekin, Simeon Brown, and Larry Parres were primarily reviewing comments and then I also reviewed their comments.
Q Did you recall whether you personally had any specific edits that you suggested making to this DIP term sheet?
A I do not specifically recall any particular edits from February 18, 2025.
Q If you look at the red line that is attached to Exhibit 48, and if you look at page 9 of the red line.
A Yes.
Q There was a section in the DIP term sheet proposed by Frontier regarding the appointment of a chief restructuring officer; is that correct?
A I see that section.
Q And Lewis Rice's edits to that remove that section in its entirety; correct?
A Correct.
Q So Lewis Rice on behalf of the debtors was

signaling to Frontier that no chief restructuring officer at all would be acceptable by deleting everything related to the CRO provisions in this term sheet; is that fair?

MR. SHANKLIN: Object to form.

THE WITNESS: The debtors were representing that to Frontier.

BY MS. BUTER:

Q Through Lewis Rice?

A We were representing the debtors. So we conveyed that red line to Frontier.

Q And then if you go to page 11 of the red line that's attached to Exhibit 48, there was a section in the term sheet that states Section 363 Sale Milestones. Do you see that?

A Yes.

Q And that was deleted in its entirety as well; is that correct?

A Yes. Is not applicable. Right.

Q I am going to hand you what I'm going to mark as Exhibit 49.

(Exhibit 49 was marked for identification.)

Exhibit 49 at the top of the first page is an email from Ms. Peters to you dated February 20,

2025; is that correct?
A That's what it says, yes.
Q Okay. And Ms. Peters conveys to you that, "We have reviewed and discussed the markup of the DIP loan term sheet with Frontier. The primary gating issue is the appointment of a CRO. This is non-negotiable for Frontier." Do you see that?
A I do.
Q So did you convey to the debtors that the appointment of a CRO was non-negotiable?
MR. SHANKLIN: Objection. Form.
BY MS. BUTER:
Q On behalf of Frontier.
A Are you asking my personal recollection?
Q I'm asking whether Lewis Rice communicated this with the debtors.
A I don't specifically recall a discussion to that effect, but I know that there were discussions about Frontier's demand for a CRO.
MR. SHANKLIN: Can we go off the record for literally one second? I mean, not literally, but two seconds?
MS. BUTER: Yes.
THE VIDEOGRAPHER: Time is 4:46 p.m. We're off the record.

(Off the record.)
THE VIDEOGRAPHER: Time is -- time is 4:47 p.m. We're on the record.
BY MS. BUTER:
Q Handing you what I've marked as Exhibit 50.
(Exhibit 50 was marked for identification.)
Exhibit 50 is an email chain between you, Mr. Parres, and certain employees of DCA; is that correct?
A Yes.
Q If you look at the first page of Exhibit 50, in the middle of that, there's an email from you to Mr. Scott, Mr. Parres CC-ing Mr. Schwope and Ms. Schwope and Jessica DeGregorio; is that correct?
A Yes.
Q Okay. And in that email, you do in fact inform the debtors that Farm Credit's counsel will not back off the requirement of a CRO; correct?
A That's correct.
Q As part of a DIP. You then indicate in your email, "They state that they believe proceeds of collateral are being impermissibly diverted. They provide no evidence or support for their claims." Do you see that?

A I do.
Q And in response to that, Ms. Samantha Schwope replies to you at the top of the first page of Exhibit 50, "When they say proceeds of collateral are being impermissibly diverted, are they suggesting we are depositing money into external accounts?" Do you see that?
A I do.
Q Did you personally conduct any investigation into the concerns of Frontier Firm Credit that proceeds of collateral were being impermissibly diverted?
A I did not because I did not understand what was meant by that.
Q Did you follow up and ask what was meant by that?
A I did not.
Q Do you know if anybody from Lewis Rice conducted any kind of analysis into Frontier's concerns that proceeds of collateral were being impermissibly diverted?
A I'm not aware of any investigation.
Q Do you know if this refers to the retainer received by Lewis Rice at all?
MR. SHANKLIN: Objection. Calls for

speculation.

THE WITNESS: I do not know what Samantha Schwope was referring to.

BY MS. BUTER:

Q When Ms. Schwope at the top of the first page of Exhibit 50 asks about depositing money into external accounts, did Lewis Rice conduct any kind of follow-up to determine if the debtors were in fact depositing money into external accounts?

MR. SHANKLIN: Beyond the scope.

You can answer if you know.

THE WITNESS: I did not. My understanding is that there were efforts to establish accounts. Whether those were permissible or impermissible, I do not know.

BY MS. BUTER:

Q I'm going to hand you what I'm marking as Exhibit 51.

(Exhibit 51 was marked for identification.)

Exhibit 51 is a continued email chain between you and certain DCA employees and Mr. Parres; is that correct?

A Yes.

Q Okay. The second page of Exhibit 51 in the

middle has that same email from you where you referenced the proceeds of collateral being impermissibly diverted. Do you see that?
A Yes.
Q And then in response to that, there is a statement or an email from Mr. Schwope, Mr. Tory Schwope, where he informs you, "They are claiming that we are collecting the AR and using it to pay employees. They referenced this in a meeting with Mike today." Do you see that?
A I do.
Q Okay. And then you respond on the first page of Exhibit 51. And with regard to that specific point, you say, "And why would using AR to pay employees be impermissible? The employees are employees of borrowers; correct? And payroll is a part of the budget you have been providing Farm Credit; correct?" Do you see that?
A I do.
Q Okay. And then there's a response to your email from Ms. Samantha Schwope and she states, "They still will have no way to prove this is happening. They will see ADP attempt to draw from the line tomorrow and they will reject it. So as far as they are aware, payroll will bounce." Do you see that?

A I do.
Q And did you have any follow-up, whether emails or discussions with Ms. Schwope, about what she meant in that email?
A I don't recall any specific discussion with Samantha Schwope about her email. I don't recall.
Q When she says, "They still will have no way to prove this is happening," did that raise any concerns to you when you received this email?
A I don't recall having or what concerns I had at the time.
Q Are you aware of an employee payroll issue ever being investigated by anyone at Lewis Rice?
MR. SHANKLIN: Objection. Beyond the scope.
You can answer if you know.
THE WITNESS: I'm not aware of a payroll investigation.
BY MS. BUTER:
Q I am handing you what I've marked as Exhibit 52.
(Exhibit 52 was marked for identification.)
Exhibit 52, not looking at the top email but looking at the second email on the first page, is an

email chain between Ms. Peters and you and some other attorneys; is that correct?

A Yes.

Q If you look at the second page of Exhibit 52, there's an email from you to Ms. Peters on February 19, 2025; correct?

A Yes.

Q And in the first paragraph, you talk about the CRO and the DIP term sheet a little. And then in the second paragraph, you inform Ms. Peters's counsel for Frontier, "You provide no information or support for Farm Credit's alleged belief that any proceeds are being impermissibly diverted. On what does Farm Credit base such a claim? DCA and its affiliates dispute any such suggestion and it has no basis." Do you see that?

A Yes.

Q What information did either you or somebody at Lewis Rice receive from DCA and its affiliates such that you could represent to Frontier's counsel that they disputed any such suggestion?

MR. SHANKLIN: Objection. Form. Objection. Scope.

You may answer if you know.

THE WITNESS: The loan documents from

DCA would've been reviewed as part of that and we knew about what the loan documents we had, what they said.
BY MS. BUTER:
Q Anything else?
A Not that I -- I don't have a specific recollection of anything else.
Q Okay. And this email that you sent back is dated February 19, 2025. I believe the email we looked at earlier where you requested loan documents from your Kansas City colleague, you indicated you did not have all the loan documents that was dated February 20th. Does that sound right to you?
A That sounds right.
Q Ms. Peters responds to your email and at the top of the second page of Exhibit 52 as part of her response, and she informs you that, "We understand that the borrowers have recently opened and/or are maintaining deposit accounts outside of Frontier." Do you see that?
A I do.
Q Did you ever make any determination as to whether that was in fact correct, that the borrowers had opened or maintained accounts, deposit accounts outside of Frontier?
MR. SHANKLIN: Objection. Scope.

You may answer if you know.
THE WITNESS: I personally did not.
BY MS. BUTER:
Q Is that something that you feel would be important to investigate on the eve of filing for bankruptcy?
MR. SHANKLIN: Objection. Calls for opinion testimony.
You may answer.
THE WITNESS: I believe it was investigated.
BY MS. BUTER:
Q And what was determined as part of that investigation?
A That there were accounts where the debtors deposited collections of receivables.
Q That were outside of the Frontier accounts?
A I don't have a specific recollection of which accounts were established there and whether they were within Frontier or outside of Frontier. That was not part of my role.
Q And then Mr. Parres forwards -- whose role was that, by the way?
A Others, primarily Larry Parres, possibly Steve Drapekin, but I believe Larry Parres.

Q Do you have any understanding as to whether the deposit of accounts receivable of the debtors into a third-party bank account would be a violation of the Frontier loan documents?

MR. SHANKLIN: Objection. Calls for legal conclusion.

You can answer if you know.

THE WITNESS: I believe that my understanding is that it was, along with all other -- I mean, there were many loan defaults already.

BY MS. BUTER:

Q Mr. Parres, going back to Exhibit 52, forwards this email to Mr. Schwope and you're CC'd on it and he says, "This is not good"; correct?

A I see that.

Q Do you have any understanding what he meant by that?

A I do not.

Q Do you agree with the sentiment that Mr. Parres expressed that, quote, "This is not good"?

A I, not knowing what he meant by that, I don't know that I can say I agree or disagree.

Q Ultimately, DIP financing at least initially in the case was obtained from Frontier Farm Credit; correct?

A Yes.
Q Prior to obtaining that DIP financing from Frontier Farm Credit, did the debtors explore other potential DIP lenders?
A Yes.
Q At this time in February, March of 2025, what other potential DIP lenders did the debtors work with?
A I believe Summit and if I recall, there was another one. I can't recall the name of the other one. Focus Management was -- no, not Focus. Steve Drapekin was looking into that. I believe we had also talked to CIBC.
Q Did any of them express interest in the February, March time period in providing DIP financing to the debtors?
A I believe they provided, or at least Summit and one other provided a term sheet.
Q Any of the other lenders that were explored provide any kind of term sheets?
A I don't have a specific recollection of which ones provided term sheets.
Q In preparing for the deposition topic of DIP financing, did you review Lewis Rice's files to determine if any other term sheets have been provided?

A Yes. And talked to Steve Drapekin about that.
Q Okay. And what did Mr. Drapekin tell you about whether any other term sheets were provided in or around this time period?
A As I recall, there were two term sheets provided and a comparison of expenses and costs between them was prepared.
Q Do you remember who the other one was?
A I can't recall the name of the other party.
Q Were you told that by Mr. Drapekin at all?
A It -- at some point -- at some point, yes.
Q I'm going to hand you what I've marked as Exhibit 53.
(Exhibit 53 was marked for identification.)
Exhibit 53 is an email sent from Summit to Juanita Schwartzkopf and Tory Schwope, excuse me, which was then forwarded to Mr. Parres, to you; is that correct?
A Yes, that looks correct.
Q Is this the term sheet you were referring to that was received from Summit in connection with the initial DIP financing that debtors were seeking?
A I believe so, yes.

Q Did anyone at Lewis Rice conduct a review or an analysis of this term sheet to determine whether it might be a feasible option for the debtors?
A Yes.
Q Who did that?
A Simeon Brown and Steve Drapekin.
Q And what was determined?
A Well, it was a -- an analysis of it. I don't know that there was a decision made because it's not our decision to make.
Q Whose decision was it to make?
A The debtors.
Q And did you provide any advice to the debtors regarding this Summit term sheet that was received on March 4th or on March 4, 2025?
A I didn't specifically investigate that term sheet, whether -- but I believe we provided them the, you know, comparison, analysis, cost structure, features of the term sheet.
Q Handing you what I'm marking as Exhibit 54.
(Exhibit 54 was marked for identification.)
Exhibit 54 is an email on the bottom half of the first page of Exhibit 54 from you to Mr. Parres; is that correct?

A Yes.
Q Dated February 21, 2025?
A Yes.
Q So this was before Summit provided the term sheet on March 4, 2025; correct?
A It was before Summit provided that term -- that March 4th term sheet.
Q Was there another Summit term sheet that was received before February 21, 2025?
A I don't specifically recall whether there was or not.
Q Okay. On February 21, 2025, you informed Mr. Parres that, and I'll quote, "The more I look at this, I don't think we'll get a priming DIP in place over Farm Credit's objection." Do you see that?
A I do.
Q Is that what you believed on February 21, 2025?
MR. SHANKLIN: Objection. Form.
THE WITNESS: I must have if I wrote it.
BY MS. BUTER:
Q Then you go on to say, "Judge Norton is not going to override a lender with a blanket lien on everything unless we can show a significant equity

cushion to protect Farm Credit." Do you see that?
A I do.
Q Was that a true statement at the time you wrote it to Mr. Parres or what you believed at least?
MR. SHANKLIN: Objection. Form.
THE WITNESS: Yeah, that was my conclusion as to what the judge might or might not do.
BY MS. BUTER:
Q You then say, "Maybe we can show that Farm Credit would only get 50 million in a complete liquidation, but our going concern is worth 125 million." Do you see that?
A I do.
Q Where did you obtain those numbers from?
A My recollection is I made up numbers as an example to explain the rationale.
Q Those weren't actual numbers of what could materialize, for example, in a liquidation or a going concern value?
A No.
Q You then go on to say, "That would be plenty of cushion, but the whole fight to get there would still be very difficult with lots of discovery evidence, et cetera. I think we're best off getting a DIP from Farm Credit." Do you see that?

A Yes.
Q And then that was then shared with Mr. Schwope February 24th by Mr. Parres; correct?
A Yes.
Q Given your opinion on February 21, 2025, that you did not believe the debtors could get a priming DIP in place over Farm Credit's objection, why did the debtors continue to pursue potential alternative lenders?
A Because we might not get Frontier's consent to a DIP Loan.
Q Did you believe or did Lewis Rice believe that any of these alternative proposals were actually realistic given Frontier's blanket first lien priority -- first priority lien?
A Yes. That's why we assisted the debtors in pursuing them.
Q Could any alternative DIP lender have primed Frontier's lien without either Frontier's consent or a court order?
MR. SHANKLIN: Objection. Calls for legal conclusion.
You can answer.
THE WITNESS: We would need Frontier's consent or the court would have to approve priming DIP

financing.
MS. BUTER: You want to take a short break?
MR. SHANKLIN: Yeah.
THE VIDEOGRAPHER: The time is 5:08 p.m. We're off the record.
(Off the record.)
THE VIDEOGRAPHER: The time is 5:23 p.m. Back on the record.
BY MS. BUTER:
Q Mr. Hall, I'm moving to topic 21 in the deposition 30(b)(6) notice. That is knowledge of viability analysis restructuring reports. Did Lewis Rice commission any kind of analysis of the viability of restructuring the debtor entities?
A We did not commission. We worked with Focus for financial information.
Q And did that working with Focus include an analysis of the viability of restructuring the debtor entities?
A It included an assessment of the financial information that we had and how that would -- could be used to support a restructuring plan.
Q Who at Lewis Rice was responsible for that assessment that you just described?

A Larry Parres.
Q Did Focus provide any written documentation that Mr. Parres would've relied upon or utilized in connection with that assessment?
A The regular weekly financial reporting that -- that we got, the -- the audit reports that we did have previously, the budgets that Focus Management was preparing with a forward look.
Q So the documents that were reviewed were the regular financial reporting documents, the prior audits that you did have, nothing specifically prepared for this analysis or assessment; is that correct?
A That's correct.
Q Did Lewis Rice reach any conclusion about the feasibility of restructuring the debtor entities?
MR. SHANKLIN: Objection to the extent it's beyond scope.
MS. BUTER: It's topic 21.
MR. SHANKLIN: Yeah, it says, "Lewis Rice's knowledge of any analysis or report and the viability." Yeah. So then it's Lewis Rice's knowledge, but --
MS. BUTER: I just asked if Lewis Rice reached any kind of conclusion regarding the viability

of whether the debtor entities could be restructured.
THE WITNESS: No because we had not gotten to a full plan process.
BY MS. BUTER:
Q And when was the plan of reorganization due?
A Well, the initial exclusive period was through June 20, 2025.
Q Was an extension obtained?
A Yes.
Q Until when?
A I believe it was October 20, 2025.
Q Okay. Did Lewis Rice ever commission any kind of analysis of the viability of refinancing the debtors' debts?
A Outside of seeking DIP financing, we did ask Focus to find potential DIP financing that could turn into exit or permanent financing.
Q Did Focus identify any DIP financing lenders who would've been willing to turn that relationship into a refinancing?
A I don't specifically recall on their results of that.
Q Did Lewis Rice reach any conclusion as to whether refinancing the debtors' debts was a viable option for the debtors?

A There was no conclusion one way or the other.
Q Why not?
MR. SHANKLIN: Objection. Form.
THE WITNESS: Because we had not gotten to a full plan process, so that was not an issue that we needed to fully press.
BY MS. BUTER:
Q Was there additional information that Lewis Rice needed in order to make that determination?
MR. SHANKLIN: Objection. Form.
THE WITNESS: There would've been more information, but, again, given the efforts to get planned terms in place that were impaired and impeded by the trustee process, we could not complete that process.
BY MS. BUTER:
Q You indicated, you just said that the ability to complete the planned terms, getting plan terms in place was impeded by the trustee process. So you're referring to the motion?
A The trustee motion, yes.
Q Okay. That the debtors chose to oppose; correct?
MR. SHANKLIN: Objection.

You may answer.
THE WITNESS: The debtors did decide to oppose the appointment of a trustee.
BY MS. BUTER:
Q And had the debtors not opposed that motion, fair to say that the efforts might have been redirected toward getting plan terms in place rather than the time opposing that trustee motion?
MR. SHANKLIN: Objection. Speculation.
You may answer.
THE WITNESS: Yeah. No way of knowing that.
BY MS. BUTER:
Q The motion to appoint a trustee was filed August 25, 2025. Does that sound right?
A Sounds right.
Q Had Lewis Rice conducted any analysis as to the viability of whether the debtors could refinance their debt prior to August 25, 2025?
A Again, we had sought DIP financing that could be permanent financing.
Q And the DIP financing you had obtained as of August 25, 2025, was through Frontier; correct?
A Correct.
Q And there was a term sheet from Summit that

was not pursued; correct?
MR. SHANKLIN: Objection. Form.
THE WITNESS: As I recall, we had filed a motion to approve DIP financing with Summit.
BY MS. BUTER:
Q But it never came into play; correct? It never occurred?
MR. SHANKLIN: Objection. Form.
THE WITNESS: Correct.
BY MS. BUTER:
Q And you indicated you pursued other lenders before August 25, 2025, who may provide a refinancing option to the debtors. Who were they?
A Focus was pursuing those.
Q Did the Summit term sheet or term sheets that the debtors received contemplate any kind of bankruptcy exit financing within them?
A Based on my review and investigation of this, I don't believe the term sheet that we received provided for exit financing.
Q Are you aware of any term sheet the debtors received while Lewis Rice was representing them that provided for the possibility of exit financing?
A I -- I did not see any to that effect. They were being sought, but I don't recall seeing any.

Q Was any kind of formal or restructuring feasibility study prepared for this case?
A No.
Q Was any formal restructuring business plan prepared?
A Business plan? You're -- you're not talking about a reorganization plan? You're asking --
Q Reorg business plan.
A The terms that we discussed earlier were prepared and circulated just prior to the trustee motion being filed.
Q And that's what you discussed with Mr. Cole earlier; correct?
A Yes.
Q Okay. And I think you just told me no restructuring feasibility study was conducted; correct?
A Correct.
Q Do you know why not?
A I don't specifically -- no, there was no specific discussion of that the -- there would not have been a feasibility study done because we would not spend resources on that before we had planned terms agreed to.
Q Did Lewis Rice believe or reach a -- well,

let me ask you this way. Was Lewis Rice's onus -- what was Lewis Rice's assessment of whether the debtor entities could be successfully reorganized?
A That there was a -- a realistic possibility and possibility of the debtors being able to reorganize as a going concern, perhaps in a -- after a sale of some or all or some or certain parts of the operation or a refinancing of all of the operation.
Q And what specific facts or financial data did Lewis Rice rely upon to reach that conclusion?
A All the financial information that we had obtained, the discussions with all of the debtors' parties, the review of historical financial information, the audited financials, the financial reports that we received from Focus, and the -- the ability of the debtors to operate at an operating cash flow positive basis during the cases.
Q You indicated that you did not conduct a feasibility analysis because plan terms had not been agreed to. Agreed to by whom?
A The principal parties that would need to agree would be the Committee and Frontier. US Trustee would also have to weigh in.
Q Did the debtors through Lewis Rice ever present potential plan terms to the Committee, to

Frontier, or to the US Trustee?
A Yes.
Q When?
A My review was August 15th or so of 2025.
Q What was included in those plan terms?
A It was the term sheet that I discussed with Mr. Cole that had the outline and deal points of discussions that the parties had had in the midst of the depositions that resulted in the plan terms.
Q Moving to topic 22, which is appraisal and valuation matters. And just to kind of, so I can determine some steps that might have been taken by Lewis Rice or by the debtors, did Lewis Rice ever conduct UCC lien searches for the debtors?
A I did not specifically investigate that. My recollection is that we knew that Frontier had done so and we requested them from Frontier.
Q Did Lewis Rice ever run any tax lien searches for the debtors?
A I don't have a specific recollection one way or the other on that.
Q Did Lewis Rice ever run any judgment searches for any of the debtor entities?
MR. SHANKLIN: Objection. Scope.
You can answer if you know.

THE WITNESS: Yeah, I don't have a specific recollection one way or on the other on that. That was not something that I was handling.
BY MS. BUTER:
Q What about litigation searches?
MR. SHANKLIN: Same.
THE WITNESS: Yeah, same answer.
BY MS. BUTER:
Q And what about title reports?
A Again, those were ones I -- I recall Steve Drapekin requesting those from Frontier because the debtors didn't want to spend the significant money to have those done. And we understood that Frontier had had those run.
Q You indicated that you requested the UCC searches from Frontier; is that correct?
A That's my recollection.
Q Do you know when you requested those from Frontier?
A I don't recall specifically. I was not directly involved in that.
Q Do you know if it was pre- or post-petition?
MR. SHANKLIN: Scope.
You can answer if you know.
THE WITNESS: Yeah, I don't have a

specific recollection of when.
BY MS. BUTER:
Q Did you ever obtain the UCC searches that you requested from Frontier?
MR. SHANKLIN: Same objection.
THE WITNESS: I don't specifically recall whether we did or did not.
BY MS. BUTER:
Q Do you know whether Lewis Rice ever had UCC searches for any of the debtors in its possession at any time?
MR. SHANKLIN: Same objection.
THE WITNESS: I don't specifically have any recollection to that effect.
BY MS. BUTER:
Q What is Lewis Rice's understanding of the primary assets of the debtors?
A Is this on one of the topics?
Q Yeah, it is. Topic 22, "appraisal evaluation-related issues."
A The -- primarily the tree inventory, tree shrubs, inventory, that, along with receivables.
Q What about real estate, real property?
A And real estate, yeah.
Q Any other primary assets of the debtors that

Lewis Rice was aware of?
A There's lots of machinery and equipment, but yeah, whatever was reflected in the -- in the schedules, but those were the -- the big categories.
Q What steps did Lewis Rice take to determine the value of the assets of debtors?
A Reviewing the audit reports and discussions with management of the debtors.
Q And the most recent audit report that you would've relied upon was from 2022; correct?
A The most recent one that we would've reviewed was from 2022.
Q I had asked you what steps Lewis Rice took to determine the value of the assets of the debtors. You said, as one of those, you looked at the audit reports and then I said the audit report, the most recent that you would've relied upon was 2022. And you corrected me and said, reviewed, not relied upon. So did Lewis Rice rely upon the 2022 audit as one of the determinations of whether the value of the assets of the debtors was accurate?
MR. SHANKLIN: Objection. Form.
You may answer.
THE WITNESS: It would've been one of the pieces, in addition to the ongoing financial

statements of the debtors, balance sheets and income statements, PIT reports, things of that nature.
BY MS. BUTER:
Q Did Lewis Rice obtain any appraisals of the real property owned by debtors?
A We tried to obtain them from Frontier, but Frontier would not provide them.
Q Did Lewis Rice independently engage any appraisers to value the real property owned by debtors?
A The debtors didn't have the funds to do that and it was not authorized in the budget.
Q Did you ever ask for it to be authorized in the budget?
A I don't recall any request to that effect.
Q So I think the answer is no independent, no third party was retained to conduct an appraisal of the real property of the debtors by Lewis Rice?
A Not by Lewis Rice.
Q You indicated that you asked for appraisals from Frontier. Had Frontier ever agreed to provide its appraisals to the debtors?
A They had -- no.
Q Did Lewis Rice ever retain a third party to value the inventory that was the other significant

asset of the debtors that you referenced?
A Lewis Rice did not retain anybody.
Q Did the debtors, during the time period in which they were in bankruptcy and Lewis Rice represented them, ever retain any third party to conduct evaluation of the inventory of debtors?
A Well, the debtors retained Bergen to prepare the 2023 and 2024 audit, which would include an inventory analysis.
Q Other than Bergen did, was any other third party retained to specifically conduct an evaluation of just the inventory?
A No, not that I recall.
Q And in terms of the analysis that Bergen was doing, just so I'm clear, it was my understanding that Bergen was conducting or providing a financial audit of the financial statements; is that correct?
A That's my understanding.
Q And what kind of independent analysis of the value of the inventory specifically would take place during that audit process?
MR. SHANKLIN: Objection. Form.
THE WITNESS: Yeah, I'm not an auditor. I don't know what that would entail.
//

BY MS. BUTER:
Q Do you know if that happened at all as part of the process of auditing --
MR. SHANKLIN: Objection. Form.
BY MS. BUTER:
Q -- the debtors' books?
MR. SHANKLIN: Objection form.
THE WITNESS: I don't specifically know what Bergen had done and where they were in their process.
BY MS. BUTER:
Q In connection with the appraisals that you requested from Frontier, was it debtors' intention or Lewis Rice's intention to rely upon the appraisals obtained by Frontier?
A It was the intention to understand what they said and to see if they would be useful and helpful in the plan process.
Q I am going to hand you what I'm marking as Exhibit 55.
(Exhibit 55 was marked for identification.)
Exhibit 55 is a cover email from Tory Schwope to you and Mr. Parres on February 20, 2025; is that correct?

A Yes.
Q And this is a summary or a letter issued by GlassRatner DBA B. Riley Advisory Services; correct?
A Yes.
Q And it notes that, "In October 2024, B. Riley Advisory Services was engaged by DCA Outdoor to review and evaluate the company with a focus in its financial condition, inventory status, and operational capacity"; is that correct?
A That's what it says, yeah.
Q Did you personally review this when you received it on February 20, 2025, or any time thereafter?
A I -- I've seen the letter, yes.
Q At the time it was received by Lewis Rice on February 20th, were there discussions within Lewis Rice about the content of this letter from B. Riley?
A Yes.
Q And what was the nature of those discussions?
A That the conclusion of the letter supported the debtors' viability and operations and management and how viable the debtors were and how professional the debtors' management farms inventory were.
Q Okay. So that was a discussion about this

report within Lewis Rice when it was received; is that fair?
A I think that's fair.
Q Okay. If you could turn with me to the third page of this Exhibit 55. It's the second page of the letter itself. I'm going to direct you to, starting at the very bottom, the last sentence and then going over to the next page.
It states, "Valuation of the inventory is a difficult task for DCA because the company lacks in the electronic system with the capacity to accurately track the cost of the millions of plants that," should be, "they grow." Do you see that?
MR. SHANKLIN: Think it might be -- you said the second page of the letter?
MS. BUTER: Second page of the letter, bottom line. And then I moved to the next page.
BY MS. BUTER:
Q You see that? And the report continues, "This also makes it difficult for DCA to precisely define costs to produce each species of tree to each caliper size." Do you see that?
A I do.
Q Okay. Did Lewis Rice review this portion of the report when it was received on February 20th?

MR. SHANKLIN: Objection. Form.
THE WITNESS: We would've read the whole letter.
BY MS. BUTER:
Q Did Lewis Rice take into consideration the fact that a third-party consultant had indicated that it was difficult for DCA to accurately track the cost of the plants they grew?
MR. SHANKLIN: Objection. Form.
THE WITNESS: We left financial decisions to that effect to our financial advisor and the auditors.
BY MS. BUTER:
Q That would've been Focus and Bergen; is that correct?
A Yes.
Q You understand that tracking the cost of a particular piece of inventory is significant to be able to determine the profitability of any particular piece of inventory?
MR. SHANKLIN: Objection. Beyond the scope.
You may answer if you know.
THE WITNESS: Yeah, I -- I don't know how valuations are determined.

BY MS. BUTER:
Q Did Lewis Rice highlight for either Focus or Bergen the fact that a reputable third-party advisor had indicated that DCA had difficulty accurately tracking the cost of the millions of plants it grew?
MR. SHANKLIN: Beyond the scope.
You may answer if you know.
THE WITNESS: Yeah, my -- I don't have any personal recollection of having a discussion like that with Bergen or Focus Management.
MS. BUTER: And I'll just note, I do not believe this is beyond the scope of topic 22, which is about Lewis Rice's knowledge and understanding of and assistance and involvement with appraisal and valuation matters with respect to the debtors' assets.
MR. SHANKLIN: I would just say that that question was about a communication to specific entities, which is not, at least in my reading of the topic, reasonably specific. But --
MS. BUTER: We can agree to disagree.
BY MS. BUTER:
Q If you could go to the last page of Exhibit 55. There were some recommendations by B. Riley; correct?

A The head or the lead in is, "B. Riley believes DC -- DCA's operations can best address the challenges it faces to turnaround processes that might include," and then it lists some of the things that might be included.
Q So in connection with this list of things that might be included, the third bullet point down states, "Aggressively reduce costs." Do you see that?
A I do.
Q Did Lewis Rice engage in discussions with the debtors about potentially aggressively reducing costs?
A Yes.
Q Who did that?
A Larry Parres.
Q And what was discussed with Mr. Parres about reducing costs? I'm sorry, what was discussed by Mr. Parres with the debtors in connection with aggressively reducing costs?
A Oh, lots of things. Reducing head count, reducing all of the costs and inputs across the operations. Generally reducing cost without impairing the overall value of the operation.
Q One of the items listed right below that, the fourth bullet point down, is, "Reassess DCA to

identify the most profitable corporate activities and focus on them." Do you see that?
A I do.
Q Did Lewis Rice take any steps to identify the most profitable corporate activities of the debtors?
A Yes.
Q What steps did Lewis Rice take to identify the most profitable corporate activities?
A Review of all the financial information before and during the case to determine whether -- which aspects of the debtors' operation were the most profitable.
Q What did Lewis Rice determine as to which portions of the debtors' activities were most profitable?
A That's -- I think that's outside the scope of the topics. My personal recollection was that, well, there were discussions and reviews about the production, distribution, and retail sides of the business. Any conclusions on which pieces were the most profitable were discussions that I was not a part of.
Q Who was a part of those discussions?
A Larry Parres, Tory Schwope, possibly other

parties of the debtors, and Focus Management likely would've had some engagement on that.

Q Okay. If we look further down the list, second bullet point from the bottom, there's a suggestion. "A potential to form a board of directors to guide the company." Did Lewis Rice ever establish a board of directors for the debtors?

MR. SHANKLIN: Objection. Form.

THE WITNESS: We were not asked to form a board of directors, no.

BY MS. BUTER:

Q Did Lewis Rice ever recommend to the debtors that they put a board of directors in place?

A It was one of the bullet points in the plan discussions.

Q Separate and apart from the plan, did Lewis Rice ever suggest to the debtors throughout the bankruptcy that they form a board of directors to guide the company?

A No.

Q The next bullet point and the last bullet point on this list is a suggestion that, "The debtors could retain a restructuring executive bestowed with full executive authority to make and implement financial decisions and direct restructuring

activities." Did Lewis Rice ever retain a restructuring executive for debtors bestowed with that full executive authority described here?
A Say did who?
Q Did Lewis Rice ever retain for the benefit of the debtors a restructuring executive bestowed with the full executive authority set forth in this bullet point?
A Yeah, Lewis Rice couldn't retain anybody for the debtors. It was the debtors' decision.
Q Did Lewis Rice ever recommend that the debtors retain a restructuring executive with full executive authority to make and implement financial decisions?
A No.
Q Okay. You indicated that the plan terms that Lewis Rice had proposed for the debtors recommended the appointment of a board; correct?
A It was one of the plan options. It was more of the plan B style option.
Q And why was the appointment of a board of directors included as an option within the plan B option?
A Because the Committee had requested that.
Q That wasn't something that Lewis Rice put in

there?

MR. SHANKLIN: Objection. Form.

THE WITNESS: Something that -- that the parties discussed and Lewis Rice agreed to as part of those discussions to include as a plan term or plan option in the term sheet.

BY MS. BUTER:

Q Handing you what I've marked as Exhibit 56.

(Exhibit 56 was marked for identification.)

Exhibit 56, the top of the first page is an email from Mike Scott to Mr. Parres CC-ing you, Tory, Schwope, and Samantha Schwope also dated February 20, 2025; is that correct?

A Yes.

Q And he attaches a PDF that Steeplechase sent to Farm Credit on February 14th; is that correct?

A Yes.

Q And under the attachments, there's a reference to a DCA proposed restructuring plan. Do you see that in the attachments portion at the very top header of the email, first page? Underneath subject, there's attachments?

A Yes. I see that it.

Q Says, "DCA proposed restructuring plan"; is

that correct?
A Yes.
Q Do you recall personally receiving this proposed restructuring plan?
A I don't specifically recall this.
Q Do you know if this was discussed at all within Lewis Rice?
A I -- I don't specifically recall a discussion to that effect.
Q Do you know if any portions of this proposed restructuring plan sent from a third party, Steeplechase, were ever considered by Lewis Rice in connection with a potential plan of reorganization?
MR. SHANKLIN: Do you want to just point to the topic?
MS. BUTER: Sure. It's 2. I think we've got appraisal and evaluation and then there's an entire topic on plan of reorganization.
MR. SHANKLIN: Well, I think the topic on plan of reorganization, it's Lewis's Rice -- 9 is "Lewis Rice's efforts to specifically draft and negotiate a bankruptcy plan."
MS. BUTER: Correct. I mean, I'm asking whether they ever considered this proposed restructuring plan in preparing any kind of plan of

reorganization.
MR. SHANKLIN: I don't think that is either specifically drafting or negotiating a plan.
But you may answer.
THE WITNESS: Yeah, my personal recollection is that all information that we had was used in connection with whatever we were proposing or considering or trying to draft.
BY MS. BUTER:
Q You personally don't recall reviewing this, but your personal recollection is that Lewis Rice used all information it had to draft or think about, consider plan terms; is that correct?
A If it was in our heads, we would've used it.
Q Do you -- was this proposed restructuring plan in your head at any time when you represented the debtors?
A On February 20th, it was in my head 'cause I would've reviewed it.
Q I'm handing you what I've marked as Exhibit 57.
(Exhibit 57 was marked for identification.)
Exhibit 57 is an email chain involving Lewis Rice, counsel for the Unsecured Creditors Committee,

and counsel for Frontier; is that fair?
A That looks to be the case, yes.
Q And the first email of the two emails on the first page are dated March 24, 2025; correct?
A Yes.
Q And if you look at the email from Mr. Fairlie on March 24, 2025, Mr. Fairlie notes that a receiver was appointed by a federal judge for Rio Verde; is that correct?
A For Rio Verde Holdings, LLC.
Q At the time you received this email, were you aware that a receiver had been appointed for Rio Verde Holdings, LLC?
A Is this a topic question?
Q I asked if you were aware.
A I can't recall any specific recollection of when receiver was appointed.
Q At some point, did you personally learn that a receiver had been appointed for Rio Verde Holdings, LLC?
A Yes.
Q And it might have been perhaps March 24, 2025, at 5:30 p.m. when you received this email?
MR. SHANKLIN: Objection. Form.
THE WITNESS: It might have been.

BY MS. BUTER:
Q And in this email, Mr. Fairlie notes that, I'll quote, he says, "A federal judge on Friday by Mr. Schwope's accounting practices and operations vis-a-vis Rio Verde Holdings, LLC as a basis to recommend appointment of a receiver for that entity (and rise to the level of fraud or the possibility of fraud.)" Do you see that?
A "The probability of fraud." But yes, I see that.
Q After receiving this email, did Lewis Rice conduct any kind of investigation into the accounting practices on operations of Rio Verde Holdings, LLC to determine if similar accounting practices and operations were being utilized by the debtors?
MR. SHANKLIN: Objection. Beyond the scope.
You can answer if you know.
THE WITNESS: I don't have any personal recollection of investigation into accounting practices.
BY MS. BUTER:
Q Generally of the debtors?
A Generally of the debtors.
Q That might answer my next question, and that

is, given the findings of the court in the Rio Verde Holdings, LLC matter, did Lewis Rice take any steps to evaluate the accounting practices of the debtors to determine whether the valuations and financials of the debtors were accurate?

MR. SHANKLIN: Same objections. Form.

THE WITNESS: Yeah, the -- are -- are you referring to the findings that Mr. Fairlie conveyed?

BY MS. BUTER:

Q Yes, to start with, and I'll ask you a follow-up question, but yes, I'm referring to those right now.

MR. SHANKLIN: Same objections.

THE WITNESS: Yeah, any investigation would've been premised upon a final determination regarding the Oregon litigation. And my recollection is there had not been a final determination that was not subject to challenge.

BY MS. BUTER:

Q Did you personally read the receivership order in the Rio Verde Holdings, LLC matter?

A I cannot recall whether I did or did not read the whole order.

Q Do you know if anyone at Lewis Rice would've

reviewed the receivership order entered in that case?
MR. SHANKLIN: Scope.
You can answer if you know.
THE WITNESS: Yeah, I don't have a specific recollection of who would have or if anyone did read that.
BY MS. BUTER:
Q Would it have been important to Lewis Rice to have evaluated the court's comments on Mr. Schwope's accounting practices in connection with Lewis Rice's representation of the debtors and the representations it was making regarding value of the debtors' assets?
MR. SHANKLIN: Objection. Beyond the scope. Form.
You can answer if you know.
THE WITNESS: Given that this was a non-debtor entity that was at issue, the importance would've been weighted accordingly.
BY MS. BUTER:
Q Did you understand that Rio Verde Holdings was a Tory Schwope entity?
A We understood that it was a -- an entity in which Tory Schwope had an interest.
Q Did you have any understanding as to what

Mr. Schwope's role was with regard to the operations of Rio Verde?

A I don't have a specific recollection of what Mr. Schwope's role was with them.

Q And you received this email from Mr. Fairlie March 24th and in it, he references that the accounting practices may rise to the level of fraud or the probability of fraud. Did that concern you at all in connection with your representation personally of the debtors?

MR. SHANKLIN: Are you saying did it not concern him personally?

MS. BUTER: Mm-hmm.

MR. SHANKLIN: Okay. Was representation personally is -- the way the question --

MS. BUTER: Do you want me to rephrase the question?

MR. SHANKLIN: Yeah, if you could.

BY MS. BUTER:

Q Okay. Did it concern you, Mr. Hall, in your representation of the debtors that there had been a receivership order entered that indicated that there could have been fraudulent activity in connection with Mr. Schwope's accounting practices?

A There's always concerns when anything like that is alleged, yes.
Q What did you do to follow up on that concern?
A Discussed it with Mr. Parres.
Q And what did you and Mr. Parres discuss?
A What we might need to do with respect to the Oregon litigation and the appointment of a receiver in connection with that.
Q Did you discuss anything else with Mr. Parres about this receivership order and the findings therein?
A I don't have a specific recollection of what discussions we would've had.
Q Did the receipt of this information result in you and Mr. Parres having a discussion about the need to evaluate the practices of the debtors you represented for similar issues?
MR. SHANKLIN: Objection. Form. Scope.
You may answer.
THE WITNESS: We discussed that we needed to -- that we had auditors and financial managers in place to monitor the debtors' operations and financial and accounting practices.

BY MS. BUTER:
Q Did you alert your auditors or your financial advisors to the receivership order?
MR. SHANKLIN: Same objections.
THE WITNESS: I don't specifically recall that I sent or alerted anything to the auditor or financial manager.
BY MS. BUTER:
Q Do you know if anybody at Lewis Rice did?
MR. SHANKLIN: Same objections.
THE WITNESS: I don't have a specific recollection of anyone doing that, whether they did or did not.
BY MS. BUTER:
Q And other than discussing that you had financial advisors and auditors looking at the information, you did not take any other steps to determine whether the same concerns that the federal judge had in Oregon existed within the debtor entities?
MR. SHANKLIN: Same objections.
THE WITNESS: I did not specifically take any action as I recall.
BY MS. BUTER:
Q And do you have any knowledge as to whether

anybody else at Lewis Rice took any such action?
MR. SHANKLIN: Same objections.
THE WITNESS: I don't have any specific knowledge of that.
BY MS. BUTER:
Q In this email, Exhibit 57 at the very top, Mr. Parres forwards Mr. Fairlie's email to Samantha Schwope and Tory Schwope. Do you see that?
A Is it 57 or 58?
Q I thought it was 57.
A Okay. I couldn't tell. It looked like 58 here. Okay.
Q That's my writing.
A Yeah. Yes. I see Mr. Parres forwarded it to Samantha Schwope and Tory Schwope.
Q And you're CC'd on that email; correct?
A Correct.
Q And Mr. Parres says, "The Oregon thing is a disaster"; is that right?
A That's what it says.
Q Do you agree with that statement?
MR. SHANKLIN: Objection to form.
THE WITNESS: The -- you'd have to ask Mr. Parres what he meant by that, but certainly, the Oregon litigation I agreed was -- raised issues that

we would need to look at.
BY MS. BUTER:
Q Handing you what I've marked as this time Exhibit 58.
(Exhibit 58 was marked for identification.)
A Okay.
Q Exhibit 58 is an email chain originally from Ms. Peters to you and Mr. Parres dated April 9, 2025. And then at the top, there is an email from Mr. Parres to Juanita Schwartzkopf, also April 9, 2025. Do you see that?
A I do.
Q And you had referenced previously that you, Lewis Rice, was aware that Frontier was conducting appraisals in this case; correct?
A Yes.
Q And do you know what entity had been retained by Frontier to conduct those appraisals?
A I believe it was Cushman Wakefield.
Q And in the email that Ms. Peters sends on the first page of Exhibit 58 on April 9th, she indicates she's "following up on an email regarding real estate and inventory appraisers needing access to the debtors' locations and time with debtors

management for discussion of the business and other ordinary course appraisal items." Do you see that?
A Yes.
Q Okay. And then she also indicates, "Attached is Hilco's initial list of documents that it would like from the debtors"; is that right?
A Yes.
Q And then Mr. Parres forwards this to Ms. Schwartzkopf and CCs you; correct?
A Yes.
Q And Mr. Parres states, "Juanita, isn't this what you didn't want to happen?" Do you see that?
A I do.
Q And you say, "Why haven't you talked them off this ledge?' Do you see that?
A Yes.
Q Do you -- when Larry Parres sent that email to Juanita, "Isn't this what you didn't want to happen," what was being described there?
MR. SHANKLIN: Objection. Form.
THE WITNESS: Yeah, I -- I do not know. You'd have to ask Mr. Parres.
BY MS. BUTER:
Q When you received this email on April 9, 2025, did you ask Mr. Parres what he meant by that?

A I don't specifically recall a discussion to that effect.
Q You continue on in this email, Mr. Parres states, "You called this long ago, and this is the kiss of death, if I recall your words." Do you see that?
A I do.
Q And Mr. Parres is presumably referring to the appraisal process that Frontier is commencing; correct?
A I don't know what he's referring to specifically.
Q Okay. Are you -- when you received this email, did you ask either Ms. Schwartzkopf or Mr. Parres what was being referred to as the kiss of death?
A I believe we had a discussion to that effect.
Q And what was the outcome of that discussion?
A That Frontier had previously commissioned an appraisal that came in significantly below any other assessments and appraisals of the subject assets.
Q What other assessments or appraisals are you referring to?
A I don't know the specific case, but Ms.

Schwartzkopf had indicated that she had been involved in a case in which that had occurred.

Q So it wasn't in this case necessarily?

A No.

Q And if Frontier obtained appraisals that came in at whatever value they came in at, as you said, lower than perhaps others, why would that be the kiss of death?

MR. SHANKLIN: Objection. Calls for speculation.

THE WITNESS: Yeah, I don't know what Larry is referring to on that.

BY MS. BUTER:

Q And if that were the discussion that you and Mr. Parres had regarding Frontier's appraisals, why did the debtors not obtain their own appraisals?

MR. SHANKLIN: Objection. Calls for speculation.

THE WITNESS: The debtors did not have money in their budget and operations to conduct expensive appraisals.

BY MS. BUTER:

Q And I think we established earlier the debtors never requested funds in the budget to conduct appraisals; correct?

A I'm not aware of a specific request to that effect.
Q Is the reason that the debtors did not conduct their own appraisals is because they too were concerned that the value would show that Frontier's cash collateral was not adequately protected?
MR. SHANKLIN: Objection. Argumentative.
THE WITNESS: I don't think there was any concern to that effect.
BY MS. BUTER:
Q Mr. Parres continues, "Why is Ryan heading down this path? I feel like they're playing us to get us through the spring season and we are playing along. We need to push back, if I recall what you told me." Do you see that?
A I do.
Q So the initial reaction of Lewis Rice was to push back on giving Frontier information necessary to conduct appraisals of the value of the debtors' assets; is that fair?
MR. SHANKLIN: Objection. Form.
THE WITNESS: I don't think that's fair.
//

BY MS. BUTER:
Q Okay. How would you characterize that statement?
A You'd have to ask Mr. Parres what he means by that.
Q In your experience, a secured lender in a bankruptcy seeks to conduct appraisals for the purposes of determining the value of the assets, is it typical for the debtors to cooperate with that lender?
MR. SHANKLIN: Objection. Calls for opinion testimony.
You can answer.
THE WITNESS: Often, the parties will cooperate as they did here.
BY MS. BUTER:
Q Eventually; correct?
MR. SHANKLIN: Objection. Form.
THE WITNESS: Throughout.
BY MS. BUTER:
Q What is your understanding of how the debtors cooperated with Frontier's appraisers in order for Frontier to get the information necessary to conduct those appraisals?
A Tory Schwope offered and followed through multiple times to meet appraisers, walk them through

the farms, and as I understand it, provide them information that he had to those appraisers. He flew around the country to meet the appraisers and spent significant time with them.

Q I'm going to hand you what's been marked as Exhibit 59.

(Exhibit 59 was marked for identification.)

Exhibit 59 is a response by Ms. Schwartzkopf regarding the email Mr. Parres sent to her that we just discussed; correct?

A Yes, looks that way.

Q Okay. About four lines down in this email, Ms. Schwartzkopf states, "I think we will probably end up in a fight of appraisals." Do you see that?

A I see that.

Q Okay. And do you have any understanding as to what she meant as when she referred to a fight of appraisals?

A No.

Q If there was going to be a fight of appraisals, there would have to be more than one appraisal; correct?

MR. SHANKLIN: Objection. Speculation.

THE WITNESS: Yeah, you'd have to ask

Ms. Schwartzkopf what she meant by that.
BY MS. BUTER:
Q You're CC'd on this email; is that right?
A Yes.
Q Did you ever ask Ms. Schwartzkopf what she meant by that?
A I don't specifically recall asking her about that.
Q She then continues, "But more importantly, we need to be putting together the outline of a plan of reorganization." Do you see that?
A I see that.
Q And that was on April 9, 2025; is that correct?
A Yes.
Q Did Lewis Rice start putting together a plan of reorganization in April of 2025?
A We had discussions throughout from February and throughout the case as to what a plan of reorganization would look like.
Q And those discussions would be reflected on the billing entries of Lewis Rice?
A In part.
Q And what part of them would not be reflected in the billing entries of Lewis Rice?

A We could have many discussions about valuation, about feasibility, things like that, that would not be stated as, draft a plan of reorganization.

Q Okay. She then continues, and I'm on the second -- third-to-last line of Ms. Schwartzkopf's email. She says, "Sales may be weather-driven, but I've asked Tory to find out why collections are so weak. 1 million under our budget or 38 percent." Do you see that?

A Yes.

Q Did you have -- did Lewis Rice have concerns about collections being weak in April of 2025?

MR. SHANKLIN: Objection. Beyond the scope.

You may answer.

THE WITNESS: I recall some discussions about collections being below what was budgeted and anticipated.

BY MS. BUTER:

Q I'm handing you what I'm marking as Exhibit 60.

(Exhibit 60 was marked for identification.)

Exhibit 60 is Mr. Parres's response to Ms.

Schwartzkopf's email; correct?
A Yes, it looks that way.
Q Okay. Mr. Parres states in his email -- oh, you're CC'd on this; correct?
A Yes.
Q "If we need an appraiser, then we need to hire one." Do you see that?
A Yes.
Q And then Mr. Parres continues, "First I heard of this is I was always told that an appraisal by a large company like Hilco will kill this business." Do you see that?
A Yes.
Q What did Mr. Parres mean by that statement?
MR. SHANKLIN: Objection. Form.
THE WITNESS: Yeah, you would have to ask Mr. Parres.
BY MS. BUTER:
Q Did you ask him what he meant when you reviewed this email?
A I believe we had a discussion to that effect.
Q And what was the discussion?
A That -- that a company like Hilco would undervalue the assets of the business because that had

been the experience in a Farm Credit matter that Ms. Schwartzkopf had been involved in.

Q And in the first sentence, Mr. Parres had indicated that if "we." By "we," I assume he means the debtors; is that right?

MR. SHANKLIN: Objection. Form.

THE WITNESS: Yeah, again, you'd have to ask him.

BY MS. BUTER:

Q Okay. "If we need an appraiser, then we need to hire one." After this email was sent, just to confirm, neither Lewis Rice nor the debtors hired an appraiser to appraise the assets of the company; correct?

A I'm not aware of any appraiser being retained by the debtors.

Q Mr. Parres then continues in his email, and I'm going to third line from the bottom, "We have stabilized, but we are not moving toward anything good other than feeding Farm Credit information that is going to kill us if the Hilco numbers are what I thought -- what I was told they would be." Do you see that?

A I do.

Q And he says, "My stomach is hurting. This

is not what we started this fight for." Do you see that?
A I do.
Q Did you follow up with Ms. Schwartzkopf at all regarding her understanding of Hilco's appraisals?
MR. SHANKLIN: Objection. Form.
THE WITNESS: We had discussions about her prior experience with Hilco and Farm Credit.
BY MS. BUTER:
Q Did you conduct any other research? Did anyone from Lewis Rice conduct any other research on Hilco of an appraiser of assets?
A I'm not -- I don't have any specific recollection of that.
Q Handing you what I marked as Exhibit 61.
(Exhibit 61 was marked for identification.)
Exhibit 61 is a follow-up response from Ms. Schwartzkopf to the email we just looked at from Mr. Parres; correct?
A Yes.
Q And if you just go to the second page of Exhibit 61, this is an email we've looked at already, but it's the email from Ms. Schwartzkopf back to Mr. Parres regarding appraisals and Ms. Schwartzkopf

states, "I think Ryan is being required to choose Hilco because they did Everde." Do you see that?

A I do.

Q Okay. Now, if you go back to the first page of Exhibit 61, you had indicated it was your understanding that Ms. Schwartzkopf indicated that Hilco came in lower than other appraisers; is that correct?

A That's my recollection.

Q Okay. And Ms. Schwartzkopf in this particular email indicates she's going to talk with Ryan. She then states, "Appraisal is what I expected and why I warned you of what we might learn. Everde went appraisal shopping to no avail." Do you see that?

A I do.

Q When you read this, did you have any understanding as to what was being referred to that Everde went appraisal shopping to no avail?

A I don't recall what I thought at the time.

Q Fair to say that if somebody goes appraisal shopping to no avail, they likely did not come back with any kind of higher appraisal value than Hilco's?

MR. SHANKLIN: Objection. Calls for speculation.

THE WITNESS: Yeah, I don't know what that meant.
BY MS. BUTER:
Q Juanita then continues in the last sentence or second-to-last sentence, "I'd also suggest we do our own present value of future cash flows to see if we can come up with a better number than the so-called experts." Do you see that?
A Yes.
Q Do you know whether that present value of future cash flow analysis was ever conducted?
A I don't have a specific recollection of -- of whether Focus did that or not.
Q Does Lewis Rice know or have any thoughts or does Lewis Rice know whether a present value of future cash flows analysis was ever conducted?
MR. SHANKLIN: Objection. Beyond the scope.
MS. BUTER: Topic 22 goes directly to valuation. This is a valuation question.
MR. SHANKLIN: Well, that question says, "Valuation matters with respect to debtors' assets." I think it's so broad that he can't be expected to know about this specific present value of cash flows that's referred to in this email.

He's not required as a corporate rep to have encyclopedia knowledge. That perfection is not required. I don't think he understood that he had to review this email in preparation for today.

With that, you can answer.

BY MS. BUTER:

Q Actually, I'll rephrase the question. Present value of future cash flows is a valuation methodology. Do you understand that?

A Yes.

Q Okay. And is Lewis Rice aware of the valuation methodology of present value of future cash flows ever being conducted on any of the debtor entities?

A As part of my review, I did not investigate whether Focus had prepared that or investigate this particular email.

Q Earlier in the email, we noted that Ms. Schwartzkopf indicated that she, quote, "warned you of what we might learn." What did Ms. Schwartzkopf warn Lewis Rice of what they might learn in connection with an appraisal?

MR. SHANKLIN: Objection. Form.

THE WITNESS: Yeah, I -- you'd have to ask her. I don't have a specific recollection of what

she warned anybody about.
BY MS. BUTER:
Q Did you talk with anyone at Lewis Rice about Ms. Schwartzkopf's opinion on the appraisals in preparation for your testimony today?
A No, not in -- not in preparation for this testimony. I discussed the appraisal process that we were going through and working with Frontier on, which is what I understood the topic to cover.
Q You said you were working with Frontier on appraisal. Are you referring to the information that the debtors were providing to Frontier?
A The cooperation that was being provided and the assistance that Tory Schwope was providing to Hilco in connection with the appraisals.
MR. SHANKLIN: It's 6:30. Are we close to a stopping point?
MS. BUTER: I think this is my last exhibit on this topic.
BY MS. BUTER:
Q Handed you what I marked as Exhibit 62.
(Exhibit 62 was marked for identification.)
Exhibit 62, I just want to draw your attention to the email from Ms. Peters in the middle

of the first page dated April 21st, 2025. And in the first sentence, Ms. Peters notes that, "The biggest issue here is valuation." Do you see that?
A I see that.
Q Okay. And then as you continue down, Ms. Peters states, "Frontier does not believe that the collateral is worth what the debtors identified in their schedules, which we discussed last week, and in light of the Committee's objections it require establishing Frontier's equity position, Frontier needs its own evidence evaluation." Do you see that?
A Yes.
Q When Frontier raised a concern that the collateral was not worth what was stated in the debtors' schedules, is that something that Lewis Rice took seriously at the time?
A Is this on one of the topics?
Q Yes. Topic 22 deals with both appraisals and valuation.
MR. SHANKLIN: And I'll just make the objection on scope that you guys chose not to include individual things that you'd be asking about there. And just with respect to that it's assets that he's done a reasonable effort to prepare for today, which may or may not include having seen this email.

You may answer.
THE WITNESS: Can you repeat the question?
BY MS. BUTER:
Q Sure. Did Lewis Rice take Frontier's concern, the primary first lien creditor's concern, that the collateral was not worth what was stated in the debtors' schedule seriously?
MR. SHANKLIN: Same objection.
THE WITNESS: We would take every concern that was raised in the case seriously, and then we would evaluate it.
BY MS. BUTER:
Q And what steps did Lewis Rice take to evaluate Frontier's concern that the collateral was not worth what was stated in the schedules?
MR. SHANKLIN: Same objection.
THE WITNESS: We discuss with the debtors, discuss with Focus, and discuss amongst ourselves any concerns that were raised.
BY MS. BUTER:
Q And what specific discussions did you have regarding Frontier's concern that the collateral was not valued at what was stated in the debtors' schedule?

MR. SHANKLIN: Same objection.
BY MS. BUTER:
Q When I say "you," I mean Lewis Rice.
MR. SHANKLIN: Same objection.
THE WITNESS: I did not specifically review or look for email discussion or information regarding any discussions that we had to that effect.
BY MS. BUTER:
Q And you personally, sitting here today, do you personally remember any such discussions?
A I don't have a specific recollection of a discussion to that effect. I know that there were discussions about Frontier's raising issues about valuation and the -- and the counter information that the debtors had based on their audited financials and other financial information from Focus.
Q So the information that was looked at to evaluate Frontier's concern was the audit?
A That was one piece.
Q The financial records of the debtors and Focus reports; is that correct?
A Those were all included.
Q Anything else?
A There may have been other information, weekly financial reports, statements, compliance, all

of that information.
Q In a situation involving a bankruptcy where a secured creditor is owed in this case approximately a hundred million dollars, valuation of assets is a core consideration to the future of the debtors; is that fair?
MR. SHANKLIN: Objection. Calls for opinion testimony.
You may answer.
THE WITNESS: Valuation of assets in any bankruptcy case is important.
BY MS. BUTER:
Q When Lewis Rice received this email from Ms. Peters on April 21, 2025, was Lewis Rice unaware as of that date that valuation was a significant issue in the case?
MR. SHANKLIN: Objection. Form.
THE WITNESS: Evaluation is always an important consideration in a case.
BY MS. BUTER:
Q In a bankruptcy case?
A In a bankruptcy case.
Q And was Lewis Rice aware as of April 21, 2025, that there were concerns about the values placed on assets by the debtors?

MR. SHANKLIN: Objection. Form.
THE WITNESS: We knew that Frontier had concerns based on the emails.
BY MS. BUTER:
Q And that was even before April 21, 2025; correct?
A I don't recall the specific time that Frontier raised valuation concerns.
MS. BUTER: Okay. I think we can finish for tonight.
THE VIDEOGRAPHER: The time is 6:37 p.m. We're off the record.
(Signature reserved.)
(Whereupon, at 6:37 p.m., the proceeding was concluded.)

CERTIFICATE OF DEPOSITION OFFICER

I, KATHLEEN BEHRENS, the officer before whom the foregoing proceedings were taken, do hereby certify that any witness(es) in the foregoing proceedings, prior to testifying, were duly sworn; that the proceedings were recorded by me and thereafter reduced to typewriting by a qualified transcriptionist; that said digital audio recording of said proceedings are a true and accurate record to the best of my knowledge, skills, and ability; that I am neither counsel for, related to, nor employed by any of the parties to the action in which this was taken; and, further, that I am not a relative or employee of any counsel or attorney employed by the parties hereto, nor financially or otherwise interested in the outcome of this action.



KATHLEEN BEHRENS
Notary Public in and for the
State of Missouri

[X] Review of the transcript was requested.

CERTIFICATE OF TRANSCRIBER

I, PROMY ISLAM, do hereby certify that this transcript was prepared from the digital audio recording of the foregoing proceeding, that said transcript is a true and accurate record of the proceedings to the best of my knowledge, skills, and ability; that I am neither counsel for, related to, nor employed by any of the parties to the action in which this was taken; and, further, that I am not a relative or employee of any counsel or attorney employed by the parties hereto, nor financially or otherwise interested in the outcome of this action.

PROMY ISLAM

Veritext Legal Solutions
1100 Superior Ave
Suite 1820
Cleveland, Ohio 44114
Phone: 216-523-1313

September 28, 2026

To: Russell J. Shankland, Esq.

Case Name: DCA Outdoor Inc., et al.

Veritext Reference Number: 8450788

Witness: John Hall, Volume I, 30(B)(6)

Deposition Date: 9/22/2026

Dear Sir/Madam:

Enclosed please find a deposition transcript. Please have the witness review the transcript and note any changes or corrections on the included errata sheet, indicating the page, line number, change, and the reason for the change. Have the witness' signature notarized and forward the completed page(s) back to us at the Production address shown above, or email to production-midwest@veritext.com.

If the errata is not returned within thirty days of your receipt of this letter, the reading and signing will be deemed waived.

Sincerely,

Production Department

NO NOTARY REQUIRED IN CA

DEPOSITION REVIEW
CERTIFICATION OF WITNESS

ASSIGNMENT REFERENCE NO: 8450788
CASE NAME: DCA Outdoor Inc., et al.
DATE OF DEPOSITION: 9/22/2026
WITNESS' NAME: John Hall, Volume I, 30(B)(6)

In accordance with the Rules of Civil Procedure, I have read the entire transcript of my testimony or it has been read to me.

I have made no changes to the testimony as transcribed by the court reporter.

_______________ _________________________
Date John Hall, Volume I, 30(B)(6)

Sworn to and subscribed before me, a Notary Public in and for the State and County, the referenced witness did personally appear and acknowledge that:

They have read the transcript;
They signed the foregoing Sworn Statement; and
Their execution of this Statement is of their free act and deed.

I have affixed my name and official seal

this ______ day of_____________________, 20____.

____________________________________
Notary Public

____________________________________
Commission Expiration Date

DEPOSITION REVIEW
CERTIFICATION OF WITNESS

ASSIGNMENT REFERENCE NO: 8450788
CASE NAME: DCA Outdoor Inc., et al.
DATE OF DEPOSITION: 9/22/2026
WITNESS' NAME: John Hall, Volume I, 30(B)(6)

In accordance with the Rules of Civil Procedure, I have read the entire transcript of my testimony or it has been read to me.

I have listed my changes on the attached Errata Sheet, listing page and line numbers as well as the reason(s) for the change(s).

I request that these changes be entered as part of the record of my testimony.

I have executed the Errata Sheet, as well as this Certificate, and request and authorize that both be appended to the transcript of my testimony and be incorporated therein.

_______________ ________________________
Date John Hall, Volume I, 30(B)(6)

Sworn to and subscribed before me, a Notary Public in and for the State and County, the referenced witness did personally appear and acknowledge that:

They have read the transcript;

They have listed all of their corrections in the appended Errata Sheet;

They signed the foregoing Sworn Statement; and

Their execution of this Statement is of their free act and deed.

I have affixed my name and official seal this ______ day of_____________________, 20____.

___________________________________
Notary Public

___________________________________
Commission Expiration Date

ERRATA SHEET

VERITEXT LEGAL SOLUTIONS MIDWEST

ASSIGNMENT NO: 8450788

PAGE/LINE(S) / CHANGE /REASON

_____________________________________________________

_____________________________________________________

_____________________________________________________

_____________________________________________________

_____________________________________________________

_____________________________________________________

_____________________________________________________

_____________________________________________________

_____________________________________________________

_____________________________________________________

_____________________________________________________

_____________________________________________________

_____________________________________________________

_____________________________________________________

_____________________________________________________

_______________ _________________________

Date John Hall, Volume I, 30(B)(6)

SUBSCRIBED AND SWORN TO BEFORE ME THIS ________

DAY OF ________________________, 20______ .

___________________________________

Notary Public

___________________________________

Commission Expiration Date

**&**

**&** 2:4 178:23 178:25

**0**

**0** 207:25
**0287** 5:11

**1**

**1** 9:4 13:3 40:7 138:9 286:9
**1.5** 14:25
**10** 105:19,20 106:16 115:11 122:5
**10,000** 144:9,13
**100** 48:14
**1000** 2:16
**1010** 199:16
**102,000** 15:10
**11** 6:11 102:17 105:4,15 106:17,20 107:3 108:1,14 108:22,25 109:3 137:3 145:1 146:11 175:2,6,23,25 195:4 196:16 204:18 218:19 219:11,20 223:18,25 224:2 227:12
**11's** 106:10
**1100** 301:1
**1107** 204:8,14
**12** 5:3,9 207:3 210:1
**12/16/24** 6:18
**1200** 3:17
**125** 242:11
**126** 5:17
**12th** 201:8 207:7
**13** 131:18 138:9 167:18 169:23 225:14 225:18,23
**131** 5:20
**137** 5:23
**13th** 138:18 139:24 140:22 168:3 221:11
**14th** 221:12 223:25 224:3 267:17
**15** 64:1 115:11 220:12
**15,925.98.** 154:2
**152** 6:5
**15th** 252:4
**16** 164:3 197:21
**16,000** 154:4
**1650** 3:7
**167** 6:10
**17** 155:16
**18** 16:4 170:14 225:6 226:13
**1820** 301:2
**184** 9:4,5
**185** 106:7
**19** 24:16,20 25:7 26:5 27:3 29:24 234:6 235:8
**192** 5:4
**196** 6:14,16
**197** 6:18

**2**

**2** 14:23 53:8 63:11 164:8 218:2 221:14 268:16
**2/12/25** 6:21
**2/14/25** 6:25
**2/18/25** 7:5
**2/19/25** 7:17
**2/20/25** 6:23 7:8,14 8:4,7
**2/24/25** 7:23
**20** 9:3 44:24 50:23 61:1,1 64:2 105:19,20 106:16 172:12 178:24 194:1 211:16,24 227:25 246:7 246:11 258:24 259:12 267:13 302:16 303:22 304:22
**200** 2:5
**200,000** 206:25 208:4
**2005** 13:3
**201** 6:21
**2014** 195:20
**2022** 216:3 255:10,12,17 255:19
**2023** 215:25 257:8
**2024** 44:5,12,12 44:14 45:8,24 46:1,17 47:7 50:24 51:20 60:9 193:22 197:21 201:7 257:8 259:5
**2025** 13:3 43:5 43:7 47:3 58:14 60:2,12 62:17,25 63:6 64:4,7 68:8,9 72:14 73:9 90:5,12 91:8,9 102:4,11,13 113:9 115:13 117:7,14,23 122:15 123:12 125:24 126:6

127:16 131:2,6 131:18 138:10 141:23 152:8 156:14 164:8 167:18 169:10 169:23 179:14 182:13 201:9 201:22 207:3 207:25 210:1 211:16,24 212:5 225:6 226:13 228:1 234:6 235:8 238:6 240:15 241:2,5,9,12,18 243:5 246:7,11 248:15,19,23 249:12 252:4 258:24 259:12 267:14 270:4,7 270:23 278:9 278:11 279:25 285:13,17 286:13 294:1 297:14,24 298:5
**2026** 1:12 10:4 24:7 80:18 89:18,19 90:3 133:8 187:19 301:4
**206a** 6:3
**20th** 212:1 235:12 259:16 260:25 269:18
**21** 212:1 241:2 241:9,12,17 243:5 244:11 245:19 297:14 297:23 298:5
**211** 6:23
**216-523-1313** 301:3
**21st** 294:1
**22** 1:12 10:4 89:17,19 90:3 90:5,12 91:9 252:10 254:19 262:12 291:19 294:18
**221** 6:25
**225** 7:5
**227** 7:8
**229** 7:11
**23** 16:4
**231** 7:14
**233** 7:17
**239** 7:20
**24** 44:3 270:4,7 270:22
**240** 7:23
**24th** 243:3 274:6
**25** 9:5 16:4 194:15 248:15 248:19,23 249:12
**25-50053-11** 1:6 10:6
**2555** 1:15 4:5
**258** 8:4
**26** 187:5
**267** 8:7
**269** 8:9
**27** 16:5 24:12
**278** 8:12
**28** 301:4
**284** 8:15
**286** 8:18
**287** 40:10
**289** 8:20
**29** 9:3 12:23 13:14 201:22
**293** 8:24
**29459** 299:16
**29660** 300:14
**2:50** 167:11
**2nd** 165:15

**3**

**3** 153:23
**3/13/25** 5:23
**3/24/25** 8:12
**30** 1:10 5:9 12:15 24:9 32:1,12 33:9 34:10,16 37:8 41:5,22 58:22 244:12 301:8 302:4,9 303:4 303:13 304:20
**31** 13:3
**324-0300** 2:21
**327** 6:12 195:4 196:16,21 205:8
**327-5108** 2:23
**329** 6:12
**34** 5:8 12:11,12 12:24 24:12 86:9 155:12 163:25
**346-6000** 3:11
**35** 5:10 39:24 40:1 42:9
**36** 5:12 72:10 72:11 77:8
**363** 127:21 227:14
**37** 5:16 126:4,7 129:5 131:12
**374-3200** 3:20
**38** 5:18 131:17 131:20 286:9
**3800** 3:17
**39** 5:21 137:19 137:21
**3:44** 191:7

**4**

**4** 16:4 73:9 133:1 240:15 241:5
**4/21/25** 8:24

**4/9/25** 8:15,18 8:20
**40** 5:11 6:3 151:24 152:1
**400** 4:14
**402** 3:11,12
**408** 8:23
**41** 6:6 167:14 167:15
**42** 6:11 196:12 196:13,15 197:11 203:11 203:16,23
**43** 6:15 196:12 196:13,19 197:12 203:11 203:16,23
**44** 6:17 197:16 197:17,20 198:1,5 199:7
**44114** 301:2
**45** 6:19 34:10 41:5,22 201:3 201:4,6,21 202:8
**46** 6:22 211:9 211:10,12
**47** 6:24 221:2,3 221:5,14 222:4 224:21
**474-6550** 4:8
**474-8100** 2:22
**48** 7:3 225:2,3 225:5,11 226:4 226:15 227:13
**49** 7:6 227:21 227:22,24
**4:46** 228:24
**4:47** 229:3
**4th** 240:15 241:7

**5**

**5** 72:14 144:13 155:15 188:15
**5,000** 144:8
**5/7/25** 5:17
**50** 7:9 229:5,6 229:8,12 230:4 231:6 242:10
**500** 199:16
**51** 7:12 231:18 231:19,21,25 232:13
**512-1957** 4:17
**52** 7:15 233:21 233:22,24 234:5 235:15 237:12
**53** 7:18 239:14 239:15,17
**54** 7:21 240:20 240:21,23,24
**55** 8:3 258:20 258:21,23 260:5 262:24
**56** 8:5 267:8,9 267:11
**57** 8:8 269:21 269:22,24 277:6,9,10
**58** 8:10 277:9 277:11 278:4,5 278:8,22
**59** 8:13 284:6,7 284:9
**5:30** 270:23

**6**

**6** 1:10 5:9 12:15 24:9 32:1,12 33:9 34:16 37:8 187:19 188:15 201:7 244:12 301:8 302:4,9 303:4,13 304:20
**60** 8:16 121:1 121:18,19,22 124:21 125:17 125:20 286:22 286:23,25
**603** 202:8
**61** 8:19 289:15 289:16,18,23 290:5
**62** 8:21 293:21 293:22,24
**64105** 3:18
**64106** 2:17 4:15
**64108** 1:16 4:6
**661-8609** 3:12
**66217** 2:6
**68102-2103** 3:8
**6:30** 293:16
**6th** 126:5 189:5 201:12

**7**

**7** 86:10 87:18 88:1,4,13,25 89:11 127:16 131:2,5 152:8 153:5
**71** 153:20 154:6
**72** 5:15
**7225** 2:5
**73** 126:6
**75272** 126:6
**7th** 126:5 127:18

**8**

**8** 98:4,19
**8/13/25** 5:20
**80** 122:5
**816** 2:22 3:20 4:8,17
**8450788** 1:18 301:7 302:2 303:2 304:2
**8:13** 138:10
**8:56** 167:24

**9**

**9** 226:15 268:20 278:9 278:11 279:24 285:13
**9/22/2026** 301:8 302:3 303:3
**90** 122:5
**913** 2:8,23
**95** 124:17 125:9,14
**962-8700** 2:8
**97,000** 15:9 207:16
**972** 2:21
**99** 48:14,16
**9:05** 1:13 10:5
**9th** 278:22

**a**

**a.m.** 1:13 10:5 68:16 138:10
**abide** 215:8
**ability** 93:15 100:7,17,21,25 101:13 143:14 214:4 247:19 251:16 299:10 300:7
**able** 122:6 144:3 251:5 261:19
**above** 145:22 301:17
**absent** 11:10
**accept** 121:6 122:3 124:15 124:18 125:14
**acceptable** 227:2
**accepting** 210:6
**access** 54:22 55:6 59:19 74:21 104:25 156:18 278:24
**accord** 13:6 53:23
**accordance** 302:5 303:5
**account** 207:19 207:20,24 208:11 237:3
**accounted** 158:25 162:8
**accounting** 218:10 271:4 271:12,14,20 272:3 273:10 274:7,25 275:25
**accounts** 208:25 210:22 230:6 231:7,9 231:14 235:18 235:23,23 236:15,17,19 237:2
**accurate** 15:1 17:19,23,25 27:23 34:23 59:3 83:16 149:21 159:15 160:15 181:9 255:21 272:5 299:9 300:5
**accurately** 260:11 261:7 262:4
**acknowledge** 302:11 303:16
**acknowledge...** 154:3
**acknowledg...** 11:8
**acquiring** 169:22
**acquisition** 169:15 170:10
**act** 302:14 303:20
**acting** 82:9
**action** 27:13 109:20 110:15 213:20 276:23 277:1 299:12 299:16 300:8 300:12
**activities** 264:1 264:5,9,15 266:1
**activity** 274:24
**actual** 53:10 63:13 242:17
**actually** 27:15 147:6 149:16 160:14 243:13 292:7
**adam** 4:11 10:21
**adam.e.miller** 4:16
**add** 17:5 117:13,13,22
**addition** 88:17 255:25
**additional** 88:3 201:25 202:3 247:9
**address** 31:23 40:18,20 53:10 63:13 109:12 151:7 194:24 199:18 200:5,6 200:7 263:2 301:15
**addressed** 77:16,25 78:3 78:16,24 79:4 79:7 126:2
**adequately** 282:6
**administer** 11:9

**admissible** 8:23
**adp** 232:23
**adverse** 52:7,9 64:14,15,17,20 195:6 200:24 202:1,4,9
**advice** 86:19 90:13 212:6,15 213:3,5 220:1 240:13
**advise** 83:8 85:8 89:13,19 94:8,12 102:5 102:9 122:6 169:18 205:23 212:10
**advised** 83:4 85:3 86:25 87:6 89:5 90:8 94:7,11 188:10 206:18 212:23
**advising** 86:11 86:12
**advisor** 261:11 262:3
**advisors** 222:10 276:3 276:16
**advisory** 259:3 259:6
**affidavit** 203:14,18
**affiliated** 49:4 49:12 52:21 61:15 64:19 179:6
**affiliates** 44:17 44:21 45:1 234:14,19
**affiliation** 65:18 93:18
**affixed** 302:15 303:21
**afternoon** 118:11 119:15 192:14
**aggregate** 14:22,23
**aggressively** 263:8,11,19
**ago** 41:22 64:2 64:2 119:17 280:4
**agree** 11:12 43:1 48:5 66:21 70:22,24 94:9,13 108:13 108:24 109:4 109:12 122:4 133:6 139:11 139:13 141:5 145:21 153:1 157:22 222:10 224:23 237:19 237:22 251:22 262:21 277:21
**agreed** 43:23 94:6,20 116:23 250:24 251:20 251:20 256:21 267:4 277:25
**agreeing** 60:16
**agreement** 46:21,24,25 79:9 188:20 189:16,18 190:1 209:21 209:25
**agreements** 189:24 190:4 198:22
**ahead** 133:21
**al** 1:6 10:5 301:6 302:3 303:3
**albers** 175:14
**alert** 276:2
**alerted** 276:6
**aligned** 52:9 63:18,20 64:8 203:1
**alleged** 234:12 275:2
**allocation** 172:3
**allowance** 18:4
**alternative** 132:5 243:9,13 243:18
**alternatives** 5:19
**ambiguous** 210:16
**amount** 14:23 41:6,7,9,11 121:6 124:5,14 125:1,13,15 136:23 144:8 145:22,22 146:3 206:25 217:25
**amounts** 122:1 136:19 148:21 150:15
**analysis** 136:21 230:19 240:2,8 240:18 244:13 244:14,19 245:12,21 246:13 248:17 251:19 257:9 257:14,19 291:11,16
**analyzing** 115:22
**andrew** 4:20
**anna** 2:13 10:11
**answer** 9:1 16:13 17:13 20:1 23:12 26:23 29:20 30:12,17 32:9 35:5,21 36:7 36:15 37:5

38:1 43:25 46:7 48:9,23 49:8,21 50:9 51:9 53:3,15 59:14 60:24 62:19 63:9,25 67:2,5,13 69:23 70:19 83:2 86:2 96:14,22 100:11 103:20 106:24 109:15 110:21 112:1,9 128:12 129:14 135:8,23 136:10,17,22 137:6 142:20 144:24 145:15 157:16 158:2 159:7 160:19 161:19 162:4 163:4,16 169:25 171:24 173:12 174:20 184:2,15,23 185:1,3,10 186:7 188:2,24 189:13,22 190:11,22 193:12 195:9 199:24 200:14 202:24 204:13 210:17 212:21 213:24 216:11 220:5 224:15 231:11 233:16 234:24 236:1,9 237:7 243:23 248:1,10 252:25 253:7 253:24 255:23 256:16 261:23 262:7 269:4 271:18,25 273:3,16 275:21 283:12 286:16 292:5 295:1 297:9

**answered** 29:10 37:4 42:4 96:21 163:3

**answering** 22:2

**answers** 33:11 193:15

**anticipated** 148:6,15,17 286:19

**anybody** 18:24 21:18 38:20 54:3 62:15,21 83:18 97:6 100:20 102:23 103:15 104:8 113:18,20 114:22 134:21 144:20 181:13 192:7 210:8 213:11 222:25 223:2 230:18 257:2 266:9 276:9 277:1 293:1

**apart** 23:12 265:16

**app** 42:11

**appear** 58:5 61:12 62:1 153:14 302:11 303:15

**appeared** 57:3 57:20 60:20 61:2,22 62:15

**appears** 11:1 138:17 152:5,6 153:5 197:20 201:8

**appended** 303:11,18

**applicable** 11:16 48:12 227:19

**application** 6:11,16 14:20 14:21,21 16:8 16:16 18:9,9 29:1,7 31:5,13 43:4 48:2 79:23 80:22 175:17 177:21 177:23 178:1,5 193:15 196:15 196:20 202:20 203:14,18

**applications** 14:10,18 15:12 15:16 16:19 17:19 18:5,7 18:14 22:9 24:22 25:9,20 26:7,10 29:16 30:22 170:23 173:20 177:14

**applied** 207:15

**appoint** 121:14 215:4 219:11 248:14

**appointed** 94:16 95:1 102:6,10,13,15 215:2 223:7 270:8,12,17,19

**appointing** 101:22 103:5

**appointment** 93:24 94:9 120:14,15 123:24 133:10 219:16,19 222:16,20 226:19 228:6 228:10 248:3 266:18,21 271:6 275:8

**appraisal** 252:10 254:19

256:17 262:15 268:17 279:2 280:9,21 284:23 287:10 290:12,14,19 290:21,23 292:22 293:7 293:11
**appraisals** 256:4,20,22 258:12,14 278:16,19 280:22,23 281:5,15,16,21 281:25 282:4 282:20 283:7 283:23 284:15 284:19,22 289:5,25 293:4 293:15 294:18
**appraise** 288:13
**appraiser** 287:6 288:10 288:13,15 289:12
**appraisers** 256:9 278:24 283:21,25 284:2,3 290:7
**appreciate** 173:5
**approach** 203:2
**approval** 18:9 20:16 47:20,23 116:5 156:12 195:25
**approve** 20:22 20:25 21:4 123:22 124:1 124:15 133:18 133:23 139:15 243:25 249:4
**approved** 43:3 79:21 178:2
**approximately** 99:25 125:9 165:17 174:16 182:13 194:15 207:15 297:3
**april** 152:7 278:9,11,22 279:24 285:13 285:17 286:13 294:1 297:14 297:23 298:5
**ar** 232:8,14
**area** 194:18
**areas** 177:10
**argumentative** 79:18 282:8
**arises** 112:4
**arising** 212:7
**arm** 127:20 128:4
**arose** 109:10,23 111:13 112:20 146:19
**aschuler** 2:19
**aside** 45:25 46:10,11,13 72:7 78:23 120:2 216:5
**asked** 15:19 25:13 29:9 33:10,13 37:4 42:3 43:22,25 45:18 62:14 74:6 79:25 81:25 96:20 121:5 127:6 150:7 156:13 163:2 164:20 179:9,17 183:4 183:9,12 185:19 186:15 187:20 191:11 191:14,20 192:22 193:2 194:7 196:3 206:8,11 210:8 210:11,12 211:1 218:18 219:14 245:24 255:13 256:20 265:9 270:15 286:8
**asking** 30:14 60:11 61:17 64:23 69:3,10 77:11,24,25 85:21,23 105:8 105:9,14,15 125:13 134:20 166:6,9 174:7 174:8 185:22 186:21 203:25 204:1 214:22 228:14,15 250:7 268:24 285:7 294:22
**asks** 27:14 231:6
**aspect** 27:12 67:17 104:5,14 121:10 147:18
**aspects** 34:22 93:15 116:17 127:23 177:3 178:17 264:12
**assembled** 66:12
**assert** 180:19
**asserted** 180:9 209:18
**asserting** 179:8 183:19 185:20
**assessment** 244:21,25 245:4,12 251:2
**assessments** 280:22,23
**asset** 106:1,14 257:1

**assets** 6:4 98:15 99:20 100:5,7 100:17,22 101:2,6,7,13 106:2,3,6 108:15 179:8 180:5,10 183:19 209:4 218:8 223:21 254:17,25 255:6,14,20 262:16 273:13 280:22 282:21 283:8 287:25 288:13 289:12 291:23 294:23 297:4,10,25
**assigned** 11:6 170:24 171:9 171:16 173:8
**assigning** 174:4
**assignment** 68:5 164:19 176:23 302:2 303:2 304:2
**assist** 14:6 43:5 44:3 61:9 156:9
**assistance** 220:12 262:14 293:14
**assistant** 61:11 151:2,9
**assisted** 243:16
**associate** 22:3 175:10,15,21
**associated** 52:20 93:20 96:10 172:25
**associates** 21:16 171:10 173:25 174:3 174:17 175:7 176:6,11,25
**association** 93:18
**assume** 288:4
**assumed** 156:11
**assumption** 68:5 156:9 164:18
**assurance** 124:24
**attach** 225:22
**attached** 72:22 72:24 73:24 79:13 132:3 226:4,14 227:13 279:5 303:7
**attaches** 267:16
**attaching** 225:6
**attachment** 73:1,3
**attachments** 267:19,21,23
**attempt** 232:23
**attention** 24:16 293:25
**attorney** 19:15 20:4,7,7,9,10 21:8 22:12,19 32:5 42:2 44:8 56:22 57:16 136:1 173:8 174:5 183:23 185:16 186:25 195:5 299:14 300:10
**attorney's** 186:11 187:3
**attorneys** 7:16 21:10,13,14,15 21:21 26:11 32:19 35:14 36:9,18 58:8 67:20 68:11 76:3 172:14 173:22 188:12 234:2
**attribution** 171:20
**auction** 133:18
**audio** 299:8 300:3
**audit** 215:21,23 216:1,3 245:6 255:7,9,15,16 255:19 257:8 257:16,21 296:18
**audited** 251:14 296:15
**auditing** 258:3
**auditor** 257:23 276:6
**auditors** 261:12 275:23 276:2,16
**audits** 217:14 245:11
**august** 24:2,7 24:11 102:3,10 102:13 122:14 123:12 125:24 130:12 131:18 187:19 188:15 189:5 248:15 248:19,23 249:12 252:4
**authority** 104:19,20 213:17,17 222:17 223:3 265:24 266:3,7 266:13
**authorization** 104:16
**authorize** 303:11
**authorized** 11:8 213:12 256:12,13

**authorizing** 6:13 196:16
**automatic** 92:17
**avail** 290:14,19 290:22
**available** 74:19 180:2
**ave** 301:1
**avenue** 4:5
**avenues** 101:4
**avoid** 144:7
**aware** 13:20 14:10,17 15:7 15:24 18:18 21:24 23:7 24:7 29:3 31:19 32:1 38:5 59:16 64:16 65:4,6 65:22 66:1,14 69:3,10 86:15 91:9,11 93:23 95:7,11,25 96:16,23 97:6 99:4,8 100:23 103:8,25 112:2 114:14 127:11 127:16 128:1 128:16,23 130:7,16,24 131:15 135:5,6 154:7,16,25 155:4 157:4 186:25 187:6,9 194:8 208:23 210:18 213:18 217:22 218:5 218:15 222:25 223:2 230:22 232:25 233:12 233:17 249:21 255:1 270:12 270:15 278:15 282:1 288:15 292:11 297:23
**awareness** 155:6

**b**

**b** 1:10 5:6,9 6:1 6:3,4 7:1 8:1 12:15 24:9 25:18 32:1,12 33:9 34:16 37:8 121:12 127:6 130:3,7 244:12 259:3,5 259:17 262:24 263:1 266:20 266:22 301:8 302:4,9 303:4 303:13 304:20
**back** 19:16 42:11 58:14,22 58:25 87:13 89:25 108:24 114:14 125:4 132:17 138:25 160:23 170:13 187:5 193:18 193:22 212:2 222:5,9 223:16 229:19 235:7 237:12 244:9 282:15,19 289:24 290:4 290:22 301:15
**background** 218:10
**bacon** 1:14 4:4
**balance** 15:5,7 171:11 207:25 256:1
**bank** 207:19,20 207:24 208:11 237:3
**bankruptcies** 20:13 84:14 128:5 212:4
**bankruptcy** 1:1 19:18,21 20:8 43:2,3,24 47:21,24 48:5 50:5,14 51:23 52:4,14 65:10 65:12 67:7 73:17 79:12 82:14 83:13 84:16,19 90:21 91:5 92:4 96:4 96:11,18 97:4 97:8 98:15 99:2,4,8,11,16 99:20,24 100:1 100:4,8,18,22 101:1,5,11,13 101:16 102:16 102:24 103:12 104:17,22 105:1,4,21,25 106:6,17 107:3 107:15,19 108:14,15,22 109:1,4 110:17 112:22 113:2 115:25 119:24 120:4 128:18 128:24 137:14 137:17 143:5,9 145:3 146:15 150:24 151:5 152:7 157:9 161:14 162:2 168:9 173:8 174:18 178:16 183:15 194:17 194:21,25 195:20 202:17 203:15 204:9 204:18,22 205:2 206:21 207:15,18 208:15,19 209:6,9 210:22 212:8 213:21

214:14,16 220:19,20 223:24,25 224:2 236:6 249:17 257:4 265:18 268:22 283:7 297:2,11 297:21,22
**base** 234:14
**based** 16:14 17:22 27:3 63:15 79:21 89:21 93:7,18 96:14 101:24 102:3,7,25 113:9 121:21 122:14 127:15 136:14 140:12 140:20 157:6 179:1 181:3,7 184:1 188:9 202:16,18 203:14 205:2 215:23 249:18 296:15 298:3
**basing** 61:22
**basis** 185:11 234:15 251:17 271:5
**bates** 40:6,7,9 126:6 132:25 202:8
**bclplaw.com** 3:19
**began** 45:23 46:1,3,15 47:7 207:22
**beginning** 111:21 127:25 136:12
**begins** 40:7 47:3 138:8 139:25
**behalf** 2:2,10 3:2,14 4:2,10 10:10,12,15,18 11:4 13:13 14:2 15:12 81:25 82:3,9 106:10 123:10 145:6 151:20 213:13 226:25 228:13
**behrens** 1:17 11:6 299:2,17
**belief** 50:20 234:12
**believe** 15:9,13 15:23 16:5,15 17:25 21:22 23:22 24:1 26:24 32:25 33:4,4,20 34:1 34:17,21 37:16 44:17 45:2 49:10 61:14 64:11 66:4,11 69:17 81:6 103:1 114:15 115:4,14,16,17 123:7 125:25 129:25 143:11 145:20 148:4 156:13 162:22 165:24 166:16 166:18 167:1 175:14 179:9 179:13 180:1 186:15 188:15 189:8 192:9 193:20 194:12 196:3,8 200:19 202:19 203:17 207:21 211:19 224:16 229:22 235:8 236:10 236:25 237:8 238:9,12,17 239:25 240:17 243:6,12,12 246:11 249:19 250:25 262:12 278:20 280:17 287:21 294:6
**believed** 99:15 215:1 241:17 242:4
**believes** 22:12 22:19 263:2
**belt** 130:4
**beneficial** 49:3 66:22
**benefit** 142:16 223:19 266:5
**bergen** 257:7 257:10,14,16 258:9 261:14 262:3,10
**berra** 25:16,22 26:2,5 27:5,10 28:1 30:23
**best** 24:6 105:19 119:9 122:9 125:3 132:17 135:4 169:6,11 170:9 192:20 217:1 242:24 263:2 299:10 300:6
**bestowed** 265:23 266:2,6
**better** 23:6 291:7
**beyond** 25:9 26:10 28:13 35:2 48:21 49:6,19 50:7 51:7 53:1 57:5 60:22 62:18 63:7,11 69:20 70:17 75:14 84:24 100:9 103:18 144:22 157:14 158:8 159:5 171:22 186:14 188:1

188:23 189:12 190:9,20 199:22 213:22 218:17 224:13 231:10 233:14 245:18 261:21 262:6,12 271:16 273:14 286:14 291:17
**bid** 133:18
**bidder** 100:4
**big** 255:4
**biggest** 294:2
**billed** 171:3 173:18
**billing** 285:22 285:25
**bind** 213:12,16 214:5
**binding** 13:17
**bit** 19:16 20:20 27:15 28:24 151:3 191:19 193:19 218:18
**blanket** 241:24 243:14
**block** 143:14
**blocking** 143:19 144:3 145:4 146:16 146:17,18,22 146:23,23 147:2,3,5,10,16 147:21 148:2
149:5,15,24 150:5,12,18 218:21
**board** 101:22 102:6,10,13,15 102:22 103:2,6 103:10 104:1 121:14 133:10 265:5,7,10,13 265:18 266:18 266:21
**books** 217:20 258:6
**borrower** 44:19 45:4 50:21,23 51:20 82:21,22 83:6 92:13,16 151:14,18 180:17 194:1 212:12,14,17 212:24
**borrowers** 46:21 92:15 194:2 232:16 235:17,22
**bottom** 138:9 138:12 202:8 225:10 240:23 260:7,17 265:4 288:18
**boulevard** 1:15
**bounce** 232:25
**bound** 40:5
**box** 125:5 153:12,13
**break** 68:14 119:22 171:8 191:3 244:3
**brent** 4:21 11:1
**briefly** 187:5
**bringing** 129:5
**broad** 291:23
**broker** 133:13
**brothers** 201:16 216:22
**brought** 215:15 215:18 216:7
**brown** 103:23 104:8 113:17 118:9 126:16 127:1 130:20 175:10 178:23 178:25 226:6 240:6
**brown's** 127:12 130:2
**bruce** 119:7
**bryan** 3:16
**budget** 139:15 143:23,25 147:12,13,25 148:5 150:10 150:13,20,21 150:22,23 225:24 232:17 256:12,14
281:20,24 286:9
**budgeted** 286:18
**budgets** 147:24 147:25 148:2 149:24 150:5 177:16 219:5 245:7
**building** 3:7
**bullet** 133:8,9 133:12,17,22 133:23 263:7 263:25 265:4 265:14,21,21 266:7
**bunch** 65:1
**business** 127:21 130:5 134:1 250:4,6 250:8 264:21 279:1 287:12 287:25
**businesses** 127:23 223:21
**buter** 3:4 5:4 10:17,17 192:13 193:17 194:3 195:12 195:18 196:10 197:10 198:18 199:6 200:1,15 203:6 204:16 204:23 205:6

205:15,22 206:10 209:13 210:20 211:7 213:1,9 214:2 214:11 216:15 219:24 220:9 223:14 224:20 227:8 228:12 228:23 229:4 231:4,16 233:19 235:3 236:3,12 237:11 241:22 242:8 244:2,10 245:19,24 246:4 247:8,17 248:4,13 249:5 249:10 253:4,8 254:2,8,15 256:3 258:1,5 258:11 260:16 260:18 261:4 261:13 262:1 262:11,21,22 265:11 267:7 268:16,23 269:9 271:1,22 272:10,20 273:7,20 274:13,17,20 276:1,8,14,24 277:5 278:2 279:23 281:13 281:22 282:11 283:1,15,19 285:2 286:20 287:18 288:9 289:9 291:3,19 292:6 293:2,18 293:20 295:4 295:13,21 296:2,8 297:12 297:20 298:4,9

**buy** 100:7 142:15

**buyer** 101:9,10 101:16 169:3

**buyers** 101:19

**buying** 140:1,2 141:2,4,6 142:10

**c**

**c** 2:1 3:1 4:1 10:1

**ca** 301:25

**cabinet** 55:3,4 55:7,15,20,23 56:4,6,8,11 58:25 74:22,23 74:25 75:3 88:8,10,12,15 181:21,22 182:1,2

**cabinets** 55:18 88:17 98:23 181:23

**caliper** 260:22

**call** 104:1 165:3 182:11 203:4

**called** 12:3 280:4 291:7

**calls** 23:10 25:23 26:22 29:18 35:17,18 37:25 48:6,7 63:23 64:21 66:5,6,24,25,25 82:24 106:22 109:13 111:24 112:7,10 129:12,13 135:20,21,22 136:8 137:4,5 142:18 155:8 157:25 159:21 160:17,17,18 161:17 162:25 163:1,1 179:2 179:4 202:22 214:6 220:3 230:25 236:7 237:5 243:21 281:9,17 283:10 290:24 297:7

**capacity** 1:10 22:3 34:14 92:19 166:12 186:22 206:13 213:6 259:9 260:11

**capital** 129:6

**caption** 115:7

**career** 194:18

**carries** 138:13

**carrying** 205:9 205:12

**carryover** 50:11

**case** 1:5 10:5,6 14:10 15:19 18:10 20:12,17 20:18,23 21:1 22:1,12,19 23:15 27:14 43:2,24 58:1,2 58:9 69:13 86:8 88:12 92:4 95:20 99:2,4,11,12,16 104:22 105:1 115:22 127:25 136:4,7 137:3 143:5 145:3 146:15 151:5 166:16 170:6 171:4,17 175:2 175:3 181:25 182:2,3,4 183:13,15 191:21 203:19 204:3,4 205:16 208:15 214:9

214:16 216:17 217:15 218:24 219:3 220:19 220:20 237:24 250:2 264:11 270:2 273:1 278:16 280:25 281:2,3 285:19 295:11 297:3 297:11,16,19 297:21,22 301:6 302:3 303:3
**cases** 19:12,13 21:10,13,21 38:12 67:8 73:17 75:8 79:12 83:13 84:16,19 90:21 99:8,24 100:2 105:15,20 106:16 115:7 158:15 159:13 175:6,24,25 179:6 251:17
**cash** 5:23 138:16 139:4 158:21 177:12 218:24 219:2,8 219:8 225:14 225:17,19 251:16 282:6 291:6,11,16,25 292:8,12
**categories** 17:6 47:2 255:4
**category** 150:9
**cause** 30:2 61:6 61:8 62:11 79:15 101:20 106:13 178:1 213:7 269:18
**cave** 3:16
**caveat** 62:7
**cc** 8:22 229:14 267:12
**cc'd** 224:22 237:13 277:16 285:3 287:4
**ccs** 221:8 225:11 279:9
**ceo** 73:21 82:6 82:10 213:6,17
**certain** 13:4 121:21 173:25 195:23 218:15 223:21 229:9 231:22 251:7
**certainly** 16:12 53:23 149:20 277:24
**certificate** 299:1 300:1 303:11
**certification** 302:1 303:1
**certified** 11:12
**certify** 299:4 300:2
**cetera** 242:24
**cgotham** 2:7
**chain** 5:16,21 6:19,22,24 7:9 7:12 8:8 201:6 201:11 202:12 221:5 229:8 231:21 234:1 269:24 278:8
**challenge** 157:12 223:5 272:19
**challenged** 119:12
**challenges** 136:12 263:3
**change** 15:10 156:7 301:13 301:14 303:8 304:3
**changes** 218:13 301:12 302:7 303:7,9
**chapter** 102:17 105:4,15 106:10,17,20 107:3 108:1,14 108:22,25 109:3 137:3 175:2,6,23,25 204:17 219:11 219:20 223:18 223:24 224:2
**characterize** 22:5 283:2
**charge** 217:2
**charles** 4:13
**check** 6:21 52:6 52:13,20,24 53:9,20 54:2,4 54:7 56:12,15 56:17,20,21,25 57:3,6,21,25 58:7,10 59:1,8 59:23 60:1,4,5 60:6,8,15,21 61:2,4,9,11,13 61:16,19 62:2 62:16 63:12 200:19 201:13 201:24 202:4 202:13 207:7,8 208:11
**checked** 153:12
**checking** 200:12
**checks** 52:20 54:1 58:5 59:12
**chief** 11:2 93:24,25 94:3 94:5,9,13,16 95:1 143:4,6 143:12,15 214:4,19 226:20 227:1

**choose** 290:1
**chose** 247:23 294:21
**cibc** 238:13
**cincinnati** 179:10 180:24
**circulated** 125:24,25 250:10
**cite** 89:23
**city** 1:3,16 2:17 3:18 4:6,15 43:12 44:1,2,8 47:10,15 95:24 172:23 173:6,7 173:9 189:20 190:4 197:23 198:10,13,21 198:24 199:17 199:20 200:10 235:10
**civil** 302:5 303:5
**claim** 30:4 157:12 234:14
**claiming** 154:8 186:6 232:7
**claims** 229:24
**clarify** 20:2 29:21 102:12 117:10 181:23
**clarifying** 16:23 17:3
**clear** 39:1 105:13 184:7 191:19 193:11 215:25 217:8 257:15
**clearing** 62:24
**cleveland** 301:2
**client** 19:6,13 20:10 47:25 48:4 50:6,17 50:18 51:23 52:3,13,22 74:14 75:6,9 75:11,17,20,23 75:25 111:22 113:23 114:1,1 114:10 135:14 136:2 174:15 182:24,25 185:16 193:21 194:4 196:5 197:5 200:12 201:12 202:19
**clients** 35:14 37:10,13,18,19 44:13 71:19,21 140:17,19 201:15
**close** 197:19 203:2,4 293:16
**closest** 106:11
**closing** 133:24
**clue** 134:17
**codes** 195:3
**cole** 2:14 5:3 10:9,9 12:9 13:7,10 16:3 16:17 17:1,18 17:24 18:3,11 18:19 22:17,24 23:5,17 24:3 26:3 27:1,11 27:19 29:14,21 30:16,20 31:9 31:11 32:17,23 34:11 35:10 36:1,10,19,24 37:11,21 38:4 38:19 39:1,2 41:12 42:7 43:8 46:6 48:13 49:2,14 49:24 50:15 51:13 52:1,23 53:5,8,18 57:13 58:3,23 59:21 61:5 62:13,22 63:10 63:19 64:3,6 64:12,25 65:2 65:17 66:3,9 67:6,18 68:13 68:18 69:8 70:2,8,23 71:3 71:8 72:6 74:20 75:10,22 77:3,20,24 78:2,7,12,22 79:24 81:23 82:8 83:7 84:2 85:21 86:7 87:4 92:2 93:9 93:22 94:22 95:10,17 96:2 96:7 97:1 100:15 103:21 104:7,23 105:11,12 107:1,8,13,20 107:24 108:7 108:12,18 109:9,21 110:3 110:16 111:1,7 111:19 112:3 112:12 113:1 114:13 116:6 117:18 118:13 118:19 127:17 128:8,15 129:18 130:1 131:4 135:11 136:5,13 137:1 137:8,18 139:22 140:15 141:3 142:23 144:11,25 145:5 146:1 149:13 151:23 152:24 153:21 154:15 155:11 157:21 158:5

158:13 159:2 159:11 160:3 160:22 161:9 161:24 162:11 162:18 163:9 163:20 166:3,8 167:7,13 169:8 169:20 170:8 172:6 173:3,16 174:23 176:10 176:16 180:11 181:6 182:12 183:16 184:3 184:14,18,22 185:4,7 186:4 186:9,18 188:6 189:4,17 190:5 190:15 191:1,9 191:18,24 192:4,10,16 194:7 250:12 252:7
**colin** 2:3 10:25
**collateral** 5:23 138:16 139:4 158:21 177:12 218:24 219:2,8 219:9 225:18 229:23 230:4 230:11,20 232:2 282:6 294:7,14 295:7 295:15,23
**colleague** 235:10
**collected** 39:11
**collecting** 232:8
**collection** 149:3
**collections** 148:20 236:16 286:8,13,18
**colloquial** 43:14
**colonial** 6:7,8,9 168:5
**come** 23:3 26:25 87:13 100:1 123:1 125:4 149:22 158:14 208:3 219:7 290:22 291:7
**coming** 14:13 18:25 29:4 33:15,16 41:25 45:10 62:14 75:15 76:10 111:11 161:25 184:5 207:6
**commencing** 280:9
**comments** 7:4 46:25 148:7 225:7,9,22 226:2,7,8 273:9
**commission** 244:14,16 246:12 302:19 303:25 304:25
**commissioned** 280:20
**committee** 2:10 10:10,12,15 103:1,4 120:13 121:13 177:19 251:22,25 266:24 269:25
**committee's** 294:9
**communicate** 25:10 28:25 29:7,17 30:23 31:6,14,23 49:1 71:18,19 91:13 144:1 165:21 166:2 213:7,11
**communicated** 27:23 28:17,18 31:19 32:5 35:13 91:21 92:4 144:15,18 144:21 228:15
**communicating** 35:14 145:9
**communication** 25:24 32:3 37:18 92:8 102:23 166:21 166:25 179:21 180:14 184:12 194:8,13 262:18
**communicati...** 22:23,25 23:1 23:7,15,21 24:20 27:21 32:15,16 35:9 36:3 37:9,12 38:23,25 71:15 71:17,21,24 76:3 83:10,19 86:10 145:2 146:14 178:23 178:24 182:6 183:5 188:11 190:8,14,16 191:12,15,21 191:25 192:5 193:2,4 218:19
**communicative** 108:5
**companies** 44:9 66:18 73:18,22 73:22 78:25 79:4,7,12,13,14 79:15,20,20 81:15,16,18,21 82:1,7 93:6,7 93:11,19,20,20
**company** 76:18 92:14 99:9,17

259:7 260:10 265:6,19 287:11,24 288:13
**company's** 225:23
**comparison** 239:7 240:18
**compensation** 8:12
**complete** 44:23 144:7 242:10 247:15,19
**completed** 216:1 301:15
**completely** 199:21
**compliance** 296:25
**component** 148:24
**compound** 65:13
**computer** 55:17 88:8,16 181:21
**conceivable** 163:11
**concept** 68:9 97:11 99:21,23 100:1 112:2 120:25 121:12 121:12,17,19 121:20 122:11 122:13 124:4 124:11 125:23 128:1
**concepts** 120:25 124:7
**concern** 19:23 34:24 36:21 37:23 71:10,12 91:22 92:6 141:10,18,22 142:22,24 212:16,22 242:11,19 251:6 274:8,12 274:21 275:4 282:10 294:13 295:6,6,11,15 295:23 296:18
**concerned** 37:22 282:5
**concerning** 34:22
**concerns** 22:22 23:3 34:24 35:1 37:1 69:18 70:1,4,5 70:10,12,15 71:7,13,23,25 72:5,8 140:1,5 140:7,22 141:1 141:13,15 142:14 230:10 230:20 233:9 233:10 275:1 276:18 286:12 295:20 297:24 298:3,8
**conclude** 223:12
**concluded** 298:15
**conclusion** 35:18 37:25 48:7 63:24 64:22 66:6,25 82:25 106:23 111:25 129:13 135:21 137:5 160:17 161:18 163:1 202:23 211:2 214:7 217:19 218:7 220:8 237:6 242:7 243:22 245:15,25 246:23 247:1 251:10 259:21
**conclusions** 219:7 264:21
**condition** 259:8
**conduct** 22:11 22:18 25:12 35:16,25 38:7 38:8,10,11 183:23 186:10 186:12,16 187:2,3 215:17 224:10 230:9 231:7 240:1 251:18 252:14 256:17 257:6 257:11 271:12 278:19 281:20 281:24 282:4 282:20 283:7 283:23 289:10 289:11
**conducted** 56:12 76:9 96:8 186:17 193:7 230:19 248:17 250:16 291:11,16 292:13
**conducting** 257:16 278:15
**confident** 62:3 93:19
**confirm** 180:25 288:12
**confirmable** 133:5,7 136:6 136:20,23
**confirmation** 54:7 136:25
**confirmed** 198:10
**conflict** 6:20 52:11,24 53:12 53:16 54:7 56:12 57:17,21 58:10 59:23

60:4,7,18 61:12 63:17 95:3,8,9,12,18 95:24,25 96:13 96:16,24 97:3 97:7 109:10,17 109:18,19,22 109:25 110:6 110:14 111:13 112:4,20 129:11,22 200:11 201:24 202:4,13 212:18
**conflicts** 37:23 52:6,13,20 53:9,10,20 54:1,2,4 56:15 56:17,20,21,22 56:25 57:3,6 57:14,16,25 58:5,7 59:1,5,8 59:12,17,18 60:1,4,6,15,21 61:2,3,8,11,16 61:19 62:2,12 62:16,24,25 63:2,3,4,5,5,11 63:13 110:13 110:19,24 111:3,8,9,22 112:13 200:12 200:19,23 201:13
**confused** 90:1
**confusing** 19:25
**connection** 14:14 23:13 32:1 34:15,16 34:18 37:7 50:20 67:15 68:4 73:16 79:11 91:17 164:18 193:25 195:24 212:4 217:12,17 219:10 239:23 245:4 258:12 263:6,18 268:13 269:7 273:10 274:9 274:24 275:9 292:21 293:15
**consent** 210:13 243:10,19,25
**consider** 92:19 102:14 110:10 150:23 269:13
**consideration** 146:6 261:5 297:5,19
**considerations** 141:8 150:19
**considered** 268:12,24
**considering** 269:8
**constitute** 11:20
**consultant** 261:6
**cont'd** 3:1 4:1 6:1 7:1 8:1
**contact** 20:11
**contacted** 164:22,25 166:11
**contacts** 42:21
**contained** 12:24 19:22
**contains** 117:19,21
**contemplate** 116:19 249:16
**contemplates** 133:16
**content** 39:15 117:14 259:17
**context** 115:22 183:18 220:23
**continue** 243:8 280:3 294:5
**continued** 220:8 231:21
**continues** 260:19 282:12 285:9 286:5 287:9 288:17 291:4
**contracts** 153:2 153:3,9
**control** 92:22 93:11,15 216:18 217:6 217:13 222:12 222:20 223:6
**convenient** 226:3
**conversation** 19:8 38:22 39:3,5,7,14 46:8,10 60:13 68:6 80:17,19 88:23 89:10 92:10 99:15 100:16,21 110:18 112:10 135:16 188:13
**conversations** 67:19 82:16,19 83:14 89:2 90:20 91:2 95:11 101:15 101:21 150:2,3 163:21 179:11 179:15 185:15 206:2,5
**convert** 123:17
**converted** 14:21
**convey** 93:3 135:14 228:9
**conveyed** 93:5 227:11 272:9

**conveys** 228:3
**cooperate** 283:9,14
**cooperated** 283:21
**cooperation** 293:13
**coordinate** 218:23 219:12
**copied** 145:20
**copies** 179:5,18 179:19
**copy** 66:7 68:4 156:14 164:18
**core** 297:5
**corner** 41:3 202:9
**corporate** 1:10 4:23 10:20 12:22 13:12,23 34:13,16 37:8 43:15,16 67:15 91:18 104:4,13 131:10,13 145:17 166:7 166:12 264:1,5 264:9 292:1
**correct** 14:11 20:14 42:13 47:5 49:17 50:19 58:6,18 72:20 73:9 75:17 77:10,17 81:6,22 86:23 87:15 88:20,21 90:6 93:2 98:12,13 106:17 109:5 112:24 119:8 119:18 124:9 126:23,24 133:16 140:9 140:23 141:15 147:7 153:16 161:4,11 162:22 177:9 180:5 181:5 189:25 193:23 194:5,15 195:2 195:7,11,17,21 196:6,6,9,17,21 197:22 198:7 198:13,17 199:10,12,19 200:20,25 201:1,18,22 202:1,2,10 203:16 204:5 204:19 205:10 205:19 207:4 207:17,18 209:19,22 211:14,21 215:15 216:1,2 217:23 221:12 221:16,19,24 222:6 225:7,19 225:24 226:20 226:23,24 227:18 228:1 229:10,15,19 229:20 231:23 232:16,18 234:2,6 235:22 237:14,25 239:20,21 240:25 241:5 243:3 245:13 245:14 247:24 248:23,24 249:1,6,9 250:13,17,18 253:16 255:10 257:17 258:25 259:3,9 261:15 262:25 266:18 267:14,17 268:1,23 269:13 270:4,9 277:16,17 278:16 279:9 280:10 281:25 283:16 284:11 284:23 285:14 287:1,4 288:14 289:20 290:8 296:21 298:6
**corrected** 218:1 218:4 255:18
**correcting** 104:19
**corrections** 16:18,23 301:12 303:17
**cost** 240:18 260:12 261:7 261:17 262:5 263:22
**costs** 239:7 260:21 263:8 263:12,17,19 263:21
**counsel** 14:6 23:11 25:3,13 25:15 26:25 27:4 28:21 29:12,15,23 30:8,12 33:7 33:13 38:14,17 46:4,8,11,13 69:16 70:7 72:7 80:11,14 83:5,9 84:4 85:4,9,13,17,19 86:6,13,20 87:1,7 89:5,14 89:18,20 90:9 90:13,19,25 91:10,15,23 92:7,11,20 106:19 107:6,9 107:14,19,25 108:10,14,17 108:21,22 109:3,11

110:13,19,24 110:24 112:11 112:14,15 118:25,25 119:1,2,3,6 151:7 171:12 171:15 185:15 187:23 188:5,8 188:10 194:25 195:5,13,21 200:23 212:23 221:18 229:18 234:10,20 269:25 270:1 299:11,14 300:7,10
**counsel's** 195:25
**count** 263:20
**counter** 296:14
**country** 284:3
**county** 302:10 303:15
**course** 157:4 213:21 279:2
**court** 1:1 43:3 47:21,24 48:5 50:5 79:21 102:17 107:9 152:10 203:22 243:20,25 272:1 302:7
**court's** 273:9
**courthouse** 4:13
**cover** 8:3 77:9 258:23 293:9
**covered** 16:3,6
**create** 212:18
**created** 80:3
**credit** 3:2,3 10:18 44:4 47:8 99:2,16 173:9,14 179:7 208:21,24 209:21 210:24 210:25 221:19 222:11 230:10 232:18 234:14 237:24 238:3 242:1,10,25 267:17 288:1 288:20 289:8
**credit's** 210:13 229:18 234:12 241:15 243:7
**creditor** 297:3
**creditor's** 295:6
**creditors** 2:11 10:10,13,16 116:15 137:11 206:1,3 223:19 223:20 269:25
**cro** 120:15 123:23 213:17 222:12,16,17 222:20 223:6 227:3 228:6,10 228:19 229:19 234:9
**ctp** 4:21
**current** 52:13
**currently** 15:3 168:12,19 171:14
**cushion** 242:1 242:22
**cushman** 278:20
**customers** 93:8 208:13

**d**

**d** 5:1 10:1 97:24
**data** 8:18 66:12 154:12 156:15 156:17,19,21 156:22 157:1,3 216:8 251:9
**date** 1:12 10:4 24:5,5 90:2 119:19 122:22 131:25 184:23 185:2 207:12 297:15 301:8 302:3,9,19 303:3,13,25 304:20,25
**dated** 72:13 73:9 117:6,8 117:10 126:5 131:18,25 167:17 197:21 211:16 221:11 225:6 227:25 235:8,11 241:2 267:13 270:4 278:9 294:1
**dates** 150:15 201:10
**dating** 193:22
**davis** 3:15 10:23,24
**day** 55:10 121:1,18,19,22 139:23 167:24 177:13 178:16 178:16,17,17 187:18 189:7 208:4 302:16 303:22 304:22
**days** 34:10 41:6 41:22 58:22 119:17 125:25 301:18
**dba** 259:3
**dc** 44:20 155:19 263:2
**dca** 1:6 2:2 6:5 7:4,7,11,13,18 7:22 8:9,11,17 8:22 10:5,25

19:7,21 20:8 44:9,16 45:3 46:21 49:12 54:11,24 55:15 55:22 66:17,19 66:23 74:11 76:20 137:2,7 152:4,13 153:15 154:4,9 155:23 157:13 157:24 158:6 159:18 160:5,7 160:14,25 161:15 162:14 162:21,23 163:6 164:7 165:11 179:6 193:7 198:1 201:18 229:9 231:22 234:14 234:19 235:1 259:6 260:10 260:20 261:7 262:4 263:25 267:20,25 301:6 302:3 303:3
**dca's** 263:2
**dcaoutdoor.c...** 76:23 77:7 78:20
**dcaoutdoor.c...** 77:7,15 78:6
**deal** 83:5 97:11 97:14 98:16,20 120:21,22 252:7
**deals** 294:18
**dear** 78:14,20 301:10
**death** 280:5,16 281:8
**debt** 121:2,7,8 122:1 123:5,12 124:5,20 248:19
**debtor** 23:2 43:5,19 48:15 48:16,18 49:4 50:13,14 61:15 66:15,22 67:10 91:21 92:14,22 93:15,19 103:13 104:10 105:1 107:7 108:17,23 109:5,8 114:16 114:18 115:7 129:22 135:5 137:10 140:8 142:15 148:16 148:17 151:7,7 152:15 153:9 159:4,14 161:4 161:7,8,11 162:7,7 168:8 168:15 195:4 195:25 197:13 204:24 205:5 205:13,14,17 205:24 208:16 209:17 215:9 215:15,19 220:18,19,25 221:22 244:15 244:19 245:16 246:1 251:2 252:23 273:18 276:19 292:13
**debtors** 1:7 2:2 24:21 25:11 27:21,23 28:5 28:10 29:1,7 29:17 30:23 31:6,14,20,24 32:5,19 33:1,3 33:23,24 42:24 44:3 47:3,7,8 47:11,20 48:20 49:1,5 52:10 52:19 58:1,1 61:3 63:18,21 64:8,14,17,20 64:20 65:19,20 65:21,24 69:16 79:23 80:11,14 90:22,22 92:5 95:5,20 96:11 96:18 98:15 99:20 100:7,17 100:21 101:2 101:23 103:7 103:11 104:17 105:6,16 106:10,16,20 107:19 108:1 108:21,25 109:3,11,22 111:14 112:21 116:19 121:1,7 121:13,20 122:7,8,17,21 123:10 124:23 125:2 127:23 128:17,19 129:10 134:4 137:13,16 139:20 140:12 140:12,14,18 146:19 148:6,8 148:21 149:6 150:20 154:14 156:5,25 157:8 158:15,18 159:10,13 162:1 163:14 165:13 168:11 168:19,25 169:3,6,11,19 170:5,11 177:15 179:6 194:25 200:25 202:18 203:1 204:3,4,8,9,18 206:22,23

207:19,23 208:3,13,19,21 208:25 209:4,6 209:10,20 210:9,23 212:8 212:18,19 213:6,8,11,12 213:13,16,19 214:5,14,20 215:2,6 216:18 216:25 217:1,4 217:19,20 218:7 219:19 220:1 222:9,12 222:15,18,20 222:21,22,23 223:1,4,6,17 224:4,6,7,11,19 226:25 227:6 227:10 228:9 228:16 229:18 231:8 236:15 237:2 238:3,7 238:16 239:24 240:3,12,14 243:6,8,16 246:14,24,25 247:23 248:2,5 248:18 249:13 249:16,21 251:5,12,16,24 252:13,14,19 253:12 254:10 254:17,25 255:6,8,14,21 256:1,5,10,11 256:18,22 257:1,3,6,7 258:6,13 259:22,23,24 262:16 263:11 263:18 264:6 264:12,15 265:1,7,12,17 265:22 266:2,6 266:10,10,12 266:17 269:17 271:15,23,24 272:3,5 273:11 273:13 274:10 274:22 275:17 275:24 278:25 278:25 279:6 281:16,19,24 282:3,20 283:9 283:21 288:5 288:12,16 291:22 293:12 294:7,15 295:8 295:19,24 296:15,20 297:5,25

**debts** 246:14 246:24

**december** 44:3 44:5,12,12,14 45:8,24 46:1 46:17 47:7 50:24 51:20 60:9 64:7 193:22 197:21 201:7,12

**decide** 42:17 248:2

**decided** 173:22

**decision** 48:25 73:21 143:14 143:16 169:12 187:24 203:10 213:6 219:19 222:19 223:1,3 223:3 224:1,4 224:8,11 240:9 240:10,11 266:10

**decisions** 143:17,21,21 143:24 144:9 145:21 150:19 205:24 222:18 261:11 265:25 266:14

**declaration** 6:15 196:19

**deed** 302:14 303:20

**deemed** 301:19

**default** 209:20

**defaults** 209:18 237:10

**define** 20:9 260:21

**defined** 143:10

**degregorio** 34:1 229:15

**delay** 85:18

**delegated** 173:25

**delete** 59:6 68:19,25 69:4 69:10 71:11

**deleted** 17:8 68:22 227:17

**deleting** 71:24 227:2

**deletion** 17:16 71:2

**delivering** 179:21

**delivery** 130:9 141:7,7

**demand** 93:25 94:3 139:1 228:19

**departed** 190:6

**department** 301:22

**departure** 187:16 188:21

**depending** 14:1 109:16 172:4

**depends** 64:15 148:25

**deposed** 18:25

**deposit** 207:8 235:18,23

237:2
**deposited** 208:4,11 236:16
**depositing** 230:6 231:6,9
**deposition** 1:9 5:8 10:3 11:18 12:11,14 13:20 13:23,24 14:15 32:8 69:19 80:7 144:19 154:19 155:13 170:13,20 185:21,25 238:23 244:12 299:1 301:8,11 302:1,3 303:1 303:3
**depositions** 18:21 19:2 252:9
**derick** 175:13
**describe** 74:8 151:3
**described** 165:6 244:25 266:3 279:19
**describes** 116:16,17
**describing** 57:5
**description** 5:7 6:2 7:2 8:2 116:12,13,21
117:21,22
**designate** 19:15 20:4
**designated** 12:22 13:12 34:18 35:19 220:11
**designation** 20:6 37:8
**designee** 5:9 12:15
**desire** 92:22 98:11
**desires** 222:11
**desk** 54:14
**desktop** 54:17
**detail** 117:3
**details** 16:24 187:9
**determination** 35:24 143:18 144:12 151:16 161:15,23 169:9 216:25 217:11,22 218:6 223:6 235:21 247:10 272:16,18
**determinations** 218:11,14 255:20
**determinative** 160:2
**determine** 28:17 29:6 46:2,15 52:3 56:12 59:25 60:15 67:8 109:24 110:6 110:13 111:12 121:3 158:4 159:24,25 168:22 207:12 216:25 231:8 238:25 240:2 252:12 255:5 255:14 261:19 264:11,14 271:14 272:4 276:18
**determined** 52:10 80:25 116:23 200:22 236:13 240:7 261:25
**determining** 14:7 156:10 217:13 283:8
**detrimental** 215:5
**develop** 111:23 219:1
**development** 6:9
**differ** 14:1 20:1 43:25
**difference** 171:19
**different** 19:10 19:11 20:20,21 43:10 74:24 112:15 116:17 127:23 171:1 172:22 200:5
**difficult** 40:16 132:13 137:25 242:23 260:10 260:20 261:7
**difficulty** 262:4
**digital** 299:8 300:3
**diligence** 8:18
**dip** 7:4,7 8:22 94:14 123:16 123:23 143:11 158:21 177:12 220:13,15,17 220:22 222:14 225:7,10,13,22 226:2,11,18 228:4 229:21 234:9 237:23 238:2,4,7,15,23 239:24 241:14 242:25 243:7 243:11,18,25 246:15,16,18 248:20,22 249:4

**direct** 24:15 260:6 265:25
**directed** 77:23 183:14 205:13
**directing** 20:11 91:1
**direction** 85:11 85:12 87:10 135:3 149:10 168:23 173:24 214:13,15
**directive** 156:8
**directly** 145:1 177:4 253:21 291:19
**director** 4:21 133:10
**directors** 104:1 121:15 265:5,7 265:10,13,18 266:22
**disagree** 75:20 237:22 262:21
**disagreed** 143:15 213:20
**disaster** 277:19
**disclose** 48:4 50:5 153:2
**disclosed** 159:1 195:24 196:4 197:4 202:20 203:10
**disclosure** 47:25 48:11 113:4,6,10,16 113:22 114:4,6 115:4,23,24 116:3,16,21 117:3,17,25 118:2 119:24 119:25 120:2 195:20 197:11 203:3,5
**disclosures** 203:21
**discovery** 23:14 34:20 97:17,19 177:16,17,18 242:23
**discrepancy** 218:3
**discretion** 149:18
**discuss** 101:12 116:25 157:11 166:1 169:15 179:13 219:6 275:6,10 295:18,19,19
**discussed** 18:17 33:14 35:13 45:17 67:21 68:2,10 84:5,7 95:12 127:24 131:7,12 142:24 163:22 164:14 165:25 170:21 179:4 194:11 212:15 219:13 228:4 250:9,12 252:6 263:16,17 267:4 268:6 275:5,22 284:11 293:7 294:8
**discusses** 136:1
**discussing** 138:15 214:25 220:11 276:15
**discussion** 5:20 30:25 33:14 35:24 45:16 46:13 57:1 80:2,4 82:21 95:16 99:12 100:24 103:4 110:13,23 112:11 130:13 130:16 132:5,9 142:7,13 143:1 157:19 163:24 228:17 233:5 250:21 259:25 262:9 268:9 275:16 279:1 280:1,17,19 281:14 287:21 287:23 296:6 296:12
**discussions** 28:21 43:6 44:4 67:23 82:13 83:11,25 87:12 89:21 90:17 94:4,20 101:19,25 102:1,7 103:7 103:9,9 104:18 115:21 127:22 130:3,17,24 131:14,16 158:17,23 164:12 168:12 168:17,20 169:19 170:4 176:15 179:1 180:16 181:4 184:7 206:15 206:16 214:12 214:18 215:4,7 215:13,14 218:9,15 223:10 228:18 233:3 251:12 252:8 255:7 259:16,20 263:10 264:19 264:22,24 265:15 267:5 275:14 285:18 285:21 286:1 286:17 289:7 295:22 296:7

296:10,13
**disengage** 51:15
**disengagement** 51:6,22
**disinterested** 195:14
**dispute** 65:22 66:2 157:23 159:18 234:15
**disputed** 218:1 234:21
**disputes** 146:18 146:20
**disqualificati...** 110:7
**disqualifying** 109:18
**distinction** 43:15,20 47:19 78:8,9
**distribution** 127:20,24 128:4 264:20
**district** 1:2
**diverted** 229:23 230:5 230:12,21 232:3 234:13
**divest** 127:3,20
**divestiture** 128:4
**divided** 177:7
**division** 1:3
**document** 12:17 31:2 73:25 114:9,16 115:3,14,15,19 116:18,25 117:6,23 132:6 132:21 140:25 147:15 151:6 153:6 155:1 226:4
**documentation** 147:20 245:2
**documents** 17:5,6,6 66:13 95:8 103:13,22 104:1,10,25 132:9 157:1 174:1 181:9 183:10,12 196:24 197:4 208:20 211:6 211:20,24 234:25 235:2,9 235:11 237:4 245:9,10 279:5
**doing** 81:4 125:3,22 162:10 173:15 257:15 276:12
**dollar** 124:14 125:1
**dollars** 297:4
**download** 25:14
**downloaded** 25:4 28:15 39:9
**downsize** 130:4
**draft** 7:19 66:14 113:2,10 113:16,22 114:6,15 115:15 119:23 119:24 120:2,3 120:12 150:24 151:2,4 160:4 221:22 222:5 268:21 269:8 269:12 286:3
**drafted** 113:5
**drafter** 178:14
**drafting** 120:10 174:1 269:3
**drag** 55:19
**dragged** 55:24
**drapekin** 5:16 19:5,12 21:24 21:24 126:16 126:19 127:6 151:17 177:3,6 183:10,12 209:1 211:23 226:6 236:25 238:12 239:1,3 239:11 240:6 253:11
**draw** 232:23 293:24
**drawn** 207:24
**driven** 286:7
**drop** 55:19
**due** 246:5
**duly** 12:3 299:5
**dundon** 132:22
**durbin** 6:20
**duties** 106:20 107:2 108:13 109:4,10 137:10 204:10 204:18,22 205:10,13,16
**duty** 107:7,9,11 107:12,14,18 108:1,6,8,11,20 108:21 109:7 137:14,17 174:14 205:1 205:18 206:2

**e**

**e** 2:1,1 3:1,1 4:1 4:1 5:1,6 6:1 7:1 8:1 10:1,1 25:18 97:24,24 97:24
**earlier** 33:22 34:18,21 40:13 47:18 58:24 69:19 75:4 89:4 110:5

111:2,21 112:14 115:21 118:21 140:16 154:18,22 162:19 165:18 190:17 191:10 193:20 196:3 198:10 215:12 218:18 235:9 250:9,13 281:23 292:18
**early** 24:11 43:5,7 58:14 58:16 82:18,21
**easier** 132:15 132:18
**east** 4:14
**edits** 226:10,13 226:22
**effect** 17:4 48:2 48:11 60:5 69:14 70:21 76:5 80:2 83:11 87:10,12 91:19 95:16 111:18 131:15 142:22,24 143:2 145:21 157:20 160:11 161:23 163:19 163:24 167:2 180:15 181:15 181:18 194:13 197:14 210:19 214:1,24 216:14 217:8 217:23 228:18 249:24 254:14 256:15 261:11 268:9 280:2,18 282:2,10 287:22 296:7 296:12
**effective** 189:7 189:8
**efficient** 174:6 174:10
**effort** 67:8 87:19 94:15 111:11 215:4 294:24
**efforts** 88:3 119:23 120:3 126:1 231:13 247:13 248:6 268:21
**eight** 171:3,5 172:9 194:16
**either** 20:2 40:23 48:14 130:7 165:3 176:24 196:23 197:4,11 234:18 243:19 262:2 269:3 280:14
**electing** 198:6
**electronic** 55:4 58:25 74:10,13 75:2 88:7 260:11
**elements** 113:5 116:3,5,7,11
**ellerman** 4:22 10:22
**emai** 7:18
**email** 5:12,16 5:18,21 6:6,19 6:22,24 7:3,6,9 7:12,15,21 8:3 8:5,8,10,13,16 8:19,21 31:20 31:22,23 32:2 32:6,15 40:18 40:20 54:7,10 54:13 55:3,4,7 55:9,14 56:7 56:11 58:17 59:1,2,3 60:4,5 60:13,18 62:12 71:19 72:13,19 72:23 73:1 74:23,24 75:3 75:14 76:19,22 76:23 77:2,9 77:14 79:3,5 88:15 89:17 90:7,14,16 91:8 98:23,23 126:5,11,13,15 126:16,25 127:9,12,15 130:2 131:18 131:18,24 132:3 134:9,12 134:15,17 137:24 138:8 138:18,22 140:21 141:11 141:13,14 142:7 145:19 165:3,5 167:17 167:20 168:3 179:20 190:19 190:25,25 198:5 200:5,6 201:6,11,23 202:12 211:12 211:13,18 221:5,15,21 222:5 223:16 225:5 227:25 229:8,13,17,22 231:21 232:1,6 232:21 233:4,6 233:9,24,25 234:1,5 235:7 235:8,14 237:13 239:17 240:23 258:23 267:12,22 269:24 270:3,6 270:11,23 271:2,11 274:5 277:6,7,16

278:8,10,21,23 279:17,24 280:3,14 284:10,13 285:3 286:7 287:1,3,20 288:11,17 289:19,23,24 290:11 291:25 292:4,17,18 293:25 294:25 296:6 297:13 301:17
**emails** 32:2 54:10,21,22,23 54:24 55:2,15 55:19,22,25 56:1,4,10 59:4 59:5 74:11,19 74:22 75:19 77:2 86:5 88:5 88:6,7,11,14,19 88:23 138:1,4 140:13 145:18 181:4,20,24 182:4 233:3 270:3 298:3
**emlawkc.com** 2:7
**employ** 195:5
**employed** 165:13 213:19 299:11,14 300:8,11
**employee** 233:12 299:13 300:10
**employees** 7:10 7:13 208:17 216:24 217:3,4 223:20 229:9 231:22 232:9 232:15,15,16
**employment** 6:13 194:24 196:16
**enclosed** 301:11
**encyclopedia** 292:2
**ended** 116:22
**ends** 40:9
**enforceable** 67:10
**engage** 256:8 263:10
**engaged** 43:4,7 43:18 44:3,13 47:19 60:1 91:7 128:20 129:2 212:4 217:18 259:6
**engagement** 5:15 6:17 44:6 44:9,11,15 45:9,11,12,13 45:17,20,21,23 46:1,15,19 50:22,25 51:3 51:21 53:9,21 54:5,21 56:13 57:21 59:24 60:9,12,16 62:17 63:1,6 63:12 72:20,22 73:1,4,5,8,13 76:11,16 77:11 77:13,16 79:8 79:22 80:23 81:14 96:3,4 170:17,25 171:10 173:18 173:23 174:9 174:25 183:24 186:12 187:3 193:19 197:20 197:21,24 198:5 199:8,9 214:9 216:17 265:2
**engagements** 172:14
**entail** 257:24
**entered** 170:6 209:22 273:1 274:23 303:9
**entire** 115:1 194:18 268:18 302:5 303:5
**entirety** 156:4 157:7 226:23 227:17
**entities** 43:16 43:19 44:21 48:15,17,18 49:4,11,12 50:23 60:20 64:14,18,19 92:15,23 93:15 103:13 104:10 105:1 114:16 114:18 128:19 129:23 135:5 139:8 159:4,15 161:4,7,8,11 168:6,8,15,16 168:24 169:11 169:22 197:13 198:22 200:8 201:17 208:16 209:17 215:9 215:15,19 216:8 244:15 244:20 245:16 246:1 251:3 252:23 262:19 276:20 292:14
**entity** 10:18 50:2 57:3 65:6 65:11,15 66:16 67:10 94:2 95:19 140:8 142:15 152:17 198:11 199:21 271:6 273:18 273:22,23

278:18
**entries** 15:16 15:20,22,25 16:16,19,23,24 17:8,10 285:22 285:25
**entry** 17:3
**equipment** 255:2
**equipped** 136:21
**equity** 121:2,8 122:1 123:3,5 123:12 124:20 129:9 137:11 206:4 241:25 294:10
**erlene** 6:6 167:20
**errata** 301:13 301:18 303:7 303:10,18 304:1
**errors** 50:12
**es** 299:4
**escaping** 175:17
**escrow** 121:6 122:4 124:5,12
**escrowing** 124:13,14,25 125:1
**esq** 301:5
**esquire** 2:3,12 2:13,14 3:4,5 3:15 4:3,11
**essentially** 120:25 121:9 125:12 133:4 198:16 204:11
**establish** 231:13 265:6
**established** 236:19 281:23
**establishing** 102:22 103:5 294:10
**estate** 107:15 107:19 108:15 137:14,17 158:7 195:7 204:19,22 205:19,25 206:3,4 212:19 254:23,24 278:24
**et** 1:6 10:5 242:24 301:6 302:3 303:3
**evaluate** 216:17 259:7 272:3 275:17 295:12,15 296:18
**evaluated** 273:9
**evaluation** 224:10 254:20 257:6,11 268:17 294:11 297:18
**evans** 2:4
**eve** 236:5
**eventually** 283:16
**everde** 97:11 97:14,16,20,22 98:15,20 290:2 290:13,19
**evidence** 229:24 242:24 294:11
**evidentiary** 11:17
**exact** 60:18 207:12
**exactly** 115:8
**examination** 5:2 12:8 109:24 110:10 192:12
**examined** 12:5
**example** 17:2 242:16,18
**examples** 193:4 193:5
**exchange** 211:12
**exclusive** 246:6
**excuse** 164:12 225:9 239:18
**executed** 73:2 303:10
**execution** 302:14 303:19
**executive** 81:16 143:15 265:23 265:24 266:2,3 266:6,7,12,13
**executory** 153:2,3,9
**exercise** 110:4 143:19 144:3 149:15,24
**exhibit** 5:8,10 5:12,16,18,21 6:3,6,11,15,17 6:19,22,24 7:3 7:6,9,12,15,18 7:21 8:3,5,8,10 8:13,16,19,21 12:11,12,24 24:12 39:24 40:1 42:9 72:10,11 73:18 73:23,24 74:1 74:3,4 75:11 75:16 76:11,14 76:15,19 77:8 79:13,15 80:1 80:3 81:1,3 86:9,9 126:4,7 129:5 131:12

131:17,20 132:15 137:19 137:21 138:5 151:24 152:1 155:12 163:25 167:14,15 196:12,13,13 196:15,19 197:11,12,16 197:17,20 198:1,4 199:7 201:3,4,6,21 202:8 203:15 203:23 211:9 211:10,12 221:1,3,5,14 222:3 224:21 225:2,3,5,11 226:4,15 227:13,21,22 227:24 229:5,6 229:8,12 230:4 231:6,18,19,21 231:25 232:13 233:20,22,24 234:4 235:15 237:12 239:14 239:15,17 240:20,21,23 240:24 258:20 258:21,23 260:5 262:23 267:8,9,11 269:20,22,24 277:6 278:4,5 278:8,22 284:6 284:7,9 286:21 286:23,25 289:15,16,18 289:23 290:5 293:19,21,22 293:24
**exhibits** 203:11
**exist** 152:18 162:23
**existed** 28:23 276:19
**existence** 75:16 76:15 80:1 155:7 157:23
**existing** 96:17 149:3 210:10 220:24
**exists** 27:15 59:19 76:12
**exit** 101:1,5,12 101:16 115:25 123:17 246:17 249:17,20,23
**expect** 59:2 148:8 149:20
**expectation** 37:17,20 92:15
**expectations** 36:17,21
**expected** 36:9 290:12 291:24
**expects** 35:8 36:18 188:12
**expenses** 198:23,25,25 208:18,18 218:16 220:19 239:7
**expensive** 281:21
**experience** 58:4 106:15 172:7 174:17,24 175:1,23 202:16,17,18 205:3 283:6 288:1 289:8
**expert** 67:1
**experts** 291:8
**expiration** 302:19 303:25 304:25
**explain** 242:16
**explanation** 116:14
**explore** 100:6 238:3
**explored** 238:19
**exposure** 82:23 212:7
**express** 90:23 92:21 97:2 168:4 238:14
**expressed** 72:7 141:10 237:20
**expressing** 97:7 140:21 141:1
**extension** 246:8
**extensive** 224:17
**extent** 23:9 26:21 30:4 31:15 86:1 184:9 185:14 186:13 187:25 188:22 189:11 245:17
**external** 230:6 231:7,9
**extreme** 93:21
**eyes** 58:10

**f**

**face** 83:21,21
**faces** 263:3
**facility** 44:19 45:4 47:8 151:15
**fact** 131:12 141:17 186:5 192:25 229:17 231:8 235:22 261:6 262:3
**factors** 110:9 203:22
**facts** 251:9

**fair** 20:24 70:11,14 81:1 84:18,20 93:12 101:3,9 106:18 109:25 122:22 123:4 127:18 137:13 161:10 178:15 185:7 195:14 196:1 199:4 202:5 204:7 222:16 227:4 248:6 260:2,3 270:1 282:21,24 290:21 297:6
**fairlie** 2:12 10:14,14 131:25 185:17 185:22 186:1,3 270:7,7 271:2 272:8 274:5
**fairlie's** 277:7
**fall** 176:23
**falls** 16:10
**familiar** 12:19 13:8 45:6 66:19 119:7 126:11 132:12 152:13,15,16 194:20,23 213:25
**fane** 2:15 10:9 10:12,15
**far** 200:7 232:24
**farm** 3:2,3 10:18 44:4,25 50:6,17,18 51:3 62:1,15 65:4,11,19,24 67:9,21 68:10 99:2,16 139:8 150:25 153:16 153:20 154:2,4 154:9 155:19 155:24 157:5 157:13 159:3 159:19 160:5 164:7 165:12 179:7 202:13 202:14 208:21 208:24 209:20 210:13 221:18 222:11 229:18 232:17 234:12 234:13 237:24 238:3 241:15 242:1,9,25 243:7 267:17 288:1,20 289:8
**farm's** 216:22
**farms** 6:10 49:15 66:15 152:18 159:14 160:12,24 161:3 162:13 162:20 259:24 284:1
**farnam** 3:7
**feasibility** 116:10 245:16 250:2,16,22 251:19 286:2
**feasible** 240:3
**features** 240:19
**february** 43:5,7 47:3 60:2,12 62:16,25 63:6 64:4 72:14 73:9 91:8 201:8 207:3,7 207:25 210:1 211:16,24 212:1,1,5 221:11,11 223:25 224:3 225:6 226:13 227:25 234:6 235:8,12 238:6 238:15 241:2,9 241:12,17 243:3,5 258:24 259:12,16 260:25 267:13 267:17 269:18 285:18
**federal** 195:19 270:8 271:3 276:18
**fee** 14:9,18 15:11 16:8,16 16:19 17:19 18:5,13,18 22:9 80:21 170:22 173:20 175:17 177:20 177:23 178:1,5 193:15
**feeding** 288:20
**feel** 138:5 236:4 282:13
**fees** 14:17 17:9 18:5,10,13 172:25 193:7 207:16,18
**fid** 88:14
**fiduciary** 107:12,18 137:3,14,17 204:18,22 205:1,18
**fight** 242:22 284:15,18,21 289:1
**figure** 182:6
**file** 54:24,25 55:13 74:6,8,9 74:10,13,14,21 75:2,2,6,9,11 75:17,20,23 76:1,2 104:17 114:10 115:1 170:2
**filed** 14:9 15:13 15:16 16:20

17:20 21:4,5,7 80:21 84:14,16 84:19 91:5 105:2 113:6,7 123:22 124:2,3 126:1 128:6 151:11,20 152:7 177:19 177:22 178:4 179:5,18 183:13 203:15 203:19 204:3 248:14 249:3 250:11
**files** 75:14 238:24
**filing** 20:18,22 21:1 73:17 79:11 82:13 83:13 90:21 99:24 104:22 151:5 206:21 207:12,14,15 208:19 209:6,9 210:22 223:24 236:5
**filings** 20:17 21:3,6 115:22 150:25
**final** 14:21 18:8 272:16,18
**finance** 22:3
**financial** 143:22,23,23 143:24 147:13 150:19,21 212:7 215:20 215:23 216:5 216:19 217:10 217:11,15 219:14 222:10 224:18 244:17 244:21 245:5 245:10 251:9 251:11,13,14 255:25 257:16 257:17 259:8 261:10,11 264:10 265:25 266:13 275:23 275:25 276:3,7 276:16 296:16 296:20,25
**financially** 299:15 300:11
**financials** 177:16 251:14 272:4 296:15
**financing** 121:2 121:8 122:2,18 122:21 123:3 123:17,18,23 124:20 125:6 125:20,23 158:21 220:13 220:15,17,18 221:22 222:15 237:23 238:2 238:15,24 239:24 244:1 246:15,16,17 246:18 248:20 248:21,22 249:4,17,20,23
**find** 31:1,17 42:19 54:6 59:3 74:3,4 81:1 101:9 122:17,21,25 123:1 124:20 125:20 131:14 165:8 179:20 180:14 181:11 181:17,19 183:11 246:16 286:8 301:11
**finding** 123:14 125:3,3
**findings** 272:1 272:8 275:11
**fine** 30:5 167:7
**finish** 298:10
**firm** 22:12,19 23:16 24:1,6 34:24 36:17 54:12 172:20 178:23 189:19 198:12 199:2 205:7 230:10
**firm's** 205:8
**first** 12:3 14:19 38:5 41:5 42:23 73:11 84:12 86:8 99:22 102:1 115:14 116:15 133:7 138:4,8 138:11,12 139:12 143:6 146:25 177:13 178:1 198:4 199:7 201:7,21 204:3 208:24 209:3 211:18 222:3,8 225:10 225:18 227:24 229:12 230:3 231:5 232:12 233:25 234:8 240:24 243:14 243:15 267:11 267:22 270:3,4 278:22 287:9 288:3 290:4 294:1,2 295:6
**five** 175:22
**flca** 3:2
**flew** 284:2
**flip** 137:23 138:5
**flipped** 182:5
**flow** 251:17 291:11
**flowing** 158:22
**flows** 291:6,16 291:25 292:8

292:13
**fmg** 24:21 25:10 27:21 28:3,16,18,22 145:2 146:14
**focus** 3:14 10:24 123:13 123:15 125:22 143:4 144:1,15 144:21 162:9 177:15 208:15 215:20 217:25 218:19,23 219:1,4,6,11,15 219:18 220:1 238:11,11 244:16,18 245:2,7 246:16 246:18 249:14 251:15 259:7 261:14 262:2 262:10 264:2 265:1 291:13 292:16 295:19 296:16,21
**focusing** 138:8
**follow** 135:3 166:4,13 185:5 214:17 218:21 230:15 231:8 233:2 272:12 275:3 289:4,18
**followed** 283:24
**following** 38:5 129:10 165:20 184:19 225:12 278:23
**follows** 12:5
**footnotes** 50:12
**forbearance** 46:21,24,25 209:16,18,21 209:24
**forecast** 149:2 149:21 225:14 225:19
**forecasted** 148:11
**forecasting** 149:1
**foregoing** 299:3,4 300:4 302:13 303:18
**forgive** 192:24 194:7
**form** 6:3 22:14 27:6,17 31:7 32:20 34:8 36:12 38:16,24 40:14 41:8 42:8,25 51:17 52:15 57:23 58:20 63:23 65:25 69:7,24 70:6 74:17 75:7,18 76:25 77:18 78:5,11 78:17 79:17 81:19 82:5 83:23 87:2 91:24 93:4,16 94:18 95:6,14 96:5 111:5,16 114:12 115:5 116:1 117:15 130:25 139:19 140:10,24 144:5 149:8 151:21 152:19 153:17 154:10 159:21 160:16 161:5 162:15 165:23 166:5 169:16 176:7 176:13 180:6 181:2 182:8 183:2 191:16 191:22 192:2 193:24 196:7 197:7 198:14 199:3 209:11 212:20 213:4 219:21 223:8 225:17 227:5 228:11 234:22 241:19 242:5 247:4,11 249:2 249:8 255:22 257:22 258:4,7 261:1,9 265:5 265:8,9,18 267:2 270:24 272:6 273:15 275:19 277:22 279:20 282:22 283:17 287:15 288:6 289:6 292:23 297:17 298:1
**formal** 20:6 37:17 43:2 51:21 250:1,4
**former** 37:13 37:18
**forth** 266:7
**forward** 124:16 148:9 223:11 245:8 301:15
**forwarded** 134:7 239:19 277:14
**forwarding** 131:24
**forwards** 126:19 221:7,7 222:4 236:22 237:13 277:7 279:8
**found** 58:17 76:14 96:11 123:25 156:15 160:4
**four** 119:17 171:8 284:13

**fourth** 263:25
**frame** 23:23 28:14 148:25 182:10
**framework** 102:14
**frank** 179:3,22
**fraud** 271:7,8,9 274:7,8
**fraudulent** 274:24
**free** 138:5 302:14 303:20
**friday** 33:8 56:18 119:15 119:15,16 164:14 271:3
**front** 12:10 37:17 72:10 98:1 126:4 137:19 155:12 163:25 168:18 170:14
**frontier** 3:2,2 10:18 44:4,10 45:4 46:22 50:21 94:2,5 99:2 120:14 121:3,4,6,13 122:2,3 124:5 124:8,12,15 125:8,13 130:8 130:10,11 139:1,3,16 151:15,18 158:20 177:19 179:7 180:4,9 180:18,18 183:10,18 208:21,24 209:10,17,20 209:25 210:9 210:13 212:12 221:18 225:17 226:19 227:1,7 227:11 228:5,7 228:13 230:10 234:11 235:18 235:24 236:17 236:20,20 237:4,24 238:3 248:23 251:22 252:1,16,17 253:11,13,16 253:19 254:4 256:6,7,21,21 258:13,15 270:1 278:15 278:19 280:9 280:20 281:5 282:19 283:22 293:8,10,12 294:6,10,13 298:2,8
**frontier's** 93:25 125:6 139:18 139:21 228:19 230:19 234:20 243:10,14,19 243:19,24 281:15 282:5 283:21 294:10 295:5,15,23 296:13,18
**fulfilling** 204:25
**full** 18:5 120:23 183:6 246:3 247:6 265:24 266:3,7,12
**fully** 247:7
**functions** 204:10
**fund** 220:19
**funds** 123:11 208:8,10 210:5 210:7,9,14 256:11 281:24
**further** 16:24 60:17 131:15 170:4 265:3 299:13 300:9
**future** 37:19 291:6,11,15 292:8,12 297:5

**g**

**g** 10:1 153:4,5
**gain** 27:25 29:23
**ganninger** 175:13
**gardens** 6:8,9 168:5
**gardents** 6:8
**gathering** 34:19
**gating** 228:5
**general** 17:6 23:11,23 25:3 25:13,15 26:25 27:4 29:12,15 29:23 30:8 37:8 38:17 39:18 70:7 71:15,16,24 110:24 112:11 112:15 116:9 124:7 135:24 138:15 172:19 187:23 188:5,7 188:9 216:23
**generally** 40:15 53:12 57:5 99:21 106:1 111:6 116:17 132:19 137:10 143:24 146:22 176:23 194:20 195:2 216:7 263:22 271:23 271:24
**generate** 52:25
**generated** 53:17,19

**genesis** 90:15
**getting** 61:9 70:3 173:25 242:24 247:19 248:7
**give** 17:2 57:6 61:10 69:9 85:12 105:18 174:22 191:2 213:2
**given** 100:3 101:7 106:9 114:25 169:1 202:25 213:17 243:5,14 247:13 272:1 273:17
**giving** 61:21 85:10 220:1 282:19
**glassratner** 4:21 259:3
**go** 16:7 54:12 55:6,9,12 110:4 115:23 116:15 122:8 122:17,21 124:20 130:3 133:21 136:21 144:9 193:18 197:25 201:20 202:7 210:23 222:3 227:12 228:20 241:23 242:21 262:23 289:22 290:4
**goalposts** 121:9
**goes** 58:8 290:21 291:19
**going** 13:22 28:24 30:16 88:18 114:2 117:9,9 124:16 125:2 129:9 132:14,16,17 138:3 139:16 148:9 149:10 157:3 167:5 183:25 184:22 185:5,10 192:16,17 193:9,18 195:3 196:11 197:3 197:15 201:2,3 206:11 211:8 212:2,3 220:10 223:11 225:1 225:17 227:20 227:20 231:17 237:12 239:13 241:24 242:11 242:18 251:6 258:19 260:6,8 284:5,21 288:18,21 290:11 293:8
**good** 10:23 11:5 12:10 68:13 192:14 237:14,20 288:19
**gotham** 2:3 10:25,25
**gotten** 101:20 116:4 117:4 246:3 247:5
**governed** 189:15
**governing** 101:22 102:6 102:10,13,14 102:22 103:2,6 103:10,12,22 103:25 104:9 104:25 121:14
**grand** 1:15 4:5
**grew** 261:8 262:5
**grinding** 144:7
**group** 3:14 10:24 47:11 143:4 144:2,16 144:21 218:20 218:23 219:12 219:18 220:2
**grow** 260:13
**growing** 160:1
**grown** 160:25 162:21
**guarantee** 212:11
**guess** 16:6 105:19 117:19
**guide** 265:6,19
**guy** 178:16
**guys** 177:7 294:21

**h**

**h** 5:6 6:1 7:1 8:1
**half** 167:6 240:23
**hall** 1:9 4:2 5:17,19,22 6:6 6:22 7:3,9,12 7:16,20 8:4 10:4 12:2,10 12:25 15:21 16:12 20:25 21:12 65:3 85:8 99:6 105:4 113:12 118:20 126:4 130:23 137:19 151:24 156:25 186:19 191:10 192:14 244:11 274:21 301:8 302:4,9 303:4 303:13 304:20
**hall's** 5:10 61:17 128:17
**halt** 144:7

**hand** 11:24 40:17,22 41:3 174:14 196:11 197:15 201:2 202:8 211:8 225:1 227:20 231:17 239:13 258:19 284:5
**handed** 131:17 151:24 293:21
**handing** 39:24 167:14 221:1 229:5 233:20 240:20 267:8 269:20 278:3 286:21 289:15
**handle** 30:5 158:18
**handled** 156:21
**handling** 156:10 176:9 253:3
**happen** 208:7 211:23 279:12 279:19
**happened** 57:7 61:23 258:2
**happening** 232:22 233:8
**happens** 57:6
**hard** 132:11,16
**hardy** 1:14 4:4
**head** 263:1,20 269:16,18
**header** 81:10 267:22
**heading** 73:3 77:14 199:13 199:15 282:12
**heads** 269:14
**hear** 124:6 180:5
**heard** 65:5 97:16,20,22 127:7,8,10 131:2 287:10
**hearing** 11:22
**heavy** 175:1
**held** 15:6
**help** 121:24
**helpful** 86:8 258:17
**hereto** 79:13 299:15 300:11
**hey** 124:19
**hi** 10:23 192:15
**high** 220:14
**higher** 149:7,12 149:16 290:23
**highlight** 63:4 63:6 138:19 262:2
**highlighted** 138:24
**highlighting** 138:20,21
**hilco** 287:11,24 288:21 289:8 289:12 290:2,7 293:15
**hilco's** 8:14 279:5 289:5 290:23
**hill** 44:25 45:3 49:15,23 50:6 50:13,17,18,21 50:22 51:3 62:1,10,15 65:4,11,16,19 65:20,23 66:15 67:9,21 68:10 139:7 150:25 151:10,14,18 151:20 152:18 153:16,19 154:2,4,9 155:19 156:14 157:5,13 158:20,22,24 159:3,14,19 160:5,12,20,24 161:3,6,7 162:6,8,13,20 164:7 165:12 165:12 179:8 180:5,10,17,19 202:13,14
**hill's** 183:19
**hire** 222:10 287:7 288:11
**hired** 288:12
**historical** 114:3 251:13
**hmm** 274:13
**hold** 15:3 53:5 195:6
**holders** 137:11 206:4
**holdings** 139:7 140:14,19 270:10,13,19 271:5,13 272:2 272:22 273:21
**hour** 167:6
**hourly** 174:13
**hours** 65:9 173:17,21
**housed** 154:13
**hundred** 48:17 297:4
**hundreds** 65:9
**hurting** 288:25

**i**

**identification** 12:13 40:2 72:12 126:8 131:21 137:22 152:2 167:16 196:14 197:18 201:5 211:11 221:4 225:4 227:23 229:7 231:20 233:23 239:16 240:22

258:22 267:10 269:23 278:6 284:8 286:24 289:17 293:23
**identified** 52:7 52:8,12 62:24 63:17 123:15 151:17 158:25 294:7
**identify** 52:25 63:3 89:3 96:9 123:11 155:3 246:18 264:1,4 264:8
**illustrated** 133:2
**imanage** 55:1
**immediately** 86:6 89:18 189:8 207:11
**impaired** 247:14
**impairing** 263:22
**impeded** 247:14,20
**impermissible** 231:15 232:15
**impermissibly** 229:23 230:5 230:11,21 232:3 234:13
**implement** 265:24 266:13
**implemented** 146:7
**importance** 93:6 217:9 273:18
**important** 236:5 273:8 297:11,19
**importantly** 285:9
**improper** 22:13 22:20 35:18
**inception** 83:12 92:12
**include** 37:12 76:2 148:5,22 148:22 174:12 190:17,19 205:18 223:20 244:18 257:8 263:4 267:5 294:21,25
**included** 22:8 44:18 45:8 50:22 57:25 61:3,15 72:17 79:22 113:5 115:2 120:25 140:18 218:16 218:16 244:21 252:5 263:5,7 266:22 296:22 301:13
**including** 24:22 25:21 26:7 47:14 52:21 81:15 123:16 158:20 206:3
**income** 148:15 148:17 149:19 256:1
**incorporated** 303:12
**incorrect** 198:19
**independent** 26:6 133:10 256:16 257:19
**independently** 215:17 256:8
**indicate** 153:14 165:1 166:24 167:4 179:23 183:9 225:23 229:21
**indicated** 17:4 44:16 165:2 166:19,20 180:16 182:10 183:6 193:1 196:5 200:18 215:12 235:10 247:18 249:11 251:18 253:15 256:20 261:6 262:4 266:16 274:23 281:1 288:4 290:5,6 292:19
**indicates** 138:24 198:5 278:23 279:4 290:11
**indicating** 194:9 301:13
**indication** 153:19 197:9
**individual** 1:9 13:20,24 14:3 21:23 85:4 95:19 109:5 132:23 155:5 193:21 294:22
**individually** 86:12 197:5 198:7
**individuals** 60:20 119:10
**industry** 216:21,22
**inform** 229:18 234:10
**information** 8:15 16:13 26:16,22 27:2 27:3,8,14 29:19,24,25 30:2,7 33:8 34:19 35:4 57:7,16,20 58:5 66:13

71:2 106:7 114:2,3 125:1 129:3 130:12 145:18 153:20 153:24 154:13 180:12 181:1 182:22,23,24 182:25 203:10 215:21,24 216:19 217:10 217:12,15 219:5,14 220:7 224:18,19 234:11,18 244:17,22 247:9,13 251:11,14 264:10 269:6 269:12 275:15 276:17 282:19 283:22 284:2 288:20 293:11 296:6,14,16,17 296:24 297:1
**informed** 241:12
**informs** 225:16 232:7 235:16
**ing** 229:14 267:12
**initial** 94:20 123:8 175:20 239:24 246:6 279:5 282:18
**initially** 63:3 92:10 151:19 222:14 237:23
**initiated** 188:17
**injection** 129:16
**input** 33:18 52:18 151:9,9
**inputs** 263:21
**inputted** 114:3
**inquired** 179:7 180:4 210:7
**inquiry** 210:5 210:19
**insolvency** 194:18 202:17 212:8
**installed** 143:4
**instance** 57:8 124:12
**instances** 69:9 87:12 107:21 147:9,15,21 149:23 150:11
**instruct** 29:20 30:5 184:1,23 184:25 185:3 185:10
**instructed** 9:1
**instructing** 184:15 186:6
**instruction** 165:21 166:4 166:14 184:20 185:5
**insurance** 179:9,10 180:20,24 187:7
**insured** 185:13 185:13
**insurer** 183:22 184:13 185:9 185:13
**intend** 18:12
**intended** 11:15 184:7
**intention** 18:17 93:3 258:13,14 258:16
**interact** 174:2
**interest** 37:23 64:13,14 65:15 98:14 99:19 129:7,10,20,22 139:21 168:4 168:14 169:6 169:11,22 179:8 180:4,9 180:10,19 183:19 195:6 206:1 208:25 209:3 212:18 217:1 238:14 273:24
**interested** 137:11 299:15 300:12
**interests** 52:9 63:18,20 64:8 64:16,20 133:6 200:24,25 203:1
**interface** 176:11,19
**interfacing** 176:6
**interim** 5:22 8:11 14:19,20 138:16 177:23 178:1,3
**internal** 54:25
**internet** 216:23
**interpret** 134:24
**interrupt** 118:11
**interrupted** 120:16 123:24
**invalid** 66:21
**inventory** 65:21 142:11 142:15 158:18 160:1,13,14,21 254:21,22 256:25 257:6,9 257:12,20 259:8,24 260:9 261:18,20 278:24

**invest** 46:11
**investigate** 31:25 32:4,12 37:7 67:15 91:17 104:4,13 112:6 113:24 157:18 158:11 159:9 161:21 163:18 189:1 189:15 190:13 210:2 211:4 213:14 236:5 240:16 252:15 292:15,16
**investigated** 24:9 25:8 51:12 194:11 233:13 236:11
**investigating** 163:13
**investigation** 25:12 26:1 30:25 33:9 38:8,10 44:16 46:2,14 52:2,5 59:25 60:14,17 63:16 73:25 76:9,13 96:8 101:24 111:18 163:19 181:8 186:11,16,20 187:2 215:18 216:6,13 230:9 230:22 233:18 236:14 249:18 271:12,20 272:15
**investor** 121:2
**investors** 122:25
**invoices** 22:8
**involve** 129:19 141:6,11
**involved** 15:18 20:18 21:7,16 52:19 67:16,19 67:23 82:19 83:15,18 84:25 99:3,16 101:2 102:23 103:10 105:5,16 106:3 106:6 108:25 113:12,15 118:6,8 119:10 161:22 163:18 163:21,24 170:22 173:25 177:2,4,23 178:6,8,9 185:21 215:3 218:9 253:21 281:1 288:2
**involvement** 262:14
**involving** 38:6 40:4 47:6 66:15 67:21 68:22 84:21 86:23,25 108:23 269:24 297:2
**ion** 88:8
**islam** 300:2,15
**issue** 19:10,11 85:19 129:11 142:8 145:14 150:23 161:25 163:13 203:22 228:6 233:12 247:6 273:18 294:3 297:15
**issued** 54:12 259:2
**issues** 83:5 104:18 136:3,7 147:14 218:24 254:20 275:18 277:25 296:13
**it'd** 185:16
**item** 139:16 222:8
**items** 147:12 263:24 279:2

**j**

**j** 301:5
**january** 13:3 201:22
**jessica** 34:1 229:15
**job** 1:18
**john** 1:9 4:2 5:10,17,19,21 6:6,22 7:3,9,12 7:15,20 8:3 10:3 12:2 15:21 20:25 21:12 61:17 85:8 99:6 113:12 128:17 130:23 156:25 186:19 301:8 302:4,9 303:4 303:13 304:20
**joining** 10:19
**joint** 219:1
**josie** 4:22 10:21
**juanita** 8:14,16 8:19 94:15 131:19 143:3 144:10 145:19 145:23 213:16 214:3 218:4 239:18 278:11 279:11,18 291:4
**judge** 241:23 242:7 270:8 271:3 276:19
**judgment** 252:22
**july** 23:24 24:11,11 28:14 89:17,19 90:3 90:5,12 91:9

**june** 246:7
**junior** 174:5

**k**

**k** 207:21
**kansas** 1:3,16 2:17 3:18 4:6 4:15 43:12 44:1,2,8 47:10 47:15 95:24 172:23 173:6,7 173:9 189:19 190:4 197:23 198:10,12,21 198:24 199:16 199:20 200:10 235:10
**kat** 207:21
**kathleen** 1:17 11:6 299:2,17
**kc** 199:12 200:6
**keep** 40:6
**kentucky** 6:5 66:19,23 152:4 152:14 153:15 154:5,9 155:19 155:23 157:13 159:18 160:6 160:15 161:1 162:24 163:6 164:7 165:11
**kentucky's** 157:24 158:6 160:7 161:16 162:14,21
**kill** 287:11 288:21
**kind** 52:10 135:15 172:17 172:21 173:10 182:1 188:20 192:17 230:19 231:7 238:20 244:14 245:25 246:13 249:16 250:1 252:11 257:19 268:25 271:12 290:23
**king** 4:21 11:1 156:9
**king's** 156:12
**kiss** 280:5,15 281:8
**knew** 212:14 217:8 235:1 252:16 298:2
**know** 14:3 15:11 16:5,7 16:18 19:24 20:1 22:5 26:8 27:22 30:24 31:15,22 33:17 37:5,10,19 38:1,2,3 48:9 48:23 50:1,2 51:4,12,21 52:8 53:25 56:18 57:18,19 59:19 61:2,6,8 62:4 65:10 67:3 76:7,15 76:17 79:14,19 79:20 80:16 87:9 90:1,3,15 97:21 98:6 103:15 111:8 114:23,25 116:10 117:8 117:25 118:4 121:8 122:8 125:17,18 128:3,12 131:10 132:11 132:16 134:13 134:14 140:16 143:20,21 144:24 149:1 150:20,22 161:7 163:5 164:25 166:1 172:22 173:12 174:16 175:21 175:23 176:4 177:14 180:23 181:12,24 185:17,17 187:12 188:2 188:24 189:13 189:22,23 190:11,22,23 191:2 192:22 192:23 193:6 193:10 195:3,9 199:24 200:2,4 200:5,9,10,14 200:16 203:3,7 203:9 206:12 207:19 208:7 208:10 209:24 210:4,8,12 211:23,25 213:24 214:5 214:10 219:22 219:23 224:7 224:15 228:18 230:18,23 231:2,11,15 233:16 234:24 236:1 237:7,22 240:9,18 250:19 252:25 253:18,22,24 254:9 257:24 258:2,8 261:23 261:24 262:7 268:6,10 271:18 272:25 273:3,16 276:9 278:18 279:21 280:11,25 281:11 291:1 291:10,14,15 291:24 296:12
**knowing** 67:4 92:12 237:21 248:11

**knowledge** 16:7 17:14 23:15 24:6 26:6 32:10 35:5,7,22,24 36:6,14 49:9 49:21 50:10 51:10 53:4,15 59:15 62:8 69:22 70:1,3,5 70:20 71:7 83:3 86:1,19 98:7,10 100:12 100:14 104:6 110:21 114:17 114:21 144:14 144:17 146:8 155:18,22,25 156:3 158:12 163:23 171:25 185:14 203:20 216:13 218:12 218:22 220:12 244:12 245:21 245:23 262:13 276:25 277:4 292:2 299:10 300:6
**known** 65:11 65:14 111:17 204:4
**krigel** 6:7 167:21 168:1 169:21 170:2 170:10
**krigel's** 168:14
**ks** 2:6
**kutak** 3:6 10:17 10:19
**kutakrock.com** 3:9,10

**l**

**labeled** 40:6
**lacks** 260:10
**laid** 58:10
**land** 6:5 66:17 66:19,23 152:4 152:13,17 153:15 154:4,9 155:19,23 157:13,24 158:6 159:18 160:5,7,14,25 160:25 161:15 162:14,21,21 162:23 163:6 164:7 165:11
**language** 19:19 138:24 139:3,5 209:19
**laptop** 54:12,17
**laptops** 54:15
**large** 287:11
**largest** 105:23 106:9 175:3
**larry** 5:14,18 5:21 6:7,15,19 6:25 7:10,13 7:19,21 8:4,5,8 8:10,13,16,20 8:21 15:13,17 16:11,15 20:7 20:13 23:1 26:9 28:25 33:1 40:4 56:14 67:24 68:3 74:7 82:20 86:3 90:14 113:19 118:9,22 127:1 130:20 131:19 134:20 138:19 145:19 146:12 146:12 156:13 164:13 165:25 170:21 173:24 178:21 179:2 179:21 180:22 187:15,17 196:19 211:14 217:24 218:3 221:6,6 224:17 224:23 226:6 236:24,25 245:1 263:15 264:25 279:17 281:12
**late** 24:11
**law** 178:23 198:11 205:7,8
**laws** 11:17
**lawyer** 111:22 112:5 171:20 171:21 172:25
**lawyer's** 135:18
**lawyers** 27:13 37:10,13 170:24 171:3,5 171:9,16
**lead** 19:15 20:4 20:6,7,9 21:8 110:7 263:1
**learn** 28:4 30:21 44:5 166:17 207:23 270:18 290:13 292:20,21
**learned** 26:1 30:11,14,14,18 31:2 46:4
**learning** 33:8
**lease** 65:23 66:2,4,8,10,14 66:21 67:4,5,9 67:16,21 68:4 68:10 152:17 152:21,22 153:15 154:8 154:12,20,23 154:24 155:4,6 155:18,23 156:1,4,14,15 156:16 157:12

157:23 158:3 159:17,24 160:4,9,10,10 161:2 162:12 162:17,20,23 164:6,15,18,19 164:20,23,24 165:1,11 166:15,22 167:3
**leases** 66:13 68:5 153:10 154:13 156:10 156:10,11
**led** 102:9 136:6
**ledge** 279:15
**left** 40:22 41:3 192:16 261:10
**legal** 35:18 37:25 48:7 63:24 64:22 66:6,25 73:16 79:10 82:25 106:23,23 129:13 135:21 137:5 160:17 161:18 163:1 202:23 211:2 212:6 213:2 214:7 237:6 243:22 301:1 304:1
**leighton** 3:16
**lender** 220:25 241:24 243:18 283:6,9
**lenders** 123:16 123:16 238:4,7 238:19 243:9 246:18 249:11
**lep** 40:7,10
**lep01** 5:11
**letter** 5:15 6:17 44:15 45:11,12 45:13 50:22,25 51:6 72:20,22 73:4,5,8,13 74:2,12 76:11 76:17 77:12,13 77:15,16,23 78:3,15,19,20 78:24 79:7,9 79:22 80:23 81:2,17 197:21 197:24 198:5 199:8,13 259:2 259:14,17,21 260:6,15,16 261:3 301:19
**letters** 81:15 174:10
**level** 117:3 129:20 144:2 148:7 149:6 220:15 271:7 274:7
**levi** 198:7
**lewis** 1:11 4:2 5:8,14 6:14,17 11:4 12:14,22 13:13,17 14:2 14:9 15:3,12 15:15 16:8 17:20 18:4,12 19:15 20:4 21:9 22:7,11 22:18 23:6 24:19,19,20 26:6,11 27:4 27:20,22 28:17 28:18,22 31:16 31:23 32:2,4,5 32:15,19 35:8 35:12 36:2,9 37:9,22 38:7 38:10,18 42:1 42:23 43:4,6,9 43:10,11,12,18 43:20,20 44:1 44:2,13 46:23 47:10,14,19,23 47:25 48:3,4 48:19 50:4,16 50:18 51:2,15 52:4,12,24 53:8,19 54:25 56:12 57:15,20 59:8 60:8,11 62:23 63:11 67:20 68:11 69:15 72:20 73:1 74:16 75:6,16 76:3 76:21 80:10,13 82:9,12,13 83:8 86:10,19 86:25 87:6 88:15 89:7,13 89:19 90:12 91:3,7,13,20 92:4,13,21 93:3 94:8,12 95:3,4,18 96:10,17 97:2 97:7 98:7,10 98:19 100:20 101:17,21 102:5,9,21 103:4,15 104:9 104:24 105:14 110:18 111:3,8 111:13 112:20 113:2 114:19 114:22 117:13 117:22 119:23 119:23 120:3 123:10 130:13 131:10 140:17 140:19 142:10 142:25 143:8 144:1 145:1,7 146:2,13 147:15 150:24 151:9,16 154:7

154:16,25 155:3,5,18,22 155:25 156:3,4 156:24 157:4,8 157:11 161:13 164:5 165:10 166:13 170:16 171:19 172:8 172:13 173:18 173:22 174:4 174:24 177:22 178:4,22,25 179:18 180:25 181:8 183:21 183:23 185:8 186:10,11 187:1,2,6,16 188:11,21 189:10 190:6 190:25 193:3,6 193:14,19,21 194:4,14 196:4 196:17 197:6 197:20,23 198:6,9,11,20 198:20 199:1,9 199:12,16,20 199:21 200:5 200:10,11,23 202:21 203:13 203:17,20 205:23 206:22 207:3,8,15,22 207:23 208:2,3 208:5,12,20,23 208:23 209:5,8 209:14 210:4,8 210:12 212:3,6 212:10,16 213:2,18 215:13,17 216:16 217:12 217:17 218:6 218:23 219:1 219:11,14,25 220:12 223:5 223:12 224:10 225:16 226:1 226:22,25 227:9 228:15 230:18,24 231:7 233:13 234:19 238:24 240:1 243:12 244:13,24 245:15,20,22 245:24 246:12 246:23 247:9 248:17 249:22 250:25 251:1,2 251:10,24 252:13,13,18 252:22 254:9 254:16 255:1,5 255:13,19 256:4,8,18,19 256:24 257:2,4 258:14 259:15 259:16 260:1 260:24 261:5 262:2,13 263:10 264:4,8 264:14 265:6 265:12,16 266:1,5,9,11,17 266:25 267:4 268:7,12,21 269:11,24 271:11 272:2 272:25 273:8 273:11 276:9 277:1 278:15 282:18 285:16 285:22,25 286:12 288:12 289:11 291:14 291:15 292:11 292:21 293:3 294:15 295:5 295:14 296:3 297:13,14,23

**lewis's** 268:20

**liability** 183:22 185:9 187:7

**lien** 210:10 220:21,22,23 220:25 241:24 243:14,15,19 252:14,18 295:6

**light** 23:3 294:9

**likely** 84:12 265:1 290:22

**limitation** 24:22 25:21

**limited** 126:3

**limits** 30:13 187:13

**line** 9:2 72:17 139:12,16,25 140:13 153:20 154:6 199:8,14 210:24,25 211:18 226:3 226:14,16 227:11,13 232:23 260:17 286:6 288:18 301:13 303:7 304:3

**lines** 131:16 284:13

**liquidation** 242:11,18

**lisa** 3:5 7:3,6,15 8:21 10:19 221:6

**lisa.peters** 3:10

**list** 44:21,24,25 45:2 61:10 72:17 76:17 140:12 202:3 202:15 263:6 265:3,22 279:5

**listed** 71:23 72:16,25 73:18 77:6 78:18,19 79:12 86:22,24 88:22 110:5 175:22 194:4 263:24 303:7 303:17
**listing** 303:7
**lists** 98:11 168:6 201:15 202:10 263:4
**literally** 228:21 228:21
**litigation** 135:25 253:5 272:17 275:8 277:25
**little** 19:16 20:20 27:14 28:24 132:11 151:3 191:19 193:19 217:16 218:18 234:9
**live** 124:22 142:1
**llc** 1:11 4:2 5:14 6:8,9,10 6:14 43:10 73:1 76:21 139:7 140:14 152:4 168:5 199:9 270:10 270:13,20 271:5,13 272:2 272:22
**llc's** 5:9 12:15
**llp** 1:14 2:15 3:6,16 4:4
**loan** 7:7 51:20 125:8 183:10 183:12 208:20 209:10 211:6 211:19,24 220:23 225:13 228:5 234:25 235:2,9,11 237:4,10 243:11
**loans** 92:13,17 117:1 209:10
**locate** 31:17 74:1 96:9
**located** 88:7
**location** 1:14
**locations** 278:25
**log** 59:11,17
**long** 123:17 137:24 139:15 172:7,10 280:4
**longer** 165:1,13 166:21
**look** 17:5 40:9 42:20 45:11 55:12 59:1 75:16 87:17,21 98:4 114:6 165:5 181:20 197:3 198:4 199:7,8 206:12 221:14 225:9 226:14,15 229:12 234:4 241:13 245:8 265:3 270:6 278:1 285:20 296:6
**looked** 13:4 42:12 58:22,25 75:23 76:2,16 81:2 87:14,19 132:19 179:20 235:9 255:15 277:11 289:19 289:23 296:17
**looking** 13:1 24:4 56:10 59:4 133:15 143:22 233:24 233:25 238:12 276:16
**looks** 41:6 153:18 239:21 270:2 284:12 287:2
**loop** 197:19
**loss** 93:21 219:17
**lot** 136:18
**lots** 242:23 255:2 263:20
**louis** 5:13 43:6 43:9,12,21 44:7 45:13 47:10,14 60:3 95:22,23 96:1 96:4 164:13 171:17 172:23 173:7 174:17 189:19,25 190:3,4 197:24 198:12,20,25 199:21 200:7 200:11 201:22 201:23 211:13
**lower** 149:12 174:13 281:7 290:7
**lr** 126:6

**m**

**machinery** 255:2
**madam** 301:10
**made** 16:18,22 23:14 47:18 118:1,3,5 128:19,22 135:6 143:14 144:12 151:16 169:12 183:18 184:6 187:24 203:7,9 210:4 218:6,11 222:19 223:1

223:25 224:4 240:9 242:15 302:7
**main** 3:17
**maintain** 75:6 75:9 129:21
**maintained** 235:23
**maintaining** 235:18
**majority** 49:13
**make** 13:5 19:19 39:1 43:19 67:8 78:8 94:2 105:13 124:18 132:12,18 143:18 149:14 158:20,24 161:14 169:9 171:19 173:4 186:4 193:11 203:3,4 216:25 222:17 235:21 240:10,11 247:10 265:24 266:13 294:20
**maker** 48:25 73:21 213:6
**makes** 260:20
**making** 78:9 125:18 187:1 217:11 223:2,3 226:1,10
273:12
**malpractice** 183:22 184:12 185:9 187:7
**management** 3:14 10:24 36:18 55:1 114:9 115:15 115:20 123:13 123:15 143:4 143:22 144:2 144:16,21 146:20 147:14 162:10 189:3 208:15 215:20 218:1,20,23 219:4,6,12,15 219:18 220:1 223:11,13 238:11 245:7 255:8 259:22 259:24 262:10 265:1 279:1
**manager** 276:7
**managers** 275:24
**managing** 4:21 178:17 188:4,7
**manner** 11:18 20:11
**march** 138:9,18 139:24 140:22 141:23 167:17 168:3 169:10
169:23 238:6 238:15 240:15 240:15 241:5,7 270:4,7,22 274:6
**mark** 2:14 10:9 118:10 167:5 201:3 227:21
**marked** 12:12 40:1 72:11 86:9 126:7 131:20 137:21 152:1 167:15 196:13 197:15 197:17 201:4 203:11 211:10 221:1,3 225:1 225:3 227:22 229:5,6 231:19 233:20,22 239:13,15 240:21 258:21 267:8,9 269:20 269:22 278:3,5 284:5,7 286:23 289:15,16 293:21,22
**market** 199:1
**marking** 196:11 211:8 231:17 240:20 258:19 286:21
**markup** 7:7 225:13 228:4
**match** 125:6
**material** 23:10 48:10 110:6
**materiality** 109:17
**materialize** 242:18
**materials** 5:20 132:6
**matter** 18:22 18:25 19:17 37:9 42:24 43:2,23,24 52:14 88:20 91:5 95:5 135:24 136:1 175:8 190:8 191:15 193:20 205:17 220:14 272:2,22 288:1
**matters** 19:6,18 20:5,8 176:9 193:8 252:11 262:15 291:22
**maximize** 206:3 224:12
**maximizing** 224:4
**mcole** 2:20
**mean** 16:4 21:4 38:25 64:1,15 65:9 71:16,20 77:4,22 101:4 101:17 119:3

133:25 134:2 151:4 163:6 177:1 182:16 185:18 214:15 228:21 237:10 268:23 287:14 296:3
**meandering** 137:24
**means** 11:19 13:25 43:2,24 97:14 283:4 288:4
**meant** 230:14 230:15 233:4 237:16,21 277:24 279:25 284:18 285:1,6 287:19 291:2
**meet** 35:8 122:23,24,25 136:24 188:11 193:3 283:25 284:3
**meeting** 83:21 84:12,13,21 85:1,3,5 86:22 86:24 89:3,4 118:22,24 119:10,13 122:10 232:9
**meetings** 84:1,3 84:7,23 87:6 87:11,13
177:14 224:17
**meets** 174:14
**member** 121:14
**membership** 188:18
**memory** 44:22 60:13 85:22 119:11
**mention** 97:10 127:6 130:19 134:18,25
**mentioned** 21:23 87:14 89:6 99:8 124:3 125:9,17 129:4 146:25 147:24 150:9 162:12 180:20 183:7 198:9 212:13
**message** 24:21 27:23 29:1 35:15 42:11 69:13
**messages** 5:10 23:19,22 24:7 25:4,5,5,9 26:11,16,17 27:21 28:2,5,6 28:7,10,12,14 28:19,22 29:2 29:8,12,17 30:22 31:3,14 31:16,18 32:18
33:1,2 34:4,12 34:22,25 35:7 36:22 37:1 38:6,15 39:4,6 39:8,15,17,19 39:22 40:3,12 41:2,4,13,18,21 41:23 42:1,5 42:15,19,20 68:20,22 69:1 69:4,11,12 70:4,10,13,16 71:10,11,24 72:1,4 166:17 190:17
**messaging** 24:21 25:9,20 26:7,10,16 29:6,16 30:22 31:5,13
**met** 84:15 121:11,25 217:3
**methodology** 292:9,12
**metrics** 121:21
**mid** 24:11 44:12 122:14 125:24
**middle** 138:1 229:13 232:1 293:25
**midst** 252:8
**midwest** 301:17 304:1
**mike** 5:12 8:5 77:6,7 221:7 232:10 267:12
**milestones** 133:2,4 227:15
**miller** 4:11 10:21,21
**million** 14:23 14:25 106:8 122:5,5,6 124:18,21 125:9,14,17,21 218:2,2 242:10 242:12 286:9 297:4
**millions** 260:12 262:5
**mind** 164:23 165:4 186:14
**minority** 129:6
**minus** 125:10
**minute** 132:10
**missouri** 1:2 11:9 199:17 299:19
**misstates** 27:7 52:16 57:9 77:22 140:25 198:15
**mm** 274:13
**mo** 1:16 2:17 3:18 4:6,15

**modifications** 118:1,3,4 190:1
**modifying** 193:14
**moment** 169:18 197:2
**money** 123:1 124:8,12,13,25 139:6,18,21 140:22 141:4,7 141:11 142:15 230:6 231:6,9 253:12 281:20
**monitor** 275:24
**month** 14:16 34:5,6,7
**monthly** 8:12
**moore** 19:5,13 21:20,20 155:10 156:21 164:20,23 166:25 167:2 177:2,6
**moothart** 119:7
**morning** 10:23 11:5 12:10
**morris** 171:13 171:13
**motion** 120:15 123:22,23,25 126:1,2 133:13 133:17,22 177:20 219:10 219:14 220:2 247:21,22 248:5,8,14 249:4 250:11
**motions** 21:17 174:1 175:20 177:12,12,13 177:18 219:9
**move** 121:15 169:15 201:20
**moved** 121:9 260:17
**moving** 178:17 244:11 252:10 288:19
**mullinix** 2:4
**multiple** 29:22 56:3 77:6 84:3 84:23 108:25 283:25

**n**

**n** 2:1 3:1 4:1 5:1 10:1
**name** 10:7 11:5 25:15,17 42:20 45:5,7 61:19 65:5 105:14 112:14 151:6,7 151:10 201:17 238:10 239:10 301:6 302:3,4 302:15 303:3,4 303:21
**names** 40:23 41:3
**natural** 100:4 172:21
**nature** 72:4 81:9,24 109:16 146:23 160:1 174:2 256:2 259:19
**ne** 3:8
**necessarily** 56:1 118:7 281:3
**necessary** 121:4 282:19 283:22
**need** 84:4 85:13 85:16 86:4,4 89:14 90:18 97:3,7 101:8,9 109:12 110:15 115:23 122:7 123:1 135:13 146:4 149:21 164:23 165:4 243:24 251:21 275:7,17 278:1 282:15 285:10 287:6,6 288:10 288:11
**needed** 83:5,9 85:4,9 91:15 91:23 92:6,11 124:23 146:18 156:11 165:1 166:22 212:23 247:7,10 275:23
**needing** 91:2 278:24
**needs** 90:24 294:11
**negotiable** 228:7,10
**negotiate** 44:9 225:17 268:22
**negotiated** 13:2 145:3 222:15
**negotiating** 269:3
**negotiation** 207:13
**negotiations** 94:4,14 102:20 129:19
**neighborhood** 175:9
**neither** 288:12 299:11 300:7
**never** 50:14 51:5,5 97:20 124:19 127:8 164:22 165:4 166:10 186:14 249:6,7 281:24
**new** 103:10 120:15 121:1,2 121:2,2 122:1

122:1,1,25 124:20 129:16 220:10
**ninth** 4:14
**non** 32:5 49:4 140:8,12 161:8 228:7,10 273:18
**normally** 58:5 59:2 71:18 203:4
**norton** 241:23
**notarized** 301:14
**notary** 11:8 299:18 301:25 302:10,18 303:15,23 304:23
**note** 173:21 262:11 301:12
**noted** 292:18
**notes** 154:1 259:5 270:7 271:2 294:2
**notice** 5:8 12:14 13:1,1 13:24 19:22 32:8 53:6 98:1 170:13 183:21 184:16,24 185:1,8 186:5 189:2,5 244:12
**noticed** 13:19 24:18
**notices** 13:23
**number** 10:6 12:11 29:24 40:10,19,21 53:8 86:10 87:18 88:13,25 89:10 105:7,17 106:2 115:11 122:3,8,10 124:24 125:3,6 125:18 149:16 150:7 173:17 187:5 291:7 301:7,13
**numbered** 126:6
**numbers** 40:23 41:2 124:19 133:1 171:2 242:14,15,17 288:21 303:7
**nurseries** 201:17
**nursery** 99:9 99:17

**o**

**o** 10:1
**oaths** 11:9
**object** 30:16 85:24 183:25 184:7 193:9
227:5
**objected** 184:4
**objection** 8:23 11:10,22 16:1 16:21 17:11 18:6,15 22:14 22:21 23:4,9 23:25 25:23 26:21 27:6,17 29:9,18 31:7 32:7,20 34:8 35:2,17 36:4 36:12,23 37:3 37:4,14,24 38:16,24 41:8 42:3,25 48:6 48:21 49:6,19 50:7 51:7,17 52:15 53:1 57:9,23 58:20 59:13 60:22 62:6 63:7,23 64:5,9,21 65:13,25 66:5 66:24 67:11 69:7,20 70:6 70:17,25 71:5 72:2 74:17 75:7,18 76:25 77:18 79:17 81:19 82:5,24 83:23 91:24 93:4,16 94:18 95:6,14,21
96:5,20 100:9 103:18 104:2 104:11 106:22 107:5,10 108:16 109:13 110:20 111:5 111:16,24 112:23 114:12 116:1 117:15 127:13 128:7 128:10 129:12 130:25 135:7 135:20 136:8 136:16 137:4 139:19 140:10 140:24 142:18 144:5,22 149:8 151:21 152:19 153:17 154:10 155:8 157:14 157:25 158:8 158:16 159:5 159:21 160:16 161:5,17 162:15,25 165:23 166:5 169:4,16,24 171:22 173:2 173:11 174:19 176:7,13 177:21 178:1,4 178:7,10 180:6 181:2 182:8 183:2 186:13

187:25 188:22 189:11 190:9 190:20 191:16 191:22 193:24 195:15 196:7 197:7 198:14 199:3,22 202:22 204:12 204:20 205:4 205:11,20 209:11 210:15 211:1 212:20 213:4,22 214:6 216:9 219:21 220:3 223:8 224:13 228:11 230:25 233:14 234:22,23 235:25 236:7 237:5 241:15 241:19 242:5 243:7,21 245:17 247:4 247:11,25 248:9 249:2,8 252:24 254:5 254:12 255:22 257:22 258:4,7 261:1,9,21 265:8 267:2 270:24 271:16 273:14 275:19 277:22 279:20 281:9,17 282:7 282:22 283:10 283:17 284:24 286:14 287:15 288:6 289:6 290:24 291:17 292:23 294:21 295:9,17 296:1 296:4 297:7,17 298:1

**objections** 17:21 18:1 37:15 67:12 80:21,22 107:16,22 108:3,9 109:6 110:1,11 112:7 129:24 137:15 177:17,19,22 272:6,14 276:4 276:10,21 277:2 294:9

**obligation** 108:4 109:19 109:23 135:18 195:20

**obtain** 87:1,7 89:5 95:3 220:24 242:14 254:3 256:4,6 281:16

**obtained** 96:1 122:2 220:13 220:14,18 237:24 246:8 248:22 251:12 258:15 281:5

**obtaining** 238:2

**occur** 187:2

**occurred** 90:11 249:7 281:2

**october** 13:3 68:8,9 156:14 164:8 165:15 179:14 182:13 246:11 259:5

**odd** 50:23 61:1 194:1

**offered** 46:25 283:24

**office** 4:12 44:8 52:7 54:2,16 96:1 103:24 164:20 171:21 172:15,22,23 172:23 173:1,7 173:7,9 174:17 197:23 198:24 198:24

**officer** 11:2 93:24 94:1,3,5 94:10,13,16 95:1 143:5,7 143:13,15 214:4,20 226:20 227:2 299:1,2

**offices** 43:11,13 172:4 198:12

**official** 2:10 6:3 43:15 51:5 302:15 303:21

**oh** 19:11 24:13 44:23 57:18 99:7 116:2 138:14 263:20 287:3

**ohio** 301:2

**okay** 12:19 13:11,22 14:4 14:5,7,8,9,25 15:3,11,15 20:2,3,16,25 22:7 23:23 24:4,17,18,25 25:6 27:2,20 27:25 29:4 30:21 31:4 33:22 39:21 41:15 42:14 45:18 46:10 51:2,14 53:7 54:17,20 55:6 55:12,19 56:7 58:17 60:11 61:21 62:1,4 68:25 71:13,23 72:10,16 73:8 73:15 75:2 77:11 80:16 81:7,12 82:12

84:10 85:12 86:15,18 87:5 87:13 88:13,22 90:7,11 97:6 97:23 98:1,4 98:18 100:20 101:7,11 105:18 106:5 106:19 110:9 111:8 112:4 117:13 118:24 119:13,19 120:17 121:24 123:1,5 124:3 124:11 125:5 125:12 126:11 126:15,19 127:5,11,18 130:23 132:3,7 132:10,14 133:9,12,15 134:5 138:7,7 138:18,24 139:5,14 140:21 141:21 141:25 146:7 147:6,23 149:14 152:13 153:14 154:25 155:15,22 156:7 161:10 162:23 163:12 164:5,10,16 170:19,24 172:12 174:24 175:12 176:19 176:22 178:12 178:15,20 184:14,19,22 186:10,19,25 187:9,12,15 190:6 191:3 193:1 194:23 195:19,23 197:2 199:20 201:11,20,25 207:6 216:3,5 218:5 222:8 228:3 229:17 231:25 232:12 232:20 235:7 239:3 241:12 246:12 247:23 250:15 259:25 260:4,24 265:3 266:16 274:14 274:21 277:11 277:12 278:7 279:4 280:13 283:2 284:13 284:17 286:5 287:3 288:10 290:4,10 292:11 294:5 298:9

**omaha** 3:7,8
**omitted** 151:18
**onboarding** 111:21
**once** 137:25
**ones** 32:24 33:20 42:12 182:1,2 238:22 253:10
**ongoing** 255:25
**online** 74:23
**onus** 251:1
**open** 116:22 125:4
**opened** 235:17 235:23
**opening** 79:2
**operate** 198:21 251:16
**operating** 189:16,18,24 189:25 190:3 198:22 204:9 208:18 220:7 251:16
**operation** 211:6 217:9 251:8,8 263:23 264:12
**operational** 259:8
**operations** 224:6 259:22 263:2,22 271:4 271:13,15 274:1 275:24 281:20
**opinion** 35:18 48:7 66:6 67:1 82:25 111:25 129:13 135:21 137:5 160:18 163:1 215:8 236:8 243:5 283:11 293:4 297:8
**oppose** 219:19 222:19 247:23 248:3
**opposed** 43:15 93:23,25 222:15,17 248:5
**opposing** 219:10,16 220:2 248:8
**option** 122:23 122:24 240:3 246:25 249:13 266:20,22,23 267:6
**options** 101:1,4 101:6,8 123:6 123:20 169:2 224:2 266:19
**order** 5:23 6:11 8:11 29:24 30:8 87:17 96:8 138:16 139:4 143:11

174:5 176:22 196:15 225:18 243:20 247:10 272:22,24 273:1 274:23 275:11 276:3 283:21
**orders** 177:13 219:2
**ordinary** 279:2
**oregon** 272:17 275:8 276:19 277:18,25
**organization** 123:2
**orient** 40:24 138:6
**original** 126:25
**originally** 278:8
**originates** 126:15 167:20
**origination** 172:4
**ouch** 134:17
**outcome** 280:19 299:16 300:12
**outdoor** 1:6 2:2 7:4,7,22 8:9,17 8:22 10:5 11:1 44:16,20 55:23 76:20 137:2,7 193:8 198:1 201:18 207:21 259:6 301:6 302:3 303:3
**outline** 120:21 252:7 285:10
**outlined** 116:3 116:8 123:8 127:12
**outlook** 55:6
**outside** 32:2,15 35:19 36:4,13 37:24 38:14 47:1 48:8 56:10 59:22 60:12 82:25 104:8 114:19 114:22 161:18 162:3 163:2,15 166:15,18 177:13 190:25 195:8 235:18 235:24 236:17 236:20 246:15 264:17
**overall** 173:24 263:23
**override** 241:24
**overstated** 217:21,25 218:8
**owe** 106:20 107:3,25 108:1 109:4 137:13 137:16 204:22
**owed** 124:8,17 148:21 154:4 205:18 297:3
**owes** 204:18
**own** 83:5,9 86:4 160:13,21 163:7,10 198:24,25 212:23 281:16 282:4 291:6 294:11
**owned** 48:16 157:5,24 158:6 159:18,19 160:14,25 161:15 162:13 162:20 163:6 256:5,9
**owner** 48:15,25 49:3,13,13 82:7 100:4
**owners** 52:21
**ownership** 65:15 129:20 158:4 160:6
**owns** 152:17 159:24 162:24

**p**

**p** 2:1,1 3:1,1 4:1,1 10:1
**p.a.** 2:4
**p.m.** 118:15,18 167:9,11,24 191:5,7 228:24 229:3 244:6,9 270:23 298:12 298:14
**page** 5:2,7 6:2 7:2 8:2 9:2 97:24 115:12 120:23 138:9 138:11,11,12 138:13 151:2,4 151:6,10 153:5 153:22,23 155:15 164:3 197:25 198:4 199:7 201:7,8 201:12,21 202:7,9 221:14 222:3 225:10 226:15 227:12 227:24 229:12 230:3 231:6,25 232:13 233:25 234:4 235:15 240:24 260:5,5 260:8,15,16,17 262:23 267:11 267:22 270:4 278:22 289:22 290:4 294:1 301:13,15 303:7 304:3

**pages** 115:9,11 138:4
**paid** 139:6
**paisner** 3:16
**paragraph** 73:11 79:2 141:25 234:8 234:10
**parres** 5:14,18 5:21 6:7,15,19 6:25 7:10,13 7:19,21 8:4,6,8 8:10,13,16,20 8:22 15:17,24 16:11,15 20:7 20:22 21:8 23:1 26:9 28:4 28:7,8,9,25 29:6,16 31:5 31:13,19,22 33:1,3,6,10,23 38:6,22 39:3 42:2 56:14,16 56:19,23,24 57:2,5,15 59:24 60:14 67:24 68:19,23 69:3,10,13 74:7 80:1,17 80:20 81:4,7 82:20 83:15 84:22 85:15 86:2 87:9,24 88:23 89:2,9 89:21 90:14,17 90:23,24 98:21 98:24,24 99:1 99:10,11,15,18 99:23 113:19 118:9,22,25 119:1,1,6 131:19,24 134:5,20 135:12 138:19 139:10,23 145:19 146:12 146:12,13 150:2,3 156:13 164:13,16,19 164:22 165:1,2 165:6 166:1,16 166:20,23,24 167:4,21 170:21 173:24 176:3,4,12,24 177:1 178:21 179:2,3,21,23 180:12,15,16 180:22 181:10 182:10,21 183:8 188:8,14 188:16,20 189:2,9 190:6 190:7,24 191:11,20 192:22 196:20 206:16,18 211:14 217:24 221:6,7,15,21 222:4,8 223:15 224:17,22 225:11 226:6 229:9,14 231:22 236:22 236:24,25 237:12,20 239:19 240:24 241:13 242:4 243:3 245:1,3 258:24 263:15 263:16,18 264:25 267:12 275:5,6,11,16 277:7,14,18,24 278:9,10 279:8 279:11,17,22 279:25 280:3,8 280:15 281:15 282:12 283:4 284:10 287:3,9 287:14,17 288:3,17 289:20,25
**parres's** 15:14 23:18 30:21 33:18 38:11,15 40:4,12,18 41:4,23 70:4,9 70:13,16 71:9 72:1 187:16 188:10 193:7 286:25
**parry** 4:20
**part** 19:8 24:9 24:25 26:18 32:12 45:16,16 51:19 67:7 75:20,23 76:19 85:4 88:11 93:10 94:14 101:11,16 102:16 104:4 104:13,16 110:4 113:24 114:10 122:16 125:12 126:13 129:4,19 130:11 135:17 139:5,12,14 141:4 145:16 156:8,12 157:18 159:12 161:13,21 169:6 172:2 173:19 224:2 229:21 232:17 235:1,15 236:13,21 258:2 264:22 264:24 267:4 285:23,24 292:15 303:9
**partial** 121:15
**particular** 25:2 42:14 57:8 116:11 131:3,6

159:25 177:10 205:17 226:12 261:18,19 290:11 292:17
**parties** 10:7 11:11 28:3,22 43:5 45:3 52:21,21 56:3 58:1 61:1,10 62:12 77:2,5,6 84:24 93:8 101:8,25 102:8 102:20 104:20 106:21 116:5 116:24 117:5 133:6 137:11 152:22 158:19 159:1 162:9 170:22 202:1,4 251:13,21 252:8 265:1 267:4 283:13 299:12,14 300:8,11
**partner** 63:2,5 129:6 172:10 172:12 175:1 175:15 188:5,7
**partners** 123:14 171:6 175:4 176:24
**partnership** 130:20
**partnerships** 127:2
**parts** 134:3,4 141:8 251:7
**party** 28:7 42:6 48:25 52:8,19 61:14 78:19 122:17,21 125:20 130:17 163:7 202:9 237:3 239:10 256:17,24 257:5,11 261:6 262:3 268:11
**pass** 168:14
**passed** 221:22
**past** 56:18 58:4 59:18 61:23 119:15
**path** 282:13
**patrick** 175:13 175:21
**pay** 124:21 141:7 208:17 210:14 232:8 232:14
**paying** 140:22 141:4,11 210:24
**payment** 208:12
**payments** 148:15 162:7
**payroll** 232:16 232:25 233:12 233:18
**pca** 3:3
**pdf** 267:16
**peel** 132:18
**pendency** 92:3 100:1 110:17 111:13 112:5 128:23
**people** 56:4 71:11 72:16 112:15 174:12
**percent** 48:14 48:15,16,17 286:9
**perfection** 292:2
**perform** 121:21
**performed** 53:20 57:21
**period** 13:2 121:1 148:16 205:1 212:5 214:3 238:15 239:5 246:6 257:3
**permanent** 246:17 248:21
**permissible** 231:14
**permitted** 11:15
**person** 84:1,3 84:13,16 86:22 86:24 87:5,11 89:3 112:16 176:5 195:14
**personal** 6:4 16:7,13,15 17:13 22:2 24:10 32:9,13 32:14 35:5,6 35:21,23 36:6 36:14 49:8,21 50:9 51:9 53:3 53:14 56:6,7 56:11 59:14,22 61:18 62:8,9 69:22 70:1,5 70:12,19 71:6 74:24 75:13 82:14,23 83:2 84:4,7,12,23 85:9,13,16,19 86:4,13,20 87:1,7 88:15 89:5,14,20 90:13,19,25 91:3,10,15,23 92:6,11,19 96:14 100:11 100:13 114:21 117:2 128:13 128:25 130:15 131:8 147:19 157:19 171:24

173:13 181:20 181:22 186:22 188:4 190:19 193:13 202:16 203:25 204:1 206:1,13 212:7 212:11 215:10 218:12 228:14 262:9 264:18 269:5,11 271:19
**personally** 55:23 62:10,21 80:5 81:8 83:20 84:6,11 84:15 85:6,10 90:15 91:1,11 91:18 92:8 94:19 95:7,15 95:16,25 96:23 97:5,21 100:23 103:8,14 104:5 104:13,14 105:10,15,25 106:12 110:22 113:12,25 114:17 117:24 126:12 135:9 135:15 142:17 166:9,10 194:10 214:12 214:18,22 226:9 230:9 236:2 259:11 268:3 269:10 270:18 272:21 274:9,12,15 296:9,10 302:11 303:15
**perspective** 198:11
**peters** 3:5 7:3,6 7:15 8:21 10:19 221:6,15 221:18,21 222:5,9 223:16 225:6,11,16 227:25 228:3 234:1,5 235:14 278:9,21 293:25 294:2,6 297:14
**peters's** 234:10
**petition** 151:2 151:4,5,8,10,11 151:20 207:16 220:24 253:22
**petitt** 175:18
**phone** 5:11 25:9 39:12 40:5,18,21,23 41:2 42:10,12 68:23 69:1 83:25 87:12 165:3 179:2,4 179:11 301:3
**phones** 25:4 26:15
**physically** 88:5
**piece** 261:18,20 296:19
**pieces** 255:25 264:21
**pit** 256:2
**place** 68:6 82:17 84:10 102:2 105:24 106:5 119:14 179:12,15 186:20 209:16 241:14 243:7 247:14,20 248:7 257:20 265:13 275:24
**placed** 214:20 297:24
**plan** 7:22 8:7 101:12,16,20 102:14,17,19 102:20 103:8 113:3,5 115:24 116:2,5,11,12 116:13,16,17 116:20,21 117:4,14,16,19 117:19,21,23 119:24 120:4,8 120:10,12,13 120:21 121:10 121:12,17 122:11 123:9 123:18 124:4 124:16,22 125:12 127:2,6 127:8,10,16,19 128:2 129:4,17 130:3,7,7,11,14 131:3,6,11 132:9 133:5,7 136:6,11,15,20 136:23,25 146:7 168:22 168:23 244:23 246:3,5 247:6 247:19 248:7 250:4,6,7,8 251:19,25 252:5,9 258:18 265:14,16 266:16,19,20 266:22 267:5,5 267:20,25 268:4,11,13,18 268:20,22,25 268:25 269:3 269:13,16 285:10,16,19 286:3
**planned** 125:23 130:17 131:14 247:14,19 250:23
**plant** 160:25
**plantas** 139:7 140:13,19

**plants** 159:14 160:6,7 260:12 261:8 262:5
**play** 249:6
**playing** 282:13 282:14
**pleading** 115:6 115:8
**pleadings** 50:12
**please** 10:7 11:24 14:3 19:25 86:5 89:18 90:9 134:18,24 145:6 224:23 301:11,11
**plenty** 242:21
**plus** 44:24 61:1 125:9
**point** 16:2 47:12,15 50:4 55:24 79:3,6 85:19 90:18 110:19 124:19 128:16 131:5 133:17,22,23 156:2,24 158:14 161:10 169:10 208:14 223:15 232:14 239:12,12 263:7,25 265:4 265:21,22 266:8 268:15 270:18 293:17
**points** 120:21 120:22 133:8,9 133:12 252:7 265:14
**policies** 174:8
**policy** 36:2,17 37:17 172:17 172:18 174:4 179:9,10 180:20,24 187:7,10,12
**portion** 260:24 267:21
**portions** 116:7 264:15 268:10
**position** 294:10
**positive** 220:7 251:17
**possession** 195:5 204:5,8 204:9,24 205:17 221:22 254:10
**possession's** 205:25
**possibilities** 122:19
**possibility** 102:21 103:2 129:5 249:23 251:4,5 271:7
**possible** 174:5 174:11,13 183:11 197:1 203:3 211:21
**possibly** 24:11 201:16 236:24 264:25
**post** 253:22
**potential** 52:22 53:10 57:25 61:3 62:24 63:3,4,13,17 67:20 85:13 101:11,16 109:22 110:7 111:9,13 112:4 112:20 123:11 123:16,16,20 129:11,22 142:14 148:13 149:6 168:4 169:2,15 170:10 200:12 201:12,15 238:4,7 243:8 246:16 251:25 265:5 268:13
**potentially** 46:7 102:15 121:15 263:11
**power** 143:9,19 144:4 145:4 146:17,17,18 146:22,23,24 147:2,3,5,10,17 147:22 148:2 149:5,15,24 150:5,12,18 218:21
**powers** 204:10
**practice** 53:24 61:7 172:13,19
**practices** 271:4 271:13,14,21 272:3 273:10 274:7,25 275:17,25
**pre** 102:19 207:16 208:17 210:10 220:24 253:22
**precisely** 260:20
**premised** 272:16
**preparation** 19:9 33:8 34:13 73:17 79:11 80:7 113:13,15 118:21 140:17 143:23,25 144:19 146:10 147:19 152:21 154:19 155:2 161:21 173:20 177:20 292:4 293:5,6

**prepare** 25:1,6 29:5 88:4,24 88:25 89:10 98:18 145:12 145:14 150:24 164:10 170:19 257:7 294:24
**prepared** 24:25 86:18 88:11 113:8 115:14 115:16 129:2 151:2 215:22 239:8 245:12 250:2,5,10 292:16 300:3
**preparing** 21:16 114:5 120:7 177:24 178:6,8,9,13 196:23 215:20 238:23 245:8 268:25
**present** 4:19 118:24 129:11 129:21 206:15 251:25 291:6 291:10,15,24 292:8,12
**presentation** 120:17
**presented** 113:23 114:1 130:8,10,11
**presenting** 130:14
**press** 247:7
**presumably** 280:8
**pretty** 78:15 184:4
**prevent** 139:6
**previously** 200:18 221:23 221:25 245:7 278:14 280:20
**primarily** 23:22 143:22 147:11 172:14 176:19 178:12 222:24 226:7 236:24 254:21
**primary** 48:19 48:25 176:5 178:14 228:5 254:17,25 295:6
**primed** 243:18
**priming** 220:21 220:22 241:14 243:7,25
**principal** 48:20 205:25 251:21
**prior** 77:23,25 84:16 99:24 115:17 197:9 197:12,19 206:21 207:11 207:14,14 208:19 209:5,9 210:14,21 211:24 223:24 238:2 245:10 248:19 250:10 289:8 299:5
**priority** 208:24 209:3 220:24 220:25 243:15 243:15
**privilege** 30:5,9 184:1,8 185:11 185:13,14,20 186:6
**privileged** 23:10 25:24 26:22,23 29:19 30:2 46:5 181:1 182:22 182:23 184:10 184:12,13
**probability** 271:9 274:8
**probably** 40:18 41:9 68:13 155:10 176:18 176:21 284:14
**problem** 30:13
**procedural** 11:16
**procedure** 133:25 188:17 195:20 302:5 303:5
**procedures** 133:18 189:15
**proceed** 12:7 13:22
**proceeding** 11:7,14 107:3 108:1,14,23 109:4 143:9 178:16 298:15 300:4
**proceedings** 96:4,11,18 97:4,8 103:12 105:5,21 106:6 106:17,20 109:1 110:18 111:15 112:22 114:24 128:18 152:7 157:9 161:14 162:2 168:9 173:9 174:18 299:3,5 299:6,9 300:6
**proceeds** 20:12 158:21 229:22 230:4,11,20 232:2 234:12
**process** 7:23 101:20 111:21 118:6,8 120:16 121:16 122:11 123:9,24 124:9 125:7 129:17

134:3 137:12 141:4 156:13 162:10 168:22 223:17 224:1 224:12 246:3 247:6,15,16,20 257:21 258:3 258:10,18 280:9 293:7
**processes** 263:3
**produce** 26:14 27:14 39:8 260:21
**produced** 11:13 26:17 27:9 28:15 31:1 39:10 40:4 74:15 88:20 114:23 115:2 137:25 181:24 182:3
**producing** 39:5
**product** 185:12
**production** 23:14 27:12 29:12 34:19,20 88:11,17 127:24 264:20 301:15,17,22
**professional** 35:16,25 183:22 185:9 187:6 259:23
**profitability** 261:19
**profitable** 264:1,5,9,13,16 264:22
**program** 4:10 4:22 114:9
**progression** 117:24
**promises** 141:7 141:7
**prompted** 90:12 92:10
**promy** 300:2 300:15
**pronouncing** 97:23
**proper** 104:20
**properly** 174:15
**property** 6:5 157:24 159:17 159:25 160:7 161:16 162:14 189:10 254:23 256:5,9,18
**proportionately** 175:4
**proposal** 94:21 94:23,23,25 122:16 132:3 134:11,14,22 135:2,6,13,19 135:25 136:2 136:15 146:2 149:5
**proposals** 128:19,21,22 128:24 129:1 147:12,23,24 150:10,12 243:13
**proposed** 8:6 94:5 102:17 103:1,3 113:2 120:13 121:5 122:13 123:8 128:5,14 146:5 170:10 219:5 223:16 225:13 226:19 266:17 267:20,25 268:4,10,24 269:15
**proposes** 222:8
**proposing** 269:7
**protect** 108:15 242:1
**protected** 92:17 282:6
**prove** 232:22 233:8
**provide** 13:12 13:19 16:23 44:13,22,23 58:6 69:9 73:16 79:9,10 87:18 98:18 114:5 116:14 145:6 173:23 179:18 180:1 180:12 181:1 183:12 212:6 219:4 229:24 234:11 238:20 240:13 245:2 249:12 256:7 256:21 284:1
**provided** 26:19 27:4 30:8 33:11 41:15 46:23 56:23 65:9 93:7,10 114:2,16,18,19 114:22 154:14 179:24 180:21 181:8 182:22 182:25 183:21 184:16,24 185:1 186:5 189:5 195:24 203:15,22 221:23,25 238:17,18,22 238:25 239:4,7 240:17 241:4,6 249:20,23 293:13
**provides** 195:4 204:15

**providing** 27:2 130:17 146:11 232:17 238:15 257:16 293:12 293:14
**provision** 174:9
**provisions** 116:20 120:7 132:24 136:24 194:24 227:3
**public** 299:18 302:10,18 303:15,23 304:23
**publicly** 180:2
**purchase** 100:17,21 101:13 168:5
**purchases** 158:18,19
**purchasing** 98:14 99:19 101:2 168:15
**purported** 152:17
**purporting** 159:20
**purpose** 67:4 73:12 79:8
**purposes** 153:1 171:20 200:12 283:8
**pursue** 169:2 219:7 243:8
**pursued** 170:11 249:1,11
**pursuing** 168:12,19 169:1,19 223:17 243:17 249:14
**push** 282:15,19
**put** 30:6 56:4 115:5 125:15 134:8 138:2 222:11 265:13 266:25
**putting** 285:10 285:16

**q**

**qualified** 299:7
**qualify** 28:8 99:7
**quarter** 133:7
**question** 14:22 16:11 20:21,22 22:16 23:6 25:19 28:16 30:11,12,17 45:22 50:16 53:11 77:21 78:15 88:19 95:23 145:9 153:8 156:20 173:4 180:8 183:4 185:2,8 185:23 193:16 194:8 197:3 203:2 262:18 270:14 271:25 272:12 274:16 274:18 291:20 291:21 292:7 295:3
**questions** 9:1 13:25 33:10,12 33:13,15 45:18 136:19 138:3 148:4 185:25 192:10,19 203:24 214:17 214:21 217:7 218:22
**quote** 237:20 241:13 271:3 292:19

**r**

**r** 2:1 3:1 4:1 10:1 25:18,18 97:24
**r.g.** 2:12
**raise** 11:24 70:10 122:9 233:8
**raised** 36:21 37:1 104:19 148:7 277:25 294:13 295:11 295:20 298:8
**raising** 102:21 296:13
**ran** 52:13 56:21
**range** 14:24 105:18 106:8 115:11,12 143:21 144:9 171:3 174:22 182:14,16,20
**rank** 105:21
**rate** 174:13
**rather** 223:18 248:7
**rationale** 242:16
**reach** 169:21 170:2 217:19 245:15 246:23 250:25 251:10
**reached** 79:10 218:7 224:7,11 245:25
**reaching** 168:4
**reaction** 134:11 192:23 282:18
**read** 81:14 132:11,13,15 137:25 138:7 261:2 272:21 272:24 273:6 290:17 302:5,6 302:12 303:5,6 303:17

**reading** 262:19 301:19
**reads** 134:17
**real** 6:4 109:24 140:1,22 141:15,18,22 158:7 254:23 254:23,24 256:5,9,18 278:24
**realistic** 243:14 251:4
**realities** 123:21
**really** 124:25 138:4 180:23
**realm** 106:16
**reason** 139:15 169:1 282:3 301:14 303:8 304:3
**reasonable** 294:24
**reasonably** 53:13 145:11 145:13 262:20
**reasons** 187:15
**reassess** 263:25
**recall** 17:15,17 28:6 33:17 34:2 41:10 47:21 48:1 49:22,23 57:1 58:12,14,18 61:8,18 62:10 66:11,18 68:7 72:5 80:2,5 81:8 82:16,20 83:11,20,25 84:6,8,11,15 85:6,10,15 86:5 89:17 90:8 91:1,18 92:8 94:19 95:16 104:5,14 106:12 110:23 111:3 113:25 116:11 117:24 119:25 126:12 127:22 128:20 128:21 131:5 132:7,8,9,22,23 135:9,15 138:21 140:6 140:12 141:12 141:23 142:6 142:21 143:1 143:20 144:6 145:19 147:20 149:9 150:14 160:10 161:22 161:25 162:17 165:2,21 168:17 170:2,3 170:7 171:2 177:25 181:14 191:12 196:25 204:2 206:14 206:15 207:6 210:3 212:13 214:23,25 215:7 217:7 226:9,12 228:17 233:5,6 233:10 238:9 238:10 239:6 239:10 241:10 246:21 249:3 249:25 253:10 253:20 254:7 256:15 257:13 268:3,5,8 269:10 270:16 272:23 276:6 276:23 280:1,5 282:15 285:7 286:17 290:20 298:7
**recalled** 56:24 150:7
**recalling** 63:16 216:21
**receipt** 275:15 301:18
**receipts** 148:6 148:8,13,15 149:1,6,16
**receivable** 154:1 208:25 210:22 237:2
**receivables** 148:20 149:3 149:19 217:24 236:16 254:22
**receive** 59:2 135:13,18 148:8 206:22 234:19
**received** 27:9 29:25 41:18 56:22 97:18 134:19,21,25 135:1 166:20 207:2 210:23 217:15 230:24 233:9 239:23 240:15 241:9 249:16,19,22 251:15 259:12 259:15 260:1 260:25 270:11 270:23 274:5 279:24 280:13 297:13
**receiver** 270:8 270:12,17,19 271:6 275:8
**receivership** 6:23 272:21 273:1 274:23 275:11 276:3
**receiving** 56:25 59:23 97:19 132:7,8,9,21,22 165:21 207:9 268:3 271:11

**recent** 255:9,11 255:17
**recently** 126:13 235:17
**recipient** 74:11
**recipients** 42:15
**recitation** 195:11
**recite** 61:1 62:11 120:24
**recognize** 152:3
**recollection** 16:15 24:10 32:13 58:7 59:22 61:18 72:4 75:13 85:23 96:15 102:25 103:23 106:13 115:10 117:2 119:9,12 128:14,25 130:15 131:8 132:20 135:4 140:20 142:4 142:12 147:2,4 147:19 148:3 149:25 157:2 157:19 159:9 162:6 163:12 170:9 175:16 195:10 196:6 204:14 211:5 215:11 226:5 228:14 235:6 236:18 238:21 242:15 252:16 252:20 253:2 253:17 254:1 254:14 262:9 264:18 269:6 269:11 270:16 271:20 272:17 273:5 274:3 275:13 276:12 289:14 290:9 291:12 292:25 296:11
**recommend** 265:12 266:11 271:6
**recommendat...** 94:17 187:1
**recommendat...** 262:24
**recommended** 186:19 266:18
**record** 10:3 11:7,10 14:3,4 29:22 30:6 63:10 68:16,17 79:9 118:15,16 118:18 167:9 167:10,12 183:11,14 186:2 191:5,6 191:8 228:20 228:25 229:1,3 244:6,7,9 298:12 299:9 300:5 303:9
**record's** 193:11
**recorded** 11:18 299:6
**recording** 11:13 299:8 300:4
**records** 87:9,15 87:17,19,21 88:22 98:22 170:22 217:20 296:20
**recovery** 148:20
**red** 226:2,14,15 227:11,12
**redirected** 248:7
**redo** 86:23
**reduce** 18:12 263:8
**reduced** 299:7
**reducing** 263:11,17,19 263:20,21,22
**redundancy** 192:24
**refer** 19:17 99:1,11 105:25 120:18 195:3 212:3
**reference** 43:14 148:10 267:20 301:7 302:2 303:2
**referenced** 39:4 47:18 74:13 89:4 112:13 115:13 117:6 118:20 119:24 129:8 232:2,9 257:1 278:14 302:11 303:15
**references** 73:23 81:17,20 81:21 130:3 274:6
**referencing** 23:8 40:13 50:24 56:5 75:3 91:9 116:25 140:8 148:14 153:25
**referral** 19:14
**referred** 77:8 99:15 280:15 284:18 290:18 291:25
**referring** 199:18 231:3 239:22 247:21 272:8,12 280:8 280:11,24 281:12 293:11

**refers** 76:20,20 230:23
**refinance** 130:5 248:18
**refinancing** 117:1 246:13 246:20,24 249:12 251:8
**reflect** 149:16
**reflected** 25:14 255:3 285:21 285:24
**refrain** 130:14 130:16
**refresh** 132:20
**regard** 63:6 192:21 216:8 232:13 274:1
**regarding** 25:3 38:8,11 65:10 70:4,15 71:1 85:13 86:19 99:19 128:19 145:2,9 146:13 146:14 149:24 150:5 159:17 169:22 183:23 184:23 185:8 186:11 192:19 203:22 214:19 215:8 218:20 218:24 219:2 226:19 240:14 245:25 272:17 273:12 278:23 281:15 284:10 289:5,25 295:23 296:7
**regular** 245:5 245:10
**regularly** 68:25 100:3
**reject** 169:14 169:18 232:24
**rejected** 156:11
**rejection** 156:9 164:19
**relate** 127:2
**related** 19:9 23:10 53:9,20 54:4 56:13 58:1 59:23 60:8 62:25 64:25 93:11 172:24 207:18 227:3 254:20 299:11 300:7
**relates** 98:19 170:16
**relating** 38:11 63:12 70:12 95:4,19 96:3 96:17 97:3,8 99:12 112:21 178:4 183:24 186:12 187:3 190:8 191:21 197:12
**relationship** 196:4 202:19 246:19
**relationships** 93:8
**relative** 299:13 300:10
**relax** 186:1,3
**relayed** 166:24
**relaying** 138:25 139:3
**released** 208:5
**relevant** 13:2
**relied** 245:3 255:10,17,18
**rely** 251:10 255:19 258:14
**relying** 30:1,7
**remain** 216:18 217:2,6,13
**remember** 34:3 42:18 45:7 141:22 160:8 175:16,17 239:9 296:10
**remind** 119:13 175:7
**remove** 188:17 226:22
**renner** 2:5
**reorg** 250:8
**reorganization** 116:19,23 127:3,20 129:10,21 137:12 168:24 169:7 223:19 246:5 250:7 268:13,18,20 269:1 285:11 285:17,20 286:4
**reorganize** 251:6
**reorganized** 99:9 251:3
**rep** 37:8 67:15 292:1
**repeat** 141:17 295:2
**repetitive** 192:20
**rephrase** 20:2 31:9 274:17 292:7
**replace** 132:14
**replacement** 123:22
**replies** 230:3
**report** 52:25 53:17,19 56:22 56:23,25 62:25 215:23 245:21 255:9,16 260:1 260:19,25
**reported** 1:17 162:9

**reporter** 11:5,6 12:6 302:7
**reporting** 143:24 150:21 245:5,10
**reports** 215:21 244:13 245:6 251:15 253:9 255:7,16 256:2 296:21,25
**represent** 10:8 43:19 46:20 47:11,15 73:23 79:21,23 86:12 89:8 91:4,4 92:18 165:6 195:6 198:6 199:1 234:20
**representation** 34:17 43:3 47:2,6 48:11 50:17 51:16,19 51:24 64:11 81:9,24 82:18 83:12 86:4 89:24 90:22 91:3 95:4,20 96:10,17 111:14 112:5 112:21 128:17 156:5,25 157:8 158:15 159:12 161:13 162:1 194:9 197:9,13 208:3 212:2 273:11 274:9 274:15,22
**representations** 273:12
**representative** 1:11 4:23 10:20 12:23 13:13,23 34:13 34:17 91:18,21 92:5 104:5,14 131:11,13 145:17 166:13
**representatives** 23:2 33:2,3
**represented** 50:6 105:6,16 163:13 208:12 257:5 269:16 275:18
**representing** 42:23 43:22 92:14 103:11 106:16 170:5 202:18 207:23 227:7,10 249:22
**reps** 33:24,24
**reputable** 262:3
**reputation** 216:22
**request** 8:15 18:18 26:14,15 31:2,2 71:11 97:17,19 164:14 169:14 181:25 183:17 256:15 282:1 303:9,11
**requested** 17:9 18:5 68:4 164:17 179:5 201:21 235:9 252:17 253:15 253:18 254:4 258:13 266:24 281:24 299:21
**requesting** 253:11
**requests** 23:14 29:13
**require** 129:15 129:16 294:9
**required** 95:13 189:9 190:7 210:13 290:1 292:1,3 301:25
**requirement** 229:19
**requires** 101:10
**research** 289:10,11
**reserved** 298:13
**resign** 187:20 187:24 188:8 188:17 191:11 191:14,20 192:23 193:2
**resignation** 189:2,16 192:21,25 193:8
**resigned** 187:17 192:25 193:1
**resist** 94:17
**resolve** 136:1,3 136:7,15
**resolved** 146:21
**resources** 250:23
**respect** 22:4 51:22 54:11 109:20 218:11 219:8 262:15 275:7 291:22 294:23
**respective** 77:2 77:4
**respond** 26:15 29:24 87:20 88:4,24 139:23 144:25 168:11 170:20 225:21 232:12
**responded** 31:16

**responding** 24:10
**responds** 139:11 221:8 224:22 235:14
**response** 8:13 8:20 23:14 25:19 26:18 27:3 28:9 29:13 31:1 34:20 45:22 87:18 88:25 102:22 126:22 134:8,10,13,18 135:12 139:12 139:14 167:23 169:14 177:20 177:21,24 178:8,9,13 180:13 181:25 203:18 219:13 224:23 230:2 232:5,20 235:16 284:9 286:25 289:18
**responses** 177:17
**responsibility** 177:7,11
**responsible** 20:10 21:9,12 21:20,25 62:23 176:5 178:12 212:24 226:1 244:24
**restate** 22:15 173:5
**restriction** 139:6
**restructured** 246:1
**restructuring** 8:6 11:2 93:24 94:1,3,5,10,13 94:16 95:1 143:5,6,13 214:4,19 215:9 226:20 227:1 244:13,15,19 244:23 245:16 250:1,4,16 265:23,25 266:2,6,12 267:20,25 268:4,11,25 269:15
**result** 172:21 219:17 275:15
**resulted** 218:13 252:9
**results** 246:21
**retail** 127:24 133:13,16,18 133:23,24 134:1,4 264:20
**retain** 86:13,20 89:14,20 91:15 92:22 129:6,9 133:13 256:24 257:2,5 265:23 266:1,5,9,12
**retained** 47:20 47:24 69:16 79:23 80:10 195:25 203:13 203:17 205:7 213:17 256:17 257:7,11 278:19 288:16
**retainer** 15:4,5 15:8 206:22 207:9,16,20,24 208:8,18 210:5 210:14 230:23
**retaining** 91:10
**retains** 74:16
**retention** 6:13 196:17 202:21 205:8 214:9
**retired** 171:14 171:14
**returned** 301:18
**revenue** 171:20
**revenues** 198:23,24,25
**review** 14:12 15:19,22 17:5 17:7,22 21:7 25:5 34:12,15 41:6,13 42:1 42:15,17 44:16 59:7,11,17 88:6,14 95:8 101:24 102:3,7 102:25 103:12 113:9 120:23 122:14 130:9 130:10 131:13 132:11,20 145:18,23 147:18 151:1 152:20 156:10 156:22 157:1 160:10 171:7 173:17 180:8 181:4 183:14 188:9 216:19 217:12 219:5 238:24 240:1 249:18 251:13 252:4 259:7,11 260:24 264:10 292:4,15 296:6 299:21 301:12 302:1 303:1
**reviewed** 14:12 14:15 15:15,17 15:21,24 16:11 16:15 18:20 32:18,21 33:23 34:3 40:12 41:4,22,22 42:6,10 46:24 55:22 70:9 71:9 73:5

80:22,24 88:5 88:12,19 98:22 98:22 103:22 104:9,25 154:20 156:15 156:17,19 170:21 173:20 208:20 209:1 216:19 217:10 224:18,18 226:7 228:4 235:1 245:9 255:12,18 269:19 273:1 287:20
**reviewing** 41:19,21 69:12 72:1 80:25 87:8 115:21 170:2 174:1 177:15,16 207:10 225:18 226:7 255:7 269:10
**reviews** 104:21 216:20 264:19
**revolving** 210:24,25
**rice** 1:11 4:2 5:8,14 6:14,17 11:4 12:15 13:13,17 14:2 14:9 15:3,12 15:15 17:20 18:4,12 19:15 20:4 21:9 22:7 22:11,18 23:7 26:6,11 27:22 28:17,18,22 31:16,23 32:2 32:4,6,15,19 35:8,12 36:2,9 37:9,22 38:7 38:10,18 42:1 42:23 43:4,6,9 43:10,11,12,18 43:20,21 44:1 44:2,13 46:23 47:10,14,19,23 47:25 48:3,4 48:19 50:4,18 51:2,15 52:4 52:12 53:8,19 54:25 56:12 57:15,20 59:8 60:8,11 62:23 67:20 68:11 69:15 72:20 73:1 74:16 75:6 76:3,21 80:10,13 82:9 82:12,13 83:8 86:25 87:6 88:15 89:8,13 89:19 91:3,7 91:13,20 92:4 92:13,21 93:3 94:8,12 95:3 95:18 97:2,7 100:20 101:17 101:21 102:5,9 102:21 103:4 103:15 104:9 104:24 110:18 113:2 114:20 114:22 117:13 117:22 119:23 120:3 123:10 130:13 131:10 140:19 142:10 142:25 143:8 144:1 145:7 147:15 150:24 151:9,16 154:7 154:16,25 155:3,6,25 156:3 157:4,11 165:10 166:13 171:19 172:8 172:13 173:18 173:22 174:4 174:25 178:25 179:18 180:25 181:8 183:21 183:23 185:8 186:10,11 187:1,2,6,16 188:12,21 189:10 190:6 190:25 193:6 193:14,19,21 194:4,14 196:4 196:17 197:6 197:20,23 198:6,9,11,20 198:21 199:1,9 199:12,16,20 199:21 200:6 200:10,11,24 202:21 203:13 203:17,20 205:23 206:22 207:3,8,15,22 207:23 208:3,5 208:12,20,23 208:23 209:5,8 210:4,8,12 212:3,6,10,16 213:2,18 215:13,17 216:16 217:12 217:18 218:6 218:23 219:1 219:11,14,25 223:5,12 224:10 225:16 226:1,25 227:9 228:15 230:18 230:24 231:7 233:13 234:19 240:1 243:12 244:14,24 245:15,24 246:12,23 247:10 248:17 249:22 250:25

251:10,24 252:13,13,18 252:22 254:9 255:1,5,13,19 256:4,8,18,19 256:24 257:2,4 259:15,17 260:1,24 261:5 262:2 263:10 264:4,8,14 265:6,12,17 266:1,5,9,11,17 266:25 267:4 268:7,12,20 269:11,25 271:11 272:2 272:25 273:8 276:9 277:1 278:15 282:18 285:16,22,25 286:12 288:12 289:11 291:14 291:15 292:11 292:21 293:3 294:15 295:5 295:14 296:3 297:13,14,23
**rice's** 12:22 16:8 24:19,19 24:20 27:4,20 50:16 52:24 63:11 75:17 86:10,19 90:12 95:4 96:10,17 98:7,10,19 105:14 111:3,8 111:14 112:20 119:23 140:17 145:2 146:2,14 155:18,22 156:4,24 157:8 161:13 164:6 170:16 177:23 178:4,22 193:3 208:2 209:14 220:12 226:22 238:24 245:21 245:22 251:1,2 254:16 258:14 262:13 268:21 273:11
**right** 11:24 15:2 31:20 40:17,19 47:4 47:7 48:5,15 48:20 49:5,16 58:11 61:24 62:5 65:4,12 66:23 72:17,23 73:18 76:18 77:9 79:16 80:1 81:5,13 81:18 82:4 83:11 85:22 86:16 87:1 93:24 98:8,9 106:21 109:1 111:23 117:11 117:20 118:22 119:19 121:18 122:18,20 123:6,21 124:6 125:10,11 127:8 128:9 130:21 132:4 133:5,10 134:6 138:16 139:2,8 139:11,18,25 141:15,19 143:5 152:11 153:2 154:20 154:23 157:5 161:1 162:14 162:24 165:14 165:19 167:21 168:6,12 172:7 177:8 190:17 191:1 202:8 216:6 227:19 235:12,13 248:15,16 263:24 272:13 277:19 279:6 285:3 288:5
**rights** 160:1 204:10
**riley** 259:3,6,17 262:24 263:1
**rio** 45:5 49:18 49:23 139:6,7 140:2,8,13,13 140:18,19,22 141:2,11 142:11,16 270:8,10,12,19 271:5,13 272:1 272:22 273:21 274:2
**rise** 109:18 271:7 274:7
**road** 2:5
**rock** 3:6 10:17 10:19
**role** 143:10 145:2 146:14 196:23 204:25 218:20 236:21 236:22 274:1,4
**room** 8:18 66:12 154:12 156:15,17,19 156:22 157:1,3
**routed** 143:17
**rshanklin** 4:7
**rule** 5:9 12:15 195:19
**rules** 11:17 35:25 302:5 303:5
**run** 52:6,19 54:1,4 60:1,15 60:18 61:9,11 62:16 200:19 201:8,13 202:4 202:13 252:18 252:22 253:14

**running** 60:6
**ruprecht** 178:23,25
**ruskamp** 119:5
**russell** 4:3 11:3 301:5
**ryan** 4:23 10:19 282:12 290:1,12

**s**

**s** 2:1 3:1 4:1 5:6 5:9 6:1 7:1 8:1 10:1 301:15 303:8,8 304:3
**sale** 100:4 101:5,7,10,20 121:16 127:21 133:16 168:12 168:20,22,25 169:5,10,19 215:9 223:17 223:21 224:1,5 224:11 227:14 251:7
**sales** 127:22 148:11,18,22 148:23,24 149:2,19 161:3 161:10 162:6 286:7
**samantha** 5:12 8:10 33:25 72:13 192:6,7 214:13,19 215:1,8 230:2 231:3 232:21 233:6 267:13 277:7,15
**sat** 71:9
**satisfy** 116:15 121:3,4,7 122:2 124:5
**saved** 55:3 115:19
**saw** 34:17 69:12,13 74:2 152:21,21 154:24 162:13 197:12
**saying** 54:18 85:15 86:5 102:16,19 105:13 115:19 117:11 139:2 201:23 274:11
**says** 78:14,20 79:8 81:12,25 127:1,9 130:20 133:1,6 141:13 141:14 168:13 199:9 222:7 224:23 225:20 228:2 233:7 237:14 245:20 259:10 267:25 271:3 277:18 277:20 286:7 288:25 291:22
**schedule** 6:3 152:3 153:1,4 153:5 295:8,25
**schedules** 179:6,18,24 255:4 294:8,15 295:16
**schoop's** 90:18
**schuler** 2:13 10:11,11 184:9
**schwartzkopf** 8:14,17,19 94:15,25 131:19 143:3 143:18 144:3 144:10 145:24 146:4,6,19,21 147:3,9,16 148:1,7 149:4 149:11 150:4,8 150:11 213:16 218:4 239:18 278:11 279:9 280:14 281:1 284:9,14 285:1 285:5 288:2 289:4,19,24,25 290:6,10 292:19,20
**schwartzkopf's** 146:16 147:1 286:6 287:1 293:4
**schwope** 5:12 5:13 6:23,24 7:18,22 8:3,9 8:11 33:25 34:1 44:17,18 47:15,25 48:3 48:14,24 49:3 49:12 51:16,18 51:22 52:3,7 52:12,18 61:12 63:16 64:13,16 65:15 68:3 72:13 73:21 77:17 78:1,4 78:14,14,16,19 78:21,23 81:13 81:18 82:3,6 82:10,13,20 83:8,15,22 84:22 85:3,8 85:16 86:11,20 86:23,25 87:6 89:5,7,8,13,20 90:8,13,15,24 91:2,10,14,22 91:22 92:5,6 92:11,12,16,21 93:23 94:6,7,8 94:12,17 95:2 95:4,12 97:10 99:13,19 100:3 100:16 101:2 101:12,22 102:5,9 103:5

129:9,16,20 142:10,16 143:15 154:8 156:13 157:5 164:8,17,21,21 164:25 165:4 165:12,13,22 166:2,11,17,19 166:21 192:1,6 192:6,7,7 193:21 194:9 196:5 197:5,9 198:2,7 200:19 201:16,16,17 202:10,20 205:24 206:6 206:16,18 211:13 212:3,7 212:11,17 213:2,20 214:13,19 215:1,8,14 216:7,18,21 217:1,5 221:8 222:4,24 223:16 224:22 229:14,15 230:3 231:3,5 232:6,7,21 233:3,6 237:13 239:18 243:3 258:24 264:25 267:13,13 273:22,24 277:8,8,15,15 283:24 293:14

**schwope's** 61:19 63:20 64:8 76:23 78:25 79:4,7 84:4 93:14 98:11 100:7,25 165:20 223:5 271:4 273:10 274:1,4,25

**scope** 17:12 32:7 35:3,19 36:5,13 37:3 37:25 46:19 48:8,22 49:7 49:20 50:8 51:8 53:2 59:13 60:23 62:18 63:8,11 63:14 69:21 70:18 73:15 83:1 85:25 100:10 103:19 107:17 110:20 128:11 135:7 136:16 144:23 145:1 157:15 158:9 159:6 161:18 162:3 163:2,15 169:24 171:23 173:2,11 174:19 183:6 186:14 188:23 189:21 190:10 190:21 193:10 195:8 199:23 200:13 203:24 204:12 213:23 216:9 218:17 224:14 231:10 233:15 234:23 235:25 245:18 252:24 253:23 261:22 262:6 262:12 264:17 271:17 273:2 273:15 275:20 286:15 291:18 294:21

**scott** 5:13 8:5 19:5,13 21:20 77:7 155:10 156:20 164:20 164:23 166:25 167:1,2 171:13 171:13 177:2,5 221:8 222:5 229:14 267:12

**scrivener's** 50:12

**seal** 302:15 303:21

**search** 42:14 54:9,13,20 74:6 75:11 96:13 181:3,7

**searched** 54:6,8 74:8,9 181:10

**searches** 125:22 216:23 216:23 252:14 252:19,23 253:5,16 254:3 254:10

**searching** 75:14 181:12

**season** 282:14

**second** 14:20 49:25 50:2 138:13 139:25 178:3,5 197:25 223:15 226:3 228:21 231:25 233:25 234:4 234:10 235:15 260:5,15,16 265:4 286:6 289:22 291:5

**secondary** 121:12

**seconds** 228:22

**section** 6:12 116:12 153:3 154:1 195:4 196:16,20 204:8 205:8 226:18,21,23 227:14,14

**secured** 125:8 283:6 297:3

**security** 139:21 180:9 208:24 209:3
**see** 12:15 16:10 24:23 40:7,10 40:17,17,20,20 41:1,2,19 42:8 54:6 72:14,25 73:3,11,13 74:3 78:13 81:10 82:1 86:13 126:9,13 126:17,20 127:3 129:7,8 130:2,5 131:22 131:25 133:1 133:11 138:10 140:3 141:20 142:2,3 152:8 152:9 153:8 155:20 160:9 164:8 165:15 167:17 170:17 175:13 181:12 197:8,14 200:5 201:10,13,23 202:12,14 216:21 221:9 222:12 223:21 224:25 225:14 226:21 227:15 228:7 229:25 230:7 232:3,10 232:18,23,25 234:16 235:19 237:15 241:15 242:1,12,25 249:24 258:17 260:13,19,22 263:8 264:2 267:21,24 271:8,9 277:8 277:14 278:12 279:2,12,15 280:5 282:16 284:15,16 285:11,12 286:10 287:7 287:12 288:22 289:1 290:2,14 291:6,8 294:3 294:4,11
**seeing** 58:12,14 58:18 60:13 61:18 126:12 181:14 249:25
**seek** 20:16 86:6 89:18 90:9,13 90:19,24 121:1 121:8 145:17 155:3
**seeking** 18:4,9 46:22 123:13 193:6 239:24 246:15
**seeks** 283:7
**seem** 15:1 144:6
**seems** 138:22
**seen** 12:17 32:25 45:12 58:12 60:4,5 66:7 83:10 95:9 146:4 181:17 259:14 294:25
**segregated** 162:9
**sell** 134:1,3 159:20
**seller** 101:10
**selling** 159:3 160:12,21,25
**send** 39:19 139:10 183:10 222:9 224:24
**sending** 72:19 166:15 181:10
**sends** 223:15 278:21
**sense** 92:25 93:17 149:14 173:4
**sent** 39:21 57:16 58:8 69:15 78:9 134:5 138:9,18 139:1 167:2 181:16 207:20 208:5 211:20 235:7 239:17 267:16 268:11 276:6 279:17 284:10 288:11
**sentence** 139:24 141:17 260:7 288:3 291:4,5 294:2
**sentiment** 237:19
**separate** 43:13 43:16 88:14 92:19 189:24 190:3 198:20 198:21,22,22 198:23 199:21 200:3,7 265:16
**separately** 162:8
**september** 1:12 10:4 34:7 301:4
**seriously** 294:16 295:8 295:11
**serve** 143:12 204:17 205:25
**services** 44:14 46:23 65:10 67:7 73:16 79:10 173:23 259:3,6
**serving** 174:15
**set** 35:13 41:18 41:21 55:16,18 144:12 162:10

214:9 266:7
**setting** 216:5
**settlement**
135:13,18,25
136:2
**several** 19:12
88:6 98:12
**shankland**
301:5
**shanklin** 4:3
11:3,3 12:25
16:1,9,21
17:11,21 18:1
18:6,15 22:14
22:21 23:4,9
23:25 25:23
26:21 27:6,17
29:9,18 30:10
30:19 31:7
32:7,20 34:8
35:2,17 36:4
36:12,23 37:3
37:14,24 38:16
38:24 41:8
42:3,25 46:5
48:6,21 49:6
49:19 50:7
51:7,17 52:15
53:1,7,11 57:9
57:23 58:20
59:13 60:22
62:6,18 63:7
63:23 64:5,9
64:21 65:13,25
66:5,24 67:11
69:7,20 70:6
70:17,25 71:5
72:2 74:17
75:7,18 76:25
77:18,22 78:5
78:11,17 79:17
81:19 82:5,24
83:23 85:18,24
87:2 91:24
93:4,16 94:18
95:6,14,21
96:5,20 100:9
103:18 104:2
104:11 105:9
106:22 107:5
107:10,16,22
108:3,9,16
109:6,13 110:1
110:11,20
111:5,16,24
112:7,23
114:12 116:1
117:15 118:10
119:4 127:13
128:7,10
129:12,24
130:25 135:7
135:20 136:8
136:16 137:4
137:15 139:19
140:10,24
142:18 144:5
144:22 145:8
149:8 151:21
152:19 153:17
154:10 155:8
157:14,25
158:8,16 159:5
159:21 160:16
161:5,17 162:3
162:15,25
163:15 165:23
166:5 167:5
169:4,16,24
171:22 173:2
173:11 174:19
176:7,13 180:6
181:2 182:8
183:2,25 184:6
184:11,17,25
185:12,19,24
186:2,8,13
187:25 188:22
189:11,21
190:9,20
191:16,22
192:2 193:9,24
195:8,15 196:7
197:7 198:14
199:3,22
200:13 202:22
204:12,20
205:4,11,20
206:8 209:11
210:15 211:1
212:20 213:4
213:22 214:6
216:9 219:21
220:3 223:8
224:13 227:5
228:11,20
230:25 231:10
233:14 234:22
235:25 236:7
237:5 241:19
242:5 243:21
244:4 245:17
245:20 247:4
247:11,25
248:9 249:2,8
252:24 253:6
253:23 254:5
254:12 255:22
257:22 258:4,7
260:14 261:1,9
261:21 262:6
262:17 265:8
267:2 268:14
268:19 269:2
270:24 271:16
272:6,14 273:2
273:14 274:11
274:14,19
275:19 276:4
276:10,21
277:2,22
279:20 281:9
281:17 282:7
282:22 283:10
283:17 284:24
286:14 287:15

288:6 289:6 290:24 291:17 291:21 292:23 293:16 294:20 295:9,17 296:1 296:4 297:7,17 298:1
**share** 200:11
**shared** 243:2
**shawnee** 2:6
**shb.com** 4:7
**sheet** 7:5,8,19 120:8,19,20 221:23 225:7 225:10,13,22 226:2,11,18 227:4,14 228:5 234:9 238:18 239:22 240:2 240:14,17,19 241:5,7,8 248:25 249:15 249:19,21 252:6 267:6 301:13 303:7 303:10,18 304:1
**sheets** 17:9 22:4 238:20,22 238:25 239:4,6 249:15 256:1
**shook** 1:14 4:4
**shopping** 290:14,19,22
**short** 119:11 151:6 244:2
**shortly** 207:9
**show** 201:2 241:25 242:9 282:5
**showed** 220:7
**showing** 219:16
**shown** 301:16
**shrubs** 159:10 254:22
**sic** 13:3
**side** 40:17,22 139:25
**sides** 264:20
**sign** 104:20 116:4 188:20 190:2
**signaling** 227:1
**signature** 15:14 21:5 298:13 299:16 300:14 301:14
**signatures** 190:3
**signed** 15:11 66:10 72:19 198:1 302:13 303:18
**significant** 136:20 219:25 241:25 253:12 256:25 261:18 284:4 297:15
**significantly** 41:10 280:21
**signing** 301:19
**simeon** 103:23 104:8 113:17 118:9 126:16 126:25 175:10 226:6 240:6
**similar** 40:13 40:15,15 42:8 127:12 131:11 271:14 275:18
**simple** 78:15 151:8 185:22
**simply** 199:9
**sincerely** 301:21
**sir** 132:14 301:10
**sit** 71:7 106:12 136:21 173:1
**sits** 171:21
**sitting** 141:21 296:9
**situation** 213:19 297:2
**six** 175:9
**size** 105:22,24 106:1 260:22
**sizes** 106:14
**skills** 299:10 300:6
**skylar** 175:18
**slide** 133:1
**smaller** 41:7,9 41:10
**sold** 65:21 159:9,14 161:6 161:7 208:16 208:17
**solutions** 301:1 304:1
**somebody** 41:16 104:15 130:18 163:10 175:19 181:16 213:19 234:18 290:21
**soon** 211:20
**sorry** 15:9 24:13 28:17 64:9 79:6 128:10 133:21 164:13 166:19 178:7 212:11 263:17
**sort** 110:5 121:12 123:8 176:22 178:15 178:17 218:10
**sought** 14:17 18:13 33:18 47:20,23 123:11 220:13 248:20 249:25
**sound** 45:5 66:19 119:7

207:3 235:12 248:15
**sounds** 14:11 15:2 130:23 145:12 176:17 181:7 235:13 248:16
**source** 208:7 210:5,7
**sources** 123:11
**speak** 18:8 19:3 43:18 56:16 95:23 142:10 160:6,9 213:12
**speaking** 19:19 26:5 38:7 59:24 60:7 69:19 98:10 119:22 194:21
**species** 260:21
**specific** 17:6,16 17:17 24:4,5 28:25 30:11,17 30:24 33:12 35:4 36:2,17 39:16 53:13 54:3 55:13 57:1,2,7 60:15 60:17,19 64:24 65:3 70:1 72:3 76:17 84:11 87:10 89:23 91:14 105:7,17 106:13 115:10 122:22 128:1,1 128:2,21,21,24 135:16 141:12 142:7,7,12,22 143:1,21 144:14,17 145:9,11,13 146:8 147:20 148:3,16 149:25 150:6,7 150:15 153:24 154:11 156:20 157:2 158:11 158:23 160:8 160:11 162:5 162:17 163:23 171:2 172:18 183:4 193:3,5 194:12 206:7 211:4,5 216:13 217:7 226:10 232:13 233:5 235:5 236:18 238:21 250:21 251:9 252:20 253:2 254:1 262:18,20 270:16 273:5 274:3 275:13 276:11 277:3 280:25 282:1 289:13 291:12 291:24 292:25 295:22 296:11 298:7
**specifically** 14:14 26:2,9 26:12 31:25 33:20 34:5 39:16 45:15 46:3 48:1 53:22 54:20 55:12 62:11 68:7 70:24 76:20,21 79:3 79:6 84:25 85:2,6 88:1,13 89:17,23 90:8 96:13 114:25 120:24 132:8 132:23 138:21 140:6,11 141:24 143:20 145:17 149:10 150:14 155:3 158:25 161:22 168:17 170:7 171:7 173:21 191:25 194:23 196:25 200:9 205:9 206:13 206:14 211:25 215:10 226:12 228:17 240:16 241:10 245:11 246:21 250:20 252:15 253:20 254:6,13 257:11,20 258:8 268:5,8 268:21 269:3 276:5,22 280:1 280:12 285:7 296:5
**specifics** 116:10,20 117:4 200:4 214:10
**specify** 178:3 199:12
**speculate** 149:17
**speculation** 66:25 109:14 112:8 135:22 136:9 142:19 155:9 158:1 159:22 160:17 163:2 220:4 231:1 248:9 281:10,18 284:24 290:25
**spell** 25:17
**spencer** 2:15 10:9,11,14
**spencerfane.c...** 2:18,19,20
**spend** 250:23 253:12
**spending** 147:13,25 150:10,12,22

**spent** 284:3
**spoke** 25:3 29:11 33:5,7 44:7 45:13 56:14,18 60:3 87:13,23 98:21 166:10 217:3
**spoken** 18:24 19:1 29:23 38:14
**spot** 118:12
**spring** 282:14
**st** 43:6,9,12,21 47:10,14 95:25 96:4 171:17 172:23 173:7 174:17 189:19 189:25 190:2,4 198:12,20,25 199:21 200:7 200:11
**stabilized** 288:19
**staff** 172:13 174:10
**staffed** 175:8
**staffing** 170:17 174:8,25
**stakeholders** 206:4
**stamp** 152:9,10 202:8
**stand** 22:7
**standard** 53:23 61:6 172:13 174:9
**standards** 35:8 35:11,12,16 36:8,11 37:1 37:22 136:24 188:11 193:3
**start** 42:23 64:4 146:25 147:25 192:16 207:25 220:11 272:11 285:16
**started** 289:1
**starting** 260:7
**starts** 73:12 138:12 201:6 221:5
**state** 10:7 57:11 92:1 99:12 131:1 211:19 229:22 299:19 302:10 303:15
**stated** 44:15 98:11 99:14 145:10 162:13 217:20 286:3 294:14 295:7 295:16,24
**statement** 99:18 113:4,6 113:10,16,22 114:4,6 115:4 115:23,25 116:4,16,22 117:3,17,25 118:2 119:25 120:2 204:7 232:6 242:3 277:21 283:3 287:14 302:13 302:14 303:19 303:19
**statements** 215:18 256:1,2 257:17 296:25
**states** 1:1 10:22 198:7 225:12 227:14 232:21 260:9 263:8 279:11 280:4 284:14 287:3 290:1,12 294:6
**status** 209:9 210:2 212:12 212:17 225:12 259:8
**statute** 195:11
**statutes** 194:21
**statutory** 194:24 195:3
**stay** 92:18
**steeplechase** 128:5,14,18,20 129:1,2 222:1 222:10 267:16 268:12
**stenographic** 11:19
**step** 116:15 138:25 160:23 160:24
**stephen** 6:20
**steps** 53:9 56:11 63:12 100:6 116:14 216:16 252:12 255:5,13 264:4 264:8 272:2 276:17 295:14
**steve** 19:5 151:17 177:3,6 183:9 209:1 211:23 226:5 236:25 238:11 239:1 240:6 253:10
**steven** 5:16 126:16 127:6
**sticker** 132:18
**stipulation** 11:20
**stomach** 288:25
**stop** 27:22 118:13 122:22
**stopping** 118:11 293:17
**stored** 114:8
**strategic** 5:19 127:2 130:19

132:5
**strategies** 219:2
**strategy** 127:8 127:10,11,16 128:2,3 131:3 131:6,11
**street** 2:16 3:7 3:17 4:14
**strike** 19:16 42:22 46:12 51:14 64:18 91:6 94:7 95:2 100:25 112:18 123:19 130:18 154:17 156:18 167:4
**string** 126:5,14 126:15 137:24 167:17
**structure** 103:8 116:22 223:10 240:18
**study** 250:2,16 250:22
**style** 266:20
**subject** 139:21 145:23 210:10 267:23 272:19 280:22
**submit** 156:12
**submitted** 22:8
**subscribed** 302:10 303:14 304:21
**subsequent** 120:15
**subsequently** 164:22 170:3
**successful** 123:14 125:2
**successfully** 251:3
**sued** 92:16
**suffer** 93:21
**suffice** 57:19
**sufficient** 124:15,21
**suggest** 265:17 291:5
**suggested** 50:13 226:10
**suggesting** 230:5
**suggestion** 234:15,21 265:5,22
**suggests** 154:6
**suite** 2:5 3:17 199:16 301:2
**summary** 129:3 259:2
**summit** 7:18 238:9,17 239:17,23 240:14 241:4,6 241:8 248:25 249:4,15
**superior** 301:1
**supervising** 21:9,13,21,25 22:6
**supplement** 203:21 204:2
**supplier** 65:20
**support** 196:20 219:15,18 220:2,8 229:24 234:11 244:23
**supported** 259:21
**supporting** 6:16
**supposed** 210:23
**sure** 13:5 14:6 19:19 45:8 61:20 76:8 92:1 108:6 132:12 158:21 158:24 173:6 175:14 184:4 186:4 190:24 193:11 196:6 214:15,17 268:16 295:5
**swear** 11:22
**switch** 220:10
**sworn** 11:11 12:3 299:5 302:10,13 303:14,18 304:21
**system** 52:24 53:12 54:2 55:1 59:9,11 59:17 115:16 115:20 117:10 200:11 260:11
**systems** 218:10

**t**

**t** 5:6 6:1 7:1 8:1 207:21
**table** 216:7 224:1
**take** 11:7,8 52:13 68:6,13 84:10 101:5 102:1 109:20 132:10,17 133:25 134:2 134:20 160:23 168:23 179:11 186:20 191:3 197:2 206:12 216:16 223:11 244:2 255:5 257:20 261:5 264:4,8 272:2 276:17,23 295:5,10,14
**taken** 18:21 53:9 63:12 100:6 110:15 116:14 252:12

299:3,12 300:9
**takes** 139:15
**talk** 47:1 91:14 142:1 146:10 155:7 177:1,3 193:18 216:24 217:16 234:8 290:11 293:3
**talked** 19:5,13 75:4 81:4 88:8 99:21,22 111:2 111:20 130:12 140:16 142:6 146:16 147:1 154:22 167:1 173:6 175:19 190:16,24 216:20 238:13 239:1 279:14
**talking** 16:8 19:20 23:18 57:22 76:22 77:9 85:2 87:9 98:6 105:21 116:18 142:4 148:18,18,25 250:6
**talks** 73:12,15
**target** 122:1,23 122:24,25
**targets** 121:11 121:25 122:20
**task** 260:10
**tax** 252:18
**technically** 16:4
**tell** 12:4 25:22 28:11 33:19 39:21 45:7 56:19,24 81:7 86:3 90:24 98:25 105:7,17 125:13 134:21 135:1,12 137:23 141:13 164:16 209:19 239:3 277:11
**telling** 45:25 89:9
**ten** 125:25 171:3,5
**term** 7:4,8,19 22:4 119:11 120:7,8,12,19 120:20 123:17 221:23 225:7 225:10,13,22 226:2,11,18 227:3,14 228:5 234:9 238:18 238:20,22,25 239:4,6,22 240:2,14,16,19 241:4,6,7,8 248:25 249:15 249:15,19,21 252:6 267:5,6
**terminated** 80:13 165:17 209:25
**termination** 165:20
**terms** 67:4,9 105:22 120:10 120:13,18 123:8 124:4 125:24 128:24 129:1 132:24 160:8,11 162:17 189:16 214:8 247:14 247:19,20 248:7 250:9,24 251:19,25 252:5,9 257:14 266:16 269:13
**testified** 12:5 29:22 33:22 34:21 47:4 58:24 154:18 162:19 191:10 193:20
**testify** 12:23 14:13 19:9,22 25:1,1,25 29:5 30:1,8 31:12 34:13 45:10 60:19 62:7 75:15 76:10,13 86:18 88:25 111:12 140:17 164:10
**testifying** 14:2 18:20 73:5 86:16 150:16 185:18 299:5
**testimony** 13:13,16 14:1 24:19 27:7 35:19 48:7 52:16 57:10 58:6 61:22 66:6 75:24 77:23,25 82:25 87:18 98:19 106:23 107:4 111:25 112:17 112:19 114:5 118:20,21 129:13 135:21 137:5 145:6 146:11 154:19 156:2 160:18 163:1 198:15 215:12 236:8 283:11 293:5,7 297:8 302:6,7 303:6,9,12
**text** 5:10 23:18 23:22 24:7,21 25:4,5,5,9 26:11,15,17 27:21,23 28:2 28:4,6,7,9,12 28:18,21 29:2

29:8,16 30:22 31:3,14,17 32:18,25 33:2 34:3,12,22,25 35:7,14 36:22 37:1 38:6,15 39:4,6,8,15,16 39:19,21 40:3 40:12 41:4,13 41:18,21,23 42:1,5,11,15,19 42:20 68:20,22 68:25 69:4,11 69:12,13,15 70:4,9,13,16 71:10,11,20 72:1,4 166:17 190:17
**texts** 33:23 42:17 70:21
**thank** 12:6 192:11 198:5
**thing** 13:1 28:20 75:1 146:25 277:18
**things** 80:23 86:5 87:14 98:12 116:9 147:24 160:1 174:1 177:2 195:23 256:2 263:4,6,20 286:2 294:22
**think** 13:2 16:3 16:9,10 20:24 24:2 25:25 26:1 30:10,12 42:10 43:13 52:18 53:13 54:14,15 64:25 78:15 79:25 83:14 84:20 89:25 91:16 97:25 99:14 106:18 112:17 113:21 114:15 119:2 120:20 125:8 132:18 145:8 146:5 153:4 165:19 165:25 169:12 171:8 174:21 175:19 176:14 183:9 194:14 195:13 198:10 199:4 200:22 203:1 206:8 215:3,25 217:24 218:2 223:9 224:3 241:14 242:24 250:15 256:16 260:3,14 264:17 268:16 268:19 269:2 269:12 281:23 282:9,23 284:14 290:1 291:23 292:3 293:18 298:9
**third** 5:22 122:17,21 125:20 138:16 202:7,9 237:3 256:17,24 257:5,10 260:5 261:6 262:3 263:7 268:11 286:6 288:18
**thirty** 301:18
**thornton** 175:21
**thought** 99:1 99:10 149:7,11 151:19 217:24 218:3 277:10 288:22 290:20
**thoughts** 291:14
**thousands** 88:6
**threaten** 146:21 147:9 148:1 149:23 150:11,16
**threatened** 147:16,21 150:4,18
**threatening** 147:4
**threats** 147:8 149:4
**three** 151:6 168:15 169:3 169:10
**threshold** 144:2,8,13,20 145:10,22,22 146:3
**tied** 149:1,2 172:25 205:9 205:12
**tighten** 130:4
**tim** 3:15 10:24
**tim.davis** 3:19
**time** 1:13 10:4 13:24 15:15,19 15:22,25 16:16 16:19,23,24 17:8,8,9,16 23:23 28:14 33:5 38:5,11 41:5,23 45:4 47:9,12,16 50:4 54:21 55:24 59:5 68:13,15 84:12 84:19 87:8,15 87:17,19,21 88:22 90:18 91:7,20 92:3 98:22 99:22 104:19,21 110:19 111:23 115:16,17 118:14,17

126:3 127:14 128:16 148:16 148:25 153:19 165:10 167:8 167:11 169:4 170:5,22 171:3 171:14 175:15 175:18 182:10 182:17 191:4,7 204:25 205:23 207:22 208:2 212:5,5 214:3 215:22,24 217:18,23 218:6 228:24 229:2,2 233:11 238:6,15 239:5 242:3 244:5,8 248:8 254:11 257:3 259:12 259:15 269:16 270:11 278:3 278:25 284:4 290:20 294:16 298:7,11
**timeline** 133:4
**times** 29:22 89:7 99:25 142:6 150:4,15 171:1 176:15 182:17,17 283:25
**timing** 42:18 118:1
**tiny** 132:16
**title** 115:3 120:20 253:9
**today** 13:20 14:13 17:25 18:4,20,25 19:9,17,21 24:19 25:1 29:5 30:1 31:5 41:25 45:10 57:22 60:19 62:14 73:6 75:4,15 76:10 80:8 86:10,16 105:21 106:13 111:3,12 114:5 118:21 141:21 144:19 154:19 184:5 232:10 292:4 293:5 294:24 296:9
**today's** 119:16
**together** 19:12 40:6 61:10 115:5 138:2 285:10,16
**told** 26:2 28:8,9 39:9 57:15 68:3 89:7 166:20 188:16 208:15 239:11 250:15 282:15 287:10 288:22
**tom** 25:16
**tomorrow** 232:24
**tonight** 298:10
**took** 119:13 179:15 191:2 213:20 255:13 277:1 294:16
**top** 40:16 77:14 131:18 152:8 202:7 211:12 224:21 225:5 227:24 230:3 231:5 233:24 235:15 267:11 267:22 277:6 278:10
**topic** 16:2,6 24:12,16,20 25:2,7 26:5 27:3,20 28:25 30:25 53:6 63:11 64:24 85:20,22 86:10 86:15 87:18 88:1,4,13,25 89:10 98:4,19 111:2,9 145:1 145:10,13 146:11 155:16 163:22 164:3,5 164:11 170:14 170:16,20 174:7 178:24 184:3 187:5 188:1,23 189:12 214:21 217:5 218:19 218:22 220:10 220:11 238:23 244:11 245:19 252:10 254:19 262:12,20 268:15,18,19 270:14 291:19 293:9,19 294:18
**topics** 12:23 13:4,14,17 16:10 24:9,18 30:9 33:14,14 33:17 35:20 48:8 86:9 87:20 91:15 113:25 155:13 157:18 164:1 172:2 186:21 192:18,19 199:23 206:7 217:17 254:18 264:18 294:17
**tory** 4:23 5:13 6:22,24 7:18 7:22 8:3,9 10:20 33:25 44:17,18 47:15 51:16,22 52:3 52:7,18 63:16

68:3 73:21 77:15,17 78:1 78:3,14,16,18 81:17 82:3,6,9 82:20,21 86:3 86:11,19,23,25 89:7,8 90:14 91:2 93:14 98:11 99:7,19 129:6 142:1,5 143:14 145:20 154:7 157:4 164:7,17 165:12,13 166:2 192:1,6 192:7 193:20 196:5 197:5,9 198:1,7 200:19 201:16 202:10 202:19 205:23 211:13 212:17 212:23 213:2 213:15,17 216:7,17,20 217:1,5,9,13 221:7 222:24 223:3,13 224:17 232:6 239:18 258:23 264:25 267:12 273:22,24 277:8,15 283:24 286:8 293:14

**tory's** 200:24 215:18
**total** 173:17
**touched** 192:18
**toward** 133:5,7 223:19 248:7 288:19
**track** 260:12 261:7
**tracking** 261:17 262:5
**transaction** 133:23,24 141:9 142:17
**transactions** 146:3 158:24 162:6
**transcribed** 302:7
**transcriber** 300:1
**transcript** 11:13 299:21 300:3,5 301:11 301:12 302:5 302:12 303:5 303:11,17
**transcriptionist** 299:8
**transcripts** 18:21
**transition** 19:6
**transmission** 164:6,14
**transmit** 164:20
**transmitted** 164:24 165:10
**tree** 44:25 49:15 50:6,17 50:18 51:3 62:1,15 65:4 65:11,19,21,24 66:15 67:9,21 68:10 139:8 150:25 152:18 153:16,19 154:2,4,9 155:19,23 157:5,13 159:3 159:14,19 160:5,12,24 161:3 162:13 162:20 164:7 165:12,12 202:13,14 216:22 254:21 254:21 260:21
**trees** 65:21 157:24 158:6 158:19 159:10 159:14,19 160:7 161:15 162:14,21,24 208:17
**tried** 74:3 105:13 181:17 181:19 256:6
**true** 157:7 242:3 299:9 300:5
**trustee** 4:10,12 4:22 10:22 108:2 120:14 123:23 126:1,2 177:20 204:11 204:17,21,25 205:13,14 215:1,4 219:11 219:13,16,20 247:15,20,22 248:3,8,14 250:10 251:22 252:1
**trustee's** 205:9
**truth** 12:4,4,5
**truthful** 108:8 108:11
**try** 20:2 40:5 42:18 74:4 122:9,17
**trying** 40:24 78:8,13 81:2 111:20 165:2 168:21 175:15 269:8
**tuesday** 1:12 119:16
**turn** 24:12 73:4 132:25 152:25 155:15 170:13 189:9 190:7

204:24 246:16 246:19 260:4
**turnaround** 263:3
**turned** 190:14
**twenty** 172:9 172:11 194:16
**two** 14:9 43:11 47:2 49:11 50:3 87:22 101:8 112:15 123:5 138:4 147:24 151:6 165:18 168:5 179:2,11 198:12 228:22 239:6 270:3
**type** 182:19 223:10
**types** 141:6
**typewriting** 299:7
**typical** 283:9
**typically** 59:6 61:15,23 81:15 146:20 175:1

**u**

**u.s.** 4:10,12,13 4:22
**u.s.c** 6:12
**ucc** 252:14 253:15 254:3,9
**ultimately** 200:22 203:9 203:13 237:23
**umbrella** 43:17 43:20
**unaware** 127:19 297:14
**under** 6:11 11:16 13:22 15:13 43:17 44:19 45:4 47:8 51:20 73:3 81:9,24 92:13,16 123:18 124:11 151:14 196:16 196:20 198:21 204:7 205:7 209:18 267:19 286:9
**undergoing** 110:10
**underlies** 30:17
**underneath** 267:22
**understand** 11:12 12:21 13:11,16 19:20 24:5 26:10 27:12,16 36:20 78:13 81:3 92:1 98:7 106:19 108:20 111:22 121:24 143:3,8 145:13 160:24 172:2 180:8,18 208:4 220:15 230:13 235:16 258:16 261:17 273:21 284:1 292:9
**understanding** 26:13,17,19 27:25 32:13,14 35:7 45:21 46:20 89:22 97:13 104:24 107:2 115:1 135:17 136:14 137:2 143:12 147:11 154:12 161:2,12 165:16 172:3 173:14 180:22 182:3 183:17 188:4,19 189:1 189:6 190:13 193:14 200:8 205:2 207:10 209:2,8,15 210:21 211:5 213:15 218:1 231:13 237:1,9 237:16 254:16 257:15,18 262:14 273:25 283:20 284:17 289:5 290:6,18
**understood** 45:3 75:25 159:13 208:14 209:2,5 253:13 273:23 292:3 293:9
**undertake** 46:2 46:11,14 56:11 59:25 60:14 88:3 109:23 111:11
**undertaken** 73:25
**undertook** 51:23 52:4
**undervalue** 287:25
**unexecuted** 164:6 165:11
**unexpired** 153:9
**united** 1:1 10:22
**unrelated** 19:6
**unsecured** 2:10 10:10,12,15 269:25
**unsigned** 66:14 154:23,24 160:5 162:12
**update** 201:21 203:21
**updated** 6:20 13:5 127:1

130:20
**updating** 201:24
**upper** 41:3
**usc** 195:4 196:16
**usdoj.gov** 4:16
**use** 30:22 54:14 145:3 146:18 146:22 147:1,5 147:8,9,16,21 148:1 149:4 150:4,11,18 219:15
**used** 25:10 26:7 26:11 29:6,16 31:5,13,22 54:17 142:15 146:17,24 208:17 244:23 269:7,11,14
**useful** 258:17
**uses** 11:15
**using** 32:5 58:4 147:3,6 149:18 150:8 174:12 190:24 210:14 232:8,14
**utilized** 245:3 271:15

**v**

**v** 97:24
**vague** 127:13 210:15 216:10
**valley** 44:25 45:3 49:15,23 50:6,13,17,18 50:21,22 51:3 62:1,10,15 65:4,11,16,18 65:20,23 66:15 67:9,21 68:10 139:7 150:25 151:10,14,17 151:20 152:18 153:15,19 154:2,3,8 155:19,23 156:14 157:5 157:13 158:20 158:22,24 159:3,13,19 160:5,12,20,24 161:3,6,7 162:6,8,13,20 164:7 165:11 165:12 179:8 180:4,10,17,19 183:19 202:13 202:14
**valuation** 218:14 252:11 260:9 262:15 286:2 291:20 291:20,22 292:8,12 294:3 294:19 296:14 297:4,10,15 298:8
**valuations** 215:22 261:25 272:4
**value** 93:6,7,10 93:21 105:24 106:2,5 129:16 206:3 215:5,14 215:19 216:5 219:17 224:4 224:12 242:19 255:6,14,20 256:9,25 257:20 263:23 273:12 281:6 282:5,20 283:8 290:23 291:6 291:10,15,24 292:8,12
**valued** 295:24
**values** 217:19 218:7 297:24
**various** 33:13 98:23 106:21 109:11 123:15 139:8 141:6,8 147:12 150:19 208:21 209:3
**vendor** 140:2
**verde** 45:5 49:18,23 139:7 139:7 140:13 140:13,18,19 270:9,10,13,19 271:5,13 272:1 272:22 273:21 274:2
**veritext** 11:7 301:1,7 304:1
**veritext.com.** 301:17
**version** 152:6
**versus** 140:2
**veto** 143:14
**viability** 244:13 244:14,19 245:22,25 246:13 248:18 259:22
**viable** 246:24 259:23
**vicki** 10:17 192:15
**vicki.buter** 3:9
**victoria** 3:4
**videographer** 4:20 10:2 68:15 118:14 118:17 167:8 167:11 191:4,7 228:24 229:2 244:5,8 298:11
**videotaped** 1:9 10:3
**view** 55:9 96:3 136:2

**viewed** 48:19
**violate** 36:3
**violation** 237:3
**vis** 271:5,5
**volume** 71:15 71:16,20,25 301:8 302:4,9 303:4,13 304:20

**w**

**wade** 5:13 44:7 45:13,14,19,25 46:14 60:3,5 95:22,23 197:24 201:22 211:13
**wade's** 60:7 201:23
**waived** 301:19
**waiver** 95:3,8,9 95:13,18,24,25 97:3,8
**waivers** 96:9 96:14,16,24
**wakefield** 278:20
**walk** 283:25
**walnut** 2:16 199:16
**want** 19:18 24:15 30:4,6 37:9 40:9 68:7 85:18 118:10 132:10,12 138:6 139:24 169:2 171:2 178:22 181:15 193:10 244:2 253:12 268:14 274:17 279:12 279:18 293:24
**wanted** 13:5 125:15 139:3 158:20 219:7
**wants** 202:4
**warn** 292:20
**warned** 290:13 292:19 293:1
**way** 20:1 31:4 31:12 37:20 76:10 115:18 117:10 123:2 135:10 137:25 138:23 160:2 172:24 174:11 181:15 192:17 213:7,10 232:22 233:7 236:23 247:1 248:11 251:1 252:20 253:2 274:15 284:12 287:2
**ways** 148:1
**we've** 88:8 125:5 132:15 167:5 173:6 175:5 268:17 289:23
**weak** 286:9,13
**weather** 286:7
**week** 182:19,19 225:14,18,23 294:8
**weekly** 143:23 177:14 245:5 296:25
**weeks** 87:22 165:18
**weigh** 251:23
**weighted** 273:19
**wendt** 179:3,5 179:17,22 180:3,15,21 181:1,9,11,14 181:17 182:7 182:22 183:1,5
**went** 42:11 58:24 290:14 290:19
**western** 1:2
**whatsapp** 24:22 25:21 26:7 31:6,8
**whatsoever** 213:3
**where'd** 55:12
**whittaker** 4:13
**who've** 21:25
**wholesale** 121:16
**willing** 122:3 246:19
**window** 59:5 121:18,22 126:3 166:18
**wired** 207:2
**withdraw** 18:12,18
**witness** 11:4,11 11:12,23 12:3 13:8 16:14,22 17:15,22 18:2 18:7,16 22:15 22:22 23:13 24:1 26:24 27:8,18 29:11 29:22 30:7 32:11,21 34:9 35:6,23 36:8 36:16 37:6,16 38:2,17 41:9 42:5 43:1 48:10,24 49:10 49:22 50:11 51:11,18 52:17 53:16 57:11,24 58:21 59:16 60:25 62:9,20 63:15 64:1,10 65:14 66:1,7 67:3,14 69:25 70:7,21 71:1,6

72:3 74:18 75:8,19 77:1 77:19 78:6,18 79:19 81:20 82:6 83:4,24 86:3 87:3 91:25 93:5,17 94:19 95:7,15 95:22 96:6,23 100:13 104:3 104:12 106:25 107:6,11,18,23 108:4,10,17 109:7,16 110:2 110:12,22 111:6,17 112:2 112:10,24 116:2 117:16 127:15 128:13 129:15,25 131:1 135:9,24 136:11,18 137:7,16 139:20 140:11 141:1 142:21 144:6 145:16 149:9 151:22 152:20 153:18 154:11 155:10 157:17 158:3 158:10,17 159:8,23 160:20 161:6 161:20 162:5 162:16 163:5 163:17 165:24 166:6 169:5,17 170:1 172:1 173:13 174:21 176:8,14 180:7 181:3 182:9 183:3 184:1 185:10 186:7 186:15 188:3 188:25 189:14 189:23 190:12 190:23 191:17 191:23 192:3 193:13,25 195:10,16 196:8 197:8 198:16 199:4 202:25 204:14 204:21 205:5 205:12,21 209:12 210:18 211:3 212:22 213:5,25 214:8 216:12 219:22 220:6 223:9 224:16 227:6 231:2,12 233:17 234:25 236:2,10 237:8 241:20 242:6 243:24 246:2 247:5,12 248:2 248:11 249:3,9 253:1,7,25 254:6,13 255:24 257:23 258:8 261:2,10 261:24 262:8 265:9 267:3 269:5 270:25 271:19 272:7 272:15 273:4 273:17 275:22 276:5,11,22 277:3,23 279:21 281:11 281:19 282:9 282:23 283:13 283:18 284:25 286:17 287:16 288:7 289:7 291:1 292:24 295:2,10,18 296:5 297:10 297:18 298:2 299:4 301:8,11 302:1,4,11 303:1,4,15

**witness'** 301:14

**word** 97:16,20 97:22

**words** 93:1 124:17 134:24 280:5

**work** 19:11 22:8 23:11 43:6 108:5 115:17,18 122:12 124:22 124:22 133:5,7 172:5 173:15 174:5 185:12 192:17 193:7 223:18 238:7

**worked** 20:13 21:21,25 22:3 22:4 106:10 175:14,20,25 244:16

**working** 21:10 21:13 172:22 177:16 194:17 202:17 225:23 244:18 293:8 293:10

**worth** 207:16 242:11 294:7 294:14 295:7 295:16

**would've** 15:17 26:25 28:14 33:25 53:23 57:25 60:8 66:17 80:5 85:7 104:15,15 111:17 115:18 118:8 145:20 155:4 160:13 235:1 245:3 246:19 247:12 255:10,11,17

255:24 261:2 261:14 265:2 269:14,19 272:16,25 273:19 275:14
**wright** 164:13
**writes** 201:25 225:11
**writing** 89:13 89:20 277:13
**written** 11:20 79:9 83:10 89:23 180:14 189:2 194:8,12 245:2
**wrong** 77:20 97:23 184:5
**wrote** 134:12 141:14 208:11 241:20 242:4

**x**

**x** 5:1,6 6:1 7:1 8:1 299:21

**y**

**ye** 165:15
**yeah** 13:7 16:9 16:14,22 17:15 17:16 18:16 19:25 22:18 26:24 29:11 32:11 35:6,23 36:16 37:6 38:2,3 40:25 49:10,22 51:11 52:17 53:11 56:14 57:11,14 59:16 60:3,25 62:9,20 63:15 64:11 65:6 67:3,14 69:25 74:18 77:13 90:4 91:25 96:19 98:21 100:13 104:3 105:9,11 110:22 115:21 118:13 119:1,5 119:11,15,21 124:13 132:13 132:14 137:16 145:16 146:12 150:14 157:6 157:17 158:10 159:8,23 161:20 162:5 162:16,19 163:5,17 165:24 167:7 168:2 169:17 170:1 172:1,21 173:13 174:21 176:15 177:1 179:1 180:7 182:14,14,15 182:19 183:3 184:6,11 188:3 188:25 189:14 189:23 190:12 193:13,13 197:8,23,23 201:23 204:21 207:18 211:3 213:25 214:8 214:23 216:12 224:16 226:5 242:6 244:4 245:20,22 248:11 253:1,7 253:25 254:19 254:24 255:3 257:23 259:10 261:24 262:8 266:9 269:5 272:7,15 273:4 274:19 277:14 279:21 281:11 284:25 287:16 288:7 291:1 292:24
**year** 23:24 80:17 90:1 190:2
**years** 64:2,2 172:9,11,12 194:15

**z**

**zach** 10:14 131:25 185:20
**zachary** 2:12
**zfairlie** 2:18

Federal Rules of Civil Procedure

Rule 30

(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

(2) Changes Indicated in the Officer's Certificate. The officer must note in the certificate prescribed by Rule 30(f)(1) whether a review was requested and, if so, must attach any changes the deponent makes during the 30-day period.

DISCLAIMER: THE FOREGOING FEDERAL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF APRIL 1, 2019. PLEASE REFER TO THE APPLICABLE FEDERAL RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS

COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the foregoing transcript is a true, correct and complete transcript of the colloquies, questions and answers as submitted by the court reporter. Veritext Legal Solutions further represents that the attached exhibits, if any, are true, correct and complete documents as submitted by the court reporter and/or attorneys in relation to this deposition and that the documents were processed in accordance with our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining the confidentiality of client and witness information, in accordance with the regulations promulgated under the Health Insurance Portability and Accountability Act (HIPAA), as amended with respect to protected health information and the Gramm-Leach-Bliley Act, as amended, with respect to Personally Identifiable Information (PII). Physical transcripts and exhibits are managed under strict facility and personnel access controls. Electronic files of documents are stored in encrypted form and are transmitted in an encrypted

fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.