UNITED STATES BANKRUPTCY COURT
FOR THE WESTERN DISTRICT OF MISSOURI
KANSAS CITY DIVISION

________________________________

IN RE:

DCA OUTDOOR, INC., et al., Case No. 25-50053-11

Debtors.

________________________________

# VIDEOTAPED DEPOSITION OF JOHN HALL IN HIS INDIVIDUAL CAPACITY AND AS 30(B)(6) CORPORATE REPRESENTATIVE FOR LEWIS RICE LLC

VOLUME II

DATE: Wednesday, September 23, 2026

TIME: 9:03 a.m.

LOCATION: Shook, Hardy and Bacon, LLP
2555 Grand Boulevard
Kansas City, MO 64108

REPORTED BY: Kathleen Behrens

JOB NO.: 8450794

A P P E A R A N C E S

ON BEHALF OF FRONTIER FARM CREDIT:

VICTORIA BUTER, ESQUIRE
LISA PETERS, ESQUIRE
Kutak Rock, LLP
1650 Farnam Street, The Omaha Building
Omaha, NE 68102-2103
vickie.buter@kutakrock.com
lisa.peters@kutakrock.com
(402) 346-6000
(402) 661-8609

ON BEHALF OF OFFICIAL COMMITTEE OF UNSECURED CREDITORS:

MARK COLE, ESQUIRE
ZACHARY R.G. FAIRLIE, ESQUIRE
ANNA SCHULER, ESQUIRE
Spencer Fane, LLP
1000 Walnut, Ste. 1400
Kansas City, MO 64106
mcole@spencerfane.com
zfairlie@spencerfane.com
aschuler@spencerfane.com
(816) 474-8100
(972) 324-0300

A P P E A R A N C E S (Cont'd)

ON BEHALF OF OFFICE OF THE U.S. TRUSTEE:
ADAM MILLER, ESQUIRE
Office of the U.S. Trustee
Charles Whittaker U.S. Courthouse
400 East 9th Street
Kansas City, MO 64106
adam.e.miller@usdoj.gov
(816) 512-1957

ON BEHALF OF FOCUS MANAGEMENT GROUP:
TIM DAVIS, ESQUIRE
Bryan Cave Leighton Paisner, LLP
1200 Main St., Ste. 3800
Kansas City, MO 64105
tim.davis@bclplaw.com
(816) 374-3200

ON BEHALF OF LEWIS RICE LLC:
RUSSELL SHANKLIN, ESQUIRE
Shook, Hardy and Bacon, LLP
2555 Grand Avenue
Kansas City, MO 64108
rshanklin@shb.com
(816) 474-6550

A P P E A R A N C E S (Cont'd)

ON BEHALF OF DCA OUTDOOR, INC.:
COLIN GOTHAM, ESQUIRE
Evans & Mullinix, P.A.
7225 Renner Road, Suite 200
Shawnee, KS 66217
egotham@emlawkc.com
(913) 962-8700

ALSO PRESENT:
Brent King, CTP Managing Director, Glass Ratner
Ryan Tory, Client Representative, Observing
Josie Ellerman, U.S. Trustee Program
Andrew Parry, Videographer

# I N D E X


| EXAMINATION: | PAGE |
|---|---|
| By Ms. Buter | 314 |
| By Mr. Miller | 504 |
| By Mr. Davis | 516 |
| By Mr. Gotham | 522 |


## E X H I B I T S


| NO. | DESCRIPTION | PAGE |
|---|---|---|
| Exhibit 63 | Email from L. Parres to DCA Outdoors Employees, 08/25/25 | 331 |
| Exhibit 64 | Email from L Peters to L. Parres, 05/29/25 | 340 |
| Exhibit 65 | Email Chain Between J. Hall, L. Parres, Alex Tricola-Walkanoff, 06/16/25, Inventory PIT Reports | 348 |
| Exhibit 66 | Email from Alex Tricoli-Walkanoff to J. Hall, 06/16/25, Inventory PIT Reports | 352 |
| Exhibit 67 | Email from Lewis Rice to Focus Management, 06/16/25, Updated Inventory Analysis | 354 |
| Exhibit 68 | Email from J. Hall to Focus Management, Adequate Protection Chart/Exhibit, 08/20/25 | 356 |

E X H I B I T S (Cont'd)

| NO. | DESCRIPTION | PAGE |
|---|---|---|
| Exhibit 69 | Email Chain from Brooks Kelley to L. Parres, 02/24/25 | 374 |
| Exhibit 70 | Email from Benjamin Zaslav to J. Hall and L. Parres, 03/10/25 | 376 |
| Exhibit 71 | Email from Geoffrey Solomon, SFT Capital to J. Hall, 05/09/25, Financial Assistance | 377 |
| Exhibit 72 | Email from Samantha to Multiple People, 09/01/25, Triple Net Lease | 381 |
| Exhibit 73 | Email Chain between Ms. Schwartzkopf and Summit, 08/25/25 | 400 |
| Exhibit 74 | Email from T. Schwope to J. Hall, 09/04/25, Settlement Proposal | 406 |
| Exhibit 75 | Email from T. Schwope to Juanita Schwartzkopf, 08/25/25, Joint Motion | 418 |
| Exhibit 76 | Email Chain, 09/11/25, Update of Hearing | 422 |
| Exhibit 77 | Email Chain, 09/29/25, Docket Entry Terms of Deal Between Committee and Frontier | 426 |
| Exhibit 78 | Email from Juanita Schwartzkopf to S. Drapekin Audit Status | 429 |

E X H I B I T S (Cont'd)

| NO. | DESCRIPTION | PAGE |
|---|---|---|
| Exhibit 79 | Email Chain Between J. Hall and Nick Mizaur, Creative Planning/BKDV | 433 |
| Exhibit 80 | Email Chain Between N. Mizaur and Juanita Schwartzkopf, 03/24/25 | 434 |
| Exhibit 81 | Email Chain from N. Mizaur to L. Parres, DCA Declaration, 2023 Audit Engagement Letter | 436 |
| Exhibit 82 | Follow-Up Email from L. Parres to Jill Parsons, Application to Employ Professional by Debtor, 04/07/25 | 438 |
| Exhibit 83 | Email from Jill Parsons to L. Parres, 04/09/25, Interim Order Approving Bergan KDF | 439 |
| Exhibit 84 | Email from Jill Parsons to L. Parres, 04/09/25, Interim Order Approving Bergan KDF | 441 |
| Exhibit 85 | Email Chain Between L. Parres and J. Hall, 04/02/25, Application to Employ Professional by Debtor | 447 |
| Exhibit 86 | Text Messages Extracted from 07/13/25 Bates Nos. 105-179 | 453 |

E X H I B I T S (Cont'd)

| NO. | DESCRIPTION | PAGE |
|---|---|---|
| Exhibit 87 | Text Messages, 27 Pages | 502 |
| Exhibit 88 | Emails from L. Parres to Samantha Schwope and J. Hall, 07/25/25, Transaction Between Tory Schwope and Debtors | 505 |

QUESTION INSTRUCTED NOT TO ANSWER

| PAGE | LINE |
|---|---|
| 510 | 6 |

P R O C E E D I N G S

THE VIDEOGRAPHER: We are on the record. This is the continued videotaped deposition of John Hall. Date is September 23, 2026. Time is 9:03 a.m.

Will all parties please state their name and who they represent?

MS. BUTER: Victoria Buter, Kutak Rock. I represent the Frontier Farm Credit entities.

MS. PETERS: Lisa Peters, Kutak Rock, and I represent Frontier -- the Frontier Farm Credit entities. And also with us today is a client representative, Ryan Tory.

MR. COLE: Mark Cole of Spencer Fane on behalf of the Official Committee of Unsecured Creditors.

MR. FAIRLIE: Zach Fairlie, Spencer Fane, on behalf of the Official Committee of Unsecured Creditors.

MS. SCHULER: Anna Schuler, Spencer Fane, on behalf of the Official Committee of Unsecured Creditors.

MR. KING: Brent King, CRO, DCA Outdoor.

MR. MILLER: Adam Miller, Office of the

United States Trustee, and also with me is Josie Ellerman.

MR. DAVIS: Good morning. This is Tim Davis for Focus Management Group.

MR. SHANKLIN: Russell Shanklin of Shook Hardy on behalf of Lewis Rice and the witness.

WHEREUPON,

JOHN HALL,

called as a witness and having been previously duly sworn to tell the truth, the whole truth, and nothing but the truth, was examined and testified as follows:

EXAMINATION

BY MS. BUTER:

Q Okay. Mr. Hall, good morning.

A Good morning.

Q Just to remind you, you're still under oath from yesterday's swearing in. I assume you know that.

A I do.

Q Okay. Yesterday when we finished up, we were talking about Topic 22, the appraisals and valuations. Prior to your deposition, what did you do to prepare for that topic?

A Spoke with Larry Parres, reviewed time records, reviewed emails, reviewed the -- in particular, the efforts to cooperate with Frontier on

the efforts to obtain the appraisals.
Q Anything else?
A That's all I can think of now.
Q Did you speak with anyone from Focus about valuation or appraisal issues to prepare for your deposition?
A No.
Q Did you speak with anyone from Bergan who conducted the '23 and '24 audits for the debtors in preparation for your -- to testify on Topic 22?
A No.
Q Sticking with the valuation issue and valuation question, at some point, did Lewis Rice learn that there were potential issues in the way in which the debtors accounted for the value of their inventory?
A My understanding in speaking with Mr. Parres and Mr. Goerisch, that during depositions in August of 2025 that some issues were raised about accounting procedures and methods.
Q Before the depositions in August of 2025, did Lewis Rice have any knowledge or understanding about potential issues in the accounting or valuation practices of inventory of the debtors?
A I think Frontier at some point had

complained about the -- how the auditors had accounted for inventory.
Q Do you remember specifically what the concerns of Frontier were regarding the auditors' accounting of inventory?
A Not specifically.
Q You indicated that during the depositions, Lewis Rice learned of some potential issues with how inventory was valued. What issues were those?
A I don't recall the specific issues that were raised that -- I don't recall the specific issues.
Q Okay. Was it a concern to Lewis Rice when those issues were raised that the inventory values as stated by debtors may be overstated?
A I don't think there was a concern with Lewis Rice other than the checking with the auditors or the audit reports to see if those complied with accounting standards.
Q So Lewis Rice's follow up to those issues was to check with the auditors to see if the valuation methods complied with auditing standards -- accounting standards?
MR. SHANKLIN: Objection. Form.
THE WITNESS: Again, I was not involved in that discussion or follow up, and I didn't review

that level of detail in preparation for this.
BY MS. BUTER:
Q Is there a reason you didn't review that level of detail before your deposition when valuation was a topic, number one, and obviously clearly an issue in the underlying bankruptcy?
MR. SHANKLIN: I just object to the question, that it's argumentative. I'll also state that valuation as a topic is not sufficiently specific to have put the witness on notice that that is something that he had to prepare for.
You may answer.
THE WITNESS: Yeah. That level of detail and specificity was not something that was delineated in -- in the topics, so I did not drill down to that level in detail and specificity of -- of the topic.
BY MS. BUTER:
Q So just to follow up on your counsel's comment, in light of everything that was raised during the depositions and in the bankruptcy with regard to the value of assets owned by the debtors, Lewis Rice did not believe that Frontier or the committee would be asking about the detail of the valuations that were applied to the inventory in this case?

MR. SHANKLIN: And again, object to the question as argumentative, and I would again state for the record that in order for a 30(b)(6) to reasonably prepare, which is what he's required to do, there must be -- it must be reasonably specific. And just the word "valuation" is not enough to put the witness on notice as to every specific issue you may go into. And if you wanted him to be prepared, it should have been delineated as such.

You can answer.

THE WITNESS: Yeah. The topic certainly was not specific enough to raise any notice to -- to us, to Lewis Rice, that we should investigate that level of detail specificity at that -- based on the list in the 30(b)(6) notice.

BY MS. BUTER:

Q Okay. Going back to what actually occurred during the bankruptcy, particularly in the latter months when Lewis Rice was involved, was Lewis Rice aware that Frontier at least had raised concerns about the application of the FAR market layer adjustment?

A I've heard that term, yes.

Q Did you do anything to analyze or prepare for your deposition today to determine what the FML issues were?

MR. SHANKLIN: Objection. Scope.
THE WITNESS: No. Because it wasn't identified in the -- in the topic list.
BY MS. BUTER:
Q And you personally, it sounds like, do not have any knowledge as to what the FML issues were in the underlying case?
A I do not.
Q During the -- Lewis Rice attended depositions of Focus during the bankruptcy; correct?
A Yes.
Q And Lewis Rice attorneys attended the deposition of Bergan during the bankruptcy; correct?
A That's my recollection.
Q Okay. Is Lewis Rice aware that one of the issues raised with regard to the value of the inventory was how the debtors were capitalizing their costs and when they were relieving that from inventory?
A This is my personal recollection, given that I didn't investigate that on behalf of -- as corporate representative. I recall discussions to that effect at a high level. I was not involved in the -- the depositions or the specifics of how the auditors handled FAR market layer issues.

Q Did you review any deposition testimony from the bankruptcy in preparation for your testimony today?
A No.
Q Do you have any knowledge as to what steps Lewis Rice took to analyze or investigate whether in fact there was a cost capitalization issue in the manner -- in the way in which the debtors were valuing their inventory?
A Again, in my personal capacity, I do not know what steps were taken.
Q And you did not investigate that for a 30(b)(6) topic?
A I did not.
Q Was Lewis Rice aware that certain of the debtor entities did not make their FAR market layer adjustments monthly but rather did so every six months?
A Again, I did not review that level of specificity in preparation for this deposition.
Q So you don't know if Lewis Rice was generally aware of that issue?
MR. SHANKLIN: Objection. Scope.
THE WITNESS: And what was the issue?
//

BY MS. BUTER:
Q The issue is whether certain debtor entities made their FML adjustments every six months as opposed to every month on their books and records.
MR. SHANKLIN: Same objection.
THE WITNESS: Yeah. I can't speak to that.
BY MS. BUTER:
Q Do you know, sitting here today as Lewis Rice's corporate representative, whether Focus in their deposition agreed that because certain debtor entities only made that adjustment every six months, that the balance sheet for those entities was inaccurate for ten months of the year?
MR. SHANKLIN: Scope.
THE WITNESS: Again, as corporate representative, I did not read or memorize the depositions of Focus Management, so I can't speak to what Focus Management said or did.
BY MS. BUTER:
Q Would it have been important to Lewis Rice during the course of the bankruptcy to understand that Focus, the financial advisor for the debtors, as you described them, believed that the balance sheets for certain entities were inaccurate for ten months of the

year?
MR. SHANKLIN: Objection. Scope. Form.
THE WITNESS: Again, as corporate representative, I did not investigate that issue. My personal recollection is that there's always concerns about accurate financials and that given that there were audited financial statements and -- and ongoing audited -- auditors preparing and Focus Management preparing financial statements, that we deferred all information and accuracy to the financial advisors to give us the information that would be appropriate.
BY MS. BUTER:
Q "Deferred all to the financial advisors and the auditors." Is that what you said?
A Deferred our understanding of the financial information to the parties that were retained by the estate to prepare that information.
Q As corporate representative for Lewis Rice, are you aware that Bergan also testified that, in light of the timing of the FAR market layer adjustments for certain debtor entities, that their balance sheets would have been inaccurate for ten months of the year?
MR. SHANKLIN: Objection. Scope.

THE WITNESS: Again, as corporate representative, I did not review depositions of Bergan or what Bergan stated.

BY MS. BUTER:

Q Did you know that personally at any time?

A I did not.

Q Would that have been important for you to know in your representation of the debtor entities?

MR. SHANKLIN: Objection. Scope. Form.

THE WITNESS: Not me. Other parties and -- and attorneys were dealing with those issues.

BY MS. BUTER:

Q And who was that?

A Larry Parres primarily.

Q Now, did you understand as corporate representative for Lewis Rice that the FML adjustment was a key component of how inventory was valued by the debtors?

A Lewis Rice was aware of the FAR market layer adjustment process that was used by the auditors and that Frontier complained about it during the bankruptcy case.

Q Did Lewis Rice take any steps other than deferring to Focus and Bergan to evaluate whether the

debtors were in fact overstating the value of their inventory in light of how they applied the FAR market layer adjustment?

A I'm aware of conversations that Larry Parres had with Focus Management to that effect to understand the FAR market layer accounting process.

Q And did Lewis Rice conclude that the inventory as stated -- the inventory value as stated on the books and records of the debtors was in fact overstated as a result of the use of the FML?

A I don't believe there was any conclusion one way or the other that it was overstated or understated.

Q Did Lewis Rice independently undertake any efforts to understand the FML accounting adjustment that was made by the debtors?

MR. SHANKLIN: Objection. Scope.

THE WITNESS: Yeah. Again, in preparation for this as corporal representative, I did not review the specifics of any investigation that any attorney at Lewis Rice undertook into FAR market layer adjustment.

BY MS. BUTER:

Q And you did not do anything personally; is that correct?

A That's correct.
Q In terms of the issues in the underlying bankruptcy, are you aware that prior to the filing of the trustee motion that the parties were preparing for a hearing on cash collateral and whether Frontier was adequately protected?
A Yes.
Q What is adequate protection?
A Well, it's not specifically defined in the bankruptcy code. It can take many, many different forms.
Q Okay. Can you give me a couple of examples of what forms adequate protection can take?
A An equity cushion, cash payments. Those are two of the primary.
Q Is financial performance of the debtor something that is considered in determining whether a secure creditor is adequately protected?
MR. SHANKLIN: Objection. Form.
THE WITNESS: Some courts will consider that.
BY MS. BUTER:
Q Some courts do not consider that?
MR. SHANKLIN: Objection. Form.
THE WITNESS: Some courts in cases, in

my understanding, will consider that. It depends on the nature of the case. If adequate protection is provided in another fashion, then the current performance may not be something that is considered.

BY MS. BUTER:

Q Is the value of the debtor's assets something that is considered generally in determining whether a secure creditor has adequate protection?

A Again, that's one factor that can be considered.

Q Is it an important factor that is considered?

A It can be.

Q Okay. Was it here?

A We did not have a contested cash collateral hearing.

Q Not a hearing. But you were aware that Frontier was challenging whether or not it had adequate protection; correct?

A They raised adequate protection as an objection to cash collateral.

Q And ultimately, there wasn't a hearing. I agree. But did Lewis Rice take steps to address the concerns of Frontier related to adequate protection?

A Yes.

Q What steps did Lewis Rice take to address those concerns?
A To respond to the objection to use of cash collateral.
Q And what was the response by Lewis Rice on behalf of the debtors?
A I can't recite the specifics of the response, but the -- the significant equity cushion and value of the assets provided significant adequate protection to Frontier was one of the responses in -- that we prepared, as well as the performance of the debtor throughout the case and being at an operational cash positive level.
Q So in preparing the response to Frontier's objection, the value of the debtor's assets was something that Lewis Rice argued in response to that; correct?
A That's my recollection.
Q And in addition, their performance -- financial performance, a financial condition of the debtors was something that was argued by Lewis Rice on behalf of the debtors in response to that objection; correct?
A The response speaks for itself. So whatever was in there is -- was the response that we provided.

So whatever we provided in that speaks for itself.
Q And the information that Lewis Rice included in any submissions to the court relating to the value of the debtor's assets, how did Lewis Rice obtain that information?
A In -- from our -- from the financial advisors to the debtors.
Q Did Lewis Rice conduct any independent analysis of the information that it was providing to the court?
A Yes.
Q With regard to value?
A Yes.
Q Okay. What independent analysis did Lewis Rice undertake?
A The debtors retained financial advisors to provide that information to the estate.
Q So Lewis Rice engaged the financial advisors, and that financial advisor was Focus; correct?
A The debtors engaged Focus Management.
Q Debtors engaged. And that was as a result of Frontier requesting a CRO be put in place at the start of the bankruptcy; correct?
A I do not believe that was the case.

Q Okay. Lewis Rice retained financial advisors, obtained information regarding value of inventory and value of assets, and used that information to argue valuation to the court in response to Frontier's objection to cash collateral; is that accurate?

MR. SHANKLIN: Objection. Form.

THE WITNESS: That's fair.

BY MS. BUTER:

Q Okay. And when Lewis Rice received the valuation information from Focus, what steps did Lewis Rice take to determine the accuracy of those valuation numbers?

A Given that we were receiving the information from the parties that were retained to be the expert in that information, there was no additional justification for more cost to double check and -- and back up the parties that we had already -- that the debtors had already retained to prepare that information.

Q Are you aware that based on the fee statements that were submitted to the court, that Lewis Rice attorneys billed approximately $290,000 in addressing cash collateral issues?

A That sounds about right.

Q In preparation for your testimony today and yesterday, did you evaluate at all the performance of the debtors during bankruptcy?

A I reviewed monthly operating reports and some of the information to that effect in the case, yes.

Q And as part of your preparation for your testimony today, did you become aware at all that Bergan issued a 2023 audit for the debtors?

A I am not aware of that. So no, I have not seen that.

Q So is it fair to say that you're also not aware that at the deposition of Bergan, following our questions regarding the valuation methodology, Bergan indicated it may need to restate its 2023 audit of the debtors?

MR. SHANKLIN: Objection. Scope.

THE WITNESS: Again, in my preparation, I did not review specific deposition testimony or deposition testimony of Bergan at that level.

BY MS. BUTER:

Q And just to be clear, did Lewis Rice -- upon receiving the inventory valuations from Focus that they utilized in court filings, did Lewis Rice take any action to follow up on whether the inventory

values were overstated or understated?
A We had -- Lewis Rice relied on its -- on the advisors to the estate that had been retained to prepare that information.
Q Handing you what I've marked as Exhibit 63. Exhibit 63 is an email from Mr. Parres to DCA Outdoors employees, Focus, and CC'ing you and Mr. Goerisch; correct?
(Exhibit 63 was marked for identification.)
A Mr. Goerisch. Yes.
Q Goerisch. I'm sorry. I said his name incorrectly. August 25th of 2025; correct?
A Yes.
Q Mr. Parres is reporting on a deposition that took place that day it appears. Does that sound accurate to you?
A Yes.
Q Did you review this email in preparing for your deposition?
A I can't specifically recall whether I reviewed this email, 'cause I reviewed thousands.
Q Mr. Parres reports that, "The deposition went fairly well. He stood behind his work, but did say he will look at the following to determine if the

inventory values need to be restated for 2023." Do you see that?
A Yes.
Q Does this refresh your recollection at all that perhaps Bergan indicated they may need to restate their 2023 audit of the debtors?
A The email speaks for itself. I was copied on it. I'm sure I saw it.
Q Do you recall any internal discussions at Lewis Rice about the fact that the 2023 audit may need to be restated to account for some of the issues Frontier was raising regarding valuation?
A Yes.
Q What do you recall?
A That there were discussions generally to that effect and that -- that Mr. Parres would be speaking with Ms. Schwartzkopf and with Bergan to that effect.
Q Was it concerning to Lewis Rice that the 2023 audit issue by Bergan may have been problematic and overstated the value of the inventory?
A I believe the understanding was that any adjustment would -- would be something that would not change the adequate protection levels or the inventory levels below -- or an overall valuation below any debt

levels, that it was -- while material, it was not anything that impacted the -- the adequacy of any protection -- adequate protection that was being provided or the equity cushion that existed.
Q What data did Lewis Rice rely upon to reach that conclusion?
A The information that was being provided by the financial advisors.
Q Specifically, do you know what that information was?
A I do not.
Q There are a few things that Mr. Parres lays out in this Exhibit 63. Subsection A, he notes, "Harvest & Load." Do you have any understanding sitting here today what the issue was with the accounting practices related to the Harvest & Load costs?
A I do not.
Q What about outbound freight? Do you have any understanding sitting here today of the issues with regard to how outbound freight was accounted for?
A I do not.
Q In Subsection D, Mr. Parres says, "This is just for SBTF." I think that Schwope Brothers Tree Farms; correct?

A That would be a reasonable assumption.
Q He said, "But given the cushion we have, we might still be okay." Do you see that?
A I see that.
Q Okay. Mr. Parres, in this email at least, did not indicate that they would be okay at this point; is that correct?
A His email says what it says.
Q Do you personally believe that an equity cushion existed within the evaluations of the debtor's inventory?
A From every -- all the information that I had seen and was working with, yes.
Q Okay. How much of an equity cushion?
A Oh, I -- I can't give you specific numbers. I don't recall the --
Q And what was it -- what was your opinion that there was an equity cushion based on?
A Financial information that had been provided.
Q Did Focus ever tell you there was a sufficient equity cushion?
A I can't recall a specific discussion to that effect.
Q Did Bergan ever tell you there was a

sufficient equity cushion to protect Frontier?
A Well, both of them provided financial information that showed significant equity cushion.
Q After August 25th of 2025, when it was recognized that adjustments may have to be made to 2023 valuations at least, did Lewis Rice receive any assurances from Bergan about equity and equity cushion that existed?
A Again, I -- I don't know. I can't cite any specific discussions or communications to that effect.
Q Mr. Parres continues in his email that there are -- in Subsection E, there are still other possible issues, including inter-company rent. That's number one. Number two, shrinkage, spoilage, disposal, or dumped inventory. And then number three, matching principle issues. Do you have any understanding of the concerns surrounding those three points?
A I do not.
Q Do you have any knowledge of the shrinkage, spoilage, disposal, or dumped inventory? Subsection two.
A Yeah. The only recollection -- and I did recall reviewing some of this information -- is that there were some issues in Oregon where a -- I believe it was Edmondson [ph] was trying to dump and dispose

of some of the debtor's inventory.
Q Are you aware of any inventory that was destroyed at Brehob during the time that the debtors were in bankruptcy?
A I'm not aware of anything to that effect.
Q Did Lewis Rice have conversations with the debtors about whether or not they were destroying or taking action with regard to any inventory?
A No. I investigated anything about Brehob, and we were not aware of anything regarding Brehob.
Q Did anyone from Bergan ever inform Lewis Rice that there was not a sufficient equity cushion?
A I'm not aware of any conversation to that effect.
Q Mr. Hall, I'm looking, but I don't have a copy of it right here, at an entry from June 22nd of 2025 that you reviewed the 2023 audit report for 1.4 hours. Do you recall doing that?
A Oh, that -- that may well be.
Q But you don't recall?
A Not specifically.
Q Was the 2023 audit report significant for the debtors to obtain during the time period you represented them in the bankruptcy?
MR. SHANKLIN: Objection. Form.

THE WITNESS: The audit and the appraisals were critical to getting to a plan process.
BY MS. BUTER:
Q Okay. The audit was critical. Appraisals were critical, but the debtors did not commission their own appraisals; correct? We established that yesterday?
A Right. That there was not funds available to prepare their own appraisals, and the debtors knew that Frontier was conducting appraisals, which we had been assured would be provided to the debtors.
Q Well, let me pause on that. So first point, just to be clear, the debtors never requested a budget money or budget item for conducting appraisals; correct?
A Frontier made it clear they would not approve anything to that effect.
Q Who at Frontier said that?
A Based on the discussions about every other line item and budget request in -- in cash collateral and DIP request, there was no possibility that Frontier would approve appraisals on top of their own appraisals.
Q Did anybody from Frontier or representing Frontier ever say, "We will not approve a budget item

for appraisals"?
A I can't cite a specific conversation to that effect.
Q And Lewis Rice on behalf of debtors never requested a budget money or money for conducting appraisals; correct?
MR. SHANKLIN: Objection. Asked and answered both today and yesterday.
You can answer.
THE WITNESS: We discussed many, many budget items and line items, and whether there was a specific request for appraisals in that, I don't recall anything to that effect given that Frontier was already conducting appraisals
BY MS. BUTER:
Q Yesterday, I asked you whether there was an agreement between the debtors and Frontier that Frontier would provide the appraisals to debtors, and you said no. There was no agreement.
A There was not an agreement between the debtors and Frontier. There was -- the committee had requested appraisals from Frontier, and the committee had committed that any information to that effect received from Frontier would be provided to the debtors.

Q Okay. So it was not Frontier who agreed; correct?
A Frontier -- agreed to what?
Q To provide the appraisals to the debtors.
A No. But they were aware of that agreement.
Q You indicated that both the audit and appraisals were key to the debtors dealing with their bankruptcy situation; correct?
A They were --
MR. SHANKLIN: Asked and answered.
THE WITNESS: They were critical to formulating and if -- a plan that -- that could be confirmed.
BY MS. BUTER:
Q And because of that, the debtors requested the ability to retain and pay Bergan as their auditor; correct?
A Yes.
Q And Frontier agreed to that; correct?
A That's my recollection.
Q Handing you what I'm marking as Exhibit 64. Exhibit 64 is an email, the bottom of the first page from Lisa Peters to you and Mr. Parres, as well as a couple of other people; correct?
//

(Exhibit 64 was marked for identification.)
A Yes.
Q And then at the top there is an email forwarding Ms. Peters's email from Larry Parres to Juanita Schwartzkopf, Samantha Schwope, Sam Williams, Tory Schwope, and you and a couple of other people; correct?
A Yes.
Q This is on May 30, 2025.
A Yes.
Q So in the Ms. Peters email at the bottom of the first page of Exhibit 64, Ms. Peters states, "The numbers in these cases speak for themselves. The debtors have been unable to meet their own projected cash receipts every single week of these case -- of this case all 12 reported weeks." Do you see that?
A Yes.
Q Was Lewis Rice aware that the debtors had not met their own projected cash receipts forecast every week of the case up until May 29th of 2025?
MR. SHANKLIN: Objection. Scope.
THE WITNESS: Yeah. I didn't go back and review every single reported 12 weeks in preparation for this deposition. My recollection is

that there were -- that the debtors were not meeting their receipts targets during the 12 weeks and that their expense levels were far below expectations as well.
BY MS. BUTER:
Q And then I do want to look at -- if you look at the second page of Exhibit 74 -- I'm sorry -- 64, there is an email from Lisa Peters halfway down the page dated May 29th of 2025, and then at the top of the page, there is an email from Mr. Parres and response in caps below. Do you see that?
A Yes.
Q So if you look at the very bottom of the second page of Exhibit 64, there is a reference in the third paragraph, last paragraph on that page, to the work that Hilco has been doing with regard to the appraisals. Do you see that?
A I see a reference to Hilco. Right.
Q And Ms. Peters states that, "Hilco at this time was unable to reconcile, among other data, the detailed inventory files to the general ledger and borrowing base certificate or sales and gross margin histories to the general ledger." Do you see that?
A Yes.
Q Okay. And Mr. Parres responds in capital

letters. He says, "We are very content with our numbers and have no reason to reconcile the requested numbers, except for the ask by Hilco to do their work." Do you see that?
A Yes.
Q What information or what had Lewis Rice done to determine that it was very content with the numbers as of May 29th of 2025?
A Again, in -- as corporate representative, I was not drilling down to this level of specific detail in a specific email as to what was done or not done or what gave rise to the contentment that Mr. Parres expressed.
My personal recollection is that we had financial information that we were relying upon and had not any basis to dispute, given that the information we had received was based on audited financial reports and provided by our financial advisors to the debtors.
Q And again, as of May 29, 2025, the only -- the last audit report was 2022; correct?
A I believe that is correct.
Q As of May 29th of 2025, when Mr. Parres indicated that he was -- "We are very content with the numbers," had anyone identified the issues that were

later addressed regarding the application of the FAR market layer adjustment and the capitalization in relieving of costs?

MR. SHANKLIN: Objection. Scope.

THE WITNESS: Yeah. As corporate representative, I did not investigate at that level of detail who had knowledge of what and when. My personal recollection is that -- that -- well, I don't have any specific knowledge of anything to that effect.

BY MS. BUTER:

Q Let's go back to the first page of Exhibit 64. In response -- if we look at the email that we were looking at from Ms. Peters, Ms. Peters informs Lewis Rice in her email on May 29th to start the discussion early.

"I do not expect that Frontier is going to consent to any further use of cash collateral beyond June 20, 2025, without incorporating additional financial metrics and limitations and case milestones similar to those we," previously proposed essentially. And then Ms. Peters offers to engage in a discussion about these additional guardrails. Do you see that?

A Yes.

Q In response to that, Mr. Parres, as I noted,

forwarded the email to Focus and to DCA. Mr. Parres states, "Game on. We now have to prove that we have the ability to use cash collateral. It's time to get serious and better our exhibits, the easier the case." Do you see that

A It says, "And the better our exhibits, the easier the case."

Q That is correct. As to that first statement, "It's time to get serious," were the debtors not treating the bankruptcy as serious prior to May 30th?

MR. SHANKLIN: Objection. Form.

THE WITNESS: You'd have to ask Mr. Parres what he means by that.

BY MS. BUTER:

Q Mr. Parres then says, "This deserves our immediate attention." Do you see that?

A Yes.

Q Is it a significant potential issue in a bankruptcy if the secure creditor -- largest secure creditor in the case does not consent to the use of cash collateral?

MR. SHANKLIN: Objection. Form.

THE WITNESS: Yes, it can be.

//

BY MS. BUTER:
Q So saying, "It deserves our immediate attention," was an appropriate response in your view, having practiced in this area for 28 years?
MR. SHANKLIN: Objection. Form.
THE WITNESS: That cash collateral objections are always something that deserve attention.
BY MS. BUTER:
Q Mr. Parres then continues, "I'm inclined to stop all further cooperation as well, but we'll wait for others to tell me why we shouldn't." Do you see that?
A I do.
Q Do you think stopping cooperation with the largest secure creditor in a bankruptcy case furthers the interest of the debtor's estate?
MR. SHANKLIN: Objection. Form.
THE WITNESS: Well, given the level of lack of cooperation that we received from Frontier, I believe it was the -- the concern as to whether or not we would still -- understanding Mr. Parres's comment to be whether we continued to provide that level of cooperation when it wasn't responded in kind.
//

BY MS. BUTER:
Q Okay. You indicate Frontier did not cooperate. Frontier had provided a DIP loan to the debtors by May -- the date of Mr. Parres's email, May 30th; correct?
MR. SHANKLIN: Objection. Form.
THE WITNESS: Yes. After much discussion.
BY MS. BUTER:
Q But that was provided by Frontier; correct?
A Yes.
Q And as of the date May 30, 2025, Frontier had commenced obtaining appraisals in this case; correct?
A That's what -- yes.
Q Okay. As of May 30, 2025, there had been prior cash collateral orders that had been negotiated between the parties and entered in the case; correct?
A After lots of objections, yes.
Q And tell me specifically as of May 30, 2025, how Frontier had not cooperated with the debtors?
A Again, there were many, many objections, fights, disputes about all aspects of the debtor's bankruptcy case, including cash collateral, including DIP financing, including whether we would get

information. There were many, many disputes to that effect that I was aware of and Mr. Parres is certainly aware of more.

Q Okay. And did Lewis Rice conduct any analysis to determine if the objections raised by Frontier were valid and appropriate?

MR. SHANKLIN: Objection. Form.

THE WITNESS: Which objections?

BY MS. BUTER:

Q Well, you didn't specify any with specificity. I'm asking you about the ones you're referring to.

MR. SHANKLIN: Objection. Form.

THE WITNESS: We responded to the objections.

BY MS. BUTER:

Q And ultimately reached -- with regard to DIP financing, reached an agreement; correct?

A The initial DIP, yes.

Q And then reached an agreement with regard to certain cash collateral orders; correct?

A Yes. We were able to obtain eventually consensual cash collateral orders.

Q You're on this email from Mr. Parres dated May 30th; correct?

A Yes.
Q And with regard to his inclination to stop all future or all further cooperation, and he indicates, "We'll wait for others to tell me why we shouldn't." Did you ever tell Mr. Parres that he should or should not stop further cooperation with Frontier?
A We would always talk about how our approach is generally to try to be collaborative and cooperative, notwithstanding how others in a case might participate.
Q And Ms. Peters invited the discussion regarding this issue on May 29th. Do you know if a discussion ever took place?
A Oh, I -- I cannot specifically identify discussions or responses, given the volume that was in this case.
Q Handing you what I've marked as Exhibit 65. Exhibit 65 is an email chain between you, Mr. Parres, Alex Tricola-Walkanoff, and Ms. Schwartzkopf at Focus; correct?
(Exhibit 65 was marked for identification.)
A Yes.
Q The top email is dated June 16th of 2025;

correct?
A Yes.
Q And in the email at the bottom of Exhibit 65, there is an email from Alex indicating he's attaching the revised inventory analysis. The prior analysis had a formula error. Do you see that?
A Yes.
Q And it looks like you reviewed -- based on your response email at the top of page -- the first page of page 65, you reviewed that inventory analysis; is that correct?
A Based on my email, yes.
Q Okay. And you say, "If you're reading these reports correctly, the overall total of all inventory as of 5/31 combining retail, distribution, and production is $149,691,338"; correct?
A Yes.
Q And you say you got there by adding different -- to the different categories; correct?
A It says what it says.
Q Okay. And you say, "This is compared against a total of $154,177,583 as of 2/20, the date of the bankruptcy filing"; correct?
MR. SHANKLIN: Objection. Form.
THE WITNESS: That's what it says.

BY MS. BUTER:
Q Okay. You then note that the combined balance sheet report sent earlier today shows balance sheet inventory of 128,626,276 as of January 1 -- January 31, 2025. Do you see that?
A Yes.
Q And you ask whether debtors increased inventory by 25 million between 1/31 and 2/20; is that right?
A That's what it says.
Q At the time you sent this email on June 16th of 2025, were you aware that the balance sheets for certain debtor entities were inaccurate for ten months of the year?
MR. SHANKLIN: Objection. Scope.
THE WITNESS: I've not heard anything to that effect.
BY MS. BUTER:
Q And were you aware that the inaccuracy that Focus and Bergan agreed with was that the revenue would have been overstated on those balance sheets for those ten months?
MR. SHANKLIN: Objection. Scope. Form.
THE WITNESS: I don't have a specific

recollection of discussion to that effect.
BY MS. BUTER:
Q Why was Alex sending an inventory analysis to Lewis Rice on June 16th of 2025?
MR. SHANKLIN: Objection. Scope. Form.
THE WITNESS: Yeah. As corporate rep, I did not review any -- the emails to that level, so I can't speak to what the background or basis was for that. We received inventory, financial information throughout the case.
BY MS. BUTER:
Q Was there a cash collateral hearing scheduled for June 20th at some point?
A I can't recall the specific date, but that sounds approximately correct.
Q Okay. Is it possible that on June 16th of 2025, the inventory report was being sent and analyzed in preparation for that cash collateral hearing?
MR. SHANKLIN: Objection. Speculation.
THE WITNESS: Yeah. I -- again, I don't know the specific background or basis for why this email exchange took place.
BY MS. BUTER:
Q What did you do to prepare to testify as a

corporate representative on cash collateral issues?
A Reviewed the cash collateral motions, responses, tried to review as many emails as I could, time records. And I think that's -- that's the -- the primary items.
Q Okay. Do you recall reviewing the email that is Exhibit 65?
A I don't have a specific recollection of it, but it's likely that I did.
Q I'm going to hand you what I've marked as Exhibit 66. Exhibit 66, at the top of the first page, is a response from Alex at Focus to you to your email that we just reviewed; is that correct?
(Exhibit 66 was marked for identification.)
A Yes.
Q And he indicates, "There are a couple of reasons that the inventory analysis table I prepared does not tie to the balance sheet." In point one, he notes that, "The inventory analysis spreadsheet comes from the monthly PIT reports that were sent to all parties"; is that correct?
A That we sent to all parties.
Q Okay. And then point two, he notes, "The balance sheet inventory is only adjusted semi-annually

for three of their production entities. The PIT reports are prepared much more frequently and do not reflect the semi-annual adjustments to the production entities." Do you see that?
A Yes.
Q Okay. Did you follow up at all with Alex before or in connection with his comment that the balance inventory -- the balance sheet inventory is only adjusted semi-annually for three of the production entities?
A I don't have a specific recollection of whether I did or did not.
Q Okay. Alex then continues in point three and describes how the current portion of the inventory and the balance sheet for production is reported at NRV, while the non-current portion of the production inventory is reported at cost. He then states in the very last line of point three, "The PIT reports will always show a higher inventory value than what is on the balance sheet." Do you see that?
A Yes.
Q When debtors submitted their inventory valuations to the court, did the debtors utilize the PIT reports that "always show a higher inventory value than what is on the balance sheet"?

A I don't recall which valuation was used.
Q That would be reflected in the submissions and filings with the court; correct?
A Whatever was submitted, yes, would be what we used.
Q Handing you what I've marked as Exhibit 67. Exhibit 67 is an email chain -- continued email chain on June 16, 2025, between Lewis Rice and Focus; is that fair?
(Exhibit 67 was marked for identification.)
A Yes.
Q Okay. And there's a reference in the middle of the first page of Exhibit 67 to Alex from Focus sending an updated inventory analysis; correct?
A Yes.
Q And Mr. Parres responds to Alex and says, "The numbers continue to change. I don't get it. Last week we were told that inventory has grown or increased since the petition date. This report clearly says otherwise. This report needs to be cleaned up." Do you see that?
A I do.
Q Was there concern at Lewis Rice that the numbers that were being provided by Focus "continued

to change"?

MR. SHANKLIN: Objection. Beyond the scope.

You may answer.

THE WITNESS: Yeah. I didn't investigate concerns about reports from Focus specifically in preparation from this. Mr. Parres's email speaks for itself.

BY MS. BUTER:

Q Personally, if you're representing debtors in a bankruptcy, and the value -- the numbers that are being provided by the financial advisor continue to change, would that cause you some concern?

MR. SHANKLIN: Form.

THE WITNESS: There could be concern that we want to get to the final accurate numbers.

BY MS. BUTER:

Q Accurate numbers are important, particularly if you're addressing objections to the use of cash collateral; is that fair?

A They can be important. Sure.

Q Is it an accurate statement that you would always want to make sure that any representations made to the court regarding value are as accurate as they can be?

A You certainly want anything provided to the court to be accurate.
Q Handing you what I'm marking as Exhibit 68. Exhibit 68 is an email from you to Focus CC'ing Mr. Parres, subject, "Adequate Protection Chart/Exhibit"; correct?
(Exhibit 68 was marked for identification.)
A Yes.
Q It's from August 20th of 2025; is that right?
A Yes.
Q And you're preparing for a cash collateral hearing it appears?
A Yes. That's what it appears.
Q And you're working with Focus to prepare a one-page demonstrative exhibit; is that right?
A That's what it says.
Q Okay. You list in the bullet points in the middle of the first page of Exhibit 68 some current value of debtor's assets. Do you see that?
A I do.
Q And you list, "Cash: 2 million?" Is that right?
A Yes.

Q "AR: 10 million?"
A Yes.
Q "Inventory: 140 million?"
A Yes.
Q "FFE: 30 million?"
A Yes.
Q "Other assets: 2 million."
A Yes.
Q No question mark.
A There's not one there.
Q And "Real property: 30 million?"
A Yes.
Q Where did you obtain these numbers from?
A I don't specifically recall.
Q Okay. You don't know what information or report you would have reviewed to put together those numbers?
A It would have been whatever financial information we had been provided and that I had available to me to get to those approximate numbers.
Q Do you happen to have or understand the basis for any of these asset values that are listed in Exhibit 68?
MR. SHANKLIN: Objection. Form.
THE WITNESS: Financial information

that I had been provided.
BY MS. BUTER:
Q By whom?
A The financial advisors to the debtors.
Q Do you know whether the accounts receivable that is listed either here or in the reports that you reviewed was all collectible?
A I -- I cannot speak to collectability of accounts receivable.
Q When you are making an argument opposing an objection to the use of cash collateral and you are representing that there's AR of a certain value available to the debtors, would it be important to analyze whether that AR is in fact collectible?
MR. SHANKLIN: Objection. Form.
THE WITNESS: That's one component in why I have a question mark there.
BY MS. BUTER:
Q Okay. And what steps did Lewis Rice take to analyze whether the AR on the books and records of the debtors was actually collectible?
A We would rely on the financial information given by the financial advisors to the debtors.
Q Do you recall or do you know if Lewis Rice had any conversations with the debtors to determine

whether the AR was collectible?
A We would not duplicate efforts that the financial advisors were undertaking.
Q So you don't recall any conversations with the debtors on that topic?
A I don't specifically have knowledge of that.
Q Do you recall ever learning that there was approximately $3 million of bad AR included in the AR numbers reported by debtors?
A I recall that there was a -- a customer that had refused to pay. I don't know if it was in the range of three million-ish, but I knew that there was that concern out there. I don't know if that was included in the AR reports that we were reviewing.
Q That was going to be my next question. Do you know if that had been backed out?
A That I -- I don't specifically recall one way or the other.
Q Presumably, if there was known bad AR, that should be backed out before representing that that was an asset of the debtors?
MR. SHANKLIN: Objection. Form.
THE WITNESS: I'm not an accountant, but -- but if there's known uncollectible, then -- then that would often be backed out. If it's

uncertain, then there can be percentages applied to that.
BY MS. BUTER:
Q Do you know if any percentages were ever applied to any of the AR in the debtor's books and records based on uncertainty of collectibility?
A I don't have any specific knowledge one way or the other.
Q Were you involved in negotiating some of the cash collateral orders that were entered in this case?
A Yes.
Q Were you aware that the cash collateral orders that were entered prohibited the debtors from using Frontier's cash collateral --
MR. SHANKLIN: Objection. Form.
MS. BUTER: I haven't finished.
MR. SHANKLIN: I'm sorry.
BY MS. BUTER:
Q For fees incurred in connection with any action that would impair the rights or remedies of Frontier?
MR. SHANKLIN: Objection. Form.
THE WITNESS: I recall those types of provisions.
//

BY MS. BUTER:
Q Okay. What steps did Lewis Rice take to ensure that the cash collateral was not being utilized in any way that would impair the rights and remedies of Frontier?
A We did not -- Lewis Rice did not file any challenge to the -- Frontier's status as a secured creditor.
Q Did Lewis Rice have any basis to challenge Frontier's position as a secured creditor?
A I don't recall any basis for that, and that's why we didn't undertake a challenge to that effect.
Q Other than Frontier's position as a secure creditor, did Frontier have other rights under the various loan agreements that it had with the debtors?
MR. SHANKLIN: Objection. Calls for legal conclusion.
You may answer.
THE WITNESS: Yeah. Yes.
BY MS. BUTER:
Q Did Lewis Rice undertake any action to ensure that the cash collateral was not being utilized to take any action that impaired the rights and remedies of Frontier under the cash collateral orders,

other than not challenging their status as a secure creditor?

A The -- there were no specific bars or barriers or prohibitions that -- that Lewis Rice established, but we advised the debtors as to what their rights and responsibilities would be under a cash collateral order.

Q Do you know if anyone at Lewis Rice conducted any analysis of Lewis Rice's billing records to determine if any fees were being utilized for a purpose that would impair the rights and remedies of Frontier?

A Given that Mr. Parres oversaw the -- the handling of the bankruptcy case, his oversight would be the guardrail against anything to that effect.

Q Did Lewis Rice have discussions with the debtors about Frontier's adequate protection requests?

A Can you specify what Frontier's adequate protection requests?

Q Sure. I'll ask you a question. Are you aware of any requests made by Frontier during the course of the bankruptcy for adequate protection?

A I can't specifically recall what requests were -- were made. I -- I can't specifically recall what requests were made.

Q So is it fair to say you don't recall having discussions with debtors about any requests that Frontier made for adequate protection?

A No. I think there were discussions to that effect. I just can't recall the specific requests that Frontier was making and what was done in response.

Q Do you know whether Frontier ever indicated it would request adequate protection payments?

A My recollection is that they did, but it wasn't for payment -- loan -- pre-petition loan payments. Or interest.

Q Are you aware of any violations of any cash collateral order during Lewis Rice's tenure as counsel for the debtors?

MR. SHANKLIN: Objection. Calls for legal conclusion.

THE WITNESS: I can't recall whether Frontier asserted any violations, but I'm not aware of any violations.

BY MS. BUTER:

Q Did you take any steps to analyze that prior to your deposition?

A No.

MR. SHANKLIN: Objection and calls for

legal conclusion.
You may answer.
THE WITNESS: As corporate representative, I did not review any level of detail regarding any allegations of potential violation of a cash collateral order, nor was I aware of any allegation to that effect.
BY MS. BUTER:
Q I'm going to move to Topic 25, which is information related to 341 meetings and U.S. Trustee meetings. You're familiar with a 341 meeting; is that right?
A Yes.
Q What is a 341 meeting?
A It's a meeting of creditors under Section 341 of the bankruptcy code in a Chapter 11. It's conducted by the United States Trustee of a -- a debtor representative as to operations and finances of the debtor.
Q What is the purpose of a 341 hearing?
A Well, in a Chapter 11, it's the United States Trustee trying to establish what issues, if any, the debtor may have, ensure that things like insurance, employees, the payroll, things of that nature are in place. In a Chapter 7 case -- well, as

well as a Chapter 11 case -- creditors can appear, ask questions, and ask questions of assets and liabilities of the debtor.
Q In your experience as a bankruptcy and insolvency attorney, have you attended 341 meetings for your clients -- with your clients?
A Yes.
Q Have you done so in a Chapter 11 case?
A Yes.
Q Did Lewis Rice -- was Lewis Rice involved in preparing the debtors for the 341 hearings that took place in this matter
A As corporate representative, I've looked into that and spoken with Mr. Parres about the 341 preparation for this case.
Q Okay. What was, kind of, the preparation that took place of the debtors for the 341 hearing?
MR. SHANKLIN: Objection. Form. Vague.
You can answer.
THE WITNESS: Yeah. As -- as I understand, there were discussions between Mr. Parres, Scott Moore of our office with Samantha Schwope, Jess DeGregorio, and Tory Schwope as to what would be expected types of questions to expect at a 341 meeting

and to become familiar with the schedules.

I believe there was specific direction to Tory Schwope to really know the schedules and know the information, so that they would be equipped to respond to the U.S. Trustee

BY MS. BUTER:

Q And the schedules that Mr. Schwope would have been instructed to review were the set of schedules that were filed in this case; correct?

A For each of the -- yeah, each of the debtors.

Q Prior to the second three -- were there two 341 meetings in this case?

A I -- I believe that's the case, yes.

Q Prior to the second 341 meeting, Ms. Schwartzkopf had identified errors in at least three of the scheduled filings. Do you recall that?

A I recall that there were some -- yeah, some corrections that needed to be made.

Q Those schedules never ultimately got made. Those schedules never -- let me rephrase that. Did the schedules ever get amended during the tenure of Lewis Rice?

MR. SHANKLIN: Objection. Scope.

You may answer.

THE WITNESS: Yeah. I -- I didn't go into schedules and amendment of schedules, 'cause I didn't understand those to be part of any of the topics. I don't recall whether any amendments to the schedules were made and whether that was -- yeah. I don't recall.

BY MS. BUTER:

Q Did you attend either of the 341 meetings in this case?

A No. No.

Q Were you present --

A Personally? No.

Q Were you present for part of a 341 hearing?

A Not that I recall. I -- it's possible that I was listening in on a 341 meeting, but I don't recall specifically doing that. My time records would reflect that one way or the other.

Q Are you aware that -- in reviewing emails and preparing for the 341 Topic 25, are you aware that after the 341 meetings, the U.S. Trustee sent an email to Lewis Rice asking who was present at the 341 meetings on behalf of the debtors?

A I don't have specific knowledge of a particular email to that effect.

Q Okay. You did not review that in

preparation for your deposition today?
A Well, I reviewed --
MR. SHANKLIN: I would just object to the scope to the extent that the topic says, "Strategy and approach with respect to 341 meetings."
You can answer.
THE WITNESS: Yeah. I -- I did not investigate post-341 meeting discussions.
BY MS. BUTER:
Q In your preparation for this topic, which includes the strategy for the 341 meetings, did you become aware that a side text chain was set up between members of -- or representatives of the debtors who were testifying Focus on Lewis Rice?
MR. SHANKLIN: Objection to form.
THE WITNESS: Yes. In discussing with Mr. Parres last week, yeah, I understand that there was a text chain established so that information could be provided to the U.S. Trustee.
BY MS. BUTER:
Q And have you reviewed those text chains?
A I have not.
Q You did not review those text chains in preparation for your deposition today?
A I did not.

Q Were you on the text chains?
A No.
Q Is it your typical practice when you are attending a 341 hearing on behalf of a debtor who is testifying to have a side chat or some kind of communication with the debtors?
MR. SHANKLIN: Objection to form.
THE WITNESS: Given that -- if -- if it's remote, then there has to be a way to communicate with the -- the client.
BY MS. BUTER:
Q So have you done that before?
A I don't -- I don't have specific knowledge of any time that I've done that, because I believe I've always attended in person.
Q Do you believe it's appropriate for a lawyer during a remote 341 hearing to instruct the witness who is answering the U.S. Trustee's questions how to answer?
MR. SHANKLIN: Objection. Form. Argumentative. Calls for legal conclusion.
THE WITNESS: The purpose -- an attorney should always assist in providing information to the U.S. Trustee in a 341 meeting, and attorneys often provide that type of information to assist in

responding to the U.S. Trustee.
BY MS. BUTER:
Q And so during the actual testimony of the debtors during a 341 hearing, do you believe it is appropriate for a lawyer to be providing answers to that debtor while the testimony is ongoing without disclosing that to the U.S. Trustee?
MR. SHANKLIN: Objection to form. Objection to calls for expert opinion.
You may answer.
THE WITNESS: I mean, attorneys in a 341 are always providing information to the debtors to assist in responding to questions by U.S. Trustee, sometimes answering the questions directly by the U.S. Trustee.
BY MS. BUTER:
Q Do you -- does Lewis Rice approve of attorneys coaching 341 witnesses during a 341 exam?
MR. SHANKLIN: Objection. Argumentative.
THE WITNESS: Lewis Rice would always assist debtors in responding to questions by the U.S. Trustee at a 341 meeting.
BY MS. BUTER:
Q Do you know if the side chats and the

information that was provided by Lewis Rice attorneys to the debtors during their questioning, was that ever disclosed to the U.S. Trustee?

MR. SHANKLIN: Objection. Form.

THE WITNESS: I don't have any specific knowledge about that.

BY MS. BUTER:

Q If you were representing a debtor at a 341 hearing, would you coach that debtor how to answer a question while the debtor was answering that question without disclosing it to the U.S. Trustee?

MR. SHANKLIN: Objection. Argumentative.

THE WITNESS: I would assist a debtor in responding and clarifying and correcting any information that the debtor may not have or may have gotten wrong.

BY MS. BUTER:

Q Would you disclose that to the U.S. Trustee if you did that?

MR. SHANKLIN: Objection. Calls for speculation.

THE WITNESS: I would -- in my -- my experience, I've always been sitting there, so it's easy for the U.S. Trustee to see that I'm providing

information to the debtor to provide that information to the U.S. Trustee.

BY MS. BUTER:

Q And if you were participating in a remote hearing and you provided information to the debtor to answer a question, would you disclose that?

MR. SHANKLIN: Objection. Calls for speculation

THE WITNESS: Possibly. I'm not aware of any requirement or regulation to do that, but I'd have to assess that and review that and under the circumstances and see if that would be appropriate or not necessary.

BY MS. BUTER:

Q Is one of the purposes of a 341 meeting to disclose information to the U.S. Trustee and to the creditors of the debtors?

MR. SHANKLIN: Objection. Form.

THE WITNESS: The -- the purpose is for the U.S. Trustee to ask questions and for the debtors to respond to those questions.

BY MS. BUTER:

Q And the purpose of the debtor responding to those questions is to disclose information to the U.S. Trustee and to the creditors who are asking questions?

MR. SHANKLIN: Objection. Form.
THE WITNESS: The purpose is to answer the questions that are posed, and if there's a request for information, then information is provided to the best of the debtor's ability.
BY MS. BUTER:
Q Over the course of Lewis Rice's representation of the debtors, did the debtors receive potential inquiries from third parties about potential purchases of debtor assets?
A Is this on a topic -- a specific topic?
Q I'm asking you generally, and then we're going to move into talking about that. And it's in connection with the plan of reorganization.
MR. SHANKLIN: Objection to scope.
You may answer if you know.
THE WITNESS: Yeah. I -- I recall we spoke yesterday about Erlene Krigel's client reaching out about some potential interest in asset purchase, and I believe there may have been some other inquiries. I can't cite to specific instances.
BY MS. BUTER:
Q Handing you what I've marked as Exhibit 69. Exhibit 69 is an email chain from February 24, 2025. It's from a Kelley Brooks at SRS Distribution. Do you

see that?
(Exhibit 69 was marked for identification.)
A Brooks Kelley. Yes.
Q I'm sorry. Brooks Kelley to Larry Parres; correct?
A Yes.
Q In the email that Brooks Kelley sends to Mr. Parres, they note, "We are familiar with the Brehob Nurseries and KAT Wholesale businesses, which are both competitors of ours, and would be very interested in acquiring those assets if ownership is open to entertaining an offer." Do you see that?
A I do.
Q And then Mr. Parres forwards this to Mr. Schwope and you as well and says, "Interesting note. Tory, how does this play out?" Do you see that?
A I do.
Q Do you recall any response from Mr. Schwope regarding this potential purchase opportunity or sale opportunity, I should say?
A I don't have specific knowledge of any response from Tory in February of 2025.
Q At this time, had the debtors communicated to Lewis Rice that they were not interested in selling

any of the companies?
MR. SHANKLIN: Objection. Scope.
THE WITNESS: Oh, I don't -- I don't recall any indication that there would never be any interest in a sale.
BY MS. BUTER:
Q Do you know whether Lewis Rice had communicated to Frontier prior to February 24th of 2025 that a sales process was not on the table?
A I believe in -- Larry Parres at one time had indicated that and another time had indicated that -- or I think in that same indication that -- that sale of some or parts of the -- of the debtors would be considered.
Q And in connection with this particular email, do you know if either Lewis Rice or the debtors followed up with SRS Distribution?
A Again, in -- as a corporate representative, I did not drill down to that level of review. I can't specifically recall whether there was any further discussion.
Q Do you recall if any kind of bid or offer was made for the nurseries by SRS Distribution at any time?
A I'm not familiar with any specific

bid/offer.
Q Handing you what I've marked as Exhibit 70. Exhibit 70 is an email from Benjamin Zaslav at Hilco Global; is that correct?
(Exhibit 70 was marked for identification.)
A Yes.
Q March 10th of 2025 to you and Mr. Parres; correct?
A Yes.
Q And in this email of March 10th of 2025, Hilco is indicating that they're interested in providing valuation, auction, or brokerage services for the property scheduled in the above named petition; correct?
A Yes.
Q And they also note in the second paragraph that they are "the nation's leader in the sale of distressed assets and specialize in overcoming complex bankruptcy situations for our clients. We can complete a successful national bankruptcy sales process in as early as 90 days from retention." Do you see that?
A Yes.
Q Did anyone from Lewis Rice follow up with

Hilco about a potential sales process?
A I don't specifically recall whether anybody from Lewis Rice did or did not.
Q Did you?
A Again, I don't specifically recall whether I responded to this email or not.
Q Handing you what I've marked as Exhibit 71. Exhibit 71 is an email from a jeffreysolomon@sftcapital.com; is that right?
(Exhibit 71 was marked for identification.)
A Yes.
Q Dated May 29th of 2025?
A Yes.
Q And this is to you; correct?
A Yes.
Q Mr. Solomon indicates he is contacting you to see if SFT Capital can be of assistance in helping you get financial transactions completed on attractive terms for your clients. Do you see that?
A Yes.
Q And then it gives some background about SFT Capital; is that right?
A Yes.
Q Do you know whether anybody from Lewis Rice

ever talked with SFT Capital about how they could assist in helping with financial transactions on attractive terms?

A I don't have any specific knowledge of that response given that we had our financial team in place.

Q Do you have any recollection of reaching out personally to SFT Capital after you received this email?

A I don't specifically recall reaching out to them.

Q Did you discuss this at all, if you recall, with the debtors?

A I can't specifically recall whether I did or did not.

MS. BUTER: Do you want to take a short break? We've been going about an hour and a half, and I'm about to switch topics.

MR. SHANKLIN: Okay.

THE VIDEOGRAPHER: It's 10:29 a.m. We are off the record.

(Off the record.)

THE VIDEOGRAPHER: Time is 10:51 a.m. We are on the record.

//

BY MS. BUTER:
Q Mr. Hall, I have a couple of questions just going back on a couple of things that we talked about earlier. I had asked you about whether Lewis Rice had engaged in any kind of analysis of trees that might have been being destroyed or inventory that might have been being destroyed. Do you recall that line of questioning?
A Yes.
Q And I think you referenced something that you're aware of from Oregon; is that right?
A Yes.
Q Schwope Brothers West Coast was a debtor in this case; correct?
A That's correct.
Q Were you -- at any time, did Lewis Rice become aware that trees were cut down at Schwope Brothers West Coast in May of 2025 and left to die?
MR. SHANKLIN: Objection. Scope.
THE WITNESS: Oh, yeah. I didn't investigate anything like that as corporate representative, and I personally have never heard anything to that effect.
BY MS. BUTER:
Q In May of 2025, the debtors were debtors in

possession in the bankruptcy; correct?
A The debt -- yes.
Q And they would have owed an obligation to the estate -- the debtor's estate; correct?
MR. SHANKLIN: Objection. Calls for legal conclusion.
THE WITNESS: Debtors have duties to the estate.
BY MS. BUTER:
Q Throughout your involvement in this case, did you ever learn from anyone that debtors in May of 2025 had cut down trees at the Schwope Brothers West Coast facility and left them to die?
MR. SHANKLIN: Objection. Asked and answered.
THE WITNESS: No.
BY MS. BUTER:
Q Suffice to say you did not then know the potential value of those trees that were cut down and left to die?
MR. SHANKLIN: Objection. Form.
THE WITNESS: No. Yeah. Did not know that.
BY MS. BUTER:
Q And you do not know why those trees might

have been cut down and left to die; is that fair?
MR. SHANKLIN: Objection. Form.
THE WITNESS: I have no specific knowledge about any trees being cut down.
BY MS. BUTER:
Q In your role personally as representing the debtors in this case, if the debtors were taking inventory that could have been sold for value and leaving it to die, is that something you would have wanted to know?
MR. SHANKLIN: Objection. Calls for speculation.
THE WITNESS: Yes.
BY MS. BUTER:
Q Yesterday, you were asked some questions by Mr. Cole about a Valley Hill Tree triple net lease. Do you remember those questions?
A Yes.
Q I'm handing you what I've marked as Exhibit 72. When you discussed the Valley Hill Tree lease with Mr. Cole, I think you indicated that Lewis Rice became aware of that lease after their representation of debtors ended. Is my recollection correct?
(Exhibit 72 was marked for identification.)

A No.
Q When did Lewis Rice become aware of that Valley Hill Tree triple net lease?
A The -- based on my review, the lease was in a data room that had been -- that the debtors had prepared. So it was in the data room.
Q Was the lease reviewed by anyone at Lewis Rice prior to the end of Lewis Rice's representation?
A I did not review that issue or detail as corporate representative. I don't have a specific recollection of whether it was reviewed. I know there were discussions about what leases were in place and the status of those leases.
Q And then Exhibit 72, Samantha Schwope sends an email on September 1st of 2025 to Focus and to Lewis Rice, including you, attaching several leases. Is that correct, or is that what appears to be?
A Yes.
Q And I'll represent to you that there were several leases attached, according to the attachments. I only printed out the Valley Hill triple net lease, because that's the one that is a topic in Topic 17. So attached to this email was a triple net lease between -- or purported to be between DCA Land Kentucky and Valley Hill Tree Farm; correct?

A That's what it looks like, yes.
Q Is this lease signed?
A I don't see any signatures on this copy.
Q When Lewis Rice received this lease, either in the data room or on September 1, 2025, did Lewis Rice conduct any analysis of the fact that there was no signed lease between DCA Kentucky and Valley Hill Tree Farm?
A Again, in my investigation, I did not drill down to that level, and I don't specifically recall what investigation may or may not have been taken.
Q Do you know more specifically whether Lewis Rice conducted any analysis of whether the -- as a result of the fact there was no signed lease, the assets of Valley Hill Tree Farm could be utilized for the benefit of the debtors?
MR. SHANKLIN: Objection. Form.
THE WITNESS: I don't have a specific recollection or knowledge of anything to that effect one way or the other.
BY MS. BUTER:
Q In a Chapter 11 bankruptcy, is it important for the debtors to identify potential assets that fall within the debtor's estate?
MR. SHANKLIN: Objection. Form.

THE WITNESS: Yes.
BY MS. BUTER:
Q At any of the debtor entities where inventory, such as trees, was being grown, did Lewis Rice become aware at any time of any trees left to die by the debtors even if they were not cut down?
MR. SHANKLIN: Objection. Beyond the scope.
THE WITNESS: Yeah. As corporate representative, I did not investigate or inquire as to anything to that effect, and I've never heard anything to that effect in my personal capacity.
BY MS. BUTER:
Q Did you personally ask questions of the debtors about their preservation of assets, including inventory, at the various debtor entity locations?
A I recall discussions that we had about the care/maintenance of inventory and how -- what was being done with respect to the inventory and status of the inventory.
Q During that time period, did it ever become apparent to Lewis Rice that some of the inventory -- plant inventory was being left to die?
MR. SHANKLIN: Objection. Asked and answered. Beyond the scope.

THE WITNESS: Yeah. As corporate representative, I did not inquire into anything to that effect, 'cause it was not as part of any topic. And I've never heard anything to that effect in my personal capacity.

BY MS. BUTER:

Q A motion to appoint a Chapter 11 trustee was filed in this case; correct?

A Yes.

Q Did Lewis Rice foresee or predict that a motion to appoint a Chapter 11 trustee might happen?

MR. SHANKLIN: Form.

THE WITNESS: I did not investigate that as corporate representative, but I believe, given the fact that Frontier had threatened the receiver, that there had been some contemplation of the possibility of that.

BY MS. BUTER:

Q Based on the issues that had been identified throughout the discovery that had taken place in the bankruptcy, when the motion to appoint a trustee was considered, what steps did Lewis Rice take to evaluate whether that might be an appropriate avenue for the debtors?

MR. SHANKLIN: Objection. Form.

THE WITNESS: Whether what would be an appropriate avenue?
BY MS. BUTER:
Q The appointment of a Chapter 11 trustee.
A Oh. We would meet with the debtors, talk to the debtors' financial managers, and try to assess what would -- whether an appointment of a trustee would destroy value of the debtors.
Q And who did you have those discussions with?
A Debtors management, Focus Management Group primarily.
Q Who within debtors management?
A Certainly Tory Schwope, Samantha Schwope, possibly Jessica DeGregorio. There may be some others that I am forgetting now, but those would be the primary parties.
Q During those discussions, was there an analysis of whether the actions of Mr. Tory Schwope were decreasing the value of the debtors' estate?
MR. SHANKLIN: Objection. Form. Objection. Scope.
THE WITNESS: There was an analysis as to whether a trustee would impair value of the estate.
BY MS. BUTER:
Q Right. And you said that, and that's why

I'm asking whether there was a counter analysis of whether the actions of Tory Schwope during the bankruptcy might have implicated negatively the value of the assets in the estate?

MR. SHANKLIN: Same objections.

THE WITNESS: There was assessment of what value Tory Schwope provided to the debtors.

BY MS. BUTER:

Q And what was that assessment as of the time that the trustee motion was filed?

MR. SHANKLIN: Objection. Form. Scope.

THE WITNESS: Yeah. As corporate representative who didn't investigate that, my recollection is that -- that given -- that the -- the conclusion was that Tory's integral nature and importance to the sales side of the business was an imperative asset of the -- of the debtors.

That -- and that without Tory Schwope handling sales, orders, management of inventory, that there would be a significant and drastic impairment of value of the debtors by the appointment of a trustee, loss of customers, loss of orders, loss of sales, particularly with respect to the spring 2026 season, which is one of the two high seasons of the debtors'

operations.
BY MS. BUTER:
Q The motion for appointment of trustee did not seek to remove Tory from the debtors; correct?
A It sought appointment of a trustee with all management authority.
Q The motion to appoint the Chapter 11 trustee did not seek or require that Tory be no longer employed by the debtors; correct?
A The motion itself did not.
Q Okay. And so the items that you just described and the value that Tory was bringing to the debtors could have continued after the appointment of a trustee if he were still with the debtors; correct?
MR. SHANKLIN: Objection. Form.
THE WITNESS: Only if Tory would continue voluntarily working with the debtors.
BY MS. BUTER:
Q Okay. Did Tory tell you, if a trustee was appointed, he would not voluntarily stay with the debtors?
A As -- I didn't investigate that as corporate representative, but I recall discussions where Tory expressed grave reservations about whether or not he could continue in some diminished capacity with the

debtors as part of a liquidation.
Q Because Tory wanted to stay in control of the debtors; correct?
MR. SHANKLIN: Objection to form
THE WITNESS: Not correct.
BY MS. BUTER:
Q Okay. I do want to direct your attention to Topic 8 on the 30(b)(6) notice. It is Lewis Rice's knowledge of Tory Schwope's stated desire to remain in control of the debtors, including his resistance to the appointment of a governing board, Chapter 11 trustee, and his interest in purchasing the debtors assets from bankruptcy by an Everde deal.
I would argue that the analysis Lewis Rice conducted in connection with what the response to the motion for trustee is within the corporate representative topics designated, and so I just want to understand that you did not investigate as a corporate representative everything Lewis Rice did to analyze the motion for appointment of trustee and determine whether to oppose it or not?
MR. SHANKLIN: Objection. It is beyond the scope -- beyond the express wording. It says, "Lewis Rice's knowledge of Tory Schwope's stated desire to remain in control of the debtors, including

his resistance to the appointment of a governing board, Chapter 11 trustee, and his interest in purchasing the debtor's assets from bankruptcy." It is limited to Lewis Rice's knowledge of Tory Schwope's stated desire.

MS. BUTER: We disagree.

BY MS. BUTER:

Q But did you review or think it was important to review for your deposition today Lewis Rice's analysis of how to act in response to the motion for trustee?

A I reviewed the -- the motion, the response to the motion, and the email discussions around that time as to what the response would be.

Q How long -- and I'll just ask this too. You were a lawyer representing the debtors from day one of this bankruptcy; correct?

A Yes.

Q And you were a lawyer all the way through the trustee hearing that took place in September; correct?

A Yes.

Q And even separate and apart from the Lewis Rice investigation, a motion to appoint a Chapter 11 trustee is quite serious; correct?

MR. SHANKLIN: Objection to form.
THE WITNESS: Yes.
BY MS. BUTER:
Q And you personally, I assume, would have taken steps to analyze that motion to determine what the appropriate response would be on behalf of the debtors?
A Yes.
Q When did Lewis Rice decide that it would oppose the motion to appoint a trustee?
MR. SHANKLIN: Objection. Beyond the scope.
THE WITNESS: Yeah. I can't recall whether -- in my personal capacity whether we had any kind of advance indication that there would be a trustee motion. So I can't speak as to when specifically, but certainly once we received the motion, we reviewed it and then started assessing the response.
BY MS. BUTER:
Q Did Tory Schwope want to oppose the motion for appointment of a trustee?
A After we spoke with him, yes.
Q And did Tory Schwope believe he would lose control of the DCA entities if a trustee was

appointed?
A That's what the motion sought.
Q And Mr. Schwope opposed the appointment of a trustee in part because he would lose control; correct?
MR. SHANKLIN: Form.
THE WITNESS: No. Not correct.
BY MS. BUTER:
Q That had no -- in your view, that had no impact on Mr. Schwope's decision to oppose the appointment of a trustee?
A In -- my understanding was that he opposed because appointment of a trustee would substantially impair the value of the debtors.
Q And the value of the debtors was Mr. Schwope's relationships, working in sales apparently, and what you described earlier; is that correct?
A That's part of his value.
Q And that value could have continued after the appointment of a Chapter 11 trustee if Mr. Schwope stayed with the debtors; correct?
MR. SHANKLIN: Asked and answered. Calls for speculation.
THE WITNESS: Assuming -- and that assumes that he would continue with the debtors.

BY MS. BUTER:
Q So it was either no trustee, or if there's a trustee, there was not Tory Schwope?
MR. SHANKLIN: Objection. Misstates the testimony.
THE WITNESS: Yeah. I don't -- no determination had been made to that effect.
BY MS. BUTER:
Q You indicated that Mr. Schwope believed that the appointment of a U.S. Trustee would impair -- or Chapter 11 trustee -- I'm sorry -- would impair the value of the bankruptcy estate?
A Yes.
Q How?
A It would destroy sales going forward. It would -- there would be an immediate loss of customers. It would impair the ability to maintain trees and inventory at the level that customers expected. The spring 2026 season depended on orders being taken in the fall of 2025, which Tory was integral to. Things of that nature.
Q How would the appointment of a trustee coming in to manage overall the financial and other aspects of the company impair the sales of the company, the spring sales of the company, the customer

relationships, if the trustee came in and just took over management and the day-to-day operations remained the same?

A Everybody -- in my understanding. Didn't investigate this as corporate representative, but my understanding is that all parties in the industry, large customers were certainly aware of whether a trustee would be appointed, and their knowledge of that would cause a drastic loss of customers and confidence.

Q And did Lewis Rice conduct an independent investigation into whether that was accurate or not?

A None was necessary.

Q Why not?

A Because we had the information that we needed to make that assessment already.

Q What information did you have?

A The financial information, discussions with management, all of the information that had been provided up to that date.

Q All the information up to that date told you that if a trustee was appointed, customers may not buy from the bankrupt -- the debtors' identities?

A We could see the trend lines. We knew what was involved. We spoke with Tory, who is essential or

a large player in the industry, tried to understand what the implications would be by appointment of a trustee. Our experience generally, appointment of a trustee being a drastic remedy, unusual remedy, unusual step in a bankruptcy case, it causes a loss of customers and value of -- of a business.

Q Did Lewis Rice talk to any customers to determine whether the appointment of a Chapter 11 trustee would impact their willingness to purchase from the debtors?

MR. SHANKLIN: Objection. Asked and answered. I believe that question was answered yesterday.

THE WITNESS: Lewis Rice didn't interface with customers. That was the job of the business itself.

BY MS. BUTER:

Q And while Lewis Rice was analyzing the steps to take in response to the motion for trustee, Mr. Schwope indicated that if one was appointed, he may leave the debtors; is that right?

A As corporate representative, I didn't investigate that level of detail, but my recollection was that if the business were going to be subject to a trustee and moving towards liquidation, that Tory

would have significant reservations about continuing with that. Because there would no longer be any value to the business of sales if it was going to a liquidation.

Q And you indicated earlier that part of Lewis Rice's assessment was that Tory Schwope was bringing value to the companies in what he was doing; correct?

A That was the conclusion.

Q And Mr. Schwope therefore was willing, if a trustee was appointed, to leave the debtors and destroy the value that he believed came from his presence of the debtors?

MR. SHANKLIN: Objection to form.

THE WITNESS: If -- if a liquidation were undertaken, then he had concerns about what purpose he would have going forward.

BY MS. BUTER:

Q Did the motion for appointment of a trustee suggest that a liquidation would be required if a trustee was appointed?

MR. SHANKLIN: Objection. Beyond the scope.

THE WITNESS: Anytime a trustee is appointed, then that is a common and likely result.

//

BY MS. BUTER:
Q Okay. But my question was, did the motion make any kind of demand or requirement that the trustee liquidate if a trustee was appointed?
MR. SHANKLIN: Scope.
THE WITNESS: Yeah. I didn't review that level of specificity in connection with this, but I don't recall a specific demand to that effect.
BY MS. BUTER:
Q You were involved in opposing the trustee motion; correct? Personally.
A Yes.
Q Yeah. And so you knew it fairly well, I would imagine, what was asked?
A A year ago I did.
Q Okay. When you say that Tory had concerns about the liquidation, what do you mean by liquidation?
A Sale of businesses, assets, inventory not as a going concern and no -- with no intent for the continuation of the business as it has been operating.
Q Tell me if I'm wrong, and I'm sure you will. But when a trustee is appointed in a Chapter 11 case, is it the trustee's obligation to assess all options to determine what would best benefit the debtor's

estate?

MR. SHANKLIN: Objection. Calls for a legal conclusion.

THE WITNESS: A trustee is subject to a business judgment, and whatever business judgment the trustee undertakes has to be supported.

BY MS. BUTER:

Q If a trustee was appointed as was requested in the motion and Mr. Schwope remained with the debtors, would that mean that, in your view, the debtor entities would maintain their value?

MR. SHANKLIN: Objection. Calls for speculation.

THE WITNESS: Yeah. I -- I didn't investigate that. We didn't discuss that, and I can't offer an opinion one way or the other to that effect.

BY MS. BUTER:

Q Did Lewis Rice ever conduct any kind of liquidation analysis in connection with its role as counsel to the debtors?

A Other than reviewing all the financial information that we have been provided that assessed value of the business, that was the -- that's what we used to assess value of the business. There was not a separate liquidation analysis which would be

undertaken as part of a plan process, because we had not gotten the elements of the plan agreed to.

Q And when you say, again, you hadn't had the aspects of a plan agreed to, you're talking about agreed to by the committee and Frontier?

A Primarily.

Q Okay. Who else?

A United States Trustee we would want to have a weigh in.

Q Okay. And in preparing the elements of the plan that was discussed yesterday, just to be clear, one of the analyses that went into determining the appropriate plan did not include a liquidation analysis by Lewis Rice?

A The -- the elements, the terms that were proposed, were elements of the plan itself, not the liquidation analysis. That is not something that is negotiated as part of a plan and nor did anybody request that as part of the plan term process.

Q Going to hand you what I've marked as exhibit 73. Exhibit 73 is an email chain that starts with a communication on the back two pages between Ms. Schwartzkopf and Summit. And ultimately, on the second page of Exhibit 73, Summit Investment forwards Ms. Schwartzkopf a draft term sheet on August 25th of

2025. Do you see that? And it's on the second page about halfway down.

(Exhibit 73 was marked for identification.)

A Yes.

Q Okay. And then that gets forwarded by Ms. Schwartzkopf to various individuals, including Mr. Parres and you; correct?

A Yes.

Q And then if you go to the bottom of the first page of Exhibit 73, you say -- you forward this to Mr. Drapekin; correct?

A Correct.

Q And you say, "New DIP loan term sheet just for laughs." You see that?

A I do.

Q What do you mean by "just for laughs"?

A I suspect that it was very expensive, and so it was -- would be very difficult for a debtor to afford.

Q And you say to that note or to that tune, "Am I reading this right, that it's about 1.2 million fees, interest and expenses"; right?

A That's what I say.

Q And that would be expensive for this level

of financing?
A It seemed that to me.
Q And this Summit term sheet was for potential DIP financing that the debtors needed at this time; correct?
A It was for potential DIP financing given that we did not have an agreement in place with Frontier for additional DIP financing.
Q And Lewis Rice had decided to pursue options other than Frontier for DIP financing on behalf of the debtors; correct?
MR. SHANKLIN: Objection. Form.
THE WITNESS: We were always pursuing alternatives and trying to find a -- an alternative DIP financing if that made sense.
BY MS. BUTER:
Q In this August 2025 time period, did the debtors receive any other potential term sheets for DIP financing?
A I -- I did look at this. I believe there were other DIP term sheets that were being -- I can't remember if they've been provided by Focus or if they had just been discussed.
Q At any time, did Lewis Rice ever ask Frontier to provide a second DIP loan?

A I believe it was asked or we either understood that Frontier had made it clear that they would not provide a second DIP loan if Tory were still in management of the debtors.
Q This Summit term sheet -- you indicate that in your email when you referenced "just for laughs," it was because it was pretty expensive financing. Is that a fair characterization of your testimony?
A That's what it seemed to me.
Q Do you know if Lewis Rice or Focus or the debtors were able to reduce the expenses from this draft term sheet that Summit was going to charge?
A I don't have a specific recollection as to whether or not there was any reduction.
Q And this Summit term sheet, I think you indicated yesterday, Lewis Rice did present to the court as a DIP financing option; is that correct?
A That's correct.
Q You then state in this email, "Frontier filed to appoint trustee. Case is about to collapse." Do you see that?
A I see that.
Q What did you mean by "case is about to collapse"?
A If a trustee were appointed, then the case

would collapse into a liquidation.
Q You knew that for certain?
A That's the normal result. That was my assumption and expectation.
Q Okay. Mr. Drapekin responds and says, "So Frontier wants a receiver trustee. Are they saying the collateral is losing value?" Do you see that?
A I see that.
Q And you respond and you say, "No. Really complaining about mismanagement, lack of plan to exit bankruptcy, running out of cash in a couple of weeks, and a lot of other things"; correct?
A Correct.
Q So Frontier had concerns about mismanagement by Tory Schwope; correct?
MR. SHANKLIN: Objection. Form.
THE WITNESS: As I recall the motion, that was one of the aspects.
BY MS. BUTER:
Q And did Lewis Rice take any steps to investigate the concerns of the senior secured lender about the mismanagement within the debtor entities?
MR. SHANKLIN: Objection to scope.
THE WITNESS: Yeah. I did not investigate that as corporate rep -- corporate

representative, but given that we had worked with the management and worked with the financial advisors throughout, we had made that assessment all along.

BY MS. BUTER:

Q And your assessment was there was no mismanagement within the debtor entities?

MR. SHANKLIN: Objection. Scope.

THE WITNESS: The assessment was that -- that management was very good at sales and -- and trees. They needed additional help in accounting, front office issues, and that's why Focus Management was brought on to assist in that regard.

BY MS. BUTER:

Q Focus Management, while they did provide certain weekly and monthly reports, they were not involved in active day-to-day running of the accounting of debtors; correct?

A Not correct.

Q They were involved?

A Juanita Schwartzkopf was the CRO.

Q Okay. Did she engage in day-to-day accounting for the debtors?

A I don't know Focus's day-to-day management, but we had weekly meetings with them and received weekly reports. So -- and Juanita Schwartzkopf was --

as CRO, had to be involved in management of the debtors.
Q Did Lewis Rice ever assess whether Focus was doing an adequate job as the CRO for the debtors?
MR. SHANKLIN: Objection. Scope.
THE WITNESS: Yeah. I did not investigate anything as corporate representative, and I don't recall any, you know, second review of Focus Management or hiring a separate financial advisor to come in and review Focus Management's work.
BY MS. BUTER:
Q And you did not do any of that personally?
A I'm not equipped to assess a financial manager's day-to-day work.
Q Did you ever suggest that perhaps you should consider utilizing another third party to evaluate the work of Focus?
MR. SHANKLIN: Objection. Form.
THE WITNESS: Again, not as corporate representative. I did not investigate that. And no, I did not make any suggestion to that effect.
BY MS. BUTER:
Q Handing you what I've marked as Exhibit 74. Exhibit 74 is an email chain, which was a settlement proposal initially proposed by Lewis Rice on behalf of

debtors after the trustee motion was filed on September 4th of 2025. Are you familiar with this document?

(Exhibit 74 was marked for identification.)

A I believe, yeah, that I reviewed this. Yes.

Q Did you have any role personally in putting together the settlement proposal that is contained in the second to last page of this document?

A Yeah. I -- I did -- personally, I did not -- was not involved in the line items of this.

Q Who was involved in putting this together?

A Larry Parres.

Q Okay. First point in the bullets that are set forth in the settlement proposal, "Debtors will agree to a seventh interim cash collateral order that will install a new chief restructuring officer, who will have complete control of the debtor's operations and any sales process and any plan of reorganization." Do you see that?

A Yes.

Q There's no reference here to the new CRO having any kind of control over the accounting of the debtors; correct?

A Well, it says, "Complete control over -- of

debtor's operations, any sale process, and any plan of reorganization." Operations would seem to include accounting.

Q Okay. So that does include the financial aspect of the company?

A You'd have to ask Mr. Parres what he meant by that.

Q How do you understand it?

A Complete control of operations say that that was -- that would include accounting.

Q If we go to the third bullet point -- no. I'm sorry. The second bullet point addresses how the new CRO will be selected; correct?

A Yes.

Q Go to the third bullet point. "The new CRO would agree that any budget he or she puts forth will include payroll to all insiders, including Tory Schwope, and the reimbursement of ordinary and reasonable business expenses approved by the new CRO for each employee." Do you see that?

A Yes.

Q At the time this email was sent on September 4th -- I'm sorry -- September 2nd of 2025, were payroll payments being made to all insiders?

MR. SHANKLIN: Objection. Scope.

THE WITNESS: Payroll payments being made to?

BY MS. BUTER:

Q To the insiders of DCA.

A The -- what the monthly operating reports -- whatever the monthly operating reports reflected. I believe there was an insider section that reflected what insider payments were being made.

Q And are you aware of any discussions or any limitations on payments to insiders that were in effect as of September 2nd of 2025?

MR. SHANKLIN: Objection. Form.

THE WITNESS: Again, I didn't investigate that specifically. I believe there were restrictions in the DIP order on payments to insiders except as approved by Frontier or designated in the order.

BY MS. BUTER:

Q And this provision in bullet point three that was put forth in an attempt to resolve the issue of the appointment of a trustee was seeking to make sure that Tory Schwope received payment as an employee; is that correct?

A It -- it mentions that -- that Tory Schwope would be included in payroll.

Q The next point, "The new CRO would agree that payments to insiders for Shaffer's Farm lease, Adams one and two farm lease, the Colonial Garden property lease, and the X Farm lease will continue throughout the case." Do you see that?

A I see that.

Q Prior to September 2nd of 2025, certain of these rent payments had stopped; correct?

MR. SHANKLIN: Objection. Scope.

THE WITNESS: Yeah. I did not investigate that as corporate representative, and I -- I can't recall the status of those lease payments.

BY MS. BUTER:

Q Who owns Shaffer Farms?

MR. SHANKLIN: Objection. Scope.

THE WITNESS: Yeah. That is not something I investigated as corporate representative. I believe that -- no. I -- Shaffer Farm I don't know.

BY MS. BUTER:

Q Do you know X Farm?

A I believe --

MR. SHANKLIN: Objection.

THE WITNESS: Yeah. And yeah, corporate representative, I did not investigate, but I believe Beth Schwope had an interest in X Farm.

BY MS. BUTER:
Q Next bullet point, "The new CRO will agree to continue to make the Volvo car payments and that car will stay titled and owned by Tory." Do you see that?
A Yes.
Q Had the payment for the Volvo car stopped as of September 2, 2025?
MR. SHANKLIN: Scope.
THE WITNESS: Yeah. As corporate representative, I did not investigate that, and I don't have any specific knowledge about status of payments on a Volvo car.
BY MS. BUTER:
Q Okay. You don't recall any discussion during the bankruptcy about payments to a Volvo car?
A Oh, there were discussions about payments on a Volvo car. I don't -- you had asked about whether the payments had stopped.
Q And you don't know that sitting here today?
A I don't know.
Q Then the second to last bullet point talks about the debtors' professionals, including OCP. What's OCP?
A Have to ask Mr. Parres. My belief would be

that would be ordinary course professionals.
Q "Will serve at the command of the new CRO, and all state professionals will continue to be paid in the ordinary course and under the approved budget"; correct?
A That's what it says.
Q Did that include Lewis Rice?
MR. SHANKLIN: Objection. Form.
THE WITNESS: Lewis Rice was an estate professional.
BY MS. BUTER:
Q Okay. So yes?
A Yes.
Q And then the last bullet point, "Tory Schwope agrees to report to work and report to the new CRO"; correct?
A Correct.
Q So out of the seven bullet points that were proposed to resolve the trustee motion, three of them, the payroll to Tory Schwope, the payment to insiders, and the payment of the Volvo car payment, were all items that would directly or indirectly benefit Tory Schwope; correct?
MR. SHANKLIN: Objection. Scope. Calls for speculation.

THE WITNESS: Yeah. As corporate representative, I can't say that or investigate -- didn't investigate that. Those items all had a relationship to Tory Schwope.

BY MS. BUTER:

Q And it would benefit him financially; correct?

MR. SHANKLIN: Objection. Calls for speculation. Beyond the scope.

THE WITNESS: Yeah. As corporate representative, I did not investigate that. But receiving payment for services and receiving payment on a car are a -- is -- can be beneficial.

BY MS. BUTER:

Q You received this email. If you need to check, you can. But September 2, 2025, the page before we're looking at, you received this email; correct?

A Yes.

Q You represented the debtors at this time; correct?

A Yes.

Q And as we'll see later, you were involved in communicating with the debtors on this email chain about this settlement offer. I understand that you're

saying you didn't investigate this as a corporate representative, but in your own role as a lawyer with obligations to clients in the court, did you personally review this email settlement proposal and determine if it was appropriate?

MR. SHANKLIN: Objection. Form.

THE WITNESS: I -- if -- if I was copied on it, I saw it. It was not my role to determine if it was appropriate or inappropriate, because those decisions lay with Larry Parres.

BY MS. BUTER:

Q And did you review this, and when you saw that three out of the seven aspects of the proposal would have benefited Tory Schwope financially, did you review this at all to determine whether this proposal was in the best interest of the debtor's estates?

MR. SHANKLIN: Objection. Argumentative. Vague. Compound.

THE WITNESS: Everything that I would review was made with a determination or an assessment of whether it was beneficial to the debtors.

BY MS. BUTER:

Q And do you believe that making sure that these payments that are set forth in the third, fourth, and fifth bullet point that had previously

been stopped was in the best interest of the debtors, as you put it?

MR. SHANKLIN: Objection. Form. Objection. Beyond the scope.

MS. BUTER: I'm asking him personally.

THE WITNESS: Yes. In my personal capacity, yes.

BY MS. BUTER:

Q You indicated that Larry Parres was the one who was responsible for determining this settlement proposal. Why was Mr. Parres the one responsible for this, and why didn't you have any responsibility for this?

MR. SHANKLIN: Objection. Compound.

THE WITNESS: Mr. Parres was the lead attorney on this and was leading the discussions on trying to seek a resolution.

BY MS. BUTER:

Q If you had concerns about something that Mr. Parres was doing, you certainly could have alerted him to that fact; correct?

A Oh, I often would, you know, raise any concerns that I have on any case.

Q Okay. Often?

A Anytime I had a concern.

Q And I believe you and Mr. Parres jointly headed up the bankruptcy practice at Lewis Rice at this time; correct?
A That's fair to say.
Q Okay. And did you raise any concerns with Mr. Parres about this settlement proposal?
A I personally don't recall raising any specific concerns.
Q So three of these points in this proposal go to items that at least involve payments being made to Tory Schwope or an insider. One of them pertains to payment of professionals, including the state professionals, which includes Lewis Rice; correct?
A Yes.
Q On one of them, the second point is simply the means by which a committee would be elected; correct?
A Correct.
Q If you look at the second page of Exhibit 74, there is a response from Ms. Peters on behalf of Frontier; correct?
A Yes.
Q Ms. Peters indicates in the second sentence of the first paragraph, "While Frontier and the committee are respectfully not agreeable to the terms

proposed by debtors below, they have authorized Kutak and committee counsel respectively to extend counteroffer terms, which are set forth in the attached proposed stipulation to the appointment of a Chapter 11 trustee"; is that correct?

A Yes.

Q And then if you go to the first page, there's an email from you dated September 4th of 2025; correct?

A Yes.

Q And it's to DCA Outdoors and Focus individuals; correct?

A Yes.

Q You say, "Here's the response on settlement, which on quick review looks like a complete non-starter to me." Do you see that?

A Yes.

Q "They want us to stipulate to a trustee, Brent King"; correct?

A Yes.

Q And this was a non-starter, using your words?

A It looked like a complete non-starter.

Q Why?

A Because it was just a consent to the motion

to appoint a trustee.
Q And that is not something Lewis Rice was recommending?
A It's not something that the debtors had determined would be appropriate with our advice.
Q And then you ask for a call to discuss, and the response from Mr. Schwope is, "What is there to discuss, John? This is a hard no."
A I see that.
Q Okay. Did you ever have a discussion with Mr. Schwope about the proposal that Frontier proposed on September 4th of 2025?
MR. SHANKLIN: Beyond the scope.
THE WITNESS: Yeah. As corporate representative, I didn't investigate specific discussions. At my personal capacity, we had, I recall, multiple discussions with Tory Schwope, Samantha Schwope, Juanita Schwartzkopf, regarding the appointment of a trustee.
BY MS. BUTER:
Q Did you specifically recall in your personal capacity discussing the proposal that was provided by Frontier on September 4th of 2025 with Tory Schwope?
A I'm -- given that I asked for a call the following morning, that aligns with my recollection

that we had a discussion. Whether it was on that day or some other time, we had discussions regarding the proposal from Frontier and its efforts to appoint a trustee.

Q Do you remember that discussion?

A Not specifically.

Q And again, was that discussion specifically about the September 4th proposal made by Frontier?

A I can't speak to exactly what it -- it was, what -- what was discussed at that specific meeting.

Q I am going to hand you what I'm marking as Exhibit 75. Exhibit 75 is an email from Tory Schwope to Ms. Schwartzkopf and to you and to Mr. Parres; correct?

(Exhibit 75 was marked for identification.)

A Yes.

Q And it says, "Tory's Notes on the Motion," is the subject; correct?

A Yes.

Q And if you could turn with me to the page that at the very top says, "Page 4 of 81."

A Yes.

Q There's a subsection four contained on that page. Do you see that?

A Yes.
Q And subsection four contains a request by the Frontier and committee that to protect and preserve the debtor's bankruptcy estates in the best interest of their creditors, a Chapter 11 trustee must be appointed as soon as possible to pursue a monetization strategy and put these cases on an exit path. Do you see that?
A Yes.
Q And then there's a highlighted comment by Mr. Schwope; is that correct?
A I see a highlighted section, yes.
Q You don't know if that's from Mr. Schwope?
A Based on this email, I -- that would be a reasonable assumption.
Q And Mr. Schwope states, "We have agreed to an exit path." Do you see that?
A I see where it says, "We have agreed to an exit path."
Q Who had agreed to an exit path?
MR. SHANKLIN: Objection. Form.
THE WITNESS: Whoever "we" was.
BY MS. BUTER:
Q Do you know?
A I don't.

Q Do you have any understanding what Mr. Schwope was referring to or who Mr. Schwope was referring to when he said, "We have agreed to an exit path"?

MR. SHANKLIN: Objection. Form.

THE WITNESS: I do not.

BY MS. BUTER:

Q What was the exit path being referred to here?

A I do not know.

Q Are you aware of any agreement to an exit path from the bankruptcy that existed around August 31st of 2025?

A Outside of the -- well, the -- the plan terms that we had discussed previously.

Q Nothing else other than those?

A I don't specifically have knowledge of any -- anything outside of that scope.

Q You indicated that over the years working with Mr. Parres, you would at times disagree or express concerns to him if you had concerns or you disagreed with something he did; is that correct?

A Yeah. As with any attorney that I worked with.

Q At any time during the course of this

bankruptcy when Lewis Rice was representing the debtors, did you raise concerns to Larry -- Mr. Parres about this particular case?

MR. SHANKLIN: And this is within your personal capacity; right? Is your question within the personal capacity?

MS. BUTER: It is within his personal capacity. Obviously, he's a member of Lewis Rice, but yes. In your personal capacity.

THE WITNESS: Yeah. I -- I -- we had discussions. I can't cite specific instances, but I know we had discussions and about, you know, which -- how to proceed on this avenue or that avenue, things of that nature. We had a lot of discussions to that effect. I can't cite you a specific instance.

BY MS. BUTER:

Q So you can't remember any specific instance where you raised a concern about an action that Mr. Parres was taking? In this case.

MR. SHANKLIN: Asked and answered.

THE WITNESS: Yeah. Not a specific instance that I can recall.

BY MS. BUTER:

Q Do you know whether you ever raised any concerns to Mr. Parres about how Mr. Schwope was

managing the DCA entities?
A I did not specifically raise concerns about management by Mr. Schwope.
Q Since Lewis Rice ceased representing the debtors, have you raised any concerns to Mr. Parres or anybody else at Lewis Rice about Lewis Rice's actions during the course of this bankruptcy?
MR. SHANKLIN: Objection. Form.
THE WITNESS: No -- no objection -- or no concerns, no.
BY MS. BUTER:
Q Handing you what I've marked as Exhibit 76. Exhibit 76 is an email chain dated September 10, 2025; correct? And going into September 11th --
(Exhibit 76 was marked for identification.)
A Yes.
Q -- at this top. And this is -- is this during the time period that there was a hearing on the motion for appointment of a trustee?
A That's my recollection.
Q Okay. And at the very top of the page of first page of Exhibit 76, you send an email to Mr. Drapekin, and you note, "Even if we win, there are still big problems. I still think this ends up

liquidating in some form." Do you see that?
A I do.
Q So as of September 11th of 2025, did you believe that even if a trustee is not appointed there are "big problems" --
A That's what it says.
Q -- with the DCA bankruptcies? Okay. What were those big problems that you identified?
MR. SHANKLIN: Objection. Beyond the scope.
You may answer.
THE WITNESS: Yeah. I did not investigate that as corporate representative, but there was DIP financing that had not yet been agreed to. And there was a plan deadline, and the plan elements had not yet been agreed to. So we had two significant hurdles out there. Without getting a DIP in place and getting plan agreed to, the appointment of a trustee would end up liquidating the case.
BY MS. BUTER:
Q Well, you're saying here, "Even if we win."
A Even if we got through the trustee, then if we didn't get past a DIP, then presumably a trustee would be appointed then, or the case would convert to a Chapter 7.

Q So you knew that there were issues with getting a DIP. You knew there was a motion to appoint a trustee that was being opposed by the debtors, but if that DIP didn't materialize, it's your position a trustee would have likely have been appointed at that time regardless of the opposition?
A No.
Q Okay. I thought that's what you testified to, so I might have misheard you.
A No. The -- it -- the case could liquidate by -- it was a possibility that it could liquidate if a trustee were appointed after a no DIP being obtained, or the case would convert to a Chapter 7. I mean, there's various things that could happen. If there's no DIP in place to finance operations, that could lead to a liquidation.
Q And Lewis Rice and Focus had been trying to get a lender in place to provide DIP financing; correct?
A And had filed a motion to that effect, yes.
Q Are there any other big problems that you were referring to here?
A No.
Q Those were them all?
A Those were the two that I was contemplating.

Q And then you say -- regardless of that, you say, "I still think this ends up liquidating in some form."
A Because there were big challenges, yes.
Q And the plan that -- and I lose -- the plan, I think, that you indicated you proposed, did that have any kind of liquidation in some form in it?
A Whatever the terms sheet provided. I can't recall those specific terms.
Q So you don't know sitting here today whether that included any kind of liquidation?
A Well, the -- the general concept was to find a buyer, new equity, new financing to take out Frontier at an agreed number. So that was, kind of, plan A, take 60 days to do that. The plan B was to appoint a three-member board that could provide for or discuss a sale of businesses and could provide for a complete sale or partial sales.
Q And your position -- as of September 11th, your opinion was, even if we win on the trustee motion, there's still big problems, and you still think it ends up liquidating in some form; is that correct?
MR. SHANKLIN: Objection. Asked and answered.

THE WITNESS: That's what the email says.

BY MS. BUTER:

Q And do you believe that when you wrote that email to Mr. Drapekin, you were expressing your thoughts accurately?

MR. SHANKLIN: Objection. Form.

THE WITNESS: It was my -- that's -- what my email says is what it says.

BY MS. BUTER:

Q Handing you what I've marked as Exhibit 77. Exhibit 77 is an email chain from September 29th of 2025; is that correct?

(Exhibit 77 was marked for identification.)

A Started on September 28, 2025.

Q I'm sorry. It did, yes. And then moved to September 29, 2025; is that right?

A Yes.

Q So in the email on the second page of Exhibit 77, you forward a docket entry to Mr. Parres, Mr. Moore, and Mr. Drapekin; correct?

A Yes.

Q And in that email, you refer that the docket entry lays out the terms of the deal the committee cut

with Frontier; correct?
A That's what it says.
Q Okay. And then you say, "As expected, the committee will get 1 million from sale proceed." Do you see that?
A I do.
Q It says, "It will also get 20 percent of any sale proceeds over 66 million"; correct?
A Yes.
Q And then it says, "Apparently Frontier thinks the assets, maybe even real estate alone, will bring $66 million." Do you see that?
A I do.
Q Okay. And then there's a response by Mr. Drapekin in the first -- bottom of the first page in Exhibit 77. Then you respond to him in the middle of the first page. Do you see that?
A Yes.
Q And you say, "So far, their fees have been paid out of cash collateral." Is that referring to Unsecured Creditors counsel fees?
A I -- I believe so.
Q And it says, "So at least Frontier had to pay that." Do you see that?
A I do.

Q Why did you make that comment?

MR. SHANKLIN: Objection. Form. Objection.

THE WITNESS: Because Frontier had to pay committee counsel fees out of the budget. So Frontier was obligated to pay committee fees.

BY MS. BUTER:

Q And you say, "At least Frontier had to pay that." What did you mean by that?

MR. SHANKLIN: Objection. Form. Asked and answered.

THE WITNESS: Yeah. That Frontier had to pay those fees of the committee.

BY MS. BUTER:

Q Okay. And then you say, "Oh, and I'm sure they'll get way more than 66 million"; right? Do you see that?

A That's what it says, yes.

Q Had you formed an opinion as of September 29th of 2025 as to whether the assets of the debtors were worth $66 million?

A At a liquidation value, straight liquidation, it was our belief -- my belief -- that they would not get 66 million outside of the real estate.

Q And then Mr. Drapekin responds to you, "We'll never get 66 million without Tory unless the real estate is worth that." Do you see that?
A Yes.
Q You are familiar with the fact that the debtors retained Bergan to conduct an audit for the debtors for 2023 and 2024; is that correct?
A Yes.
Q Handing you what I've marked as Exhibit 78. For some reason, I only have three of those. Oh, no. There. Exhibit 78 is an email chain. On the second page at the bottom, there's an email from Ms. Schwartzkopf to Eric Thuente at Creative Planning dot-com. Do you see that?
(Exhibit 78 was marked for identification.)
A Yes.
Q Is Creative Planning an affiliate of Bergan BDV or KDV?
A That's my understanding.
Q Okay. And Ms. Schwartzkopf emails Creative Planning/Bergan and states, "Would you tell me the amount of fees related to the 2023 audit and a rough estimate of the 2024 costs," and then asks for a draft 2023 audit. Do you see that?

A Yes.
Q And then in response on the second page of Exhibit 78, Mr. Thuente responds and sets forth what they are currently owed, which is $83,335 for the 2023 audit, 9,900 for the DCA tax return, and 9,000 for Tory's tax return. Do you see that?
A Yes.
Q And then he gives a quote for the 2024 audit to be $165,000. Do you see that?
A I do.
Q Okay. Ms. Schwartzkopf forwards this to Mr. Drapekin at Lewis Rice; correct?
A Yes.
Q And notes, "I believe Tory will need to pay for his own tax return." Do you see that?
A Yes.
Q Do you agree with that statement?
MR. SHANKLIN: Objection. Beyond the scope.
BY MS. BUTER:
Q Personally, do you agree with that statement?
MR. SHANKLIN: Objection. Form.
THE WITNESS: Well, yeah. Tory has to pay for his own tax return.

BY MS. BUTER:
Q Okay. And then she indicates, "We need to deal with a much larger balance owed." Do you see that?
A Yes.
Q Do you know what she was referring to there?
A I do not.
Q Do you have any understanding as to whether at this stage the debtors were seeking to retain Bergan/Creative Planning to conduct the 2024 audit?
MR. SHANKLIN: Beyond the scope.
THE WITNESS: Yeah. As -- as corporate representative, I can't recall -- I -- I did not investigate the timing of that. I don't personally recall exactly when the Bergan application was filed, but I -- yeah. I don't recall specific dates.
BY MS. BUTER:
Q In connection with seeking to retain a professional in a bankruptcy, does that professional -- if the professional has outstanding fees, would those need to be waived to be retained?
MR. SHANKLIN: Objection. Calls for legal conclusion.
THE WITNESS: As -- as a general matter, a -- a professional has to be disinterested,

and most of the time, if there is -- are fees that are owed, then that can render a party not to be disinterested.

MS. BUTER: And I'll save you the objections. I'm asking all of these questions about Bergan in this capacity in his personal capacity.

MR. SHANKLIN: Okay.

BY MS. BUTER:

Q In response, Mr. Drapekin responds to Ms. Schwartzkopf at the top of page -- the first page of Exhibit 78, and includes you in the CC and says, "Tory pays his own. 165,000 for an audit seems absurd. We may need to get bids." Do you see that?

Q I do.

Q Do you know if any other bids were obtained for a company to conduct an audit of the DCA debtor entities?

A I recall having discussions with Ms. Schwartzkopf or hearing about Ms. Schwartzkopf's efforts to seek other bids, which she did, and that those bids were significantly more than the 165.

Q More than 165?

A Yes.

Q Handing you what I've marked as Exhibit 79. Do you happen to know, sitting here today, what audit

firms provided those other bids?
(Exhibit 79 was marked for identification.)
A I do not.
Q This is an email chain between you and Mr. Mizaur at Creative Planning dot-com from March 20th of 2025; is that correct?
A Yes.
Q Mr. Mizaur reaches out to you as an in-house counsel for Creative Planning, BKDV. Bergan KDV. Do you see that?
A Yes.
Q And there's a reference in here that he is -- they are an unsecured creditor in DCA's current bankruptcy filing, and he was chair of the Unsecured Creditors Committee at the time.
A Right.
Q And then he goes on to talk about DCA paying off the amounts owed for the 2023 tax and audit work. Do you see that?
A Yes.
Q Okay. Your response is, "Given the current conflict situation, I must decline your invitation to discuss further." Do you see that?
A Yes.

Q What were you referring to there?
A That -- that Bergan/Creative Planning was chair of the creditors committee.
Q And at some point, did Mr. Mizaur step down from the Unsecured Creditors Committee?
MR. SHANKLIN: Objection. Form.
THE WITNESS: I believe it was Creative Planning. I don't know if Mr. Mizaur was on the committee himself or if it was Creative Planning. I believe it was Creative Planning.
BY MS. BUTER:
Q And did they step down?
A My -- I recall them resigning at some point.
Q I'm handing you what I've marked as Exhibit 80. And Exhibit 80 is an email chain again between Mr. Mizaur, and he involves eventually Ms. Schwartzkopf on this email. Do you see that?
(Exhibit 80 was marked for identification.)
A See -- yes.
Q Okay. On the top of the second page of Exhibit 80, there's an email from Mr. Thuente that says, "Juanita, I have copied Nick Mizaur, our in-house counsel, to this email. You can see his comments below. He has reached out to John Hall with

Lewis Rice but is yet to hear back."
And then he states, "As a firm, we are ready to proceed toward obtaining payment and moving forward with the audit. We need some help with the next steps." Do you see that?
A Yes.
Q And then ultimately, on the first page of Exhibit 80, Ms. Schwartzkopf sends that to you; correct?
A Yes.
Q And you say, "We can't pay them anything for their pre-bankruptcy amounts due, even if they are ordinary course professional." Do you see that?
A Yes.
Q Then you say, "They need to give us a bid to do the audit work now, and they'll need to waive their pre-petition amount to get retained." Do you see that?
A Yes.
Q You say, "I assume they will charge a premium to do the audit, given that they were not paid previously." Do you see that?
A Yes.
Q Is that all accurate based on your understanding of how a professional is retained in

bankruptcy?
MR. SHANKLIN: Objection. Calls for legal opinion.
THE WITNESS: It is accurate that they would have to waive their pre-petition amount to get retained.
BY MS. BUTER:
Q And was it also accurate that you could not at that time -- or debtors could not at that time pay anything for pre-bankruptcy amounts due?
A That's --
MR. SHANKLIN: Same objection.
THE WITNESS: Yes.
BY MS. BUTER:
Q Going to hand you what I've marked as Exhibit 81. Exhibit 81 is an email chain. On the bottom of the first page, it has an email from Mr. Mizaur to Mr. Parres attaching the 2023 audit engagement letter. Do you see that?
(Exhibit 81 was marked for identification.)
A Yes.
Q And then at the start -- at the top of the first page of Exhibit 81, there's an email from Mr. Parres back to Mr. Mizaur, and you are CC'd on that

email; correct?
A Yes.
Q And Mr. Parres informs Mr. Mizaur, "Nick, the U.S. Trustee's Office is demanding that Bergan KDV waive their unsecured claim in full to be hired by the debtors to do the 2024 and finish the 2023 audits. Is it possible to have a call first thing Monday morning to understand Bergan KDV's position? Will it waive its unsecured claim of almost 75,000 to be hired to complete the 2023 work and to perform the 2024 audit?" Do you see that?
A Yes.
Q Okay. Do you know whether Bergan KDV ultimately waived their pre-petition claim?
A Yes.
Q They did?
A Yes.
Q And did Bergan KDV, because they were disinterested and waived that pre-petition claim, ultimately get retained by the debtors in bankruptcy to finish the 2023 audit and perform the 2024 audit?
MR. SHANKLIN: Objection. Form.
THE WITNESS: That's my recollection.
BY MS. BUTER:
Q Handing you what I'm marking as Exhibit 82.

Exhibit 82 is a follow-up email or an email from Mr. Parres to Ms. Parsons at the U.S. Trustee's Office; correct?

(Exhibit 82 was marked for identification.)

A Yes.
Q And you were CC'd on this; correct?
A Yes.
Q And Mr. Parres indicates that Bergan KDV is willing to waive their claim and become employed under 327 of the code under two circumstances. First, they have withdrawn the negotiated fee reduction for 2024 of 160,000 and have gone back to their request of 165,000; correct?
A Yes.
Q And they say they want everyone to know that their fee to complete the 2023 audit is going to be somewhere between 60 and 75,000. The debtor does not want this to become a feeding trough and would like to set a fixed fee at 65,000, and Mr. Parres asks if this is acceptable. Do you see that?
A I do.
Q Okay. Do you have any comments at all on this email communication to the U.S. Trustee's office?
MR. SHANKLIN: Objection. Form.

THE WITNESS: I don't recall any specific comments.
BY MS. BUTER:
Q Handing you what I've marked as Exhibit 83. This is an email. It starts at the bottom of the page of Exhibit 83, April 8th from Larry Parres to Ms. Parsons and some others including you CC'd; correct?
(Exhibit 83 was marked for identification.)
A Yes.
Q And it purports to attach an interim order approving Bergan KDV as tax and audit professionals; correct?
A Was the -- let's see. It -- it does appear from Larry's email that he says, "I have not had final sign off on this interim order." So I assume -- I -- I don't see an attachment of the order, but it may have been attached.
Q Okay. Ms. Parsons responds to Mr. Parres on April 9th of 2025. Do you see that?
A Yes.
Q And she states, "The amounts listed to be paid to Bergan KDV in paragraph six are the exact same amounts as those identified in the application to employ, which consisted of the pre-petition claim that

that Bergan KDV is now waiving. There is nothing in this order that reflects that the amounts to be billed and paid to Bergan KDV will only be for the actual post-petition work performed, not an attempted end run around the disinterested issue." Do you see that?

A Yes.

Q Did you share or have any conversations with Mr. Parres after receiving this email about the amounts listed to be paid to Bergan in the interim order?

A I don't recall specific discussions about the amounts listed.

Q Did you have any discussions at all that you can recall personally about this email that Ms. Parson sent?

A I -- I recall having discussions that we would need to make sure that Bergan is only getting paid for work that it does post-petition, and that we would need to clarify that in an order or make sure that Bergan was only going to be paid for actual work done post-petition.

Q Going to hand you what I've marked as Exhibit 84. Exhibit 84 is an email chain between Mr. Parres and Mr. Mizaur; is that correct?

//

(Exhibit 84 was marked for identification.)
A Yes.
Q And you are CC'd on this email; is that correct?
A I was CC'd on Larry's email to Mr. Mizaur.
Q And that's the one at the top of the first page of Exhibit 84; correct?
A Yes.
Q In that email, Mr. Parres states, "Thanks for the spreadsheet. We are never going to get an inconvenience fee paid, so please come up with a new category of work to bill the remaining 13,000, such as 'review of changes to inventory values due to bankruptcy filing.'" Do you see that?
A Yes.
Q Do you have any understanding as to what the "remaining 13,000" refers to?
MR. SHANKLIN: Objection. Form.
THE WITNESS: No.
BY MS. BUTER:
Q When you reviewed this email, having received it on April 9th of 2025, did you have any concerns about Mr. Parres's advice that Bergan come up with a new category of work to bill the remaining

13,000, such as -- and then he quotes a potential description?

MR. SHANKLIN: Objection. Form.

THE WITNESS: Yeah. I remember we had a -- a discussion of making sure that whatever work was done -- or whatever payment would be made to Bergan had to be for actual work done post-petition.

BY MS. BUTER:

Q Did you have any concerns that Mr. Parres was instructing Bergan to make up a billing category, so it could actually be paid?

MR. SHANKLIN: Objection. Argumentative.

THE WITNESS: No. I had concerns -- no. I did not have that concern.

BY MS. BUTER:

Q So the fact that this 13,000 may have been an inconvenience fee or something, and Mr. Parres informed Bergan to bill it as a different description, you did not have any concerns about that?

A I expressed the concern that we had to make clear to Bergan that it would -- that whatever work was being done had to be done post-petition and then billed under a fee application in the normal course.

Q Okay. Then Mr. Parres continues, "Please

change first entry to 'work on and complete income tax provision for in 2023 audit'"; correct?
A Where are you -- where is this again?
Q Continuing in the first paragraph.
A Okay. Yes.
Q He says, "Delete everything else"; correct?
A Yes.
Q "Please send back new spreadsheet"; correct?
A Yes.
Q And he says, "I do not intend to share this spreadsheet unless forced to. Just a heads up." Do you see that?
A Yes.
Q Reviewing this email, at the time, April 9th of 2025, did you have any concerns at all about what Mr. Parres was instructing Bergan to do?
MR. SHANKLIN: Objection. Form.
THE WITNESS: I had concerns that it could be misconstrued, yes.
BY MS. BUTER:
Q By whom?
A By Bergan.
Q Did you raise the concerns that it could be misconstrued?
A We discussed the fact that -- that we had to

make sure that post-petition work was being done to justify post-petition -- or justify compensation to Bergan. And so if there's any -- if there was confusion about that, then that need to be made clear.

Q Was there any follow up to clarify what could have been misconstrued in this email?

A As I recall, there were follow-up emails that Mr. Parres sent to Mr. Mizaur to attempt to clarify that.

Q Okay. And do you know if these proposed billing entries or billing categories that Mr. Parres proposed in this Exhibit 84 email were actually billing entries that Bergan adopted?

A I do not.

Q Did you ever follow up on that after April 9th of 2025?

MR. SHANKLIN: Objection. Form.

THE WITNESS: I did not, knowing that Bergan would have to submit fee applications.

BY MS. BUTER:

Q Are you aware that there is a dispute over Bergan's fee applications in this matter at this time?

A I'm aware that there's been an objection.

Q What do you know about that objection?

A I don't know anything about that objection.

Q You don't?
A I have not -- I -- I probably have read it, but I couldn't sit here and tell you now what the elements of the objection are.
Q When you read the objection, did you have any concerns that -- did you have any concerns about the actions of Lewis Rice?
MR. SHANKLIN: Objection. Form.
MS. BUTER: Or any attorney at Lewis Rice.
MR. SHANKLIN: Objection. Form. Are you talking about when he -- is this connected to when he read the objection?
MS. BUTER: Yep.
MR. SHANKLIN: Oh.
THE WITNESS: No.
MS. BUTER: No?
THE WITNESS: Not that I can recall.
MS. BUTER: Let's take a break.
THE VIDEOGRAPHER: Time is 12:19. Off the record.
(Off the record.)
THE VIDEOGRAPHER: Time is 1:01 p.m. We are on the record.
//

BY MS. BUTER:
Q Mr. Hall, do you have Exhibit 82? Do you have that in front of you?
A Yes. I think I've got 82, yes.
Q Perfect. This is an email we looked at before from Mr. Parres to Ms. Parsons -- you're CC'd on it -- regarding the application to employ Bergan BDV; correct?
A Yes.
Q And the second bullet point that we looked at, Mr. Parres notes that they want everyone to know their fee to complete the 2023 audit is going to be somewhere between 60 and 75,000. The debtor does not want this to become a feeding trough and would like to set a fixed fee at 65,000. Do you see that?
A Yes.
Q Was that your suggestion that Bergan BDV proposed to complete the 2023 audit at a fixed fee?
MR. SHANKLIN: Objection. Form.
THE WITNESS: When you say -- are you referring to me as corporate representative?
BY MS. BUTER:
Q No. Any -- I apologize. Bergan KDV questions are all about you.
A Yeah. No.

Q I'm going to hand you what I'm going to mark as Exhibit 85. Exhibit 85 is an email chain. It starts on the bottom of the first page, an email from Mr. Parres to you saying, "Please get some research on this ASAP. This isn't good."

(Exhibit 85 was marked for identification.)

And Ms. Parsons -- he's forwarding a message from Ms. Parsons who states that, "I've heard from the Chapter 11 strike team, and the program's position is this would be an end run around section 327 and isn't allowed. If they want to be retained in this case, they are going to have to waive their pre-petition claim." Do you see that?

A Yes.

Q And if you go to the first page, Mr. Parres asks you to do some research or to get some research on the issue; is that right?

A He says, "Please get some research on this ASAP."

Q And by "this," does he mean the issue raised by Ms. Parsons about whether Bergan needs to waive its pre-petition claim?

MR. SHANKLIN: Objection form.

THE WITNESS: As I recall, that's how I

took it, yeah.
BY MS. BUTER:
Q Okay. And you then ask Hunter Brown, it appears, to do some research?
A Yes.
Q And then you report to Mr. Parres and CC Mr. Brown on April 2nd of 2025; correct?
A Yes.
Q Okay. And in this email, if you've had the -- if you need to take some time to read it, you can. But in the second and third paragraphs, you provide a couple of options for how to get Bergan BDV retained; is that correct?
A Yes.
Q And the first option, you say, in the start of the second paragraph, "As I see it, we either roll the dice and press with the current application, hoping the judge will find Bergan is disinterested enough to allow retention." Do you see that?
A I do.
Q And then you say in the last paragraph, "Alternatively, Bergan waives the claim. I wish they had waived the claim and just charged a premium for the 2024 audit. Or maybe they waive the claim and just charge now to 'complete' the 2023 audit, charging

60K for that plus 160K for 2024?" Do you see that?
A Yes.
Q Why did you put "complete" in quotation marks when you're referring to completing the 2023 audit?
A Because it wasn't complete at the time that they would be retained.
Q And it's your testimony you did not mean that it would be a situation where they would be simply pretending to complete that 2023 audit?
MR. SHANKLIN: Objection. Form.
THE WITNESS: Certainly not. Yeah.
BY MS. BUTER:
Q And so did you suggest as an option this scenario that Mr. Parres presented to the U.S. Trustee in what is Exhibit 82? I know the number is a little different, but is that something that was a suggestion of yours?
A I'm not sure I followed the question.
Q Sure. In Exhibit 82, Mr. Parres tells Ms. Parsons that Bergan KDV is willing to waive their claim and become employed under 327. Do you see that?
A Yes.
Q And then you refer -- he refers in point one to the fee for 2024?

A Yes.
Q And then in point two, he refers to their fee to complete, without quotation marks around it, the 2023 audit, and he has a fixed fee of 65,000 that he is proposing. Did this proposal to the U.S. Trustee's Office arise from one of the recommendations you gave in the email that we have marked as Exhibit 85?
A I could not speculate as to what Larry factored into in making that proposal.
Q Did you propose in your email that is Exhibit 85 that one option for the retention of Bergan KDV would be for them to waive their pre-petition claim and just charge now to "complete" the 2023 audit, charging 60K for that plus 160 for 2024?
A And my email says what it says.
Q So yes?
A It says that they had -- that one option or -- was to waive the claim, charge a premium, as firms do when they are not getting paid for the pre-petition work, or waive the claim and charge to complete the 2023 audit.
Q That was an option you proposed to Mr. Parres; correct?
A That was a discussion point that we could

discuss. I won't say it was an option that was proposed or intended to be an option. It was something that we could discuss.

Q So if you didn't intend it to be an option, when Mr. Parres sent that to Ms. Parsons and CC'd you on it, did you indicate any response to Mr. Parres as to whether or not this was an appropriate way to proceed?

MR. SHANKLIN: Objection. Form.

THE WITNESS: Did we -- I did not -- don't recall specifically speaking to Mr. Parres after he sent the email to Ms. Parsons.

BY MS. BUTER:

Q Okay. And you indicated that one option -- I guess one statement you made. Maybe you weren't presenting options to Mr. Parres. We'll ask him how he interpreted it. But you said that it would be a waiver of a pre-petition claim and then charging a premium for the work to be completed on the 2024 audit?

A Yes. That's what typically happens, yeah.

Q Okay. So you believe it is acceptable for a creditor of a bankruptcy estate to waive a pre-petition claim and then simply charge a premium for the work they conduct during the bankruptcy?

A Not saying it's proper or improper. I'm saying that's what firms do in my experience when they are not -- have not been paid and now are asking to be paid by a debtor in bankruptcy, and they're going to have to take on that concern, that they typically charge a premium to do that work and become engaged by a debtor in bankruptcy.

Q And do you have any examples of firms that have charged such a premium?

A I can't cite you specific items to that effect.

Q And you have filed applications for the retention of professionals in bankruptcy court where you're aware that the professional is charging a premium to try and recoup some of its pre-petition claims?

MR. SHANKLIN: Objection to form.

THE WITNESS: We filed applications for retention of professionals on the terms that they've proposed.

BY MS. BUTER:

Q I am going to hand you a stack of documents. This is going to be Collective Exhibit 86. I will represent to you that Exhibit 86 are text messages that were produced in this case that were, we were

informed, extracted from your phone, Bates stamped Text 105 through Text 179. Are you familiar with these text messages?

(Exhibit 86 was marked for identification.)

A Yes.

Q Did you provide your phone to counsel or to a vendor to extract text messages from your phone?

A I gave it to our IT people at the instruction of our in-house counsel.

Q Lewis Rice?

A Yeah. Our general counsel at Lewis Rice.

Q Okay. And was it somebody from the Lewis Rice team that extracted these text messages? Do you know?

A I don't know specifically who -- who did.

Q Do you know if they gave it to a third party vendor at all?

A I -- I don't know.

Q Okay. And it looks like from the bottom -- I'm just looking at the first page of Exhibit 86. It looks these were extracted on July 13th of 2025 -- I'm sorry -- of 2026. Does that sound about the time that you provided your phone?

A Yes. Could well be.

Q Do you know what instructions were given in terms of what text messages should be pulled from your phone?
A I -- I think we had received requests for communications between certain parties.
Q Were you involved at all in deciding what got extracted from your phone?
A No.
Q If you could look at the page -- this starts Bates number Text 112. It's clipped separately. These appear to be messages between you and Scott Moore; is that correct?
A Yes.
Q Okay. And just to confirm, (314) 497-5261, is that your cell number?
A Yes.
Q Okay. There are large black boxes on many of these pages. Do you happen to know why these text messages were redacted?
A Yes.
Q Why?
A They had -- were completely unrelated to DCA, representation of DCA.
Q Okay. When you say they were unrelated to DCA, were they personal text messages?

A Yeah. A lot of them. Scott and I text all the time about many things. Yeah.
Q Okay. Would there have been included in the redactions text messages that might have been about other clients?
A I can't recall specifically, but we've probably talked about other cases.
Q Okay. Did you have any role in determining which text messages would be redacted from this?
A Our counsel asked me to review and make sure that those text messages were not related to anything with DCA.
Q So you did review the redacted text messages?
A Yes.
Q And did you believe that they were all text messages that were not related to DCA?
A I knew they were not related to DCA.
Q Going back to -- let's go to the first page of Exhibit 86, and actually, if we go to the second page of Exhibit 86 Bates stamped Text 106.
A Okay.
Q There is a set of text messages that appear to be between you, Larry Parres, and I'm going to say his name wrong again, I'm sure, but David Goerisch.

A Goerisch.
Q Goerisch. Is that correct?
A Yes.
Q Okay. If you could switch or go with me to the page that is Bates stamped Text 109, about halfway down that page are text messages from September 11th of 2025. Do you see that?
A Yes.
Q On September 11th of 2025, is that the day that there was an agreement between the parties in this case including debtors to appoint Brent King as a CRO for the debtors?
A Yes. That sounds right.
Q And had the parties in this case been involved in a hearing where certain witnesses were presented on September 10th and 11th in front of the court?
A Yes. Frontier had presented witnesses, yes.
Q You were at that hearing?
A Yes.
Q Did you have a role at that hearing?
A I took notes at that hearing.
Q Did you make any argument or question any witnesses or object to any testimony if you recall?
A I don't recall doing any of that.

Q Was Mr. Parres scheduled to go on a trip in or around September 11th of 2025?
A I think that he was hoping to go somewhere for his or his wife's birthday.
Q I think it was his birthday.
A That could be.
Q Okay. And were you intending at any time to be -- kind of, take over or be the lead counsel at the hearing had it continued after his departure?
A No.
Q Okay. Who was going to do that, if he had left?
A He would not have left.
Q Okay. He was not going to leave?
A No.
Q Okay. In your text message that is toward the bottom of Text 109, Larry Parres texts you and David and says, "Thanks, guys. Hate the result. Judge was simply wrong and didn't want to screw up her -- screw her week up next week." Do you see one -- see that?
A Yes.
Q And then Mr. Parres says, "Best in long run as we needed loan." Do you see that?
A Yes.

Q What's your understanding of what he was referring to when he said, "Best in long run as we needed loan"?
A Yeah. I don't know what that meant.
Q Did you share the opinion that appointing Mr. King as a CRO was best in the long run?
MR. SHANKLIN: Objection. Form.
THE WITNESS: No.
MS. BUTER: No?
THE WITNESS: No.
BY MS. BUTER:
Q Two texts down, it looks like you send a text message to Mr. Parres and Mr. Goerisch, and you say, "What was the big error you couldn't tell us?" Do you see that?
A Yes.
Q At some point, had you -- had Mr. Parres mentioned a "big error" to you?
A He had mentioned something that he thought was a concern, wrong, something to that effect that he was looking into.
Q Okay. And you say -- did he describe it as a "big error," or is that your words?
A I don't recall what words he used.
Q When did he first tell you about that?

A Oh, I don't know. It was probably -- I don't know exactly when. It was right at the time of the hearing. Maybe the morning of that hearing.
Q Okay. And then you say, the big error "you couldn't tell us." Did Mr. Parres tell you he was not going to tell you what the error was?
A No.
Q What did you mean when you say, "you couldn't tell us"?
A I think it was a function of timing that he didn't have -- he hadn't looked at it or hadn't investigated it, and so he wasn't going to tell us what it was that he was thinking.
Q Did he indicate that he knew what the error was at the time he told you?
A I don't recall anything to that effect.
Q Okay. Did he tell you that he didn't want anyone to know about it before going into the hearing?
A I don't recall anything to that effect.
Q Okay. And did he indicate at all that it was an error that may need to be corrected to the court?
A I don't recall anything specific about anything on that topic. Yeah.
Q Were you comfortable proceeding with the

trustee hearing, knowing that there could be a -- what you described as a big error?

A Not knowing what that error was and what it related to, I -- I couldn't make a decision one way or the other.

Q Did you push Mr. Parres to tell you what the big error was before the trustee hearing?

A Again, not knowing what it was, what it related to, then I did not have any specific discussions that I recall on that.

Q I think that's the point of my question. You didn't know what it was and so didn't know how significant it was. So did you push Mr. Parres to find out what that big error, as you described it, was?

A Yeah. I --

MR. SHANKLIN: Objection. Asked and answered.

THE WITNESS: I didn't even know what it related to.

BY MS. BUTER:

Q Okay. Did you ask him what it related to?

MR. SHANKLIN: Objection. Asked and answered.

THE WITNESS: Again, I didn't have any

specific discussions on that point that I can recall.
BY MS. BUTER:
Q Okay. So you just recall learning going into the trustee hearing there was a big error that Mr. Parres could not tell you?
MR. SHANKLIN: Objection. Form.
THE WITNESS: He said that there was an issue that he was looking into. "Remind me to talk to you about it at some point," something to that effect.
BY MS. BUTER:
Q Did you have any concerns about the fact there was an issue that Mr. Parres was looking into as you were going into the trustee hearing?
A Well, certainly I would want -- I don't recall a specific concern to that effect because any issue that he had would be something that he would be handling and disclosing.
Q But it was still on your mind the evening of September 11th after the proceedings had closed such that you asked Mr. Parres what it was?
A Yeah. I was curious, because he had mentioned that earlier
Q And apparently, he had figured it out by six o'clock that night; is that correct? Because he was able to answer you.

MR. SHANKLIN: Objection. Form.
THE WITNESS: He did answer.
BY MS. BUTER:
Q Okay. And he provided specifics as to what he believed the big error was; correct?
A He provided some explanation.
Q He said AR is overstated by 2 million; is that correct?
A That's what it says.
Q And then he also says, "We kept saying it was up 3 million from petition date. It wasn't." Do you see that?
A I see that.
Q Okay. And when he says, "We kept saying," who is the "we"?
A The debtors, Focus.
Q Okay. You respond to him and say, "Juanita is here and disagrees." Do you see that?
A Yes.
Q Okay. And then Mr. Parres responds, "Look at 7/31 balance sheet comparison. Then go to page three of her charts. How do AR go down 2 million with Arbor Valley still out there? She reduced it for collections of pre-petition AR, then compared it to 8/31. Can't be right." Do you see that?

A Yes.
Q Okay. And then you respond -- or somebody responds at least and says, "Pre-petition AR is a fixed number. It never changes as it was what was there on 2/21." Do you see that?
A I see that. I don't know who is that -- who that's from. It looks like from Larry.
Q Other than this analysis, did you or anybody at Lewis Rice undertake to determine whether Mr. Parres's concerns about the AR were correct?
A Yes. I had asked Juanita about that.
Q When?
A On September 11th.
Q Okay. Other than asking Juanita about it on September 11th, which is addressed in these text messages, was any other follow-up done to determine whether Mr. Parres's concern was correct?
MR. SHANKLIN: Objection. Scope.
You can answer.
THE WITNESS: Yeah. I don't recall any specific investigation or review or anything like that that I was involved in.
BY MS. BUTER:
Q Okay. And did you help prepare the omnibus response to the fee objection to Lewis Rice's fee

request?
A Yes.
Q And do you recall that Lewis Rice continued to assert in that omnibus response that AR was up 3 million from petition date?
A Possibly. Whatever it says, it says.
Q You should have in the exhibits from yesterday -- and you can set -- yeah. And for these text messages, just set them to the left of you for right now. Maybe we're going to look at them just quickly again.
A So you want --
Q From yesterday, there were text messages, Larry Parres text messages. I believe it was Exhibit 37. I might be wrong on the exhibit number. Do you have those there?
MR. SHANKLIN: Yeah. There.
THE WITNESS: Yeah.
MR. SHANKLIN: That's the one.
THE WITNESS: Yes.
BY MS. BUTER:
Q Okay. Was I correct? Was it 37, or is that a different number?
A Looks like 35.
Q Thirty-five. Perfect. Thank you. So you

have in front of you Exhibit 35, which are text messages that were produced by Larry Parres in this case. And you're familiar with the fact that Mr. Parres produced text messages in this case; correct?
A Yes.
Q And I know -- I understand you've read at least some of the text messages?
A Yes.
Q Okay. Have you read all of them?
A I -- I can't sit here and say that I've read all of these that are in front of me.
Q Okay. If we look at the text messages that you produced that is Exhibit 86, we have on the very first page text messages between you and Mr. Goerisch; correct?
A On Exhibit 86, yes.
Q Yeah. And then we also have text messages, if you go to the next page, that we just looked at between you, Mr. Parres, and Mr. Goerisch; correct?
A Yes.
Q If you go to the text chain that starts at Text 112, which is the large clipped version.
A Oh, yes.
Q Those are text messages between you and Mr. Scott Moore; is that correct?

A Yes.
Q And then if you look at the last page of Exhibit 86, are those text messages between you and Mr. Drapekin?
A Yes.
Q If you could look with me at Exhibit 35, which is Mr. Parres's text messages that he produced, and if you could go to the page number starting LEP 51. Are you there?
A Yes.
Q This begins a series of pages and it goes through, I think, approximately Bates number LEP 78, text messages between you and Mr. Parres; is that correct? If you look at the top.
A Yes.
Q In the production of text messages from your phone, we did not receive any text messages between just you and Mr. Parres. Do you have any knowledge as to why that is?
A No. I turned over my phone, and they extract.
Q Did you delete any text messages between you and Mr. Parres at any time?
A No.
Q Do you still have text messages on your

phone between you and Mr. Parres?
A Yes.
Q Okay. Do you have any understanding why those would not have been produced to us in this litigation?
A No. They were produced.
Q They were not.
A What was not produced?
Q There were no text messages produced in the batch of text messages from your phone between you and Mr. Parres. We just looked through in Exhibit 86 the messages that were produced from your phone, and there was nothing in there between you and Mr. Parres. Alone.
A Oh, then my only assumption is that none of those texts between me and Mr. Parres related to DCA, or the IT didn't download those for whatever reason.
Q Okay. Well, so, I mean, we can look at the very first page of the text message between you and Mr. Parres that Mr. Parres produced Bates stamped LEP 51, and there's a reference halfway down, text from Mr. Parres to you, "You swamped at work? Got a shot at another 11." Do you see that?
A Yes.
Q And then you say, "Freeing up a little bit.

Bring it on." Do you see that?
A Yes.
Q Okay. And then if you go to the next page, Bates stamp LEP 52, there's an email from you -- or I'm sorry -- text message from you saying, "Check email. Farm Credit says they're filing emergency receiver tomorrow." Do you see that?
A Yes.
Q So there are text messages between you and Mr. Parres relating to the debtors and this bankruptcy; is that correct?
A I see that one, yes.
Q Okay. And you just don't have any knowledge as to why text those text messages were not pulled from your phone and produced?
A I do not. I was asked to turn over my phone and I did. And if they need to supplement or pull them, then they can certainly do that.
Q Okay. Do you know if the text messages with Mr. Parres should have been produced?
MR. SHANKLIN: Objection. Calls for a legal conclusion.
You may answer.
THE WITNESS: Yeah. I don't recall the specific request, but that would not surprise me.

BY MS. BUTER:
Q If you could turn with me in Exhibit 35 to LEP 47.
MR. SHANKLIN: Okay. What number did you say?
MS. BUTER: Forty-seven.
BY MS. BUTER:
Q There is a text message at the top from you. You say, "Tory, this is John Hall at Lewis Rice." Do you see that?
A Yes.
Q And in the second paragraph you say, "Tory, I think we have to file bare bones bankruptcy cases this morning or afternoon. We cannot allow a receiver to be appointed." Do you see that?
A Yes.
Q Why did you inform Mr. Schwope that, "We cannot allow a receiver to be appointed"?
A This is odd, because it says, "Please send" -- it says, "Please send John -- John Hall and I an email authoring us -- authorizing us to file. I'll need your signatures on a lot of paper today, so please be somewhere that you can print and scan back. I'm flying back to St. Louis as I -- as I'm sending this." That would have been Larry Parres speaking.

Q Right. So as it states, the first line, "John, this is" -- or, "Tory, this is John Hall at Lewis Rice. Larry wasn't able to send you this text from the claim, so I'm forwarding to you."
A Yeah. I was just -- I see. I'm just forwarding Larry's text. Yes.
Q So why did Mr. Parres type and you send to Mr. Schwope a text message that said the words, "We cannot allow a receiver to be appointed"?
A The -- I believe the discussion was that a receiver would result in a liquidation destroying the value of the companies.
Q Do you recall that discussion specifically?
A I -- yes. And I recall -- I think even sent an email at one point to the debtors explaining what the effect of a receiver would be.
Q Did you see any potential benefits to a receiver being appointed?
A Given what we knew about the debtors, no, because of the loss in value to the company.
Q And at that point, when you formed that opinion, did you -- had you conducted any analysis as to the value of the assets held by the debtors?
MR. SHANKLIN: Objection. Asked and answered.

THE WITNESS: Yeah. I don't recall specific analysis of assets at the time, because everything was moving so fast.

BY MS. BUTER:

Q Did you know the then value of the company when you sent Mr. Schwope an email saying, "We cannot allow a receiver" -- a text saying, "We cannot allow a receiver to be appointed"?

A I think we had some idea as to inventory, real estate values.

Q Who from?

A The audited financials from 2021-'22 discussions with debtor's management, including Tory Schwope.

Q Lewis Rice had in its possession the audited financials from '21 and '22 as of 2/20/2025?

A I don't know that we had them in our possession, but that we had understood that they had audited financials that showed values of the company.

Q Let's continue on to text messages between you and Mr. Parres later on in the same day. Let's turn to LEP 54, and at the top of that page, you will see the text message where Mr. Parres asks you to send that text to Mr. Schwope. Do you see that?

A Yes.

Q Okay. And you told him, "Got your texts. We're on it." And you did in fact follow up; correct?
A Say -- say again?
Q You responded to Mr. Parres and said, "Got your texts. We're on it." Do you see that?
A Oh, I -- yes.
Q Okay. And then the next text you received from Mr. Parres states, "Thanks. I am going to bury this Lisa bitch. It's personal now." Do you see that?
A I do.
Q That's referring to Ms. Peters; correct?
A That -- I believe so, yes.
Q And Ms. Peters was counsel for Frontier; correct?
A Yes.
Q And did you, as a lawyer representing the debtors, have any concern that Mr. Parres's resentment toward Ms. Peters was personal at that time?
MR. SHANKLIN: Objection. Form.
THE WITNESS: I -- I don't agree with how Larry stated anything to that effect.
BY MS. BUTER:
Q Well, your response wasn't to say that. Your response was, "Ha ha"; correct?

A That was part of it.
Q And then you say, "When she pisses me off like she has, you know it's bad." Do you see that?
A Yes.
Q There was a contentious relationship between Lewis Rice and counsel for Frontier from the start; correct?
A Yes.
Q And generally, debtors are required throughout the course of a bankruptcy to at least work with the counsel for the secured creditors as they go through the bankruptcy process; correct?
A Not a requirement, but that is common.
Q It's typical?
A Yeah. You always try to work with all of the parties in the case.
Q Okay. Did you tell Mr. Parres that you had concerns about his personal animosity toward Ms. Peters?
MR. SHANKLIN: Objection. Form.
THE WITNESS: We talked about how we have to get -- try to get along and work through an issue and issues in a case, yes.
BY MS. BUTER:
Q Let's go to Bates stamp LEP 66. LEP 66 is a

text chain between you and Mr. Parres dated starting October -- or I'm sorry -- August 25th and going through August 27th; is that correct?
A That looks right.
Q Okay. And this is August 25th, the date that the motion for a trustee was filed. Is that --
A That's --
Q -- consistent with your recollection?
A Yes.
Q Okay. Further down, about halfway down this page, you send Mr. Parres a text that states, "DIP term sheet is crazy. 1.2 million in fees and interest." Do you see that?
A Yes.
Q What did you mean by "DIP term sheet is crazy"?
A My recollection is that it was expensive in context.
Q In context of what?
A In context of DIP financing.
Q Okay. And then you say, "Maybe Tory just calls their bluff, walks away, and buys from trustee. Frontier can't really want that." Do you see that?
A Yes.
Q Had Tory expressed interest in buying the

assets of the debtors?
A Not that I recall.
Q So this is something you were coming up with?
MR. SHANKLIN: Objection. Form.
THE WITNESS: It was -- it was a -- something that I viewed as a possibility.
BY MS. BUTER:
Q You were aware that Mr. Schwope was a co-borrower on the loans that were in default with Frontier; correct?
A Yes.
Q Did you have any understanding or thoughts as you were typing this as to how Tory could come up with the funds to purchase the debtors from the trustee?
MR. SHANKLIN: Objection. Form.
THE WITNESS: I had no idea as to whether or not he could come up with any funds to do that.
BY MS. BUTER:
Q Did Tory ever suggest to you that he purchase the debtors out of bankruptcy in some form?
A I can't recall if he -- I think he asked how a sale might happen in bankruptcy and whether he could

be a bidder at that -- at those sales. And so we explained the process to him.
Q Okay. And so by making the suggestion that you do in this text message to Mr. Parres, you are essentially making a suggestion that ultimately benefits Tory Schwope; correct?
MR. SHANKLIN: Objection. Form.
THE WITNESS: It's not a suggestion. It was a possibility.
BY MS. BUTER:
Q If you could turn with me to the page that is Bates stamped LEP 81. LEP 81 is a text exchange between Mr. Parres and Juanita Schwartzkopf; is that correct? Is that what it looks like to you?
A Yes.
Q And in this text message that is at the top of LEP 81, Mr. Parres said to Ms. Schwartzkopf, "Just like I want Tory's taxes paid for under a one line invoice from Creative. Just saying." Do you see that?
A Yes.
Q Ms. Schwartzkopf responds, "Just pay more for this next order, take a lower margin right." Do you see that?
A Yes.

Q Okay. And then he says -- Mr. Parres says, "Amen." Do you see that?
A Yes.
Q Were you aware that Mr. Parres was suggesting to Focus that he would like Tory's personal taxes paid for under a one line invoice from Creative?
MR. SHANKLIN: Objection. Form.
THE WITNESS: No.
BY MS. BUTER:
Q Would it be appropriate for the debtor's funds in bankruptcy to pay for the personal taxes of Mr. Tory Schwope?
A No.
Q Do you know if this ever happened?
A I don't know.
Q If you could turn to LEP 106. Actually, let's go to 105. This is a continuation of text message chain between Mr. Parres and Ms. Schwartzkopf, and I'll direct your attention to a text message sent August 24, 2025, at 10:12:26 a.m. And Mr. Parres says to Ms. Schwartzkopf, "I have to be accurate. I assume the first time debtors went to FML was the 2020 audit; correct?" Do you see that?
A I see that.
Q And then Ms. Schwartzkopf says in response,

"That is what I have been told, but I do not have all the historic audits. I can get them and confirm. Would you like me to do that?" Mr. Parres responds and says, "I need 2020-2021 audit." Do you see that?

A Yes.

Q Okay. At this point, August 24th of 2025, is it correct that Mr. Parres at least did not have access to the 2021 audit?

MR. SHANKLIN: Objection. Form.

THE WITNESS: I don't know whether we had that or whether it was in the data room or whether he was -- I -- I don't know. I'd have to ask, Mr. Parres.

BY MS. BUTER:

Q Do you think that you had seen the 2021 audit before August 24, 2025?

A I can't cite specifically when we got that audit.

Q Let's go to page 106. On Bates stamp LEP 106, again, a continuation of text messages between Mr. Parres and Ms. Schwartzkopf. On 8/25/2025 at 4:20, Ms. Schwartzkopf states, "We need the DIP by week ending 10/5. Can't get to 10/31." Do you see that?

A I do.

Q And Mr. Parres says, "Really? Bummer. Disappointing." Do you see that?
A Yes.
Q So by August 25th of 2025, same day, I believe, the trustee motion was filed, Focus had informed at least Mr. Parres that the debtors could not get to 10/31 without DIP financing?
MR. SHANKLIN: Objection. Form.
THE WITNESS: You'd have to ask Ms. Schwartzkopf about what she meant on that.
BY MS. BUTER:
Q How do you read that?
A That we need a DIP by the week ending 10/5. Can't get to 10/31.
Q And what do you think -- what's your understanding of what could have been meant by "can't get to 10/31"?
MR. SHANKLIN: Objection. Form.
THE WITNESS: My speculation would be that the debtors would not have enough liquidity to get to 10/31 without a DIP in place.
BY MS. BUTER:
Q Okay. Let's look at text message Bates stamped LEP 107, the next page. Again, it is text messages between Mr. Parres and Ms. Schwartzkopf.

There's a series of texts starting 8/26 at 11:54 from Ms. Schwartzkopf. Do you see that?
A Yes.
Q Ms. Schwartzkopf states, "We need to regroup on the options after Tory gets to say his piece. Need to lay out the options. We need to be absolutely sure Tory understands." Do you see that?
A Yes.
Q And then Mr. Schwartzkopf then says, "So Tory is saying he will not do a compromise with a board of any kind." Do you see that?
A Yes.
Q Do you involve Mr. Schwope ever informing you that he would not compromise with a board of any kind?
A I don't recall anything to that effect.
Q Okay. Ms. Schwartzkopf continues and says, "He wants to fight each step." Do you see that?
A Yes.
Q Are you aware that Mr. Schwope wanted to fight each step?
MR. SHANKLIN: Objection. Form.
THE WITNESS: I'm not sure what that refers to.
//

BY MS. BUTER:
Q Okay. Let's go to Bates stamp LEP 108. Again, continued text messages between Mr. Parres and Ms. Schwartzkopf. On 8/26/2025 at 2:47, Ms. Schwartzkopf writes, "It sounds like Tory is instructing the team to juice sales and receipts to plug the hole. Man, that is a gamble. It's like watching a chainsaw come closer and closer." Do you see that?
A Yes.
Q Do you have any understanding as to what Ms. Schwartzkopf meant by, "Tory is instructing the team to juice sales and receipts to plug the hole"?
A No.
Q Were you -- did you become aware from Mr. Parres or anyone that Tory might have been instructing the team to juice sales and receipts to plug a hole?
A No.
Q Would that be appropriate in your opinion.
A I don't know what -- I don't even know what "juice sales and receipts to plug the hole" means.
Q You don't know what that means?
A No.
Q Okay. If you could turn to LEP 128, there is a reference at the top of this page, 9/4/2025,

11:57. Mr. Parres texts to Ms. Schwartzkopf, "My fear is cash liquidity issues." Do you see that?

A Yes.

Q And he states, "No matter what, we can't get through the spring without a DIP loan. Just not possible." Do you see that?

A Yes.

Q And Ms. Schwartzkopf responds, "We need to have a plan to confirm on or about 10/20 even if we win the trustee." Do you see that?

A Yes.

Q And then Mr. Parres states, "Agreed, even though it will take them 90 days to confirm a plan. Not a slam dunk either." Do you see that?

A Yes.

Q Okay. Were there concerns within Lewis Rice about cash liquidity issues in September of 2025?

MR. SHANKLIN: Objection to scope.

THE WITNESS: Yeah. I mean, I didn't investigate anything to that effect, but based on Larry's text, he had some concern to that effect.

BY MS. BUTER:

Q Well, you were billed a lot of time in this case; correct?

A Yes.

Q And you were actively involved in drafting and preparing an opposition to the trustee motion; correct?

A Yes.

Q Were you aware that Mr. Parres was expressing concerns about cash liquidity issues?

A The -- not at the time that we were preparing response to the trustee motion.

MS. BUTER: Okay. I do want to just point out, since you objected to scope, Topic 19 is Lewis Rice's communications with debtors and FMG via text message or other messaging applications, including without limitation of WhatsApp.

MR. SHANKLIN: I'll respond. Again, that is a topic that is not stated with reasonable -- is not reasonably specific as to what particular communications. You asked him what a particular communication within this meant, and that is not stated in such a way that he would have known to been prepared for that question.

MS. BUTER: So it's your position that under this topic, which specifically spelled out text messages between Lewis Rice and FMG, that no text messages -- it was not reasonable to review text messages?

MR. SHANKLIN: It's not reasonable to explain the meaning behind any particular text messages that he's presented with. Again, as a corporate rep, it's not anticipated that has an encyclopedic knowledge. It's not expected that we know everything. It's expected that he reasonably prepare for the deposition, which we're halfway through the second day, and he clearly has. We may continue.

MS. BUTER: We may disagree with that, but we'll continue.

BY MS. BUTER:

Q Mr. Parres also shared the view with Ms. Schwartzkopf that, "No matter what, we can't get through the spring without a DIP loan. Just not possible." Did you share that same position?

A We had filed the app -- request -- motion to get a DIP loan. We needed -- the debtors needed a DIP loan.

Q And that was the expensive DIP financing that you referenced; correct?

A It was the option that the debtors had, yes.

Q Did you have any reasonable expectation that that would get approved?

A We filed the motion, so yes.

Q You did have a reasonable expectation that that would be approved by the court?

MR. SHANKLIN: Asked and answered.

THE WITNESS: It -- it was -- it would be difficult. We knew it would be very difficult, but it was certainly an option.

BY MS. BUTER:

Q Okay. And then Ms. Schwartzkopf here tells Mr. Parres, "We need to have a plan to confirm on or about 10/20." Do you see that?

A Yes.

Q And Mr. Parres agreed. Do you see that?

A Yes.

Q Did you share that same position that the debtors needed a plan to confirm by 10/20?

A That was the end of the exclusive period. So yes, that was our deadline in the exclusive period to get a plan on file.

Q Okay. And in September of 2025, did Lewis Rice take steps to move forward with getting a plan to confirm?

A We had circulated the plan terms outline that would be the basis for a plan, yes.

Q And that was before September, I believe, wasn't it?

A That was in mid-August.
Q Yeah. So in September, with this date looming, did Lewis Rice take any further actions to get a plan ready to confirm?
A We were in the midst of the trustee motion and trial, so we could not go to the plan term sheet at that time while the trustee litigation was going on.
Q Why not?
A Because we were involved with the trustee litigation.
Q And if you continue reading these text messages, Mr. Parres indicates that the plan is not a slam dunk either. Do you see that?
A Yes.
Q Do you think a plan could have been confirmed over Frontier's objection?
MR. SHANKLIN: Objection. Calls for speculation.
THE WITNESS: It would not have been a slam dunk. I agree with that aspect.
BY MS. BUTER:
Q And then Juanita says, "I know." And Mr. Parres states, "That's how I convinced Tory it is over." Do you see that?

A Yes.
Q Were you aware that Mr. Parres was trying to convince Tory "it is over"?
A No. We did have discussions with Tory in the -- and I can't -- I forget the first day of hearings, but after the first day of hearings and meeting with the judge, that we had to have discussions with Mr. Schwope about whether continuing to oppose trustee makes sense.
Q Did you have conversations with Mr. Schwope about whether continuing to oppose the trustee motion made sense?
A Yes.
Q Did you believe it made sense to continue opposing the trustee motion?
A As -- after meeting with the judge, we saw that it would be very difficult.
Q Before meeting with the judge -- and I believe you're referring to the conversation in chambers that we had with Judge Norton?
A Yes.
Q Before that, did Lewis Rice believe then it would be very difficult to overcome the trustee motion?
MR. SHANKLIN: Objection. Beyond the

scope.
THE WITNESS: We were confident that we could prevail with the trustee motion.
BY MS. BUTER:
Q You were?
A Yes.
Q If you could look at LEP 180, it indicated that, "Lewis Rice was confident it could prevail on the trustee motion." Was that advice that you gave to Mr. Schwope?
A Yes.
Q And Mr. Parres, we just looked at a text message where he talked about convincing Tory it is over. Despite that comment, you personally still believed you could prevail on the trustee motion?
A Yes.
Q And told Mr. Schwope about that?
MR. SHANKLIN: Objection. Form.
THE WITNESS: We discussed that we believe we could prevail on the trustee motion but had significant obstacles and challenges ahead for the debtors after that.
BY MS. BUTER:
Q If you look at LEP 180, it's a text exchange between Mr. Parres and Ms. Schwope. Do you see that?

A Yes.
Q And had you reviewed these text messages in preparation for your testimony today?
A I believe I saw or looked at these, yes.
Q Okay. On September 12th of 2025, Mr. Parres writes to Ms. Schwope, "Tory seems to be okay considering. So sorry." Do you see that?
A Yes.
Q And Ms. Schwope responds, "I feel good today. My team took the news well, and the leadership team seems to be okay. I wish we could have gotten Tory to do this weeks ago or even in February before we filed, but everything happens for a reason." Do you see that?
A Yes.
Q Was Lewis Rice aware that Ms. Schwope believed getting Tory to have a CRO in place even before the bankruptcy was filed might have been a good idea?
MR. SHANKLIN: Objection. Beyond the scope. Form.
THE WITNESS: Yeah. We had never heard that expressed before.
BY MS. BUTER:
Q So it's your testimony Ms. Schwope never

expressed the sentiment to at least you at Lewis Rice?
A Yeah. I had never heard that from Ms. Schwope.
Q Did you personally directly ask Ms. Schwope if she believed Tory Schwope should stay in charge of the debtor entities?
A I never -- I don't recall asking her specific question to that effect.
Q If you could look at the text chain -- the next page, a text chain between Ms. Schwope and Mr. Parres. 181.
A Yes.
Q Mr. Parres sends Ms. Schwope a text message on September 17, 2025, "Call me now -- call me if you can talk now." And then he says, "You okay" -- the next day he says, "You okay? Do we need to talk?" Do you see that?
A Yes.
Q Ms. Schwope says, "I thought we weren't allowed to talk. If you're allowed, let's chat tomorrow." Do you see that?
A Yes.
Q Do you have any understanding as to what Ms. Schwope meant when she said, "I thought we weren't allowed to talk"?

MR. SHANKLIN: Objection to scope.
THE WITNESS: No. As -- as corporate representative, I don't know what that -- what that means. And I -- in my personal capacity, I don't know what that refers to.
BY MS. BUTER:
Q There was no Lewis Rice mandate or a statement that Lewis Rice attorney should not talk to either Ms. Schwope or Mr. Schwope?
A I -- again, I didn't investigate that, any kind of directive to that effect.
Q I don't think I'm asking you if you investigated it. You're a member of Lewis Rice. You worked on this case. Was there any directive at Lewis Rice that Lewis Rice attorneys should not speak to Mr. Schwope, Ms. Schwope, or anybody at DCA?
MR. SHANKLIN: Objection to scope.
THE WITNESS: I don't recall anything to that effect.
MS. BUTER: Okay.
MR. SHANKLIN: Counsel, you've been going for an hour, which had been the time you said you were going to. What do you think?
MS. BUTER: Probably another 30 minutes, I'm guessing.

MR. SHANKLIN: Okay. Again, we had an agreement that he was going to be done by noon. And it's now 2:00 p.m., and there's still questioning --

MR. COLE: Can we go off the record?

MS. BUTER: We can go off the record.

MR. SHANKLIN: No. This needs to be on the record.

MS. BUTER: Okay. Then I'll put this on the record. We had talked about Mr. Hall needing to be done by noon. Last night, we recognized that off the record. We said, "If he needs to be done by noon." Mr. Hall jumped in and said, "No. I don't have a hard stop." I had proposed starting at eight, and as a result, we did not start at eight o'clock. Okay?

MR. SHANKLIN: That's one hour, and we're now two hours past noon.

MS. BUTER: Yes.

MR. SHANKLIN: Okay. So that accounts --

MS. BUTER: And maybe we would have had to have continued the deposition, but either way, we have three parties who noticed this deposition. We are doing our best to get through it. If you do not want -- and I understand why you're objecting now,

given what's coming in these text messages. But --

MR. SHANKLIN: I'm objecting now, because we made it clear when we scheduled this deposition that there was a limit and you guys agreed to that in accepting the deposition. You --

MR. MILLER: There's no limit in the scheduling order.

MS. BUTER: Yeah, no. There's no limit.

MR. MILLER: -- there's not --

MR. SHANKLIN: Well, there's limits in the emails when we scheduled it. I think I --

MS. BUTER: What do you -- if you'd like to shut it down, we'll take this to Judge Norton.

MR. SHANKLIN: I'm not -- did I threaten to shut it down? I'm just saying that's something that you agreed to and that -- you did. It's in the emails, and we planned accordingly. And I think it's both disrespectful to me as counsel and to the witness.

And so I'm putting that on the record now that this was the arrangement that was agreed to, and it's something that you've decided to blow through. So that's on the record now, and we can continue.

MS. BUTER: I would like to say in response to that, by the way, what we are dealing with and have been dealing with for most of the last hour are text messages that we did not receive despite asking to get them from Shook Hardy for at least over a week. But we did not receive those until the night I was driving down here, which was two days ago.

MR. FAIRLIE: -- three months --

MS. BUTER: So this hour --

MR. SHANKLIN: You're not on the record.

MR. FAIRLIE: I'm on the record.

MR. SHANKLIN: You're not on the record.

MS. BUTER: This hour that we're utilizing right now are things that we didn't even have to be able to determine and factor it into our analysis. In addition, we've had a lot of objections and a lot of push back on non-responsive questions -- non-responsive answers to questions. We can continue going through this. I think we're moving pretty quickly through it, but I don't have much more to say.

MR. SHANKLIN: We'll go through it. Let me respond to that last thing you just said. At the break we took at noon, you said you had an hour

left, and it's now --
MS. BUTER: That's what I thought it would be.
MR. SHANKLIN: Just wait. And it's now been an hour. And so everything you mentioned about text message and other stuff, it's -- we continue to, sort of, breeze past the time. So it's been said on the record, and you may continue.
MS. BUTER: Okay.
MR. SHANKLIN: I do need to take a break at 2:30.
MS. BUTER: We've already agreed to that. And it was my best estimate at the time.
BY MS. BUTER:
Q Okay. Can you now move, Mr. Hall, to Bates stamp number LEP 184? This is, again, a continued text chain between Mr. Parres and Ms. Schwope. Do you see that?
A Yes.
Q Mr. Parres is still employed or still a member of Lewis Rice on September 18, 2025; correct?
A Yes.
Q Okay. Ms. Schwope at 10:43 on 9/18 says, "We'll all be okay. I think this will end up being a blessing in the long run. I hope he can eventually

move on." Do you see that?
A Yes.
Q And then Mr. Parres responds, "Can he sell inventory quickly off Valley Hill? If so, he needs to." Do you see that?
A Yes.
Q Were you aware that Mr. Parres was communicating with Ms. Schwope on providing advice to Mr. Schwope at this time?
A No.
Q Do you know if anybody at Lewis Rice was aware of this?
MR. SHANKLIN: Objection. Beyond the scope.
THE WITNESS: No. I'm not aware of anybody.
BY MS. BUTER:
Q Okay. At any time, did Lewis Rice make the determination that the assets of Valley Hill would be the -- or the Valley Hill Tree Farms, the entity, even though not in bankruptcy would be the property of the debtors?
A I don't recall a specific analysis to that effect, because those types of analyses were being done, as I understood, by the financial advisors,

auditors, so on.
Q But Lewis Rice did have a copy of a lease that was not signed between DCA Kentucky and Valley Hill Tree Farm; correct?
A Yes.
Q And you are not aware of any signed lease that Lewis Rice was ever -- ever located between DCA Kentucky and Valley Hill Tree Farm?
A I'm aware that there was a signed lease. I don't think -- Lewis Rice didn't have it in its possession.
Q Ms. Schwope responds, "Live a normal life with a normal job." She then says, "I'm not sure. I don't know that he's gotten that far yet." Then Mr. Parres responds, "He needs to concentrate on liquidating assets and protecting them. Needs to start with Valley Hill. Quickly, quickly, quickly." Do you see that?
A Yes.
Q Shortly -- Mr. Cole asked you about this yesterday, but shortly after September 18th of 2025, Mr. Schwope reached out to Lewis Rice and asked for a copy of the Valley Hill lease. Do you recall that?
A Yeah. I think that was in October sometime.
Q Okay. And you testified that Mr. Parres

explained to you in your preparation for the 30(b)(6) deposition that it was because Mr. Schwope was addressing assumption or rejection of leases. Do you recall that testimony?

A Yes.

Q Were you aware that at the time Mr. Schwope requested the Valley Hill Tree Farm lease, he was no longer employed by the debtors?

A I was not personally aware, but Lewis Rice was aware at the time that that request had come in.

Q And Mr. Schwope, if he was not employed by the debtors, would not have been involved in any kind of motion to assume or reject leases?

MR. SHANKLIN: Objection. Misstates the testimony from yesterday.

THE WITNESS: He was -- had an interest in the landlord for that lease. So to that extent, he would have an interest in that assumption or rejection.

BY MS. BUTER:

Q He was the landlord?

A He had an interest in the landlord entity. He was the owner of the landlord entity.

Q And the landlord entity was in bankruptcy and being controlled by the CRO at that time; correct?

A That's correct.
Q Okay. Ms. Schwope then asked Mr. Parres, "How does protect them put them in a trust?" Do you see that?
A Yes.
Q And Mr. Parres says, "In his wife's name." Do you see that?
A Yes.
Q Are you aware of the concept of fraudulent transfers?
A Yes.
Q Would you have given the advice to Ms. Schwope to sell the assets of Valley Farm, put them into his wife's -- Mr. Schwope's wife's name?
MR. SHANKLIN: Objection. Form.
THE WITNESS: No.
BY MS. BUTER:
Q If you could turn to the page that is Bates stamped LEP 230, there is a text chain between Mr. Parres and Mr. Tory Schwope on this page, and I'll direct you to a text that is 8/23 at 4:12 p.m.
A Yes.
Q And Mr. Parres states, "We have to keep this quiet, not even tell Juanita. No one to know." Do you see that?

A Yes.
Q Do you have any idea what Mr. Parres was referring to there?
MR. SHANKLIN: Objection. Form.
THE WITNESS: Yeah. I do not.
BY MS. BUTER:
Q On the text that we just looked at where Mr. Parres suggested putting assets in his wife's name, does Lewis Rice agree with that recommendation from Mr. Parres?
MR. SHANKLIN: Outside the scope.
You may answer.
MS. PETERS: Twenty-seven.
MS. BUTER: Twenty-seven. "Any investigation or review concerning the Lewis Rice's attorney's conduct relating to the engagement, including actions taken as a result of any investigation or review."
MR. SHANKLIN: I don't see how that falls in the scope. Same objection.
You can answer. Do you need the question read back?
THE WITNESS: No.
No. Lewis Rice does not agree with that advice.

BY MS. BUTER:
Q You were aware that -- I think you testified to this before, that Mr. Parres instructed Ms. Schwope to delete emails; correct?
MR. SHANKLIN: Objection. Form.
THE WITNESS: I recall seeing a text in my review of this to that effect.
BY MS. BUTER:
Q Is that conduct that Lewis Rice would condone?
A No.
Q I think I've got two more areas just to ask you about. One of them, I am going to have to show you on a laptop, because I did not have it printed. These are text messages we just received.
MS. BUTER: Would you like to see this?
MR. SHANKLIN: Yeah. If you can show it to me.
MS. BUTER: Yeah. I'll need it back to read from it. But ...
MR. COLE: Is it Exhibit 87?
MS. BUTER: It is not anything yet.
BY MS. BUTER:
Q Okay. I am showing you a document on a computer screen. Unfortunately -- I apologize -- I

did not have it printed. I'll represent to you that these are text messages between Mr. Parres and Mr. Goerisch.

A Goerisch.

Q Goerisch. One day I will get that right. We will designate this as Exhibit 87, and we'll provide a written copy to the court reporter, so the transcript is complete.

(Exhibit 87 was marked for identification.)

In this text message, Mr. Parres writes, "The KC bankruptcy court set the next hearing next Thursday. I'm" -- I won't say the word -- "and have to trust John Hall. We won every issue today. Biggest car of my life." Do you have any understanding what Mr. Parres meant when he indicated that he was F'd and would have to trust John Hall?

MR. SHANKLIN: Objection. Form.

THE WITNESS: No. I don't.

BY MS. BUTER:

Q Were you aware that Mr. Parres ever said that about you?

A No.

Q If you could -- I think we can take that back now. Although, actually, maybe leave it there

for just a second. I'm just going to show you the text message on LEP 9 in Exhibit 80 -- I'm sorry. Exhibit 35. So the --
A Oh, sorry.
Q -- Larry text messages --
A Yeah.
Q -- on LEP 9.
MR. SHANKLIN: Did you say nine?
MS. BUTER: Yes. Right at the start.
BY MS. BUTER:
Q On LEP 9, it looks like -- these are the texts produced by Mr. Parres between himself and Mr. Goerisch. And it looks like, in this instance, Mr. Parres actually redacted the information that we just reviewed about you. Do you see that?
A Yes.
Q Do you have any understanding or knowledge -- and you may not -- but as to why those were redacted in Mr. Parres's text?
MR. SHANKLIN: Objection. Form.
THE WITNESS: No.
MS. BUTER: Thank you for your time. I know it was a long day and a half. I appreciate it. I don't have any further questions.
(Discussion held off the record.)

EXAMINATION

BY MR. MILLER:

Q Hi, Mr. Hall. I'm Adam Miller. I'm with the U.S. Trustee's Office, and I just have a few follow-up questions for you. You testified at length yesterday in response to the committee's questions about the conflicts checks and conflicts determinations that were made. Do you recall that testimony?

A I recall, yes.

Q Okay. And you talked at -- I think you testified -- and correct me if I'm wrong -- that you did not believe that Mr. Schwope needed to initially be disclosed because his interests were not adverse to the estate; is that correct?

A I believe that was the determination, yes.

Q Okay. Are you aware that Bankruptcy Rule 2014 uses the word "connections" and not "conflicts"?

A I can't tell you that I know the specific language as we sit here, but that sounds right.

Q Okay. And certainly, Mr. Schwope had a connection to the debtor, did he not?

A He was connected to the debtors. I -- I agree.

Q Okay. And your representation or the firm's

representation of him would have been a connection in the case, would it not have been?

MR. SHANKLIN: Objection. Calls for legal conclusion.

You can answer.

THE WITNESS: Yeah. Without -- yes. I think that's -- that's a fair connection. It was a very slim connection that we had prior to bankruptcy.

MR. SHANKLIN: I think we're on -- oh, I don't -- 80 --

MR. MILLER: 80 -- 82.

MS. BUTER: 88.

BY MR. MILLER:

Q Okay. I'm going to mark you -- I'm going to hand you what I'm marking as Exhibit 88, which is the only exhibit I have.

(Exhibit 88 was marked for identification.)

A I'm glad to hear.

Q I'll ask if you've seen that before. For the record, these are some emails between Mr. Parres, yourself, and Samantha Schwope that are dated in July of 2025. Do you see that?

A Yes.

Q Okay. Did you happen to review these emails

before your deposition?
A I reviewed a lot of emails. I may have seen this one.
Q Okay. Well, these particular emails appear to describe a transaction allegedly between Mr. Schwope -- Mr. Tory Schwope and one of the debtor entities; is that correct?
A I -- yeah. It looks like an equipment lease.
Q Okay. Well, if you look at what is the second to last page -- and I realize these are in reverse chronological order, but there's an email dated July 25, 2025, at 9:53 a.m. --
A Yes.
Q -- from Samantha Schwope to Mr. Parres and yourself; is that correct?
A Yes.
Q Okay. And it appeared to describe a transaction in which Tory leased some equipment under his personal name; is that correct?
A Yes.
Q Okay. And Mrs. Schwope indicated to you and Mr. Parres that Schwope Brothers West Coast was using that equipment; is that correct?
A Yes.

Q Okay. And Schwope Brothers West Coast was also one of the debtor entities; is that correct?
A Yes.
Q Okay. And Mrs. Schwope was seeking advice from you and Mr. Parres about how to document that transaction. Would that be a fair statement?
A Yes.
Q Okay. And then Mr. Parres responds at 10:02, and he appears to instruct Mrs. Schwope to write a lease; is that correct? If you look at the bottom of page two.
A Yeah. He says, "Write a sublease," yes.
Q Okay. So does that indicate to you as somebody who was involved in the case that there was no existing written lease between the parties?
MR. SHANKLIN: Objection. Form.
THE WITNESS: It suggested that there was no written sublease, yes.
BY MR. MILLER:
Q Okay. And then Mrs. Schwope describes in the next email up at 10:05 a.m. that the equipment lease -- some of the equipment leases started in May; is that correct?
A Yes.
Q Okay. And then she indicates she's going to

write the leases; is that correct?
A Yes.
Q Okay. And then Larry responds, "Yikes. He did this post-petition. That's not smart. John, do you think we can say this is ordinary course"; is that correct?
A Yes.
Q And that John would be you; is that correct?
A Yes.
Q Okay. And then did you respond to that email?
A It shows it here, yes.
Q Okay. And your advice was that you did not believe this was an ordinary course transaction unless he regularly did this pre-petition; is that correct?
A That's right.
Q Would it be a fair statement that the "this" would be regularly leased equipment from himself?
A I -- yes.
Q Okay. Were you aware of any other leases between Mr. Schwope and any of the debtor entities?
A For -- for equipment leases, no.
Q Having seen this transaction, do you have any belief as the attorney as to whether that made Mr. Schwope potentially adverse to one of the debtor

entities?
MR. SHANKLIN: Objection. Calls for a legal conclusion.
You may answer.
THE WITNESS: As a counter party to a lease, to the extent that that is adverse, then that could make him adverse.
BY MR. MILLER:
Q Okay. And it looks like to me that the very first email, if you go back to the second to last page, Mrs. Samantha Schwope is indicating to you and Mr. Parres that they're trying to figure out how to document the payments really to Mr. Schwope under that lease; is that correct?
A Yeah. I -- I think that's fair.
Q Well, she writes, "We have three options for getting Tory paid."
A Yes.
Q Do you see that?
A Yes.
Q So Tory was essentially making a claim against one of the debtor entities for payment. Would that be true?
A It looks like he was asking for payment from a debtor entity.

Q Thank you. I do want to ask a follow-up question, and I know your counsel objected to this. And I don't know if he's going to object again, but have you contacted your insurer regarding this deposition and this fee dispute?

MR. SHANKLIN: And I'll again object based on the common interest privilege, work product, attorney-client. And because there is issues and it's related to malpractice, I'll object on the insured-insurer privilege and instruct you not to answer.

BY MR. MILLER:

Q So you're following your counsel's instruction not to answer?

A Yes.

Q Okay. Are you aware of whether there is any insurance coverage for any disgorgement of fees that would be ordered if the court were to order Lewis Rice to disgorge fees as a result of the objections filed in this case?

A I -- I don't know the terms of any policy.

Q You testified yesterday about the retainer that was issued -- or that was paid by the debtors in this case. Do you recall that testimony?

A Yes.

Q And do you recall that you testified that KAT Outdoor was the entity that actually paid Lewis Rice?
A Yes.
Q Okay. And KAT Outdoor is actually a DBA for KAT Nurseries, LLC; is that correct?
A That sounds right.
Q Okay. And then you indicated that you -- nobody at Lewis Rice investigated where KAT Outdoor obtained those funds; is that correct?
A That's right.
Q Okay. Did anybody at Lewis Rice ever ask Tory or Samantha Schwope where those funds originated?
A No. Not at the time of the retainer payment. I want to say that at some point down the line that -- that Tory Schwope told Focus something about the source of those funds, and then we've learned of that at the -- somewhere down the line.
Q Okay. You're an attorney who's been practicing in bankruptcy for -- I think you testified 28 years yesterday; is that correct?
A That's how long I've been at Lewis Rice.
Q Okay. How long have you been practicing bankruptcy law?
A Longer than that. Another five years.

Q Okay. Are you aware that the bankruptcy code requires a debtor's attorney to disclose the source of a retainer that the firm receives?
A Yes.
Q Okay. And you disclosed that that came from KAT Outdoor; is that correct?
A I think that's right.
Q Okay. Are you aware that the firm filed a Rule 2016(b) disclosure statement in this case?
A I -- yes.
Q Okay. And in fact, it actually filed disclosures in each of the related cases; is that correct?
A That sounds right.
Q Are you aware that those disclosures were actually said that the firm received no funds and did not disclose the retainer initially?
A I'm not familiar with the specifics in that, so no. I don't know what exactly the 2016 statement said.
Q Okay. Did you prepare the 2016 statements?
A No.
Q Did you review them before they were filed?
A No.
Q Okay. Would that have been Mr. Parres?

A Yes.
Q Okay. There was some brief testimony about the 341 meeting, and you were asked, I think, by counsel for Frontier about the text message chain that was going on; is that correct? Do you recall that?
A I recall that.
Q Okay. And you are aware that testimony at a meeting of creditors is given under oath by the witness; is that correct?
A Yes.
Q Okay. And you, I think, indicated that part of the 341 process was to give accurate information to our office, to the U.S. Trustee; is that correct?
A That's -- yes.
Q Okay. Do you know if any inaccurate information was given to Mr. Schwope that was given to our office at the 341 meeting?
MR. SHANKLIN: Objection.
THE WITNESS: No.
MR. SHANKLIN: Objection. Form.
You can answer.
THE WITNESS: No. I'm not aware of anything.
BY MR. MILLER:
Q Okay. You, I think, testified about -- I'll

strike that. If testimony -- if information was given in that text chain to Mr. Schwope to testify to that was incorrect, that would be problematic, would it not?

A Yes.

Q Okay. Okay. There was a reference in one of the text messages to some subordinated debt that Mr. Parres was referring to. Do you recall that?

A Boy, I -- not specifically.

Q Okay. And I think this is in -- I don't have the exhibit in front of me.

(Discussion held off the record.)

BY MR. MILLER:

Q Okay. So we're looking at Exhibit 35.

A So those -- those are the texts?

Q Yeah. Those are the texts.

A Okay.

Q I believe it's on page 54. It's marked -- Bates stamped LEP 54.

A Okay.

Q Okay. So the very last text at the bottom it refers to.

A Yes.

Q Mr. Parres says, "When we do the schedules, we need to make sure that we record the subordinated

debt that he has from a previous purchase eight years ago." Are you familiar with what the subordinated debt was?
A I -- I -- it -- I saw this. I don't recall what that was or what it referred to.
Q In your billing records for this case, it looks like that on February 20th of 2025, you billed six and a half hours for revising and reviewing all of the disclosures that were made in the petitions. Do you recall doing that work?
A I recall working on petitions. Yeah.
Q Okay. Do you know if as part of that review you reviewed any of the debt structures of the debtor entities?
A I can't say specifically what I reviewed then.
Q Okay. Do you have any recollection of the subordinated debt that Tory incurred?
A I do not.
Q Do you know if that debt was in Mr. Schwope's personal name or in the name of one of the debtor entities?
A I -- I don't recall anything about subordinated debt.
MR. MILLER: I don't think I have

anything else. Thank you.

MR. DAVIS: Russell, I know you have to take a call. I had a couple of things I wanted to follow up on.

MR. SHANKLIN: Okay. It's not ringing yet if you want to start, you know.

MR. DAVIS: Hopefully I'll be done by the time that phone rings.

And I didn't mean to jump in front of you now.

MR. GOTHAM: No problem.

MR. DAVIS: Thank you, Mr. Gotham.

EXAMINATION

BY MR. DAVIS:

Q Mr. Hall, hello. I've introduced myself on the record a couple of times, but so you understand, I'm Tim Davis, one of the lawyers that represents Focus Management Group.

A Yes.

Q Okay. Obviously, it's clear from your testimony over the last couple of days you're here testifying not only as John Hall, but also as the corporate rep for Lewis Rice. You understand that; correct?

A Yes.

Q One of the topics that you got ready for was Topic 11, and I'm paraphrasing it. I don't think you need to go back and look at it. But Topic 11 asked about communications between Lewis Rice and my client, Focus Management Group, regarding its responsibilities with respect to the bankruptcy. You recall that topic?
A Yes.
Q And so I assume, as part of getting ready for that topic, you would have made a reasonable effort to, kind of, review and get up to speed on the communications between your firm and Focus Management Group; is that fair?
A Yes.
Q Okay. In the course of your prep, your review, getting ready for this deposition, did you come across any instance in which you observed or believed that Focus Management Group somehow fell short or failed in its duties or obligations as chief restructuring officer?
A No.
Q Okay. Let me broaden that question out a little bit. The last one was asking about your review, getting ready for this deposition. Obviously, you were counsel that worked on this bankruptcy

personally; correct?
A Yes.
Q So based on your personal knowledge and experience working on this case, was there ever a time that you personally observed Focus Management Group in any way falling short or failing in its duties as chief restructuring officer?
A No.
Q Okay. Was there ever a time -- based on your personal knowledge or based on your prep getting ready for this deposition, was there ever a time that you observed any instance where you thought Focus Management Group was putting the interests of some person or entity above the interests of the bankruptcy estate?
A No.
Q Okay. In other words, let me ask a more precise question. Based on your review, getting ready for this deposition, based on your personal knowledge, working on this case, did you ever observe a time that Focus Management Group put the interests of Mr. Tory Schwope or any of his family members or any people connected with him, putting those folks above the interests of the debtor's estates in this case? Did you ever observe that happening?

A No.
Q Okay. There's been some discussion of a blocking right with respect to Focus Management Group; correct?
A Yes.
Q And obviously, that's described and set forth in the court's orders describing Focus Management Group's role in this case; right?
A It is.
Q So I'll paraphrase a little bit, but as I understand it, the idea of the blocking right was even during Focus Management's tenure, Tory Schwope was still going to be CEO with power to manage and execute on the affairs of the debtors, but Focus Management Group had a right to basically veto or block his decisions. Am I generally understanding that correctly?
A That's my understanding, yes.
Q Okay. Was there any time over the course of your involvement in this case or anything you saw on prep and getting ready for this deposition where you observed a situation where you thought Focus Management Group should have exercised its blocking right but did not?
A No.

Q Okay. In the course of your prep for this case and based on your personal knowledge, did you ever observe a time where Focus Management Group was performing work in its role as CRO for any non-debtor entities or any non-debtor natural individual persons?
A No.
Q Okay. You recall there was some discussion with counsel for Frontier about an issue surrounding Bergan, the auditor, and what they were going to do about pre-petition expenses and how to handle all that. You recall that topic?
A Yeah. Yes.
Q Was my client, Focus Management Group, involved in that issue at all, to your knowledge?
A I don't believe so.
Q Okay. And then the last thing I wanted to ask you -- and hopefully that phone won't ring -- but you were talking with counsel for Frontier about something getting ready for, like, a September 10th hearing, and there was something about an overstatement of AR discussed in text messages involving Mr. Parres. Do you recall that?
A Yes.
Q And if I heard you right, you said something about, as part of following up on that issue, you had

a discussion with Ms. Juanita Schwartzkopf on that issue. Did I hear you correctly?
A Yes.
Q Okay. I don't know if it was discussed or came out or not. I apologize if I missed it. What did you discuss with Ms. Schwartzkopf about that issue?
A Yeah. I -- I raise it to her, because we were sitting together, and said, "Larry's raising this question, this issue," and Juanita said, "No. I disagree, and here's why." I can't -- I can't recite what it was that she said, but here's what Larry's missing.
Q Did her explanation satisfy you at that time?
A Yes. I don't profess to be, you know, as -- understanding as much as Ms. Schwartzkopf does on financial issues like that, but -- but yes. Her explanation made sense.
Q Okay. And then last question. Over the course of your work in this case, I assume you had some ability and opportunity to observe the personnel and specifically the amount of personnel that Focus Management Group was utilizing to work on this case; is that fair?

A Yes.
Q Okay. In your estimation, did you ever view or come across a time where you thought Focus Management Group was either over staffing or under staffing the matter?
A No.
Q To ask a better question, to your observation, did you think Focus Management's staffing of this matter was appropriate?
A Yes.
MR. DAVIS: Okay. Thank you. I don't have any further questions at this time.
MR. GOTHAM: I have a couple, one or two questions.

EXAMINATION

BY MR. GOTHAM:
Q Mr. Moore [sic], Colin Gotham for DCA Outdoor. The Valley Hill Tree Farm, you would acknowledge that it's alleged that Tory Schwope was the owner of Valley Hill Tree Farm; right?
A Yes.
Q Okay. And they allegedly had a lease with one of the DCA entities; correct?
A Correct.
Q And so that relationship between Mr. Schwope

as owner of the Valley Hill Tree Farm leasing a property to one of the debtor entities, that would make it adverse to the debtor's estate; correct?
A Valley Hill --
MR. SHANKLIN: Objection. Calls for legal conclusion.
You may answer.
THE WITNESS: Yeah. Valley Hill would have a potential right to payment from a debtor entity.
BY MR. GOTHAM:
Q Okay. Would -- was there -- the Valley Hill Tree Farm lease, was that part of any lease assumption motion filed by the debtor entities?
A I don't recall whether we got to that point. Scott Moore was handling the lease assumption issues, so I can't recall specifically.
Q Well, I'll represent to you that the lease motion that was filed, the motion to assume or reject various leases, it's not included in it.
A Okay.
Q And do you have any reason to know why it wasn't included in it?
A I don't know.
Q Okay. Is that -- would -- is that the

debtor's acknowledgment that that lease doesn't exist?
MR. SHANKLIN: Objection to form.
THE WITNESS: Well, I don't know what the debtors would acknowledge or not acknowledge.
BY MR. GOTHAM:
Q You understand that there's a deadline to file a motion to assume or reject leases in a Chapter 11?
A Of non-residential real estate, yes.
Q Yes. Excuse me. And if you miss that deadline, then it's deemed rejected; correct?
A Correct.
Q Okay. And so if that lease is not included on the motion to assume or reject, then it's rejected; correct?
A It's deemed rejected. Right.
MR. GOTHAM: I don't have any further.
MR. SHANKLIN: No questions for me. Thank you, everyone, for accommodating my 2:30, although he's not called yet, but --
THE WITNESS: That may be a bad sign.
MR. SHANKLIN: Yeah.
THE VIDEOGRAPHER: The time is 2:38 p.m. We are off the record.
(Signature reserved.)

(Whereupon, at 2:38 p.m., the proceeding was concluded.)

CERTIFICATE OF DEPOSITION OFFICER

I, KATHLEEN BEHRENS, the officer before whom the foregoing proceedings were taken, do hereby certify that any witness(es) in the foregoing proceedings, prior to testifying, were duly sworn; that the proceedings were recorded by me and thereafter reduced to typewriting by a qualified transcriptionist; that said digital audio recording of said proceedings are a true and accurate record to the best of my knowledge, skills, and ability; that I am neither counsel for, related to, nor employed by any of the parties to the action in which this was taken; and, further, that I am not a relative or employee of any counsel or attorney employed by the parties hereto, nor financially or otherwise interested in the outcome of this action.

KATHLEEN BEHRENS
Notary Public in and for the
State of Missouri

[X] Review of the transcript was requested.

CERTIFICATE OF TRANSCRIBER

I, J. RACHEL ROBERTS, do hereby certify that this transcript was prepared from the digital audio recording of the foregoing proceeding, that said transcript is a true and accurate record of the proceedings to the best of my knowledge, skills, and ability; that I am neither counsel for, related to, nor employed by any of the parties to the action in which this was taken; and, further, that I am not a relative or employee of any counsel or attorney employed by the parties hereto, nor financially or otherwise interested in the outcome of this action.



J. RACHEL ROBERTS

Veritext Legal Solutions
1100 Superior Ave
Suite 1820
Cleveland, Ohio 44114
Phone: 216-523-1313

To: Russell J. Shankland, Esq.

Case Name: DCA Outdoor Inc., et al.

Veritext Reference Number: 8450794

Witness: John Hall, Volume II, 30(B)(6)
Deposition Date: 9/23/2026

Dear Sir/Madam:

Enclosed please find a deposition transcript. Please have the witness review the transcript and note any changes or corrections on the included errata sheet, indicating the page, line number, change, and the reason for the change. Have the witness' signature notarized and forward the completed page(s) back to us at the Production address shown

above, or email to production-midwest@veritext.com.

If the errata is not returned within thirty days of your receipt of this letter, the reading and signing will be deemed waived.

Sincerely,

Production Department

NO NOTARY REQUIRED IN CA

DEPOSITION REVIEW
CERTIFICATION OF WITNESS

ASSIGNMENT REFERENCE NO: 8450794
CASE NAME: DCA Outdoor Inc., et al.
DATE OF DEPOSITION: 9/23/2026
WITNESS' NAME: John Hall, Volume II, 30(B)(6)

In accordance with the Rules of Civil Procedure, I have read the entire transcript of my testimony or it has been read to me.

I have made no changes to the testimony as transcribed by the court reporter.

_______________ _________________________
Date John Hall, Volume II, 30(B)(6)

Sworn to and subscribed before me, a Notary Public in and for the State and County, the referenced witness did personally appear and acknowledge that:

They have read the transcript;
They signed the foregoing Sworn Statement; and
Their execution of this Statement is of their free act and deed.

I have affixed my name and official seal

this ______ day of_____________________, 20____.

____________________________________
Notary Public

____________________________________
Commission Expiration Date

DEPOSITION REVIEW
CERTIFICATION OF WITNESS

ASSIGNMENT REFERENCE NO: 8450794
CASE NAME: DCA Outdoor Inc., et al.
DATE OF DEPOSITION: 9/23/2026
WITNESS' NAME: John Hall, Volume II, 30(B)(6)

In accordance with the Rules of Civil Procedure, I have read the entire transcript of my testimony or it has been read to me.

I have listed my changes on the attached Errata Sheet, listing page and line numbers as well as the reason(s) for the change(s).

I request that these changes be entered as part of the record of my testimony.

I have executed the Errata Sheet, as well as this Certificate, and request and authorize that both be appended to the transcript of my testimony and be incorporated therein.

_______________ ________________________
Date John Hall, Volume II, 30(B)(6)

Sworn to and subscribed before me, a Notary Public in and for the State and County, the referenced witness did personally appear and acknowledge that:

They have read the transcript;
They have listed all of their corrections in the appended Errata Sheet;
They signed the foregoing Sworn Statement; and
Their execution of this Statement is of their free act and deed.

I have affixed my name and official seal this ______ day of_____________________, 20____.

___________________________________
Notary Public

___________________________________
Commission Expiration Date

ERRATA SHEET

VERITEXT LEGAL SOLUTIONS MIDWEST

ASSIGNMENT NO: 8450794

PAGE/LINE(S) / CHANGE /REASON

____________________________________________________

____________________________________________________

____________________________________________________

____________________________________________________

____________________________________________________

____________________________________________________

____________________________________________________

____________________________________________________

____________________________________________________

____________________________________________________

____________________________________________________

____________________________________________________

____________________________________________________

____________________________________________________

____________________________________________________

_______________ ________________________

Date John Hall, Volume II, 30(B)(6)

SUBSCRIBED AND SWORN TO BEFORE ME THIS ________

DAY OF ________________________, 20______ .

___________________________________

Notary Public

___________________________________

Commission Expiration Date

**&**

**&** 308:4 333:14 333:16

**0**

**02/24/25** 310:4
**03/10/25** 310:6
**03/24/25** 311:7
**04/02/25** 311:22
**04/07/25** 311:14
**04/09/25** 311:16,19
**05/09/25** 310:8
**05/29/25** 309:13
**06/16/25** 309:16,18,21
**07/13/25** 311:25
**07/25/25** 312:5
**08/20/25** 309:25
**08/25/25** 309:11 310:13 310:17
**09/01/25** 310:11
**09/04/25** 310:15
**09/11/25** 310:19
**09/29/25** 310:21

**1**

**1** 350:4 383:5 427:4
**1.2** 400:22 474:12
**1.4** 336:17
**1/31** 350:8
**10** 357:1 422:13
**10/20** 482:9 485:10,15
**10/31** 478:23 479:7,14,17,21
**10/5** 478:23 479:13
**1000** 306:19
**105** 453:2 477:17
**105-179** 311:25
**106** 455:21 477:16 478:19 478:20
**107** 479:24
**108** 481:2
**109** 456:5 457:17
**10:02** 507:9
**10:05** 507:21
**10:12:26** 477:20
**10:29** 378:20
**10:43** 495:23
**10:51** 378:23
**10th** 376:8,11 456:16 520:19
**11** 364:16,21 365:1,8 383:22 385:7,11 386:4 388:7 389:11 390:2,24 392:20 393:11 395:8 397:23 416:5 419:5 447:10 467:23 517:2,3 524:8
**1100** 528:1
**112** 454:10 465:22
**11:54** 480:1
**11:57** 482:1
**11th** 422:14 423:3 425:19 456:6,9,16 457:2 461:19 463:13,15
**12** 340:17,24 341:2
**1200** 307:14
**128** 481:24
**128,626,276** 350:4
**12:19** 445:20
**12th** 489:5
**13,000** 441:13 441:18 442:1 442:17
**13th** 453:22
**140** 357:3
**1400** 306:19
**149,691,338** 349:16
**154,177,583** 349:22
**16** 354:8
**160** 450:15
**160,000** 438:13
**160k** 449:1
**165** 432:21,22
**165,000** 430:9 432:12 438:14
**1650** 306:6
**16th** 348:25 350:11 351:4 351:17
**17** 382:22 490:14
**179** 453:2
**18** 495:21
**180** 488:7,24
**181** 490:11
**1820** 528:2
**184** 495:16
**18th** 497:21
**19** 483:10
**1:01** 445:23
**1st** 382:15

## 2

**2** 356:23 357:7 410:8 412:16 462:7,22
**2/20** 349:22 350:8
**2/20/2025** 471:16
**2/21** 463:5
**20** 343:19 427:7 529:16 530:22 531:22
**200** 308:5
**2014** 504:18
**2016** 512:9,19 512:21
**2020** 477:22
**2020-2021** 478:4
**2021** 471:12 478:8,15
**2022** 342:21
**2023** 311:9 330:9,15 332:1 332:6,10,20 335:6 336:17 336:22 429:7 429:23,25 430:4 433:19 436:18 437:6 437:10,21 438:17 443:2 446:12,18 448:25 449:4 449:10 450:4 450:14,22
**2024** 429:7,24 430:8 431:10 437:6,10,21 438:12 448:24 449:1,25 450:15 451:19
**2025** 315:19,21 331:13 335:4 336:17 340:10 340:21 341:9 342:8,20,23 343:19 346:12 346:16,20 348:25 350:5 350:12 351:4 351:18 354:8 356:10 373:24 374:23 375:9 376:8,11 377:13 379:18 379:25 380:12 382:15 383:5 393:20 400:1 401:17 406:2 407:23 408:11 409:7 410:8 412:16 416:8 417:12,23 420:13 422:13 423:3 426:13 426:16,18 428:20 433:7 439:20 441:23 443:15 444:16 448:7 453:22 456:7,9 457:2 477:20 478:6 478:16 479:4 482:17 485:19 489:5 490:14 495:21 497:21 505:23 506:13 515:7
**2026** 305:13 313:4 387:24 393:19 453:23
**20th** 351:14 356:10 433:6 515:7
**21** 471:16
**216-523-1313** 528:3
**22** 314:20 315:10 471:12 471:16
**22nd** 336:16
**23** 305:13 313:4 315:9
**230** 499:19
**24** 315:9 373:24 477:20 478:16
**24th** 375:8 478:6
**25** 350:8 364:9 367:19 506:13
**25-50053-11** 305:6
**2555** 305:16 307:22
**25th** 331:13 335:4 399:25 474:2,5 479:4
**26713** 527:14
**27** 312:3
**27th** 474:3
**28** 345:4 426:16 511:21
**29** 342:20 426:18
**290,000** 329:23
**29459** 526:16
**29th** 340:21 341:9 342:8,23 343:15 348:13 377:13 426:12 428:20
**2:00** 492:3
**2:30** 495:11 524:19
**2:47** 481:4
**2nd** 407:23 408:11 409:7 448:7

## 3

**3** 359:8 462:11 464:4

**30** 305:10 318:3,15 320:13 340:10 346:12,16,20 357:5,11 389:8 491:24 498:1 528:8 529:4,9 530:4,13 531:20
**30th** 344:11 346:5 347:25
**31** 350:5
**314** 309:3 454:14
**31st** 420:13
**324-0300** 306:25
**327** 438:11 447:11 449:22
**331** 309:11
**340** 309:13
**341** 364:10,11 364:14,16,20 365:5,11,14,17 365:25 366:13 366:15 367:8 367:13,15,19 367:20,21 368:5,8,11 369:4,17,24 370:4,12,18,18 370:23 371:8 372:15 513:3 513:12,17
**346-6000** 306:10
**348** 309:16
**35** 464:24 465:1 466:6 469:2 503:3 514:14
**352** 309:19
**354** 309:22
**356** 309:25
**37** 464:15,22
**374** 310:4
**374-3200** 307:17
**376** 310:6
**377** 310:9
**3800** 307:14
**381** 310:11

**4**

**4** 418:22
**400** 307:6 310:13
**402** 306:10,11
**406** 310:15
**418** 310:18
**422** 310:20
**426** 310:23
**429** 310:25
**433** 311:5
**434** 311:7
**436** 311:10
**438** 311:14
**439** 311:17
**441** 311:20
**44114** 528:2
**447** 311:23
**453** 311:25
**47** 469:3
**474-6550** 307:25
**474-8100** 306:24
**497-5261** 454:14
**4:12** 499:21
**4:20** 478:22
**4th** 406:2 407:23 416:8 417:12,23 418:8

**5**

**5/31** 349:15
**502** 312:3
**504** 309:4
**505** 312:7
**51** 466:9 467:21
**510** 312:11
**512-1957** 307:9
**516** 309:5
**52** 468:4
**522** 309:6
**54** 471:22 514:18,19

**6**

**6** 305:10 312:11 318:3 318:15 320:13 389:8 498:1 528:8 529:4,9 530:4,13 531:20
**60** 425:15 438:18 446:13
**60k** 449:1 450:15
**63** 309:10 331:5,6,9 333:13
**64** 309:12 339:21,22 340:1,13 341:7 341:14 343:13
**64105** 307:15
**64106** 306:20 307:7
**64108** 305:17 307:23
**65** 309:14 348:18,19,22 349:4,10 352:7
**65,000** 438:20 446:15 450:4
**66** 309:17 352:11,11,14 427:8,12 428:16,21,24

429:2 473:25 473:25
**661-8609** 306:11
**66217** 308:6
**67** 309:20 354:6,7,10,14
**68** 309:23 356:3,4,7,20 357:23
**68102-2103** 306:7
**69** 310:3 373:23,24 374:2

**7**

**7** 364:25 423:25 424:13
**7/31** 462:21
**70** 310:5 376:2 376:3,5
**71** 310:7 377:7 377:8,10
**72** 310:10 381:20,24 382:14
**7225** 308:5
**73** 310:12 399:21,21,24 400:3,11
**74** 310:14 341:7 405:23 405:24 406:4 415:20
**75** 310:16 418:12,12,15
**75,000** 437:9 438:18 446:13
**76** 310:19 422:12,13,15 422:23
**77** 310:21 426:11,12,14 426:21 427:16
**78** 310:24 429:9,11,15 430:3 432:11 466:12
**79** 311:3 432:24 433:2

**8**

**8** 389:8
**8/23** 499:21
**8/25/2025** 478:21
**8/26** 480:1
**8/26/2025** 481:4
**8/31** 462:25
**80** 311:6 434:15,15,18 434:22 435:8 503:2 505:10 505:11
**81** 311:8 418:22 436:16 436:16,20,24 476:12,12,17
**816** 306:24 307:9,17,25
**82** 311:11 437:25 438:1,4 446:2,4 449:16 449:20 505:11
**83** 311:15 439:4,6,8
**83,335** 430:4
**84** 311:18 440:23,23 441:1,8 444:12
**8450794** 305:19 528:7 529:2 530:2 531:2
**85** 311:21 447:2,2,6 450:8,12
**86** 311:24 452:23,24 453:4,21 455:20,21 465:13,16 466:3 467:11
**87** 312:3 501:21 502:6,9
**88** 312:4 505:12,15,17
**8th** 439:6

**9**

**9** 503:2,7,11
**9,000** 430:5
**9,900** 430:5
**9/18** 495:23
**9/23/2026** 528:9 529:3 530:3
**9/4/2025** 481:25
**90** 376:22 482:13
**913** 308:8
**962-8700** 308:8
**972** 306:25
**9:03** 305:14 313:5
**9:53** 506:13
**9th** 307:6 439:20 441:23 443:14 444:16

**a**

**a.m.** 305:14 313:5 378:20 378:23 477:20 506:13 507:21
**ability** 339:16 344:3 373:5 393:17 521:22 526:10 527:7
**able** 347:22 402:11 461:25 470:3 494:17

**above** 376:14 518:14,23 528:17
**absolutely** 480:6
**absurd** 432:12
**acceptable** 438:21 451:22
**accepting** 493:5
**access** 478:8
**accommodati...** 524:19
**accordance** 529:5 530:5
**account** 332:11
**accountant** 359:23
**accounted** 315:15 316:1 333:21
**accounting** 315:19,23 316:5,17,21 324:6,15 333:16 404:10 404:17,22 406:23 407:3 407:10
**accounts** 358:5 358:9 492:20
**accuracy** 322:11 329:12
**accurate** 322:7 329:6 331:17 355:16,18,22 355:24 356:2 394:12 435:24 436:4,8 477:21 513:12 526:9 527:5
**accurately** 426:6
**acknowledge** 522:19 524:4,4 529:11 530:16
**acknowledg...** 524:1
**acquiring** 374:12
**act** 390:10 529:14 530:20
**action** 330:25 336:8 360:20 361:22,24 421:18 526:12 526:16 527:8 527:12
**actions** 386:18 387:2 422:6 445:7 486:3 500:17
**active** 404:16
**actively** 483:1
**actual** 370:3 440:3,20 442:7
**actually** 318:17 358:21 442:11 444:12 455:20 477:16 502:25 503:14 511:2,5 512:11,16
**adam** 307:3 313:25 504:3
**adam.e.miller** 307:8
**adams** 409:3
**adding** 349:18
**addition** 327:19 494:18
**additional** 329:16 343:19 343:23 401:8 404:10
**address** 326:23 327:1 528:16
**addressed** 343:1 463:15
**addresses** 407:12
**addressing** 329:24 355:19 498:3
**adequacy** 333:2
**adequate** 309:24 325:8 325:13 326:2,8 326:19,20,24 327:9 332:24 333:3 356:5 362:17,18,22 363:3,9 405:4
**adequately** 325:6,18
**adjusted** 352:25 353:9
**adjustment** 318:21 321:12 323:17,21 324:3,15,22 332:23 343:2
**adjustments** 320:17 321:3 322:22 335:5 353:3
**adopted** 444:13
**advance** 391:15
**adverse** 504:14 508:25 509:6,7 523:3
**advice** 417:5 441:24 488:9 496:8 499:12 500:25 507:4 508:13
**advised** 362:5
**advisor** 321:23 328:19 355:12 405:9
**advisors** 322:11,14 328:7,16,19 329:2 331:3

333:8 342:19 358:4,23 359:3 404:2 496:25
**affairs** 519:14
**affiliate** 429:18
**affixed** 529:15 530:21
**afford** 400:20
**afternoon** 469:14
**ago** 397:15 489:12 494:7 515:2
**agree** 326:23 406:16 407:16 409:1 410:2 430:17,21 472:21 486:21 500:9,24 504:24
**agreeable** 415:25
**agreed** 321:11 339:1,3,19 350:20 399:2,4 399:5 419:16 419:18,20 420:3 423:14 423:16,18 425:14 482:12 485:12 493:4 493:17,22 495:12
**agreement** 338:17,19,20 339:5 347:18 347:20 401:7 420:11 456:10 492:2
**agreements** 361:16
**agrees** 411:15
**ahead** 488:21
**al** 305:6 528:6 529:3 530:3
**alerted** 414:20
**alex** 309:15,17 348:20 349:4 351:3 352:12 353:6,13 354:14,17
**aligns** 417:25
**allegation** 364:7
**allegations** 364:5
**alleged** 522:19
**allegedly** 506:5 522:22
**allow** 448:19 469:14,18 470:9 471:7,7
**allowed** 447:12 490:20,20,25
**alternative** 401:14
**alternatively** 448:22
**alternatives** 401:14
**amen** 477:2
**amended** 366:22
**amendment** 367:2
**amendments** 367:4
**amount** 429:23 435:17 436:5 521:23
**amounts** 433:19 435:12 436:10 439:22 439:24 440:2,9 440:12
**analyses** 399:12 496:24
**analysis** 309:22 328:9,14 347:5 349:5,6,10 351:3 352:18 352:20 354:15 362:9 379:5 383:6,13 386:18,22 387:1 389:14 390:10 398:19 398:25 399:14 399:17 463:8 470:22 471:2
494:18 496:23
**analyze** 318:23 320:6 358:14 358:20 363:22 389:20 391:5
**analyzed** 351:18
**analyzing** 395:18
**andrew** 308:14
**animosity** 473:18
**anna** 306:17 313:20
**annual** 353:3
**annually** 352:25 353:9
**answer** 312:9 317:12 318:10 338:9 355:4 361:19 364:2 365:20 366:25 368:6 369:19 370:10 371:9 372:6 373:2,16 423:11 461:25 462:2 463:19 468:23 500:12 500:21 505:5 509:4 510:11 510:14 513:21 523:7
**answered** 338:8 339:10

380:15 384:25 392:22 395:12 395:12 421:20 425:25 428:11 460:18,24 470:25 485:3
**answering** 369:18 370:14 371:10
**answers** 370:5 494:20
**anticipated** 484:4
**anybody** 337:24 377:2 377:25 399:18 422:6 463:8 491:16 496:11 496:16 511:12
**anytime** 396:23 414:25
**apart** 390:23
**apologize** 446:23 501:25 521:5
**app** 484:17
**apparent** 384:22
**apparently** 392:16 427:10 461:23
**appear** 365:1 439:14 454:11 455:23 506:4 529:11 530:15
**appeared** 506:18
**appears** 331:16 356:14,15 382:17 448:4 507:9
**appended** 530:11,18
**application** 311:12,22 318:21 343:1 431:15 439:24 442:24 446:7 448:17
**applications** 444:19,22 452:12,18 483:12
**applied** 317:25 324:2 360:1,5
**appoint** 385:7 385:11,21 388:7 390:24 391:10 402:20 417:1 418:3 424:2 425:16 456:11
**appointed** 388:20 392:1 394:8,22 395:20 396:10 396:20,24 397:4,23 398:8 402:25 419:6 423:4,24 424:5 424:12 469:15 469:18 470:9 470:18 471:8
**appointing** 458:5
**appointment** 386:4,7 387:22 388:3,5,13 389:11,20 390:1 391:22 392:3,11,13,20 393:10,22 395:2,3,8 396:18 408:21 416:4 417:19 422:20 423:18
**appraisal** 315:5
**appraisals** 314:20 315:1 337:2,4,6,9,10 337:14,22,23 338:1,6,12,14 338:18,22 339:4,7 341:17 346:13
**appreciate** 503:23
**approach** 348:8 368:5
**appropriate** 322:12 345:3 347:6 369:16 370:5 372:12 385:23 386:2 391:6 399:13 413:5,9 417:5 451:7 477:10 481:19 522:9
**approve** 337:17 337:22,25 370:17
**approved** 407:19 408:16 411:4 484:24 485:2
**approving** 311:17,20 439:12
**approximate** 357:20
**approximately** 329:23 351:16 359:8 466:12
**april** 439:6,20 441:23 443:14 444:15 448:7
**ar** 357:1 358:12 358:14,20 359:1,8,8,14,19 360:5 462:7,22 462:24 463:3 463:10 464:4 520:21
**arbor** 462:23
**area** 345:4

**areas** 501:12
**argue** 329:4 389:14
**argued** 327:16 327:21
**argument** 358:10 456:23
**argumentative** 317:8 318:2 369:21 370:20 371:13 413:18 442:13
**arrangement** 493:22
**asap** 447:5,20
**aschuler** 306:23
**asked** 338:7,16 339:10 379:4 380:14 381:15 384:24 392:22 395:11 397:14 402:1 410:18 417:24 421:20 425:24 428:10 455:10 460:17 460:23 461:20 463:11 468:16 470:24 475:24 483:17 485:3 497:20,22 499:2 513:3 517:3
**asking** 317:24 347:11 367:21 372:25 373:12 387:1 414:5 432:5 452:3 463:14 490:7 491:12 494:5 509:24 517:23
**asks** 429:24 438:20 447:17 471:23
**aspect** 407:5 486:21
**aspects** 346:23 393:24 399:4 403:18 413:13
**assert** 464:4
**asserted** 363:19
**assess** 372:11 386:6 397:24 398:24 405:3 405:13
**assessed** 398:22
**assessing** 391:18
**assessment** 387:6,9 394:16 396:6 404:3,5 404:8 413:20
**asset** 357:22 359:21 373:19 387:18
**assets** 317:22 326:6 327:9,15 328:4 329:3 356:21 357:7 365:2 373:10 374:12 376:19 383:15,23 384:15 387:4 389:13 390:3 397:19 427:11 428:20 470:23 471:2 475:1 496:19 497:16 499:13 500:8
**assignment** 529:2 530:2 531:2
**assist** 369:23 369:25 370:13 370:22 371:14 378:2 404:12
**assistance** 310:9 377:18
**assume** 314:17 391:4 435:20 439:16 477:21 498:13 517:9 521:21 523:19 524:7,14
**assumes** 392:25
**assuming** 392:24
**assumption** 334:1 403:4 419:15 467:15 498:3,18 523:13,16
**assurances** 335:7
**assured** 337:11
**attach** 439:11
**attached** 382:20,23 416:4 439:18 530:7
**attaching** 349:5 382:16 436:18
**attachment** 439:17
**attachments** 382:20
**attempt** 408:20 444:8
**attempted** 440:4
**attend** 367:8
**attended** 319:9 319:12 365:5 369:15
**attending** 369:4
**attention** 344:17 345:3,8 389:7 477:19
**attorney** 324:21 365:5 369:23 414:16 420:23 445:9 491:8 508:24 510:8 511:19

512:2 526:14 527:10
**attorney's** 500:16
**attorneys** 319:12 323:12 329:23 369:24 370:11,18 371:1 491:15
**attractive** 377:19 378:3
**auction** 376:13
**audio** 526:8 527:3
**audit** 310:25 311:10 316:17 330:9,15 332:6 332:10,20 336:17,22 337:1,4 339:6 342:21 429:6 429:23,25 430:5,8 431:10 432:12,16,25 433:19 435:4 435:16,21 436:18 437:10 437:21,21 438:17 439:12 443:2 446:12 446:18 448:24 448:25 449:5 449:10 450:4 450:15,22 451:20 477:22 478:4,8,16,18
**audited** 322:8,9 342:17 471:12 471:15,19
**auditing** 316:21
**auditor** 339:16 520:9
**auditors** 316:1 316:4,16,20 319:24 322:9 322:15 323:21 497:1
**audits** 315:9 437:6 478:2
**august** 315:18 315:21 331:13 335:4 356:10 399:25 401:17 420:12 474:2,3 474:5 477:20 478:6,16 479:4 486:1
**authoring** 469:21
**authority** 388:6
**authorize** 530:11
**authorized** 416:1
**authorizing** 469:21
**available** 337:8 357:20 358:13
**ave** 528:1
**avenue** 307:22 385:23 386:2 421:13,13
**aware** 318:20 319:15 320:15 320:22 322:20 323:20 324:4 325:3 326:17 329:21 330:8 330:10,13 336:2,5,10,13 339:5 340:19 347:2,3 350:12 350:19 360:12 362:21 363:13 363:19 364:6 367:18,19 368:12 372:9 379:11,17 381:22 382:2 384:5 394:7 408:9 420:11 444:21,23 452:14 475:9 477:4 480:20 481:15 483:5 487:2 489:16 496:7,12,15 497:6,9 498:6 498:9,10 499:9 501:2 502:21 504:17 508:20 510:16 512:1,8 512:15 513:7 513:22

**b**

**b** 305:10 309:8 310:1 311:1 312:1 318:3,15 320:13 389:8 425:15 498:1 512:9 528:8 529:4,9 530:4 530:13 531:20
**back** 318:17 329:18 340:23 343:12 379:3 399:22 435:1 436:25 438:13 443:8 455:19 469:23,24 494:19 500:22 501:19 502:25 509:10 517:3 528:16
**backed** 359:16 359:20,25
**background** 351:9,22 377:22
**bacon** 305:15 307:21
**bad** 359:8,19 473:3 524:21

**balance** 321:13 321:24 322:23 350:3,3,12,21 352:19,25 353:8,8,15,20 353:25 431:3 462:21
**bankrupt** 394:23
**bankruptcies** 423:7
**bankruptcy** 305:1 317:6,21 318:18 319:10 319:13 320:2 321:22 323:23 325:3,10 328:24 330:3 336:4,24 339:8 344:10,20 345:16 346:24 349:23 355:11 362:14,22 364:16 365:4 376:20,21 380:1 383:22 385:21 387:3 389:13 390:3 390:17 393:12 395:5 403:11 410:16 415:2 419:4 420:12 421:1 422:7 431:19 433:15 435:12 436:1 436:10 437:20 441:15 451:23 451:25 452:4,7 452:13 468:11 469:13 473:10 473:12 475:23 475:25 477:11 489:18 496:21 498:24 502:12 504:17 505:8 511:20,24 512:1 517:6,25 518:14
**bare** 469:13
**barriers** 362:4
**bars** 362:3
**base** 341:22
**based** 318:14 329:21 334:18 337:19 342:17 349:8,12 360:6 382:4 385:19 419:14 435:24 482:20 510:7 518:3,9,10,18 518:19 520:2
**basically** 519:15
**basis** 342:16 351:9,22 357:22 361:9 361:11 485:23
**batch** 467:10
**bates** 311:25 453:1 454:10 455:21 456:5 466:12 467:20 468:4 473:25 476:12 478:19 479:23 481:2 495:15 499:18 514:19
**bclplaw.com** 307:16
**bdv** 429:19 446:8,17 448:12
**begins** 466:11
**behalf** 306:2,13 307:2,11,19 308:2 313:15 313:18,21 314:6 319:21 327:6,22 338:4 367:22 369:4 391:6 401:10 405:25 415:20
**behrens** 305:18 526:2,17
**belief** 410:25 428:23,23 508:24
**believe** 317:23 324:11 328:25 332:22 334:9 335:24 342:22 345:21 366:2 366:14 369:14 369:16 370:4 373:20 375:10 385:14 391:24 395:12 401:20 402:1 406:6 408:7,14 409:18,21,25 413:23 415:1 423:4 426:4 427:22 430:14 434:7,10 451:22 455:16 464:14 470:10 472:13 479:5 485:24 487:14 487:19,22 488:20 489:4 504:13,16 508:14 514:18 520:15
**believed** 321:24 393:9 396:11 462:5 488:15 489:17 490:5 517:18
**beneficial** 412:13 413:21
**benefit** 383:16 397:25 411:22 412:6
**benefited** 413:14

**benefits** 470:17 476:6
**benjamin** 310:5 376:3
**bergan** 311:17 311:20 315:8 319:13 322:20 323:2,3,25 330:9,13,14,20 332:5,17,20 334:25 335:7 336:11 339:16 350:20 429:6 429:18,22 431:10,15 432:6 433:10 434:2 437:4,8 437:13,18 438:9 439:12 439:23 440:1,3 440:9,17,20 441:24 442:7 442:10,19,22 443:16,22 444:3,13,19 446:7,17,23 447:22 448:12 448:18,22 449:21 450:12 520:9
**bergan's** 444:22
**best** 373:5 397:25 413:16 414:1 419:4 457:23 458:2,6 492:24 495:13 526:10 527:6
**beth** 409:25
**better** 344:4,6 522:7
**beyond** 343:18 355:2 384:7,25 389:22,23 391:11 396:21 412:9 414:4 417:13 423:9 430:18 431:11 487:25 489:20 496:13
**bid** 375:22 376:1 435:15
**bidder** 476:1
**bids** 432:13,15 432:20,21 433:1
**big** 422:25 423:5,8 424:21 425:4,21 458:14,18,23 459:4 460:2,7 460:14 461:4 462:5
**biggest** 502:15
**bill** 441:13,25 442:19
**billed** 329:23 440:2 442:24 482:23 515:7
**billing** 362:9 442:10 444:11 444:11,13 515:6
**birthday** 457:4 457:5
**bit** 467:25 517:23 519:10
**bitch** 472:9
**bkdv** 311:5 433:10
**black** 454:17
**blessing** 495:25
**block** 519:15
**blocking** 519:3 519:11,23
**blow** 493:23
**bluff** 474:22
**board** 389:11 390:2 425:16 480:11,14
**bones** 469:13
**books** 321:4 324:9 358:20 360:5
**borrower** 475:10
**borrowing** 341:22
**bottom** 339:22 340:12 341:13 349:3 400:10 427:15 429:12 436:17 439:5 447:3 453:20 457:17 507:11 514:21
**boulevard** 305:16
**boxes** 454:17
**boy** 514:9
**break** 378:17 445:19 494:25 495:11
**breeze** 495:7
**brehob** 336:3,9 336:10 374:9
**brent** 308:11 313:23 416:19 456:11
**brief** 513:2
**bring** 427:12 468:1
**bringing** 388:12 396:6
**broaden** 517:22
**brokerage** 376:13
**brooks** 310:3 373:25 374:4,5 374:8
**brothers** 333:24 379:13 379:18 380:12 506:23 507:1

**brought** 404:12
**brown** 448:3,7
**bryan** 307:13
**budget** 337:13 337:14,20,25 338:5,11 407:16 411:4 428:5
**building** 306:6
**bullet** 356:19 407:11,12,15 408:19 410:2 410:22 411:14 411:18 413:25 446:10
**bullets** 406:14
**bummer** 479:1
**bury** 472:8
**business** 387:17 395:6 395:16,24 396:3 397:21 398:5,5,23,24 407:19
**businesses** 374:10 397:19 425:17
**buter** 306:3 309:3 313:8,8 314:13 317:2 317:18 318:16 319:4 321:1,8 321:20 322:13 323:4,13 324:23 325:22 326:5 329:9 330:21 337:3 338:15 339:14 341:5 343:11 344:15 345:1,9 346:1,9 347:9 347:16 350:1 350:18 351:2 351:12,24 355:9,17 358:2 358:18 360:3 360:16,18 361:1,21 363:21 364:8 366:6 367:7 368:9,20 369:11 370:2 370:16,24 371:7,18 372:3 372:14,22 373:6,22 375:6 378:16 379:1 379:24 380:9 380:17,24 381:5,14 383:21 384:2 384:13 385:6 385:18 386:3 386:24 387:8 388:2,18 389:6 390:6,7 391:3 391:20 392:8 393:1,8 395:17 396:17 397:1,9 398:7,17 401:16 403:19 404:4,13 405:11,22 408:3,18 409:13,19 410:1,14 411:11 412:5 412:14 413:11 413:22 414:5,8 414:18 417:20 419:23 420:7 421:7,16,23 422:11 423:20 426:3,10 428:7 428:14 430:20 431:1,17 432:4 432:8 434:11 436:7,14 437:24 439:3 441:21 442:8 442:16 443:20 444:20 445:9 445:14,17,19 446:1,22 448:2 449:13 451:13 452:21 458:9 458:11 460:21 461:2,10 462:3 463:23 464:21 469:1,6,7 471:4 472:23 473:24 475:8 475:21 476:10 477:9 478:14 479:11,22 481:1 482:22 483:9,21 484:10,12 485:7 486:22 488:4,23 489:24 491:6 491:20,24 492:5,8,18,21 493:8,13 494:1 494:9,15 495:2 495:9,12,14 496:17 498:20 499:17 500:6 500:14 501:1,8 501:16,19,22 501:23 502:20 503:9,10,22 505:12
**buy** 394:22
**buyer** 425:13
**buying** 474:25
**buys** 474:22

**c**

**c** 306:1 307:1 308:1 313:1
**ca** 528:25
**call** 417:6,24 437:7 490:14 490:14 516:3

**called** 314:9 524:20
**calls** 361:17 363:16,25 369:21 370:9 371:21 372:7 380:5 381:11 392:23 398:2 398:12 411:25 412:8 431:22 436:2 468:21 474:22 486:18 505:3 509:2 523:5
**capacity** 305:10 320:10 384:12 385:5 388:25 391:14 414:7 417:16 417:22 421:5,6 421:8,9 432:6 432:6 491:4
**capital** 310:8 341:25 377:18 377:23 378:1,8
**capitalization** 320:7 343:2
**capitalizing** 319:17
**caps** 341:11
**car** 410:3,4,7 410:13,16,18 411:21 412:13 502:15
**care** 384:18
**case** 305:6 317:25 319:7 323:23 326:2 327:12 328:25 330:5 340:16 340:17,21 343:20 344:4,7 344:21 345:16 346:13,18,24 348:10,17 351:11 360:10 362:14 364:25 365:1,8,15 366:9,13,14 367:9 379:14 380:10 381:7 385:8 395:5 397:23 402:20 402:23,25 409:5 414:23 421:3,19 423:19,24 424:10,13 447:12 452:25 456:11,14 465:3,4 473:16 473:23 482:24 491:14 505:2 507:14 510:20 510:24 512:9 515:6 518:4,20 518:24 519:8 519:20 520:2 521:21,24 528:6 529:3 530:3
**cases** 325:25 340:14 419:7 455:7 469:13 512:12
**cash** 325:5,14 326:15,21 327:3,13 329:5 329:24 337:20 340:16,20 343:18 344:3 344:22 345:6 346:17,24 347:21,23 351:13,19 352:1,2 355:19 356:13,23 358:11 360:10 360:12,14 361:3,23,25 362:7 363:13 364:6 403:11 406:16 427:20 482:2,17 483:6
**categories** 349:19 444:11
**category** 441:13,25 442:10
**cause** 331:22 355:13 367:2 385:3 394:9
**causes** 395:5
**cave** 307:13
**cc** 432:11 448:6
**cc'd** 436:25 438:7 439:7 441:4,6 446:6 451:5
**cc'ing** 331:7 356:4
**ceased** 422:4
**cell** 454:15
**ceo** 519:13
**certain** 320:15 321:2,11,25 322:22 347:21 350:13 358:12 403:2 404:15 409:7 454:5 456:15
**certainly** 318:12 347:2 356:1 386:13 391:17 394:7 414:20 449:12 461:14 468:18 485:6 504:21
**certificate** 341:22 526:1 527:1 530:11
**certification** 529:1 530:1
**certify** 526:4 527:2

**chain** 309:14 310:3,12,19,21 311:3,6,8,21 348:19 354:7,7 368:12,18 373:24 399:21 405:24 412:24 422:13 426:12 429:11 433:5 434:15 436:16 440:23 447:2 465:21 474:1 477:18 490:9 490:10 495:17 499:19 513:4 514:2
**chains** 368:21 368:23 369:1
**chainsaw** 481:8
**chair** 433:15 434:3
**challenge** 361:7 361:9,12
**challenges** 425:4 488:21
**challenging** 326:18 362:1
**chambers** 487:20
**change** 332:24 354:18 355:1 355:13 443:1 528:14,15 530:8 531:3
**changes** 441:14 463:4 528:13 529:7 530:7,9
**chapter** 364:16 364:21,25 365:1,8 383:22 385:7,11 386:4 388:7 389:11 390:2,24 392:20 393:11 395:8 397:23 416:5 419:5 423:25 424:13 447:10 524:7
**characterizati...** 402:8
**charge** 402:12 435:20 448:25 450:14,19,21 451:24 452:6 490:5
**charged** 448:23 452:9
**charging** 448:25 450:15 451:18 452:14
**charles** 307:5
**chart** 309:25 356:5
**charts** 462:22
**chat** 369:5 490:20
**chats** 370:25
**check** 316:20 329:17 412:16 468:5
**checking** 316:16
**checks** 504:7
**chief** 406:17 517:19 518:7
**chronological** 506:12
**circulated** 485:22
**circumstances** 372:12 438:11
**cite** 335:9 338:2 373:21 421:11 421:15 452:10 478:17
**city** 305:3,17 306:20 307:7 307:15,23
**civil** 529:5 530:5
**claim** 437:5,9 437:14,19 438:10 439:25 447:14,23 448:22,23,24 449:22 450:14 450:19,21 451:18,24 470:4 509:21
**claims** 452:16
**clarify** 440:19 444:5,9
**clarifying** 371:15
**cleaned** 354:22
**clear** 330:22 337:13,16 399:11 402:2 442:22 444:4 493:3 516:20
**clearly** 317:5 354:21 484:8
**cleveland** 528:2
**client** 308:12 313:12 369:10 373:18 510:8 517:4 520:13
**clients** 365:6,6 376:20 377:20 413:3 455:5
**clipped** 454:10 465:22
**closed** 461:19
**closer** 481:8,8
**coach** 371:9
**coaching** 370:18
**coast** 379:13,18 380:13 506:23 507:1
**code** 325:10 364:16 438:11 512:2

**cole** 306:15 313:14,14 381:16,21 492:4 497:20 501:21
**colin** 308:3 522:17
**collaborative** 348:9
**collapse** 402:20 402:24 403:1
**collateral** 325:5 326:15,21 327:4 329:5,24 337:20 343:18 344:3,22 345:6 346:17,24 347:21,23 351:13,19 352:1,2 355:20 356:13 358:11 360:10,12,14 361:3,23,25 362:7 363:14 364:6 403:7 406:16 427:20
**collectability** 358:8
**collectibility** 360:6
**collectible** 358:7,14,21 359:1
**collections** 462:24
**collective** 452:23
**colonial** 409:3
**com** 429:14 433:6
**combined** 350:2
**combining** 349:15
**come** 405:10 441:12,24 475:14,19 481:8 498:10 517:17 522:3
**comes** 352:20
**comfortable** 459:25
**coming** 393:23 475:3 493:1
**command** 411:2
**commenced** 346:13
**comment** 317:20 345:22 353:7 419:10 428:1 488:14
**comments** 434:25 438:23 439:2
**commission** 337:5 529:19 530:25 531:25
**committed** 338:23
**committee** 306:13 310:23 313:15,18,21 317:23 338:21 338:22 399:5 415:16,25 416:2 419:3 426:25 427:4 428:5,6,13 433:16 434:3,5 434:9
**committee's** 504:6
**common** 396:24 473:13 510:7
**communicate** 369:9
**communicated** 374:24 375:8
**communicating** 412:24 496:8
**communication** 369:6 399:22 438:24 483:18
**communicati...** 335:10 454:5 483:11,17 517:4,12
**companies** 375:1 396:7 470:12
**company** 335:13 393:24 393:25,25 407:5 432:16 470:20 471:5 471:19
**compared** 349:21 462:24
**comparison** 462:21
**compensation** 444:2
**competitors** 374:11
**complained** 316:1 323:22
**complaining** 403:10
**complete** 376:21 406:18 406:25 407:9 416:15,23 425:18 437:10 438:17 443:1 446:12,18 448:25 449:3,6 449:10 450:3 450:14,21 502:8
**completed** 377:19 451:19 528:16

**completely** 454:22
**completing** 449:4
**complex** 376:19
**complied** 316:17,21
**component** 323:18 358:16
**compound** 413:18 414:14
**compromise** 480:10,14
**computer** 501:25
**concentrate** 497:15
**concept** 425:12 499:9
**concern** 316:12 316:15 345:21 354:24 355:13 355:15 359:13 397:20 414:25 421:18 442:15 442:21 452:5 458:20 461:15 463:17 472:18 482:21
**concerning** 332:19 500:15
**concerns** 316:4 318:20 322:6 326:24 327:2 335:17 355:6 396:15 397:16 403:14,21 414:19,23 415:5,8 420:21 420:21 421:2 421:25 422:2,5 422:10 441:24 442:9,14,20 443:15,18,23 445:6,6 461:11 463:10 473:18 482:16 483:6
**conclude** 324:7
**concluded** 525:2
**conclusion** 324:11 333:6 361:18 363:17 364:1 369:21 380:6 387:16 396:8 398:3 431:23 468:22 505:4 509:3 523:6
**condition** 327:20
**condone** 501:10
**conduct** 328:8 347:4 383:6 394:11 398:18 429:6 431:10 432:16 451:25 500:16 501:9
**conducted** 315:9 362:9 364:17 383:13 389:15 470:22
**conducting** 337:10,14 338:5,14
**confidence** 394:10
**confident** 488:2 488:8
**confirm** 454:14 478:2 482:9,13 485:9,15,21 486:4
**confirmed** 339:13 486:17
**conflict** 433:23
**conflicts** 504:7 504:7,18
**confusion** 444:4
**connected** 445:12 504:23 518:23
**connection** 353:7 360:19 373:14 375:15 389:15 397:7 398:19 431:18 504:22 505:1,7 505:8
**connections** 504:18
**consensual** 347:23
**consent** 343:18 344:21 416:25
**consider** 325:20,23 326:1 405:16
**considered** 325:17 326:4,7 326:10,12 375:14 385:22
**considering** 489:7
**consisted** 439:25
**consistent** 474:8
**cont'd** 307:1 308:1 310:1 311:1 312:1
**contacted** 510:4
**contacting** 377:17
**contained** 406:8 418:24
**contains** 419:2
**contemplating** 424:25
**contemplation** 385:16

**content** 342:1,7 342:24
**contentious** 473:5
**contentment** 342:12
**contested** 326:15
**context** 474:18 474:19,20
**continuation** 397:21 477:17 478:20
**continue** 354:18 355:12 388:17,25 392:25 409:4 410:3 411:3 471:20 484:9 484:11 486:12 487:14 493:25 494:20 495:6,8
**continued** 313:3 345:23 354:7,25 388:13 392:19 457:9 464:3 481:3 492:22 495:16
**continues** 335:11 345:10 353:13 442:25 480:17
**continuing** 396:1 443:4 487:8,11
**control** 389:2 389:10,25 391:25 392:4 406:18,23,25 407:9
**controlled** 498:25
**conversation** 336:13 338:2 487:19
**conversations** 324:4 336:6 358:25 359:4 440:7 487:10
**convert** 423:24 424:13
**convince** 487:3
**convinced** 486:24
**convincing** 488:13
**cooperate** 314:25 346:3
**cooperated** 346:21
**cooperation** 345:11,15,20 345:24 348:3,6
**cooperative** 348:10
**copied** 332:7 413:8 434:23
**copy** 336:16 383:3 497:2,23 502:7
**corporal** 324:19
**corporate** 305:10 319:21 321:10,16 322:4,19 323:1 323:16 342:9 343:5 351:7 352:1 364:3 365:13 375:18 379:21 382:10 384:9 385:1,14 387:13 388:22 389:16,19 394:5 395:22 403:25,25 405:7,19 409:11,17,24 410:10 412:1 412:10 413:1 417:14 423:13 431:12 446:21 484:4 491:2 516:23
**correct** 319:10 319:13 324:25 325:1 326:19 327:17,23 328:20,24 331:8,13 333:25 334:7 337:6,15 338:6 339:2,8,17,19 339:24 340:8 342:21,22 344:8 346:5,10 346:14,18 347:18,21,25 348:21 349:1 349:11,16,19 349:23 351:16 352:13,22 354:3,15 356:6 366:9 374:6 376:4,9,15 377:15 379:14 379:15 380:1,4 381:23 382:17 382:25 385:8 388:4,9,14 389:3,5 390:17 390:21,25 392:5,7,17,21 396:7 397:11 400:8,12,13 401:5,11 402:17,18 403:12,13,15 404:17,18 406:24 407:13 408:23 409:8 411:5,16,17,23 412:7,18,21

414:21 415:3 415:13,17,18 415:21 416:5,9 416:12,19 418:14,19 419:11 420:22 422:14 424:19 425:23 426:13 426:22 427:1,8 429:7 430:12 433:7 435:9 437:1 438:3,7 438:14 439:7 439:13 440:24 441:5,8 443:2 443:6,8 446:8 448:7,13 450:24 454:12 456:2 461:24 462:5,8 463:10 463:17 464:22 465:4,15,19,25 466:14 468:11 472:2,12,15,25 473:7,12 474:3 475:11 476:6 476:14 477:23 478:7 482:24 483:3 484:21 495:21 497:4 498:25 499:1 501:4 504:12 504:15 506:7 506:16,20,24 507:2,10,23 508:1,6,8,15 509:14 511:6 511:10,21 512:6,13 513:5 513:9,13 516:24 518:1 519:4 522:23 522:24 523:3 524:11,12,15

**corrected** 459:21

**correcting** 371:15

**corrections** 366:19 528:13 530:17

**correctly** 349:14 519:17 521:2

**cost** 320:7 329:17 353:17

**costs** 319:18 333:17 343:3 429:24

**counsel** 363:14 398:20 416:2 427:21 428:5 433:10 434:24 453:7,10,12 455:10 457:8 472:14 473:6 473:11 491:21 493:19 510:2 513:4 517:25 520:8,18 526:11,14 527:7,10

**counsel's** 317:19 510:13

**counter** 387:1 509:5

**counteroffer** 416:3

**county** 529:10 530:15

**couple** 325:12 339:24 340:7 352:17 379:2,3 403:11 448:12 516:3,16,21 522:13

**course** 321:22 362:22 373:7 411:1,4 420:25 422:7 435:13 442:24 473:10 508:5,14 517:15 519:19 520:1 521:21

**court** 305:1 328:3,10 329:4 329:22 330:24 353:23 354:3 355:24 356:2 402:17 413:3 452:13 456:17 459:22 485:2 502:7,12 510:18 529:7

**court's** 519:7

**courthouse** 307:5

**courts** 325:20 325:23,25

**coverage** 510:17

**crazy** 474:12 474:16

**creative** 311:4 429:13,18,21 431:10 433:6 433:10 434:2,7 434:9,10 476:19 477:6

**credit** 306:2 313:9,11 468:6

**creditor** 325:18 326:8 344:20 344:21 345:16 361:8,10,15 362:2 433:14 451:23

**creditors** 306:14 313:16 313:19,22 364:15 365:1 372:17,25 419:5 427:21 433:16 434:3,5 473:11 513:8

**critical** 337:2,4 337:5 339:11
**cro** 313:23 328:23 404:20 405:1,4 406:22 407:13,15,19 409:1 410:2 411:2,16 456:12 458:6 489:17 498:25 520:4
**ctp** 308:11
**curious** 461:21
**current** 326:3 353:14,16 356:20 433:14 433:22 448:17
**currently** 430:4
**cushion** 325:14 327:8 333:4 334:2,10,14,18 334:22 335:1,3 335:7 336:12
**customer** 359:10 393:25
**customers** 387:23 393:17 393:18 394:7,9 394:22 395:6,7 395:15
**cut** 379:17 380:12,19 381:1,4 384:6 426:25

**d**

**d** 309:1 313:1 333:23
**data** 333:5 341:20 382:5,6 383:5 478:11
**date** 305:13 313:4 346:4,12 349:22 351:15 354:20 394:20 394:21 462:11 464:5 474:5 486:2 528:9 529:3,9,19 530:3,13,25 531:20,25
**dated** 341:9 347:24 348:25 377:13 416:8 422:13 474:1 505:22 506:13
**dates** 431:16
**david** 455:25 457:18
**davis** 307:12 309:5 314:3,4 516:2,7,12,14 516:17 522:11
**day** 331:16 390:16 394:2,2 404:16,16,21 404:21,23,23 405:14,14 418:1 456:9 471:21 479:4 484:8 487:5,6 490:16 502:5 503:23 529:16 530:22 531:22
**days** 376:22 425:15 482:13 494:7 516:21 528:19
**dba** 511:5
**dca** 305:6 308:2 309:10 311:9 313:23 331:6 344:1 382:24 383:7 391:25 408:4 416:11 422:1 423:7 430:5 432:16 433:18 454:23,23,25 455:12,17,18 467:16 491:16 497:3,7 522:17 522:23 528:6 529:3 530:3
**dca's** 433:14
**deadline** 423:15 485:17 524:6,11
**deal** 310:22 389:13 426:25 431:3
**dealing** 323:12 339:7 494:2,3
**dear** 528:10
**debt** 332:25 380:2 514:7 515:1,3,13,18 515:20,24
**debtor** 311:13 311:23 320:16 321:2,11 322:22 323:8 325:16 327:12 350:13 364:18 364:19,23 365:3 369:4 370:6 371:8,9 371:10,14,16 372:1,5,23 373:10 379:13 384:3,16 398:11 400:19 403:22 404:6 432:16 438:18 446:13 452:4,7 490:6 504:22 506:6 507:2 508:21,25 509:22,25 515:13,22 520:4,5 523:2 523:9,14
**debtor's** 326:6 327:15 328:4 334:10 336:1

345:17 346:23 356:21 360:5 373:5 380:4 383:24 390:3 397:25 406:18 407:1 413:16 419:4 471:13 477:10 512:2 518:24 523:3 524:1
**debtors** 305:7 312:7 315:9,15 315:24 316:14 317:22 319:17 320:8 321:23 323:19 324:1,9 324:16 327:6 327:21,22 328:7,16,21,22 329:19 330:3,9 330:16 332:6 336:3,7,23 337:5,9,11,13 338:4,17,18,21 338:25 339:4,7 339:15 340:15 340:19 341:1 342:19 344:10 346:4,21 350:7 353:22,23 355:10 358:4 358:13,21,23 358:25 359:5,9 359:21 360:13 361:16 362:5 362:17 363:2 363:15 365:11 365:17 366:11 367:22 368:13 369:6 370:4,12 370:22 371:2 372:17,20 373:8,8 374:24 375:13,16 378:13 379:25 379:25 380:7 380:11 381:7,7 381:23 382:5 383:16,23 384:6,15 385:24 386:5,6 386:8,10,12,19 387:7,18,22,25 388:4,9,13,14 388:17,21 389:1,3,10,12 389:25 390:16 391:7 392:14 392:15,21,25 394:23 395:10 395:21 396:10 396:12 398:10 398:20 401:4 401:11,18 402:4,11 404:17,22 405:2,4 406:1 406:15,24 410:23 412:20 412:24 413:21 414:1 416:1 417:4 421:2 422:5 424:3 428:20 429:6,7 431:9 436:9 437:6,20 456:11,12 462:16 468:10 470:15,19,23 472:18 473:9 475:1,15,23 477:22 479:6 479:20 483:11 484:18,22 485:15 488:22 496:22 498:8 498:12 504:23 510:23 519:14 524:4
**decide** 391:9
**decided** 401:9 493:23
**deciding** 454:6
**decision** 392:10 460:4
**decisions** 413:10 519:16
**declaration** 311:9
**decline** 433:23
**decreasing** 386:19
**deed** 529:14 530:20
**deemed** 524:11 524:16 528:20
**default** 475:10
**deferred** 322:10,14,16
**deferring** 323:25
**defined** 325:9
**degregorio** 365:24 386:14
**delete** 443:6 466:22 501:4
**delineated** 317:15 318:9
**demand** 397:3 397:8
**demanding** 437:4
**demonstrative** 356:17
**department** 528:22
**departure** 457:9
**depended** 393:19
**depends** 326:1
**deposition** 305:9 313:3 314:21 315:6 317:4 318:24 319:13 320:1

320:20 321:11 330:13,19,20 331:15,20,23 340:25 363:23 368:1,24 390:9 484:7 492:22 492:23 493:4,5 498:2 506:1 510:5 517:16 517:24 518:11 518:19 519:21 526:1 528:9,12 529:1,3 530:1 530:3
**depositions** 315:18,21 316:7 317:21 319:10,24 321:18 323:2
**describe** 458:22 506:5 506:18
**described** 321:24 388:12 392:17 460:2 460:14 519:6
**describes** 353:14 507:20
**describing** 519:7
**description** 309:9 310:2 311:2 312:2 442:2,19
**deserve** 345:7
**deserves** 344:16 345:2
**designate** 502:6
**designated** 389:17 408:16
**desire** 389:9,25 390:5
**despite** 488:14 494:4
**destroy** 386:8 393:15 396:11
**destroyed** 336:3 379:6,7
**destroying** 336:7 470:11
**detail** 317:1,4 317:14,16,24 318:14 342:10 343:7 364:4 382:9 395:23
**detailed** 341:21
**determination** 393:7 413:20 496:19 504:16
**determinations** 504:8
**determine** 318:24 329:12 331:25 342:7 347:5 358:25 362:10 389:21 391:5 395:8 397:25 413:5,9 413:15 463:9 463:16 494:17
**determined** 417:5
**determining** 325:17 326:7 399:12 414:10 455:8
**dice** 448:17
**die** 379:18 380:13,20 381:1,9 384:5 384:23
**different** 325:10 349:19 349:19 442:19 449:17 464:23
**difficult** 400:19 485:5,5 487:17 487:23
**digital** 526:8 527:3
**diminished** 388:25
**dip** 337:21 346:3,25 347:17,19 400:14 401:4,6 401:8,10,15,19 401:21,25 402:3,17 408:15 423:14 423:17,23 424:2,4,12,15 424:18 474:11 474:15,20 478:22 479:7 479:13,21 482:5 484:15 484:18,18,20
**direct** 389:7 477:19 499:21
**direction** 366:2
**directive** 491:11,14
**directly** 370:14 411:22 490:4
**director** 308:11
**disagree** 390:6 420:20 484:10 521:11
**disagreed** 420:22
**disagrees** 462:18
**disappointing** 479:2
**disclose** 371:19 372:6,16,24 512:2,17
**disclosed** 371:3 504:14 512:5
**disclosing** 370:7 371:11 461:17
**disclosure** 512:9

**disclosures** 512:12,15 515:9
**discovery** 385:20
**discuss** 378:12 398:15 417:6,8 425:17 433:24 451:1,3 521:6
**discussed** 338:10 381:20 399:11 401:23 418:10 420:15 443:25 488:19 520:21 521:4
**discussing** 368:16 417:22
**discussion** 316:25 334:23 343:16,22 346:8 348:12 348:14 351:1 375:21 410:15 417:10 418:1,5 418:7 442:5 450:25 470:10 470:13 503:25 514:12 519:2 520:7 521:1
**discussions** 319:22 332:9 332:15 335:10 337:19 348:16 362:16 363:2,4 365:22 368:8 382:12 384:17 386:9,17 388:23 390:13 394:18 408:9 410:17 414:16 417:16,17 418:2 421:11 421:12,14 432:18 440:11 440:13,16 460:10 461:1 471:13 487:4,8
**disgorge** 510:19
**disgorgement** 510:17
**disinterested** 431:25 432:3 437:19 440:5 448:18
**disposal** 335:14 335:20
**dispose** 335:25
**dispute** 342:16 444:21 510:5
**disputes** 346:23 347:1
**disrespectful** 493:19
**distressed** 376:19
**distribution** 349:15 373:25 375:17,23
**district** 305:2
**division** 305:3
**docket** 310:21 426:21,24
**document** 406:3,9 501:24 507:5 509:13
**documents** 452:22
**doing** 336:18 341:16 367:16 396:7 405:4 414:20 456:25 492:24 515:10
**dot** 429:14 433:6
**double** 329:17
**download** 467:17
**draft** 399:25 402:12 429:24
**drafting** 483:1
**drapekin** 310:25 400:12 403:5 422:24 426:5,22 427:15 429:1 430:12 432:9 466:4
**drastic** 387:21 394:9 395:4
**drill** 317:15 375:19 383:9
**drilling** 342:10
**driving** 494:7
**due** 435:12 436:10 441:14
**duly** 314:9 526:5
**dump** 335:25
**dumped** 335:15 335:20
**dunk** 482:14 486:14,21
**duplicate** 359:2
**duties** 380:7 517:19 518:6

**e**

**e** 306:1,1 307:1 307:1 308:1,1 309:1,8 310:1 311:1 312:1 313:1,1 335:12
**earlier** 350:3 379:4 392:17 396:5 461:22
**early** 343:16 376:22
**easier** 344:4,7
**east** 307:6
**easy** 371:25
**edmondson** 335:25
**effect** 319:22 324:5 330:5 332:16,18

334:24 335:10 336:5,14 337:17 338:3 338:13,23 343:10 347:2 350:17 351:1 361:13 362:15 363:5 364:7 367:24 379:23 383:19 384:11 384:12 385:3,4 393:7 397:8 398:16 405:21 408:11 421:15 424:20 452:11 458:20 459:16 459:19 461:9 461:15 470:16 472:22 480:16 482:20,21 490:8 491:11 491:19 496:24 501:7
**effort** 517:11
**efforts** 314:25 315:1 324:15 359:2 418:3 432:20
**egotham** 308:7
**eight** 492:13,14 515:1
**either** 358:6 367:8 375:16 383:4 393:2 402:1 448:16 482:14 486:14 491:9 492:22 522:4
**elected** 415:16
**elements** 399:2 399:10,15,16 423:16 445:4
**ellerman** 308:13 314:2
**email** 309:10 309:12,14,17 309:20,23 310:3,5,7,10,12 310:14,16,19 310:21,24 311:3,6,8,11,15 311:18,21 331:6,19,22 332:7 334:5,8 335:11 339:22 340:4,5,12 341:8,10 342:11 343:13 343:15 344:1 346:4 347:24 348:19,25 349:3,4,9,12 350:11 351:23 352:6,12 354:7 354:7 355:8 356:4 367:20 367:24 373:24 374:8 375:16 376:3,11 377:6 377:8 378:9 382:15,23 390:13 399:21 402:6,19 405:24 407:22 412:15,17,24 413:4 416:8 418:12 419:14 422:13,23 426:1,5,9,12,20 426:24 429:11 429:12 433:5 434:15,17,22 434:24 436:16 436:17,24 437:1 438:1,1 438:24 439:5 439:15 440:8 440:14,23 441:4,6,10,22 443:14 444:6 444:12 446:5 447:2,3 448:9 450:7,11,16 451:12 468:4,6 469:21 470:15 471:6 506:12 507:21 508:11 509:10 528:17
**emails** 312:4 314:24 351:8 352:3 367:18 429:21 444:7 493:12,18 501:4 505:21 505:25 506:2,4
**emergency** 468:6
**emlawkc.com** 308:7
**employ** 311:13 311:23 439:25 446:7
**employed** 388:9 438:10 449:22 495:20 498:8,11 526:11,14 527:8,11
**employee** 407:20 408:23 526:13 527:10
**employees** 309:11 331:7 364:24
**enclosed** 528:12
**encyclopedic** 484:5
**ended** 381:23
**ends** 422:25 425:2,22
**engage** 343:22 404:21
**engaged** 328:18 328:21,22 379:5 452:6

**engagement** 311:10 436:19 500:16
**ensure** 361:3 361:23 364:23
**entered** 346:18 360:10,13 530:9
**entertaining** 374:13
**entire** 529:5 530:5
**entities** 313:9 313:12 320:16 321:2,12,13,25 322:22 323:8 350:13 353:1,4 353:10 384:3 391:25 398:11 403:22 404:6 422:1 432:17 490:6 506:7 507:2 508:21 509:1,22 515:14,22 520:5 522:23 523:2,14
**entity** 384:16 496:20 498:22 498:23,24 509:25 511:2 518:14 523:10
**entries** 444:11 444:13
**entry** 310:22 336:16 426:21 426:25 443:1
**equipment** 506:8,19,24 507:21,22 508:18,22
**equipped** 366:4 405:13
**equity** 325:14 327:8 333:4 334:9,14,18,22 335:1,3,7,7 336:12 425:13
**eric** 429:13
**erlene** 373:18
**errata** 528:14 528:19 530:7 530:10,18 531:1
**error** 349:6 458:14,18,23 459:4,6,14,21 460:2,3,7,14 461:4 462:5
**errors** 366:16
**es** 526:4
**esq** 528:5
**esquire** 306:3,4 306:15,16,17 307:3,12,20 308:3
**essential** 394:25
**essentially** 343:21 476:5 509:21
**establish** 364:22
**established** 337:6 362:5 368:18
**estate** 322:18 328:17 331:3 345:17 380:4,4 380:8 383:24 386:19,23 387:4 393:12 398:1 411:9 427:11 428:25 429:3 451:23 471:10 504:15 518:15 523:3 524:9
**estates** 413:16 419:4 518:24
**estimate** 429:24 495:13
**estimation** 522:2
**et** 305:6 528:6 529:3 530:3
**evaluate** 323:25 330:2 385:22 405:16
**evaluations** 334:10
**evans** 308:4
**evening** 461:18
**eventually** 347:22 434:16 495:25
**everde** 389:13
**everybody** 394:4
**exact** 439:23
**exactly** 418:9 431:15 459:2 512:19
**exam** 370:18
**examination** 309:2 314:12 504:1 516:13 522:15
**examined** 314:11
**examples** 325:12 452:8
**except** 342:3 408:16
**exchange** 351:23 476:12 488:24
**exclusive** 485:16,17
**excuse** 524:10
**execute** 519:13
**executed** 530:10
**execution** 529:14 530:19

**exercised** 519:23
**exhibit** 309:10 309:12,14,17 309:20,23,25 310:3,5,7,10,12 310:14,16,19 310:21,24 311:3,6,8,11,15 311:18,21,24 312:3,4 331:5 331:6,9 333:13 339:21,22 340:1,13 341:7 341:14 343:12 348:18,19,22 349:3 352:7,11 352:11,14 354:6,7,10,14 356:3,4,5,7,17 356:20 357:23 373:23,24 374:2 376:2,3 376:5 377:7,8 377:10 381:19 381:24 382:14 399:21,21,24 400:3,11 405:23,24 406:4 415:19 418:12,12,15 422:12,13,15 422:23 426:11 426:12,14,21 427:16 429:9 429:11,15 430:3 432:11 432:24 433:2 434:14,15,18 434:22 435:8 436:16,16,20 436:24 437:25 438:1,4 439:4 439:6,8 440:23 440:23 441:1,8 444:12 446:2 447:2,2,6 449:16,20 450:7,12 452:23,24 453:4,21 455:20,21 464:14,15 465:1,13,16 466:3,6 467:11 469:2 501:21 502:6,9 503:2 503:3 505:15 505:16,17 514:11,14
**exhibits** 344:4 344:6 464:7
**exist** 524:1
**existed** 333:4 334:10 335:8 420:12
**existing** 507:15
**exit** 403:10 419:7,17,19,20 420:3,8,11
**expect** 343:17 365:25
**expectation** 403:4 484:23 485:1
**expectations** 341:3
**expected** 365:25 393:19 427:3 484:5,6
**expense** 341:3
**expenses** 400:23 402:11 407:19 520:10
**expensive** 400:18,25 402:7 474:17 484:20
**experience** 365:4 371:24 395:3 452:2 518:4
**expert** 329:15 370:9
**expiration** 529:19 530:25 531:25
**explain** 484:2
**explained** 476:2 498:1
**explaining** 470:15
**explanation** 462:6 521:14 521:19
**express** 389:23 420:21
**expressed** 342:13 388:24 442:21 474:25 489:23 490:1
**expressing** 426:5 483:6
**extend** 416:2
**extent** 368:4 498:17 509:6
**extract** 453:8 466:21
**extracted** 311:24 453:1 453:14,22 454:7

**f**

**f'd** 502:17
**facility** 380:13
**fact** 320:7 324:1,9 332:10 358:14 383:6 383:14 385:15 414:21 429:5 442:17 443:25 461:11 465:3 472:2 512:11

**factor** 326:9,11 494:17
**factored** 450:10
**failed** 517:19
**failing** 518:6
**fair** 329:8 330:12 354:9 355:20 363:1 381:1 402:8 415:4 505:7 507:6 508:17 509:15 517:13 521:25
**fairlie** 306:16 313:17,17 494:8,12
**fairly** 331:24 397:13
**fall** 383:23 393:20
**falling** 518:6
**falls** 500:20
**familiar** 364:11 366:1 374:9 375:25 406:2 429:5 453:2 465:3 512:18 515:2
**family** 518:22
**fane** 306:18 313:14,18,21
**far** 318:21 319:25 320:16 322:21 323:20 324:2,6,21 341:3 343:1 427:19 497:14
**farm** 306:2 313:9,11 382:25 383:8 383:15 409:2,3 409:4,18,20,25 468:6 497:4,8 498:7 499:13 522:18,20 523:1,13
**farms** 333:25 409:14 496:20
**farnam** 306:6
**fashion** 326:3
**fast** 471:3
**fear** 482:1
**february** 373:24 374:23 375:8 489:12 515:7
**fee** 329:21 438:12,17,20 441:12 442:18 442:24 444:19 444:22 446:12 446:15,18 449:25 450:3,4 463:25,25 510:5
**feeding** 438:19 446:14
**feel** 489:9
**fees** 360:19 362:10 400:23 427:19,21 428:5,6,13 429:23 431:20 432:1 474:12 510:17,19
**fell** 517:18
**ffe** 357:5
**fifth** 413:25
**fight** 480:18,21
**fights** 346:23
**figure** 509:12
**figured** 461:23
**file** 361:6 469:13,21 485:18 524:7
**filed** 366:9 385:8 387:10 402:20 406:1 424:20 431:15 452:12,18 474:6 479:5 484:17,25 489:13,18 510:19 512:8 512:11,23 523:14,19
**files** 341:21
**filing** 325:3 349:23 433:15 441:15 468:6
**filings** 330:24 354:3 366:17
**final** 355:16 439:15
**finance** 424:15
**finances** 364:18
**financial** 310:9 321:23 322:8 322:10,11,14 322:16 325:16 327:20,20 328:6,16,18,19 329:1 333:8 334:19 335:2 342:15,18,18 343:20 351:10 355:12 357:18 357:25 358:4 358:22,23 359:3 377:19 378:2,5 386:6 393:23 394:18 398:21 404:2 405:9,13 407:4 496:25 521:18
**financially** 412:6 413:14 526:15 527:11
**financials** 322:7 471:12 471:16,19
**financing** 346:25 347:18 401:1,4,6,8,10

401:15,19 402:7,17 423:14 424:18 425:13 474:20 479:7 484:20
**find** 401:14 425:12 448:18 460:14 528:12
**finish** 437:6,21
**finished** 314:19 360:16
**firm** 435:2 512:3,8,16 517:12
**firm's** 504:25
**firms** 433:1 450:19 452:2,8
**first** 337:12 339:22 340:13 343:12 344:8 349:9 352:11 354:14 356:20 400:11 406:14 415:24 416:7 422:23 427:15 427:15,17 432:10 435:7 436:17,24 437:7 438:11 441:7 443:1,4 447:3,16 448:15 453:21 455:19 458:25 465:14 467:19 470:1 477:22 487:5,6 509:10
**five** 464:25 511:25
**fixed** 438:20 446:15,18 450:4 463:4
**flying** 469:24
**fmg** 483:11,23
**fml** 318:24 319:6 321:3 323:17 324:10 324:15 477:22
**focus** 307:11 309:20,23 314:4 315:4 319:10 321:10 321:18,19,23 322:9 323:25 324:5 328:19 328:21 329:11 330:23 331:7 334:21 344:1 348:20 350:20 352:12 354:8 354:14,25 355:6 356:4,16 368:14 382:15 386:10 401:22 402:10 404:11 404:14 405:3,8 405:10,17 416:11 424:17 462:16 477:5 479:5 511:16 516:18 517:5 517:12,18 518:5,12,21 519:3,7,12,14 519:22 520:3 520:13 521:23 522:3,8
**focus's** 404:23
**folks** 518:23
**follow** 311:11 316:19,25 317:19 330:25 353:6 376:25 438:1 444:5,7 444:15 463:16 472:2 504:5 510:1 516:4
**followed** 375:17 449:19
**following** 330:13 331:25 417:25 510:13 520:25
**follows** 314:11
**forced** 443:11
**forecast** 340:20
**foregoing** 526:3,4 527:4 529:13 530:18
**foresee** 385:10
**forget** 487:5
**forgetting** 386:15
**form** 316:23 322:3 323:10 325:19,24 329:7 336:25 344:12,23 345:5,18 346:6 347:7,13 349:24 350:24 351:6 355:14 357:24 358:15 359:22 360:15 360:22 365:18 368:15 369:7 369:20 370:8 371:4 372:18 373:1 380:21 381:2 383:17 383:25 385:12 385:25 386:20 387:11 388:15 389:4 391:1 392:6 396:13 401:12 403:16 405:18 408:12 411:8 413:6 414:3 419:21 420:5 422:8 423:1 425:3,7 425:22 426:7 428:2,10 430:23 434:6 437:22 438:25 441:19 442:3 443:17 444:17

445:8,11 446:19 447:24 449:11 451:9 452:17 458:7 461:6 462:1 472:20 473:20 475:5,17,23 476:7 477:7 478:9 479:8,18 480:22 488:18 489:21 499:15 500:4 501:5 502:18 503:20 507:16 513:20 524:2
**formed** 428:19 470:21
**forms** 325:11 325:13
**formula** 349:6
**formulating** 339:12
**forth** 406:15 407:16 408:20 413:24 416:3 430:3 519:7
**forty** 469:6
**forward** 393:15 396:16 400:11 426:21 435:3 485:20 528:16
**forwarded** 344:1 400:6
**forwarding** 340:5 447:8 470:4,6
**forwards** 374:15 399:24 430:11
**four** 418:24 419:2
**fourth** 413:25
**fraudulent** 499:9
**free** 529:14 530:20
**freeing** 467:25
**freight** 333:19 333:21
**frequently** 353:2
**front** 404:11 446:3 456:16 465:1,11 514:11 516:9
**frontier** 306:2 310:23 313:9 313:11,11 314:25 315:25 316:4 317:23 318:20 323:22 325:5 326:18 326:24 327:10 328:23 332:12 335:1 337:10 337:16,18,22 337:24,25 338:13,17,18 338:21,22,24 339:1,3,19 343:17 345:20 346:2,3,10,12 346:21 347:6 348:7 360:21 361:5,15,25 362:12,21 363:3,6,8,19 375:8 385:15 399:5 401:8,10 401:25 402:2 402:19 403:6 403:14 408:16 415:21,24 417:11,23 418:3,8 419:3 425:14 427:1 427:10,23 428:4,6,8,12 456:18 472:14 473:6 474:23 475:11 513:4 520:8,18
**frontier's** 327:14 329:5 360:14 361:7 361:10,14 362:17,18 486:17
**full** 437:5
**function** 459:10
**funds** 337:8 475:15,19 477:11 511:10 511:13,17 512:16
**further** 343:18 345:11 348:3,6 375:20 433:24 474:10 486:3 503:24 522:12 524:17 526:13 527:9
**furthers** 345:16
**future** 348:3

**g**

**g** 313:1
**gamble** 481:7
**game** 344:2
**garden** 409:3
**general** 341:21 341:23 425:12 431:24 453:12
**generally** 320:22 326:7 332:15 348:9 373:12 395:3 473:9 519:16
**geoffrey** 310:7
**getting** 337:2 423:17,18 424:2 440:17 450:20 485:20 489:17 509:17

517:9,16,24 518:10,18 519:21 520:19
**give** 322:12 325:12 334:15 435:15 513:12
**given** 319:20 322:7 329:14 334:2 338:13 342:16 345:19 348:16 358:23 362:13 369:8 378:5 385:14 387:15 401:6 404:1 417:24 433:22 435:21 454:1 470:19 493:1 499:12 513:8,16,16 514:1
**gives** 377:22 430:8
**glad** 505:19
**glass** 308:11
**global** 376:4
**go** 318:7 340:23 343:12 367:1 400:10 407:11,15 415:9 416:7 447:16 455:19 455:20 456:4 457:1,3 462:21 462:22 465:18 465:21 466:8 468:3 473:11 473:25 477:17 478:19 481:2 486:6 492:4,5 494:23 509:10 517:3
**goerisch** 315:18 331:7 331:11,12 455:25 456:1,2 458:13 465:14 465:19 502:3,4 502:5 503:13
**goes** 433:18 466:11
**going** 318:17 343:17 352:10 359:15 364:9 373:13 378:17 379:3 393:15 395:24 396:3 396:16 397:20 399:20 402:12 418:11 422:14 436:15 438:17 440:20,22 441:11 446:12 447:1,1,13 452:4,22,23 455:19,24 457:11,14 459:6,12,18 461:3,13 464:10 472:8 474:2 486:7 491:22,23 492:2 494:21 501:13 503:1 505:14,14 507:25 510:3 513:5 519:13 520:9
**good** 314:3,14 314:15 404:9 447:5 489:9,18
**gotham** 308:3 309:6 516:11 516:12 522:13 522:16,17 523:11 524:5 524:17
**gotten** 371:17 399:2 489:11 497:14
**governing** 389:11 390:1
**grand** 305:16 307:22
**grave** 388:24
**gross** 341:22
**group** 307:11 314:4 386:10 516:18 517:5 517:13,18 518:5,13,21 519:3,15,23 520:3,13 521:24 522:4
**group's** 519:8
**grown** 354:19 384:4
**guardrail** 362:15
**guardrails** 343:23
**guess** 451:15
**guessing** 491:25
**guys** 457:18 493:4

**h**

**h** 309:8 310:1 311:1 312:1
**ha** 472:25,25
**half** 378:17 503:23 515:8
**halfway** 341:8 400:2 456:5 467:21 474:10 484:7
**hall** 305:9 309:14,18,23 310:6,8,14 311:3,22 312:5 313:4 314:8,14 336:15 379:2 434:25 446:2 469:9,20 470:2 492:9,12 495:15 502:14

502:17 504:3 516:15,22 528:8 529:4,9 530:4,13 531:20
**hand** 352:10 399:20 418:11 436:15 440:22 447:1 452:22 505:15
**handing** 331:5 339:21 348:18 354:6 356:3 373:23 376:2 377:7 381:19 405:23 422:12 426:11 429:9 432:24 434:14 437:25 439:4
**handle** 520:10
**handled** 319:25
**handling** 362:14 387:20 461:17 523:16
**happen** 357:21 385:11 424:14 432:25 454:18 475:25 505:25
**happened** 477:14
**happening** 518:25
**happens** 451:21 489:13
**hard** 417:8 492:13
**hardy** 305:15 307:21 314:6 494:5
**harvest** 333:14 333:16
**hate** 457:18
**headed** 415:2
**heads** 443:11
**hear** 435:1 505:19 521:2
**heard** 318:22 350:16 379:22 384:11 385:4 447:9 489:22 490:2 520:24
**hearing** 310:20 325:5 326:16 326:17,22 351:13,19 356:14 364:20 365:17 367:13 369:4,17 370:4 371:9 372:5 390:20 422:19 432:19 456:15 456:19,21,22 457:9 459:3,3 459:18 460:1,7 461:4,13 502:12 520:20
**hearings** 365:11 487:6,6
**held** 470:23 503:25 514:12
**hello** 516:15
**help** 404:10 435:4 463:24
**helping** 377:18 378:2
**hereto** 526:15 527:11
**hi** 504:3
**high** 319:23 387:25
**higher** 353:19 353:24
**highlighted** 419:10,12
**hilco** 341:16,18 341:19 342:3 376:3,12 377:1
**hill** 381:16,20 382:3,21,25 383:7,15 496:4 496:19,20 497:4,8,17,23 498:7 522:18 522:20 523:1,4 523:8,12
**hired** 437:5,9
**hiring** 405:9
**historic** 478:2
**histories** 341:23
**hole** 481:7,13 481:17,21
**hope** 495:25
**hopefully** 516:7 520:17
**hoping** 448:18 457:3
**hour** 378:17 491:22 492:16 494:3,9,15,25 495:5
**hours** 336:18 492:17 515:8
**house** 433:9 434:24 453:10
**hunter** 448:3
**hurdles** 423:17

**i**

**idea** 471:9 475:18 489:19 500:2 519:11
**identification** 331:10 340:2 348:23 352:15 354:11 356:8 374:3 376:6 377:11 381:25 400:4 406:5 418:16 422:16 426:15 429:16 433:3 434:19 436:21 438:5 439:9 441:2 447:7 453:5 502:10 505:18

**identified** 319:3 342:25 366:16 385:19 423:8 439:24
**identify** 348:15 383:23
**identities** 394:23
**ii** 305:12 528:8 529:4,9 530:4 530:13 531:20
**imagine** 397:14
**immediate** 344:17 345:2 393:16
**impact** 392:10 395:9
**impacted** 333:2
**impair** 360:20 361:4 362:11 386:23 392:14 393:10,11,17 393:24
**impaired** 361:24
**impairment** 387:21
**imperative** 387:18
**implicated** 387:3
**implications** 395:2
**importance** 387:17
**important** 321:21 323:7 326:11 355:18 355:21 358:13 383:22 390:8
**improper** 452:1
**inaccuracy** 350:19
**inaccurate** 321:14,25 322:23 350:13 513:15
**inappropriate** 413:9
**inclination** 348:2
**inclined** 345:10
**include** 399:13 407:2,4,10,17 411:7
**included** 328:2 359:8,14 408:25 425:11 455:3 523:20 523:23 524:13 528:14
**includes** 368:11 415:13 432:11
**including** 335:13 346:24 346:24,25 382:16 384:15 389:10,25 400:7 407:17 410:23 415:12 439:7 456:11 471:13 483:13 500:17
**income** 443:1
**inconvenience** 441:12 442:18
**incorporated** 530:12
**incorporating** 343:19
**incorrect** 514:3
**incorrectly** 331:13
**increased** 350:7 354:20
**incurred** 360:19 515:18
**independent** 328:8,14 394:11
**independently** 324:14
**indicate** 334:6 346:2 402:5 451:6 459:14 459:20 507:13
**indicated** 316:7 330:15 332:5 339:6 342:24 363:8 375:11 375:11 381:21 393:9 395:20 396:5 402:16 414:9 420:19 425:6 451:14 488:7 502:16 506:22 511:8 513:11
**indicates** 348:4 352:17 377:17 415:23 431:2 438:9 486:13 507:25
**indicating** 349:4 376:12 509:11 528:14
**indication** 375:4,12 391:15
**indirectly** 411:22
**individual** 305:9 520:5
**individuals** 400:7 416:12
**industry** 394:6 395:1
**inform** 336:11 469:17
**information** 322:11,12,17 322:18 328:2,5 328:9,17 329:2 329:4,11,14,16 329:20 330:5

331:4 333:7,10 334:12,19 335:3,23 338:23 342:6 342:15,17 347:1 351:10 357:15,19,25 358:22 364:10 366:4 368:18 369:23,25 370:12 371:1 371:16 372:1,1 372:5,16,24 373:4,4 394:15 394:17,18,19 394:21 398:22 503:14 513:12 513:16 514:1
**informed** 442:19 453:1 479:6
**informing** 480:13
**informs** 343:14 437:3
**initial** 347:19
**initially** 405:25 504:13 512:17
**inquire** 384:10 385:2
**inquiries** 373:9 373:21
**insider** 408:7,8 415:11
**insiders** 407:17 407:24 408:4 408:10,15 409:2 411:20
**insolvency** 365:5
**install** 406:17
**instance** 421:15 421:17,22 503:13 517:17 518:12
**instances** 373:21 421:11
**instruct** 369:17 507:9 510:10
**instructed** 312:9 366:8 501:3
**instructing** 442:10 443:16 481:6,12,16
**instruction** 453:10 510:14
**instructions** 454:1
**insurance** 364:24 510:17
**insured** 510:10
**insurer** 510:4 510:10
**integral** 387:16 393:21
**intend** 443:10 451:4
**intended** 451:2
**intending** 457:7
**intent** 397:20
**inter** 335:13
**interest** 345:17 363:12 373:19 375:5 389:12 390:2 400:23 409:25 413:16 414:1 419:5 474:13,25 498:16,18,22 510:7
**interested** 374:11,25 376:12 526:15 527:12
**interesting** 374:16
**interests** 504:14 518:13 518:14,21,24
**interface** 395:15
**interim** 311:16 311:19 406:16 439:11,16 440:9
**internal** 332:9
**interpreted** 451:17
**introduced** 516:15
**inventory** 309:16,18,22 315:16,24 316:2,5,9,13 317:25 319:17 319:19 320:9 323:18 324:2,8 324:8 329:3 330:23,25 332:1,21,24 334:11 335:15 335:20 336:1,2 336:8 341:21 349:5,10,14 350:4,8 351:3 351:10,18 352:18,20,25 353:8,8,14,17 353:19,22,24 354:15,19 357:3 379:6 381:8 384:4,16 384:18,19,20 384:22,23 387:20 393:18 397:19 441:14 471:9 496:4
**investigate** 318:13 319:21 320:6,12 322:5 343:6 355:6 368:8 379:21 384:10 385:13 387:14 388:22

389:18 394:5 395:23 398:15 403:21,25 405:7,20 408:14 409:11 409:24 410:11 412:2,3,11 413:1 417:15 423:13 431:14 482:20 491:10
**investigated** 336:9 409:17 459:12 491:13 511:9
**investigation** 324:20 383:9 383:11 390:24 394:12 463:21 500:15,18
**investment** 399:24
**invitation** 433:23
**invited** 348:12
**invoice** 476:19 477:6
**involve** 415:10 480:13
**involved** 316:24 318:19 319:23 360:9 365:10 394:25 397:10 404:16 404:19 405:1 406:11,12 412:23 454:6 456:15 463:22 483:1 486:10 498:12 507:14 520:14
**involvement** 380:10 519:20
**involves** 434:16
**involving** 520:22
**ish** 359:12
**issue** 315:12 317:6 318:7 320:7,22,24 321:2 322:5 332:20 333:15 344:19 348:13 382:9 408:20 440:5 447:18 447:21 461:8 461:12,16 473:23 502:14 520:8,14,25 521:2,7,10
**issued** 330:9 510:23
**issues** 315:5,14 315:19,23 316:8,9,10,11 316:13,19 318:25 319:6 319:16,25 323:12 325:2 329:24 332:11 333:20 335:13 335:16,24 342:25 352:1 364:22 385:19 404:11 424:1 473:23 482:2 482:17 483:6 510:8 521:18 523:16
**item** 337:14,20 337:25
**items** 338:11,11 352:5 388:11 406:11 411:22 412:3 415:10 452:10

**j**

**j** 309:14,18,23 310:5,8,14 311:3,22 312:5 527:2,15 528:5
**january** 350:4 350:5
**jeffreysolomon** 377:9
**jess** 365:23
**jessica** 386:14
**jill** 311:12,15 311:18
**job** 305:19 395:15 405:4 497:13
**john** 305:9 313:4 314:8 417:8 434:25 469:9,20,20 470:2,2 502:14 502:17 508:4,8 516:22 528:8 529:4,9 530:4 530:13 531:20
**joint** 310:17
**jointly** 415:1
**josie** 308:13 314:1
**juanita** 310:16 310:24 311:7 340:6 404:20 404:25 417:18 434:23 462:17 463:11,14 476:13 486:23 499:24 521:1 521:10
**judge** 448:18 457:19 487:7 487:16,18,20 493:14
**judgment** 398:5,5
**juice** 481:6,13 481:17,21
**july** 453:22 505:22 506:13
**jump** 516:9

**jumped** 492:12
**june** 336:16 343:19 348:25 350:11 351:4 351:14,17 354:8
**justification** 329:17
**justify** 444:2,2

**k**

**kansas** 305:3 305:17 306:20 307:7,15,23
**kat** 374:10 511:2,5,6,9 512:6
**kathleen** 305:18 526:2 526:17
**kc** 502:12
**kdf** 311:17,20
**kdv** 429:19 433:10 437:4 437:13,18 438:9 439:12 439:23 440:1,3 446:23 449:21 450:13
**kdv's** 437:8
**keep** 499:23
**kelley** 310:3 373:25 374:4,5 374:8
**kentucky** 382:25 383:7 497:3,8
**kept** 462:10,14
**key** 323:18 339:7
**kind** 345:24 365:16 369:5 375:22 379:5 391:15 397:3 398:18 406:23 425:7,11,14 457:8 480:11 480:15 491:11 498:12 517:11
**king** 308:11 313:23,23 416:19 456:11 458:6
**knew** 337:9 359:12 394:24 397:13 403:2 424:1,2 455:18 459:14 470:19 485:5
**know** 314:17 320:11,21 321:9 323:5,8 333:9 335:9 348:13 351:22 357:15 358:5 358:24 359:11 359:13,16 360:4 362:8 363:8 366:3,3 370:25 373:16 375:7,16 377:25 380:18 380:22,25 381:10 382:11 383:12 402:10 404:23 405:8 409:18,20 410:20,21 414:22 419:13 419:24 420:10 421:12,12,24 425:10 431:6 432:15,25 434:8 437:13 438:16 444:10 444:24,25 446:11 449:16 453:15,16,17 453:19 454:1 454:18 458:4 459:1,2,18 460:12,12,19 463:6 465:6 468:19 471:5 471:17 473:3 477:14,15 478:10,12 481:20,20,22 484:6 486:23 491:3,4 496:11 497:14 499:24 503:23 504:19 510:2,3,21 512:19 513:15 515:12,20 516:2,6 521:4 521:16 523:22 523:24 524:3
**knowing** 444:18 460:1,3 460:8
**knowledge** 315:22 319:6 320:5 335:19 343:7,9 359:6 360:7 367:23 369:13 371:6 374:22 378:4 381:4 383:19 389:9,24 390:4 394:8 410:12 420:17 466:18 468:13 484:5 503:17 518:3 518:10,19 520:2,14 526:10 527:6
**known** 359:19 359:24 483:19
**krigel's** 373:18
**ks** 308:6
**kutak** 306:5 313:8,10 416:1
**kutakrock.com** 306:8,9

**l**

**l** 309:10,12,12 309:14 310:4,6 311:8,11,15,18 311:21 312:4
**lack** 345:20 403:10
**land** 382:24
**landlord** 498:17,21,22 498:23,24
**language** 504:20
**laptop** 501:14
**large** 394:7 395:1 454:17 465:22
**larger** 431:3
**largest** 344:20 345:16
**larry** 314:23 323:15 324:4 340:5 374:5 375:10 406:13 413:10 414:9 421:2 439:6 450:9 455:24 457:17 463:7 464:14 465:2 469:25 470:3 472:22 503:5 508:3
**larry's** 439:15 441:6 470:6 482:21 521:9 521:12
**laughs** 400:15 400:17 402:6
**law** 511:24
**lawyer** 369:16 370:5 390:16 390:19 413:2 472:17
**lawyers** 516:17
**lay** 413:10 480:6
**layer** 318:21 319:25 320:16 322:21 323:20 324:3,6,21 343:2
**lays** 333:12 426:25
**lead** 414:15 424:16 457:8
**leader** 376:18
**leadership** 489:10
**leading** 414:16
**learn** 315:14 380:11
**learned** 316:8 511:18
**learning** 359:7 461:3
**lease** 310:11 381:16,20,22 382:3,4,7,21,23 383:2,4,7,14 409:2,3,4,4,12 497:2,6,9,23 498:7,17 506:9 507:10,15,22 509:6,14 522:22 523:13 523:13,16,18 524:1,13
**leased** 506:19 508:18
**leases** 382:12 382:13,16,20 498:3,13 507:22 508:1 508:20,22 523:20 524:7
**leasing** 523:1
**leave** 395:21 396:10 457:14 502:25
**leaving** 381:9
**ledger** 341:21 341:23
**left** 379:18 380:13,20 381:1 384:5,23 457:12,13 464:9 495:1
**legal** 361:18 363:17 364:1 369:21 380:6 398:3 431:23 436:3 468:22 505:4 509:3 523:6 528:1 531:1
**leighton** 307:13
**lender** 403:21 424:18
**length** 504:5
**lep** 466:8,12 467:20 468:4 469:3 471:22 473:25,25 476:12,12,17 477:16 478:19 479:24 481:2 481:24 488:7 488:24 495:16 499:19 503:2,7 503:11 514:19
**letter** 311:10 436:19 528:20
**letters** 342:1
**level** 317:1,4,13 317:16 318:14 319:23 320:19 327:13 330:20 342:10 343:6 345:19,23 351:8 364:4 375:19 383:10 393:18 395:23 397:7 400:25

**levels** 332:24 332:25 333:1 341:3
**lewis** 305:11 307:19 309:20 314:6 315:13 315:22 316:8 316:12,15,19 317:22 318:13 318:19,19 319:9,12,15 320:6,15,21 321:9,21 322:19 323:17 323:20,24 324:7,14,21 326:23 327:1,5 327:16,21 328:2,4,8,14,18 329:1,10,11,23 330:22,24 331:2 332:10 332:19 333:5 335:6 336:6,11 338:4 340:19 342:6 343:15 347:4 351:4 354:8,24 358:19,24 361:2,6,9,22 362:4,8,9,16 363:14 365:10 365:10 366:23 367:21 368:14 370:17,21 371:1 373:7 374:25 375:7 375:16 376:25 377:3,25 379:4 379:16 381:21 382:2,7,8,16 383:4,5,12 384:4,22 385:10,22 389:8,14,19,24 390:4,9,23 391:9 394:11 395:7,14,18 396:5 398:18 399:14 401:9 401:24 402:10 402:16 403:20 405:3,25 411:7 411:9 415:2,13 417:2 421:1,8 422:4,6,6 424:17 430:12 435:1 445:7,9 453:11,12,13 463:9,25 464:3 469:9 470:3 471:15 473:6 482:16 483:11 483:23 485:19 486:3 487:22 488:8 489:16 490:1 491:7,8 491:13,14,15 495:21 496:11 496:18 497:2,7 497:10,22 498:9 500:9,15 500:24 501:9 510:18 511:2,9 511:12,22 516:23 517:4
**liabilities** 365:2
**life** 497:12 502:15
**light** 317:20 322:21 324:2
**likely** 352:9 396:24 424:5
**limit** 493:4,6,9
**limitation** 483:13
**limitations** 343:20 408:10
**limited** 390:4
**limits** 493:11
**line** 312:10 337:20 338:11 353:18 379:7 406:11 470:1 476:18 477:6 511:16,18 528:14 530:7 531:3
**lines** 394:24
**liquidate** 397:4 424:10,11
**liquidating** 423:1,19 425:2 425:22 497:16
**liquidation** 389:1 395:25 396:4,14,19 397:17,18 398:19,25 399:13,17 403:1 424:16 425:7,11 428:22,23 470:11
**liquidity** 479:20 482:2 482:17 483:6
**lisa** 306:4 313:10 339:23 341:8 472:9
**lisa.peters** 306:9
**list** 318:15 319:3 356:19 356:23
**listed** 357:22 358:6 439:22 440:9,12 530:7 530:17
**listening** 367:15
**listing** 530:7
**litigation** 467:5 486:7,11

**little** 449:16 467:25 517:23 519:10
**live** 497:12
**llc** 305:11 307:19 511:6
**llp** 305:15 306:5,18 307:13,21
**load** 333:14,16
**loan** 346:3 361:16 363:11 363:11 400:14 401:25 402:3 457:24 458:3 482:5 484:15 484:18,19
**loans** 475:10
**located** 497:7
**location** 305:15
**locations** 384:16
**long** 390:15 457:23 458:2,6 495:25 503:23 511:22,23
**longer** 388:8 396:2 498:8 511:25
**look** 331:25 341:6,6,13 343:13 401:20 415:19 454:9 462:20 464:10 465:12 466:2,6 466:14 467:18 479:23 488:7 488:24 490:9 506:10 507:10 517:3
**looked** 365:13 416:23 446:5 446:10 459:11 465:18 467:11 488:12 489:4 500:7
**looking** 336:15 343:14 412:17 453:21 458:21 461:8,12 514:14
**looks** 349:8 383:1 416:15 453:20,22 458:12 463:7 464:24 474:4 476:14 503:11 503:13 506:8 509:9,24 515:7
**looming** 486:3
**lose** 391:24 392:4 425:5
**losing** 403:7
**loss** 387:23,23 387:23 393:16 394:9 395:5 470:20
**lot** 403:12 421:14 455:1 469:22 482:23 494:18,19 506:2
**lots** 346:19
**louis** 469:24
**lower** 476:23

**m**

**madam** 528:10
**made** 321:3,12 324:16 335:5 337:16 355:23 362:21,24,25 363:3 366:19 366:20 367:5 375:23 393:7 401:15 402:2 404:3 407:24 408:2,8 413:20 415:10 418:8 442:6 444:4 451:15 487:12 487:14 493:3 504:8 508:24 515:9 517:10 521:19 529:7
**main** 307:14
**maintain** 393:17 398:11
**maintenance** 384:18
**make** 320:16 355:23 394:16 397:3 405:21 408:21 410:3 428:1 440:17 440:19 442:10 442:21 444:1 455:10 456:23 460:4 496:18 509:7 514:25 523:3
**makes** 487:9
**making** 358:10 363:6 413:23 442:5 450:10 476:3,5 509:21
**malpractice** 510:9
**man** 481:7
**manage** 393:23 519:13
**management** 307:11 309:21 309:24 314:4 321:18,19 322:9 324:5 328:21 386:10 386:10,12 387:20 388:6 394:2,19 402:4 404:2,9,11,14 404:23 405:1,9 422:3 471:13 516:18 517:5

517:12,18 518:5,13,21 519:3,8,14,23 520:3,13 521:24 522:4
**management's** 405:10 519:12 522:8
**manager's** 405:14
**managers** 386:6
**managing** 308:11 422:1
**mandate** 491:7
**manner** 320:8
**march** 376:8,11 433:6
**margin** 341:22 476:23
**mark** 306:15 313:14 357:9 358:17 447:1 505:14
**marked** 331:5 331:9 340:1 348:18,22 352:10,14 354:6,10 356:7 373:23 374:2 376:2,5 377:7 377:10 381:19 381:24 399:20 400:3 405:23 406:4 418:15 422:12,15 426:11,14 429:9,15 432:24 433:2 434:14,18 436:15,20 438:4 439:4,8 440:22 441:1 447:6 450:7 453:4 502:9 505:17 514:18
**market** 318:21 319:25 320:16 322:21 323:20 324:2,6,21 343:2
**marking** 339:21 356:3 418:11 437:25 505:15
**marks** 449:4 450:3
**matching** 335:15
**material** 333:1
**materialize** 424:4
**matter** 365:12 431:25 444:22 482:4 484:14 522:5,9
**mcole** 306:21
**mean** 370:11 397:17 398:10 400:17 402:23 424:14 428:9 447:21 449:8 459:8 467:18 474:15 482:19 516:9
**meaning** 484:2
**means** 344:14 415:16 481:21 481:22 491:4
**meant** 407:6 458:4 479:10 479:16 481:12 483:18 490:24 502:16
**meet** 340:15 386:5
**meeting** 341:1 364:11,14,15 365:25 366:15 367:15 368:8 369:24 370:23 372:15 418:10 487:7,16,18 513:3,8,17
**meetings** 364:10,11 365:5 366:13 367:8,20,22 368:5,11 404:24
**member** 421:8 425:16 491:13 495:21
**members** 368:13 518:22
**memorize** 321:17
**mentioned** 458:18,19 461:22 495:5
**mentions** 408:24
**message** 447:8 457:16 458:13 467:19 468:5 469:8 470:8 471:23 476:4 476:16 477:18 477:19 479:23 483:12 488:13 490:13 495:6 502:11 503:2 513:4
**messages** 311:24 312:3 452:24 453:3,8 453:14 454:2 454:11,19,25 455:4,9,11,14 455:17,23 456:6 463:16 464:9,13,14 465:2,4,7,12,14 465:17,24

466:3,7,13,16 466:17,22,25 467:9,10,12 468:9,14,19 471:20 478:20 479:25 481:3 483:23,24,25 484:3 486:13 489:2 493:1 494:4 501:15 502:2 503:5 514:7 520:21
**messaging** 483:12
**met** 340:20
**methodology** 330:14
**methods** 315:20 316:21
**metrics** 343:20
**mid** 486:1
**middle** 354:13 356:20 427:16
**midst** 486:5
**midwest** 528:17 531:1
**milestones** 343:20
**miller** 307:3 309:4 313:25 313:25 493:6 493:10 504:2,3 505:11,13 507:19 509:8 510:12 513:24 514:13 515:25
**million** 350:8 356:23 357:1,3 357:5,7,11 359:8,12 400:22 427:4,8 427:12 428:16 428:21,24 429:2 462:7,11 462:22 464:5 474:12
**mind** 461:18
**minutes** 491:25
**misconstrued** 443:19,24 444:6
**misheard** 424:9
**mismanagem...** 403:10,14,22 404:6
**missed** 521:5
**missing** 521:13
**missouri** 305:2 526:19
**misstates** 393:4 498:14
**mizaur** 311:4,6 311:8 433:6,9 434:4,8,16,23 436:18,25 437:3 440:24 441:6 444:8
**mo** 305:17 306:20 307:7 307:15,23
**monday** 437:7
**monetization** 419:7
**money** 337:14 338:5,5
**month** 321:4
**monthly** 320:17 330:4 352:21 404:15 408:5,6
**months** 318:19 320:18 321:3 321:12,14,25 322:24 350:13 350:22 494:8
**moore** 365:23 426:22 454:12 465:25 522:17 523:16
**morning** 314:3 314:14,15 417:25 437:7 459:3 469:14
**motion** 310:18 325:4 385:7,11 385:21 387:10 388:3,7,10 389:16,20 390:10,12,13 390:24 391:5 391:10,16,18 391:21 392:2 395:19 396:18 397:2,11 398:9 403:17 406:1 411:19 416:25 418:18 422:20 424:2,20 425:21 474:6 479:5 483:2,8 484:17,25 486:5 487:11 487:15,24 488:3,9,15,20 498:13 523:14 523:19,19 524:7,14
**motions** 352:2
**move** 364:9 373:13 485:20 495:15 496:1
**moved** 426:17
**moving** 395:25 435:3 471:3 494:21
**mullinix** 308:4
**multiple** 310:10 417:17

**n**

**n** 306:1 307:1 308:1 309:1 311:6,8 313:1
**name** 313:7 331:12 455:25

499:6,14 500:8 506:20 515:21 515:21 528:6 529:3,4,15 530:3,4,21
**named** 376:14
**nation's** 376:18
**national** 376:21
**natural** 520:5
**nature** 326:2 364:25 387:16 393:21 421:14
**ne** 306:7
**necessary** 372:13 394:13
**need** 330:15 332:1,5,10 412:15 430:14 431:2,21 432:13 435:4 435:15,16 440:17,19 444:4 448:10 459:21 468:17 469:22 478:4 478:22 479:13 480:4,5,6 482:8 485:9 490:16 495:10 500:21 501:19 514:25 517:3
**needed** 366:19 394:16 401:4 404:10 457:24 458:3 484:18 484:18 485:15 504:13
**needing** 492:9
**needs** 354:21 447:22 492:6 492:11 496:4 497:15,16
**negatively** 387:3
**negotiated** 346:17 399:18 438:12
**negotiating** 360:9
**neither** 526:11 527:7
**net** 310:11 381:16 382:3 382:21,23
**never** 337:13 338:4 366:20 366:21 375:4 379:22 384:11 385:4 429:2 441:11 463:4 489:22,25 490:2,7
**new** 400:14 406:17,22 407:13,15,19 409:1 410:2 411:2,15 425:13,13 441:12,25 443:8
**news** 489:10
**nick** 311:4 434:23 437:3
**night** 461:24 492:10 494:6
**nine** 503:8
**non** 353:16 416:16,21,23 494:19,20 520:4,5 524:9
**noon** 492:2,10 492:12,17 494:25
**normal** 403:3 442:24 497:12 497:13
**norton** 487:20 493:14
**nos** 311:25
**notarized** 528:15
**notary** 526:18 528:25 529:10 529:18 530:15 530:23 531:23
**note** 350:2 374:9,16 376:17 400:21 422:24 528:13
**noted** 343:25
**notes** 333:13 352:20,24 418:18 430:14 446:11 456:22
**notice** 317:10 318:7,12,15 389:8
**noticed** 492:23
**notwithstandi...** 348:10
**nrv** 353:16
**number** 317:5 335:13,14,15 425:14 449:16 454:10,15 463:4 464:15 464:23 466:8 466:12 469:4 495:16 528:7 528:14
**numbers** 329:13 334:15 340:14 342:2,3 342:7,25 354:18,25 355:11,16,18 357:13,17,20 359:9 530:7
**nurseries** 374:10 375:23 511:6

**o**

**o** 313:1
**o'clock** 461:24 492:14

**oath** 314:16 513:8
**object** 317:7 318:1 368:3 456:24 510:3,6 510:9
**objected** 483:10 510:2
**objecting** 492:25 493:2
**objection** 316:23 319:1 320:23 321:5 322:2,25 323:9 324:17 325:19 325:24 326:21 327:3,15,22 329:5,7 330:17 336:25 338:7 340:22 343:4 344:12,23 345:5,18 346:6 347:7,13 349:24 350:15 350:23 351:5 351:20 355:2 357:24 358:11 358:15 359:22 360:15,22 361:17 363:16 363:25 365:18 366:24 368:15 369:7,20 370:8 370:9,19 371:4 371:12,21 372:7,18 373:1 373:15 375:2 379:19 380:5 380:14,21 381:2,11 383:17,25 384:7,24 385:25 386:20 386:21 387:11 388:15 389:4 389:22 391:1 391:11 393:4 395:11 396:13 396:21 398:2 398:12 401:12 403:16,23 404:7 405:5,18 407:25 408:12 409:9,15,22 411:8,24 412:8 413:6,17 414:3 414:4,14 419:21 420:5 422:8,9 423:9 425:24 426:7 428:2,3,10 430:18,23 431:22 434:6 436:2,12 437:22 438:25 441:19 442:3 442:12 443:17 444:17,23,24 444:25 445:4,5 445:8,11,13 446:19 447:24 449:11 451:9 452:17 458:7 460:17,23 461:6 462:1 463:18,25 468:21 470:24 472:20 473:20 475:5,17 476:7 477:7 478:9 479:8,18 480:22 482:18 486:17,18 487:25 488:18 489:20 491:1 491:17 496:13 498:14 499:15 500:4,20 501:5 502:18 503:20 505:3 507:16 509:2 513:18 513:20 523:5 524:2
**objections** 345:7 346:19 346:22 347:5,8 347:15 355:19 387:5 432:5 494:18 510:19
**obligated** 428:6
**obligation** 380:3 397:24
**obligations** 413:3 517:19
**observation** 522:8
**observe** 518:20 518:25 520:3 521:22
**observed** 517:17 518:5 518:12 519:22
**observing** 308:12
**obstacles** 488:21
**obtain** 315:1 328:4 336:23 347:22 357:13
**obtained** 329:2 424:13 432:15 511:10
**obtaining** 346:13 435:3
**obviously** 317:5 421:8 516:20 517:24 519:6
**occurred** 318:17
**ocp** 410:23,24
**october** 474:2 497:24
**odd** 469:19
**offer** 374:13 375:22 376:1

398:16 412:25
**offers** 343:22
**office** 307:2,4 313:25 365:23 404:11 437:4 438:2,24 450:6 504:4 513:13 513:17
**officer** 406:17 517:20 518:7 526:1,2
**official** 306:13 313:15,18,21 529:15 530:21
**oh** 334:15 336:19 348:15 375:3 379:20 386:5 410:17 414:22 428:15 429:10 445:15 459:1 465:23 467:15 472:6 503:4 505:9
**ohio** 528:2
**okay** 314:14,19 316:12 318:17 319:15 325:12 326:14 328:14 329:1,10 334:3 334:5,6,14 337:4 339:1 341:25 346:2 346:16 347:4 349:13,21 350:2 351:17 352:6,24 353:6 353:13 354:13 356:19 357:15 358:19 361:2 365:16 367:25 378:19 388:11 388:19 389:7 397:2,16 399:7 399:10 400:6 403:5 404:21 406:14 407:4 410:15 411:12 414:24 415:5 417:10 422:22 423:7 424:8 427:3,14 428:15 429:21 430:11 431:2 432:7 433:22 434:21 437:13 438:23 439:19 442:25 443:5 444:10 448:3,9 451:14,22 453:13,20 454:14,17,24 455:3,8,22 456:4 457:7,11 457:14,16 458:22 459:4 459:17,20 460:22 461:3 462:4,14,17,20 463:2,14,24 464:22 465:9 465:12 467:3 467:18 468:3 468:13,19 469:4 472:1,7 473:17 474:5 474:10,21 476:3 477:1 478:6 479:23 480:17 481:2 481:24 482:16 483:9 485:8,19 489:5,6,11 490:15,16 491:20 492:1,8 492:15,19 495:9,15,23,24 496:18 497:25 499:2 501:24 504:11,17,21 504:25 505:14 505:25 506:4 506:10,18,22 507:1,4,8,13,20 507:25 508:3 508:10,13,20 509:9 510:16 511:5,8,12,19 511:23 512:1,5 512:8,11,21,25 513:2,7,11,15 513:25 514:6,6 514:10,14,17 514:20,21 515:12,17 516:5,20 517:15,22 518:9,17 519:2 519:19 520:1,7 520:16 521:4 521:20 522:2 522:11,22 523:12,21,25 524:13
**omaha** 306:6,7
**omnibus** 463:24 464:4
**once** 391:17
**ones** 347:11
**ongoing** 322:8 370:6
**open** 374:12
**operating** 330:4 397:21 408:5,6
**operational** 327:12
**operations** 364:18 388:1 394:2 406:18 407:1,2,9 424:15
**opinion** 334:17 370:9 398:16 425:20 428:19 436:3 458:5 470:22 481:19

**opportunity** 374:20,21 521:22
**oppose** 389:21 391:10,21 392:10 487:9 487:11
**opposed** 321:3 392:3,12 424:3
**opposing** 358:10 397:10 487:15
**opposition** 424:6 483:2
**option** 402:17 448:15 449:14 450:12,18,23 451:1,2,4,14 484:22 485:6
**options** 397:24 401:9 448:12 451:16 480:5,6 509:16
**order** 311:16 311:19 318:3 362:7 363:14 364:6 406:16 408:15,17 439:11,16,17 440:2,10,19 476:23 493:7 506:12 510:18
**ordered** 510:18
**orders** 346:17 347:21,23 360:10,13 361:25 387:20 387:23 393:19 519:7
**ordinary** 407:18 411:1,4 435:13 508:5 508:14
**oregon** 335:24 379:11
**originated** 511:13
**outbound** 333:19,21
**outcome** 526:16 527:12
**outdoor** 305:6 308:2 313:24 511:2,5,9 512:6 522:18 528:6 529:3 530:3
**outdoors** 309:11 331:6 416:11
**outline** 485:22
**outside** 420:14 420:18 428:24 500:11
**outstanding** 431:20
**overall** 332:25 349:14 393:23
**overcome** 487:23
**overcoming** 376:19
**oversaw** 362:13
**oversight** 362:14
**overstated** 316:14 324:10 324:12 331:1 332:21 350:21 462:7
**overstatement** 520:21
**overstating** 324:1
**owed** 380:3 430:4 431:3 432:2 433:19
**own** 337:6,9,22 340:15,20 413:2 430:15 430:25 432:12
**owned** 317:22 410:4
**owner** 498:23 522:20 523:1
**ownership** 374:12
**owns** 409:14

**p**

**p** 306:1,1 307:1 307:1 308:1,1 313:1
**p.a.** 308:4
**p.m.** 445:23 492:3 499:21 524:24 525:1
**page** 309:2,9 310:2 311:2 312:2,10 339:22 340:13 341:7,9,10,14 341:15 343:12 349:9,10,10 352:11 354:14 356:17,20 399:24 400:1 400:11 406:9 412:16 415:19 416:7 418:21 418:22,25 422:22,23 426:20 427:15 427:17 429:12 430:2 432:10 432:10 434:21 435:7 436:17 436:24 439:5 441:8 447:3,16 453:21 454:9 455:19,21 456:5,6 462:21

465:14,18 466:2,8 467:19 468:3 471:22 474:11 476:11 478:19 479:24 481:25 490:10 499:18,20 506:11 507:11 509:11 514:18 528:14,16 530:7 531:3
**pages** 312:3 399:22 454:18 466:11
**paid** 411:3 427:20 435:21 439:23 440:3,9 440:18,20 441:12 442:11 450:20 452:3,4 476:18 477:6 509:17 510:23 511:2
**paisner** 307:13
**paper** 469:22
**paragraph** 341:15,15 376:17 415:24 439:23 443:4 448:16,21 469:12
**paragraphs** 448:11
**paraphrase** 519:10
**paraphrasing** 517:2
**parres** 309:10 309:12,15 310:4,6 311:9 311:11,16,19 311:21 312:4 314:23 315:17 323:15 324:4 331:6,15,23 332:16 333:12 333:23 334:5 335:11 339:23 340:5 341:10 341:25 342:12 342:23 343:25 344:1,14,16 345:10 347:2 347:24 348:5 348:19 354:17 356:5 362:13 365:14,22 368:17 374:5,9 374:15 375:10 376:8 400:8 406:13 407:6 410:25 413:10 414:9,11,15,20 415:1,6 418:13 420:20 421:2 421:19,25 422:5 426:21 436:18,25 437:3 438:2,9 438:20 439:6 439:19 440:8 440:24 441:10 442:9,18,25 443:16 444:8 444:11 446:6 446:11 447:4 447:16 448:6 449:15,20 450:24 451:5,6 451:11,16 455:24 457:1 457:17,23 458:13,17 459:5 460:6,13 461:5,12,20 462:20 464:14 465:2,4,19 466:13,18,23 467:1,11,13,16 467:20,20,22 468:10,20 469:25 470:7 471:21,23 472:4,8 473:17 474:1,11 476:4 476:13,17 477:1,4,18,20 478:3,7,13,21 479:1,6,25 481:3,16 482:1 482:12 483:5 484:13 485:9 485:12 486:13 486:24 487:2 488:12,25 489:5 490:11 490:13 495:17 495:20 496:3,7 497:15,25 499:2,6,20,23 500:2,8,10 501:3 502:2,11 502:16,21 503:12,14 505:21 506:15 506:23 507:5,8 509:12 512:25 514:8,24 520:22
**parres's** 345:22 346:4 355:7 441:24 463:10 463:17 466:7 472:18 503:19
**parry** 308:14
**parson** 440:14
**parsons** 311:12 311:15,18 438:2 439:7,19 446:6 447:8,9 447:22 449:21 451:5,12
**part** 330:7 367:3,13 385:3 389:1 392:4,18

396:5 399:1,18 399:19 473:1 513:11 515:12 517:9 520:25 523:13 530:9
**partial** 425:18
**participate** 348:11
**participating** 372:4
**particular** 314:25 367:24 375:15 421:3 483:16,17 484:2 506:4
**particularly** 318:18 355:18 387:24
**parties** 313:6 322:17 323:11 325:4 329:15 329:18 346:18 352:22,23 373:9 386:16 394:6 454:5 456:10,14 473:16 492:23 507:15 526:12 526:14 527:8 527:11
**parts** 375:13
**party** 405:16 432:2 453:17 509:5
**past** 423:23 492:17 495:7
**path** 419:8,17 419:19,20 420:4,8,12
**pause** 337:12
**pay** 339:16 359:11 427:24 428:5,6,8,13 430:14,25 435:11 436:9 476:22 477:11
**paying** 433:18
**payment** 363:11 408:22 410:7 411:20 411:21,21 412:12,12 415:12 435:3 442:6 509:22 509:24 511:15 523:9
**payments** 325:14 363:9 363:12 407:24 408:1,8,10,15 409:2,8,12 410:3,13,16,17 410:19 413:24 415:10 509:13
**payroll** 364:24 407:17,24 408:1,25 411:20
**pays** 432:12
**people** 310:11 339:24 340:7 453:9 518:22
**percent** 427:7
**percentages** 360:1,4
**perfect** 446:5 464:25
**perform** 437:10 437:21
**performance** 325:16 326:4 327:11,19,20 330:2
**performed** 440:4
**performing** 520:4
**period** 336:23 384:21 401:17 422:19 485:16 485:17
**person** 369:15 518:14
**personal** 319:20 320:10 322:6 342:14 343:8 384:12 385:5 391:14 414:6 417:16 417:21 421:5,6 421:7,9 432:6 454:25 472:9 472:19 473:18 477:5,11 491:4 506:20 515:21 518:3,10,19 520:2
**personally** 319:5 323:5 324:24 334:9 355:10 367:12 378:8 379:22 381:6 384:14 391:4 397:11 405:12 406:7 406:10 413:4 414:5 415:7 430:21 431:14 440:14 488:14 490:4 498:9 518:1,5 529:11 530:15
**personnel** 521:22,23
**persons** 520:5
**pertains** 415:11
**peters** 306:4 309:12 313:10 313:10 339:23 340:12,13 341:8,19 343:14,14,22 348:12 415:20 415:23 472:12 472:14,19 473:19 500:13

**peters's** 340:5
**petition** 354:20 363:11 376:15 435:17 436:5 437:14,19 439:25 440:4 440:18,21 442:7,23 444:1 444:2 447:13 447:23 450:13 450:20 451:18 451:24 452:15 462:11,24 463:3 464:5 508:4,15 520:10
**petitions** 515:9 515:11
**ph** 335:25
**phone** 453:1,7 453:8,24 454:3 454:7 466:17 466:20 467:1 467:10,12 468:15,16 516:8 520:17 528:3
**piece** 480:5
**pisses** 473:2
**pit** 309:16,19 352:21 353:1 353:18,24
**place** 328:23 331:16 348:14 351:23 364:25 365:12,17 378:6 382:12 385:20 390:20 401:7 423:18 424:15,18 479:21 489:17
**plan** 337:2 339:12 373:14 399:1,2,4,11,13 399:16,18,19 403:10 406:19 407:1 420:14 423:15,15,18 425:5,5,15,15 482:9,13 485:9 485:15,18,20 485:22,23 486:4,6,13,16
**planned** 493:18
**planning** 311:5 429:13,18,22 431:10 433:6 433:10 434:2,8 434:9,10
**plant** 384:23
**play** 374:17
**player** 395:1
**please** 313:6 441:12 442:25 443:8 447:4,19 469:19,20,23 528:12,12
**plug** 481:7,13 481:17,21
**plus** 449:1 450:15
**point** 315:13,25 334:7 337:12 351:14 352:19 352:24 353:13 353:18 406:14 407:11,12,15 408:19 409:1 410:2,22 411:14 413:25 415:15 434:4 434:13 446:10 449:24 450:2 450:25 458:17 460:11 461:1,9 470:15,21 478:6 483:10 511:15 523:15
**points** 335:17 356:19 411:18 415:9
**policy** 510:21
**portion** 353:14 353:16
**posed** 373:3
**position** 361:10 361:14 424:4 425:19 437:8 447:10 483:21 484:16 485:14
**positive** 327:13
**possession** 380:1 471:15 471:18 497:11
**possibility** 337:21 385:17 424:11 475:7 476:9
**possible** 335:12 351:17 367:14 419:6 437:7 482:6 484:16
**possibly** 372:9 386:14 464:6
**post** 368:8 440:4,18,21 442:7,23 444:1 444:2 508:4
**potential** 315:14,23 316:8 344:19 364:5 373:9,9 373:19 374:20 377:1 380:19 383:23 401:3,6 401:18 442:1 470:17 523:9
**potentially** 508:25
**power** 519:13
**practice** 369:3 415:2
**practiced** 345:4

**practices** 315:24 333:16
**practicing** 511:20,23
**pre** 363:11 435:12,17 436:5,10 437:14,19 439:25 447:13 447:23 450:13 450:20 451:18 451:24 452:15 462:24 463:3 508:15 520:10
**precise** 518:18
**predict** 385:10
**premium** 435:21 448:23 450:19 451:19 451:24 452:6,9 452:15
**prep** 517:15 518:10 519:21 520:1
**preparation** 315:10 317:1 320:2,20 324:19 330:1,7 330:18 340:25 351:19 355:7 365:15,16 368:1,10,24 489:3 498:1
**prepare** 314:22 315:5 317:11 318:4,23 322:18 329:19 331:4 337:9 351:25 356:16 463:24 484:7 512:21
**prepared** 318:8 327:11 352:18 353:2 382:6 483:20 527:3
**preparing** 322:9,10 325:4 327:14 331:19 356:13 365:11 367:19 399:10 483:2,8
**presence** 396:12
**present** 308:10 367:11,13,21 402:16
**presented** 449:15 456:16 456:18 484:3
**presenting** 451:16
**preservation** 384:15
**preserve** 419:4
**press** 448:17
**presumably** 359:19 423:23
**pretending** 449:10
**pretty** 402:7 494:21
**prevail** 488:3,8 488:15,20
**previous** 515:1
**previously** 314:9 343:21 413:25 420:15 435:22
**primarily** 323:15 386:11 399:6
**primary** 325:15 352:5 386:16
**principle** 335:16
**print** 469:23
**printed** 382:21 501:14 502:1
**prior** 314:21 325:3 344:10 346:17 349:5 363:22 366:12 366:15 375:8 382:8 409:7 505:8 526:5
**privilege** 510:7 510:10
**probably** 445:2 455:7 459:1 491:24
**problem** 516:11
**problematic** 332:20 514:3
**problems** 422:25 423:5,8 424:21 425:21
**procedure** 529:5 530:5
**procedures** 315:20
**proceed** 421:13 427:4 435:3 451:8
**proceeding** 459:25 525:2 527:4
**proceedings** 461:19 526:3,5 526:6,9 527:6
**proceeds** 427:8
**process** 323:21 324:6 337:2 375:9 376:22 377:1 399:1,19 406:19 407:1 473:12 476:2 513:12
**produced** 452:25 465:2,4 465:13 466:7 467:4,6,8,9,12 467:20 468:15 468:20 503:12

**product** 510:7
**production** 349:16 353:1,3 353:10,15,16 466:16 528:16 528:17,22
**profess** 521:16
**professional** 311:13,23 411:10 431:19 431:19,20,25 435:13,25 452:14
**professionals** 410:23 411:1,3 415:12,13 439:12 452:13 452:19
**program** 308:13
**program's** 447:10
**prohibited** 360:13
**prohibitions** 362:4
**projected** 340:15,20
**proper** 452:1
**property** 357:11 376:14 409:4 496:21 523:2
**proposal** 310:15 405:25 406:8,15 413:4 413:13,15 414:11 415:6,9 417:11,22 418:3,8 450:5 450:10
**propose** 450:11
**proposed** 343:21 399:16 405:25 411:19 416:1,4 417:11 425:6 444:10 444:12 446:18 450:23 451:2 452:20 492:13
**proposing** 450:5
**protect** 335:1 419:3 499:3
**protected** 325:6,18
**protecting** 497:16
**protection** 309:24 325:8 325:13 326:2,8 326:19,20,24 327:10 332:24 333:3,3 356:5 362:17,19,22 363:3,9
**prove** 344:2
**provide** 328:17 338:18 339:4 345:23 369:25 372:1 401:25 402:3 404:14 424:18 425:16 425:17 448:11 453:7 502:7
**provided** 326:3 327:9,25 328:1 333:4,7 334:20 335:2 337:11 338:24 342:18 346:3,10 354:25 355:12 356:1 357:19 358:1 368:19 371:1 372:5 373:4 387:7 394:20 398:22 401:22 417:22 425:8 433:1 453:24 462:4,6
**providing** 328:9 369:23 370:5,12 371:25 376:13 496:8
**provision** 408:19 443:2
**provisions** 360:24
**public** 526:18 529:10,18 530:15,23 531:23
**pull** 468:17
**pulled** 454:2 468:14
**purchase** 373:19 374:20 395:9 475:15 475:23 515:1
**purchases** 373:10
**purchasing** 389:12 390:3
**purported** 382:24
**purports** 439:11
**purpose** 362:11 364:20 369:22 372:19,23 373:2 396:16
**purposes** 372:15
**pursue** 401:9 419:6
**pursuing** 401:13
**push** 460:6,13 494:19
**put** 317:10 318:6 328:23 357:16 408:20

414:2 419:7 449:3 492:8 499:3,13 518:21
**puts** 407:16
**putting** 406:7 406:12 493:21 500:8 518:13 518:23

**q**

**qualified** 526:7
**question** 312:9 315:13 317:8 318:2 357:9 358:17 359:15 362:20 371:10 371:10 372:6 395:12 397:2 421:5 449:19 456:23 460:11 483:20 490:8 500:22 510:2 517:22 518:18 521:10,20 522:7
**questioning** 371:2 379:8 492:3
**questions** 330:14 365:2,2 365:25 369:18 370:13,14,22 372:20,21,24 372:25 373:3 379:2 381:15 381:17 384:14 432:5 446:24 494:19,20 503:24 504:5,6 522:12,14 524:18
**quick** 416:15
**quickly** 464:11 494:22 496:4 497:17,17,17
**quiet** 499:24
**quite** 390:25
**quotation** 449:3 450:3
**quote** 430:8
**quotes** 442:1

**r**

**r** 306:1 307:1 308:1 313:1
**r.g.** 306:16
**rachel** 527:2,15
**raise** 318:12 414:22 415:5 421:2 422:2 443:23 521:8
**raised** 315:19 316:11,13 317:20 318:20 319:16 326:20 347:5 421:18 421:24 422:5 447:21
**raising** 332:12 415:7 521:9
**range** 359:12
**rather** 320:17
**ratner** 308:11
**reach** 333:5
**reached** 347:17 347:18,20 434:25 497:22
**reaches** 433:9
**reaching** 373:18 378:7 378:10
**read** 321:17 445:2,5,13 448:10 465:6,9 465:10 479:12 500:22 501:20 529:5,6,12 530:5,6,17
**reading** 349:13 400:22 486:12 528:20
**ready** 435:2 486:4 517:1,9 517:16,24 518:11,18 519:21 520:19
**real** 357:11 427:11 428:24 429:3 471:10 524:9
**realize** 506:11
**really** 366:3 403:9 474:23 479:1 509:13
**reason** 317:3 342:2 429:10 467:17 489:13 523:22 528:15 530:8 531:3
**reasonable** 334:1 407:19 419:15 483:15 483:24 484:1 484:23 485:1 517:10
**reasonably** 318:3,5 483:16 484:6
**reasons** 352:18
**recall** 316:10 316:11 319:22 331:21 332:9 332:14 334:16 334:23 335:23 336:18,20 338:13 351:15 352:6 354:1 357:14 358:24 359:4,7,10,17 360:23 361:11 362:23,24 363:1,5,18 366:17,18 367:4,6,14,16

373:17 374:19 375:4,20,22 377:2,5 378:10 378:12,14 379:7 383:10 384:17 388:23 391:13 397:8 403:17 405:8 409:12 410:15 415:7 417:17 417:21 421:22 425:9 431:13 431:15,16 432:18 434:13 439:1 440:11 440:14,16 444:7 445:18 447:25 451:11 455:6 456:24 456:25 458:24 459:16,19,23 460:10 461:1,3 461:15 463:20 464:3 468:24 470:13,14 471:1 475:2,24 480:16 490:7 491:18 496:23 497:23 498:4 501:6 504:8,10 510:24 511:1 513:5,6 514:8 515:4,10,11,23 517:6 520:7,11 520:22 523:15 523:17

**receipt** 528:19

**receipts** 340:16 340:20 341:2 481:6,13,17,21

**receivable** 358:5,9

**receive** 335:6 373:8 401:18 466:17 494:4,6

**received** 329:10 338:24 342:17 345:20 351:10 378:8 383:4 391:17 404:24 408:22 412:15,17 441:23 454:4 472:7 501:15 512:16

**receiver** 385:15 403:6 468:7 469:14,18 470:9,11,16,18 471:7,8

**receives** 512:3

**receiving** 329:14 330:23 412:12,12 440:8

**recite** 327:7 521:11

**recognized** 335:5 492:10

**recollection** 319:14,20 322:6 327:18 332:4 335:22 339:20 340:25 342:14 343:8 351:1 352:8 353:11 363:10 378:7 381:23 382:11 383:19 387:15 395:23 402:13 417:25 422:21 437:23 474:8,17 515:17

**recommendat...** 500:9

**recommendat...** 450:6

**recommending** 417:3

**reconcile** 341:20 342:2

**record** 313:3 318:3 378:21 378:22,24 445:21,22,24 492:4,5,7,9,11 493:21,24 494:11,12,14 495:8 503:25 505:21 514:12 514:25 516:16 524:24 526:9 527:5 530:9

**recorded** 526:6

**recording** 526:8 527:4

**records** 314:24 321:4 324:9 352:4 358:20 360:6 362:9 367:16 515:6

**recoup** 452:15

**redacted** 454:19 455:9 455:13 503:14 503:19

**redactions** 455:4

**reduce** 402:11

**reduced** 462:23 526:7

**reduction** 402:14 438:12

**refer** 426:24 449:24

**reference** 341:14,18 354:13 406:22 433:13 467:21 481:25 514:6 528:7 529:2 530:2

**referenced** 379:10 402:6

484:21 529:11 530:15
**referred** 420:8 515:5
**referring** 347:12 420:2,3 424:22 427:20 431:6 434:1 446:21 449:4 458:2 472:12 487:19 500:3 514:8
**refers** 441:18 449:24 450:2 480:24 491:5 514:22
**reflect** 353:3 367:17
**reflected** 354:2 408:6,7
**reflects** 440:2
**refresh** 332:4
**refused** 359:11
**regard** 317:21 319:16 328:12 333:21 336:8 341:16 347:17 347:20 348:2 404:12
**regarding** 316:4 329:2 330:14 332:12 336:10 343:1 348:13 355:24
364:5 374:20 417:18 418:2 446:7 510:4 517:5
**regardless** 424:6 425:1
**regroup** 480:4
**regularly** 508:15,18
**regulation** 372:10
**reimbursement** 407:18
**reject** 498:13 523:19 524:7 524:14
**rejected** 524:11 524:14,16
**rejection** 498:3 498:19
**related** 326:24 333:16 364:10 429:23 455:11 455:17,18 460:4,9,20,22 467:16 510:9 512:12 526:11 527:7
**relating** 328:3 468:10 500:16
**relationship** 412:4 473:5 522:25
**relationships** 392:16 394:1
**relative** 526:13 527:10
**relied** 331:2
**relieving** 319:18 343:3
**rely** 333:5 358:22
**relying** 342:15
**remain** 389:9 389:25
**remained** 394:2 398:9
**remaining** 441:13,18,25
**remedies** 360:20 361:4 361:25 362:11
**remedy** 395:4,4
**remember** 316:3 381:17 401:22 418:5 421:17 442:4
**remind** 314:16 461:8
**remote** 369:9 369:17 372:4
**remove** 388:4
**render** 432:2
**renner** 308:5
**rent** 335:13 409:8
**reorganization** 373:14 406:19 407:2
**rep** 351:7 403:25 484:4 516:23
**rephrase** 366:21
**report** 336:17 336:22 342:21 350:3 351:18 354:20,21 357:16 411:15 411:15 448:6
**reported** 305:18 340:17 340:24 353:15 353:17 359:9
**reporter** 502:7 529:7
**reporting** 331:15
**reports** 309:16 309:19 316:17 330:4 331:23 342:18 349:14 352:21 353:2 353:18,24 355:6 358:6 359:14 404:15 404:25 408:5,6
**represent** 313:7,9,11 382:19 452:24

502:1 523:18
**representation** 323:8 373:8 381:22 382:8 454:23 504:25 505:1
**representations** 355:23
**representative** 305:10 308:12 313:13 319:22 321:10,17 322:5,19 323:2 323:17 324:19 342:9 343:6 352:1 364:4,18 365:13 375:18 379:22 382:10 384:10 385:2 385:14 387:14 388:23 389:17 389:19 394:5 395:22 404:1 405:7,20 409:11,17,24 410:11 412:2 412:11 413:2 417:15 423:13 431:13 446:21 491:3
**representatives** 368:13
**represented** 336:24 412:20
**representing** 337:24 355:10 358:12 359:20 371:8 381:6 390:16 421:1 422:4 472:17
**represents** 516:17
**request** 337:20 337:21 338:12 363:9 373:3 399:19 419:2 438:13 464:1 468:25 484:17 498:10 530:9 530:11
**requested** 337:13 338:5 338:22 339:15 342:2 398:8 498:7 526:21
**requesting** 328:23
**requests** 362:17,19,21 362:23,25 363:2,5 454:4
**require** 388:8
**required** 318:4 396:19 473:9 528:25
**requirement** 372:10 397:3 473:13
**requires** 512:2
**research** 447:4 447:17,17,19 448:4
**resentment** 472:18
**reservations** 388:24 396:1
**reserved** 524:25
**residential** 524:9
**resigning** 434:13
**resistance** 389:10 390:1
**resolution** 414:17
**resolve** 408:20 411:19
**respect** 368:5 384:19 387:24 517:6 519:3
**respectfully** 415:25
**respectively** 416:2
**respond** 327:3 366:5 372:21 403:9 427:16 462:17 463:2 483:14 494:24 508:10
**responded** 345:24 347:14 377:6 472:4
**responding** 370:1,13,22 371:15 372:23
**responds** 341:25 354:17 403:5 429:1 430:3 432:9 439:19 462:20 463:3 476:22 478:3 482:8 489:9 496:3 497:12,15 507:8 508:3
**response** 327:5 327:8,14,16,22 327:24,25 329:5 341:11 343:13,25 345:3 349:9 352:12 363:7 374:19,23 378:5 389:15 390:10,12,14 391:6,19 395:19 415:20 416:14 417:7 427:14 430:2 432:9 433:22 451:6 463:25 464:4 472:24 472:25 477:25

483:8 494:2 504:6
**responses** 327:10 348:16 352:3
**responsibilities** 362:6 517:5
**responsibility** 414:12
**responsible** 414:10,11
**responsive** 494:19,20
**restate** 330:15 332:5
**restated** 332:1 332:11
**restrictions** 408:15
**restructuring** 406:17 517:20 518:7
**result** 324:10 328:22 383:14 396:24 403:3 457:18 470:11 492:14 500:17 510:19
**retail** 349:15
**retain** 339:16 431:9,18
**retained** 322:17 328:16 329:1,15,19 331:3 429:6 431:21 435:17 435:25 436:6 437:20 447:12 448:12 449:7
**retainer** 510:22 511:14 512:3 512:17
**retention** 376:22 448:19 450:12 452:13 452:19
**return** 430:5,6 430:15,25
**returned** 528:19
**revenue** 350:20
**reverse** 506:12
**review** 316:25 317:3 320:1,19 323:2 324:20 330:19 331:19 340:24 351:8 352:3 364:4 366:8 367:25 368:23 372:11 375:19 382:4,9 390:8,9 397:6 405:8,10 413:4 413:12,15,20 416:15 441:14 455:10,13 463:21 483:24 500:15,18 501:7 505:25 512:23 515:12 517:11,16,24 518:18 526:21 528:13 529:1 530:1
**reviewed** 314:23,24,24 330:4 331:22 331:22 336:17 349:8,10 352:2 352:13 357:16 358:7 368:2,21 382:7,11 390:12 391:18 406:6 441:22 489:2 503:15 506:2 515:13 515:15
**reviewing** 335:23 352:6 359:14 367:18 398:21 443:14 515:8
**revised** 349:5
**revising** 515:8
**rice** 305:11 307:19 309:20 314:6 315:13 315:22 316:8 316:12,16 317:22 318:13 318:19,19 319:9,12,15 320:6,15,21 321:21 322:19 323:17,20,24 324:7,14,21 326:23 327:1,5 327:16,21 328:2,4,8,15,18 329:1,10,12,23 330:22,24 331:2 332:10 332:19 333:5 335:6 336:6,12 338:4 340:19 342:6 343:15 347:4 351:4 354:8,24 358:19,24 361:2,6,9,22 362:4,8,16 365:10,10 366:23 367:21 368:14 370:17 370:21 371:1 374:25 375:7 375:16 376:25 377:3,25 379:4 379:16 381:21 382:2,8,16 383:4,6,13 384:5,22 385:10,22 389:14,19 390:24 391:9 394:11 395:7

395:14,18 398:18 399:14 401:9,24 402:10,16 403:20 405:3 405:25 411:7,9 415:2,13 417:2 421:1,8 422:4 422:6 424:17 430:12 435:1 445:7,10 453:11,12,14 463:9 464:3 469:9 470:3 471:15 473:6 482:16 483:23 485:20 486:3 487:22 488:8 489:16 490:1 491:7,8,13,15 491:15 495:21 496:11,18 497:2,7,10,22 498:9 500:9,24 501:9 510:18 511:3,9,12,22 516:23 517:4

**rice's** 316:19 321:10 362:9 363:14 373:7 382:8 389:8,24 390:4,9 396:6 422:6 463:25 483:11 500:15

**right** 329:25 336:16 337:8 341:18 350:9 356:11,17,24 364:12 377:9 377:23 379:11 386:25 395:21 400:22,23 421:5 426:18 428:16 433:17 447:18 456:13 459:2 462:25 464:10 470:1 474:4 476:23 494:16 502:5 503:9 504:20 508:16 511:7 511:11 512:7 512:14 519:3,8 519:11,15,24 520:24 522:20 523:9 524:16

**rights** 360:20 361:4,15,24 362:6,11

**ring** 520:17

**ringing** 516:5

**rings** 516:8

**rise** 342:12

**road** 308:5

**roberts** 527:2 527:15

**rock** 306:5 313:8,10

**role** 381:6 398:19 406:7 413:2,8 455:8 456:21 519:8 520:4

**roll** 448:16

**room** 382:5,6 383:5 478:11

**rough** 429:23

**rshanklin** 307:24

**rule** 504:17 512:9

**rules** 529:5 530:5

**run** 440:4 447:11 457:23 458:2,6 495:25

**running** 403:11 404:16

**russell** 307:20 314:5 516:2 528:5

**ryan** 308:12 313:13

**s**

**s** 306:1 307:1 308:1 309:8 310:1,25 311:1 312:1 313:1 528:16 530:8,8 531:3

**sale** 374:20 375:5,12 376:18 397:19 407:1 425:17 425:18 427:4,8 475:25

**sales** 341:22 375:9 376:21 377:1 387:17 387:20,23 392:16 393:15 393:24,25 396:3 404:9 406:19 425:18 476:1 481:6,13 481:17,21

**sam** 340:6

**samantha** 310:10 312:4 340:6 365:23 382:14 386:13 417:18 505:22 506:15 509:11 511:13

**satisfy** 521:14

**save** 432:4

**saw** 332:8 413:8,12 487:16 489:4 515:4 519:20

**saying** 345:2 403:6 413:1 423:21 447:4 452:1,2 462:10

462:14 468:5 471:6,7 476:19 480:10 493:16
**says** 333:23 334:8,8 342:1 344:6,16 349:20,20,25 350:10 354:17 354:21 356:18 368:4 374:16 389:23 403:5 406:25 411:6 418:18,22 419:18 423:6 426:2,9,9 427:2,7,10,23 428:18 432:11 434:23 439:15 443:6,10 447:19 450:16 450:16,18 457:18,23 462:9,10,14 463:3 464:6,6 468:6 469:19 469:20 477:1,1 477:20,25 478:4 479:1 480:9,17 486:23 490:15 490:16,19 495:23 497:13 499:6 507:12 514:24
**sbtf** 333:24
**scan** 469:23
**scenario** 449:15
**scheduled** 351:14 366:17 376:14 457:1 493:3,12
**schedules** 366:1,3,7,9,20 366:21,22 367:2,2,5 514:24
**scheduling** 493:7
**schuler** 306:17 313:20,20
**schwartzkopf** 310:13,17,24 311:7 332:17 340:6 348:20 366:16 399:23 399:25 400:7 404:20,25 417:18 418:13 429:13,21 430:11 432:10 432:19 434:17 435:8 476:13 476:17,22 477:18,21,25 478:21,22 479:10,25 480:2,4,9,17 481:4,5,12 482:1,8 484:14 485:8 521:1,6 521:17
**schwartzkopf's** 432:19
**schwope** 310:14,16 312:5,6 333:24 340:6,7 365:23 365:24 366:3,7 374:16,19 379:13,17 380:12 382:14 386:13,13,18 387:2,7,19 391:21,24 392:3,20 393:3 393:9 395:20 396:6,9 398:9 403:15 407:18 408:22,24 409:25 411:15 411:20,23 412:4 413:14 415:11 417:7 417:11,17,18 417:23 418:12 419:11,13,16 420:2,2 421:25 422:3 469:17 470:8 471:6,14 471:24 475:9 476:6 477:12 480:13,20 487:8,10 488:10,17,25 489:6,9,16,25 490:3,4,5,10,13 490:19,24 491:9,9,16,16 495:17,23 496:8,9 497:12 497:22 498:2,6 498:11 499:2 499:13,20 501:3 504:13 504:21 505:22 506:6,6,15,22 506:23 507:1,4 507:9,20 508:21,25 509:11,13 511:13,16 513:16 514:2 518:22 519:12 522:19,25
**schwope's** 389:9,24 390:4 392:10,16 499:14 515:21
**scope** 319:1 320:23 321:15 322:2,25 323:9 324:17 330:17 340:22 343:4 350:15,23 351:5 355:3

366:24 368:4 373:15 375:2 379:19 384:8 384:25 386:21 387:12 389:23 391:12 396:22 397:5 403:23 404:7 405:5 407:25 409:9 409:15 410:9 411:24 412:9 414:4 417:13 420:18 423:10 430:19 431:11 463:18 482:18 483:10 488:1 489:21 491:1 491:17 496:14 500:11,20
**scott** 365:23 454:11 455:1 465:25 523:16
**screen** 501:25
**screw** 457:19 457:20
**seal** 529:15 530:21
**season** 387:24 393:19
**seasons** 387:25
**second** 341:7 341:14 366:12 366:15 376:17 399:24 400:1 401:25 402:3 405:8 406:9 407:12 410:22 415:15,19,23 426:20 429:11 430:2 434:21 446:10 448:11 448:16 455:20 469:12 484:8 503:1 506:11 509:10
**section** 364:15 408:7 419:12 447:11
**secure** 325:18 326:8 344:20 344:20 345:16 361:14 362:1
**secured** 361:7 361:10 403:21 473:11
**see** 316:17,20 332:2 334:3,4 340:17 341:11 341:17,18,23 342:4 343:23 344:5,17 345:12 349:6 350:5 353:4,20 354:22 356:21 371:25 372:12 374:1,13,17 376:23 377:18 377:20 383:3 394:24 400:1 400:15 402:21 402:22 403:7,8 406:20 407:20 409:5,6 410:4 412:23 416:16 417:9 418:25 419:8,12,17,18 423:1 427:5,12 427:17,24 428:17 429:3 429:14,25 430:6,9,15 431:3 432:13 433:11,20,24 434:17,20,24 435:5,13,17,22 436:19 437:11 438:21 439:14 439:17,20 440:5 441:15 443:12 446:15 447:14 448:16 448:19 449:1 449:22 456:7 457:20,21,24 458:15 462:12 462:13,18,25 463:5,6 467:23 468:1,7,12 469:10,15 470:5,17 471:23,24 472:5,9 473:3 474:13,23 476:19,24 477:2,23,24 478:4,23 479:2 480:2,7,11,18 481:9 482:2,6 482:10,14 485:10,12 486:14,25 488:25 489:7 489:14 490:17 490:21 495:18 496:1,5 497:18 499:4,7,25 500:19 501:16 503:15 505:23 509:19
**seeing** 501:6
**seek** 388:4,8 414:17 432:20
**seeking** 408:21 431:9,18 507:4
**seem** 407:2
**seemed** 401:2 402:9
**seems** 432:12 489:6,11
**seen** 330:11 334:13 478:15 505:20 506:2 508:23
**selected** 407:13
**sell** 496:3 499:13

**selling** 374:25
**semi** 352:25 353:3,9
**send** 422:23 443:8 458:12 469:19,20 470:3,7 471:23 474:11
**sending** 351:3 354:15 469:24
**sends** 374:8 382:14 435:8 490:13
**senior** 403:21
**sense** 401:15 487:9,12,14 521:19
**sent** 350:3,11 351:18 352:21 352:23 367:20 407:22 440:15 444:8 451:5,12 470:14 471:6 477:19
**sentence** 415:23
**sentiment** 490:1
**separate** 390:23 398:25 405:9
**separately** 454:10
**september** 305:13 313:4 382:15 383:5 390:20 406:2 407:22,23 408:11 409:7 410:8 412:16 416:8 417:12 417:23 418:8 422:13,14 423:3 425:19 426:12,16,18 428:19 456:6,9 456:16 457:2 461:19 463:13 463:15 482:17 485:19,24 486:2 489:5 490:14 495:21 497:21 520:19
**series** 466:11 480:1
**serious** 344:4,9 344:10 390:25
**serve** 411:2
**services** 376:13 412:12
**set** 366:8 368:12 406:15 413:24 416:3 438:20 446:15 455:23 464:8,9 502:12 519:6
**sets** 430:3
**settlement** 310:15 405:24 406:8,15 412:25 413:4 414:10 415:6 416:14
**seven** 411:18 413:13 469:6 500:13,14
**seventh** 406:16
**several** 382:16 382:20
**sft** 310:7 377:18,22 378:1,8
**sftcapital.com** 377:9
**shaffer** 409:14 409:18
**shaffer's** 409:2
**shankland** 528:5
**shanklin** 307:20 314:5,5 316:23 317:7 318:1 319:1 320:23 321:5 321:15 322:2 322:25 323:9 324:17 325:19 325:24 329:7 330:17 336:25 338:7 339:10 340:22 343:4 344:12,23 345:5,18 346:6 347:7,13 349:24 350:15 350:23 351:5 351:20 355:2 355:14 357:24 358:15 359:22 360:15,17,22 361:17 363:16 363:25 365:18 366:24 368:3 368:15 369:7 369:20 370:8 370:19 371:4 371:12,21 372:7,18 373:1 373:15 375:2 378:19 379:19 380:5,14,21 381:2,11 383:17,25 384:7,24 385:12,25 386:20 387:5 387:11 388:15 389:4,22 391:1 391:11 392:6 392:22 393:4 395:11 396:13 396:21 397:5 398:2,12 401:12 403:16

Case 25-50053-can11 Doc 895-7 Filed 11/03/26 Entered 11/03/26 21:49:54 Desc
Exhibit G - John Hall Deposition Transcript - Day 2 Page 285 of 299



403:23 404:7 405:5,18 407:25 408:12 409:9,15,22 410:9 411:8,24 412:8 413:6,17 414:3,14 417:13 419:21 420:5 421:4,20 422:8 423:9 425:24 426:7 428:2,10 430:18,23 431:11,22 432:7 434:6 436:2,12 437:22 438:25 441:19 442:3 442:12 443:17 444:17 445:8 445:11,15 446:19 447:24 449:11 451:9 452:17 458:7 460:17,23 461:6 462:1 463:18 464:17 464:19 468:21 469:4 470:24 472:20 473:20 475:5,17 476:7 477:7 478:9 479:8,18 480:22 482:18 483:14 484:1 485:3 486:18 487:25 488:18 489:20 491:1 491:17,21 492:1,6,16,19 493:2,11,15 494:10,13,23 495:4,10 496:13 498:14 499:15 500:4 500:11,19 501:5,17 502:18 503:8 503:20 505:3,9 507:16 509:2 510:6 513:18 513:20 516:5 523:5 524:2,18 524:22
**share** 440:7 443:10 458:5 484:16 485:14
**shared** 484:13
**shawnee** 308:6
**shb.com** 307:24
**sheet** 321:13 350:3,4 352:19 352:25 353:8 353:15,20,25 399:25 400:14 401:3 402:5,12 402:15 425:8 462:21 474:12 474:15 486:6 528:14 530:7 530:10,18 531:1
**sheets** 321:24 322:23 350:12 350:21 401:18 401:21
**shook** 305:15 307:21 314:6 494:5
**short** 378:16 517:19 518:6
**shortly** 497:20 497:21
**shot** 467:22
**show** 353:19,24 501:13,17 503:1
**showed** 335:3 471:19
**showing** 501:24
**shown** 528:16
**shows** 350:3 508:12
**shrinkage** 335:14,19
**shut** 493:14,16
**sic** 522:17
**side** 368:12 369:5 370:25 387:17
**sign** 439:16 524:21
**signature** 524:25 526:16 527:14 528:15
**signatures** 383:3 469:22
**signed** 383:2,7 383:14 497:3,6 497:9 529:13 530:18
**significant** 327:8,9 335:3 336:22 344:19 387:21 396:1 423:17 460:13 488:21
**significantly** 432:21
**signing** 528:20
**similar** 343:21
**simply** 415:15 449:10 451:24 457:19
**sincerely** 528:21
**single** 340:16 340:24
**sir** 528:10
**sit** 445:3 465:10 504:20
**sitting** 321:9 333:15,20 371:24 410:20 425:10 432:25 521:9

**situation** 339:8 433:23 449:9 519:22
**situations** 376:20
**six** 320:17 321:3,12 439:23 461:23 515:8
**skills** 526:10 527:6
**slam** 482:14 486:14,21
**slim** 505:8
**smart** 508:4
**sold** 381:8
**solomon** 310:7 377:17
**solutions** 528:1 531:1
**somebody** 453:13 463:2 507:14
**soon** 419:6
**sorry** 331:12 341:7 360:17 374:5 393:11 407:12,23 426:17 453:23 468:5 474:2 489:7 503:2,4
**sort** 495:7
**sought** 388:5 392:2
**sound** 331:16 453:23
**sounds** 319:5 329:25 351:16 456:13 481:5 504:20 511:7 512:14
**source** 511:17 512:3
**speak** 315:4,8 321:6,18 340:14 351:9 358:8 391:16 418:9 491:15
**speaking** 315:17 332:17 451:11 469:25
**speaks** 327:24 328:1 332:7 355:8
**specialize** 376:19
**specific** 316:10 316:11 317:9 318:5,7,12 330:19 334:15 334:23 335:10 338:2,12 342:10,11 343:9 350:25 351:15,22 352:8 353:11 360:7 362:3 363:5 366:2 367:23 369:13 371:5 373:11 373:21 374:22 375:25 378:4 381:3 382:10 383:18 397:8 402:13 410:12 415:8 417:15 418:10 421:11 421:15,17,21 425:9 431:16 439:2 440:11 452:10 459:23 460:9 461:1,15 463:21 468:25 471:2 483:16 490:8 496:23 504:19
**specifically** 316:3,6 325:9 331:21 333:9 336:21 346:20 348:15 355:7 357:14 359:6 359:17 362:23 362:24 367:16 375:20 377:2,5 378:10,14 383:10,12 391:17 408:14 417:21 418:6,7 420:17 422:2 451:11 453:16 455:6 470:13 478:17 483:22 514:9 515:15 521:23 523:17
**specificity** 317:14,16 318:14 320:20 347:11 397:7
**specifics** 319:24 324:20 327:7 462:4 512:18
**specify** 347:10 362:18
**speculate** 450:9
**speculation** 351:20 371:22 372:8 381:12 392:23 398:13 411:25 412:9 479:19 486:19
**speed** 517:11
**spelled** 483:22
**spencer** 306:18 313:14,17,20
**spencerfane.c...** 306:21,22,23
**spoilage** 335:14 335:20
**spoke** 314:23 373:18 391:23 394:25
**spoken** 365:14
**spreadsheet** 352:20 441:11

443:8,11
**spring** 387:24 393:19,25 482:5 484:15
**srs** 373:25 375:17,23
**st** 307:14 469:24
**stack** 452:22
**staffing** 522:4,5 522:8
**stage** 431:9
**stamp** 468:4 473:25 478:19 481:2 495:16
**stamped** 453:1 455:21 456:5 467:20 476:12 479:24 499:19 514:19
**standards** 316:18,21,22
**start** 328:24 343:15 436:23 448:15 473:6 492:14 497:17 503:9 516:6
**started** 391:18 426:16 507:22
**starter** 416:16 416:21,23
**starting** 466:8 474:1 480:1 492:13
**starts** 399:21 439:5 447:3 454:9 465:21
**state** 313:6 317:8 318:2 402:19 411:3 415:12 526:19 529:10 530:15
**stated** 316:14 323:3 324:8,8 389:9,24 390:5 472:22 483:15 483:19
**statement** 344:9 355:22 430:17,22 451:15 491:8 507:6 508:17 512:9,19 529:13,14 530:19,19
**statements** 322:8,10 329:22 512:21
**states** 305:1 314:1 340:13 341:19 344:2 353:17 364:17 364:22 399:8 419:16 429:22 435:2 439:22 441:10 447:9 470:1 472:8 474:11 478:22 480:4 482:4,12 486:24 499:23
**status** 310:25 361:7 362:1 382:13 384:19 409:12 410:12
**stay** 388:20 389:2 410:4 490:5
**stayed** 392:21
**ste** 306:19 307:14
**step** 395:5 434:4,12 480:18,21
**steps** 320:5,11 323:24 326:23 327:1 329:11 358:19 361:2 363:22 385:22 391:5 395:18 403:20 435:5 485:20
**sticking** 315:12
**stipulate** 416:18
**stipulation** 416:4
**stood** 331:24
**stop** 345:11 348:2,6 492:13
**stopped** 409:8 410:7,19 414:1
**stopping** 345:15
**straight** 428:22
**strategy** 368:4 368:11 419:7
**street** 306:6 307:6
**strike** 447:10 514:1
**structures** 515:13
**stuff** 495:6
**subject** 356:5 395:24 398:4 418:19
**sublease** 507:12,18
**submissions** 328:3 354:2
**submit** 444:19
**submitted** 329:22 353:22 354:4
**subordinated** 514:7,25 515:2 515:18,24
**subscribed** 529:10 530:14 531:21
**subsection** 333:13,23 335:12,20 418:24 419:2

**substantially** 392:13
**successful** 376:21
**suffice** 380:18
**sufficient** 334:22 335:1 336:12
**sufficiently** 317:9
**suggest** 396:19 405:15 449:14 475:22
**suggested** 500:8 507:17
**suggesting** 477:5
**suggestion** 405:21 446:17 449:17 476:3,5 476:8
**suite** 308:5 528:2
**summit** 310:13 399:23,24 401:3 402:5,12 402:15
**superior** 528:1
**supplement** 468:17
**supported** 398:6
**sure** 332:8 355:21,23 362:20 397:22 408:22 413:23 428:15 440:17 440:19 442:5 444:1 449:19 449:20 455:10 455:25 480:6 480:23 497:13 514:25
**surprise** 468:25
**surrounding** 335:17 520:8
**suspect** 400:18
**swamped** 467:22
**swearing** 314:17
**switch** 378:18 456:4
**sworn** 314:10 526:5 529:10 529:13 530:14 530:18 531:21

**t**

**t** 309:8 310:1 310:14,16 311:1 312:1
**table** 352:18 375:9
**take** 323:24 325:10,13 326:23 327:1 329:12 330:24 358:19 361:2 361:24 363:22 378:16 385:22 395:19 403:20 425:13,15 445:19 448:10 452:5 457:8 476:23 482:13 485:20 486:3 493:14 495:10 502:24 516:3
**taken** 320:11 383:11 385:20 391:5 393:20 500:17 526:3 526:12 527:9
**talk** 348:8 386:5 395:7 433:18 461:8 490:15,16,20 490:25 491:8
**talked** 378:1 379:3 455:7 473:21 488:13 492:9 504:11
**talking** 314:20 373:13 399:4 445:12 520:18
**talks** 410:22
**targets** 341:2
**tax** 430:5,6,15 430:25 433:19 439:12 443:1
**taxes** 476:18 477:6,11
**team** 378:5 447:10 453:14 481:6,12,17 489:10,11
**tell** 314:10 334:21,25 345:12 346:20 348:4,5 388:19 397:22 429:22 445:3 458:14 458:25 459:5,5 459:6,9,12,17 460:6 461:5 473:17 499:24 504:19
**tells** 449:20 485:8
**ten** 321:14,25 322:23 350:13 350:22
**tenure** 363:14 366:22 519:12
**term** 318:22 399:19,25 400:14 401:3 401:18,21 402:5,12,15 474:12,15 486:6
**terms** 310:22 325:2 377:20 378:3 399:15

415:25 416:3 420:15 425:8,9 426:25 452:19 454:2 485:22 510:21
**testified** 314:11 322:20 424:8 497:25 501:2 504:5,12 510:22 511:1 511:20 513:25
**testify** 315:10 351:25 514:2
**testifying** 368:14 369:5 516:22 526:5
**testimony** 320:1,2 330:1 330:8,19,20 370:3,6 393:5 402:8 449:8 456:24 489:3 489:25 498:4 498:15 504:9 510:24 513:2,7 514:1 516:21 529:6,7 530:6 530:9,12
**text** 311:24 312:3 368:12 368:18,21,23 369:1 452:24 453:2,2,3,8,14 454:2,10,18,25 455:1,4,9,11,13 455:16,21,23 456:5,6 457:16 457:17 458:13 463:15 464:9 464:13,14 465:1,4,7,12,14 465:17,21,22 465:24 466:3,7 466:13,16,17 466:22,25 467:9,10,19,21 468:5,9,14,14 468:19 469:8 470:3,6,8 471:7,20,23,24 472:7 474:1,11 476:4,12,16 477:17,19 478:20 479:23 479:24 481:3 482:21 483:12 483:22,23,24 484:2 486:12 488:12,24 489:2 490:9,10 490:13 493:1 494:4 495:6,17 499:19,21 500:7 501:6,15 502:2,11 503:2 503:5,19 513:4 514:2,7,21 520:21
**texts** 457:17 458:12 467:16 472:1,5 480:1 482:1 503:12 514:15,16
**thank** 464:25 503:22 510:1 516:1,12 522:11 524:19
**thanks** 441:10 457:18 472:8
**thing** 437:7 494:24 520:16
**things** 333:12 364:23,24 379:3 393:21 403:12 421:13 424:14 455:2 494:16 516:3
**think** 315:3,25 316:15 333:24 345:15 352:4 363:4 375:12 379:10 381:21 390:8 402:15 422:25 425:2,6 425:22 446:4 454:4 457:3,5 459:10 460:11 466:12 469:13 470:14 471:9 475:24 478:15 479:15 486:16 491:12,23 493:12,19 494:21 495:24 497:10,24 501:2,12 502:24 504:11 505:7,9 508:5 509:15 511:20 512:7 513:3,11 513:25 514:10 515:25 517:2 522:8
**thinking** 459:13
**thinks** 427:11
**third** 341:15 373:9 405:16 407:11,15 413:24 448:11 453:17
**thirty** 464:25 528:19
**thought** 424:8 458:19 490:19 490:24 495:2 518:12 519:22 522:3
**thoughts** 426:6 475:13
**thousands** 331:22
**threaten** 493:16
**threatened** 385:15

**three** 335:15,17 353:1,9,13,18 359:12 366:12 366:16 408:19 411:19 413:13 415:9 425:16 429:10 462:22 492:23 494:8 509:16
**thuente** 429:13 430:3 434:22
**thursday** 502:13
**tie** 352:19
**tim** 307:12 314:3 516:17
**tim.davis** 307:16
**time** 305:14 313:4 314:23 323:5 336:3,23 341:20 344:3,9 350:11 352:4 367:16 369:14 374:24 375:10 375:11,24 378:23 379:16 384:5,21 387:9 390:14 401:4 401:17,24 407:22 412:20 415:3 418:2 420:25 422:19 424:6 432:1 433:16 436:9,9 443:14 444:22 445:20,23 448:10 449:6 453:23 455:2 457:7 459:2,15 466:23 471:2 472:19 477:22 482:23 483:7 486:7 491:22 495:7,13 496:9 496:18 498:6 498:10,25 503:22 511:14 516:8 518:4,9 518:11,20 519:19 520:3 521:15 522:3 522:12 524:23
**times** 420:20 516:16
**timing** 322:21 431:14 459:10
**titled** 410:4
**today** 313:12 318:24 320:3 321:9 330:1,8 333:15,20 338:8 350:3 368:1,24 390:9 410:20 425:10 432:25 469:22 489:3,10 502:14
**together** 357:16 406:8 406:12 521:9
**told** 354:19 394:21 459:15 472:1 478:1 488:17 511:16
**tomorrow** 468:7 490:21
**took** 320:6 331:16 348:14 351:23 365:11 365:17 390:20 394:1 448:1 456:22 489:10 494:25
**top** 337:22 340:4 341:9 348:25 349:9 352:11 418:22 422:18,22 432:10 434:21 436:23 441:7 466:14 469:8 471:22 476:16 481:25
**topic** 314:20,22 315:10 317:5,9 317:17 318:11 319:3 320:13 359:5 364:9 367:19 368:4 368:10 373:11 373:11 382:22 382:22 385:3 389:8 459:24 483:10,15,22 517:2,3,7,10 520:11
**topics** 317:15 367:4 378:18 389:17 517:1
**tory** 308:12 312:6 313:13 340:7 365:24 366:3 374:17 374:23 386:13 386:18 387:2,7 387:19 388:4,8 388:12,16,19 388:23 389:2,9 389:24 390:4 391:21,24 393:3,20 394:25 395:25 396:6 397:16 402:3 403:15 407:17 408:22 408:24 410:4 411:14,20,22 412:4 413:14 415:11 417:17 417:23 418:12 429:2 430:14 430:24 432:11 469:9,12 470:2 471:13 474:21 474:25 475:14

475:22 476:6 477:12 480:5,7 480:10 481:5 481:12,16 486:24 487:3,4 488:13 489:6 489:12,17 490:5 499:20 506:6,19 509:17,21 511:13,16 515:18 518:21 519:12 522:19
**tory's** 387:16 418:18 430:6 476:18 477:5
**total** 349:14,22
**toward** 435:3 457:16 472:19 473:18
**towards** 395:25
**transaction** 312:6 506:5,19 507:6 508:14 508:23
**transactions** 377:19 378:2
**transcribed** 529:7
**transcriber** 527:1
**transcript** 502:8 526:21 527:3,5 528:12 528:13 529:5 529:12 530:5 530:11,17
**transcriptionist** 526:8
**transfers** 499:10
**treating** 344:10
**tree** 333:24 381:16,20 382:3,25 383:8 383:15 496:20 497:4,8 498:7 522:18,20 523:1,13
**trees** 379:5,17 380:12,19,25 381:4 384:4,5 393:18 404:10
**trend** 394:24
**trial** 486:6
**tricola** 309:15 348:20
**tricoli** 309:17
**tried** 352:3 395:1
**trip** 457:1
**triple** 310:11 381:16 382:3 382:21,23
**trough** 438:19 446:14
**true** 509:23 526:9 527:5
**trust** 499:3 502:14,17
**trustee** 307:2,4 308:13 314:1 325:4 364:10 364:17,22 366:5 367:20 368:19 369:24 370:1,7,13,15 370:23 371:3 371:11,19,25 372:2,16,20,25 385:7,11,21 386:4,7,23 387:10,22 388:3,5,7,14,19 389:12,16,20 390:2,11,20,25 391:10,16,22 391:25 392:4 392:11,13,20 393:2,3,10,11 393:22 394:1,8 394:22 395:3,4 395:9,19,25 396:10,18,20 396:23 397:4,4 397:10,23 398:4,6,8 399:8 402:20 402:25 403:6 406:1 408:21 411:19 416:5 416:18 417:1 417:19 418:4 419:5 422:20 423:4,19,22,23 424:3,5,12 425:20 449:15 460:1,7 461:4 461:13 474:6 474:22 475:16 479:5 482:10 483:2,8 486:5 486:7,10 487:9 487:11,15,23 488:3,9,15,20 513:13
**trustee's** 369:18 397:24 437:4 438:2,24 450:6 504:4
**truth** 314:10,10 314:11
**try** 348:9 386:6 452:15 473:15 473:22
**trying** 335:25 364:22 401:14 414:17 424:17 487:2 509:12
**tune** 400:21
**turn** 418:21 468:16 469:2 471:22 476:11 477:16 481:24 499:18

**turned** 466:20
**twenty** 500:13 500:14
**two** 325:15 335:14,21 352:24 366:12 387:25 399:22 409:3 423:16 424:25 438:11 450:2 458:12 492:17 494:7 501:12 507:11 522:14
**type** 369:25 470:7
**types** 360:23 365:25 496:24
**typewriting** 526:7
**typical** 369:3 473:14
**typically** 451:21 452:5
**typing** 475:14

**u**

**u.s.** 307:2,4,5 308:13 364:10 366:5 367:20 368:19 369:18 369:24 370:1,7 370:13,14,22 371:3,11,19,25 372:2,16,20,24 393:10 437:4 438:2,24 449:15 450:5 504:4 513:13
**ultimately** 326:22 347:17 366:20 399:23 435:7 437:14 437:20 476:5
**unable** 340:15 341:20
**uncertain** 360:1
**uncertainty** 360:6
**uncollectible** 359:24
**under** 314:16 361:15,25 362:6 364:15 372:11 411:4 438:10,11 442:24 449:22 476:18 477:6 483:22 506:19 509:13 513:8 522:4
**underlying** 317:6 319:7 325:2
**understand** 321:22 323:16 324:5,15 357:21 365:22 367:3 368:17 389:18 395:1 407:8 412:25 437:8 465:6 492:25 516:16 516:23 519:11 524:6
**understanding** 315:17,22 322:16 326:1 332:22 333:14 333:20 335:16 345:22 392:12 394:4,6 420:1 429:20 431:8 435:25 441:17 458:1 467:3 475:13 479:16 481:11 490:23 502:16 503:17 519:16,18 521:17
**understands** 480:7
**understated** 324:13 331:1
**understood** 402:2 471:18 496:25
**undertake** 324:14 328:15 361:12,22 463:9
**undertaken** 396:15 399:1
**undertakes** 398:6
**undertaking** 359:3
**undertook** 324:21
**unfortunately** 501:25
**united** 305:1 314:1 364:17 364:21 399:8
**unrelated** 454:22,24
**unsecured** 306:13 313:15 313:18,21 427:21 433:14 433:15 434:5 437:5,9
**unusual** 395:4 395:5
**update** 310:19
**updated** 309:21 354:15
**usdoj.gov** 307:8
**use** 324:10 327:3 343:18 344:3,21 355:19 358:11
**used** 323:21 329:3 354:1,5

398:24 458:24
**uses** 504:18
**using** 360:14 416:21 506:23
**utilize** 353:23
**utilized** 330:24 361:3,23 362:10 383:15
**utilizing** 405:16 494:16 521:24

**v**

**vague** 365:19 413:18
**valid** 347:6
**valley** 381:16 381:20 382:3 382:21,25 383:7,15 462:23 496:4 496:19,20 497:3,8,17,23 498:7 499:13 522:18,20 523:1,4,8,12
**valuation** 315:5 315:12,13,23 316:20 317:4,9 318:6 329:4,11 329:12 330:14 332:12,25 354:1 376:13
**valuations** 314:21 317:24 330:23 335:6 353:23
**value** 315:15 317:22 319:16 324:1,8 326:6 327:9,15 328:3 328:12 329:2,3 332:21 353:19 353:24 355:11 355:24 356:21 358:12 380:19 381:8 386:8,19 386:23 387:3,7 387:22 388:12 392:14,15,18 392:19 393:12 395:6 396:2,7 396:11 398:11 398:23,24 403:7 428:22 470:12,20,23 471:5
**valued** 316:9 323:18
**values** 316:13 331:1 332:1 357:22 441:14 471:10,19
**valuing** 320:8
**various** 361:16 384:16 400:7 424:14 523:20
**vendor** 453:8 453:18
**veritext** 528:1,7 531:1
**veritext.com.** 528:17
**version** 465:22
**veto** 519:15
**vickie.buter** 306:8
**victoria** 306:3 313:8
**videographer** 308:14 313:2 378:20,23 445:20,23 524:23
**videotaped** 305:9 313:3
**view** 345:3 392:9 398:10 484:13 522:2
**viewed** 475:7
**violation** 364:5
**violations** 363:13,19,20
**volume** 305:12 348:16 528:8 529:4,9 530:4 530:13 531:20
**voluntarily** 388:17,20
**volvo** 410:3,7 410:13,16,18 411:21

**w**

**wait** 345:11 348:4 495:4
**waive** 435:16 436:5 437:5,8 438:10 447:13 447:22 448:24 449:21 450:13 450:19,21 451:23
**waived** 431:21 437:14,19 448:23 528:20
**waiver** 451:18
**waives** 448:22
**waiving** 440:1
**walkanoff** 309:15,17 348:20
**walks** 474:22
**walnut** 306:19
**want** 341:6 355:16,23 356:1 378:16 389:7,17 391:21 399:8 416:18 438:16 438:19 446:11 446:14 447:12 457:19 459:17 461:14 464:12 474:23 476:18 483:9 492:25

510:1 511:15 516:6
**wanted** 318:8 381:10 389:2 480:20 516:3 520:16
**wants** 403:6 480:18
**watching** 481:8
**way** 315:14 320:8 324:12 359:18 360:7 361:4 367:17 369:9 383:20 390:19 398:16 428:16 451:7 460:4 483:19 492:22 494:2 518:6
**we've** 378:17 455:6 494:18 495:12 511:17
**wednesday** 305:13
**week** 340:16,21 354:19 368:17 457:20,20 478:23 479:13 494:6
**weekly** 404:15 404:24,25
**weeks** 340:17 340:24 341:2 403:11 489:12
**weigh** 399:9
**went** 331:24 399:12 477:22
**west** 379:13,18 380:12 506:23 507:1
**western** 305:2
**whatsapp** 483:13
**whittaker** 307:5
**wholesale** 374:10
**wife's** 457:4 499:6,14,14 500:8
**williams** 340:6
**willing** 396:9 438:10 449:21
**willingness** 395:9
**win** 422:24 423:21 425:20 482:10
**wish** 448:22 489:11
**withdrawn** 438:12
**witness** 314:6,9 316:24 317:10 317:13 318:6 318:11 319:2 320:24 321:6 321:16 322:4 323:1,11 324:18 325:20 325:25 329:8 330:18 337:1 338:10 339:11 340:23 343:5 344:13,24 345:6,19 346:7 347:8,14 349:25 350:16 350:25 351:7 351:21 355:5 355:15 357:25 358:16 359:23 360:23 361:20 363:18 364:3 365:21 367:1 368:7,16 369:8 369:17,22 370:11,21 371:5,14,23 372:9,19 373:2 373:17 375:3 379:20 380:7 380:16,22 381:3,13 383:18 384:1,9 385:1,13 386:1 386:22 387:6 387:13 388:16 389:5 391:2,13 392:7,24 393:6 395:14 396:14 396:23 397:6 398:4,14 401:13 403:17 403:24 404:8 405:6,19 408:1 408:13 409:10 409:16,23 410:10 411:9 412:1,10 413:7 413:19 414:6 414:15 417:14 419:22 420:6 421:10,21 422:9 423:12 426:1,8 428:4 428:12 430:24 431:12,24 434:7 436:4,13 437:23 439:1 441:20 442:4 442:14 443:18 444:18 445:16 445:18 446:20 447:25 449:12 451:10 452:18 458:8,10 460:19,25 461:7 462:2 463:20 464:18 464:20 468:24 471:1 472:21 473:21 475:6 475:18 476:8 477:8 478:10 479:9,19

Case 25-50053-can11 Doc 895-7 Filed 11/03/26 Entered 11/03/26 21:49:54 Desc
Exhibit G - John Hall Deposition Transcript - Day 2 Page 295 of 299



480:23 482:19 485:4 486:20 488:2,19 489:22 491:2 491:18 493:20 496:15 498:16 499:16 500:5 500:23 501:6 502:19 503:21 505:6 507:17 509:5 513:9,19 513:22 523:8 524:3,21 526:4 528:8,12 529:1 529:4,11 530:1 530:4,15
**witnesses** 370:18 456:15 456:18,24
**witness'** 528:15
**won** 502:14
**word** 318:6 502:13 504:18
**wording** 389:23
**words** 416:22 458:23,24 470:8 518:17
**work** 331:24 341:16 342:4 405:10,14,17 411:15 433:19 435:16 437:10 440:4,18,20 441:13,25 442:5,7,22 443:1 444:1 450:21 451:19 451:25 452:6 467:22 473:10 473:15,22 510:7 515:10 520:4 521:21 521:24
**worked** 404:1,2 420:23 491:14 517:25
**working** 334:13 356:16 388:17 392:16 420:19 515:11 518:4,20
**worth** 428:21 429:3
**write** 507:10,12 508:1
**writes** 481:5 489:6 502:11 509:16
**written** 502:7 507:15,18
**wrong** 371:17 397:22 455:25 457:19 458:20 464:15 504:12
**wrote** 426:4

**x**

**x** 309:1,8 310:1 311:1 312:1 409:4,20,25 526:21

**y**

**yeah** 317:13 318:11 321:6 324:18 335:22 340:23 343:5 351:7,21 355:5 361:20 365:21 366:10,18 367:1,5 368:7 368:17 373:17 379:20 380:22 384:9 385:1 387:13 391:13 393:6 397:6,13 398:14 403:24 405:6 406:6,10 409:10,16,23 409:23 410:10 412:1,10 417:14 420:23 421:10,21 423:12 428:12 430:24 431:12 431:16 442:4 446:25 448:1 449:12 451:21 453:12 455:1,2 458:4 459:24 460:16 461:21 463:20 464:8 464:17,18 465:17 468:24 470:5 471:1 473:15 482:19 486:2 489:22 490:2 493:8 497:24 500:5 501:17,19 503:6 505:6 506:8 507:12 509:15 514:16 515:11 520:12 521:8 523:8 524:22
**year** 321:14 322:1,24 350:14 397:15
**years** 345:4 420:19 511:21 511:25 515:1
**yep** 445:14
**yesterday** 314:19 330:2 337:7 338:8,16 373:18 381:15 395:13 399:11 402:16 464:8 464:13 497:21 498:15 504:6 510:22 511:21
**yesterday's** 314:17

**yikes** 508:3

**z**

**zach** 313:17
**zachary** 306:16
**zaslav** 310:5
376:3
**zfairlie** 306:22

Federal Rules of Civil Procedure

Rule 30

(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

(2) Changes Indicated in the Officer's Certificate. The officer must note in the certificate prescribed by Rule 30(f)(1) whether a review was requested and, if so, must attach any changes the deponent makes during the 30-day period.

DISCLAIMER: THE FOREGOING FEDERAL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF APRIL 1, 2019. PLEASE REFER TO THE APPLICABLE FEDERAL RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS

COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the foregoing transcript is a true, correct and complete transcript of the colloquies, questions and answers as submitted by the court reporter. Veritext Legal Solutions further represents that the attached exhibits, if any, are true, correct and complete documents as submitted by the court reporter and/or attorneys in relation to this deposition and that the documents were processed in accordance with our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining the confidentiality of client and witness information, in accordance with the regulations promulgated under the Health Insurance Portability and Accountability Act (HIPAA), as amended with respect to protected health information and the Gramm-Leach-Bliley Act, as amended, with respect to Personally Identifiable Information (PII). Physical transcripts and exhibits are managed under strict facility and personnel access controls. Electronic files of documents are stored in encrypted form and are transmitted in an encrypted

fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.