UNITED STATES BANKRUPTCY COURT
FOR THE WESTERN DISTRICT OF MISSOURI
KANSAS CITY DIVISION

In re: )
)
DCA OUTDOOR, INC., et al., ) Case No. 25-50053-11
)
) Chapter 11
Debtors. )

VIDEO-RECORDED DEPOSITION OF LARRY PARRES

TAKEN ON BEHALF OF THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS OF DCA OUTDOOR, INC.

SEPTEMBER 30, 2026

I N D E X


| WITNESS: | PAGE |
|---|---|
| LARRY PARRES | |
| EXAMINATION BY MR. COLE | 11 |
| EXAMINATION BY MS. BUTER | 177 |
| EXAMINATION BY MR. MILLER | 280 |
| EXAMINATION BY MR. GOTHAM | 299 |


PREVIOUSLY MARKED EXHIBITS


| EXHIBIT NUMBER | DESCRIPTION | PAGE |
|---|---|---|
| Exhibit 14 | Text Messages from Scott Moore's Cell Phone | 205 |
| Exhibit 21 | E-mail Chain with Subject "DCA Outdoor" | 139 |
| Exhibit 23 | E-mail from Scott Moore to Tory Schwope with Attached Triple Net Lease | 145 |
| Exhibit 35 | Text Messages and Call Logs from Larry Parres' Cell Phone | 84 |
| Exhibit 36 | E-mail From Samantha Schwope and Attached Engagement Letter | 29 |
| Exhibit 42 | Application for Order Under 11 U.S.C. Section 327(a) and 329 Authorizing Employment and Retention of Lewis Rice, LLC | 186 |
| Exhibit 43 | Declaration of Larry Parres | 186 |
| Exhibit 44 | Lewis Rice Engagement Letter, 12/16/24 | 183 |

| | | |
|---|---|---|
| Exhibit 47 | E-mail Chain with Subject "Re: DCA Outdoors" | 217 |
| Exhibit 49 | E-mail Chain with Subject "RE: DCA Outdoor" | 224 |
| Exhibit 51 | E-mail Chain with Subject "DCA 13 Week Cash Flow Forecast/DIP Budget" | 193 |
| Exhibit 57 | E-mail Chain with Subject "DCA Outdoor - Committee Discovery re DIP and CC" | 268 |
| Exhibit 61 | E-mail Chain with Subject "Re: DCA Outdoor, Inc. - Data Room and Diligence" | 229 |
| Exhibit 63 | E-mail From Larry Parres to Multiple People with Subject "FML" | 256 |
| Exhibit 72 | E-mail from Samantha to Multiple People with Attached Triple Net Lease | 201 |
| Exhibit 74 | E-mail Chain with Subject "Settlement Proposal" | 271 |
| Exhibit 84 | E-mail Chain between Larry Parres, Nick Mizaur and John Hall | 245 |
| Exhibit 88 | E-mail Chain with Subject "Tory Leased Equipment" | 284 |


E X H I B I T S


| EXHIBIT NUMBER | DESCRIPTION | PAGE |
|---|---|---|
| Exhibit 89 | E-mail Chain Between Larry Parres and Mark Hoeman | 22 |
| Exhibit 90 | E-mail Chain; LR 601-604 | 40 |

| | | |
|---|---|---|
| Exhibit 91 | E-mail Chain Between Tory Schwope, Larry Parres, John Hall, and Steve Drapekin | 58 |
| Exhibit 92 | Letter From Buechler Law Office Dated April 17, 2025 | 68 |
| Exhibit 93 | E-mail Chain Between Larry Parres, Scott Moore, and John Hall | 93 |
| Exhibit 94 | E-mail Chain Between Larry Parres, Scott Moore, and John Hall | 97 |
| Exhibit 95 | E-mail Chain with Subject "341 Meeting" | 99 |
| Exhibit 96 | E-mail Chain with Subject "Valley Hill Payroll" | 108 |
| Exhibit 97 | E-mail Chain with Subject "DCA Outdoor, Inc. - Data Room and Diligence" | 116 |
| Exhibit 98 | E-mail Chain with Subject "DCA Outdoor, Inc. - Data Room and Diligence" | 120 |
| Exhibit 99 | E-mail From Larry Parres to Samantha Schwope | 124 |
| Exhibit 100 | E-mail Chain Between Larry Parres and Samantha Schwope | 125 |
| Exhibit 101 | E-mail Chain with Subject "Termination" | 134 |
| Exhibit 102 | E-mail Chain with Subject "Valley Hill Lease" | 144 |
| Exhibit 103 | Exhibit B, E-mail Chain with Subject "Term Sheet - Comments (Schwope)" | 213 |
| Exhibit 104 | E-mail Chain with Subject "Review of Historicals - DCA Outdoor (updated)" | 234 |

| | | |
|---|---|---|
| Exhibit 105 | E-mail Chain with Subject "DIP Order/Credit Agreement" | 239 |
| Exhibit 106 | E-mail Chain with Subject "BerganKDV" | 244 |
| Exhibit 107 | E-mail Chain with Subject "DCA Outdoor - DIP/CC Objection - 408 NOT ADMISSIBLE FOR ANY PURPOSE" | 251 |
| Exhibit 108 | E-mail Chain Between Juanita Schwartzkopf and Larry Parres, Subject "I need $50,000 to retain Oregon Counsel" | 260 |
| Exhibit 109 | Article Entitled: "Prominent St. Louis Attorney 'No Longer a Member' of Lewis Rice After Nearly Four Decades" | 278 |

NOTE: Exhibits were attached to the original transcript. Previously marked exhibits were retained by counsel and sent electronically to the stenographer.

UNITED STATES BANKRUPTCY COURT
FOR THE WESTERN DISTRICT OF MISSOURI
KANSAS CITY DIVISION

In re: )
)
DCA OUTDOOR, INC., et al., ) Case No. 25-50053-11
)
) Chapter 11
Debtors. )

VIDEO-RECORDED DEPOSITION OF LARRY PARRES, produced, sworn, and examined on September 30, 2026, between the hours of 9:03 and 5:05 of that day at Seyferth Blumenthal & Harris LLC, 4801 Main Street, Suite 310, Kansas City, Missouri 64112, before Meghan N. Minnick, a Certified Court Reporter, in a certain cause now pending in the United States Bankruptcy Court for the Western District of Missouri, Kansas City Division, In Re: DCA OUTDOOR, INC., et al., Debtors; on behalf of the Official Committee of Unsecured Creditors of DCA Outdoor, Inc.

A P P E A R A N C E S

APPEARING FOR THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS OF DCA OUTDOOR, INC.:

Mr. Mark Cole
Ms. Anna Schuler
Mr. Zach Fairlie
SPENCER FANE LLP
1000 Walnut Street
Suite 1400
Kansas City, Missouri 64106
816-474-8100
mcole@spencerfane.com
aschuler@spencerfane.com
zfairlie@spencerfane.com

APPEARING FOR FRONTIER FARM CREDIT, FLCA, AND FRONTIER FARM CREDIT, PCA:

Ms. Victoria Buter
Ms. Lisa Peters
KUTAK ROCK LLP
1650 Farnam Street
Omaha, Nebraska 68102
402-346-6000
victoria.buter@kutakrock.com
lisa.peters@kutakrock.com

APPEARING FOR THE UNITED STATES TRUSTEE:

Mr. Adam Miller
Ms. Josephine Ellerman
OFFICE OF THE UNITED STATES TRUSTEE
400 East 9th Street
Room 3440
Kansas City, Missouri 64106
816-512-1940
adam.e.miller@usdoj.gov

A P P E A R A N C E S (Cont.)

APPEARING FOR DCA OUTDOOR, LLC:

Mr. Colin Gotham
EVANS & MULLINIX, P.A.
7225 Renner Road
Suite 200
Shawnee, Kansas 66217
913-962-8700
Cgotham@emlawkc.com

APPEARING FOR FOCUS MANAGEMENT GROUP:
Mr. Timothy Davis
BRYAN CAVE LEIGHTON PAISNER LLP
One Kansas City Place
1200 Main Street, Suite 3800
Kansas City, Missouri 64105
816-374-3241
Tim.davis@bclplaw.com

APPEARING FOR LEWIS RICE LLC:

Mr. Todd Ruskamp
SHOOK HARDY & BACON L.L.P.
2555 Grand Boulevard
Kansas City, Missouri 64108
816-559-2319
Truskamp@shb.com

APPEARING FOR THE WITNESS:

Mr. Bruce Moothart
SEYFERTH BLUMENTHAL & HARRIS LLC
4801 Main Street
Suite 310
Kansas City, Missouri 64112
816-756-0700
Bruce@sbhlaw.com

A P P E A R A N C E S (Cont.)

ALSO PRESENT:

Mr. Brent King, GlassRatner
Ryan Torpy, Frontier Farm Credit

VIDEOGRAPHER: Mr. Richard Deasley

STENOGRAPHER:
Meghan N. Minnick, RPR, CCR-MO #1428, CCR-KS #1787
Veritext Office Address Missouri-Kansas
10 South Broadway, Suite 1400
St. Louis, Missouri 63102
1-314-241-6750
1-877-421-0099

IT IS HEREBY STIPULATED AND AGREED by and counsel that this deposition may be taken in shorthand by Meghan N. Minnick, RPR, CCR-MO #1428, CCR-KS #1787, and afterwards transcribed into typewriting; and the signature of the witness is expressly reserved.

* * * * *

(Deposition commenced at 9:03 a.m.)

THE VIDEOGRAPHER: Today is Wednesday, September 30th, 2026. We'll go on the record at 9:03 a.m. We're here to take the deposition of Larry Parres in Case Number 25-50053-11 in the U.S. Bankruptcy Court for the Western Direct of Missouri.

Will counsel state their names and affiliations for the record, please.

MR. COLE: Mark Cole of Spencer Fane on behalf of the Official Committee of Unsecured Creditors.

MS. SCHULER: Anna Schuler for Spencer Fane on behalf of the Official Committee of Unsecured Creditors.

MR. FAIRLIE: Zach Fairlie, Spencer Fane, on behalf of the Official Committee of Unsecured Creditors.

MS. BUTER: Victoria Buter, Kutak Rock, representing Frontier entities.

MS. ELLERMAN: Josephine Ellerman, United States Trustee.

MR. MILLER: Adam Miller for United States Trustee.

MS. PETERS: Lisa Peters, Kutak Rock, on behalf of the Frontier Farm Credit FLCA and Frontier Farm Credit PCA, and also with us today is our client representative J. Ryan Torpy.

MR. GOTHAM: Colin Gotham for DCA Outdoor. Brent King also appears for DCA Outdoor.

MR. RUSKAMP: Todd Ruskamp for Lewis Rice LLC.

MR. MOOTHART: And Bruce Moothart for the witness, Larry Parres.

MR. DAVIS: And I'm Tim Davis for Focus Management Group.

THE VIDEOGRAPHER: Will the court reporter please swear in the witness.

LARRY PARRES,

having been first duly sworn and examined on behalf of the Official Committee of Unsecured Creditors, testifies as follows:

EXAMINATION

BY MR. COLE:

Q. Good morning, Mr. Parres.

A. Good morning, Mark. How are you?
Q. Am I pronouncing it correctly?
A. Parres, as in the city.
Q. Okay. Great. It's my understanding that you are no longer a partner in Lewis Rice; is that correct?
A. That is correct.
Q. Okay. Why is that?
A. I resigned on August 6th of 2026.
MR. MOOTHART: Can I interrupt just for a second? Is there anybody on Zoom?
MR. COLE: I don't think so.
MR. MOOTHART: Is there anybody on the Zoom? Is there any reason we have to run this if there's nobody on it? I assume that's what that's for.
MR. COLE: Mm-hmm. I don't think so.
MR. FAIRLIE: Is Will planning to call in?
MR. DAVIS: I don't think so. I think we can -- no one from Focus is going to observe.
MR. COLE: Why don't we go off the record real quick to fix that.
MR. MOOTHART: Sorry. I just saw it just now.
THE VIDEOGRAPHER: Off the record at 9:05

a.m.
(Recess.)
THE VIDEOGRAPHER: We're back on the record at 9:06 a.m.
Q. (By Mr. Cole) Mr. Parres, I think you said you resigned your membership in Lewis Rice LLC effective August 6th, 2026; is that right?
A. That's correct.
Q. Okay. Were you asked to resign?
A. Yes, I was.
Q. Okay. By whom?
A. Lewis Rice.
Q. Who -- did anybody in particular deliver that message?
A. Rick Walsh.
Q. What is Rick's position?
A. Chairman of the management committee.
Q. When did he ask you to resign?
A. August 6th.
Q. Before August 6th --
A. I'm sorry. August 5th. I apologize.
Q. Before August 5th, when Mr. Walsh asked you to resign, had you had conversations with him or anybody else at Lewis Rice regarding your ability to continue as a partner in the firm?

A. No, I had not.
Q. Did -- why did Mr. Walsh tell you he was asking you to resign?
MR. MOOTHART: Object to form, calls for speculation.
A. I have no idea why he asked me to resign.
Q. (By Mr. Cole) Did he tell you why?
A. No, he did not.
Q. Okay. What were his words?
A. "Management committee has voted unanimously to ask you to resign."
Q. Did you have an understanding from anybody as to why you were being asked to resign?
A. I did not think about it prior to that time.
Q. Okay. After speaking with Mr. Walsh on August 5th, did you gain an understanding as to why you were being asked to resign?
A. I've never had another conversation with Mr. Walsh regarding that subject.
Q. Did you gain an understanding from anybody after your conversation with Mr. Walsh on August 5th?
MR. MOOTHART: Are you including lawyers, like myself?
Q. (By Mr. Cole) Well, let's start there. If

your answer is "yes" and it includes your lawyer, Mr. Moothart, then we may have to have a conversation as to what information was being shared --
(Simultaneous speakers and stenographer admonition.)
Q. (By Mr. Cole) Possibly Mr. Ruskamp as well.
A. Could you ask the question again? I apologize.
Q. Sure. Following your conversation with Mr. Walsh on August 5th in which he asked you to resign, did you gain an understanding from anybody outside of Mr. Walsh why you were being asked to resign?
A. No.
Q. Okay. So between the point where you're asked to resign by Mr. Walsh on August 5th and you resign on August 6th, did you gain any information as to why the Lewis Rice law firm was asking you to resign?
A. No.
Q. Did you ask why?
A. No.
Q. Okay. Did you -- what did you think was the reason they were asking you?

A. I was shocked, disappointed, and I don't know that I had a reason.
Q. So you resigned on August 6th, 2026, without knowing the reason why you were being asked to resign?
A. I have never been given a formal reason as to why they asked for my resignation.
Q. Okay. What about an informal reason?
A. I have never had a conversation with anyone from management committee at Lewis Rice regarding my resignation.
Q. Did you have a conversation with anybody outside of the management committee at Lewis Rice regarding your resignation?
A. With counsel.
Q. And who was counsel?
A. Both Bruce and Todd at the time.
Q. Okay. Outside of Mr. Moothart and Mr. Ruskamp, have you had a conversation with anybody regarding your resignation from Lewis Rice?
A. My wife.
Q. Okay. Anybody else?
A. No.
Are we talking before the resignation? I certainly have talked to other people since August 6th

and my resignation about my resignation, but not from Lewis Rice.

Q. Okay. So let's talk -- let's separate that into two categories, then. And let me ask it in a little bit of a different way.

A. Sure.

Q. Before you spoke to Mr. Walsh on August 5th, did you understand -- or I'll start over there.

Before you spoke to Mr. Walsh on August 5th, did you have an understanding that Lewis Rice was investigating any activity of yours relating to the DCA Outdoor bankruptcies?

A. I have no idea.

Q. So, then, let me ask you this: Post August 6th, after your resignation, aside from the counsel you've identified and your spouse, who have you spoken to about your resignation?

A. My brother, Ryan Parres. A priest at Assumption parish church. Probably my best friend.

Q. Anybody else?

A. Not that I can recall.

Q. After resigning from Lewis Rice on August 6th, do you have -- have you had any agreement with Lewis Rice regarding any compensation?

A. On August 5th, they told me that they would

pay me through September of 2026. And when I say "pay," I'm a partner, so I get a draw. They would continue to fund the draws through September 30 of 2026.
Q. Did you -- if Lewis Rice receives fees relating to the DCA Outdoor bankruptcies, do you believe that you are entitled to any of those fees?
A. I don't think anyone's entitled to anything. So, no.
Q. Do you have an agreement with Lewis Rice by which you would receive any part of those fees, if they're received?
A. A specific agreement or just the operating agreement? There was no specific agreement regarding DCA fees with Lewis Rice after my resignation. The operating agreement is still what it is.
Q. And what is the operating agreement as it would relate to the fees involved in the DCA Outdoor bankruptcies?
A. The operating agreement provides that management committee gets to determine the number of points that each partner gets on an annual basis.
Q. And those number of points determine your compensation?
A. Correct.

Q. Okay.
A. Well, indirectly, yes.
Q. Being that you resigned as a partner in 2026, it is your understanding that you will get assigned points and, therefore, additional compensation at some point later?
A. It wasn't discussed, but the operating agreement is still in effect.
Q. When you say, "The operating agreement is still in effect," do you have a belief that you will have an ability to receive points and, therefore, additional compensation?
A. I don't know what my belief is right now, to be honest with you. I mean, the operating agreement is still in effect, and I'm confident that Lewis Rice is going to continue to operate thereunder.
Q. And when you say, "The operating agreement is still in effect," are you saying that it applies to former partners?
A. It does. There's a specific provision of the operating agreement that deals with withdrawing partners.
Q. Do you believe that you were asked to resign from Lewis Rice -- well, let me ask that a different way.

Do you believe that the request for you to resign from Lewis Rice was in any way related to the DCA Outdoor bankruptcies?
A. I do believe that.
Q. Okay. What leads you to believe that?
MR. MOOTHART: And I would say -- caution you, if that information came from either me or Mr. Ruskamp, that you should not provide that information.
A. Just the timing of it.
Q. (By Mr. Cole) Anything else?
A. Not really.
Q. And so Mr. Walsh never discussed with you any particular actions you took relating to the DCA Outdoor Bankruptcies?
A. No. It was a pretty quick conversation on August 5th.
Q. How did the engagement that became the DCA Outdoor bankruptcies start at Lewis Rice?
A. As far as I'm concerned?
Q. As far as anyone's concerned.
A. I was contacted by a partner in Kansas City that said there was an opportunity to represent some companies in a Chapter 11 bankruptcy, that they had retained counsel and were not happy with that counsel.

Q. What partner was that?
A. Lou is his first name. I don't know his last name.
Q. Is it Lou Wade?
A. I don't know his last name.
Q. Okay. Whoever Lou is, it sounds like somebody who maybe you hadn't worked with before?
A. Being from St. Louis, when you say, "Whoever Lou is," has a different meaning. But I had not worked with Lou before, that is correct.
Q. When you say that they were unhappy with their -- and you said current counsel, who was that?
A. As I understand it, they had retained bankruptcy counsel and were working with them. And bankruptcy counsel gave them a -- advice that they did not believe was correct. So they wanted to replace them.
Q. Do you know who that bankruptcy counsel was?
A. I don't.
Q. Did you ever ask?
A. I'm sure I did when it was going on, but I don't recall who it was.
Q. You don't recall today?
A. I don't.

Q. Was that -- was that in a conversation with Lou Wade?
A. No. It would have been with Tory Schwope.
Q. What was your understanding as to why Mr. Wade was calling you?
A. He saw an opportunity for us to be of assistance to the DCA debtors.
Q. Did he tell you -- well, strike that.
Was he currently representing Mr. Schwope?
A. I don't know.
Q. Did you ask?
A. I did not.
Q. Okay. Do you know who he was representing?
A. I know that he was negotiating with Frontier Bank on a forbearance agreement.
Q. What's your understanding of when that engagement with Lewis Rice began?
A. Weeks earlier. So I'm going to say January of 2025.
(Exhibit 89 was marked for identification.)
THE WITNESS: If you do that, I get to do that.
MR. MOOTHART: You're on camera.
Q. (By Mr. Cole) That's marked at the bottom.
THE WITNESS: Same?

MR. MOOTHART: Yeah.
Q. (By Mr. Cole) Mr. Parres, you have Exhibit 89 in front of you. That's an e-mail from you to an mhoeman@hoemancapital.
Do you see that?
MR. MOOTHART: Are you referring to -- which one of the string?
MR. COLE: We'll start at the top.
A. At the top of Exhibit 89, it shows that this is an e-mail from my Lewis Rice Exchange to mhoeman@hoemancapital.
Q. (By Mr. Cole) You're familiar with who M. Hoeman is?
A. I am.
Q. Who is that?
A. Mark Hoeman.
Q. Okay. You say here: "The lifeline is the DIP by 2-21."
Do you see that?
A. I do.
Q. "After that, we're in trouble," right?
A. Correct.
Q. And here, you're talking about DCA as the "we," right?
A. Correct.

Q. And you tell Mr. Hoeman that you just got hired on Friday, but your KC office "has worked with these guys a long time, as I understand it," right?
A. That's what the e-mail says.
Q. Okay. Does that fit your recollection?
MR. MOOTHART: Recollection of what?
MR. COLE: Of the situation.
A. That's what the e-mail says.
Q. (By Mr. Cole) Okay. Do you disagree with it?
A. I have no reason to disagree with what's in the e-mail.
Q. And you wrote it, right?
A. Yeah, absolutely.
Q. Okay. So if this was Monday, February 3rd, then based on your e-mail, you would have been retained Friday, January 31st?
A. I don't know.
Q. You don't know?
A. Hmm-mm.
Q. Okay. This e-mail here, based on your recollection, would have followed your conversation with Lou Wade, right?
A. I don't know that.
Q. Well, had you been introduced to anybody at

DCA before having a conversation with Lou Wade?
A. Your statement was "a conversation with Lou Wade." I didn't know what conversation you were talking about, so I can't tell you that I have -- it was following a conversation with Lou Wade.
Q. Okay. You told me earlier that Lou Wade reached out to you to engage you -- well, to explore you getting engaged to represent DCA Outdoor, correct?
A. An opportunity to talk to DCA about Lewis Rice representing them in a Chapter 11.
Q. And based on your e-mail here, you had been retained three days earlier to represent DCA Outdoor, right?
A. I don't know the "three days earlier." But if you're going to state that on the record as being true, I'll take -- you have no reason to mislead, so I believe you.
Q. I don't know that it's important. But you keep pointing it out, and I'm just confused as to why we can't agree on that. Because this e-mail --
(Simultaneous speakers and stenographer admonition.)
A. There's an engagement letter -- there's an engagement letter that is signed by DCA that is the date that we were engaged.

Q. (By Mr. Cole) Okay. And what I'm confused about, then, is -- this is sent on Monday, February 3rd.
A. Okay.
Q. We can agree on that, right?
A. Yes.
Q. And you -- it's your words that you say, "I just got hired Friday," right?
A. Correct.
Q. Okay. Are you saying -- there is a Friday before that Monday that is three days earlier.
A. Okay.
Q. Make sense?
A. Okay.
Q. Does it make sense?
A. Logically, it makes sense.
Q. Okay. Do you believe that you were hired on the Friday that was three days earlier or some other Friday?
A. I don't know that the date that I got hired is important to this e-mail. So that's why I say the date of the engagement letter will tell you the date that I was hired.
My point to Mark is, "I just got this case. We need to go."

Q. Okay. Before sending this e-mail, had you had a conversation with Lou Wade about DCA Outdoor, Tory Schwope, any related entity?
A. This e-mail is dated February 3rd. So I would say, yes, I did.
Q. Okay. Do you have a recollection of that conversation?
A. Other than there was an opportunity that I should pursue.
Q. Following your conversation with Lou Wade, did you speak with somebody at DCA?
A. I would have spoke with Tory Schwope, yes.
Q. When was that conversation, if you recall?
A. I don't recall.
Q. Okay. What did you speak with Mr. Schwope about?
A. The opportunity to assist DCA.
Q. In doing what?
A. In pursuing a possible forbearance with Frontier and/or a Chapter 11 bankruptcy filing.
Q. Was Mr. Wade already working with Mr. Schwope on a forbearance with Frontier?
A. He was working on behalf of all the co-borrowers on a forbearance agreement.
Q. Okay. And those co-borrowers included a

long list of DCA-related entities, right?
A. DCA-related entities...
Included a list of companies, correct.
Q. Okay. One of those core borrowers was Tory Schwope, right?
A. I did not know that at the time, but I subsequently have learned that.
Q. When did you learn that Tory Schwope was a co-borrower?
A. When we got the loan documents. Like, on February 18th, 19th, or 20th.
Q. So not at this time, but a couple weeks later?
A. Correct.
MR. COLE: Bruce, we previously marked exhibits here, and I'm trying not to remark things. So I'm going to hand him what's been marked. I have an additional binder that I can give to you, if that's --
MR. MOOTHART: Yes, that would be great.
MR. COLE: -- how you'd like to handle it. But I didn't bring additional copies for everybody else.
MR. MOOTHART: Okay.
MR. COLE: I'm going to hand this over.

It's big. Sir, I'm going to hand this to you.
THE WITNESS: Oh, it's upside down.
Q. (By Mr. Cole) And in front of you, I believe it's turned to Exhibit 36.
Do you see that?
A. I do.
Q. And this is a document that we've previously marked in depositions in this case. Do you see that the cover page is an e-mail?
A. From Samantha Schwope.
Q. Correct. And if you'll turn to the second page, do you recognize that as the Lewis Rice engagement letter for what would ultimately become the bankruptcies that we're here on?
A. Yes. It's a really bad copy.
Q. It is not the clearest copy. I understand that. Who was --
MR. MOOTHART: Flip through it and make sure it's just the engagement letter and not -- just making sure it's not multiple documents.
THE WITNESS: Okay.
Q. (By Mr. Cole) That engagement letter is from you, right?
A. Prepared by me, that's correct.
Q. Okay. Were you the primary partner in

charge at Lewis Rice for this engagement?
A. Yes.
Q. You laugh. Is that a word that you all do not use at Lewis Rice, "partner in charge"?
A. You stopped at Lewis Rice. I was the primary partner in charge at Lewis Rice. That's why I laughed. Like, obviously not. Then you finished the statement.
But that's what I was laughing at.
Q. You said you prepared that letter?
A. I did. Well, my assistant did, yes.
Q. Okay. Who was Lewis Rice's client?
A. DCA Outdoors and their affiliates.
Q. And where in that letter does it list who those clients are?
A. The party -- the signature block. It is signed by Tory Schwope as majority and controlling shareholder of each of the companies.
Q. And does it list each of the companies?
A. It would refer to an Exhibit A.
Q. Does that Exhibit 36 contain an Exhibit A?
A. It does not.
Q. And I'll represent to you, Mr. Parres, that we've asked for and not received a copy of an Exhibit A, and it appears it doesn't exist.

Are you aware that an Exhibit A exists regarding what is Exhibit 36?
A. There were drafts of an Exhibit A, but Exhibit A was continuously changing because we were led to believe by parties that certain parties were borrowers under the loan agreement, and we found out that they were not. So they became non-clients at that point.
Q. Would one of those parties be Valley Hill Tree Farm?
A. That would be one.
Q. Okay. So in that situation, the Exhibit A, if it was in existence at the time, would have included Valley Hill Tree Farm. And it was subsequently removed because they were not a co-borrower?
A. Exhibit A was continuously changing. There were other parties, as well as Valley Hill, that were taken off that list.
Q. Okay. So Valley Hill was on the list, and then was taken off?
A. They originally were going to be a client, and they were taken off. That's correct.
Q. Okay. When were they a client, and when were they not a client?

A. They were never a client.
Q. Okay. Were they on the list that was Exhibit A?
A. They would have been one of the parties that would have been on an Exhibit A. That is correct.
Q. Do you recall speaking with John Hall about his preparation for a deposition in this matter?
A. I do.
Q. Okay. And did he ask you about the existence of an Exhibit A?
A. He did.
Q. Okay. And what did you tell him?
A. That an Exhibit A was never finalized and attached to this letter.
Q. As the partner in charge on this engagement, were you responsible for evaluating conflicts?
A. Lewis Rice has a system as to how conflicts get cleared. I am not the one in charge of that. But it's my obligation to make sure that the conflict memo gets sent out, and then to review any possible conflicts with conflict counsel.
Q. Who is in -- well, specifically as it relates to this engagement that is the subject of

Exhibit 36, who at Lewis Rice was in charge of evaluating conflicts?
A. Evaluating -- I would say I was probably in charge of evaluating conflicts, or making sure that they got evaluated.
Q. Then were you also in charge of clearing conflicts, if a conflict had been cleared?
A. No, I would not be.
Q. Who would be in charge of that?
A. Conflict counsel.
Q. And who was that, in this specific circumstance?
A. It would have been our general counsel, Tom Berra.
Q. You said -- is it Berra?
A. Berra, B-E-R-R-A.
Q. You mentioned a conflict memo. Was a conflict memo prepared for this engagement?
A. I don't recall.
Q. Is a conflict memo, as a general practice at Lewis Rice, prepared for every engagement?
A. Yes.
Q. Okay. So you just don't have a specific recollection of the conflict memo related to this engagement?

A. Correct. I'm sure it exists. I just don't recall it.
Q. I want to understand that, the process for that. What's the first step that you go through to get to a conflict memo?
A. Me, personally?
Q. You as a lawyer at Lewis Rice. How do you get to a conflict memo?
A. I'm sure every lawyer at Lewis Rice does it differently. But I draft the engagement letter first, and then run my conflict -- I call it memo, which is technically an e-mail. Then I review that e-mail, and it gets sent out to all of the attorneys at Lewis Rice for -- that they can review and make any comments they have regarding any of the parties that are listed on that e-mail.
Then it goes to -- I'm going to say Steve Durbin, but don't hold me responsible for his last name, who is in charge of comparing that e-mail to the conflict base, as I understand it, at Lewis Rice. I have no idea what that base is, other than we're told there's a base.
Q. When you say "base," is that short for database?
A. I -- sure. I honestly don't know.

Q. You don't know? Okay.
So the e-mail that you're referring to as the conflict memo goes out to all Lewis Rice attorneys?
A. It should, yes.
Q. When you say, "It should," is that an e-mail that comes from you or somebody else?
A. My assistant sends them.
Q. So assuming your assistant followed instructions, it would go to every attorney?
A. That's correct.
Q. And then an individual -- remind me of his name?
A. I believe it's Steve Durbin.
Q. Durbin?
A. Correct.
Q. Compares the list of -- well, let me back up.
The list of entities or individuals that you include in there, how do you designate that? Are those potential clients?
A. Whoever you think could be adverse, whoever your clients are, whoever -- whatever parties you want other lawyers to know and recognize should be on that list.

Q. Okay. So you list people who -- clients or potential clients, adverse or potential adverse?
A. It's a -- it changes monthly, I swear, in that they want you to list more and more parties. So at the time of 2025, I don't know if we were listing owners and shareholders and members of LLCs. I just don't know what was going on in 2025.
Q. You said that the list of clients relating to this engagement was changing over time. When it changed, did you go through a new conflict memo process?
A. Hmm-mm. I did not.
Q. Why is that?
A. We were taking off, not adding.
Q. So because somebody was going from being a client to not being a client, there was no need to update the conflict memo?
MR. RUSKAMP: Object to form.
You may answer.
A. I can't answer that question. I don't know what the need would be. That's for somebody else to decide.
Q. (By Mr. Cole) Was it not you who decided whether or not to run another conflict memo?
A. I don't know that we had that discussion.

Q. After going through the process, you identified a conflict memo going out to lawyers at Lewis Rice, and Mr. Durbin checking it against the conflict base.
Were potential conflicts identified for this engagement?
A. I believe one was identified.
Q. What was that?
A. Ameren Illinois.
Q. Ameren?
A. Ameren Illinois.
Q. And you took steps to clear that potential conflict?
A. I did.
Q. In performing your conflicts check, was Tory Schwope considered an adverse party?
A. I'd have to see the conflict memo that went -- e-mail that went out.
Q. Would it makes sense, based on your experience, that he would be considered an adverse party for the purposes of a conflict memo?
A. I would have to see the e-mail.
Q. So you don't know one way or another whether he --
A. I don't recall at this time as to whether

he was listed as an adverse party or not.
Q. And whether or not he was listed as an adverse party, based on your experience as a lawyer and your experience in bankruptcy matters, would Mr. Schwope, as the owner of multiple of the debtor entities, be considered a potential adverse party?
A. It's possible. It's something that certainly should have been discussed.
Q. Did you discuss the possibility with Mr. Schwope of needing a waiver of any kind of conflicts?
A. I did not.
Q. Were any waivers of any conflicts obtained relating to this engagement?
A. Written waivers?
Q. Yes, sir.
A. No.
Q. What about oral waivers?
A. I believe we -- that the partner with Ameren Illinois had a discussion with Ameren Illinois.
Q. Outside of the Ameren Illinois potential conflict, were there any other oral conflict waivers?
A. Not that I'm aware of.
Q. The engagement letter that's in Exhibit 36, what's the date on that?

A. Looks to be February -- the letter is dated February 4, 2025.
Q. And then if you look on the last page -- maybe it's the second-to-last page. When was it signed?
A. Looks to be signed electronically by Tory Schwope on February 5 of 2025 -- I'm sorry -- by Samantha Schwope. That doesn't make sense.
MR. MOOTHART: She may have just created it. She may have done the e-sign.
Q. (By Mr. Cole) There is a signature that's actually --
A. It's an electronic signature.
Q. Yeah. And really, I'm just more curious about the date. It's February 5th, right?
A. According to the DocuSign or whatever report that is, the Adobe Acrobat sign on the last page of that Exhibit, it looks like it was created on February 5th. That's correct.
Q. So your letter is dated February 4th. It was signed February 5th.
A. Correct.
Q. Do you recall when you sent out the conflict memo?
A. I do not.

Q. Was it before or after February 4th?
A. I do not know.
Q. Based on your general practices that -- as to what you testified earlier, that you prepared the engagement letter and then sent out the conflicts memo, would you believe that you sent the conflicts memo out on or after February 4th?
A. When I say I prepared the engagement letter, I would prepare the engagement letter, then send a conflict out to make sure there wasn't a conflict. Then send the engagement letter to the client for a signature.
(Exhibit 90 was marked for identification.)
Q. (By Mr. Cole) Handing you Exhibit 90. You see that's an e-mail string that, on the first page, ends with an e-mail from you to Stephen Durbin.
Do you see that?
A. I do.
Q. Okay.
MR. COLE: Oh, I'm sorry.
Q. (By Mr. Cole) And Stephen Durbin is the individual who you referred to earlier as the person who is responsible for running a list of potential adverse parties against the conflict base?
A. And I got his name right.

Q. You did. This e-mail, if you look -- you know, these go in reverse order, right? So on the last page, it begins with an e-mail from Lou Wade to conflicts group.

Do you see that?

A. I do.

Q. And he's sending out what appears to be a conflicts check; is that fair?

A. He's from the Kansas City office, so I don't know what he's doing. But it looks to be that way.

Q. Does the Kansas City office operate differently from the St. Louis office?

A. I don't know the answer to that.

Q. Okay. You -- when referencing this, you said, "He's from the Kansas City office, so I don't know what he's doing here." So it led me to believe that you have, you know, some experience with the Kansas City office operating differently from your office, which is the St. Louis office; is that correct?

A. I don't have experience with that, but I just know that Kansas City does what Kansas City does, and St. Louis does what St. Louis does.

Q. Mr. Wade sends an e-mail, here, out to

conflicts group?
A. Correct.
Q. Is that a similar e-mail address to what you would send a conflicts check out to?
A. I believe so.
Q. And then he structures it as potential, with listing potential clients, adverse, and then the nature of the engagement. Would you also structure this in a similar way?
A. I would do this completely different, but something similar to this. These parties would be listed. I would typically describe what the representation is about so that someone would understand, when they read this, as to what it is that we're being asked to do.
Q. So that was sent on Friday, December 6th. Do you see that?
A. Mine says --
Q. It's on the back.
A. -- Wednesday, January 29th.
Q. My apologies. It's on the back page. We're still talking about that original e-mail.
A. I apologize.
Friday, December 6th. I see that.
Q. Okay. So that conflicts check would not

have been related to the matter in which you were engaged later, correct?
A. Correct. It seems to be a month earlier.
Q. Then if you turn to the next e-mail, which begins on the first page of Exhibit 90, do you see that that's an e-mail from Louis Wade, again, to conflicts group?
A. I do.
Q. And he says, "They're updating conflicts check," right?
A. Correct.
Q. This is around the time that you're discussing possibly being retained to represent the DCA entities?
A. I would agree with that.
Q. Did you know that Mr. Wade was running an updated conflicts check?
A. I probably asked him to do that, because I was unfamiliar with the names of the companies that he was asking us to look at.
Q. So he sends this additional conflicts check, lists the additional adverse parties.
Do you see that long list there?
A. I do.
Q. Okay. If you look on the page, and these

pages are Bates numbered that -- at the bottom is LR, bunch of zeros, 603?
A. Yes.
Q. See that?
And do you see three down from the top, Tory Schwope is listed?
A. I do see that.
Q. Okay. This conflicts check e-mail goes to this conflicts group, and we don't know who is a part of that group, at least based on this e-mail, right?
A. You may not. I do.
Q. Oh, I don't. I'm saying we don't, as we're sitting here today.
A. Well, "we" includes me. I know who it would have went to. But, yes.
Q. And that's -- that's a good distinction. Who did that go to?
A. Every attorney at Lewis Rice.
Q. Then there's a forward of that e-mail. Do you see that in the middle there? From conflicts share to attorneys and Janna Beattie.
A. I do.
Q. And then you forward that e-mail to Stephen Durbin, correct?
A. I do.

Q. Okay. When you sent this to Stephen Durbin, this e-mail string that included a list of additional adverse parties, what was the purpose of that e-mail?
A. I was being asked to represent the DCA debtors, and I wanted to make sure that we did not have a conflict with any of the parties that were listed below.
Q. Any of the adverse parties that were listed in Mr. Wade's e-mail?
A. You're using the word "adverse." I would use the name "parties" that were listed below.
Q. So Mr. Wade listed them as additional adverse parties. Do you disagree with how he describes them?
A. You'd have to ask Mr. Wade that question.
Q. Well, you forwarded this e-mail to Mr. Durbin to get a response from Mr. Durbin. And I'm asking you: In doing so, did you agree with Mr. Wade's characterization that those parties listed in his e-mail were additional adverse parties for purposes of a conflicts check?
A. I was not geared on the word "adverse." My question to Stephen was, "Am I to understand that none of these creditors on this conflict check are clients

of the firm, and we have zero conflicts?"
Q. Okay. So you understood this list that Mr. Wade prepared to be a list of creditors?
A. I understood them to be a list of creditors and possible debtors.
Q. If -- and, you know, you can look through the list if you like, but were there debtors listed in here?
A. When you use the word "debtors," I'm talking about the debtors that I could possibly represent.
Q. And that's why -- yeah, we're on the same page. Were there debtors that you could possibly represent listed?
A. Does not look to be any. Does not look to be any of the debtors.
Q. And that would makes sense, right, because the debtors would be your clients?
A. Okay.
Q. Do you agree with that?
A. Yes.
Q. This e-mail that you send at the top of Exhibit 90 is sent on February 12th of 2025, right?
A. Correct.
Q. So that's after the engagement letter that

we looked at earlier was signed, correct?
A. Correct.
Q. Before February 12th of 2025, was it your understanding that the firm had not cleared all potential conflicts?
A. I don't know.
Q. You don't know one way or another whether they were cleared before February 12th, 2025?
A. That is correct. Otherwise, I wouldn't have sent that e-mail.
Q. Do you recall getting a response from Mr. Durbin to your e-mail?
A. I do not.
Q. If you didn't, would you have followed up with him?
A. Possibly, but it's his job to notify us of conflicts. It's not our job to get clearance of conflicts from him. So if he knew that there was a conflict or saw that there was a conflict, his job was to pick up the phone and call us.
Q. Do you believe it's part of your duties to ensure that the firm is free of conflicts before beginning an engagement?
MR. RUSKAMP: Object to form.
You may answer.

A. Part of my duty? Duty to who?
Q. (By Mr. Cole) Your duty as a lawyer.
MR. RUSKAMP: Object to form.
A. To be clear of conflicts before I begin an engagement?
Q. (By Mr. Cole) Yes, sir.
A. Sure. That's why this process is in place.
Q. Did you -- around the time -- well, the engagement began, it appears, when -- at least when the engagement letter was signed on February 5th of 2025, fair to say?
A. Okay.
Q. Before that engagement letter was signed, had you had a conversation with Mr. Schwope about the possibility of him filing for personal bankruptcy?
A. Larry Parres? No.
Q. Are you aware of other -- anybody else having a conversation with Mr. Schwope prior to February 5th of 2025 regarding the possibility of him filing for personal bankruptcy?
A. No.
Q. After February 5th of 2025, did you have a conversation with Mr. Schwope about him filing for personal bankruptcy?
A. I'm sure at some point, when it became

clear that he was a co-borrower under the Frontier indebtedness, that we would have said something to him at some point, like, "You're going to have to get counsel and think about your own personal bankruptcy."
But it was not a specific conversation.
Q. If I recall your testimony earlier, you believe you found out that Mr. Schwope was a co-borrower a couple weeks after becoming engaged in -- on February 5th?
A. Correct.
Q. Do you recall a conversation that you had with him at that time regarding his co-status -- regarding his status as a co-borrower?
A. I'm sure I mentioned it to him when I found out that he was a co-borrower.
Q. Okay. And what did you tell him about the possibility of him filing for personal bankruptcy?
A. We would not have had that -- I don't recall.
Q. Did you advise him, at that time, that he needed to retain personal counsel?
A. As soon as we learned that he was a co-borrower, we told him he needed to get separate counsel.
Q. Did you assist him, at that time, in

getting separate counsel?
A. I don't recall.
Q. Did you suggest any lawyers to him?
A. I don't recall.
Q. When he didn't retain individual counsel, did you follow up with him and tell him that he really needed to get individual counsel?
A. Numerous times.
Q. Okay. Did you ever document those in writing?
A. Oh, I'm sure there's e-mails and text messages to that extent.
Q. Do you believe that every time you advised him to get personal counsel, you did so in writing?
A. No.
Q. Why would you advise him to get personal counsel? Or -- I'll strike that.
I'll ask: Why did you advise him to get personal counsel?
A. Because Lewis Rice did not represent him.
Q. Okay. And Lewis Rice could not represent him, correct?
MR. RUSKAMP: Object to form.
You may answer.
A. I don't know.

Q. (By Mr. Cole) Well, if you could represent him, why wouldn't you?

MR. RUSKAMP: Object to form.

You may answer.

A. It assumes a whole lot of things in that question. Where were we in the process? Were we in the middle of the Chapter 11? Were we before the Chapter 11? Is it waivable? Is it not waivable? Would the two parties agree to waive it?

That question has so many points to it, it can't be answered.

Q. (By Mr. Cole) Okay. But it was your assessment that Mr. Schwope, at least as early as you discovering that he was a co-borrower on the Frontier loans, needed his own counsel?

A. Any Chapter 11 bankruptcy attorney will tell you it's best when ownership gets their own counsel.

Q. Okay. But this is beyond him being an owner, right? He was -- you knew he was an owner from day one?

A. And I knew he was a co-borrower on February 20th.

Q. Okay. When -- did you advise him before February 20th to get individual counsel?

A. I don't recall.
Q. Because he was a co-borrower on the Frontier loans, Frontier could have pursued him for payment on those loans individually, right?
A. Sure.
Q. Okay. Upon finding out that Mr. Schwope was a co-borrower on February 20th of 2025, did you have any conversations at Lewis Rice about the development of potential conflict involving Mr. Schwope?
MR. RUSKAMP: Can you repeat that, please?
MR. COLE: Sure.
Q. (By Mr. Cole) And let me establish something I think I've been assuming. But you said -- you referenced the date February 20th is when you --
A. On or about.
Q. Okay. So on or about February 20th, when you learned that Mr. Schwope was a co-borrower in the Frontier loans, did you have a conversation with anybody at Lewis Rice about whether or not that development could create a potential conflict?
MR. MOOTHART: That's a "yes" or "no," and then we can get into who the conversation was.
A. You're going to hate me for this, but can you rephrase that or reask that?

Q. (By Mr. Cole) On or about February 20th, when you found out that Mr. Schwope was a co-borrower under the Frontier loans, did you have a conversation with anybody at Lewis Rice about whether or not that created a potential conflict of interest?
A. No.
Q. Did that development Mr. Schwope -- you learning that Mr. Schwope was a co-borrower on February 20th of 2025, did it cause you to believe that there could be a potential conflict of interest?
A. Of course there's always a possibility, but no.
Q. Because Mr. Schwope was a co-borrower under the Frontier loans, any payment to those loans by the debtor would necessarily reduce Mr. Schwope's obligations; is that accurate?
A. Factually.
Q. When did you find out that Valley Hill was not a borrower on the loan documents?
A. We filed on February 20th, so it would have been the eve of February 20th.
Q. Before you filed -- and you -- when you say you filed, you filed the bankruptcies that we're here on today?
A. We filed the DCA Outdoor case on February

20th, is my recollection.
Q. Before filing that case, had you received the loan documents relating to the debtors at Frontier?
A. I personally did not.
Q. Okay. Had anybody at Lewis Rice?
A. I don't know.
Q. Before filing the bankruptcies on February 20th, had you received any of the debtors' real estate agreements?
A. I don't know what documents you're referring to, so I'm going to say I don't know.
Q. Okay. You're an experienced bankruptcy attorney. What would be a real estate agreement?
A. A mortgage, a deed of trust, a lease, a memorandum of lease, a easement, a water right, a mineral right. The documents just go on and on.
There's no limit to what a real estate agreement could be.
Q. Did you receive any document that you, Mr. Parres, would consider to be a real estate agreement relating to the debtors before you filed the bankruptcies on February 20th?
A. I am sure I saw a real estate agreement before February 20th that involved the debtors.

Q. Fair to say you do not believe you had them all, right?
A. I don't think anyone in this room has them all.
Q. Sitting here today?
A. It would be impossible to have all of those real estate agreements in any one room, other than a recorder of deeds somewhere.
Q. Before filing the bankruptcies, did you understand the complete ownership structure of the debtors?
A. Before we filed? I think the answer is, no, we did not have it right.
Q. Before filing the bankruptcies, did you have a -- an understanding of all the leases that the debtors had entered into?
A. No.
Q. When you found out that Valley Hill was not a borrower on the loan docs, then did you make a determination that it should not be a debtor in the bankruptcy?
A. Lewis Rice would not have made that determination. We would have discussed that with the client.
Q. So who made that determination?

A. Tory Schwope.
Q. Did you agree with that determination?
A. It's not my job to agree or disagree. It's to allow the client to have the correct information and allow them to make that decision.
Q. But did you agree or disagree?
A. I don't have an opinion.
Q. So you just took his direction and didn't have an opinion on the matter?
A. He instructed us not to file a Chapter 11 on behalf of Valley Hill, so we followed his direction.
Q. And you believe that to be proper?
A. Not my job to second-guess what he decided.
Q. You're a lawyer, right?
A. Correct.
Q. Okay. And you believe that everything you file in a bankruptcy matter has to be truthful?
A. Correct.
Q. Accurate?
A. Correct.
Q. Did you believe that listing Valley Hill as a nondebtor was accurate?
A. I don't know what document you're referring to. But we listed Valley Hill in the footnote on

February 20th, that they were going to be a debtor, with the assumption that they were a borrower under the Frontier loan documents.

Q. Do you believe that the action of not including Valley Hill as a debtor was accurate?

MR. RUSKAMP: Object to form.

You may answer.

A. I don't have an opinion.

Q. (By Mr. Cole) You understand that Valley Hill was owned by Tory Schwope, right?

A. I believe that to be correct.

Q. And if it was a nondebtor entity, it was an adverse party to the debtors, correct?

MR. RUSKAMP: Object to form.

You may answer.

A. The word "adverse" has meaning, and it means that there is a conflict between them and the party. Just because they are a party that has a relationship with another party does not make them adverse, such as you and your wife. You have a relationship with your wife, but it doesn't have to be adverse.

The same with the debtor and an owner. It does not have to be adverse. It certainly can become adverse.

Q. (By Mr. Cole) There's a potential for them to become adverse?
A. Absolutely.
(Exhibit 91 was marked for identification.)
MR. MOOTHART: You can close this up.
THE WITNESS: I like the info.
MR. MOOTHART: You like it? Okay.
Q. (By Mr. Cole) Mr. Parres, I've handed you Exhibit 91. It's an e-mail string. At the top is from Tory Schwope to you, John Hall, and Steve Drapekin.
Do you see that?
A. At the very top of 91, I do.
Q. Okay. This e-mail starts on the -- this e-mail string starts on the second page, an e-mail from John Hall to Tory Schwope with a CC to you.
Do you see that?
A. I'm reading the document now.
Q. Are you familiar with this e-mail?
A. I'm reading the document now.
Q. Have you seen this e-mail before today?
MR. MOOTHART: And you're referring to the 7:59 p.m.?
MR. COLE: This e-mail string. I'll let him finish reading. Then I'll ask.

MR. MOOTHART: Okay. Yeah. He's reading.
A. I'm sorry?
Q. (By Mr. Cole) Before coming here today, did you review this e-mail that I've marked as Exhibit 91?
MR. MOOTHART: Are you asking, like, at some point in time after it was sent, or are you asking --
Q. (By Mr. Cole) Before coming here today, did you review it?
A. I would have reviewed it when it was sent to me on February 20th of 2025.
Q. Have you seen it since that day?
A. I don't believe so.
Q. The e-mail starts with an e-mail -- the e-mail string starts with an e-mail from John Hall, talking about how Farm Credit is complaining about any of their class collateral being used with respect to Valley Hill.
Do you see that?
A. I do.
Q. Okay. Is that when you, Mr. Parres, learned that Valley Hill was not a co-borrower?
A. No.
Q. Okay. Was it before this e-mail?

A. Around the same time on February 20th, but not from that e-mail.
Q. Okay. How did you learn that Valley Hill was not a co-borrower?
A. I believe Steven Drapekin would have come down to our offices and asked to have a meeting with John Hall and I.
Q. And that's, I think, consistent with your e-mail that's two later, on February 20th, to Tory Schwope that's in the middle of the first page.
Do you see that e-mail there?
A. I do.
Q. And you say, "Steve Drapekin, can you tell if Valley Farms is a co-borrower tomorrow?"
A. Correct.
Q. Okay. You say, "Were they are the DIP loan term sheet."
Is that -- do you mean to say they were on the DIP loan term sheet?
A. I don't recall.
Q. Okay. Okay. You say, "This is good news. Maybe great news"?
A. I do.
Q. The potential that Valley Hill Farms is not a co-borrower?

A. Correct.
Q. And why is that good news, maybe great news?
A. One less debtor in the bankruptcy case.
Q. If having assets be a part of the bankruptcy estate -- well, you would agree with me that having more assets a part of the bankruptcy estate is a good thing, right?
MR. RUSKAMP: Object to form.
You may answer.
A. If you're implying that Valley Hill brings more assets to the estate, that's not a true assumption. Valley Hill would have been their own estate. So whatever assets they had would have been in their estate. The assets of Valley Hill would not have brought more assets to any other estate. They were all separate debtors being maintained separately.
Q. (By Mr. Cole) Okay. So -- and the way you think about these, and the way you think about the individual bankruptcy estates, is each individual debtor entity has its own bankruptcy estate, right?
MR. RUSKAMP: Object to form.
A. That's how we filed these cases. That is correct.
Q. (By Mr. Cole) And you wouldn't look at

them as being one total combined bankruptcy estate?
A. We could not do that.
Q. Okay. These debtors have relationships with each other, correct?
A. Correct.
Q. So if one debtor owes another debtor money, and pays that debtor, that is going to reduce the estate for one and increase the estate for the other, fair to say?
MR. MOOTHART: Object to form, incomplete hypothetical, lacks foundation.
A. It's possible.
Q. (By Mr. Cole) I mean, it seems fairly straightforward. If one debtor has $10 and gives $10 to another debtor, the debtor who gave the $10 to the bankruptcy estate is now worth $10 less, and the other is worth $10 more, fair?
MR. RUSKAMP: Object to form.
A. It's logical.
Q. (By Mr. Cole) Okay. And if -- well, you would agree with me that Valley Hill had relationships with debtor entities, right?
MR. RUSKAMP: Object to form.
A. I don't know the extent of those relationships. But, yes.

Q. (By Mr. Cole) Did you ever know the extent of those relationships?
A. No.
Q. Did you ever undertake any effort to understand the extent of those relationships?
A. Other than the preparation of the debtors' bankruptcy schedules, no.
Q. When were those bankruptcy schedules filed?
A. Scott Moore of our office -- of Lewis Rice would have handled that.
Q. Whatever that date is, after the date of those bankruptcy schedules being filed, you didn't investigate the relationship between Valley Hill Tree Farms and any debtor entity?
A. We were specifically told by Frontier not to spend any money regarding anything to do with Valley Hill, so we did not do such an investigation.
Q. And you took that to mean that you shouldn't investigate any debtor relationship with Valley Hill Tree Farms?
MR. RUSKAMP: Object to form.
You may answer.
A. I don't know what that means, so I can't answer it.
Q. (By Mr. Cole) Did you investigate whether

a debtor entity had any claims against Valley Hill Tree Farms?
A. When we prepared the bankruptcy schedules, we did.
Q. Anytime after that?
A. I don't recall.
MR. MOOTHART: Let's take a short break.
MR. COLE: Sure.
THE VIDEOGRAPHER: We're going off the record at 10:12 a.m.
(Recess.)
THE VIDEOGRAPHER: We're back on record at 10:22 a.m.
Q. (By Mr. Cole) Mr. Parres, did you understand at any point in time that Valley Hill Tree Farms had a lease with any of the debtors?
A. At some point, I was made aware of it.
Q. When were you made aware of that?
A. I'm not for sure, but sometime during the depositions in August of 2025 that Frontier took of the DCA parties.
Q. Was it your understanding the Valley Hill Tree Farms sold items to the debtors entities?
A. I wouldn't know that, but that's what I heard.

Q. You believe you learned that on or around -- in or around August of 2025?

A. I wouldn't use the word "learned." I just heard that Valley Hill was selling trees to the debtor entities. And it would have been significantly before August of 2025.

Q. Okay. Did you do anything to investigate those sales?

A. I did not. That was for management and for the financial advisors, both Focus, the Unsecured Creditors Committee, and Frontier's.

Q. Did you make any effort to determine whether the sales between Valley Hill Tree Farms and any of the debtor entities were real?

A. Again, we left that to the financial advisors of both the Unsecured Creditors Committee, the debtors, and Frontier. We did not -- we, Lewis Rice, did not dig into the business operations and the day-to-day transactions between the entities. We believed that the three financial advisors, who were being paid significant amounts of monies, were doing that.

Q. Is it your understanding that advising the debtors to take actions that benefited Valley Hill Tree Farms presented a conflict?

A. I'm sorry. Say that again.
Q. Is your understanding that advising the debtors to take actions that benefited Valley Hill Tree Farms would present a conflict?
MR. RUSKAMP: Object to form.
A. I'm still not following the question. I apologize.
Can you do that one more time for me?
Q. (By Mr. Cole) Sure. Is it your understanding that advising the debtors to take actions that benefited Valley Hill Tree Farms would present a conflict?
MR. MOOTHART: Object to form, incomplete hypothetical.
A. I've asked you to ask me this question three times, and I still don't understand it. So I'm going to say I don't know.
Q. (By Mr. Cole) Mr. Schwope talked to you about the operations of Valley Hill Tree Farms, right?
A. Not specifically, but I knew that Valley Hill was operating.
Q. You don't recall having any conversations with Mr. Schwope about Valley Hill Tree Farms' operations?
A. Very generically, and only to the extent

that -- how they interfaced with DCA. And those conversations would have been with Focus on the call as well so that we all understood what transactions were being done between Valley Hill and the debtors.

Because we were under extreme scrutiny by Frontier on a weekly basis to disclose all of those transactions and how the money and product flew back and forth between the two companies.

But I personally did not get into that. That's why we paid the three financial advisors in this case to do that work.

Q. Did you task anybody on your team with understanding, from a legal perspective, any of those transactions?

A. No.

Q. Are you familiar with Rio Verde Plantas?

A. I know of the name and I know of the company. I'm not familiar with them.

Q. Are you familiar with an issue involving Rio Verde Plantas and Tory Schwope?

A. Oh, boy. I don't know. I think your statement is a false statement, so I don't know the answer to it.

Q. What about it's false?

A. Rio Verde had a relationship with DCA, who

managed them, and you used the word "Tory Schwope." And I don't believe that that's correct.
So it was tough to answer your question.
(Exhibit 92 was marked for identification.)
Q. (By Mr. Cole) Handing you Exhibit 92, which is a letter from the Beuchler Law Office to you, dated April 17th, 2025.
Do you see that?
A. I do.
Q. Okay. Do you remember receiving this letter?
A. May I read it, please?
Q. Sure. And do you want to read the whole thing?
A. Are you going to ask me questions about it?
Q. I'm going to ask you questions about some of it.
A. Then I'd like to read it.
Q. Okay.
MR. COLE: We'll go off the record.
THE VIDEOGRAPHER: Going off the record at 10:28 a.m.
(Recess.)
THE VIDEOGRAPHER: We're back on the record at 10:35 a.m.

Q. (By Mr. Cole) Mr. Parres, you reviewed Exhibit 92?
A. I did.
Q. Okay. Do you recall receiving Exhibit 92?
A. I do not.
Q. Do you dispute that you did receive it?
A. No.
Q. Do -- after reading Exhibit 92, do you recall any issues raised regarding Rio Verde Plantas?
MR. MOOTHART: Object to form, vague and ambiguous.
A. I mean, there are allegations in this letter, if that's what you're referring to.
Q. (By Mr. Cole) After receiving this letter, did you undertake any effort to investigate those allegations?
A. They did not involve the debtors. So, no, we did not.
Q. You read through this?
A. I did.
Q. You see that there were allegations that involve the debtors, right?
A. After speaking with the debtors' management team and Focus, we were convinced that this did not involve the debtors.

Q. Okay. There's allegations in here that Mr. Schwope is mismanaging assets, right?
A. Mr. Schwope is not a bankrupt debtor or a client of Lewis Rice.
Q. I understand that. There's allegations in Exhibit 92 that Mr. Schwope is mismanaging assets of a company, right?
A. Allegations, correct.
Q. Okay. Did you undertake any effort to determine whether those allegations were accurate?
A. No. Mr. Schwope was not a bankrupt debtor.
Q. Did you talk to Mr. Schwope about the allegations in Exhibit 92?
A. I'm sure we shared the letter with them and had a Teams meeting regarding this letter and whether or not these allegations were anywhere near the truth.
Q. What did you ask him?
A. I don't recall.
Q. Okay. Do you recall having a meeting, though?
A. I said I'm sure we did. I don't recall the specific meeting, but I am confident that this letter would have been shared and discussed.
Q. Okay. You would agree with me that part of your duties as a lawyer for entities in bankruptcy is

that you're charged with protecting the assets of those entities in bankruptcy, right?
MR. RUSKAMP: Object to form.
You may answer.
A. You are correct, but these are not bankrupt entities that Lewis Rice represented.
Q. (By Mr. Cole) And you and I can agree on that. And can we also agree that Mr. Schwope was the principal of all of the entities that were in bankruptcy here?
A. In this letter, he was not the principal of -- I believe he was a 50/50 owner with Mr. Edmundson.
Q. And my question was perhaps a bad one, but more directed at the DCA Outdoor entities that were in bankruptcy.
A. I'm sorry.
Q. Mr. Schwope was the principal of those entities, right?
A. Yes.
Q. Did it occur to you that the allegations in Exhibit 92 might raise issues regarding Mr. Schwope's control over the debtors?
A. Not at all.
Q. Did Exhibit 92 cause you to look into any transactions between Valley Hill Tree Farms and the

debtors?
A. No. We counted on the three financial advisors from Frontier, the Unsecured Creditors Committee, and the debtors to look into those transactions. Lawyers don't typically look into business transactions. That's why we hire financial advisors.
Q. Did you ask Focus Management Group to look into the transactions between Valley Hill Tree Farms and the debtors?
A. And we asked the Unsecured Creditors Committee and Frontier's financial advisors their input as well.
Q. So I think your answer is, yes, you did ask Focus Management Group to look into the transactions between Valley Hill Tree Farms and the debtors?
A. We would have shared this letter, and the three entities should have looked into that. That's correct.
Q. Okay. Did you follow up with Focus Management Group as to their conclusions after they looked into the transactions between Valley Hill Tree Farms and the debtors?
A. I believe that Focus spoke to the financial advisor for the Unsecured Creditors Committee, and

came to a conclusion that most of these allegations weren't true. But that was for them to decide.

Q. And it sounds like you came to no conclusion as to whether or not the allegations were true?

A. We did not conduct an independent investigation. Lewis Rice did not conduct an independent investigation because these were not debtor entities.

Q. Did -- following the receipt of the letter that's Exhibit 92, did you advise Mr. Schwope that he needed to get an individual attorney?

A. I believe he already had an individual attorney in Oregon that represented his interest out there.

Q. Did you advise him that he needed to retain a personal attorney relating to -- in any way to the bankruptcy matter that you were engaged on?

A. I constantly told Tory he needed to get independent counsel for the Chapter 11 bankruptcy case.

Q. Did you ever tell Mr. Schwope that, "I can't talk to you personally about anything in particular until you get personal counsel"?

A. In what regard?

Q. In regards to any subject, did you ever tell Mr. Schwope, "I can't talk to you about a specific subject until you get personal counsel"?
A. Regarding DCA?
Q. Yes, sir.
A. No. He was the face of DCA. He was the human being of DCA. There was no one to talk to at DCA --
MR. MOOTHART: That's just a "yes" or "no," Larry.
A. -- other than Tory Schwope.
Q. (By Mr. Cole) You said earlier that Focus -- you believe that Focus Management Group spoke to the financial advisor to the Committee about the content of Exhibit 92.
Did I hear you correctly?
A. I believe they had a conversation.
Q. Okay. Who at Focus Management Group was involved in that conversation?
A. I don't know.
Q. Okay. Do you know who for the Committee's financial advisor was involved in that conversation?
A. I don't know.
Q. How did you learn of that conversation?
A. I recall sharing this letter with Focus,

who told me that they would have shared it with the Committee. Because the Committee had concerns.
Q. Okay. So you shared it with Focus. They told you they would share it with the Committee?
A. Okay.
Q. I'm asking you: Is that what happened?
A. I don't recall.
Q. Okay. So you don't know, actually, then, what Focus Management Group did with Exhibit 92?
A. I know nothing that Focus Management did for sure, but I know what they would typically have done. That's correct.
Q. Did you get a report from anybody at Focus Management Group regarding their investigation into the allegations contained in Exhibit 92?
A. We would have had discussions regarding it.
Q. Okay. With whom did you have discussions?
A. The Focus team.
Q. Who?
A. Whoever they appointed to look into this. It would have been Juanita as the head, and she would have had some of her assistants look into it.
Q. Do you recall a specific conversation with Juanita Schwartzkopf about the allegations in Exhibit 92?

A. I do not.
Q. As counsel for the debtors in a Chapter 11 proceeding, you owe duties to the Court. You would agree with me to that, right?
MR. RUSKAMP: Object to form.
A. To the Court?
Q. (By Mr. Cole) Yes, sir.
A. Yes.
Q. Okay. And as counsel for the debtors in the Chapter 11 bankruptcy proceeding, you would agree with me that you owe duties to your client?
MR. RUSKAMP: Object to form.
A. To the debtors, correct.
Q. (By Mr. Cole) As counsel for the debtors in the Chapter 11 bankruptcy proceeding, you would agree with me that you owe duties to the bankruptcy estate, right?
MR. RUSKAMP: Object to form.
A. The debtors' duties -- the debtors' attorneys' duties are to the debtor, and that's because of the professional responsibility rules that have been adopted in the state of Missouri and every other state. We cannot have dual responsibilities to parties, so our responsibility is to the debtors.
Q. (By Mr. Cole) You understand that the

debtors owe a fiduciary duty to the bankruptcy estate?
MR. RUSKAMP: Object to the form.
A. The debtors owe a fiduciary duty. That is correct.
Q. (By Mr. Cole) Okay. And is it your testimony, then, that you, as a lawyer, owe no duties to the bankruptcy estate?
A. I didn't say that. Those are your words.
Q. Well --
A. I said my duties are to the debtor.
Q. Okay. So do you, as an attorney in a Chapter 11 proceeding representing the debtors, owe any duties to the bankruptcy estate?
MR. RUSKAMP: Object to form.
A. There are certain duties that all of us owe to non-debtor -- I mean non-clients. If there was a crime that was committed, I would have a duty to disclose that to somebody or to withdraw. But, yes.
Q. (By Mr. Cole) What other duties would you owe to the bankruptcy estates?
A. There's unlimited examples.
Q. Give me some.
A. I -- let's assume that we knew that a secretary was sending out scandalous materials in the debtor's name. I would have to bring that to

someone's attention if the debtor refused to take action on that.

It can go on and on. There's no limit to it.

Q. As counsel for the debtors in a Chapter 11 bankruptcy proceeding, you agree that you owe duties to the U.S. Trustee?

MR. RUSKAMP: Object to form.

A. Duties to the U.S. Trustee? Duties of honesty, duties of forthcoming. But I don't owe any duties, per se.

Q. (By Mr. Cole) Beyond the duties of honesty?

A. And being a lawyer. You owe all the duties to parties on the other side. As a whole, we like to treat the United States Trustee as being a friend and make sure that we give them everything that they want.

Q. If you had concerns about Tory Schwope as the principal of the debtors acting in the best interest of the debtors, you would owe a duty to the bankruptcy estates to raise that, wouldn't you?

MR. RUSKAMP: Sorry. Object to the form of the question, calls for opinion testimony, improper hypothetical.

You may answer.

MR. MOOTHART: Joined.
A. I don't know.
Q. (By Mr. Cole) If there was an employee of the debtors who was mismanaging money, you would owe a duty, in general, to raise that, correct, with somebody?
MR. RUSKAMP: Object to form for the same reasons I repeat for that.
MR. MOOTHART: Join.
A. I would bring it to the attention of the debtor. That is correct --
Q. (By Mr. Cole) And if a debtor -- I apologize.
(Simultaneous speakers and stenographer clarification.)
A. I would bring it to the attention of the debtor.
Q. (By Mr. Cole) And if the debtor did nothing with that, you would be obligated to raise that with somebody else, correct?
A. You used the word "obligated." I don't know the specific that you're referring to. But given the severity of the issue, I may have an obligation to do something further.
Q. Okay. You were involved with the fee

petition that was submitted on behalf of Lewis Rice in this case, right?
A. Correct.
Q. Did you prepare it?
A. I believe I drafted it. That's correct.
Q. And I say it. There were two, right?
A. Two and a half.
Q. Two and a half. Fair.
Sitting here today, do you stand by all the fees that are requested in those fee applications?
A. 100 percent.
Q. Do you believe that all of the fees that were charged by Lewis Rice were for services that were beneficial to the estate?
A. Yes.
Q. You understand that the Court has scheduled an evidentiary hearing in January regarding the fee applications, right?
A. I've been told that, correct.
Q. Do you intend to attend that hearing?
MR. MOOTHART: I'll object. To the extent that he has any information on that, it's privileged. I instruct him --
A. I don't know.
MR. MOOTHART: -- not to answer.

MR. RUSKAMP: Join that.
Q. (By Mr. Cole) You don't know one way or another?
A. I don't.
Q. Sitting here today, are you planning on attending?
MR. MOOTHART: Object to that --
(Simultaneous speakers and stenographer admonition.)
MR. MOOTHART: Wait just a second. Stop. I'm going to lodge an objection. To the extent he has any information that would call for attorney-client privilege, then I'm going to instruct you not to answer. So...
MR. COLE: Just to be clear, I'm asking about his personal intent. Not anything you've told him or any communication --
MR. MOOTHART: He wouldn't have any intent if it wasn't discussed with counsel. So let's --
MR. COLE: Okay.
Q. (By Mr. Cole) So any -- any -- your decision to attend is going to be at the direction of counsel, then; is that fair?
MR. MOOTHART: I guess you can answer that.
I think he's already answered he doesn't

have any present intent to appear.
MR. COLE: Well, no, he didn't. And that's actually what I was just trying to get at.
A. I don't know the date, and I don't know if I'll attend or not.
Q. (By Mr. Cole) You communicated with the debtors via e-mail, right?
A. Correct.
Q. And you communicated with the debtors via text message?
A. Correct.
Q. Phone calls as well?
A. Yes, sir.
Q. Did you use any other method of communication to communicate with the debtors?
A. No.
Q. With e-mail, we've seen that you've communicated with the debtors through your Lewis Rice e-mail, right?
A. Correct.
Q. We've also seen that you communicated with your Gmail?
A. Correct.
Q. Any other e-mail addresses that you've used?

A. No.
Q. Before taking on this case, you initially had reservations about it, it's fair to say?
A. Before taking on the DCA case?
Q. Yes, sir.
A. Well, you never like -- yes.
Q. And what were those reservations?
A. The fact that we did not have prebankruptcy opportunity to work with Frontier to better understand how to exit the bankruptcy case. So we were filing a free-for-all bankruptcy, which is very troublesome for all.
Q. Was this bankruptcy matter the biggest Chapter 11 you had ever been involved in?
A. Ever been involved?
Q. Yes.
A. No. I was involved in significant bankruptcy cases with much more money at stake than these.
Q. Was this the biggest that you were the primary attorney on?
A. As debtors' counsel?
Q. Yes, sir.
A. I'd say in the top three.
Q. Were you in charge of staffing for this

bankruptcy matter at Lewis Rice?
A. Along with John Hall, yes.
Q. In front of you, there's Exhibit 35 that's previously marked.
A. 35?
Q. Yes, sir.
A. I'm there.
MR. COLE: You have those, too, Bruce?
MR. MOOTHART: Yeah, I've got 35.
Q. (By Mr. Cole) You recognize Exhibit 35? Those are your text messages?
A. I'll take your representation --
MR. MOOTHART: Flip through it just to make sure it's one document and not something else.
Q. (By Mr. Cole) It is a document that's Bates labeled LEP1 through LEP266.
A. I'll take your representation.
MR. RUSKAMP: Counsel, just so that you know, the one that was given to me is through 287.
THE WITNESS: Mine's through 287, too.
Mine is through 287, too.
MR. COLE: Yeah. Those include the phone logs as well.
MR. MOOTHART: Right.
MR. COLE: So thank you for clarifying

that. Yeah. The text messages end at, so you know, 266.

Q. (By Mr. Cole) Okay. Will you flip with me to LEP 51?

A. I'm there.

Q. And before coming here today, did you review your text messages that were produced?

A. I did.

Q. So you're familiar with how they're organized, which texts are from you and which texts are from other people?

A. I have never seen Document Number 35 before, but I'm very familiar with my text messages and the production of them.

Q. So you understand that the messages on the right side are from you, while the messages on the left side are from other folks?

A. I am.

Q. Okay. And the text messages we're looking at here at LEP 351 are between you and John Hall; is that right?

A. At the top it suggests that, correct.

Q. And throughout, there are messages on the left that are labeled John Hall, right?

A. Correct.

Q. On the right, and I'm looking about three-quarters of the way down, you send a text on February 6th, 2025, at 6:24 p.m. You say you're swamped at work. "Got a shot at another 11."
Do you see that?
A. I do.
Q. Okay. John Hall responds, and then you reply to him: "Not sure we can handle it," right?
A. Correct.
Q. You're referring to the DCA Outdoor case, correct?
A. I don't know.
Q. What other Chapter 11 were you looking at bringing on at this time that you were not sure you could handle?
A. There were three cases going on at this time that we had an opportunity to take, and I don't know -- your statement as to whether this was DCA when I said, "Not sure we can handle it," I don't know that.
Q. Okay. This was sent right around the time that you're communicating your engagement letter with Tory Schwope, right?
A. February 6th? That would be after it, yes.
Q. Okay. Were you --

A. So that tells me this isn't DCA, because we already signed the engagement letter.
Q. So you think it's for another one?
A. I do.
Q. Okay. When you say -- you have a text at the bottom. You say: "Hell, tgst" -- I think you probably meant "that," right?
A. Okay.
Q. Would you disagree with that?
A. It makes sense.
Q. So with that correction, you say: "Hell, that would 4X what we did the last ten years."
What did you mean by that?
A. If we got all three of the cases that we were involved in being on, that would be more debtor work than we've done in the last ten years combined.
Q. Okay. And you at least had concerns about whether or not, as a firm, you could handle that?
A. I was not concerned regarding the firm handling that at all. The firm would give us the manpower to get this done.
Q. So what did you mean by: "Not sure we can handle it"?
A. Mentally, physically, as Larry Parres and John Hall, up to managing four of these cases.

Q. Larry Parres, as an individual, only has so much time in the day?
A. Absolutely.
Q. When you became engaged by the debtors in early February, was filing for bankruptcy the plan from the beginning?
A. It was the most likely plan. We had always hoped that we could solve the problem with Frontier and move forward through 2025 to be in a better position to put a negotiated plan on file if we ultimately had to file.
Q. And you understand that Lou Wade had been working with the debtors in this case and Frontier prior to your involvement, right?
A. Not really, but I understand now that that's the case.
Q. So you didn't talk to Mr. Wade about what he was doing for the debtors?
A. I did not.
Q. You didn't ask him any background about the debtors or the situation -- you know, their involvement with Frontier?
A. I know he told me that he was working towards a forbearance agreement.
Q. Did you ask him how far he had gotten with

that?
A. I did not.
Q. Did you review any of his work product?
A. I did not.
Q. Did you meet with Mr. Wade at any point in time to discuss the details of his services relating to the debtors?
A. I personally did not.
Q. Did you speak with Mr. Wade about his representation of Mr. Schwope?
A. I did not.
Q. You understand that Mr. Schwope was individually a client of Mr. Wade's?
A. I did not.
Q. You do now?
A. I do not.
Q. You do not? Is that what you said?
A. I do not.
Q. What do you base that on?
A. Well, if you go back to the exhibit that you showed me, Tory Schwope was listed as a party that I sent to Steve Durbin and said, "Are you telling me that these are not -- clients are adverse to the firm?" And he responded.
Q. Yeah, because --

A. He was on there. Correct.
Q. He was listed as a potential adverse party?
A. Correct.
Q. Okay. You referenced earlier that you were disappointed that -- and correct me if I'm wrong, but you were disappointed that Frontier did not give you more time to work out a forbearance agreement?
A. To work out a global solution.
Q. Okay. Did you consider the relationship with Frontier to be adverse from the get-go?
A. Adverse? No.
Q. Okay. Do you believe that there was some personal animosity?
A. There was conflict from the very beginning.
Q. With whom?
A. Lisa Peters.
Q. And you had a personal dislike for Ms. Peters, right?
A. That's your words, not mine.
Q. Would you turn to LEP 54? Do you see on the right side, those are your texts, right?
A. Excuse me. I do.
Q. Okay. And in your words, you say, "Thanks. I'm going to bury this Lisa bitch. It's personal now," right?

A. I see that.
Q. Right. So in your words, it was personal?
A. I had just flown to Florida for three days for a golf tournament. And as soon as I landed in Florida, we were told by John Hall that they were filing an emergency motion for a receiver. So I went and checked my golf bags in, turned right around, went back to the airport, and was flying back home.
So I was very aggravated.
Q. And do you believe that that was done to you personally?
A. I was in the moment, and my filters didn't work.
Q. You --
A. And I apologize, Lisa, for saying that.
Q. Sir, you were responsible at Lewis Rice for overseeing the DCA Outdoor bankruptcies, right?
A. That is correct.
Q. And you weren't present at his deposition, but John Hall testified that you were the guardrail.
Would you agree with that?
A. Not a term I would use, but I understand it.
Q. Okay. Next, you -- we were looking at LEP 54. On the next page is LEP 55. Do you see there's a

black box up there?
A. I do.
Q. And there are other redactions in here. Did you review these text messages to determine what needed to be redacted?
A. With the assistance of counsel.
Q. Okay. And I don't want to get into what counsel decided or advised you, but did you make the decision as to what -- as to any of these redactions?
You, personally.
A. With the assistance of counsel.
Q. And is it your testimony that -- well, let me ask you this: Without getting into the conversations, why are these redactions here?
MR. MOOTHART: Yeah, I'll tell you they're either -- one, there's a handful that are discussions about the fee dispute, where they're talking internally, lawyer to lawyer, about the fee dispute. That's only a couple.
These -- most of these are other matters, other clients.
MR. COLE: Okay. Beyond --
MR. MOOTHART: That's the only two categories.
MR. COLE: That's the only two categories?

MR. MOOTHART: We kept -- we left everything else in there.

MR. COLE: Okay.

Q. (By Mr. Cole) Mr. Parres, you were involved in the initial debtor interviews and 341 exams, right?

A. I was involved. Scott Moore of our office took the lead.

Q. Did you attend the IDI and the 341 exams?

A. I do not believe I attended the IDI, and I believe I was only in part of the 341.

Q. Okay. You understand that the purpose of both an IDI and the 341 is an open and honest sharing of information?

A. It's to give the United States Trustee as much information as we possibly can give them that they want.

Q. And consistent with the bankruptcy process as a whole, you would err on the side of disclosure?

A. Absolutely.

(Exhibit 93 was marked for identification.)

Q. (By Mr. Cole) Handing you Exhibit 93. Are you familiar with this e-mail?

A. I see the e-mail, yes.

Q. Okay. This e-mail's discussing the

preparation of bankruptcy schedules, right?
A. I don't recall.
Q. You've read the e-mail, right?
A. I have.
Q. Is this e-mail discussing the preparation of bankruptcy schedules?
A. I don't see where it refers to that anywhere in this document. But if you're telling me it is, I will agree.
Q. The subject is, "Co-debtor schedule."
Do you see that?
A. I do.
Q. Okay. Would that suggest to you that this e-mail string is about the preparation of bankruptcy schedules?
A. Of the co-debtor schedule, yes.
Q. That's something that's filed with the Court, right?
A. Yes.
Q. Do you recall when the schedules were actually filed for this case?
A. I do not.
Q. It wasn't immediately, right?
A. I think we asked for one extension, and I think it was important for us to get the information

on file as quickly as possible. I may be wrong and we asked for a second, but I'm not sure.

Q. You send an e-mail at the top, on April 5th of 2025, to Scott Moore and John Hall.

Do you see that?

A. I do.

Q. And is it your recollection that Mr. Moore was the Lewis Rice attorney responsible for preparing the schedules?

A. Lewis Rice was responsible for preparing the schedules. Scott Moore took the lead.

Q. And you tell Scott Moore here: "We will file what we have on Monday. I say err on the side of nondisclosure, then disclosure. We can always amend," right?

A. Correct. Correct.

Q. If there's something that is incorrect in a schedule, then you're obligated to amend, right?

MR. RUSKAMP: Object to form.

You may answer.

A. Dependent upon the incorrectness, correct. But let's say that I say I owe you $7, and I really owe you $6. I don't know it's worth the attorneys' time to amend that schedule to reflect it's $6 rather than 7.

So there's a cost-benefit analysis to those amendments, but we try to be as accurate as we can possibly be.
Q. (By Mr. Cole) And with these schedules, you were erring on the side of nondisclosure and then amending later?
MR. RUSKAMP: Misstates the witness's testimony.
A. We're talking about the co-debtors' schedule, correct.
Q. (By Mr. Cole) Just that specific schedule?
A. On this e-mail, correct.
Q. Did you list Tory Schwope as a co-debtor, do you recall?
A. I do not recall.
Q. Is that something you believe should have been done?
MR. RUSKAMP: Object to form.
A. Scott Moore of our office would have led the charge on that.
Q. (By Mr. Cole) Would you have checked his work?
A. I would have checked his work, but I would not have had a conversation with Focus and/or the debtor regarding the accuracy or what needed to be on

the co-debtors' schedule.
(Exhibit 94 was marked for identification.)
Q. (By Mr. Cole) I've handed you Exhibit 94. It's an e-mail that's sent on the same day, I believe, as what we were just talking about, April 5th of 2025.
Do you see that?
A. I do.
MR. MOOTHART: What was your lead-in there? I'm sorry. I missed that.
MR. COLE: That the e-mails on Exhibit 94 are sent on April 5th, the same as 93.
MR. MOOTHART: Oh, okay.
Q. (By Mr. Cole) You see that -- this is a conversation between -- well, involving you, John Hall, and Scott Moore, right?
A. Correct.
Q. And this discussion is about whether or not to list leases on schedules that would be filed with the Court, right?
A. These are schedules as to whether listing leases as having a ownership in real property.
Q. And there's a discussion here as to whether or not to list some leases, right?
A. The leases regarding whether there is an option to buy the property at the end of the lease.

Q. And Mr. Moore tells you he hasn't seen the leases, and he can ask Jessica about them, but she hasn't responded to anything today.
Do you see that?
A. I do.
Q. And you respond: "Don't list them"?
A. Because we don't know affirmatively that they are a real property lease. If we get the leases later on and we come to that conclusion, we will amend.
The last thing you want to do on a bankruptcy schedule is to list a property as being owned by the debtor, and then come back and learn that they don't own the property. Because everyone asks you then, "Why did that property disappear?"
So what we wanted to do was put in place the issues, and then we would review the lease. And if we needed to amend them because they needed to be listed on the real property side, we would do so.
Q. So to the extent you filed a schedule that did not include a lease on that schedule, and you later found out that there was a lease that should be listed, you would amend to include it?
A. I don't read this document as what you said. I read this document as to whether we would

list them as owning on the real estate side. I would hope that we still listed the lease on the lease side.
Q. And Mr. Moore responds with a question, and he tells you that: "The schedule asks to list all real property that is owned or leased, so it seems like we should list it there, even if they don't own improvements," right?
A. Correct.
Q. Do you recall responding to him?
A. I do not.
Q. Do you recall if those leases were listed?
A. I do -- Scott would have made that decision.
Q. Okay. Did you expect him to follow your direction to not list them?
A. No. Scott would have made his own independent decision.
(Exhibit 95 was marked for identification.)
Q. (By Mr. Cole) Handing you Exhibit 95. 95 is an e-mail string with the subject line, "341 meeting."
Do you see that?
A. I do.
Q. Okay. And you're familiar with 341 meetings in this case?

A. I am.
Q. Okay. There's an e-mail from Mr. Moore to a number of individuals, including you, on April 23rd of 2025, asking about errors that may need to be corrected in the schedules.
Do you see that? It's on the first page.
MR. MOOTHART: Starting with: "FYI, we have found some minor errors"? Is that what you're referring to?
MR. COLE: It's on the first page.
MR. MOOTHART: Oh, different one.
A. Okay. I'm sorry.
Q. (By Mr. Cole) On the first page, do you see the e-mail from Scott Moore to yourself and other individuals?
It's in the middle.
A. I do.
Q. And Mr. Moore is saying -- he's asking about what potential errors there are because he's keeping a record of those that may need to be corrected in the schedules.
Do you see that?
A. I do.
Q. And he asks in what context the DCA team is planning to fix them, right?

A. I do.
Q. You responded to that e-mail saying: "Why are we talking about unsecured debt with the UST?"
Right?
A. Correct.
Q. Why did you think it was not appropriate to be talking about unsecured debt with the UST?
A. We are supposed to talk to the UST about unsecured debt. Again, the level is, are we $10 off or are we $15 off? Because every minute we spend -- Scott Moore spends on this is more fees that the debtor's going to have to pay.
And I'm like, "We have to keep in mind" -- remember, I'm the billing attorney -- "We have to keep in mind that this is a cost-benefit analysis. We can not be perfect at a cost of $2 million."
Q. Your e-mail is about the unsecured debt --
A. Correct.
Q. -- right? And you say: "Talking about unsecured debt is a waste of time and the debtor's dollars" --
A. Correct.
Q. -- right? Is that because there -- you were never going to get to a point where unsecured creditors are collecting money here?

A. No, not at all. What we're talking about is the schedules, and what we're talking about is the money that the debtor is going to spend to be accurate on those schedules. Remember that in a Chapter 11, there is a process. And the process is a creditor looks at what's scheduled on their -- as their unsecured debt. And if they don't object to it, then they don't have to file a proof of claim. If we file a schedule that is way off, then it's on the creditor to determine if they want to file a proof of claim.

So we don't have to be perfect on the Unsecured Creditors Committee schedules because they have the opportunity to review it and file a proof of claim if they don't believe we're accurate.

Q. What was the error?

A. I'm sorry?

Q. What were the errors that were found here?

A. They were all over the board from being $10 to being $100 to being $1,000.

Q. How much was --

A. They were all over --

Q. What was the dollar value of the --

A. I have no --

(Simultaneous speakers and stenographer admonition.)

MR. RUSKAMP: Counsel, let me him finish.
MR. COLE: Yeah, I got it.
A. I have no idea.
Q. (By Mr. Cole) You don't know. So you don't know whether the errors that are discussed in Exhibit 95 are, in fact, minor or not?
A. Well, we do know they're minor because Scott says they're minor.
Q. What is -- and you -- but you didn't look at those. You don't know if they're minor or not?
A. Again, I have a duty to make sure that we don't spend $2 million putting the most perfect bankruptcy schedules together. Our duty is to try to disclose as much information as accurately as we can, and we went through great pains to be as accurate as we can on these bankruptcy schedules.
Q. Did you ever tell anybody to stop wasting time on unsecured debt?
A. Stop wasting time on unsecured debt? I don't know.
Q. Did you instruct Mr. Schwope to reach out to members of the Unsecured Creditors Committee?
A. I did the opposite of that.
Q. You told him not to?
A. Correct.

Q. Why would you tell him not to?
A. It's just never a good thing for the lead agent of the debtor to reach out to members of the Unsecured Creditors Committee.
Q. Why?
A. It's not illegal. It's just not a good thing.
Q. Why would that be?
A. You never know what comes through those discussions.
Q. During the pendency of the bankruptcy when Lewis Rice was involved, who was making decisions on behalf of the debtors?
A. Tory Schwope.
Q. Did that change?
A. On September 11th.
Q. Of 2025?
A. Of 2025.
Q. Before September 11th of 2025, did Mr. Schwope make all decision on behalf of the debtors?
A. As the 99 percent and 100 percent owner, yes, he did.
Q. Was any decision on behalf of the debtors made by the CRO, Juanita Schwartzkopf?

A. She was not given that ability to do that.
Q. She was given the ability to stop decisions from being made, right?
A. Not from being made. She had the ability to block decisions that were made.
Q. So in that instance, if Mr. Schwope had made a decision to do something, it's your interpretation that Ms. Schwartzkopf had the power to stop that decision from being implemented?
A. Correct.
Q. Did she ever exercise that power?
A. She didn't need to. She was the world's best negotiator with Tory. And when she needed something -- Tori's attention to get him off of first base to get him to second, she was amazing at the ability to do that without a fight.
Q. Fair to say that Mr. Schwope was opposed, from the beginning, to the imposition of a CRO with control over the debtors?
MR. RUSKAMP: Object to form.
Q. (By Mr. Cole) Right?
A. He did not want to have a CRO make decisions on behalf of the debtor. That is correct.
Q. And that was described by you multiple times as a deal-breaker, right?

A. As it was for Frontier, correct.
Q. When you say, "As it was for Frontier," you mean that Frontier wanted a CRO?
A. That was the clash in this case. Frontier came into the case wanting a CRO, and Tory didn't want a CRO. And that's why the two parties never saw eye to eye.
Q. As counsel for the debtors, was there any time between the time you were engaged and September 11th, 2025, when you considered the need for an independent decision-maker over the debtors?
A. There was never a need. But it was clear that the Unsecured Creditors Committee had teamed up with Frontier and were working as one unit. And we took that opportunity, once we had that knowledge, to see if we couldn't put something in place that would be short of a -- a new CRO.
Q. You considered a -- recommended appointing a governing board, right?
A. I don't know that I did or Zach Fairlie did, but it was mentioned during the depositions when we were having discussions. And I actually think that that was a suggestion that the Unsecured Creditors Committee counsel put forward, or their financial advisor, Eric. I don't remember which one exactly.

But I thought it was a decent idea.
Q. Do you recall recommending to Mr. Schwope that he should agree to the appointment of a governing board?
A. That day, we had -- we were supposed to have a day's worth of deposition. We didn't. And I had convinced Tory, through our negotiations, that an independent board, of which he would be one of, was not a bad idea and should be something that he should consider.
Q. Mr. Schwope rejected that idea, right?
A. No. I think he actually accepted the idea, eventually.
Q. Eventually, after September 11th?
A. No, way before September 11th. I think there are term sheets out there in August that provided that we would agree to that.
Q. And those term sheets were contingent on other parties agreeing to additional terms, right?
A. It wasn't the only term, there was a term sheet that had several terms on it.
Q. You took no action -- or Mr. Schwope took no action to say, "We're appointing a governing board," right?
A. Correct.

The reason I struggle on that --
MR. MOOTHART: You've answered.
Q. (By Mr. Cole) Would you agree with me that Ms. Schwartzkopf had decision-making authority over budgets?
A. She did not.
Q. At all?
A. No, she was an integral part and had to approve a budget approved by the debtor, but she did not have authority over the budget.
Q. If she didn't approve a budget, the budget wouldn't end up being approved. Is that fair to say?
A. You can't say that. Because, at that point, it would have been, "Is she going to block it or not?" And we never got to that point, so she never had to exercise that blocking point because she was the world's best negotiator with Tory to get Tory to do what he needed to do.
Q. And we've already talked about that Ms. Schwartzkopf had a blocking position on managerial decisions, right?
A. Correct.
(Exhibit 96 was marked for identification.)
Q. (By Mr. Cole) I've handed you Exhibit 96, an e-mail string involving you and Ms. Schwartzkopf.

Do you see that?
A. I'm reading it.
Q. And if you want to take your time and read the whole thing, we can go off the record.
MR. MOOTHART: It's not very long. We'll stay on the record.
A. Okay.
Q. (By Mr. Cole) Part of this e-mail is you trying to lay out a groundwork process for how and when Ms. Schwartzkopf would be able to make decisions; is that fair?
A. I don't agree with that.
Q. Okay. At the bottom of Page 2 of that e-mail string, do you see where you sent an e-mail on February 28th, 2025?
A. I do, at 11:03 a.m.
Q. 10:42 a.m.?
A. I'm sorry?
Q. Bottom of Page 2?
A. Oh, I was at the bottom of Page 1. I apologize. Okay.
Q. You say: "Okay, guys. We have to have a process as to how and when we need Juanita's permission to do something is needed."
Do you see that?

A. Correct. Mm-hmm.
Q. So that's you trying to come up with a process to determine when Ms. Schwartzkopf can exercise her powers?
MR. RUSKAMP: Object to form.
You may answer.
A. So that's a different question than what I thought you asked me first. But, yes, we were trying to understand how and -- it was going to happen if Juanita was going to block something.
Q. And similar -- or consistent with what we talked about earlier, you say that the CRO agreement gives Juanita a blocking position on managerial decision and budgets, right?
A. Mm-hmm.
Q. And you say: "Let's agree that anything that costs over $10,000 needs Juanita's input," right?
A. Correct.
Q. Okay. And is that just you coming up with a dollar that you think is material?
A. I was talking to the team and just trying to come up with something that we would be able to rely upon.
Q. Okay. Ms. Schwartzkopf responds to your e-mail right above that, and she tells you that she

already has a place -- a process in place with Samantha to approve all disbursements.
Do you see that?
A. I do.
Q. Okay. Then on the second paragraph, she says: "On the seasonal workers, I will want to get Sam involved in that discussion."
Do you see that?
A. I do.
Q. Do you understand that "Sam" is referencing Sam Williams?
A. I don't.
Q. Do you see that the e-mail that she sent is sent to you, Samantha Schwope --
A. Mm-hmm.
Q. -- John Hall, Tory Schwope, and Sam Williams?
A. Correct.
Q. In the first paragraph, Ms. Schwartzkopf references a process with Samantha, right?
A. Correct.
Q. And in the second paragraph, she references that she wants to get Sam involved in that discussion.
A. Okay.
Q. And says: "He is available to talk with

Samantha on that," right?
A. Okay. You're correct.
Q. Okay. So she's telling you that she wants to get Sam Williams involved in the discussion as to whether or not to bring up seasonal workers, fair?
A. Fair enough.
Q. You respond on the first page of this document. And to jump to the end of your response, you take everybody else off of this and you say: "This is a private e-mail between us," right?
A. I don't say that. But, okay.
Q. Well, at the -- last sentence in your e-mail, you say: "As you can see, assist" -- I think you mean "this is" -- "a private e-mail just between us."
A. Okay.
Q. So what I said was accurate, right?
A. Okay.
Q. "Yes"?
A. Okay.
Q. "Yes" or "no"?
MR. MOOTHART: What was the question?
A. Yeah. You want to read the statement back?
MR. MOOTHART: Yeah, I've lost the thread.
Q. (By Mr. Cole) You sent an e-mail here,

taking everybody else off, and you say: "This is a private e-mail between us."

A. That's what the last sentence says, correct.

Q. Okay. And that's what you did?

A. Correct.

Q. And you tell Ms. Schwartzkopf: "Do you really think these are decisions that you need to weigh in on? You only have a blocking position and budget control," right?

A. Mm-hmm.

Q. Okay. Why are you pushing back on Ms. Schwartzkopf taking any action here?

A. Again, we have a limited professional budget in this case, and I want to make sure that we are not blowing that budget out on making decisions that don't take a whole lot of professionals to understand.

So I was simply trying to loosen -- lighten the workload on Juanita to only make decisions that are meaningful. I don't need her micromanaging the business.

Q. Did you have an understanding as to the input that would go into a decision as to whether or not call up seasonal workers?

A. My understanding is that it already had been made.
Q. But do you, Larry Parres, have an understanding as to what factors to consider when making a decision as to whether --
A. I do not.
Q. -- to call up seasonal workers?
A. I do not.
Q. Okay. So you don't know how much effort it's going to take or what needs to be considered, right?
A. I do not.
Q. Okay. And you respond to Ms. Schwartzkopf saying, "Are you -- do you really want to weigh in on these decisions?"
Right?
A. Okay.
Q. Okay. Did Mr. Schwope ask you to push back on her?
A. I don't recall.
Q. Did Mr. Schwope ever ask you to push back on Ms. Schwartzkopf?
A. Ever?
Q. Yeah.
A. I'm sure there were times that Tory and

Juanita didn't see eye to eye, and Tory would have said something to me and Juanita would have said something to me.

Q. Okay. Did you view it, as your role as the lawyer, to determine what decisions Ms. Schwartzkopf weigh in on?

A. No, but I wanted to set up a process that would work, and I wanted everyone to understand what that process was. Because we're very early on in this case, and the last thing I wanted -- didn't want to have happen was for the process not to be in place when something important needed to occur.

I wanted to make sure the process was working.

Q. You're trying to prevent conflict between Ms. Schwartzkopf and Mr. Schwope?

A. I don't know if it's conflict or just a decision needed to be made.

Q. And you thought this decision should be Tory Schwope's?

A. DCA's.

MR. RUSKAMP: Object to form.

Q. (By Mr. Cole) Which, in your opinion, was Tory Schwope?

MR. RUSKAMP: Object to form.

A. Tory Schwope was the human being of DCA.
MR. MOOTHART: Let's take a short break.
MR. COLE: Sure.
MR. MOOTHART: And then I propose we'll come back, go another hour, unless you're miraculously done. Then we'll take a lunch break.
THE VIDEOGRAPHER: Going off the record at 11:32 a.m.
(Recess.)
THE VIDEOGRAPHER: We're back on the record at 12:21 p.m.
(Exhibit 97 was marked for identification.)
Q. (By Mr. Cole) Mr. Parres, we've handed you Exhibit 97. This is an e-mail string involving you, Juanita Schwartzkopf, and others. And the subject line is, "DCA Outdoor, Inc. - data room and diligence."
Do you see that?
A. At the very top of Exhibit 97, I do.
Q. Okay. And then the original e-mail, which is on the second page -- or the first e-mail in the string, I should say, is from Lisa Peters to you and John Hall on April 3rd, 2025.
Do you see that?
A. From Lisa Peters to myself and John Hall,

correct.
Q. And in this e-mail, Ms. Peters is asking about a number of things. But first, she's asking about -- well, to gain access to the debtors' data room.
Do you see that?
A. I'm reading it now.
Okay.
Q. So you see in the first paragraph, Ms. Peters is asking for access to the debtors' data room, right?
A. Correct.
Q. And the data room is an electronic repository where the debtors stored documents, right?
A. Okay.
Q. Is that right?
A. Correct.
Q. And in the second paragraph, she informs you that: "Kutak has retained real estate inventory appraisals to prepare appraisals of the real estate and inventory collateral."
Do you see that?
A. I do.
Q. Okay. And she identifies those appraisers for you in the last sentence as being Cushman &

Wakefield and Hilco.
Do you see that?
A. I do.
Q. Fair to say that you were opposed to Frontier bringing in appraisers in this circumstance, right?
A. No.
Q. Okay. Ms. Peters -- that original e-mail was sent on April 3rd. She follows up on April 9th.
Do you see that e-mail there?
A. I do.
Q. Okay. And then in the second paragraph, she says: "Attached is Hilco's initial list of documents that they would like from the debtors."
Do you see that?
A. I do.
Q. At this time, were you familiar with Hilco?
A. I know who Hilco is.
Q. What is Hilco?
A. An appraisal company.
Q. Were you familiar with them at this time?
A. Yes.
Q. Had you ever used them?
A. When you say "have you," Larry Parres has never used them. They have been in several cases that

I've been involved in.
Q. Okay. Then you forward Ms. Peters' e-mail to Juanita Schwartzkopf, right?
A. Correct.
Q. And you say: "Juanita, isn't this what you didn't want to happen? Why haven't you talked them off this ledge?"
Right?
A. That's the sentence.
Q. So you're saying it's part of Juanita's job to talk Frontier off the ledge of needing to bring in appraisers, right?
A. Those are your words. I would never have used those.
Q. You don't agree with that?
A. I would never have said, "This is your job."
Q. Okay. You asked her -- you thought she should have talked them off that ledge, right?
A. I had hoped that that was something that she was working on, but she doesn't control Frontier or anyone else.
Q. And the ledge you're talking about is the use of the valuation appraisals?
A. Well, we all know we needed real estate

appraisals. We were specifically talking about Hilco evaluating the inventory.
Q. You say, in your third sentence that you write: "You called this long ago, and this is the kiss of death, if I recall your words," right?
A. That's what it says.
Q. Yeah. You say a couple sentences later: "We need to push back, if I recall what you told me," right?
A. Correct.
Q. And what Ms. Schwartzkopf told you was that it was likely that those appraisals would be lower than you wanted them to be?
A. That's not what she told me.
Q. Okay. You ended your e-mail with: "I do not like where this is headed," right?
A. Correct.
(Exhibit 98 was marked for identification.)
Q. (By Mr. Cole) Handed you Exhibit 98, which if you look at the first -- well, if you go in reverse order here, this is the e-mail string we were looking at, the first three e-mails on here.
And then the first e-mail at the -- well, at the bottom of Page 1, is an e-mail from Juanita Schwartzkopf responding to your e-mail that we

were talking about in Exhibit 97, right?
A. It looks to be correct.
Q. Okay. And she tells you -- she says: "I think Ryan is being required to choose Hilco because they did Everde."
Do you see that?
A. I do.
Q. Are you familiar with what "Everde" means?
A. She's explained to me what "Everde" means.
Q. When you say "she," Ms. Schwartzkopf --
A. Yes.
Q. -- had explained to you what Everde was?
A. That's correct.
Q. She says: "I think we will probably end up in a fight of appraisals."
A. That's what it says.
Q. And then you respond and you say: "If we need an appraiser, then we need to hire one," right?
A. Correct.
Q. And you say the first you heard of even needing one -- first of hearing this is you were always told an appraisal by a large company, like Hilco, would kill this business; is that right?
A. Correct.
Q. And that's what you were concerned about in

these e-mails, right?
A. We knew that the Everde case that Hilco was hired by Frontier, that Hilco came in with an appraisal that was so low that it caused all kinds of valuation fights and caused Frontier to suffer a significant loss in that case.
Q. And if you wanted to offer anything in response to that, then the debtors would need to conduct their own appraisals?
A. Not necessarily, but something we certainly should be talking and discussing.
Q. Sir, you could evaluate the appraisals that were done and criticize them in certain ways. You'd agree with that?
A. Anything's possible. Hilco may have came in at a much higher value than we thought. We don't know.
Q. But you certainly didn't think they were going to, at this point in time, fair?
A. We knew Frontier's experience with Hilco was that this appraisal was coming in significantly less than what we would hope.
Q. Yeah. And that's something you wanted to avoid?
A. I wanted the truth to come out. I didn't

care to avoid a subject, I just want a fair valuation of the inventory.
Q. You did not hire appraisers, right?
A. When you say "you," you're talking about DCA?
Q. The debtors did not hire appraisers?
A. That is correct. We did not have the budget to do that.
Q. Do you recall how many budgets you submitted as part of this process?
A. Let's just say between seven and ten.
Q. In those budgets, did you request an amount of money to conduct appraisals?
A. We knew this case couldn't afford it, so we counted on the Unsecured Creditors Committee and Frontier to provide real appraisals so that we'd have an opportunity to respond to it before we went and got our own appraisals.
Q. So I think your answer to my question is, no, there wasn't a requested budget line for appraisals; is that correct?
A. What budget are you talking about?
Q. Any of your budgets.
A. I don't know.
Q. You viewed Ms. Schwartzkopf's role in this

as primarily needing to be a cheerleader, right?
A. What are you referring to?
Q. I'm just asking you a question.
A. I rarely use the word "cheerleader," but she was probably the best financial advisor on the three teams that were put together.
(Exhibit 99 was marked for identification.)
Q. (By Mr. Cole) I've handed you Exhibit 99. This is an e-mail from you to Samantha Schwope, right?
A. Mm-hmm.
Q. And the only thing that's written in here is the subject line in which you write: "Please let Tory know that I told Focus to start being a cheerleader. He's down on them as he doesn't think they're being positive."
Do you see that?
A. Correct.
Q. Focus's role was not to be a cheerleader for Mr. Schwope, right?
A. That's not what that sentence says. It doesn't say for you to go get your pom-poms and show up on Sunday afternoon at 3 o'clock, that kickoff's going to be here.
It says to please start talking positive about the positive things that are going on at the

debtors, such as cash flow being positive, such as the ability to cut expenses by over 40 percent, such as the ability to operate with only three managers in the company.

There's a whole lot of great things that needed to be discussed, and we didn't feel as though Juanita was taking the opportunity to tell the other financial advisors all of the great work that Juanita and Tory were doing together.

Q. You thought Juanita was focusing too much on the things that needed to be improved?

A. Not at all. I don't think she was concentrating on the great things that were going on at DCA.

(Exhibit 100 was marked for identification.)

Q. (By Mr. Cole) Exhibit 100 is a follow-up to the e-mail that we just talked about on Exhibit 99. Ms. Schwope responded --

A. Can I see that again?

Q. Did I not hand you -- Ms. Schwope responded to your e-mail, and you -- then you replied back, and you say: "I will continue to get in their grill. They're being bad way too much money" -- I think -- did you mean to say "paid"?

A. Keep going. I don't -- I don't recall.

Q. Okay. Well --
A. It would make sense, but I don't recall. I mean, the word says "bad." I can't tell you what I meant to say. But "paid" makes sense.
Q. Okay. So if it means that, then you would have said: "They are being paid way too much money to say anything but positive things. Have a great day."
A. Correct.
Q. Right?
A. Mm-hmm. That's to Samantha Schwope about Focus.
Q. And you thought they were being paid way too much money to say anything but positive things?
A. No, no, no. Their job was to make sure that the financial information was accurate and got out there. My point of all these e-mails were that we need to concentrate on the great things that were going on at DCA at the time.
Spring sales were fairly strong, expenses were being cut significantly, and we were cash flowing.
Q. You still needed a DIP loan, though, right?
A. Every Chapter 11 debtor needs a DIP loan.
Q. Including this one?
A. Yeah, this one's no different.

Q. Multiple DIP loans?
A. Well, it all depends on the term of the DIP loan. But, yeah, given the term of this first DIP loan, we were in a position where we needed a second DIP loan.
Q. Did Ms. Schwartzkopf become the cheerleader you thought she should be?
A. I think we all did a better job talking about the good things that DCA had going on, yes.
Q. Did you ever have conversations with Mr. Schwope where he expressed an interest in buying the assets of DCA Outdoor?
A. He, personally?
Q. Yes, sir.
A. No.
Q. Did you talk about the concept of a stalking horse bidder with Mr. Schwope?
A. Any Chapter 11 debtor talks to the debtor's principal about the idea of a stalking horse, what it does, and the value that it can bring to the debtors if you go into the sale process. So I'm confident that we've had that discussion, and I'm sure Juanita and the Unsecured Creditors Committee's financial advisor was part of those discussions as well.
Q. And you had discussions with Mr. Schwope

about him being a part of a team that was a stalking horse bidder?

A. Mr. Schwope always believed that he was going to be able to find an investor that was going to be able to raise enough money to take Frontier out. So if that was part of a stalking horse or part of a plan, I don't know.

But we knew at the beginning of the case, and shared with the financial advisors in each, to Frontier and the Unsecured Creditors Committee, that we had two options to reorganize this case.

Option A was to find a financial investor that would support a plan, a reorganization. And Option B was to start selling off parts of the business to scale it down to a point where the business would survive on its own.

But it was always something that was discussed.

Q. You never found a financial investor that would allow that to happen, right?

A. You used the word "you." Not Lewis Rice's job to find an investor.

Q. Mr. Schwope never found a financial investor, right?

A. He talked to several, but he was taken out

of management on September 11th and did not have an opportunity to close that deal.
Q. So between February of 2025 and September of 2025, he, Mr. Schwope, did not find a financial investor, as you discussed, in part of Plan A?
A. He was having discussions with parties, but we did not pull the trigger because all of the financial people needed two things that were promised by the Unsecured Creditors Committee and Frontier: A copy of the '23-'24 audit and the appraisal reports that were being generated for the real estate.
Any investor was going to need to look at those documents, and they were both being promised to us by Frontier and by the Unsecured Creditors Committee's financial advisors and lawyers.
Q. Those were -- the audit reports and the appraisals were items that the debtors could have generated themselves, right?
A. We were -- we couldn't -- it really made no sense for us to hire real estate appraisers to appraise the exact same property that was being appraised by Frontier. So Frontier --
MR. MOOTHART: Slow down a little bit, Larry.
A. Frontier agreed to give those appraisals to

the Unsecured Creditors Committee. The Unsecured Creditors Committee then had an agreement with us -- "us," the debtors, DCA -- to give us a copy of those appraisals.

It made no sense, in this tight-money case, to spend three times the money for a real estate appraisal; for Frontier to spend it, for the Unsecured Creditors Committee to spend it, and for the debtor to spend it.

So we agreed that Frontier would do it. They would share it with the Committee. And the Committee, on the record at one of the depositions, stated that they would share it with the debtor.

Q. Is there any other reason why the companies could not have conducted the appraisals other than what you just said?

A. Any other reason?

Q. Yeah.

A. No, they were -- they could have sought to get their own appraisals, if they had chosen to.

Q. Okay.

A. But this money -- this case did not have the money for that opportunity.

Q. The debtors didn't have that kind of money?

A. It wasn't in the budget, and there was not

a whole lot of room in the budget for that to occur. So we knew that we were stuck with whatever the number was that Frontier gave to the Committee and they gave to us.

We knew that that was a number that we were going to have to live with, unless we could have an offer to purchase certain of those pieces of real estate independently. But we knew that we were going to be stuck with those numbers.

Q. You recall that a motion to appoint a Chapter 11 trustee was filed in August of 2025, right?

A. I believe on August 26th, the same day that the Unsecured Creditors Committee and Frontier signed a plan agreement.

Q. And I'll correct you a little bit, just to reorient ourselves. It was on August 25th, if that helps?

A. August 25th. Thanks.

Q. Okay. And there was a decision that was made to contest that motion, right?

A. DCA made a decision to contest that motion. That is correct.

Q. And you agreed with that decision?

A. As counsel to DCA, my job was to advise them as to what their rights and obligations were, and

then take the lead from what they asked us to do.
Q. Did you advise DCA to contest the motion to appoint a trustee?
A. We discussed what the ramifications were of it, and what the consequences were of it, and what the opportunities were to fight it. And they made the decision to challenge it.
Q. And opposing that motion was a big task. You'd agree with that?
MR. MOOTHART: Object to form, vague and ambiguous.
MR. RUSKAMP: Join.
A. I don't know what "big task" means, but it was a significant undertaking by the debtors.
Q. (By Mr. Cole) And required an investment of significant resources by your firm?
A. Lewis Rice spent significant time drafting the response and attending the hearing on that case. That is correct.
Q. Do you have an understanding of how much in fees Lewis Rice billed for opposing the trustee motion?
A. I do not.
Q. When was the last time you talked with Tory Schwope?

A. "Talked" as in a phone conversation, or talked in person?
Q. When was the last time you had a conversation with Tory Schwope?
A. Oral conversation?
Q. Yes.
A. I don't know.
Q. Was it in the last -- was it in 2026?
A. I produced the phone records that would show the last time I talked to Tory Schwope.
Q. Okay. When was the last time you had written communication with Mr. Schwope?
A. I produced my text messages, which would show the last time I had a written communication with Tory Schwope.
Q. Okay. They would be reflected in your texts?
A. They would.
Q. Okay.
MR. MOOTHART: You guys got the e-mails last night, right?
MR. COLE: Yes. And I -- I don't know that we have to go into this too much on the record, but was that all of them? I think you said -- you mentioned something about preliminary, so I just

wanted to make sure.
MR. MOOTHART: Preliminary objections.
That's all we're producing. That's it.
MR. COLE: Okay.
(Exhibit 101 was marked for identification.)
Q. (By Mr. Cole) Handing you Exhibit 101.
And it's printed back to front. So there is a second page, just so you know. Are you familiar with this e-mail?
A. I recall it.
Q. And this is the e-mail in which you learned that Mr. Schwope had been terminated from the DCA entities?
A. That is correct. There should be an attachment to this e-mail, I believe.
Q. There was an attachment to the original e-mail, because it had a letter. But this is your response, which did not include the attachment.
A. Gotcha.
Q. So you have a good recollection of what was on here originally, because that letter detailed the reasons for Mr. Schwope's termination.
Is that your recollection?
A. I have not seen the letter in some time, but that's what I recall.

Q. This was a surprise to you, fair to say?
A. Yes, no.
Q. In any event, at this point in time, you knew that Mr. Schwope was no longer an employee of the DCA entities, right?
A. I learned that from Tory.
Q. And you knew, as of this date, September 17th, that he no longer had any, you know, management decisions or capabilities with those entities, right?
A. That was as of September 11th.
Q. That was -- and you're describing that because that's when the CRO was appointed, after the trustee hearing; is that right?
A. As a resolution of the trustee -- motion to appoint a trustee. That is correct.
Q. Okay. You advised Mr. Schwope, in your e-mail, that he needed to hire a personal lawyer to deal with this, as Lewis Rice is counsel to the debtors.
Do you see that?
A. This is about the 2,000th time I told Tory he needs to hire a personal attorney.
Q. And is that because you recognize that, you know, at least at this point in time, he had a conflict of interest with the debtors?

MR. RUSKAMP: Object to form.
You may answer.
A. I didn't say that. Did not enter my mind.
Q. (By Mr. Cole) Okay. Do you believe he had a conflict of interest at this time with the debtors?
A. I don't know.
Q. And that never entered your mind?
A. A conflict of interest? No, it never entered my mind.
Q. At any point in time since you were retained in February of 2025, did the concept of Tory Schwope having a conflict of interest with any of the debtors' entities enter your mind?
A. Prior to -- no. I don't know. I don't know.
Q. Then why did he need his own personal lawyer if there was no conflict of interest?
A. Any Chapter 11 bankruptcy attorney will tell you that the owner needs his own personal attorney. And I begged Tory, throughout this entire case, to get his own personal attorney.
Q. Did you understand at this point in time, September 17th, 2025, that Mr. Schwope might have claims against the debtors?

A. I don't know.
Q. Did you ever consider that possibility?
A. I don't know what I considered at that time.
Q. As you sit here today, do you believe that Mr. Schwope had potential claims against the debtors as of September 17th, 2025?
MR. RUSKAMP: Object to form.
You may answer.
A. I -- I really -- I don't know.
Q. (By Mr. Cole) You don't know one way or the other?
A. I don't.
Q. Did Mr. Schwope believe he was -- or strike that.
Did Mr. Schwope tell you, at any point, that he believed he was improperly terminated?
A. I think he sent me an e-mail or a text in which he talked about whether or not there was a case on it. And I don't know if he thought it was a strong case or a weak case, but he mentioned it to me, I think, in the text messages -- text message.
Q. That -- sorry.
That would be a case against the DCA debtors?

A. I don't know who he thought the case was against, so I don't know.
Q. Who employed him before he was fired?
A. DCA.
Q. Okay. After Mr. Schwope was terminated, Lewis Rice continued to be engaged, correct?
MR. MOOTHART: By who?
Q. (By Mr. Cole) After Mr. Schwope was terminated, Lewis Rice continued to be engaged by the debtors; is that right?
A. We were asked to wrap up the affairs that we were doing.
Q. At this point in time, September 17th?
A. We had no communication with Mr. King. We sent them an e-mail suggesting that we had three open items that needed to be addressed, and they asked us to address one of those.
Q. Okay. When did you send that e-mail?
A. I don't recall.
Q. Do you think it was close to September 17th?
A. I don't recall.
Q. You feel like it was maybe more like October?
A. I don't recall. It's out there.

Q. You had an understanding, after Mr. Schwope was terminated, that the attorneys at Lewis Rice were not supposed to communicate with him, right?

A. I did not have that opinion and/or believe that. We were certainly not directed not to.

Q. Handing you what's previously been marked as Exhibit 21. If you look at the first e-mail in this string, it's an e-mail from Scott Moore to Brent King, copying you, right?

A. Correct.

Q. And then there's a response from Brent King, and then a reply from you, Mr. Parres, on the same day we've been discussing, September 17th, 2025, right?

A. That's -- the e-mail that you're referring to from Scott Moore answers your previous questions as to whether this was an October event that Lewis Rice said that we had open affairs. It's on September 17th that Scott Moore informed Mr. King of our duties regarding the open leases.

So it was not an October event, as you suggested. It was a September event.

Q. And -- all right. So let's talk about that e-mail real quick. So that's an e-mail from Mr. Moore, and he sends this e-mail to Mr. King

saying: "I'm a partner at Lewis Rice, and have been working on a few aspects of these cases," right?
A. Yes, that's what the first sentence says.
Q. And he's reporting in this e-mail on his specific tasks --
A. Correct.
Q. -- regarding the debtors, right?
A. Correct.
MR. MOOTHART: Slow down and let him -- she can't get both of you at the same time. So let him finish his question and give your answer.
Q. (By Mr. Cole) And I'll ask it again. Mr. Moore is reporting here on his tasks that he's been asked to assist with in the filing of the debtors' monthly operating reports, right?
A. Lewis Rice tasks which he's working on.
Q. He's not reporting here on all the Lewis Rice tasks, right?
A. The tasks that he was working on on behalf of Lewis Rice.
Q. Okay. This isn't a list of all of Lewis Rice's tasks or open items, right?
A. Correct.
Q. Okay. So the e-mail that you were referencing earlier when you said there were, you

know, three tasks that you were asked to be sent -- that you were asked to send, that's not this e-mail, is it?
A. I wasn't insinuating that it was sent in one e-mail. I was telling you that we knew we had three tasks that needed to be completed.
Q. Then Mr. King responds to Mr. Moore and asks if anybody at Lewis Rice has had any communication with Tory Schwope in the last two days, right?
A. I see that.
Q. Okay. And then you respond to Mr. King, and you say that you have asked the Lewis Rice team to avoid communications with Tory since last Friday's court appearance, right?
A. Correct.
Q. You report on the e-mail that Mr. Schwope sent you informing you of his termination, and you say that you responded by telling him he needs to retain personal counsel, right?
A. Correct.
Q. And then you confirm that Lewis Rice represents the debtors and not Tory Schwope, right?
A. Correct.
Q. Okay. So you did, in fact, ask the Lewis

Rice team to avoid communicating with Mr. Schwope, right?
A. I did not tell them they couldn't. Your statement was were we told that we shouldn't communicate with Tory Schwope, and I told you that we were not told that by Mr. King or DCA. I personally reached out to our team, suggested that we not have communications with Tory to the extent that we could avoid it, and then I put that in writing to Mr. King.
Q. And you agree that, at the same time, you shouldn't be providing Mr. Schwope with legal advice, right?
A. When you say "you," are you referring to Lewis Rice?
Q. Well, let's ask you, Mr. Parres, first.
A. Well, Larry Parres did not have a client, Tory Schwope or DCA.
Q. You would agree with me that Lewis Rice should not be communicating with Tory Schwope to provide legal advice to Tory Schwope?
A. Tory Schwope was not Lewis Rice's client.
Q. So you would agree with me that it would be improper to provide legal advice --
MR. MOOTHART: Object to form.
Q. (By Mr. Cole) -- to Tory Schwope?

MR. MOOTHART: Incomplete hypothetical.
MR. RUSKAMP: Join.
MR. MOOTHART: Are you saying legal advice about DCA, or legal advice about --
MR. COLE: Legal advice about anything.
A. Tory Schwope was not Lewis Rice's client, and I made that clear to Tory Schwope at least a thousand times during these cases. So, no, Lewis Rice should not be providing legal advice to Tory Schwope.
Q. (By Mr. Cole) Why did you inform the Lewis Rice attorneys to avoid communicating with Tory?
A. Mr. King, down below, was inquiring as to whether there was any communication. So I wanted to make sure that none of the team were talking to Tory that I didn't know about. So I wanted to make sure that we would cut it off, to the extent that we could.
Q. And because you were still representing the debtors at this point, right?
A. We were counsel of record for the debtors. That is correct.
Q. Is that different from representing the debtors?
A. We were not being engaged in any issue other than the three that we were discussing.
Q. You had not disengaged at this point,

right?
A. We had not disengaged.
Q. The debtors were still Lewis Rice's clients?
A. Correct.
Q. And you would want to avoid communicating with Mr. Schwope in a way that could be seen as adverse to your clients, right?
MR. RUSKAMP: Object to form.
You can answer.
A. Not knowing all the facts of that hypothetical, I would agree.
Q. (By Mr. Cole) Are you aware of anybody at Lewis Rice providing legal advice to Tory Schwope after November -- or sorry -- after September 17th, 2025?
A. No.
Let me change that. I really don't know, because I can't speak for the 139 attorneys at Lewis Rice.
MR. MOOTHART: He just asked if you were aware. You said, "No." So...
(Exhibit 102 was marked for identification.)
Q. (By Mr. Cole) Handing you Exhibit 102. You see that this is an e-mail that starts from

Tory Schwope to you, asking if Scott could send him the lease between DCA Land Kentucky and Valley Hill Tree Farms, right?
A. I see that.
Q. It's dated October 1 of 2025?
A. Correct.
Q. So this is after Mr. Schwope was terminated?
A. Correct.
Q. And you forward that e-mail to Mr. Moore, right?
A. I did.
Q. And you tell Mr. Moore to send the lease and use Tori's Gmail, right?
A. Correct.
Q. Before sending this, did you ask anybody at DCA whether they approved of sending the lease to Mr. Schwope?
A. I did not.
Q. You're aware that the lease was sent by Mr. Moore to Mr. Schwope, right?
A. I'm aware -- I have heard that that was, in fact, the case.
Q. Handing you what's been previously marked as Exhibit 23. It's an e-mail from Scott Moore to

Tory Schwope's Gmail address, copying you, right?
A. Me and John Hall. That's correct.
Q. And: "Tory, per your request, please see attached," is what Scott says. And he attaches what purports to be a Valley Hill lease; is that right?
MR. RUSKAMP: Object to form.
You may answer.
A. The Valley Hill lease that was in the data room. That is correct.
Q. (By Mr. Cole) How do you know this was in the data room?
A. I was told.
Q. By whom?
A. Scott Moore.
Q. Would it surprise you if Scott Moore testified he didn't know where he got this?
A. Where he got that?
Q. Yeah, where he got the lease.
A. Scott Moore testified that he didn't know where he got the lease that he sent to somebody? Yes, that would surprise me.
Q. Did you ever inform Brent King that Mr. Schwope had requested a copy of the Valley Hill lease?
MR. RUSKAMP: Object to form.

A. I never had a conversation with Brent King.
Q. (By Mr. Cole) Ever?
A. Ever.
Q. And you certainly didn't forward Mr. Schwope's request on to Brent King, right?
A. I did not.
Q. Did you ever tell anybody at the DCA debtors to delete their communications with you?
A. I told Samantha Schwope to delete personal texts that were between her and I for a one-week period.
Q. Anybody else?
A. Never.
Q. You mentioned one time you told Ms. Schwope to delete texts. Is that the only time you told somebody affiliated with debtors to delete text messages with you?
A. Yes.
Q. Did you ever ask anybody at the debtors to delete e-mails involving you?
A. No. There is a text message that uses the word "e-mails" that should have used the word "text," if that's what you're referring to.
Q. Did you delete text messages involving anybody who is affiliated with the debtors?

A. I did not.
Q. If you were asking Ms. Schwope to delete text messages involving you, why wouldn't you delete them yourself?
A. You're referring to September 18th. And on September 18th, late at night, I asked her to delete the prior week's text messages between myself and her, and asked her to delete Tory's as well because I did not want those private text messages getting in the hands of the Unsecured Creditors Committee and Brent King.
Q. Why not?
A. I didn't want to become locker room fodder for the two individuals that ran both of those.
Q. What do you mean by "locker room fodder"?
A. I was -- one of the things that I asked to be deleted was a picture of me and my wife on my birthday, and I was in a pair of pink shorts. And that's not something that Larry Parres often wears.
Q. Do you think it reflects poorly on you that you were wearing pink shorts?
A. I let my wife pick out my clothes on my birthday, so I wore what she asked me to wear.
Q. I happen to like pink shorts. I like your pink tie.

A. Well, guess who picked that out.
Q. You understand that Ms. Schwope was, when you asked her to delete text messages, employed by the debtors, right?
A. I did.
Q. And would you agree with me that that was an improper request?
MR. MOOTHART: Object to -- are you asking him -- let me talk to him.
MR. COLE: Talk to him?
MR. MOOTHART: Yeah, to see if it invades privilege. We'll be back.
MR. COLE: Okay.
THE VIDEOGRAPHER: Going off the record at 1:05 p.m.
(Recess.)
THE VIDEOGRAPHER: We're back on the record at 1:07 p.m.
MR. MOOTHART: So I'm going to object to that question on the basis of privilege, instruct the witness not to answer. If you want to ask him whether he has any opinion about the propriety as he sits here right now, independent of communication with counsel, you can ask him that question.
Q. (By Mr. Cole) And we can get into -- I

think you said you believe you sent that on September 18th?
A. I believe that's the case.
Q. And I think you're right. But not necessarily -- not totally important to my question. But at that point in time -- maybe it is.
At that point in time, on September 18th, the debtors were still clients of Lewis Rice. We've established that, right?
A. Correct.
Q. And Ms. Schwope was still employed with the debtors, correct?
A. Correct.
Q. And on that date, you sent a text message to Ms. Schwope asking her to delete text messages, correct?
A. Of this week, correct.
Q. And you would agree with me that it would be improper for you to do so?
MR. MOOTHART: Object on the basis of privilege, instruct the witness not to answer.
Again, if you want to ask for his current state of mind or opinions that are independent of communications with counsel, you're free to ask him that question.

MR. COLE: I think all I can ask him is what his -- what he thinks.

MR. MOOTHART: Okay.

MR. COLE: I'm not asking for your communications.

MR. MOOTHART: Then I'm going to --

Q. (By Mr. Cole) I'm not saying did he tell you -- did your attorney tell you it was improper. I'm asking you, Mr. Parres: Was that improper?

MR. MOOTHART: Okay. And those discussions -- that question necessarily invades the attorney-client privilege and discussions that counsel had with Mr. Parres regarding those texts.

So I'm going to object on the basis of privilege and instruct the witness not to answer.

Q. (By Mr. Cole) Mr. Parres, do you believe that your actions in asking an employee of one of the debtors to delete text messages was improper?

MR. MOOTHART: I'm going to -- okay. Same objection.

MR. COLE: I just asked him if he believes.

MR. MOOTHART: Right, but his belief is intertwined with communications that he's had with counsel. So if you want to ask him if he has any belief independent of communications with counsel,

you're free to ask him that question.

Q. (By Mr. Cole) When you sent the text message on September 18th, 2025, asking Ms. Schwope to delete text messages, did you believe at that time that that was a proper request?

A. I did not believe it to be improper.

Q. Okay. Did you believe it to be proper?

A. I don't know what that means, to be proper.

Q. It would be the opposite of improper. So you said you didn't think it was improper, so I'm asking you: Do you think it was proper?

And let me ask you differently. I'll strike that.

Do you believe it was appropriate?

MR. MOOTHART: And you're asking him at the time he sent it?

MR. COLE: At the time.

MR. RUSKAMP: Object to form.

A. I don't know what I thought at that time.

Q. (By Mr. Cole) Okay. Do you have an independent belief, sitting here today, outside of what your counsel has instructed you as to what is proper or improper, as to whether your request to delete text messages of Samantha Schwope was proper?

A. All of my beliefs have been formed since

sending that message, and they've all been guided by counsel.

Q. And if you'll turn to -- I believe you're there. Those are your text messages, Exhibit 35.

A. Okay.

Q. And we covered this a little bit earlier, but those text messages that start at LEP 1, right, and -- and let's just talk about the text messages, because I know there's call logs on there too. And we'll cover those separately.

But the text messages that are LEP 1 through LEP 266, and you can review those if you'd like, but those are your text messages taken from your phone, right?

A. I'll take your representation.

Q. Okay. They were produced to us in the case as if they were that. I just want to make sure that we're not going to have a disagreement that that's what those are.

A. Based upon your representation that you provided this book to me and this copy of the Exhibit, I will take your representation that that's true. We did provide those documents.

Q. Do you believe that the text messages that you produced in this case, LEP 1 through 266, are

accurate copies of the text messages that you exchanged with the -- with those individuals in there?
A. I do.
Q. Let's go to LEP 184.
A. I'm there.
Q. And as you've testified to, this was a -- these are text messages that were sent by you on September 18th, 2025 -- well, after -- on that page, they begin at 10:43 p.m.
A. I see that.
Q. And the text messages we've -- the text message, rather, we've been discussing is the last one on this page. You see it there, where you say: "Goodnight. Please delete e-mails starting this week. Leave old ones," right?
A. Correct.
Q. Okay. Did you follow up with Ms. Schwope to inquire whether she did, in fact, honor your request to delete e-mails?
A. I did not. And just so that -- the e-mails that you're referring to, the word "e-mails," which you'll find that I do, is interchangeable with "texts." We were not talking about deleting e-mails. We were talking about deleting texts.
Q. Okay. Fair point.

So when you said "e-mails" here, you really meant, "Delete texts starting this week, leave old ones"?
A. Correct.
Q. Okay. Then the ones that you sent that week -- well, you didn't delete any, right?
A. I did not.
Q. Okay. So your text messages with Ms. Schwope are still contained within Exhibit 35, right?
A. Correct.
Q. And I'm not going to focus on it, but the picture you referenced is in there, right?
A. It is.
Q. Okay. And you have a conversation with Ms. Schwope around that, and just saying you -- "Hope your night is great," right?
A. I hope I'm not as great?
Q. "I hope your night is great."
A. Oh, I'm sorry.
Q. It's okay.
Then on September 17th, you send a text: "In meeting till noon. Can I call you then?"
Right?
A. Correct.

Q. And we can look at your call logs, but I believe that's in response to a phone call that you received that you didn't answer.
A. Okay.
Q. Does that sound right?
A. Plausible.
Q. Okay. Then you exchange some more communications, and you follow up with Ms. Schwope over the next couple of days into the 18th. Then let's start on LEP 183.
A. 183. Yes.
Q. So you send a text on September 18th, 2025, at 10:38 p.m. You say: "Any chance Tory buys this back?"
Right?
A. Correct.
Q. And you're talking about the DCA entities?
A. I don't know we specifically were talking about the DCA entities. I meant is he going to buy anything back.
Q. All or part of?
A. Yeah. Right, all or part of. Correct.
Q. She says she doesn't think so anymore, and that he's finally facing reality.
Do you see that?

A. I do.
Q. And then you ask: "How does he materialize Valley Farms, or impossible?"
Right?
A. Correct.
Q. What did you mean by that?
A. I know he had an ownership interest in Valley Hill, and I had no idea what he was doing with Valley Hill. I was completely out of the picture as of 9/11. I didn't know if he had -- was continuing to operate it, or if he was doing nothing.
So I was like, "What's going on with Valley Hill?"
Q. Why did you think it would be impossible for him to materialize anything from Valley Hill?
A. I didn't know what was on Valley Hill to materialize. I don't know the condition of Valley Hill.
Q. What did Valley Hill own?
A. I don't know.
Q. What did Valley Hill do?
A. I don't know.
Q. Do you not know sitting here today, or did you ever know?
A. I knew it was in the tree business. But if

you ask me what it did, I, honest to God, don't know if it was selling cocktail trees or selling palm trees. I had no clue.

Q. You knew that it was an entity that you originally planned to file bankruptcy on behalf of, right?

A. We originally thought that, due to the audited financial statements that Valley Hill had borrowed $1.4 million from Frontier, and that we were prepared to file a bankruptcy due to that audited financial statement that was reviewed by a CPA, that that was an obligation of Valley Hill.

Q. And so you knew that it would be, in the parlance of this, a nondebtor affiliate.

Would you agree with me to that?

A. It was a nondebtor. The word "affiliate" has so -- such meaning. I don't know that it was affiliated. It was commonly owned. So if that makes it affiliated in your book, then, yes.

Q. Would it make it affiliated in your book?

A. Not -- affiliated with Tory Schwope. I don't know if I would say it's affiliated with DCA, because DCA had no ownership interest in Valley Hill. Tory Schwope had an ownership interest in Valley Hill and in DCA.

Q. Okay. Then Ms. Schwope responds: "I don't think he does. I think he loses Valley Hill to Frontier unless he can make a deal," right?
A. Correct.
Q. Then you said: "Brent gives us a list of leases to reject tomorrow. I'm sure most insider leases are rejected," right?
A. Correct. Scott Moore is handling this on behalf of Lewis Rice.
Q. And you were under the assumption that there was an insider lease that involved Valley Hill Tree Farms?
A. Oh, I don't think that's what that says, no.
Q. You don't think so?
A. No.
Q. Okay. Did you -- you became aware later that there might be, right?
A. I became aware later that there was an unsigned lease in the data room between Valley Hill and DCA Kentucky.
Q. And that would be an insider lease?
A. Correct.
Q. And you weren't aware of that on September 18th. Is that what you're saying?

A. Let's be careful. The definition of "insider" in the bankruptcy world is very complex. To the extent that Tory Schwope had an ownership interest in Valley Hill and an open interest in DCA, that could mean that they were an insider lease, correct.
Q. Because Tory Schwope was an insider?
A. Correct. But Valley Hill was not an insider of DCA.
Q. That text was sent at 10:40.
A. Correct.
Q. And I'm going to jump ahead a little bit. At 10:44, you say: "Can he sell inventory quickly off Valley Hill? If so, he needs to."
A. Correct.
Q. Why were you asking that?
A. I don't know.
Q. I mean, you knew that the property that may be owned by Valley Hill was the subject of a potential claim of the debtors, right?
A. Not on this date, no.
Q. When did you learn that?
A. Would have been mid October. At -- I'm not sure on the date, but I would say mid October.
Q. Then you send another text a minute later at 10:45 p.m.: "He needs to concentrate on

liquidating assets and protecting them."
Do you see that?
A. I do.
Q. Then you follow up 30 seconds later: "Needs to start with Valley Hill quickly, quickly, quickly," right?
A. That's what it says.
Q. Why did you believe he needed to move quickly?
A. Tory Schwope had called me the morning of September 18th. And in that phone conversation, I told him again that he needed to retain counsel. And he said, "Larry, they're going to require a retainer." And I said, "Probably a hundred-thousand-dollar retainer."
And so I was telling Samantha he needs to move quickly.
Q. And you intended for Samantha to tell Tory that, right?
A. That's what it says.
Q. You intended for Samantha to tell -- get to relay Tory -- I'll start over.
You intended for Samantha to relay this information to Tory, right?
A. That's what it says. I don't disagree with

that comment.
Q. Okay. Part of what you're talking about here is protecting assets, and Ms. Schwope responds: "How does protect them? Put them in a trust?" And you respond: "In his wife's name," right?
A. Correct.
Q. So you're proposing that assets that he sells from Valley Hill, he puts in his wife's name?
A. No.
Q. "No"?
A. No.
Q. Did you follow up with Ms. Schwope as to whether or not she had conversation about Mr. Schwope regarding the things that you were outlining here?
A. We did not.
Q. She told you she was going to tell him that, right?
A. She told me -- I think she put it in a text message.
Q. Yeah, and we can go back to it. It's on 184.
A. Yeah.
Q. She says: "I'll tell him"?
A. Yeah.
Q. We were just discussing texts that were

sent in the time frame of 10:44 to 10:47 p.m. on September 18th.
If you'll flip back with me to LEP 182, just one page earlier.
A. Yes.
Q. You sent a text. It's at the top right on September 18th, same night, 10:32 p.m.
Do you see that there?
MR. MOOTHART: What page?
A. Yes, I do.
Q. (By Mr. Cole) 182.
A. I do. The first blue ribbon?
Q. Where you say: "I truly care about your family"?
A. Yep. Mm-hmm.
Q. The second sentence of that is: "Please delete my texts from this week," right?
A. Correct.
Q. So you, at 10:32, had requested Samantha Schwope to delete your texts, right?
A. I led with that, correct.
Q. Okay. Then after that conversation -- after that request, you have conversations about Tory Schwope materializing his interest in Valley Hill Farms, right?

A. Mm-hmm.
Q. And then, after having those conversations, you again ask Ms. Schwope to delete e-mails starting this week, which you say means delete texts, right?
A. Correct.
Q. So you were asking Ms. Schwope to delete your text messages where you are giving her advice on what to tell Tory Schwope to do with the inventory at Valley Hill, right?
A. I disagree with that. I was asking her, at 10:32, to delete my texts from previously, which were all personal and locker room fodder.
Q. And I don't disagree with you. At 10:32, you sent that text that appears on LEP 182. That is -- let's call it ten texts after you sent the e-mail -- or I'm sorry -- the picture that you referenced earlier, right?
A. Correct.
Q. And then after asking Ms. Schwope to delete those texts from this week, that's when you started conversation regarding Tory's interests in Valley Hill, right?
A. That's what's here.
Q. And then after completing that conversation regarding Valley Hill, you repeat your request to

delete your text messages?
A. From the previous week, correct.
Q. Which would include the text messages you just sent?
A. It was not meant to be.
Q. Oh. But you didn't say that.
A. Okay.
Q. You said: "Please delete all e-mails starting this week. Leave old ones." That would include the ones that you had just sent within the ten minutes prior, right?
A. That would mean that at 10:32, I knew what we were going to text each other during that day. So it was never the intent for her to delete going-forward messages. It was merely to delete the personal text messages and locker room fodder that I had given the week before.
Q. I'm not disputing that you're -- that this doesn't say, "Delete things going forward." It's, "Delete the ones I've sent to you."
You'd agree with that, right?
A. From the previous week, correct.
Q. On September 18th, when you're having this text message exchange with Ms. Schwope, you know that Mr. Schwope had been fired from DCA, right?

A. Yes, I had been informed of that the day before.
Q. Turn with me to LEP 188.
A. 188?
Q. Yes, sir.
A. I'm there.
Q. There is a picture that's sent at the bottom right --
A. Correct.
Q. -- of that page. This is, again, text message exchanges between you and Samantha Schwope.
What is that picture of?
A. 2025. I'm wishing her a happy new year.
Q. Oh, I'm sorry. Right below there.
A. Oh, I'm sorry. Used to be I could see stuff.
Oh, that's the memorandum from me to Samantha -- or really, to myself. We had been requested by the Unsecured Creditors Committee to produce text messages and phone records from various parties. I did not have landlines for any of the DCA people. I was under the impression that they had landlines, that I had never used them.
And from this message to her, I learned that DCA did not have landlines, that all they used

were cell phones. And I thought that the cell phones from DCA -- I mean, that they used were owned by DCA. So I was just verifying to try to get the complete list of phone numbers that we needed to search for the request of the Unsecured Creditors Committee.

Q. Was Ms. Schwope, at this time in February of 2026, still employed by the debtors?

A. I don't know the answer to that. I don't believe so. I didn't know who else to reach out to.

And if you see the next page on 189, it says: "Any way you can fill in these blanks and send back to me?" So I was asking her if she had these other phone numbers that we could search.

And she asked: "What in the world is that?"

Q. The text messages that are contained within LEP 1 through 266, did you ever put any of those text messages into the Lewis Rice client file?

A. The word "ever" is a big word. Lewis Rice -- the Unsecured Creditors Committee asked for our texts. I produced the texts, and it would have gone into the Lewis Rice file at that time.

Q. Okay. And would it have gone into the Lewis Rice file because they were communications with a client?

A. No. They would have gone into the file because the Unsecured Creditors Committee asked for the texts of the individual attorneys.
Q. The request that you sent to Ms. Schwope that we were discussing, and I think you still have in front of you, was that for text messages?
A. It was for all, because they asked for phone calls and phone records. So it was any phone numbers -- these were the parties that I knew I dealt with, and I went through my records to try to find as many phone numbers as I could. And I knew there were still some blanks, as you can see the blanks in there.
So I sent it to her, hoping that she would have the ability to fill them in.
Q. Did you collect text messages in response to that request?
A. Did I collect text messages? No. I was merely trying to identify the numbers that we needed to search.
Q. Okay. And at that point in time, Lewis Rice was no longer counsel for the debtors, right?
A. That's correct. I think it's February of -- this was sent in -- February 17th of 2026.
Q. So where -- so you didn't, at that point, have access to the debtors' files, right?

A. Access to the debtors' files? I don't know that I ever had access to the debtors' files.
Q. So what were you searching to find with those phone numbers?
A. The ones that I put on here?
Q. Yes, sir.
A. I would have done e-mail searches from Lewis Rice. I would have done text searches, phone record searches from my personal phone.
Q. Okay. Did you look for texts on your personal phone?
A. I didn't -- I was just trying to gather phone numbers.
Q. The text messages that you have in front of you, on the bottom, they have some dates. In very small print it says: "Database date when extracted, July 12th of 2026."
Do you see that?
A. I do.
Q. Did you -- or were text messages collected from your phone related to the DCA Outdoor case before that date?
A. I don't believe so.
Q. And I'm just trying to connect the dots here, because I believe -- and correct me if I'm

wrong, but I believe you said earlier that part of what you were doing in reaching out to Ms. Schwope to get those numbers is to identify the phone numbers so that you could go and identify, in part, text messages -- text message exchanges with those phone numbers.

Did I hear that right?

A. I don't know if it was text messages or phone calls. But we had been asked to produce records that required me to have phone numbers, and I thought it odd that I didn't have land numbers for the DCA people. So I was hoping that Samantha could give me those numbers.

And there were some that I didn't have text -- I mean, cell phones for, and I was hoping that she could give me those as well.

Q. And I'm going to set aside the collection of text messages that were done in -- July 12th. So I'm going to ask before that day, okay?

Before that day, had Lewis Rice collected any text messages involving individuals affiliated with DCA Outdoor?

MR. RUSKAMP: Object to form.

You may answer.

A. I don't know what Lewis Rice did, so it's

hard for me to answer. I don't believe so.
Q. (By Mr. Cole) Okay. Do you have a recollection of Lewis Rice -- of any collections of text messages before July of 2025?
A. Not from me personally.
Q. Who else on your team would have been responsible for collecting text messages, if they would have been collected?
A. You used the word "responsible." I don't -- there's -- any attorney who had phone calls or text messages on their personal phone was responsible for themselves. That's their property, and Lewis Rice would have asked them to produce their property.
Q. Turn with me, if you will, to LEP 244.
A. Yes, sir.
Q. These are text messages between you and Tory Schwope, right?
A. That's what it says at the top of the page. That's correct.
Q. There's a text message on September 17th at 10:40 a.m.
Do you see that?
A. I do.
Q. You tell Mr. Schwope: "Quit using your DCA

e-mail. They are watching it. Let's talk later. But you need a personal attorney," right?
A. About the 3,000th time I told Tory he needs a personal attorney.
Q. How many times before that had you told him to stop using his DCA e-mail?
A. I didn't.
Q. Was this the only time you told him to stop using his DCA e-mail?
A. Correct. He had just sent me the termination e-mail in which he used the DCA e-mail.
Q. Then he responds to you. He provides his Gmail address and asks if you can talk in the morning, right?
A. I see that.
Q. Okay. On the next page, which is text messages occurring on September 19th, 2025, Mr. Schwope tells you: "I've decided to let go and move on. Thanks for all your help and support."
Do you see that?
A. I do.
Q. And you ask him: "So you won't be a buyer?"
Right?
A. Correct.

Q. On September 20th, you send Mr. Schwope a text. You say: "You see we filed the lease rejection motion yesterday," right?
A. I do.
Q. You say: "I know he rejected the X Farm. Not sure on others," right?
A. Correct.
Q. What was X Farm?
A. X Farm was a parcel of land that was attached to his personal residence that he leased -- that DCA leased from Tory and his wife.
Q. Okay. So -- and that was a lease that was rejected by DCA?
A. I don't know that, but I'm assuming that that's the case.
Q. Well, you say it was, right?
A. As I sit here right now, I know he filed to reject it. I did not follow up to determine if, in fact, it was rejected.
Q. And we've already established this, but Mr. Schwope was terminated by DCA three days prior to you sending that text, right?
A. That is correct.
Q. Your texts with Mr. Schwope continue through the end of that -- of the text messages that

you produced, LEP 266.
And if you want to confirm that, you can.
A. That's fine.
Q. Okay. Fair to say that all of the text messages you send Mr. Schwope, starting at 244 through 266, were sent to Mr. Schwope after he was terminated by DCA?
A. Anytime one of them is dated after September 17th, that is correct.
Q. If you'll turn with me to LEP 252.
A. 252. I'm there.
Q. And if you want to look prior to this, I'm not going to ask you about these individual screenshots that are sent. If you look on the pages before them, they're screenshots that Mr. Schwope sends you. They're very hard to read in this version.
Are you familiar with those screenshots?
A. Generically, yes.
Q. I'm not going to ask you specifically about any of them. But generally speaking, do you understand that that's Mr. Schwope forwarding you communications he had with an attorney he was trying to retain?
A. I don't know the status of the retention, but an attorney he was talking to.

Q. Then back to 252. Under another screenshot, Mr. Schwope asks you: "Thoughts?" You say that you'll review shortly. Then you respond a little over 30 minutes later saying: "That's unfortunate. Valley Hill has problems, and you need counsel to navigate around them."
What problems were you referencing?
A. Whatever Victor was identifying for Tory, he needed to address those.
Q. Is it your recollection that those problems related to a conflict of interest between Tory Schwope and the debtors?
MR. RUSKAMP: Object to form.
A. I didn't look at it that way.
Q. (By Mr. Cole) Then on 253, almost 20 minutes later, in a text you send at 2:52 a.m., you say: "No, there has not been a claim yet."
Is that in response to Mr. Schwope's question about whether he should reach out to his insurance company?
A. It appears that way, yes.
Q. Then you repeat at the end of that text: "You need counsel to get through the Valley Hill mess," right?
A. Correct.

Q. Do you know what you meant by "the Valley Hill mess"?
A. Well, all I know is what was laid out in the Victor texts. I had no independent knowledge of what was going on at Valley Hill or DCA at that time. But those texts made it clear that he needed counsel, and I told him for the 4,000th time that he needs them.
Q. Do you recall, at that time, disagreeing with any of the assessments that were made by Victor?
A. I really didn't study them to know to disagree with them. I was out of the case, so I was not following what DCA was doing or what Valley Hill was doing. I was seeing the pleadings come through, and I would read them generically. But I was not involved in the case.
Q. Okay. You text Mr. Schwope at the bottom of 255, and this is on October 28th, 2025, 9:53 p.m. You say: "What's Valley Hill doing?"
Do you see that?
A. At the very bottom, I do.
Q. Okay. Then Mr. Schwope responds on the next page: "I let all the people go last week. I was down there. The place looked great. It was tough."
Do you see that?

A. I do.
Q. Then you ask: "What's the plan?" And Mr. Schwope responds: "Brent demanded today that I surrender it to DCA," right?
A. Correct.
Q. And you respond and you say: "Fuck that. No way. Make him sue," right?
A. Correct.
Q. At this point on October 28th, 2025, Lewis Rice is still counsel to the debtors, right?
A. We are of record. That is correct.
MR. COLE: Can we take a quick break?
MR. MOOTHART: Absolutely.
THE WITNESS: Gladly.
MR. MOOTHART: I was just going to ask for one.
THE VIDEOGRAPHER: Going off the record at 1:42 p.m.
(Recess.)
THE VIDEOGRAPHER: We're back on the record at 1:56 p.m.
MR. COLE: Thank you for your time, Mr. Parres. I have no further questions right now.
THE WITNESS: Thank you.
EXAMINATION

BY MS. BUTER:
Q. Good afternoon, Mr. Parres.
A. Hey, Vickie. How are you?
Q. I'm doing well. I have some questions for you on behalf of Frontier. I'm going to do my best not to be repetitive of everything that Mr. Cole already asked you. Can't promise, but I'll do my best.
A. Thank you.
Q. Before we get into some substance, I have a couple of questions about what you did to prepare for your deposition today.
A. Sure.
Q. You probably talked with your lawyer, Mr. Moothart?
A. I did.
Q. Did you talk with any counsel for Lewis Rice?
A. We had a meeting last Friday to prepare John Hall for the 30(b)(6) deposition in which Mr. Hall, Todd, and Bruce were present.
Q. Okay.
A. And myself.
Q. Okay. You're aware that Mr. Hall was deposed last week?

A. I was told that.
Q. Okay. Have you reviewed his transcript?
A. I did.
Q. Okay. Have you reviewed the transcripts of Mr. Moore?
A. I did.
Q. And the transcript of Mr. Drapekin?
A. I did.
Q. Did you talk with any attorneys from Lewis Rice, except for your conversation with Mr. Hall, in preparation for your deposition?
A. I have not.
Q. Have you -- I know you indicated that your text messages showed when you talked with Mr. Tory Schwope last. Since those text messages were collected in July of 2026, have you communicated with Mr. Schwope via text since then?
A. No, I have not.
Q. Did you meet Mr. Schwope in person in Kansas City for this trip?
A. For this trip?
Q. Yes.
A. No.
Q. Did you know he was planning to attend today's deposition?

A. I had no idea.
Q. Okay. Did you review some documents to prepare for your deposition?
A. I reviewed my text messages and pleadings that I was able to get off of PACER.
Q. In connection with your resignation from Lewis Rice, I believe you testified, when Mr. Cole asked you some questions, that you were not provided a reason why they were asking you to resign; is that correct?
A. That's correct.
Q. Do you have any knowledge or understanding as to whether -- you read Mr. Hall's testimony, correct?
A. I did.
Q. And did you see that in Mr. Hall's deposition -- 30(b)(6) deposition, he indicated that there were certain text messages that did not meet Lewis Rice standards?
A. I read that.
Q. Had you -- have you any reason to disagree that that is the reason for the request to resign?
A. They did not communicate that to me, but we all assume that that was the case. And I'm pretty sure John was assuming that as well.

Q. When you were at Lewis Rice, were you chair of the bankruptcy practice?
A. I was co-chair.
Q. Co-chair. And that was with Mr. Hall; is that correct?
A. That is correct.
Q. How long had you been co-chair of the bankruptcy practice at Lewis Rice?
A. Oh, boy. I don't recall.
Q. Long time?
A. I don't recall.
Q. How long have you practiced in the bankruptcy and insolvency area?
A. 38 years.
Q. Is that almost your entire career?
A. It is my entire career.
Q. You were asked some questions by Mr. Cole about the size of this case in comparison to other bankruptcy cases in which you've been involved.
A. Correct.
Q. I have a couple of follow-ups on that.
More specifically, was the DCA Outdoor case one of the largest cases that you've been involved in as debtors' counsel specifically?
A. It was one of the top three. We had two

large cases in St. Louis that were a hundred million and 130 million.

Q. Are you able to disclose the names of those other two?

MR. MOOTHART: Is it public?

Q. (By Ms. Buter) It should be public if you were counsel of record for debtors.

MR. MOOTHART: Yeah. If they're not public, I would say no. But if it's public...

A. LOS is what we called it, which is a case in Eastern District of Missouri. And -- just slipped my mind. When it comes back to me, I'll give it to you.

Q. (By Ms. Buter) Okay.

A. I apologize.

Q. I want to talk a little bit about -- going back to the retention of Lewis Rice --

A. Yes, ma'am.

Q. -- in this case. And I think we looked at an engagement letter that was in connection with this bankruptcy engagement dated, I believe, February 5th of 2025; is that correct?

A. I recall that.

Q. Have you seen any other engagement letter between Lewis Rice and any of the debtor entities?

A. And the debtor entities, any other engagement letters? I did see the -- in the last two weeks, I was provided a copy of a engagement letter from the Kansas City office that involved some of the debtor entities.
Q. Okay. I think that should be Exhibit 44 in the binder you have in front of you.
A. Yes, ma'am. I have that.
Q. If you can turn there.
Exhibit 44, is this the letter that you're referring to?
A. It is.
Q. And that was an engagement letter sent out by Mr. Louis Wade, correct?
A. I don't know that, but we can assume that.
Q. Okay. And it's dated December 16th, 2024, correct?
A. That document is dated December 16th, 2024.
Q. And if you look at the first page, it's addressed to Tory Schwope at DCA Outdoor, correct?
A. Outdoor, Inc., correct.
Q. And it says: "Dear Tory, thank you for selecting Lewis Rice to represent," and in the first line says, "Tory Levi Schwope, individually."
Do you see that?

A. I do.
Q. And then it says: "And the following entities." And there's a list of entities, correct?
A. I see that.
Q. And at the very end of that first page of Exhibit 44, there's a reference to Valley Hill Tree Farms.
Do you see that?
A. I do.
Q. If you could turn with me to the second-to-last page of Exhibit 44. It's going to be the signature page.
A. I see that.
Q. It is signed by Tory Schwope, president of DCA Outdoor, Inc., and Utopian Trees, Inc.; is that correct?
A. It is.
Q. And then it is signed by Tory Schwope, sole manager of several entities, correct?
A. I see that.
Q. The last one of those several entities being Valley Hill Tree Farms, correct?
A. It is.
Q. And then it's also signed: "Tory Schwope -- Tory Levi Schwope, an individual," correct?

A. It is.
Q. So at least as of December 16th of 2024, it appears that Tory Schwope was a client of Lewis Rice in connection with this particular engagement?
A. You said 16th. It says December 19th. But if they're the same date, then that's correct.
Q. That's a good distinction. The letter is dated December 16th. It appears the signature is December 19th, 2024.
A. Okay. Somewhere around that date.
Q. Okay. And are you personally aware of any termination letter that was sent from Lewis Rice to Tory Schwope, individually, terminating Lewis Rice's representation of Tory Schwope as an individual?
A. I am not aware of any such document.
Q. In connection with representing debtors and bankruptcy, a law firm is required to file an application to be retained that has to be approved by the Court, correct?
A. Correct.
Q. And in this instance, it's my understanding that you prepared both the retention motion and submitted an affidavit in connection with Lewis Rice's retention in this case?
A. I would have been the primary party

drafting that. It would have been reviewed by others. But, yes.
Q. And I will direct your attention to Exhibits 42 and 43 in the binder that you have in front of you that were previously marked.
A. Yes.
MR. MOOTHART: Which one first?
MS. BUTER: I'm going to probably ask about both of them a little bit together.
Q. (By Ms. Buter) And I have -- have you had an opportunity to review these recently at all?
A. I have not.
Q. Okay. Do you have any knowledge, sitting here today, whether either of these documents, the motion or the affidavit, disclose to the Court that Tory Schwope had been a client of Lewis Rice?
A. I don't know.
Q. Fair to say, if that's not in there, it's not in there?
A. Absolutely correct.
Q. Same question for Valley Hill. Do you have any knowledge, sitting here today, or recollection as to whether Valley Hill was disclosed to the Court as an entity that Lewis Rice previously represented?
A. I do not believe that it was.

Q. And you understand the general bankruptcy rules regarding the requirement that a law firm who is retained by the debtors must be disinterested, correct?
A. Correct.
Q. And in connection with a Rule 2014 disclosure, based on your familiarity with the rule, is it fair to say it utilizes the word "connection" to determine if a person or party may be disinterested?
MR. RUSKAMP: Object to form.
You may answer.
A. I haven't memorized 2014 to 2016, but sounds logical.
Q. (By Ms. Buter) Would you agree that a -- Tory Schwope, in this instance, would have a connection with the debtor entities that you represented?
MR. RUSKAMP: Object to form.
You can answer.
A. I don't know that I would agree or disagree. He was the owner of those entities.
Q. (By Ms. Buter) Which makes him connected, in everyday parlance at least, to the entities?
MR. RUSKAMP: Object to form. It's argumentative.

You may answer.
A. I'm not going to disagree with what you're saying. He was the owner of these entities.
Q. (By Ms. Buter) And do you have any thoughts, sitting here today, as to whether Lewis Rice's representation of Tory Schwope, beginning on or around December 19th of 2024, means that the firm had a prior connection with Mr. Schwope and the debtor entities?
MR. RUSKAMP: Object to form.
You may answer.
A. When you use the word "connection," I, again, don't know exactly what you're referring to. But it is obvious from the document that you've shown me, and that I've seen for the first time two weeks ago, that Lewis Rice had an engagement letter signed by Tory Schwope individually.
Q. (By Ms. Buter) You had also mentioned, in response to some questions from Mr. Cole, that prior to retaining Lewis Rice for these -- for the bankruptcy proceedings, that the debtor entities had used another law firm -- or had been working with another law firm.
A. I recall that.
Q. Do you know if that happened to be

Fredrikson and Byron?
A. I do not.
Q. Are you aware that the debtors have a requirement to disclose to the Court any kind of payment that might have been made to a prior law firm within the last year of filing for bankruptcy?
A. Of course.
Q. And do you know whether, in this case, any payments to this prior law firm were disclosed in the schedules or other documents that were filed with the Court?
A. As I understand, the prior law firm was appointed by Steeplechase. And I don't know anything to do with who or how or why they were paid.
Q. Is that something that you looked into prior to submitting schedules to the Court on behalf of the debtors?
A. I would have relied upon Scott Moore to do schedules on -- on his part.
Q. Do you have any knowledge, sitting here today, whether a $25,000 retainer was paid to that prior law firm?
A. I have no idea -- knowledge.
Q. In this -- connection with your retention by the debtor entities in this case, did you receive a

retainer?
A. We did.
Q. How much of a retainer did you receive?
A. I believe $200,000.
Q. Do you recall when that was received, approximately?
A. I don't.
Q. If I said around February 11th, February 12th, does that sound about right to you, 2025?
A. It would have been early/mid-February. That makes sense.
Q. At the time Lewis Rice obtained the $200,000 retainer, had you personally reviewed the loan documents between Frontier and the various debtor entities?
A. We have asked for those from Frontier, and we have not received them yet. I don't believe we -- Lewis Rice received those loan documents until closer to the petition date.
Q. Did you ask for the loan documents from Mr. Schwope?
A. I'm sure we did.
Q. And you don't think you had them before the retainer was received?
A. I don't know.

Q. Do you know whether Mr. Wade, in his capacity as representing certain debtor entities in December of 2024, had those loan documents?
A. I don't know, but I don't think so.
Q. Do you have any understanding as to where the $200,000 came from that was sent to Lewis Rice as the retainer?
A. I think it came from KAT.
Q. I think that's right. An account in the name of KAT Outdoor?
A. Okay.
Q. And had you -- you or, if you know, anyone else at Lewis Rice conducted any investigation as to the source of that $200,000 retainer prior to receiving it?
A. I don't know.
Q. Did you personally conduct any investigation as to the source of those funds?
A. I did not.
Q. Have you ever -- you personally ever conducted an investigation as to the source of those retainer funds?
A. In what instance?
Q. Any instance. Have you conducted any investigation at any time as to the source of those

funds?
A. In the DCA case?
Q. Yes.
A. I personally did not.
Q. Did you direct anyone else at Lewis Rice to conduct that investigation?
A. I did not direct anyone at Lewis Rice to do that.
Q. Did you ask anyone other than somebody at Lewis Rice to conduct an investigation as to the source of those funds?
A. I don't believe so, but -- I don't recall. I don't know.
Q. Did you know that at the time the retainer was sent by -- it was KAT Outdoor in this particular instance -- did you know whether Frontier held a first priority lien on the receivable and proceeds of the debtors?
A. I don't know that I knew, but I assumed.
Q. Did you know, at the time that you received the retainer, that the debtors were in default under the loan documents from Frontier?
A. I don't know that I knew, but I assume, because there was discussions regarding a forbearance agreement.

Q. Do you know whether a forbearance agreement was ever entered into between the debtors and Frontier?
A. I believe so.
Q. And do you know whether -- at some point prior to February 20th of 2025, whether Frontier had essentially terminated that forbearance agreement?
A. I don't know. I would assume.
Q. You indicated that, at some point, you had asked for loan documents from Frontier. Is it your testimony that you asked for loan documents from Frontier before the retainer was paid on or around February 12th of 2025?
A. I don't recall the exact date, nor would I be able to tell you that that was a request from me or someone else at Lewis Rice.
Q. Would it be safe to say that was a request that likely went to Ms. Peters at Kutak Rock?
A. I wouldn't know.
Q. I'm going to ask you to turn to what was previously marked as Exhibit 51.
A. In the binder?
Q. In the binder, yes, in front of you.
Exhibit 51, I will just represent to you, is an e-mail chain dated February 19th and February

20th of 2025, if you look at the entire four pages.
And I'm happy to give you a moment to look at that, if you would like.
A. Okay.
Q. Okay. I'm going to direct you to the second page of Exhibit 51. There is an e-mail from John Hall to Mike Scott and you CCing Tory Schwope, Samantha Schwope, and Jessica DeGregorio dated February 19th.
Do you see that?
A. Is that the second one or the first one? Because I don't see Tory on there.
It's the second one. Okay.
Q. It's the second one.
And in that e-mail, Mr. Hall notes, and it's about -- right in the middle of that paragraph: "And they state that they believe proceeds of collateral are being impermissibly diverted."
Do you see that?
A. I do.
Q. And then you say: "They provide no evidence or support for their claims" -- or Mr. Hall says that, correct?
A. Correct.
Q. And if you scroll -- if you go back up to

the top of that page, the second page of Exhibit 51, I believe Mr. Schwope writes: "John, they are claiming that we are collecting the A/R and using it to pay employees. They referenced this in a meeting with Mike today."

Do you see that?

A. I do.

Q. Okay. And then if you go to the first page of Exhibit 51, there is a response from John Hall to Tory's e-mail, and then there's a response from Ms. Schwope, the very first e-mail on the first page.

Do you see that?

A. Correct.

Q. And Ms. Schwope indicates: "They still will have no way to prove this is happening. They will see ADP attempt to draw from the line tomorrow, and they will reject it. So as far as they are aware, payroll will bounce."

Do you see that?

A. I do.

Q. You received this e-mail when Ms. Schwope sent it on February 20th of '25, correct?

A. There or about.

Q. There or about?

A. I don't recall exactly.

Q. Do you recall doing any follow-up to Ms. Schwope's comment that: "They still will have no way to prove this is happening"?
A. I do not.
Q. Do you, sitting here today, remember any discussions about payroll and how payroll was being paid on or around February 20th of 2025?
A. I don't recall.
Q. Did you have any concerns, when you read Ms. Schwope's e-mail, that there was something occurring that perhaps should not have been occurring with regard to the use of funds?
A. I don't know what the complaint was by Frontier, so I don't know that I can weigh in on what was occurring and what wasn't occurring.
Q. Did you remember if you ever personally followed up with Frontier to ask about their particular concerns with regard to the diversion of collateral?
A. I don't recall.
Q. You were asked some questions about Valley Hill Tree Farms by Mr. Cole.
Do you recall those questions?
A. I do.
Q. And in connection with Valley -- Valley

Hill Tree Farms, Mr. Cole had asked you some questions about what investigation you did with regard to Valley Hill.

Do you recall that?

A. I do.

Q. And I think your response was, "We didn't really do much because it was not a debtor entity," and you didn't want to incur fees for a nondebtor entity; is that right?

A. We were told by Frontier not to spend any time or money on Valley Hill.

Q. Did you conduct any investigation on behalf of the debtor entities as to whether the debtor entities might have claims against Valley Hill?

A. We did not. Not as to debtors. We believed and had discussions with the Unsecured Creditors Committee that they would be doing that. We did not, on our own, do it because we were prohibited to do that under the cash collateral agreements.

Q. And why were you prohibited from doing that under the cash collateral agreements?

A. We were under prohibition to spend any money for or against Valley Hill.

Q. Valley Hill or Frontier?

A. Both. We weren't supposed to spend any

money working on Valley Hill, and we weren't supposed to spend any money challenging Frontier.

Q. So if you were -- as part of the role, I assume, as debtors counsel, you look at potential avenues and sources of funds that a debtor may have; is that fair?

A. Eventually, you get there. Correct.

Q. Okay. And one of those areas of inquiry may be whether there are potential claims or potential assets outside of the bankruptcy estates that ultimately belong to the bankruptcy estate; is that fair?

A. That's fair.

Q. Was that analysis ever done -- not on behalf of Valley Hill, but on behalf of the debtors you represented -- to see whether there were any assets at Valley Hill that might benefit the debtors' estate?

A. No. We were always under the impression that we were leaving that for the Unsecured Creditors Committee's counsel to review. We were not going to take that on ourselves.

Q. And when did you have a conversation with the Unsecured Creditors' counsel about them doing an investigation into claims against Valley Hill?

A. It had been early on in the case, because we were coming to the point where we needed to decide if we were going to do the UCC search to see what liens were against the assets. And Zach had just been retained, and we came to the conclusion that it didn't makes sense for Frontier to do a UCC search, the Unsecured Creditors Committee to do a UCC search, and the debtor to do it.

Because it's a fact, I mean, whatever those searches are, they are. So we were going to leave that information to Zach to challenge, and he had the ability under the budget to spend X dollars to do that.

Q. So that was a conversation with Zach Fairlie, just to confirm?

A. It would have been Zach and his partner or associate that he was working with.

Q. And at any time after that discussion that you indicated occurred, did you follow up with the Unsecured Creditors Committee to determine whether, in fact, there were potential assets or claims involving Valley Hill that might benefit the debtors' estates?

A. I don't know that we did.

Q. I think you testified earlier that you did become aware, at some point, that there was a written

lease -- oh, let me ask it this way. Would be a better way to ask this.

Do you know what entity owned the land that Valley Hill operated on?

A. I do not.

Q. Do you have a general understanding that the land that Valley Hill operated on was, in fact, owned by a debtor entity?

A. We operated under that assumption.

Q. And did you become aware, at some point, that while there was a draft lease between that debtor entity and Valley Hill to lease that ground, that that lease was actually unsigned?

A. I -- I personally did not know that. It was brought up in the August depositions.

Q. The first you learned that there was a lease that was, perhaps, unsigned between a debtor entity and Valley Hill was during the August depositions that we took?

A. I think it was brought up -- you use the word "learned." As we sit here right now, I still don't know that it's unsigned. And we used the word "draft." I don't know if it was a draft. I literally I have no information regarding the Valley Hill alleged lease.

Q. Okay. After -- well, actually, if you want to look at what I believe is Exhibit 72 in your binder.
A. Yes, ma'am.
Q. Exhibit 72 is an e-mail from Ms. Schwope dated September 1st of 2025 to you and several other people, both at Lewis Rice and Focus; is that correct?
A. Dated September 1. That's correct.
Q. Did I say that wrong?
A. I apologize.
Q. I might have.
A. My mind was ahead of you, I apologize.
Q. September 1.
And in this e-mail, Ms. Schwope indicates that she and Jessica were able to find all land co-leases.
Do you see that?
A. That's what it says.
Q. And then she says: "Some are not executed, which is unfortunate."
Do you see that?
A. I do.
Q. Okay. And then, for just size-wise, when we utilized this Exhibit during Mr. Hall's deposition, we just attached the -- what is the last attachment

reflected on the attachment lines, that is the Valley Hill triple net lease, to this.

So if you look at the second page of Exhibit 72, you will see that triple net lease between DCA Land Kentucky, LLC, and Valley Hill Tree Farms.

Do you see that?

A. Dated as October 19th, 2022.

Q. That's the one.

A. I do see it.

Q. Okay. And if you scroll to the end of this, you'll see that it is, in fact, one of those unexecuted leases that Ms. Schwope refers to, correct?

A. It is unsigned.

Q. Okay. Do you recall, when you received this e-mail on or around September 1st of 2025, whether you took any action at that time to investigate the implications of this to the debtors' estates?

A. September 1 of 2025, we were five days away from trying the motion to appoint a trustee. So I'm sure that we did not have the time, nor the debtors' executors have the time, to do anything further on this.

Q. I'm going to switch to another topic here.

A. Sure.

Q. 341 meetings.
A. 341. Okay.
Q. And what's a 341 meeting?
A. A 341 meeting is a meeting of creditors in which creditors have the opportunity to come and ask questions of the debtor.
(Stenographer clarification.)
A. It is a meeting of the creditors of the debtor that have the opportunity to come and ask questions of the debtors. And it's to provide as much information as we can to the creditors and United States Trustee's office regarding the debtors' estates.
Q. And I think you testified earlier that it's good to err on the side of disclosure; is that correct?
A. It's always better to disclose more than less, as long as it's correct.
Q. And you were involved and participated, I believe, in at least -- there was more than one 341 meeting for these debtors; is that right?
A. I believe so.
Q. And it's my understanding you were involved in one of those, but perhaps not so much in the second one.

Is that your recollection?
A. So I was beating myself up preparing for this deposition as to what my involvement was in the first and second 341. I know I didn't take the lead. I know Scott Moore would have taken the lead. According to my time records, I recorded 2.6 hours on March 14th, and I don't know if that was the entire meeting or portion of the meeting. I just don't recall my involvement in the 341 meeting.
Q. Okay. You are aware, I'm assuming from reading Mr. Hall's transcript, that during both of the 341 meetings, there was a separate -- or a text chain between certain individuals associated with the debtors, certain Lewis Rice attorneys, and certain Focus employees, correct?
A. Correct.
Q. And that text chain was ongoing, as I understand it, throughout the 341 hearing -- or hearings that were taking place?
A. I don't know that. But, okay.
Q. Okay. You were on both of those text chains, correct?
A. My phone number was on both of those text chains, correct.
Q. Okay. I'm going to hand you what we've

previously marked as Exhibit 14.
A. In this binder?
Q. In Scott Moore's deposition. It's not in that binder. It's going to be in this binder.
A. Okay. Thank you.
Q. And I think if you go to -- there's -- these are Scott Moore's text messages that he produced to us.
A. Okay.
Q. And if you go to the page that starts "text 79" in the bottom right-hand corner?
A. 7-9?
Q. Yes.
A. Okay.
Q. Okay. Starting there, there is a text chain on April 14th of 2025. The very first text that morning is: "Sam, are you on?"
Sent by you; is that correct?
A. That is my text.
Q. And your phone number is (314) 616-0252?
A. It is correct.
Q. And do you have any recollection, or do you know that this was a text chain that was established during that -- one of the 341 hearings that took place?

A. There was such a text chain, so yes.
Q. Okay. So as we scroll further down on these texts, I'm looking specifically at a text that was sent at 9:24:23 a.m. by you, where you say: "Co-borrower is farm leasing only."
Do you see that?
A. Yes.
Q. Do you have any recollection today what you were referring to there?
A. I do not.
Q. Were you providing information to the debtors who were answering questions in response to a question from either the U.S. trustee or a creditor?
A. I don't recall. Farm leasing is different than Frontier, so I don't -- I don't recall.
Q. You then send a text message at 9:25:50 and you say: "We do not want to get into specifics, if possible."
Do you see that?
A. On the farm leasing, I do.
Q. And that's what you were referring to, the farm leasing?
A. It appears that.
Q. Okay. Then at 9:30:17 a.m., you simply text: "No."

A. I see that.
Q. And was that a text, again, to the debtors with regard to a question or line of questioning that was being asked at the 341 hearing?
A. I don't know. I doubt it.
Q. Why do you say you doubt it?
A. "No" wouldn't have been specific enough to lead anyone down that path. So I have no idea.
Q. 9:30:31 a.m., right, a few seconds after you say, "No," you say: "Good job."
Do you see that?
A. I do.
Q. Okay. And then at 9:40 -- if you go to the next page, 9:44:55, you suggest a call, presumably during a break; is that correct?
A. I don't know.
Q. Okay. And it appears everybody calls in and has a call; is that right?
A. I don't know.
Q. Okay. If you continue on the second page of Exhibit 14, there is a text, it looks like, from Juanita Schwartzkopf.
A. Yes.
Q. And she says: "Larry, what about the 2004 exam request? May we address that topic?"

Do you see that?
A. I do.
Q. And you say: "We are moving to quash it."
Do you see that?
A. Correct.
Q. Do you know what is being referred to in the connection with the 2004 exam?
A. The only 2004 exam that I'm aware of at this time would have been from Edmundson, and we did move to quash that.
Q. Okay.
A. So I don't recall specifically what's going on, but that was the only 2004 exam that was out there.
Q. Okay. Then the chats move to 4/24/25.
Do you see that?
A. 4/24 -- yes.
Q. And is this the second 341 hearing that took place for the debtors in this case?
A. I -- Vickie, honestly, I don't know. But it makes sense that it was.
Q. Okay. And this one, you don't say as much on. But I will direct you to -- it's toward the end of this text chain, and it is -- let me just get you the number.

Okay. If you could scroll -- or turn to text 88 in the bottom right-hand corner.
A. Yes, ma'am.
Q. Toward the bottom of that, there is a text from you at 1:44:18 on 4/24/25.
Do you see that?
A. 1:44. That says: "No choice in matter"?
Q. It's actually two above that, on the left-hand side.
A. "Tory, you should correct your statement"?
Q. No. If you look at the left-hand texts, not the -- not the --
A. I keep thinking the green is me. I apologize.
I see that. I apologize.
Q. So you see where you say: "Don't continue unless you have to"?
A. Correct.
Q. And then you say: "Push to close."
A. Correct.
Q. Do you see that?
A. I do.
Q. And then Scott Moore responds: "No choice in matter." And you say a word, and then you say: "Put a time limit on it."

Do you see that?
A. I do.
Q. Why were you pushing to close the 341 hearing?
A. The 341 meeting is just something that needs to come to a conclusion. There's some 2004 exams if you want more information. We're going to give the United States Trustee's office whatever information they need. So we would like to have this closed so that we don't continue to have to jump on a meeting with other creditors and other parties.
Because we can deal with the United States Trustee's requests, and we want this thing brought to a conclusion so that we can move on in the case.
Q. Did you ever disclose to the United States Trustee's office that during the two 341 meetings in this case, there was -- there were side text messages going on between the debtors who were answering questions?
A. I don't know that it was asked, and I don't know that we disclosed.
Q. Is it a common practice for you, as counsel for debtors -- when you've been counsel for debtors, to have a side text chain going on while the debtors are testifying?

A. No. This is the first time that we did a 341 virtually, and I'll never let it happen again. We will show up in person.
Q. When you first got involved in the case -- oh, you can set that binder aside. I don't think we'll use that one again. When you first got involved in the case, Frontier was at least potentially seeking to appoint a receiver in the case; is that correct -- or appoint a receiver, I should say?
A. I don't believe that that's correct, but --
Q. Okay.
A. -- we moved to that point.
Q. Okay. So at some point prior to the bankruptcy filing, you became aware that Frontier was considering appointing a receiver for the debtor entities?
A. That is correct.
Q. Okay. That is something that was opposed by the debtor entities; is that correct?
A. That is correct.
Q. Do you know or do you recall whether the debtor entities informed you that the receiver was something they opposed, or whether that was advice that you provided to them?
A. Lawyers don't provide that type of advice.

We explain what's going on and listen to the client tell us how they wish to proceed.
Q. In this instance, who of the debtors did you talk with about whether appointing a receiver would be a way -- would be or would not be a way forward for the debtors?
A. As everyone was aware, Tory was the decision-maker for the debtor entities.
Q. And did Tory Schwope want to appoint -- or have a receiver appointed over his entities?
A. No.
Q. He was pretty adamant against it; is that fair?
A. Correct.
Q. And ultimately, the debtors ended up filing for Chapter 11 bankruptcy, as we know, to avoid having a receiver appointed, correct?
MR. RUSKAMP: Object to form.
You may answer.
A. Ultimately, the DCA companies filed bankruptcy due to the threat that Frontier was moving for an emergency motion to appoint a receiver.
Q. (By Ms. Buter) During the discussions that you had had with Frontier, were you aware that, as part of the filing for bankruptcy, Frontier --

A. Excuse me.
Q. -- that Frontier was going to require that a CRO be put in place?
A. Can you ask that question again? I apologize.
Q. Yeah, that was probably badly worded.
Were you aware that in connection with the bankruptcy filings, Frontier was requesting that a CRO be put in place?
MR. RUSKAMP: Object to form.
A. We were aware that Frontier wanted Tory out of decision-making ability. I don't know that we got to the point where they wanted a CRO to that. But we were well aware that Frontier wanted to replace Tory as decision-maker for the DCA entities.
(Exhibit 103 was marked for identification.)
Q. (By Ms. Buter) Going to hand you what I've marked as Exhibit 103. Exhibit 103, just for the record, starting on the second page is an e-mail chain between Simeon Brown, Mr. Hall, and you, with Steve Drapekin CC'd dated February 18th of 2025.
Have you seen this e-mail before?
A. I'm on it, so I'm sure I have.
Q. Okay. In the e-mail dated February 18th of 2025, Mr. Brown -- that's an associate at Lewis Rice;

is that correct?
A. That is correct.
Q. He sets forth some comments to you and Mr. Hall about a revised term sheet.
Do you see that?
A. I see the reference, yes.
Q. Okay. And there are -- then there's a response from you where you say: "Answers in caps below."
Do you see that?
A. I do.
Q. Okay. And if you look down at Point 6, which is the bottom of that long e-mail --
A. I do.
Q. Do you see that?
-- Mr. Brown writes: "References to the 363 sale were largely removed where applicable."
Do you see that?
A. I do.
Q. Had Frontier requested of the debtors that they consider a 363 sale prior to -- prior to the filing of bankruptcy?
A. I don't recall.
Q. Okay. You then -- Mr. Brown then writes: "Regarding the budget and the CRO requirements, we do

often see these mechanisms in DIP facilities. Noting that," he says, "we address them as follows." And then he has Point A and Point B.
Do you see that?
A. Mm-hmm.
Q. And in Point B, Mr. Brown writes: "We removed the concept of the CRO. They likely will push back on that, and may need to find a common ground there."
Do you see that?
A. I do.
Q. And then you respond in all caps. That's your response, correct?
A. Correct.
Q. You say: "Deal breaker"?
A. I do.
Q. "We are not going to put a CRO in place. Not happening, so remove it completely."
Do you see that?
A. I do.
Q. What was your basis of calling the appointment of CRO a deal-breaker?
A. Well, you have to remember that Frontier was threatening to appoint a receiver. And to Frontier, the appointment of a receiver and

appointment of a full-power CRO was one and the same. We filed the bankruptcy to prevent the receiver from being -- taking place. There was no way in the world I was going to be able to talk Tory into allowing a receiver called a CRO to take over under the first cash collateral agreement.

Q. Tory did not want a CRO in place, correct?

A. He did not.

Q. Okay. He wanted to stay in control of the debtor entities?

A. That is correct.

Q. And ultimately, to kind of close the loop, when the Committee and Frontier moved for the appointment of a Chapter 11 trustee, that was also something that was opposed as well, correct?

At least initially?

MR. RUSKAMP: Object to form.

A. It kind of misstates the facts, because we had talked in August at the depositions, when we canceled the depositions for a day, as to mechanisms that we could put a third party in play. We could not come to an agreement as to what those terms were, and we didn't know that the Unsecured Creditors Committee and Frontier were conducting plan negotiations behind the back and that a plan sheet was going to be signed

on August 26th.

We did not know that, and we were during our exclusive period, so we were shocked to hear that. So we had those discussions, but we didn't realize the discussions that were going on behind our back.

Q. Okay. Ultimately, a motion for a Chapter 11 trustee was filed, and there was an opposition filed to that by the debtor entities.

You'd agree with that?

A. That is correct.

Q. Okay. And then we all know that that got resolved, and Mr. King was appointed as basically a CRO over the debtors; is that correct?

A. That is correct.

Q. Okay. Let's take a look at, in the binder that you have in front of you, Exhibit 47.

A. Mine goes from 46 to -- oh, sorry. I'm here.

Q. This is an -- Exhibit 47 is an e-mail chain -- exchange. It's dated February 14th of 2025, and it starts with an e-mail chain between you and Ms. Peters on the very last page and second-to-last-page of Exhibit 47.

Do you see that?

A. I do.

Q. And it appears that you and Ms. Peters had a call that day; is that right?
A. I'm reading it now. I apologize.
Q. Go ahead.
A. Okay.
Q. Okay. And it appears you and Ms. Peters had a telephone conversation --
A. It does.
Q. -- at some point that day?
A. Yes.
Q. Was this your first kind of reach-out or communication with counsel for Frontier in connection with this bankruptcy -- with this engagement?
A. If not the first, one of.
Q. Okay. And if you continue -- if you go back in time -- I'm sorry -- forward in time, there's a response from Ms. Peters where she indicates that she has spoken with Farm Credit and passed along the updates that you had shared with her.
And she notes that she is attaching a DIP financing term sheet that was provided to Steeplechase on behalf of the borrowers on January 25th of 2025.
Do you see that?
A. I do.
Q. Okay. You then -- if you go to the first

page of Exhibit 47, you then forward that to Mr. Tory Schwope and Mike Scott at DCA Outdoor, correct?
A. Correct.
Q. And you indicate: "Tory, with your permission, I would like to respond to Lisa's e-mail as follows."
Do you see that?
A. I do.
Q. And then you have three bullet points, primarily, in there. And I'm -- specifically want to ask you about Point 2, where you say: "The debtors will not be pursuing a sale process in the Chapter 11, but rather will work with all creditors towards a reorganization that will benefit all creditors' employees, which may include the sale of certain businesses or assets."
Do you see that?
A. I do.
Q. As of February -- this e-mail is dated February 14th -- had you had discussions with Mr. Schwope about whether a sales process might be a viable alternative in the Chapter 11 bankruptcy?
A. No. I just saw the paperwork from Steeplechase.

Q. Okay. Is there a reason that this -- I would say this early, you know, prior to filing for bankruptcy, that there was a decision made that the debtors would not be pursuing a sale process?

A. Well, it really doesn't say that. It says we're not going to put ourselves out for sale, but we'll include -- which may include the sale of certain businesses.

So what that was supposed to say is, "We're not putting DCA, as a whole, up for sale. But if we need to break out the parts, we will do so." Because we were convinced that the parts were worth more than the sum, because most people would not want to be in the integrated business that Tory built because there were some inefficiencies in that process.

Q. Okay. A sale process in connection with a bankruptcy is a potential option for debtors in bankruptcy; is that fair?

A. Absolutely.

Q. Is that something that you, as counsel for the debtors, ever revisited at all as a potential option for these debtors in the course of your representation of them?

A. Well, keep in mind that we had hired three financial advisors. Frontier had a financial advisor,

the Unsecured Creditors Committee had a financial advisor, and the debtor hired Focus as their financial advisor. So when it came to decisions as to whether a sale process was necessary, or what parts of the sale needed -- what parts of the business needed to be sold, that was all up to the financial advisors.

Lewis Rice would have been told their thoughts, and then we would have tried to implement it through the bankruptcy case.

Q. Okay. So as I understand your testimony, that's -- whether or not a sales process became a viable alternative for these debtors was not something you personally considered; is that correct?

A. It wasn't the job of Lewis Rice. We would have implemented what the financial advisors advised us, what was in the best interest of the debtors would have been.

Q. So because, in your opinion, it wasn't the job of Lewis Rice, it's not something you did, correct?

A. We listened to the financial advisors. That's why we paid them.

Q. Did any of the financial advisors, to your knowledge, ever suggest that some kind of sales process might be an alternative that the debtors could

look at here?
A. Well, the fact is that Tory met with the Unsecured Creditors Committee financial advisor, and I'm going to say his name was Eric, and I -- don't hold me to that -- and walked through with Eric the possibility of breaking the company up and selling this to this party, this to this party, and this to this party. Eric fell in love with that concept and never moved off of it.
So the financial advisors were having discussions from day one with not only each other, but with Tory, because we made Tory available to him to have those discussions.
Q. So at any time, are you aware, whether through Tory or whether through any of the financial advisors, if any of them ever suggested as a possible option selling all the assets of DCA Outdoor?
A. Selling all of the assets?
Q. Yeah.
A. I don't believe anyone believed that that was the best interest. I think Eric's concept was that he was going to sell all retail and distribution and put the tree farms into a trust.
But there were a zillion different options that were going on out there, Vickie, and that's the

process with having a free-for-all bankruptcy. There was no one plan to accomplish that.
Q. And you described this as a free-for-all bankruptcy?
A. We filed without an idea as to what a plan would look like. That is, by definition, a free-for-all bankruptcy.
Q. Mr. Cole had shown you an Exhibit in -- where you had reached out to an individual called, it appears, Mr. Hoeman at Hoeman Capital?
A. Mark Hoeman, correct.
Q. Mark. Why did you reach out to Mr. Hoeman at Hoeman Capital?
A. I've used Mr. Hoeman before to find debtor-in-possession financing, and we were up against it. So I wanted to make sure that I reached out to all of my contacts in the bankruptcy world that had a possibility of bringing a debtor-in-possession loan to the table.
Q. Okay. And ultimately, did Hoeman Capital or Mr. Hoeman ever make any kind of proposal for a DIP financing?
A. I don't recall, but it was -- if he did, it wasn't something that was excitable or something that we moved on.

Q. Did you ever get a term sheet from him?
A. I don't recall who provided what term sheets, but we got three term sheets. But I don't recall who they all came from. I think two of the three came from Focus.
Q. And one was from Frontier, correct?
A. Not early on. It wasn't until the other term sheets were received that we received something from Frontier.
Q. Well, there was a term sheet in the e-mail we just looked at, Exhibit 49, that Ms. Peters had previously provided in January to the debtors and provided to your firm, correct?
A. That called for a CRO, a full-blown CRO. And we just knew that that was not something that Tory was going to agree to, so we did not consider that to be a viable term sheet.
Q. Okay. Of the term sheets that were received in or around the February time period -- February-March time period, which did the debtors end up going with?
A. You're testing my recollection, but I believe the name was Summit.
Q. Are you sure Frontier didn't provide a DIP loan at the start of the bankruptcy?

A. Oh, I thought you meant "went with" as in filed the motion. I apologize.
Ultimately, we reached an agreement with Frontier once the Summit term sheet was filed with the Court.
Q. The first time around, when the first DIP financing was obtained by the debtors, was any motion for a Summit DIP loan filed?
A. I don't recall. John Hall and Steve Drapekin and Simeon Brown would have handled those.
(Stenographer clarification.)
THE WITNESS: Simeon Brown.
MR. MOOTHART: Slow down a little bit.
Q. (By Ms. Buter) You were asked some questions by Mr. Cole about appraisals.
A. Correct.
Q. And you indicated that Frontier was conducting appraisals utilizing Hilco, correct?
A. As we understood it, for the inventory.
Q. Okay. For the inventory?
A. Hilco was inventory, I believe.
Q. Yeah. And there were other appraisers who were appraising the real estate; is that correct?
A. Cushman & Wakeman -- Wakeman Cushman,

Cushman & Wakeman. Whatever their name is.
Q. Correct. And just so I'm clear, the debtors, during the time they were in bankruptcy, did not obtain independent appraisals for either the inventory or for the real estate, correct?
A. We never got any appraisals. We didn't get those from the Unsecured Creditors Committee that promised it to us, and I don't know that they got it from Frontier.
Q. Okay. And I was actually going to follow up with you on that.
So I think you had indicated that you had an agreement with the Unsecured Creditors Committee that the Unsecured Creditors Committee would provide what Frontier provided to them; is that correct?
A. Correct. We thought we had an agreement with Frontier to get those directly from Frontier. Then at the moment that we thought they were being produced, we were told that that didn't happen.
And then we were in the depositions, and I questioned the Unsecured Creditors Committee's counsel as to his promise to produce those to the debtors, and we read into the record his promise.
Q. And I do have that. So I want to go back on a couple of those things.

To be clear, Frontier communicated to you, at least at some point, that there was no agreement that they would provide their appraisals to the debtors, correct?

A. I don't recall, but I -- I don't recall.

Q. Okay. And the debtors never served any kind of discovery request on Frontier formally requesting those appraisals throughout the time, at least, that you represented the debtors?

A. That is correct.

Q. And the agreement by the Unsecured Creditors Committee was that the Unsecured Creditors Committee would provide to the debtors, as I understand it, what Frontier provided to them in discovery?

A. They had requested informal discovery, the appraisals from Frontier. That is correct.

Q. So it's your position that your agreement with the Unsecured Creditors Committee was specific to appraisals?

A. It was read into the records in the depositions. It is what it is.

Q. During the questions that Mr. Cole asked you about the appraisals, one of the comments you made was there was nothing in the budget for those

appraisals.
And I just want to confirm that, at least from what I had seen, there was never any question or request that Frontier allow in the budget some money for the debtors to obtain appraisals, right?
A. I think it was pretty universally accepted that Frontier was taking the lead on getting the appraisals, was going to share that information with the Unsecured Creditors, who was going to share that information with the debtor.
Now, we suspected that they hired a decent real estate appraisal company, and we expected those numbers to be reasonable. So we had no reason to believe that we needed to double their efforts.
So we left it at that, and I think the Committee did the same thing.
Q. Okay. With regard to the inventory, I think you testified -- and we looked at the e-mails between you and Ms. Schwartzkopf talking about the kiss of death and such. I think you indicated that you had an opinion or Ms. Schwartzkopf had an opinion that Hilco would come in low.
A. We didn't have an opinion. We knew what they did in the last case that Frontier hired them in.
Q. Okay. And my first question to you is: Do

you know at all whether Frontier was the lead agent in that Everde bankruptcy?

A. I have no idea.

Q. Okay. Would it surprise you that they were not, in fact?

A. Wouldn't matter. We were talking about Hilco.

Q. Okay. So there was a concern, at least, raised that Hilco gave low valuations. Is that what I understand your testimony to be?

A. We were afraid that Hilco's opinion of the ag business at that time was very low. And that we would suspect that given their low opinion of the ag business, that any appraisal they did was going to be artificially low.

Q. And if you could take a look with me -- and that's based on the Everde -- I think you said that's based on what happened in the Everde bankruptcy; is that right?

A. That was the example that was shared with me by Focus, but I think that it was pretty well known that Hilco had a down view of the ag business at that time.

Q. Okay. And if you look -- if you could look with me at Exhibit 61 that you had looked at earlier.

A. Yes, ma'am.
Q. Okay. This is the e-mail chain where the appraisal -- the request for information for Frontier's appraisals was being discussed between you and Ms. Schwartzkopf.
And in this last e-mail that Ms. Schwartzkopf sends to you on April 9th of 2025, she did particularly note in the -- the third or fourth sentence, she states: "Everde went appraisal shopping to no avail."
Do you see that?
A. I do.
Q. Okay. And then Ms. Schwartzkopf continues: "I do have the name of one firm that I will reach out to if we think it's time to engage an appraisal."
Do you see that?
A. I do.
Q. She then goes on a sentence later. She said: "I'd also suggest we do our own present value of future cash flows to see if we can come up with a better number than the so-called experts."
Do you see that?
A. I do.
Q. Do you know if anyone from Focus ever conducted a present value of future cash flow

analysis?
A. If this is as of April 9th, I don't believe that they did. And if they did, I didn't see it.
Q. And that's at any time throughout your representation of the debtors?
A. Well, that's not true. We were waiting for the 2023 and the 2024 audit so that they would have the information that was necessary to complete the cash flow analysis that they were going -- that said they were going to do.
Without the 2023 and 2024 audit, we were merely going off of the company's books and records, and we were uncomfortable doing that, as was Frontier, which is why they put it in the DIP order that we had to get those audits done.
Q. And Frontier did allow funds for the audits to get done, correct?
A. I believe we paid that money over to Bergan. I believe so.
Q. And kind of going back to this present value of future cash flows, understanding you were waiting for the audits to come in -- or Focus was waiting for the audits, do you know at any time during the course of the time period you were representing the debtors, whether a present value of the future

cash flow analysis was ever completed for the debtors?
A. The '23-'24 audit were never -- let me start over. The '23 audit was published and then criticized in depositions by Frontier. The 2024 audit was never finished.
So they did not have the information that they needed to be able to take something to market that they felt comfortable with.
Q. And did they -- to your knowledge, did they ever conduct such an analysis, just based on the company's numbers, to get any kind of sense of what the value may be?
A. I don't know.
Q. Did you, at any time representing the debtors, ever conduct -- I think you mentioned this, and I think the answer is "no," but just to confirm -- any UCC lien searches or UCC searches --
A. No, we asked --
Q. -- to debtors?
A. -- the Unsecured Creditors Committee to do that.
Q. Do you know if the Unsecured Creditors Committee ever did that?
A. I'm sure they did. I mean, we talked very early on in the case, when they were appointed.

Q. Did you ever request or see any UCC searches that were run by the Unsecured Creditors Committee?
A. I personally did not.
Q. Do you have any understanding, sitting here today, whether Frontier was involved at all in the Everde bankruptcy that Ms. Schwartzkopf was referencing to you?
A. I do not.
Q. Did you take any steps to look that up before?
A. As to Frontier's involvement?
Q. Yes.
A. I don't recall, but I don't believe so.
Q. Okay.
MS. BUTER: Let's take five minutes. I'm going to -- yeah.
MR. MOOTHART: Okay.
THE VIDEOGRAPHER: We're going off the record at 3:03 p.m.
(Recess.)
THE VIDEOGRAPHER: We're back on the record at 3:20 p.m.
Q. (By Ms. Buter) Mr. Parres, I'm just going to close the loop on the appraisal discussion that we

were having. I'm going to hand you what I've marked as Exhibit 104.

(Exhibit 104 was marked for identification.)

Q. (By Ms. Buter) Exhibit 104 is an e-mail chain that starts at the very back with a Hilco e-mail to Ms. Schwartzkopf and some others. And then there's an e-mail chain throughout.

If you'd like a minute to look through it, I'm happy to give that to you.

A. Yes.

Q. Okay. So in the very first page of Exhibit 104, Ms. Schwartzkopf forwards to you, it appears, a chain from -- originated with Hilco that was sent to the debtors and to Focus, and to Ms. Peters as well; is that correct?

Or does that sound right to you?

A. Are we talking middle of the second page, from Estella Kwok?

Q. No, I'm talking -- if you look at the first page --

A. I apologize.

Q. -- it appears that Juanita is sending a message to you that includes the chain that follows; is that right?

A. Okay. Yes.

Q. Okay. And in the e-mail to you, dated June 12th of 2025, Ms. Schwartzkopf notes: "They are asking DCA to review for reasonableness and accuracy," per the first e-mail in the string.
Do you see that?
A. I do.
Q. And if you look at -- it's the third page of Exhibit 104.
A. Yes, ma'am.
Q. I believe she's referencing an e-mail from Ms. -- I think it's Kwok, K-W-O-K, where she e-mails Ms. Schwartzkopf. And in the text below, she indicates she's attaching DCA Outdoor exhibits summarizing historical information provided on the inventory reconciliation, an inventory composition by category exhibits. And she concludes the bottom of that paragraph by saying: "Please review for accuracy and reasonableness."
Do you see that?
A. I do see that.
Q. Okay. And then you respond to Ms. Schwartzkopf on the first page of Exhibit 104, and you say: "Not our job. That is their job."
Do you see that?
A. I do.

Q. If the debtors were intending to utilize the appraisals that were being conducted by Hilco on -- you know, for Frontier, why would you not want the debtors to review and ensure reasonableness and accuracy?
A. Those are your words. The debtor was fairly convinced that we were not going to support anything from Hilco. We knew what Hilco's reputation was. We know what they did previously for Frontier. So we were not going to -- and it's very unusual for an appraiser to ask the other side, who is going to be an expert in a case, to "review my work and tell me what's wrong with it" so that you don't have an opportunity to cross-examine them at trial.
Q. So to break that down, you said you knew what Hilco had done previously for Frontier. Are you referring to the Everde matter?
A. That's what I was told by Juanita. That is correct.
Q. Okay. And you indicated that they were low, at least in that matter. Hilco was low in the appraisals, right?
A. That they had a down view of the agriculture business. That is correct.
Q. And we also looked at an e-mail that

Ms. Schwartzkopf indicated that Everde tried to get other appraisals, but to no avail?
A. The debtor tried to find an appraiser who would challenge Hilco's number.
Q. To no avail, correct?
A. And we believe that was because of monetary. But, yes, that's what she said.
Q. Okay. And so here, as of June 12th, 2025, it had already been determined by the debtors that they would not be utilizing Hilco's appraisals; is that right?
Is that what you testified to?
A. No. We wanted to see what Hilco's numbers were, but we were not going to tell them what their numbers should be based upon. We gave them all of the information that they needed. As you see in this e-mail, it said that we gave them the historical information. And then on the last page of this, it says there's a Word document attached. And that Word document had what other documents they looked at as well.
Q. Okay. And your response to Ms. Schwartzkopf was: "Not our job," debtors, I assume. "That is their job," correct?
A. It's Hilco's job. I don't know that it's

the debtors' job. It's Hilco's job, as the expert, to review their own work and be satisfied that they've done what they were hired to do.

Q. Okay. In this case, did you recommend that the debtors obtain a piece of software called Best Case?

A. I did.

Q. And did they, in fact, separately obtain access to the Best Case software?

A. I believe they purchased the software, Best Case. That is correct.

Q. Okay. And do you recall informing the debtors that they should not tell anybody that they purchased that software?

A. Well, normally, counsel would use their software called Best Case, which is how you create the bankruptcy schedules. And that information between the debtor and counsel would be protected.

In this case, with 20 debtors, it became cost absorbant for Lewis Rice to be the -- the enterer of the information. So we asked the accounting department at DCA to obtain that software and to use it themselves.

Q. Did Lewis Rice have access to Best Case for this matter?

A. Absolutely. They would give us the information, and we would download it into our system. So there was really a duplicate system going on. They would download the information, send it over to us. We would put it in our information, and then we would print it as reports as we needed to see, or we'd ask them to print based upon what the information was.
Q. Did Lewis Rice have access to the Best Case software for the debtors, the actual software itself?
A. No. It's a separate license. It's a cloud-based -- what am I talking about? I am the least IT person in the world. As I understand it, it's a cloud-based thing, which means it's all up in the cloud and you can share what you need to.
That's all I know about software.
Q. Okay. So when you went to access -- I just want to be clear. When you went to access what the debtors had put into Best Case, did they send you a -- kind of an output from Best Case to look at, or did you log into Best Case software and look at it in Best Case itself?
A. You're asking the wrong person. I didn't do any of that.
Q. Okay.
(Exhibit 105 was marked for identification.)

Q. (By Ms. Buter) I'm going to show you what I'm marking as Exhibit 105. Not sure if this will help or not help.

But Exhibit 105, I think, really, the important information that I'm trying to get at for Best Case is in this first page. There's an e-mail from Mr. Fairlie, representing the Unsecured Creditors Committee, who asked for the underlying data for the debtors schedules from Focus.

A. Okay.

Q. And you respond to Mr. Fairlie and you state: "Zach, we have never shared Best Case data with anyone as it is housed by Lewis Rice and created by Lewis Rice."

A. Okay.

Q. Was that true in this case?

A. The statement is. As far as Lewis Rice is concerned, in our cases, we don't share Best Case data with anybody. That is a true statement.

Q. In this instance, was the data -- Best Case data created by Lewis Rice, or was it created by the debtors?

A. All the data is the debtors' information. It was a combination of Lewis Rice and the debtor putting their information into Best Case, as I

understand it.
I am not the IT person.
Q. Okay. So the debtors have their own version of Best Case and could upload and put the information in there themselves in this case, correct?
A. As did we, as I understand it.
Q. Okay. So you did have access to Best Case?
A. I personally --
Q. Lewis Rice?
A. -- didn't, but Lewis Rice would have.
Q. Okay. We talk a little bit about Bergan being retained to conduct the 2023 and 2024 audits for the debtors, correct?
A. Correct.
Q. And you were involved in the retention of Bergan and having their retention approved by the Court, correct?
A. Correct.
Q. And Bergan had previously conducted work for the debtors prior to them filing for bankruptcy, right?
A. Correct.
Q. And at the time you reached out to Bergan about them conducting the '23 and '24 audit -- or finishing and conducting the '24 audit, I think is

more accurate, they had some outstanding invoices with the debtors; is that correct?
A. Your statement is correct, but I'm not the one who reached out to them.
Q. It was Focus.
A. Correct.
Q. I misstated that, so I apologize.
A. That's fine.
Q. But you were aware that they had some funds -- or outstanding balances due from the debtors?
A. Prepetition claims is what we called them.
Q. Okay. And those prepetition claims, ultimately, Bergan -- at least, they were supposed to waive those prepetition claims to be retained; is that correct?
A. They clearly waived their prepetition claims.
Q. Okay. Do you have any recollection of whether Bergan had also conducted -- or been involved in preparing Tory Schwope's personal taxes prior to filing the bankruptcy?
A. My understanding is that he prepared the tax returns for -- no, I got to back -- I don't know if it was all the debtor entities or not. But some of the debtor entities, and Tory was one of them as well.

Q. And do you have any recollection as to whether there was an outstanding prepetition amount for -- resulting from the preparation of Tory Schwope's personal tax returns owed to Bergan?

A. On one of the invoices that Bergan had sent on the prepetition claims, I believe there was an amount that was due for the preparation of Tory's 2020 -- I don't know what year -- tax return.

Q. If you could turn with me to -- I think it's Exhibit 35, which are your text messages.

A. Yes, ma'am.

Q. And if we could go to the Bates stamp LEP 81?

A. Yes, ma'am.

Q. And I'll wait for you to get there.

A. Okay. I'm on Page 81.

Q. Okay. These are text messages. Again, these are your text messages, so your texts are on the right in color, and the left are text messages -- text messages with Juanita Schwartzkopf, correct?

A. That's correct.

Q. And on March 26th, it looks like, at 2:39 p.m., you say to Ms. Schwartzkopf: "Just like I want Tory's taxes paid for under a one-line invoice from Creative. Just saying."

Do you see that?
A. I do.
Q. And Creative is Bergan, correct?
A. Correct.
Q. And Ms. Schwartzkopf responds: "Just pay more for this next order. Take a lower margin," right?
See that?
A. I do.
Q. And you say: "Amen"?
A. I do.
Q. Okay. And then I'm going to hand you what I marked as Exhibit 106.
(Exhibit 106 was marked for identification.)
A. Just so you know --
MR. MOOTHART: There was no question pending.
Q. (By Ms. Buter) Exhibit 106 is an e-mail chain between you and Ms. Schwartzkopf dated March 28th of 2025. Subject matter is, "BerganKDV."
Do you see that?
A. I do.
Q. And in the first e-mail on the first page of Exhibit 106, Ms. Schwartzkopf talks about: "I'm okay with the 165,000."

Do you see that?
A. I do.
Q. And then she says: "Do you have the dollar amount for the one-line invoice, as you requested, or do you want me to confirm the amount? Is it to include or not include Tory's taxes?"
Do you see that?
A. I do.
Q. And then you instruct Ms. Schwartzkopf: "Drop your knowledge of Tory's taxes. We have paid the entire bill, as requested."
Do you see that?
A. I do.
Q. And the entire bill, as requested, includes the amount of approximately 9,000, I think, for Tory's taxes?
A. I don't know the exact amount, but somewhere in that neighborhood. But that was disclosed in the application that we filed.
Q. If you could take a look at what is previously marked as Exhibit 84.
MR. MOOTHART: Sorry. Thank you.
A. 84?
Q. (By Ms. Buter) 84.
A. Yes, ma'am.

Q. Exhibit 84 is an e-mail chain between Nick Mizaur and you CCing John Hall on or around, at least the first page, April 9th of 2025; is that right?
A. It is.
Q. Okay. And Mr. Mizaur was who?
A. He was counsel for BerganKDV.
Q. And in this particular e-mail, are you discussing the retention of BerganKDV for the debtors?
A. The subject is, "BerganKDV's application." The timing of this e-mail is very strange.
Q. Why do you say that?
A. By April 9th, we had an agreement, and he was following up with a question that was asked on April 6th or April 5th.
And he was way behind the timeline.
Q. Okay. In response to the question -- or the questions in Mr. Mizaur's e-mail, you do tell him -- you say: "Thanks for the spreadsheet." You say: "We are never going to get an inconvenience fee paid, so please come up with a new category of work to bill the remaining 13,000, such as 'review of changes to inventory valuations due to bankruptcy filing.'"
Do you see that?
A. I do.

Q. And what was the inconvenience fee you were referring to?

A. So when we were dealing with Nick as counsel for BerganKDV, our question was that the U.S. Trustee's office wanted to know how much it was going to cost to finish the 2023 audit. I had no idea.

So I asked Nick to provide a spreadsheet that would tell us what the cost would be to provide -- to finish the 2023 audit. He provided this, a spreadsheet, and on there was an item that had an inconvenience fee. And I believe it was based upon a percent of a previous audit or something. I don't remember what it was based upon.

But I'm like, "There's no way in the world that the U.S. Trustee is going to approve this. To the extent that that is work, you need to relocate that work as to what that's work for. If it's working for inventory account, then you need to put those hours on inventory. If it's working for something else, you need to recirculate that, because there is no way in the world you're going to get paid what we're calling an inconvenience fee."

Q. And ultimately, if you recall, did Bergan change the entry to something similar to what you proposed here?

A. It was irrelevant. By the time he sent this, we already had an agreement. And the agreement was that BerganKDV was going to be paid for their postpetition work as they -- as they worked. The purpose of the spreadsheet was to try to get a fixed fee so that we could give it to the U.S. Trustee, who would approve it.

And we were never going to get there because she had come to the belief that any number we gave her was going to be an attempt to try to pay them for their prepetition fee.

So BerganKDV, on our April 7th call, said, "Larry, we want the 2024 work. We'll do the 2024 work, and we'll agree. If you can get us a flat fee -- a fixed fee on 2023, great. If you can't, we'll bill the time and we'll waive the prepetition amount."

Q. Okay.

A. So this e-mail from him on April 9th is just way out of time.

Q. Okay. You then tell him -- continue on in the e-mail: "Also, please change first entry to 'work on and complete income tax provision for -- in 2023 audit.'"

Do you see that?

A. I do.
Q. And you say: "Delete everything else"?
A. Correct.
Q. If this was kind of past the time where you already had an agreement, why were you and Mr. Mizaur discussing making changes to the spreadsheet?
A. Because I wanted a final spreadsheet to send over to the U.S. Trustee because she was convinced that we were trying to get a $65,000 fixed fee that had something to do with the prepetition amount.
So I wanted to come to an agreement as to what that number really was going to be so that I could send it over to Jill so that she had an idea, and we could compare what BerganKDV's work was going -- moving forward.
Q. And -- and did you, in fact, receive an edited spreadsheet back from Mr. Mizaur?
A. I don't recall that I did or didn't, to be honest with you.
Q. And do you recall whether you sent any such spreadsheet to Ms. Parsons?
A. I know I didn't send this spreadsheet. I don't know that I got a second spreadsheet. If I did, I wouldn't have sent it, because we already agreed

with her that we were going to -- they were going to charge their time as they worked moving forward, not on a fixed fee.

Q. Okay. And then you did ask him to: "Please send back new spreadsheet." And you do say, I think, like you indicated: "I do not intend to share this spreadsheet unless forced to. Just a heads-up."

A. Yeah, it was -- it was a goofy spreadsheet. I have no idea why he sent it.

Q. Okay. And is your recollection correct that you filed the...

A. I'm sorry?

Q. Is it your understanding that you had filed the request for the Court to approve retention of BerganKDV on April 1 of 2025?

A. I thought I did that on March 30th. It could have been April 1. The original application was with the idea that we were going to pay the prepetition amount, because that's what Bergan wanted. Then we had to file an amended application in which we needed to address the concerns of the U.S. Trustee, and BerganKDV raised their rate from -- what was once 165, went to 160, and then back to 165.

Q. Okay. As part of your representation of the debtors in this bankruptcy, you became aware that

Frontier had concerns about the value of the assets owned by the debtors; is that fair?
A. I'm sure there's e-mail traffic to that effect. I don't know when and if that ever was -- I don't know when that would have been relayed to me.
Q. Okay.
(Exhibit 107 was marked for identification.)
Q. (By Ms. Buter) I will hand you what I'm marking as Exhibit 107. Exhibit 107 is an e-mail chain between you and Ms. Peters, on the first page, in or around April 21st of 2025, correct?
A. April 21st is correct.
Q. Okay. And in the top e-mail on the first page of Exhibit 107, Ms. Peters tells you and Mr. Hall that: "The biggest issue here is valuation," very first part of the first sentence, correct?
A. That's what this sentence says.
Q. And then she says and also -- well, she doesn't say "also." But: "The Committee's objections to Frontier having liens on proceeds of Chapter 5 recoveries assets that were previously unencumbered prepetition."
Do you see that?
A. I'm reading it now.
Q. Okay.

A. Yes, ma'am.
Q. And in that same e-mail, Ms. Peters continues in the second paragraph: "Frontier does not believe that the collateral is worth what the debtors identified in their schedules, which we discussed last week."
Do you see that?
A. I do.
Q. So as of at least April 21st of 2025, Frontier had communicated to the debtors, through counsel, that Frontier did not believe the collateral was worth what the schedule showed; is that fair?
A. We took this as posturing because Lisa was trying to capture the Chapter 5 causes of action from the Unsecured Creditors Committee, and we didn't have a fight in that battle. So we think what she sent us on the 21st was her way of trying to put Zach on notice that, "Hey, we have a valuation battle going on, and we need the Chapter 5 causes of action."
That's what we took it to be.
Q. Okay. She doesn't do that here specifically. She doesn't say that in this e-mail, correct?
A. She says: "The biggest issue we have is valuation of the Committee's objections to Frontier

having liens on the proceeds of Chapter 5 recoveries."
(Stenographer admonition.)
Q. (By Ms. Buter) But -- she mentions the Chapter 5 recoveries. I'm not fighting that with you at all. But she does say the biggest issue here is valuation, correct?
A. That's what the e-mail says.
Q. And she then says -- again, she's informing you Frontier does not believe that the collateral is worth what the debtors identified in their schedules, correct?
A. Okay.
Q. And the counsel for the Unsecured Creditors Committee is not on that e-mail, correct?
A. On this e-mail?
Q. Yes.
A. That is correct.
Q. Okay. And as the case progressed, presumably, it became evident to debtors that Ms. Peters may not have been posturing. And, in fact, valuation did become a big issue in the underlying case, correct?
MR. MOOTHART: Object to form.
MR. RUSKAMP: Join.
A. I don't believe that that's correct, but

they didn't like the valuation under the '23 and '24 audit of the inventory.
Q. Well, '24 audit was never provided, correct?
A. I thought a draft was sent to everybody. I don't know if it wasn't or not, now that I say that. I apologize.
Q. Okay. In any event, there were certainly depositions that took place where valuation of the inventory was discussed, correct?
A. But not with the experts. Not with Hilco and not with anyone who had a valuation. It was only regarding the audits of the '23 that was prepared by Bergan.
Q. And I didn't mean to imply whether it was with experts or not.
A. I apologize.
Q. But there were depositions that took place in this case where there were numerous questions about how the debtors calculated the value of their inventory?
A. On their balance sheet under the fair market layer adjustments. That's correct.
Q. So -- and you kind of got to my next point.
So at some point, did you become aware that

there were concerns, at least by Frontier, as to how the debtors were utilizing the fair market layer adjustment in their accounting?

A. I know that they had questions regarding how the formula was being utilized. That is correct.

Q. And at some point, did you become aware that Frontier, at least, had concerns about how costs were being capitalized in the debtors' accounting and then subsequently relieved?

A. I don't recall that specifically, but there were specific items that -- at the time, that I knew that Frontier had questions regarding the debtors' and their auditors' FML adjustments.

Q. Prior to those issues being raised at depositions, had anybody from Focus talked to you about any concerns with how the debtors were accounting for their inventory values?

A. No, it was not an issue.

Q. And prior to -- I think I know the answer to this. Prior to the depositions and these issues being raised, had anybody at Lewis Rice, to your knowledge, identified any concerns about how the debtors were valuing their inventory in their books and records?

A. I am sure that 99.9.999 percent of the

attorneys at Lewis Rice have no idea what an FML adjustment is.

Q. After it came to light that there were concerns about how the debtors were accounting for certain inventory values, you did conduct a follow-up with both Focus and Bergan, correct?

A. I did.

Q. Okay. And I think, if we look at Exhibit 63 -- I hope.

Exhibit 63 is an e-mail from you dated August 25th of 2025. It's from you, and it's to both certain debtors -- or personnel of the debtors and to Focus, correct?

A. That is correct.

Q. And August 25th of 2025 was a deposition of BerganKDV, correct?

A. I don't recall.

Q. Okay. And you indicated that: "Deposition went fairly well, but did say he will look at the following to determine if the inventory values need to be restated for 2023."

See that?

A. I do.

Q. And Bergan, at the conclusion of his deposition, did indicate it would have to take a look

to see if any of the 2023 audit needed to be restated with regard to these issues, correct?
A. I don't know what Bergan did or didn't do.
Q. Well, you -- did you participate in that deposition?
A. I listened to the deposition.
Q. You identify a few things, which I presume were your notes from the deposition. You talk about harvest and load, outbound freights, and then in subsection E, you talk about other possible issues, and you list three other possible issues.
Do you see that?
A. I do.
Q. And then you asked Focus to: "Generate a report that shows, if we back this out, the inventory value is," and then you have several dollar signs.
Do you see that?
A. Yes, I do.
Q. Okay. Other than sending this e-mail and talking with Focus about these issues, do you remember if you personally conducted any additional follow-up to analyze whether or not the debtors' inventory valuations were accurate?
A. No. The financial advisors were talking amongst themselves, so it made no sense for a lawyer

who just learned what FML is to interfere in what they were doing.

Q. As part of the depositions, where the financials of the debtors were discussed, there were questions asked of both Focus and Bergan about how often certain debtor entities adjusted the -- made the FML adjustment.

Do you recall that?

A. I do.

Q. And I believe two of the debtor entities that utilized FML adjusted every month, and I think there were three that adjusted every six months; is that right?

A. All of the others adjusted --

Q. That's fair.

A. -- every six months.

Q. That's fair. And during those depositions, both Focus and Bergan, as I recall, indicated that as a result, that meant for ten months of the year, for those entities that adjusted every six months, the balance sheets may be off in the numbers that were reflected in those balance sheets.

Do you recall that testimony?

A. Not really, but it's vaguely familiar.

Q. Okay. And then my next question is: You

know, based on that testimony, did you personally conduct any kind of follow-up to determine the implications of the fact that those balance sheet numbers may not be accurate for some of the debtors for a ten-month period of time every year?

A. I would have relied upon the three financial advisors from Frontier, the Unsecured Creditors Committee, and Focus to provide that information to us.

Q. If any of those advisors had suggested that the balance sheets being off for ten months of the year for certain entities was something that was problematic, is that something you would have taken seriously as counsel to the debtors?

MR. RUSKAMP: Object to the form of the question, calls for improper --

(Stenographer clarification.)

MR. RUSKAMP: I can.

Object to the form of the question, calls for improper opinion, evidence, and it's an improper hypothetical.

A. I don't know what the facts were. If the facts were presented to me, we would have asked questions.

Q. (By Ms. Buter) You indicated that there

were three sets of financial advisors in this case. There was obviously Focus --

A. Mm-hmm.

Q. -- who was working with the debtors, Aprio working with Frontier, and Dundon, I think, working with the Committee; is that right?

A. I believe those were the parties.

Q. Were the debtors relying upon -- let's take Frontier's financial advisor -- Aprio?

A. As I understood it -- and again, I'm not a financial advisor, I'm a lawyer -- the financial advisors had weekly meetings in which they discussed issues that each of them had, and tried to resolve whatever those issues were so that all three of them were on the same page, or all three agreed to disagree as to what it was.

But as lawyers, I would never interfere with what a financial advisor does. All I'll say is that those balance sheets and issues is what Frontier had for ten years. And they -- when they implemented the FML the first time, that's what was provided to Frontier at that time forward.

(Exhibit 108 was marked for identification.)

Q. (By Ms. Buter) I'm going to hand you what I've marked as Exhibit 108. Exhibit 108 is an e-mail

chain between you and Ms. Schwartzkopf on April 10th of 2025; is that right?

A. April 10th, 2025. That is correct.

Q. Okay. And I think the way that I read it is there's an initial e-mail on the second page from you on April 10th. Appears to be blank. And then Ms. Schwartzkopf responds on the first page -- bottom Of the first page of Exhibit 108 and states: "Are you asking me to put it in the budget or originate a payment?"

Do you see that?

A. I do.

Q. And is she referring to the subject line that, perhaps, was contained within your first e-mail that says: "I need 50,000 to retain Oregon counsel"?

A. Where do you see that first e-mail subject line? The first e-mail subject line I see is from Juanita to me that says: "I need 50,000 to retain Oregon counsel"; is that correct?

Q. Correct. And it says "re," R-E.

A. Yeah, I see that.

Q. Okay. And then she asks: "Are you asking me to put it in the budget or originate a payment?"

Do you have any recollection as to what you're referring to?

A. I'm not too sure that's from me, is it?
Q. It appears to me that you sent an e-mail to Ms. Schwartzkopf that maybe just had something in the subject line, and then she responds and --
A. I don't know.
Q. -- says -- you don't remember?
A. I have no recollection of this.
Q. Okay. Then you respond to Ms. Schwartzkopf and say: "Need to know if it can be done, like, on Monday."
Do you see that? It's in the middle of the first page.
A. This is a weird e-mail. I see the language that you're referring to.
Q. Okay. And then Ms. Schwartzkopf responds to you on April 10th of 2025 and says: "We are concerned about funds for payroll. Tory is not. He thinks collections will come in."
She then says: "DCA is $1 million behind on collections."
Do you see that?
A. I do.
Q. When Ms. Schwartzkopf informed you in April -- or April 10th of 2025 that DCA was $1 million behind on collections, did you do any kind of

follow-up to determine the cash position or the future potential cash position of the debtors in the bankruptcy?

A. That's why we hire financial advisors. The financial advisors from the Committee, the debtor, and Frontier are all to be in charge of that. It's not my job, as counsel to the debtor, to look into why the debtors is a million dollars behind. My job is to listen to what the financial advisors are telling me.

Q. Okay. So I think the answer is, no, you would not have done any kind of follow-up. That would have been something you would have requested of Focus?

MR. RUSKAMP: Object to form.

A. I don't -- when you say that --

MR. RUSKAMP: That's not what he said.

Go ahead.

A. When you say that, I would have listened to what Focus and the other financial advisors had to say.

Q. (By Ms. Buter) You didn't do any independent analysis yourself; is that fair?

A. Lewis Rice did not go and look at the books and records of DCA to determine why they were a million dollars behind. We paid three sets of them to do that for us.

Q. And when you say, "We paid the financial advisors," that was coming from the -- at this stage, the DIP financing that --
A. It was coming from the revenues of the debtor.
Q. Did the debtors pay the cost of Frontier's financial advisors?
A. I don't know the answer to that, to be honest with you. If we didn't pay Frontier's, then we know it was being added to the note. We knew that Frontier wasn't giving us a gift.
Q. So if you look -- continuing on on Exhibit 108, Ms. Schwartzkopf continues --
MR. MOOTHART: Right here.
MS. BUTER: Oh, sorry.
Q. (By Ms. Buter) Ms. Schwartzkopf continues: "Had to cut disbursements way back."
Do you see that?
A. I see that.
Q. And then she says: "Glad the lender agreed to the net cash flow test."
Do you see that?
A. I do.
Q. Do you have any understanding what Ms. Schwartzkopf meant when she said: "Glad the

lender agreed to the net cash flow test"?
A. As lawyers, we don't get bogged down in this. We trust our financial advisors to do their job. And if I needed to know what the net cash flow test was for -- to explain to a Court or to cross-examine, I would learn it.
But as we sit here now, that's what the financial advisors are for and that's what we were paying them for.
Q. Okay. You were asked some questions by Mr. Cole regarding Rio Verde. Do you recall being asked questions about Rio Verde?
A. Is that the Oregon company?
Q. It is.
A. Yes.
Q. Okay. And he had showed you a letter that you had received from counsel for Edmundson. Do you recall that?
A. I do.
Q. Did you also become aware, at some point during your representation of the debtors, that a receiver was appointed in some litigation of federal court relating to Rio Verde?
A. I became aware of it. I was always confused as to what exactly that receiver was doing.

Because as I understand it, the receiver turned around and hired DCA to do the management of that company.
But I never really got into that because it wasn't something that affected these debtors other than the agreement with DCA.
Q. Okay. When you were asked questions by Mr. Cole, I think you had indicated that you, you know, did not really do any follow-up in connection with that letter because it didn't impact -- it wasn't a debtor that was impacted, correct?
A. It was a Rio Verde case, and they were not a debtor, and Lewis Rice did not represent them.
Q. Now, at the time you received that correspondence -- and if you need to look at it, it's Exhibit 92. And I think it's in the pile here --
A. Okay.
Q. -- if you want to look at it.
But at that time --
MR. MOOTHART: I'll get it for you. Listen to her.
Q. (By Ms. Buter) I think you know the answer to this, but I just didn't want to trick you in case you want to look at the date.
I think at the time that letter was received, Mr. Schwope was managing all of the debtor

entities still; is that right?
A. If it was before September 17th, that's true.
Q. Okay. And in that letter, there are allegations made that Mr. Schwope mismanaged Rio Verde, correct?
A. From the other 50 percent owner of the company, who Tory would say is the one who mismanaged the company.
Q. Okay. And in light of those allegations, just by who they were from, did it cause you any concern or cause you to investigate whether any of those allegations were correct, just in case Mr. Schwope was engaging in similar activity with regard to any of the debtor entities?
A. I would have had a conversation, after I sent this letter to Juanita, to see if she believed that any of these allegations were something that we need to be concerned about.
Q. And did you have that conversation with her?
A. I don't recall, but I'm pretty comfortable that we did.
Q. Going to show you -- or not show you, I think it was in your binder -- what was previously

marked as Exhibit 57.
A. Yes, ma'am.
Q. The first page of Exhibit 57 is an e-mail, starting in the middle, from Mr. Fairlie to you and others where he, in the third paragraph, references the fact that: "A federal judge on Friday found Mr. Schwope's accounting practices and operations vis-à-vis Rio Verde Holdings, LLC as a basis to recommend appointment of a receiver for that entity."
Do you see that?
A. I do.
Q. And then he says: "And rise to the level of fraud or the probability of fraud."
Do you see that?
A. I do.
Q. And then you forward that e-mail to Ms. Samantha Schwope and Tory Schwope, correct?
A. Correct.
Q. And you say: "Oh, boy. The Oregon thing is a disaster. We will be hearing about this for months to come."
Do you see that?
A. I do.
Q. Again, after receiving or learning about the appointment of a receiver in Rio Verde, did you

review the receivership order?
A. I did.
Q. And did you take any steps, as counsel to the debtor entities, to investigate whether any of those findings by the Court in connection with the appointment of a receiver were occurring in any of the debtor entities?
A. I am sure we've had a conversation with Mr. Fairlie, and we've asked our financial advisors to look into this and report back to us.
Q. And which -- so you would have had a conversation with Mr. Fairlie. What financial advisors did you ask to look into this?
A. We would have asked -- I'm confident that he would have asked his, and I'm confident that I would have asked mine to look into it and report back to us.
Q. What do you recall about any report back to you on this particular topic?
A. I think we came to the conclusion, and I think that the Unsecured Creditors Committee supported it, that most of the allegations were not going to be able to be proven, but that they're something that we needed to keep our eye on.
And at the same time, as I recall, the

receiver that was appointed was interviewing DCA to conduct the management of the company -- DCA being Tory -- company, DCA, to do the management of that company.

So we never got really comfortable with Oregon, but we got to a point where the receiver trusted Tory enough to continue to manage the business.

Q. And did Tory continue to manage that -- the Rio Verde business?

A. Again, Oregon was an absolute mess. But, yes, Tory had an agreement -- I believe it was in writing -- with the receiver to continue to operate the business.

When I say "Tory," that's not fair. DCA did.

Q. And that was a management agreement, correct?

A. I drafted the original draft of that management agreement and sent it to them. They modified it. I think they actually came to an oral agreement and didn't actually have a written agreement because the two owners could never agree on what to do. The -- Edmundson wanted his company in, Tory wanted his company in, and the receiver was caught in

the middle of that fight.
And I think that he merely came to the conclusion that it was best to orally -- for him to manage it, and orally have both parties do whatever they were doing.
Q. Did DCA Outdoor receive a fee from Rio Verde for any services provided to Rio Verde by DCA Outdoor during the bankruptcy?
A. As I understand it, they did.
Q. If you can take a look at what was previously marked as Exhibit 74. Exhibit 74 is an e-mail chain that starts on the second page with an e-mail from you dated September 2nd, 2025, to various attorneys; is that correct?
At the bottom of that second page.
A. Is that -- oh, the very bottom. From me to Lisa Peters, Zach, yourself, and Chase, Andrea, John Hall. Yes.
Q. Yes. And the subject line is, "Settlement proposal," correct?
A. Correct.
Q. This was after the motion to appoint a Chapter 11 trustee was appointed?
A. Days before the hearing started on this.
Q. The hearing was September 10th, correct?

A. I'll take your word for it.
Q. I think it was your birthday the next day, wasn't it?
A. September 13 is my birthday.
Q. September 13th? Okay.
A. So that's why I would have said a couple days before. But that's fine.
Q. Okay. In this e-mail, you propose to Frontier and the Unsecured Creditors Committee, in an effort to reduce fees and avoid costs of litigation in connection with the joint motion to appoint a trustee, you set forth the following terms for a global resolution.
Do you see that?
A. I do.
Q. Okay. And in this, you -- first bullet point: "Debtors will agree to a seventh interim cash collateral order that will install a new chief restructuring officer who will have complete control of the debtors' operations, any sale process, and any plan of reorganization."
Do you see that?
A. I do.
Q. Okay. And then the second bullet point pertains to how that new CRO would be elected.

A. I do.
Q. Is that correct?
And then the third bullet point: "The new CRO would agree that any budget he or she puts forth will include payroll to all insiders, including Tory Schwope, and the reimbursement of ordinary and reasonable business expenses approved by the new CRO for each employee."
Do you see that?
A. I do.
Q. Do you recall that prior to September 2nd of 2025, payments to insiders, including Mr. Schwope, had been stopped?
A. I don't recall, but would not surprise me.
Q. Okay. And then the next bullet point you propose to the Unsecured Creditors Committee and to Frontier is that: "The new CRO would agree that lease payments to insiders," which includes Schaffer's Farm, Adams 1 and 2, Colonial Garden and X Farm, "will continue."
Do you see that?
A. Throughout the case, correct.
Q. And Mr. Tory Schwope was -- had ownership interest in X Farm, correct?
A. He and his wife owned the X Farm. That is

correct.
Q. And did Mr. Tory Schwope or any family member of Mr. Tory Schwope have any interest in Schaffer Farm?
A. Is that the one he owned with his mom? I don't know.
Q. I think you're right.
What about Adams 1 and 2?
A. I don't recall.
Q. And Colonial Garden?
A. I think that was with his wife.
Q. And then the next bullet point is: "The new CRO will agree to continue to make the Volvo car payment, and that the car will stay titled and owned by Tory."
Do you see that?
A. I do.
Q. The three bullet points I just looked at, the first one, where Mr. Tory Schwope would continue to -- or would get paid for his services, that's a benefit to Mr. Schwope, correct?
A. All insiders. But, yes.
Q. Yes. And to the extent Mr. Schwope had ownership interest in at least X Farm and Colonial and Schaffer that you identified, those lease payments

would serve to benefit Mr. Tory Schwope, correct?
A. He would receive the payment, but the benefit would be to the debtor for the continued use of those properties.
Q. Okay. And then, obviously, being able to make the Volvo car payment that is titled in Tory's name and owned by him would be a benefit to Mr. Schwope, correct?
A. Okay.
Q. You agree?
A. It would be a benefit to Tory because the car was in his name because he got a better financing deal than what the debtor could get.
Q. And then the second-to-last bullet point: "The debtors' professionals, including OCP professionals, will serve at the command of the new CRO, and all estate professionals will continue to be paid in the ordinary course and under the approved budget," correct?
A. That's what it says.
Q. And then: "Tory Schwope would agree to report to work and to report to the new CRO."
Do you see that?
A. I do.
Q. Okay. So in connection with the proposal

that was put forth by the debtors, there was -- the appointment of the new chief restructuring officer was proposed, and there was a bullet point about selecting how that CRO would be selected.
And then the next three, I believe, would all serve to benefit Tory Schwope personally in some way, shape, or form?
A. Tory would get a benefit from those three items, but we now have learned that these could never be accepted because Frontier and the Unsecured Creditors Committee had negotiated and signed a plan restructuring agreement on August 25, during the debtors' exclusive period, which the debtor was not a party.
So when we sent this e-mail on September 7th, it was dead in the water.
Q. Okay. Not really my question.
My question is: Just looking at the seven bullet points that are here, as I see them, three of them would serve to provide Tory Schwope with a personal benefit of some kind?
A. But it could never happen because the agreement had been signed.
Q. You did not know that when you sent this e-mail?

A. No, I didn't. That's the problem with plan negotiations behind the debtor's back, is that the debtor doesn't know what they're doing.
Q. And Ms. Peters responds to your e-mail on September 4th of 2025, and essentially indicates that they are not agreeable to the terms proposed by debtors. And they set forth a proposed stipulation for the payment of a Chapter 11 trustee.
Do you see that?
A. She responded two days after the offer --
Q. Yes.
A. -- in which she says, "No, we cannot agree to that. If you want to give us full powers under the trustee motion, we'll take that."
Q. Yep.
A. But we now know that she had signed an agreement with the Unsecured Creditors Committee.
Q. Of course, you did not know that at the time, though, right?
A. During the debtors' exclusive period, we did not know that.
Q. Okay. Mr. Hall then forwards that response to Mr. Schwope, Samantha Schwope, Ms. Schwartzkopf, and Mr. Williams, correct?
A. That is correct.

Q. And Mr. Hall sends another e-mail asking if everybody is available to discuss. Mr. Schwope then responds: "What is there to discuss, John? This is a hard 'no.'"
Do you see that?
A. I do.
Q. Okay.
MR. MOOTHART: Let's take a short break.
MS. BUTER: Okay.
THE VIDEOGRAPHER: Going off the record at 4:16 p.m.
(Recess.)
THE VIDEOGRAPHER: Back on the record at 4:30 p.m.
Q. (By Ms. Buter) Are you familiar, Mr. Parres, with an attorney called Sarah Mattingly --
A. I am not.
Q. -- at Dinsmore law firm?
A. I am not.
Q. Okay. So safe to say you've never spoken with somebody called Sarah Mattingly?
A. I don't believe I have.
Q. Okay.
(Exhibit 109 was marked for identification.)
Q. (By Ms. Buter) I'm going to hand you what

I'm marking as Exhibit 109. Exhibit 109 is an article that was published in, I think, the Missouri Business Journal about your departure from Lewis Rice.
Did you happen to see this before?
A. It was sent to me.
Q. Okay. Who sent it to you?
A. I don't recall, but a friend did.
Q. Okay. The only reason I'm showing this to you is, in connection with your departure from Lewis Rice, you had previously represented a company called Pap-R Products Co; is that right?
A. Pap-R Products.
Q. Ah, Pap-R Products Co.
And you had spoken with an individual there called Scott Ware about your departure from Lewis Rice; is that right?
A. I don't believe I did. But...
Q. According to this article, anyway, Mr. Ware said: "I think he left the Lewis Rice law firm. When I talked to him, he said there's a difference in opinion between him and one of his partners."
And my question is: Did you talk -- do you remember talking to Mr. Ware and indicating there was a difference in opinion between you and one of your partners?

A. No, I did not.
Q. Are you aware of there being a difference of opinion between you and one of your partners at Lewis Rice?
A. I'm not aware.
Q. Did you agree with Lewis Rice's decision to ask you to resign from the firm?
A. I was disappointed.
Q. Did you agree with the decision?
A. I ultimately resigned, so I would say I agreed with it.
Q. Okay.
MS. BUTER: I do not have any further questions. Thank you for your time.
THE WITNESS: Mm-hmm.

EXAMINATION

BY MR. MILLER:
Q. Good afternoon, Mr. Parres. I have some mostly follow-up questions on what's been asked, and I have maybe one area of topics we haven't covered yet.
A. Thank you. I don't know that we've met.
Q. Yeah, I think we met on some St. Louis matters.
A. Oh, okay. I'm sorry. Adam is your first name?

Q. Adam Miller.
A. Oh, yeah. Okay. Adam. I agree now. I had put you up here, and I'm like, "I don't remember."
Q. I understand.
You have testified today about the accuracy of the schedules, and I think counsel here asked you some questions about your views on the accuracy of the schedules in this case.
Do you recall that testimony?
A. I do.
Q. Okay. You're aware that your clients would sign schedules and bankruptcy cases under penalty of the perjury, correct?
A. I do.
Q. In this case, did you undergo any process to review the schedules with Mr. Schwope or anybody at DCA for accuracy?
A. I wasn't in charge of this. Scott Moore would have, but I know Scott spent an enormous amount of time with the executives at DCA to go through the schedules.
Q. Okay. So you were not personally involved in any of those conversations?
A. I was not.
Q. Okay. Okay. You talked about, I think, a

cost-benefit analysis in amending schedules. Do you recall that testimony?
A. I do.
Q. Okay. Because your client signed the schedules under penalty of perjury, do you discuss with them whether it is worth amending the schedules if amendments might need to be made?
A. Absolutely.
Q. Okay. Did you discuss, in this case with Mr. Schwope, whether amendments needed to be made to the schedules or anyone else at DCA?
A. I personally didn't, but Scott Moore would have had those conversations. I know that we had a -- a couple things that needed to be amended.
Q. Okay. You've testified significantly today about Valley Hill Tree Farms; is that correct?
A. I -- it's come up, yes.
Q. Okay. You, I think, testified -- and correct me if I'm misstating your testimony -- that you did not believe that you needed to conduct an investigation into any of the business affairs of Valley Hill Tree Farms in this case; is that correct?
A. We left that to the Unsecured Creditors Committee because they had the opportunity to bring all of the causes of action in this case.

Q. Okay. You are aware, I think you testified earlier, that there was some debt on the financial statements that indicated that Valley Hill Tree Farms was obligated to Frontier; is that correct?
A. That's what the financial statements -- the audited financial statements revealed.
Q. And then when you reviewed -- or somebody at Lewis Rice reviewed the Frontier loan documents, you determined that was incorrect; is that true?
A. The audited financial statements that we were able to review were parties that we never spoke to. So we never had a conversation with whoever prepared that audited financial statement to show that a portion of the debt was assigned to Valley Hill.
Q. Okay. Did you ever ask any of the debtors' financial advisors to investigate why there was debt owed to Frontier on Valley Hill Tree Farms' financial statements?
A. I knew that there were intercompany transactions between the parties, so we would have had that discussion with Focus, yes.
Q. Okay. Did you ever determine why there was any debt booked on Valley Hill Tree Farms' books that was owed to Frontier?
A. I don't know that I made that

determination. We would have asked, when we prepared the schedules for the debtor and to Focus, to come to an agreement as to what that number is.

Q. Okay. I'm going to ask you to turn to Exhibit 88 in that binder.

A. Yes, sir.

Q. And do you see that these appear to be some e-mails between you and Ms. Samantha Schwope?

A. I do.

Q. And if you turn to the last page of the Exhibit, we'll take them in chronological order, which is in reverse of how they're presented here.

So if you go to the -- I think it's really the second-to-last page.

A. Yes, sir.

Q. There is an e-mail on July 25th of 2025 at 9:53 a.m.

Do you see that?

A. I do.

Q. Okay. And that appears to be from Ms. Schwope to you and Mr. Hall; is that correct?

A. That is correct.

Q. And it appears to reference some leased equipment that is being used by Schwope Brothers West Coast; is that correct?

A. That's what it says.
Q. Have you seen these e-mails before today?
A. I think they were part of John Hall's deposition, so I would have seen those.
Q. I did ask Mr. Hall about those, so your recollection would be correct. Schwope Brothers West Coast was one of the debtors in this -- in these cases, correct?
A. I believe that to be correct.
Q. Okay. And, in fact, that was one of the entities that was operating the Oregon property.
Would that be a true statement?
A. I don't know that I know that, but I won't doubt that.
Q. Okay. Well, in this e-mail, Samantha indicates to you that there are some equipment that is being used by Schwope Brothers West Coast; is that correct?
A. It says that: "Tory has leased equipment under his name that Schwope Brothers West Coast is using." Correct.
Q. And it indicates further that that equipment was leased to Tory in his personal name; is that correct?
A. That is correct.

Q. And the vendors are John Deere and Kubota; is that correct?
A. That is correct.
Q. Do you recall ever reviewing those lease agreements between Mr. Schwope and John Deere and Kubota?
A. No, but I wouldn't have. That would have been under Scott Moore's purview.
Q. Okay. Do you have any personal knowledge of whether Lewis Rice ever received those lease agreements?
A. I do not know.
Q. Okay. And it appears that Ms. Schwope is seeking advice as to how to essentially reimburse Tory for those lease payments.
Would that be a fair statement?
A. Or to get the debtors to pay for that. That is correct.
Q. Okay. So DCA or one of the entities would be paying Mr. Schwope for the use of that equipment; is that correct?
A. Or paying the John Deere and Kubota directly. But, yes.
Q. Okay. Well, it says specifically here: "We have three options for getting Tory paid"; is that

correct?
A. That's what it says.
Q. Okay. And then she provides three options. One is write a lease, then submitting a bill to Focus Management, or the third option was Tory pays the bill and gets reimbursed; is that correct?
A. That's what it says.
Q. And then you responded, if you go to the next e-mail, which would be the bottom of the page before, at 10:02 a.m.
Do you see that?
A. I do.
Q. Okay. And you said, I'm quoting here: "Write a sublease from Tory to SBWC"; is that correct?
A. It says: "Write a sublease from Tory to SBWC and pay it." It does.
Q. Okay. So at that point, there was no written lease agreement from Tory to Schwope Brothers West Coast; is that correct?
A. I don't know that.
Q. Okay. Well, you're --
A. I can assume, from these e-mails, that that's the case. But I don't know that.
Q. Okay. Had you seen a prior lease agreement between Tory and Schwope Brothers West Coast?

A. I had not.
Q. Okay. And, in fact, in the prior e-mail, Ms. Schwope indicates to you that no such agreement exists.
Isn't that a fair reading of that e-mail?
A. That's correct.
Q. Okay. Going to the next e-mail, which would be from Samantha at 10:05 a.m., so approximately three minutes later. She reports that: "He" -- I'm presuming -- would it be a fair statement that the "he" would be Tory?
A. I believe so.
Q. Okay.
-- "started leasing the equipment in May for John Deere, so I'll have to backdate that one."
Do you see that?
A. I do.
Q. Okay. And then she indicates that the lease for Kubota has not been signed yet; is that correct?
A. Correct.
Q. So would that lease with Kubota -- would that indicate that that lease is postpetition to you?
A. To the extent -- it says that there's not a lease. But to the extent a lease shows up, yes.

Q. And, in fact, in the very next e-mail you wrote back that -- you suggested he did this postpetition, and your exact words were: "That's not smart"; is that correct?
A. I say: "Yikes. He did this postpetition. That's not smart." That is correct.
Q. Why do you believe that it was not smart to do that postpetition?
A. Typically, I would like my clients to get permission to do those type of transactions.
Q. Okay. So you're aware, at this point, that neither Mr. Schwope nor the debtors had requested court approval to enter into these leases?
A. Can you ask that question again?
Q. Sure. Did the debtor -- at this point when these e-mails were exchanged on July 25th, had either the debtors or Mr. Schwope sought court approval to enter into these loan agreements?
A. I don't know that the debtor had signed a lease at this point. It was -- as explained to us, this would have been a lease with Tory and those two parties.
Q. Okay. Did you ever advise the debtor to obtain court approval for these loan agreements?
A. I asked John Hall if he thought this was in

the ordinary course of their business so that they wouldn't have to do that.

Q. And Mr. Hall, in fact, responds at 10:17 a.m.: "Not unless he did this regularly prepetition."

Do you see that?

A. I do.

Q. Okay. And when he says "regularly," I would take that to mean regularly leased equipment to one of his entities.

Would that be your understanding?

A. I don't know what John meant, but I think that's fair.

Q. Okay. So I took this to mean that Mr. Hall was responding that this would probably not be in the ordinary course of business.

Would that be your reading of this e-mail?

A. Unless he did this other times. That's correct.

Q. Okay. So I'll ask my question again: Do you believe that you advised the debtor to obtain court approval to enter into these leases?

A. I don't know that there was a lease that was entered into by the debtor.

Q. Okay. Well, do you know if Mr. Schwope ever received any payments on account of these leases

or subleases?
A. I do not know.
Q. Okay. Your last response, which is on the very first page of this, says to, quote: "Document a lease dated as of the date it was put in place. And if it's prepetition, the better"; is that correct?
A. Correct.
Q. What did you mean by, "If it's prepetition, the better"?
A. If the equipment was put in place before the petition was identified, that makes it a prepetition agreement.
Q. Okay. You testified earlier about affiliates of the debtors; is that correct?
A. That came up, yes.
Q. Okay. And, in fact, the term "affiliate" has a definition in the bankruptcy code.
Are you familiar with that?
A. I know it's in there.
Q. Okay. I think you testified and agreed earlier that both Valley Hill Tree Farms and all the debtor entities were owned primarily by Mr. Schwope; is that correct?
A. That is correct.
Q. So would it not, in fact, be true that

Valley Hill Tree Farms and the debtors were affiliates under the bankruptcy code?
A. Yes.
Q. Okay. You've testified at length today regarding your advice to Mr. Schwope to get his own lawyer.
Do you recall that?
A. I do.
Q. Okay. And you testified, I think, in response to committee counsel's questions that you advised him to get his own lawyer because any good Chapter 11 lawyer would do that; is that true?
A. Correct.
Q. Why would a Chapter 11 lawyer think it's important for the debtor's principal to have their own counsel?
A. To avoid this.
Q. Okay. And when you say "this," you mean what?
A. Being accused that you're his personal attorney.
Q. Okay. Did you ever consider whether Tory's interests were so intertwined with the debtors that you cannot proceed in this case without him having individual counsel?

A. I didn't.
Q. Okay. Can you walk me through the process that you followed when you executed the employment affidavit in this case?
A. Walk you through the process -- the application to be employed by Lewis Rice?
Q. Yes. So I'll rephrase that.
So committee counsel questioned you about the -- or might have been Frontier's counsel that questioned you about the affidavit that was attached to the employment application --
A. Yes.
Q. -- is that correct?
A. Yes.
Q. And you signed that --
A. I did.
Q. -- is that correct?
(Stenographer admonition.)
MR. MILLER: I'm sorry.
Q. (By Mr. Miller) Could you walk me through the process that you followed to determine the connections that were listed in that affidavit?
A. So Larry Parres's process of clearing conflicts for Chapter 11 debtor work is first to have an engagement letter drafted and reviewed by me. And

then, based on that engagement letter, we then send out what we call a -- an e-mail conflict, which my assistant would provide and send out through what I'm going to call conflict share, which goes to all of the attorneys in the firm.

And they acknowledge as to whether any of those parties are their clients, or if they're adverse to any of those parties, or whatever information they have regarding those parties.

Based upon that, all of that information then goes to -- and now I'm -- this is beyond my purview, but I believe it goes through Stephen Durbin, who then reviews all of the responses that are sent by all of the attorneys as to whether they identify any of the parties that are on that list.

And he also checks that against the firm's conflict base, wherever that is kept, and then sends you an e-mail as to whether or not there are any known conflicts from the attorneys and/or the conflict base.

Q. Okay. As a partner at Lewis Rice at the time, would you have had independent access to the conflict base, as you refer to it?

A. I don't know where it's at. I don't know how you get to it. I would have access to the client list, but I don't know that I would have access to the

client conflict base. I don't know where that's kept, or if it's kept, or if it's a software. I just don't know.

Q. Okay. When an e-mail -- well, let me strike that.

Do you know if your assistant ever sent a conflict e-mail out regarding the Chapter 11 representation of DCA?

A. I don't know, but -- I don't know.

Q. Okay. Do you know if any partners responded regarding any conflicts e-mails regarding the Chapter 11 representations in these cases?

A. I don't know. I do know that someone pointed out Ameren Illinois, so someone had to respond to something.

Q. Okay. When you signed the affidavit in this particular representation, what were you relying on to determine what to list in that?

A. The process I just went through.

Q. Okay. But you don't know if that process was actually followed in this case?

A. As I sit here, I don't know. I sure hope it was.

Q. Do you know if Mr. Wade or anybody else responded to you or to Mr. Durbin that Mr. Schwope was

a client?
A. To the contrary, we saw the Exhibit that said that Tory Schwope -- which I sent specifically to Stephen Durbin, in which Tory was listed. I said, "Are you telling me that none of these parties or creditors are adverse to the firm?"
Q. And I think we established that Mr. Durbin didn't respond to that e-mail; is that correct?
A. When we use the word "established," I don't know -- Steve would have responded. I don't know if he picked up the phone and called me, or if he sent an e-mail. I don't know the answer to that.
Q. So you were relying on Steve Durbin to ensure that -- that the conflicts were cleared in this case?
A. No. I sent him a specific e-mail regarding that list, because I know I was signing an affidavit and I wanted to make sure that -- the parties on that list, that we did not have any conflict with them.
Q. Okay. I think you testified earlier that you did not see the prior engagement letter, that would be Mr. Wade's engagement letter, until approximately two weeks before this deposition; is that correct?
A. That's correct.

Q. In what context did you first see that engagement letter?

MR. MOOTHART: I mean, I showed it to him because it was attached to John Hall's deposition. But --

MR. MILLER: Well, I think he can answer that.

MR. MOOTHART: Yeah, I know --

(Simultaneous speakers and stenographer admonition.)

MR. MOOTHART: I think that's fine. He can -- so --

A. It would have had to have been provided to me by counsel.

Q. (By Mr. Miller) Okay. Nobody at Lewis Rice independently provided that to you prior to your representation of DCA?

A. No. No one at Lewis Rice prior to -- no. I did not know that document existed.

Q. Okay. You mentioned, I think, that you first learned about the potential to represent DCA from -- you did not know it was Lou Wade, but from Lou at Lewis Rice; is that correct?

A. That's correct.

Q. Did Lou ever provide you with any details

about his representation of either Mr. Schwope or DCA?
A. He just said he was negotiating with Frontier on a forbearance agreement. I think they signed it. I'm not a hundred percent confident on that.
Q. Okay. Did you ask him for copies of any of the documents that he reviewed while he was representing DCA or Mr. Schwope?
A. I did not.
Q. Okay. You were shown a collection of your text messages during this deposition. Do you recall that?
A. I do.
Q. Okay. I think you indicated that that information was extracted from your phone in July; is that correct?
A. That's what the document says, correct.
Q. Okay. Do you know when you first provided your phone to anyone at Lewis Rice to review in connection with these matters?
A. I don't.
Q. Okay.
A. But it would have been around that time.
Q. You've said several times during this deposition that you were essentially -- you, DCA, was

paying three sets of financial advisors, so it was not Lewis Rice's job to investigate some of the financial questions in this case.

Do you recall that testimony?

A. I do.

Q. Did you ever have occasion to ask the debtors' financial advisors why there were discrepancies between the valuations that were being provided by independent evaluators, like Hilco and the debtors' books?

A. The debtors never -- during my tenure as debtors' counsel, we never saw those appraisals.

Q. Did you ever advise the debtors that they should get an independent appraisal?

A. We were waiting to see what those appraisals came back at. We understood that those were going to set the basis for the case.

MR. MILLER: I don't think I have anything further.

MR. DAVIS: This is Tim Davis for Focus Management Group. I don't have any questions for the witness at this time. Thank you, Mr. Parres.

MR. GOTHAM: Colin Gotham for DCA. I have, like, one or two questions, if that's all right.

EXAMINATION

BY MR. GOTHAM:
Q. Mr. Parres --
MR. GOTHAM: Sorry. Thank you.
Q. (By Mr. Gotham) As I understand and have learned, the debtors in the DCA case were basically separate entities with common ownership and some common debt.
Would that be fair to characterize the debtors in this case?
A. They were all co-borrowers of Frontier. That's correct.
Q. Okay. And generally, they were all owned by Tory Schwope, at least the supermajority owner of all of them; is that correct?
A. Correct.
Q. Okay. And there were various transactions between some of those entities, correct? There was some property-owning entity. There's some operating entities that maybe leased property from some of the property entities; is that fair to say?
A. Correct.
Q. And so there was intercompany leases between each other; is that right?
A. As I understand.
Q. Okay. And at times, one or more of those

entities didn't have the funds to pay the other entity that it owed money to; is that correct?

A. I don't know that.

Q. Okay. Were you aware that there were obligations? They would list them under the due tos and due fors with these various debtors among each other.

Were you aware that's how they were tracking that?

A. I was aware that there were intercompany transactions and debt ledgers.

Q. Okay. And so what was the plan to try to keep those companies, at least post filing, to be separated?

A. As I understand, and I was not a part of it, Scott Moore and Focus worked specifically with the UST to try to accomplish that ability. And I don't know how that came out. That was not something that I was working on.

Scott Moore from our office would have been.

Q. Who would review the monthly operating reports that were filed with the Court at Lewis Rice?

A. Scott Moore would have been reviewing that, and then he would have sent those to me for final

review, and I would skirt through them just so I would have an idea as to where the debtor was at.

Q. So did you -- you didn't personally, then, review the financial reports to determine if there was any ongoing intercompany transactions happening?

A. Only to the extent it was reported. Scott Moore was a CPA, so I thought he was the appropriate party to do that.

Q. Okay. And I think there was some questions about it, but there was -- the answers you provided weren't really, I think -- didn't answer the question. So I'm going to reask it.

When there's a transaction between the intercompanies and one entity gets paid some money from the other entity and -- Tory Schwope, as the owner of that entity, he receives a benefit from that transaction, correct?

MR. RUSKAMP: Object to form.

You may answer.

A. As the owner of that company, yes.

MR. GOTHAM: Okay. I do not have any further questions. Thank you.

MR. MOOTHART: Todd?

MR. RUSKAMP: I don't have any questions. Thanks.

MR. MOOTHART: Okay. Let's take a short break, then, and I'll let you know if I have any questions.

THE VIDEOGRAPHER: Going off the record at 4:59 p.m.

(Recess.)

THE VIDEOGRAPHER: We're back on the record at 5:05 p.m.

MR. MOOTHART: I do not have any questions.

Are we done?

MR. RUSKAMP: That's a question.

MR. MOOTHART: Here, I had a question.

We are done. Thank you very much.

THE VIDEOGRAPHER: Going off the record at 5:05 p.m.

THE STENOGRAPHER: What kind of transcript would you like? Hard copy, E-Tran, or both?

MS. PETERS: Expedited, rough, and E-Trans, please, by Monday.

MR. MOOTHART: He will read and sign. Send to me.

MR. DAVIS: I'll do an E-Tran with exhibits. And as long as you're expediting it for Vickie, I'll take it expedited as well, please.

MR. FAIRLIE: We would like it by Friday.

E-Tran with exhibits and rough.

MR. MILLER: E-Tran with exhibits, expedited.

MR. RUSKAMP: Same.

THE STENOGRAPHER: Do you want it expedited as well?

MR. RUSKAMP: Yes. No rough. Exhibits attached.

(WHEREIN, the deposition was concluded at 5:05 p.m.)

CERTIFICATE OF STENOGRAPHER

I, Meghan N. Minnick, RPR, CCR-MO #1428, CCR-KS #1787, do hereby certify that the witness whose testimony appears in the foregoing deposition was duly sworn by me; that the testimony of said witness was taken by me to the best of my ability and thereafter reduced to typewriting under my direction; that I am neither counsel for, related to, nor employed by any of the parties to the action in which this deposition was taken, and further that I am not a relative or employee of any attorney or counsel employed by the parties thereto, nor financially or otherwise interested in the outcome of the action.

Meghan N. Minnick, RPR, CCR-MO #1428, CCR-KS #1787

Veritext Legal Solutions
1100 Superior Ave
Suite 1820
Cleveland, Ohio 44114
Phone: 216-523-1313

October 2, 2026

To: Mr. Moothart

Case Name: In Re: DCA Outdoor Inc, Et Al. v.

Veritext Reference Number: 8450796

Witness: Larry Parres Deposition Date: 9/30/2026

Dear Sir/Madam:

Enclosed please find a deposition transcript. Please have the witness review the transcript and note any changes or corrections on the included errata sheet, indicating the page, line number, change, and the reason for the change. Have the witness' signature notarized and forward the completed page(s) back to us at the Production address shown above, or email to production-midwest@veritext.com.

If the errata is not returned within thirty days of your receipt of this letter, the reading and signing will be deemed waived.

Sincerely,
Production Department

NO NOTARY REQUIRED IN CA

DEPOSITION REVIEW
CERTIFICATION OF WITNESS

ASSIGNMENT REFERENCE NO: 8450796
CASE NAME: In Re: DCA Outdoor Inc, Et Al. v.
DATE OF DEPOSITION: 9/30/2026
WITNESS' NAME: Larry Parres

In accordance with the Rules of Civil Procedure, I have read the entire transcript of my testimony or it has been read to me.

I have made no changes to the testimony as transcribed by the court reporter.

_______________ ________________________
Date Larry Parres

Sworn to and subscribed before me, a Notary Public in and for the State and County, the referenced witness did personally appear and acknowledge that:

They have read the transcript;
They signed the foregoing Sworn Statement; and
Their execution of this Statement is of their free act and deed.

I have affixed my name and official seal

this ______ day of_____________________, 20____.

___________________________________
Notary Public

___________________________________
Commission Expiration Date

DEPOSITION REVIEW
CERTIFICATION OF WITNESS

ASSIGNMENT REFERENCE NO: 8450796
CASE NAME: In Re: DCA Outdoor Inc, Et Al. v.
DATE OF DEPOSITION: 9/30/2026
WITNESS' NAME: Larry Parres

In accordance with the Rules of Civil Procedure, I have read the entire transcript of my testimony or it has been read to me.

I have listed my changes on the attached Errata Sheet, listing page and line numbers as well as the reason(s) for the change(s).

I request that these changes be entered as part of the record of my testimony.

I have executed the Errata Sheet, as well as this Certificate, and request and authorize that both be appended to the transcript of my testimony and be incorporated therein.

_______________ ________________________
Date Larry Parres

Sworn to and subscribed before me, a Notary Public in and for the State and County, the referenced witness did personally appear and acknowledge that:

They have read the transcript;
They have listed all of their corrections in the appended Errata Sheet;
They signed the foregoing Sworn Statement; and
Their execution of this Statement is of their free act and deed.

I have affixed my name and official seal this ______ day of_____________________, 20____.

___________________________________
Notary Public

___________________________________
Commission Expiration Date

ERRATA SHEET

VERITEXT LEGAL SOLUTIONS MIDWEST

ASSIGNMENT NO: 8450796

PAGE/LINE(S) / CHANGE /REASON

____________________________________________________
____________________________________________________
____________________________________________________
____________________________________________________
____________________________________________________
____________________________________________________
____________________________________________________
____________________________________________________
____________________________________________________
____________________________________________________
____________________________________________________
____________________________________________________
____________________________________________________
____________________________________________________
____________________________________________________

_______________ ________________________

Date Larry Parres

SUBSCRIBED AND SWORN TO BEFORE ME THIS ________

DAY OF ________________________, 20______ .

___________________________________

Notary Public

___________________________________

Commission Expiration Date

**&**

**&** 6:12 8:4,15 8:20 117:25 225:25 226:1

**1**

**1** 109:20 120:24 145:5 153:7,11,25 167:17 201:8 201:13 202:19 250:15,17 262:19,24 273:19 274:8
**1,000** 102:19
**1-314-241-6...** 9:10
**1-877-421-0...** 9:11
**1.4** 158:9
**10** 9:9 62:14,14 62:15,16,17 101:9 102:18
**10,000** 110:17
**100** 4:17 80:11 102:19 104:22 125:15,16
**1000** 7:6
**101** 4:18 134:5 134:6
**102** 4:20 144:23,24
**103** 4:21 213:16,18,18
**104** 4:23 234:2 234:3,4,12 235:8,22
**105** 5:1 239:25 240:2,4
**106** 5:2 244:13 244:14,18,24
**107** 5:4 251:7,9 251:9,14
**108** 4:10 5:6 260:23,25,25 261:8 264:13
**109** 5:9 278:24 279:1,1
**10:02** 287:10
**10:05** 288:8
**10:12** 64:10
**10:22** 64:13
**10:28** 68:22
**10:32** 163:7,19 164:11,13 165:12
**10:35** 68:25
**10:38** 156:13
**10:40** 160:9 171:22
**10:42** 109:17
**10:43** 154:9
**10:44** 160:12 163:1
**10:45** 160:25
**10:47** 163:1
**10th** 261:1,3,6 262:16,24
271:25
**11** 1:5 2:4,20 6:6 20:24 25:10 27:20 51:7,8,16 56:10 73:20 76:2,10,15 77:12 78:5 83:14 86:4,13 102:4 126:23 127:18 131:11 136:19 212:16 216:14 217:7 219:13,23 271:23 277:8 292:12,14 293:24 295:7 295:12
**1100** 306:1
**116** 4:11
**11:03** 109:16
**11:32** 116:8
**11th** 104:16,19 106:10 107:14 107:15 129:1 135:10 190:8
**12/16/24** 2:25
**120** 4:13
**1200** 8:10
**124** 4:15
**125** 4:17
**12:21** 116:11
**12th** 46:23 47:3 47:8 169:17
170:18 190:9 193:13 235:2 237:8
**13** 3:4 272:4
**13,000** 246:22
**130** 182:2
**134** 4:18
**139** 2:14 144:19
**13th** 272:5
**14** 2:12 205:1 207:21
**1400** 7:7 9:9
**1428** 9:8 10:3 305:3,17
**144** 4:20
**145** 2:15
**14th** 204:7 205:16 217:20 219:21
**15** 101:10
**160** 250:23
**165** 250:23,23
**165,000** 244:25
**1650** 7:14
**16th** 183:16,18 185:2,5,8
**17** 4:3
**177** 2:5
**1787** 9:8 10:3 305:4,17
**17th** 68:7 135:8 136:24 137:7 138:13,21

139:13,18 144:15 155:22 168:23 171:21 174:9 267:2
**182** 163:3,11 164:14
**1820** 306:2
**183** 2:24 156:10,11
**184** 154:4 162:21
**186** 2:20,23
**188** 166:3,4
**189** 167:10
**18th** 28:11 148:5,6 150:2 150:7 152:3 154:8 156:9,12 159:25 161:11 163:2,7 165:23 213:21,24
**193** 3:4
**19th** 28:11 172:17 185:5,9 188:7 193:25 194:9 202:7
**1:05** 149:15
**1:07** 149:18
**1:42** 177:18
**1:44** 209:7
**1:44:18** 209:5
**1:56** 177:21
**1st** 201:6 202:15

**2**

**2** 101:16 103:12 109:13 109:19 219:12 273:19 274:8 306:4
**2,000th** 135:21
**2-21** 23:18
**2.6** 204:6
**20** 175:15 238:19 307:16 308:22 309:22
**200** 8:5
**200,000** 190:4 190:13 191:6 191:14
**2004** 207:24 208:7,8,13 210:6
**201** 3:12
**2014** 187:6,12
**2016** 187:12
**2020** 243:7
**2022** 202:7
**2023** 231:7,11 241:12 247:6,9 248:15,23 256:21 257:1
**2024** 183:16,18 185:2,9 188:7 191:3 231:7,11 232:4 241:12 248:13,13
**2025** 4:3 22:19 36:5,7 39:2,7 46:23 47:3,8 48:11,19,22 52:7 53:9 59:12 64:20 65:2,6 68:7 86:3 88:9 95:4 97:5 100:4 104:17,18,19 106:10 109:15 116:23 129:3,4 131:11 136:12 136:24 137:7 139:13 144:16 145:5 152:3 154:8 156:12 166:13 171:4 172:17 176:18 177:9 182:22 190:9 193:6,13 194:1 196:7 201:6 202:15 202:19 205:16 213:21,25 217:20 218:22 230:7 235:2 237:8 244:20 246:3 250:15 251:11 252:9 256:11,15 261:2,3 262:16 262:24 271:13 273:12 277:5 284:16
**2026** 1:12 6:10 10:9 12:9 13:7 16:3 18:1,4 19:4 133:8 167:7 168:23 169:17 179:16 306:4
**205** 2:12
**20th** 28:11 51:23,25 52:7 52:15,17 53:1 53:9,20,21 54:1,9,23,25 57:1 59:12 60:1,9 173:1 193:6 194:1 195:22 196:7
**21** 2:14 139:7
**213** 4:21
**216-523-1313** 306:3
**217** 3:1
**21st** 251:11,12 252:9,17
**22** 3:22
**224** 3:2
**229** 3:8
**23** 2:15 129:10 145:25 232:2,3 241:24 254:1 254:13
**234** 4:23

**239** 5:1
**23rd** 100:3
**24** 129:10 232:2 241:24 241:25 254:1,3
**244** 5:2 171:15 174:5
**245** 3:15
**25** 195:22 276:12
**25,000** 189:21
**25-50053-11** 1:4 6:5 10:11
**251** 5:4
**252** 174:10,11 175:1
**253** 175:15
**255** 176:18
**2555** 8:15
**256** 3:10
**25th** 131:16,18 218:22 256:11 256:15 284:16 289:16
**260** 5:6
**266** 85:2 153:12,25 167:17 174:1,6
**268** 3:6
**26th** 131:12 217:1 243:22
**271** 3:14
**278** 5:9
**280** 2:6
**284** 3:17
**287** 84:19,20,21
**28th** 109:15 176:18 177:9 244:20
**29** 2:19
**299** 2:7
**29th** 42:20
**2:52** 175:16
**2nd** 271:13 273:11

**3**

**3** 124:22
**3,000th** 172:3
**30** 1:12 6:10 18:3 161:4 175:4 178:20 180:17
**30th** 10:9 250:16
**310** 6:13 8:21
**314** 205:20
**31st** 24:17
**327** 2:21
**329** 2:21
**341** 4:8 93:5,9 93:11,13 99:20 99:24 203:1,2 203:3,4,20 204:4,9,12,18 205:24 207:4 208:18 210:3,5 210:16 211:2
**3440** 7:21
**34431** 305:17
**35** 2:17 84:3,5 84:9,10 85:12 153:4 155:9 243:10
**351** 85:20
**36** 2:19 29:4 30:21 31:2 33:1 38:24
**363** 214:17,21
**38** 181:14
**3800** 8:10
**3:03** 233:20
**3:20** 233:23
**3rd** 24:15 26:3 27:4 116:23 118:9

**4**

**4** 39:2
**4,000th** 176:7
**4/24** 208:17
**4/24/25** 208:15 209:5
**40** 3:24 125:2
**400** 7:21
**402-346-6000** 7:15
**408** 5:5
**42** 2:20 186:4
**43** 2:23 186:4
**44** 2:24 183:6 183:10 184:6 184:11
**44114** 306:2
**46** 217:17
**47** 3:1 217:16 217:19,23 219:1
**4801** 6:12 8:20
**49** 3:2 224:11
**4:16** 278:11
**4:30** 278:14
**4:59** 303:5
**4th** 39:20 40:1 40:7 277:5
**4x** 87:12

**5**

**5** 39:7 251:20 252:14,19 253:1,4
**50** 267:7
**50,000** 5:7 261:15,18
**50/50** 71:12
**51** 3:4 85:4 193:21,24 194:6 195:1,9
**54** 90:20 91:25
**55** 91:25
**57** 3:6 268:1,3
**58** 4:1
**5:05** 6:11 303:8 303:15 304:10

**5th** 13:21,22 14:17,22 15:11 15:17 17:8,10 17:25 20:17 39:15,19,21 48:10,19,22 49:9 95:3 97:5 97:11 182:21 246:15

**6**

**6** 95:23,24 178:20 180:17 214:12
**601-604** 3:24
**603** 44:2
**61** 3:8 229:25
**616-0252** 205:20
**63** 3:10 256:9 256:10
**63102** 9:10
**64105** 8:11
**64106** 7:7,22
**64108** 8:16
**64112** 6:13 8:21
**65,000** 249:9
**66217** 8:5
**68** 4:3
**68102** 7:15
**6:24** 86:3
**6th** 12:9 13:7 13:19,20 15:18 16:3,25 17:15 17:23 42:16,24 86:3,24 246:15

**7**

**7** 95:22,25
**7-9** 205:12
**72** 3:12 201:2,5 202:4
**7225** 8:4
**74** 3:14 271:11 271:11
**79** 205:11
**7:59** 58:23
**7th** 248:12 276:16

**8**

**81** 243:13,16
**816-374-3241** 8:11
**816-474-8100** 7:8
**816-512-1940** 7:22
**816-559-2319** 8:16
**816-756-0700** 8:22
**84** 2:17 3:15 245:21,23,24 246:1
**8450796** 306:7 307:2 308:2 309:2
**88** 3:17 209:2 284:5
**89** 3:22 22:20 23:3,9

**9**

**9,000** 245:15
**9/11** 157:10
**9/30/2026** 306:8 307:3 308:3
**90** 3:24 40:13 40:14 43:5 46:23
**91** 4:1 58:4,9 58:13 59:5
**913-962-8700** 8:6
**92** 4:3 68:4,5 69:2,4,8 70:6 70:13 71:21,24 73:11 74:15 75:9,15,25 266:15
**93** 4:4,4 93:21 93:22 97:11
**94** 4:6 97:2,3 97:10
**95** 4:8 99:18,19 99:19 103:6
**96** 4:10 108:23 108:24
**97** 4:6,11 116:12,14,19 121:1
**98** 4:13 120:18 120:19
**99** 4:8,15 104:22 124:7,8 125:17
**99.9.999** 255:25
**9:06** 13:4
**9:24:23** 206:4
**9:25:50** 206:16
**9:30:17** 206:24
**9:30:31** 207:9
**9:40** 207:13
**9:44:55** 207:14
**9:53** 176:18 284:17
**9th** 7:21 118:9 230:7 231:2 246:3,13 248:19

**a**

**a.m.** 10:7,10 13:1,4 64:10 64:13 68:22,25 109:16,17 116:8 171:22 175:16 206:4 206:24 207:9 284:17 287:10 288:8 290:4
**ability** 13:24 19:11 105:1,2 105:4,16 125:2

125:3 168:14 199:12 213:12 301:17 305:7
**able** 109:10 110:22 128:4,5 180:5 182:3 193:15 201:15 216:4 232:7 269:23 275:5 283:11
**above** 110:25 209:8 306:17
**absolute** 270:11
**absolutely** 24:14 58:3 88:3 93:20 177:13 186:20 220:19 239:1 282:8
**absorbant** 238:20
**accepted** 107:12 228:6 276:10
**access** 117:4,10 168:25 169:1,2 238:9,24 239:8 239:16,17 241:7 294:21 294:24,25
**accomplish** 223:2 301:17
**accordance** 307:5 308:5
**account** 191:9 247:18 290:25
**accounting** 238:21 255:3,8 255:17 256:4 268:7
**accuracy** 96:25 235:3,17 236:5 281:5,7,17
**accurate** 53:16 56:20,23 57:5 70:10 96:2 102:3,14 103:15 112:17 126:15 154:1 242:1 257:23 259:4
**accurately** 103:14
**accused** 292:20
**acknowledge** 294:6 307:11 308:16
**acrobat** 39:17
**act** 307:14 308:20
**acting** 78:19
**action** 57:4 78:2 107:22,23 113:13 202:16 252:14,19 282:25 305:10 305:14
**actions** 20:14 65:24 66:3,11 151:17
**activity** 17:11 267:14
**actual** 239:9
**actually** 39:12 75:8 82:3 94:21 106:22 107:12 200:13 201:1 209:8 226:10 270:21 270:22 295:21
**adam** 7:19 11:3 280:24 281:1,2
**adam.e.miller** 7:23
**adamant** 212:12
**adams** 273:19 274:8
**added** 264:10
**adding** 36:14
**additional** 19:5 19:12 28:18,22 43:21,22 45:3 45:13,21 107:19 257:21
**address** 9:9 42:3 138:17 146:1 172:13 175:9 207:25 215:2 250:21 306:15
**addressed** 138:16 183:20
**addresses** 82:24
**adjusted** 258:6 258:11,12,14 258:20
**adjustment** 255:3 256:2 258:7
**adjustments** 254:23 255:13
**admissible** 5:5
**admonition** 15:5 25:22 81:9 102:25 253:2 293:18 297:10
**adobe** 39:17
**adopted** 76:22
**adp** 195:16
**adverse** 35:22 36:2,2 37:16 37:20 38:1,3,6 40:24 42:7 43:22 45:3,9 45:11,14,21,23 57:13,16,20,22 57:24,25 58:2 89:23 90:2,10 90:11 144:8 294:7 296:6

**advice** 21:15 142:11,20,23 143:3,4,5,9 144:14 164:7 211:23,25 286:14 292:5
**advise** 49:20 50:16,18 51:24 73:11,16 131:24 132:2 289:23 299:13
**advised** 50:13 92:8 135:16 221:15 290:20 292:11
**advising** 65:23 66:2,10
**advisor** 72:25 74:14,22 106:25 124:5 127:24 220:25 221:2,3 222:3 260:9,11,18
**advisors** 65:10 65:16,20 67:10 72:3,7,12 125:8 128:9 129:15 220:25 221:6,15,21,23 222:10,16 257:24 259:7 259:10 260:1 260:12 263:4,5 263:9,18 264:2 264:7 265:3,8 269:9,13 283:16 299:1,7
**affairs** 138:11 139:18 282:21
**affected** 266:4
**affidavit** 185:23 186:15 293:4,10,22 295:16 296:17
**affiliate** 158:14 158:16 291:16
**affiliated** 147:16,25 158:18,19,20 158:21,22 170:21
**affiliates** 30:13 291:14 292:1
**affiliations** 10:14
**affirmatively** 98:7
**affixed** 307:15 308:21
**afford** 123:14
**afraid** 229:11
**afternoon** 124:22 178:2 280:18
**ag** 229:12,13,22
**agent** 104:3 229:1
**aggravated** 91:9
**ago** 120:4 188:16
**agree** 25:20 26:5 43:15 45:19 46:20 51:9 56:2,3,6 61:6 62:21 70:24 71:7,8 76:4,10,16 78:6 91:21 94:9 107:3,17 108:3 109:12 110:16 119:15 122:14 132:9 142:10,18,22 144:12 149:6 150:18 158:15 165:21 187:14 187:20 217:9 224:16 248:14 270:23 272:17 273:4,17 274:13 275:10 275:21 277:12 280:6,9 281:2
**agreeable** 277:6
**agreed** 10:1 129:25 130:10 131:23 249:25 260:15 264:20 265:1 280:11 291:20
**agreeing** 107:19
**agreement** 5:1 17:23 18:10,13 18:14,14,16,17 18:20 19:8,9 19:15,17,21 22:15 27:24 31:6 54:14,19 54:22,24 88:24 90:7 110:12 130:2 131:14 192:25 193:1,7 216:6,22 225:3 226:13,16 227:2,11,18 246:13 248:2,2 249:5,12 266:5 270:12,17,20 270:22,22 276:12,23 277:17 284:3 287:18,24 288:3 291:12 298:3
**agreements** 54:10 55:7 197:19,21 286:5,11 289:18,24
**agriculture** 236:24

**ah** 279:13
**ahead** 160:11 201:12 218:4 263:16
**airport** 91:8
**al** 1:4 6:5,17 306:6 307:3 308:3
**allegations** 69:12,16,21 70:1,5,8,10,13 70:16 71:20 73:1,4 75:15 75:24 267:5,10 267:13,18 269:22
**alleged** 200:25
**allow** 56:4,5 128:20 228:4 231:16
**allowing** 216:4
**alternative** 219:23 221:12 221:25
**amazing** 105:15
**ambiguous** 69:11 132:11
**amen** 244:10
**amend** 95:14 95:18,24 98:10 98:18,23
**amended** 250:20 282:14 281:16 295:24
**amending** 96:6 282:1,6
**amendments** 96:2 282:7,10
**ameren** 37:9,10 37:11 38:20,20 38:21 295:14
**amount** 123:12 243:2,7 245:4 245:5,15,17 248:17 249:11 250:19 281:19
**amounts** 65:21
**analysis** 96:1 101:15 198:14 231:1,9 232:1 232:10 263:21 282:1
**analyze** 257:22
**andrea** 271:17
**animosity** 90:13
**anna** 7:5 10:18
**annual** 18:22
**answer** 15:1 36:19,20 41:14 47:25 50:24 51:4 55:12 57:7,15 61:10 63:22,24 67:23 68:3 71:4 72:14 78:25 80:25 81:14,24 95:20 110:6 123:19 136:2 137:9 140:11 144:10 146:7 149:21 150:21 151:15 156:3 167:8 170:24 171:1 187:11 187:19 188:1 188:11 212:19 232:16 255:19 263:10 264:8 266:21 296:12 297:6 302:11 302:19
**answered** 51:11 81:25 108:2
**answering** 206:12 210:18
**answers** 139:16 214:8 302:10
**anybody** 12:11 12:13 13:13,24 14:12,21 15:12 16:12,19,22 17:20 24:25 48:17 52:20 53:4 54:6 67:12 75:13 103:17 141:8 144:13 145:16 147:7,12,19,25 238:13 240:19 255:15,21
**anymore** 156:23
**anyone's** 18:8 20:21
**anything's** 122:15
**anytime** 64:5 174:8
**anyway** 279:18
**apologies** 42:21
**apologize** 13:21 15:9 42:23 66:7 79:13 91:15 109:21 182:15 201:10 201:12 209:14 209:15 213:5 218:3 225:2 234:21 242:7 254:7,17
**appear** 82:1 284:7 307:11 308:15
**appearance** 141:15
**appearing** 7:3 7:11,18 8:2,8 8:13,18
**appears** 11:10 30:25 41:7 48:9 164:14 175:21 185:3,8 206:23 207:17

218:1,6 223:10 234:12,22 261:6 262:2 284:20,23 286:13 305:5
**appended** 308:11,18
**applicable** 214:17
**application** 2:20 185:18 245:19 246:10 250:17,20 293:6,11
**applications** 80:10,18
**applies** 19:18
**appoint** 131:10 132:3 135:15 202:20 211:8,9 212:9,22 215:24 271:22 272:11
**appointed** 75:20 135:12 189:13 212:10 212:17 217:12 232:25 265:22 270:1 271:23
**appointing** 106:18 107:23 211:15 212:4
**appointment** 107:3 215:22 215:25 216:1 216:14 268:9 268:25 269:6 276:2
**appraisal** 118:20 121:22 122:4,21 129:10 130:7 228:12 229:14 230:3,9,15 233:25 299:14
**appraisals** 117:20,20 119:24 120:1 120:12 121:15 122:9,12 123:13,16,18 123:21 129:17 129:25 130:4 130:15,20 225:16,19 226:4,6 227:3 227:8,17,20,24 228:1,5,8 230:4 236:2,22 237:2,10 299:12,16
**appraise** 129:21
**appraised** 129:22
**appraiser** 121:18 236:11 237:3
**appraisers** 117:24 118:5 119:12 123:3,6 129:20 225:23
**appraising** 225:24
**appropriate** 101:6 152:14 302:8
**approval** 289:13,17,24 290:21
**approve** 108:9 108:11 111:2 247:15 248:7 250:14
**approved** 108:9,12 145:17 185:18 241:16 273:7 275:18
**approximately** 190:6 245:15 288:8 296:23
**april** 4:3 68:7 95:3 97:5,11 100:3 116:23 118:9,9 205:16 230:7 231:2 246:3,13,15,15 248:12,19 250:15,17 251:11,12 252:9 261:1,3 261:6 262:16 262:24,24
**aprio** 260:4,9
**area** 181:13 280:20
**areas** 198:8
**argumentative** 187:25
**article** 5:9 279:1,18
**artificially** 229:15
**aschuler** 7:9
**aside** 17:15 170:17 211:5
**asked** 13:9,22 14:6,13,18 15:11,13,17 16:4,7 19:23 30:24 42:15 43:18 45:5 60:6 66:15 72:11 94:24 95:2 110:8 119:18 132:1 138:11,16 140:14 141:1,2 141:13 144:21 148:6,8,16,23 149:3 151:21 167:14,20 168:2,7 170:9 171:13 178:7 180:8 181:17

190:16 193:10 193:11 196:21 197:1 207:4 210:20 225:15 227:23 232:18 238:21 240:8 246:14 247:7 257:14 258:5 259:23 265:10 265:12 266:6 269:9,14,15,16 280:19 281:6 284:1 289:25
**asking** 14:3 15:19,25 43:20 45:19 59:6,8 75:6 81:15 100:4,18 117:2 117:3,10 124:3 145:1 148:2 149:8 150:15 151:4,9,17 152:3,11,15 160:15 164:6 164:10,19 167:12 180:9 235:3 239:22 261:9,22 278:1
**asks** 98:14 99:4 100:24 141:8 172:13 175:2 261:22
**aspects** 140:2
**assessment** 51:13
**assessments** 176:10
**assets** 61:5,7,12 61:14,15,16 70:2,6 71:1 127:12 161:1 162:3,7 198:10 198:17 199:4 199:21 219:17 222:17,18 251:1,21
**assigned** 19:5 283:14
**assignment** 307:2 308:2 309:2
**assist** 27:17 49:25 112:13 140:14
**assistance** 22:7 92:6,11
**assistant** 30:11 35:8,9 294:3 295:6
**assistants** 75:22
**associate** 199:17 213:25
**associated** 204:13
**assume** 12:15 77:23 180:24 183:15 192:23 193:8 198:4 237:24 287:22
**assumed** 192:19
**assumes** 51:5
**assuming** 35:9 52:14 173:14 180:25 204:10
**assumption** 17:19 57:2 61:13 159:10 200:9
**attached** 2:16 2:19 3:12 5:13 32:15 118:13 146:4 173:10 201:25 237:19 293:10 297:4 304:8 308:7
**attaches** 146:4
**attaching** 218:20 235:13
**attachment** 134:15,16,18 201:25 202:1
**attempt** 195:16 248:10
**attend** 80:20 81:22 82:5 93:9 179:24
**attended** 93:10
**attending** 81:6 132:18
**attention** 78:1 79:10,16 105:14 186:3
**attorney** 5:9 35:10 44:18 51:16 54:14 73:12,14,17 77:11 81:12 83:21 95:8 101:14 135:22 136:19,21,22 151:8,12 171:10 172:2,4 174:22,25 278:16 292:21 305:12
**attorneys** 34:13 35:4 44:21 76:20 95:23 139:2 143:11 144:19 168:3 179:9 204:14 256:1 271:14 294:5,14,19
**audit** 129:10,16 231:7,11 232:2 232:3,4 241:24 241:25 247:6,9 247:12 248:24 254:2,3 257:1
**audited** 158:8 158:10 283:6 283:10,13

**auditors** 255:13
**audits** 231:15 231:16,22,23 241:12 254:13
**august** 12:9 13:7,19,20,21 13:22 14:17,22 15:11,17,18 16:3,25 17:7,9 17:14,22,25 20:17 64:20 65:2,6 107:16 131:11,12,16 131:18 200:15 200:18 216:19 217:1 256:11 256:15 276:12
**authority** 108:4 108:10
**authorize** 308:11
**authorizing** 2:21
**avail** 230:10 237:2,5
**available** 111:25 222:12 278:2
**ave** 306:1
**avenues** 198:5
**avoid** 122:24 123:1 141:14 142:1,9 143:11 144:6 212:16 272:10 292:17
**aware** 31:1 38:23 48:17 64:17,18 144:13,22 145:20,22 159:17,19,24 178:24 185:11 185:15 189:3 195:17 199:25 200:10 204:10 208:8 211:14 212:7,24 213:7 213:11,14 222:14 242:9 250:25 254:25 255:6 265:20 265:24 280:2,5 281:11 283:1 289:11 301:4,8 301:10

**b**

**b** 3:20 4:21 33:16 128:14 178:20 180:17 215:3,6
**back** 13:3 35:17 42:19,21 64:12 67:7 68:24 89:20 91:8,8 98:13 112:23 113:12 114:18,21 116:5,10 120:8 125:21 134:7 149:12,17 156:14,20 162:20 163:3 167:12 175:1 177:20 182:12 182:17 194:25 215:8 216:25 217:5 218:16 226:24 231:20 233:22 234:5 242:23 249:18 250:5,23 257:15 264:17 269:10,16,18 277:2 278:13 289:2 299:16 303:7 306:15
**backdate** 288:15
**background** 88:20
**bacon** 8:15
**bad** 29:15 71:13 107:9 125:23 126:3
**badly** 213:6
**bags** 91:7
**balance** 254:22 258:21,22 259:3,11 260:19
**balances** 242:10
**bank** 22:15
**bankrupt** 70:3 70:11 71:5
**bankruptcies** 17:12 18:6,19 20:3,15,19 29:14 53:23 54:8,23 55:9 55:14 91:17
**bankruptcy** 1:1 6:1,15 10:12 20:24 21:14,15 21:18 27:20 38:4 48:15,20 48:24 49:4,17 51:16 54:13 55:21 56:18 61:4,6,7,20,21 62:1,16 63:7,8 63:12 64:3 70:25 71:2,10 71:15 73:18,20 76:10,15,16 77:1,7,13,20 78:6,21 83:10 83:11,13,18 84:1 88:5 93:18 94:1,6 94:14 98:12 103:13,16 104:11 136:19 158:5,10 160:2

181:2,8,13,19 182:21 185:17 187:1 188:21 189:6 198:10 198:11 211:14 212:16,21,25 213:8 214:22 216:2 218:13 219:23 220:3 220:17,18 221:9 223:1,4 223:7,17 224:25 226:3 229:2,18 233:7 238:17 241:20 242:21 246:23 250:25 263:3 271:8 281:12 291:17 292:2
**base** 34:20,21 34:22,23 37:4 40:24 89:19 105:15 294:17 294:19,22 295:1
**based** 24:16,21 25:11 37:19 38:3 40:3 44:10 153:20 187:7 229:17 229:18 232:10 237:15 239:7 239:11,13 247:11,13 259:1 294:1,10
**basically** 217:12 300:5
**basis** 18:22 67:6 149:20 150:20 151:14 215:21 268:8 299:17
**bates** 44:1 84:16 243:12
**battle** 252:16 252:18
**bclplaw.com** 8:12
**beating** 204:2
**beattie** 44:21
**becoming** 49:8
**began** 22:17 48:9
**begged** 136:21
**beginning** 47:23 88:6 90:14 105:18 128:8 188:6
**begins** 41:3 43:5
**behalf** 1:10 6:18 10:16,19 10:22 11:6,20 27:23 56:11 80:1 104:13,20 104:24 105:23 140:19 158:5 159:9 178:5 189:16 197:12 198:15,15 218:22
**belief** 19:10,13 151:22,25 152:21 248:9
**beliefs** 152:25
**believe** 18:7 19:23 20:1,4,5 21:16 25:17 26:17 29:4 31:5 35:14 37:7 38:19 40:6 41:17 42:5 47:21 49:7 50:13 53:9 55:1 56:13,17,22 57:4,11 59:14 60:5 65:1 68:2 71:12 72:24 73:13 74:13,17 80:5,12 90:12 91:10 93:10,11 96:16 97:4 102:14 131:12 134:15 136:4 137:5,14 139:4 150:1,3 151:16 152:4,6,7,14 153:3,24 156:2 161:8 167:9 169:23,25 170:1 171:1 180:7 182:21 186:25 190:4 190:17 192:12 193:4 194:17 195:2 201:2 203:20,22 211:10 222:20 224:23 225:22 228:14 231:2 231:18,19 233:14 235:10 237:6 238:10 243:6 247:11 252:4,11 253:9 253:25 258:10 260:7 270:12 276:5 278:22 279:17 282:20 285:9 288:12 289:7 290:20 294:12
**believed** 65:20 128:3 137:17 197:16 222:20 267:17
**believes** 151:21
**belong** 198:11
**beneficial** 80:14
**benefit** 96:1 101:15 198:17 199:22 219:15 274:21 275:1,3 275:7,11 276:6

276:8,21 282:1 302:16
**benefited** 65:24 66:3,11
**bergan** 231:19 241:11,16,19 241:23 242:13 242:19 243:4,5 244:3 247:23 250:19 254:14 256:6,24 257:3 258:5,18
**bergankdv** 5:3 244:20 246:7,9 247:4 248:3,12 250:15,22 256:16
**bergankdv's** 246:10 249:15
**berra** 33:14,15 33:16
**best** 17:19 51:17 78:19 105:13 108:17 124:5 178:5,8 221:16 222:21 238:5,9,10,16 238:24 239:8 239:18,19,20 239:20 240:6 240:12,18,20 240:25 241:4,7 271:3 305:7
**better** 83:9 88:9 127:8 200:2 203:17 230:21 275:12 291:6,9
**beuchler** 68:6
**beyond** 51:19 78:12 92:22 294:11
**bidder** 127:17 128:2
**big** 29:1 132:8 132:13 167:19 253:21
**biggest** 83:13 83:20 251:15 252:24 253:5
**bill** 245:11,14 246:22 248:16 287:4,5
**billed** 132:21
**billing** 101:14
**binder** 28:18 183:7 186:4 193:22,23 201:3 205:2,4 205:4 211:5 217:15 267:25 284:5
**birthday** 148:18,23 272:2,4
**bit** 17:5 129:23 131:15 153:6 160:11 182:16 186:9 225:14 241:11
**bitch** 90:24
**black** 92:1
**blank** 261:6
**blanks** 167:11 168:12,12
**block** 30:16 105:5 108:14 110:10
**blocking** 108:16,20 110:13 113:9
**blowing** 113:16
**blown** 224:14
**blue** 163:12
**blumenthal** 6:12 8:20
**board** 102:18 106:19 107:4,8 107:24
**bogged** 265:2
**book** 153:21 158:19,20
**booked** 283:23
**books** 231:12 255:23 263:22 283:23 299:10
**borrowed** 158:9
**borrower** 28:9 31:16 49:1,8 49:13,15,23 51:14,22 52:2 52:7,18 53:2,8 53:13,19 55:19 57:2 59:23 60:4,14,25 206:5
**borrowers** 27:24,25 28:4 31:6 218:22 300:10
**bottom** 22:24 44:1 87:6 109:13,19,20 120:24 166:8 169:15 176:17 176:21 205:11 209:2,4 214:13 235:16 261:7 271:15,16 287:9
**boulevard** 8:15
**bounce** 195:18
**box** 92:1
**boy** 67:21 181:9 268:19
**break** 64:7 116:2,6 177:12 207:15 220:11 236:15 278:8 303:2
**breaker** 105:25 215:15,22
**breaking** 222:6

**brent** 9:3 11:10 139:8,11 146:22 147:1,5 148:10 159:5 177:3
**bring** 28:22 77:25 79:10,16 112:5 119:11 127:20 282:24
**bringing** 86:14 118:5 223:18
**brings** 61:11
**broadway** 9:9
**brother** 17:18
**brothers** 284:24 285:6 285:17,20 287:18,25
**brought** 61:16 200:15,20 210:13
**brown** 213:20 213:25 214:16 214:24 215:6 225:10,13
**bruce** 8:19,22 11:13 16:17 28:15 84:8 178:21
**bryan** 8:9
**budget** 3:5 108:9,10,11,11 113:10,15,16 123:8,20,22 130:25 131:1 199:12 214:25 227:25 228:4 261:9,23 273:4 275:19
**budgets** 108:5 110:14 123:9 123:12,23
**buechler** 4:3
**built** 220:14
**bullet** 219:10 272:16,24 273:3,15 274:12,18 275:14 276:3 276:19
**bunch** 44:2
**bury** 90:24
**business** 65:18 72:6 113:22 121:23 128:15 128:16 157:25 220:14 221:5 229:12,14,22 236:24 270:8 270:10,14 273:7 279:2 282:21 290:1 290:15
**businesses** 219:17 220:8
**buter** 2:5 7:13 10:24,24 178:1 182:6,14 186:8 186:10 187:14 187:22 188:4 188:18 212:23 213:17 225:15 233:16,24 234:4 240:1 244:18 245:24 251:8 253:3 259:25 260:24 263:20 264:15 264:16 266:21 278:9,15,25 280:13
**buy** 97:25 156:19
**buyer** 172:23
**buying** 127:11
**buys** 156:13
**byron** 189:1

**c**

**c** 7:1 8:1 9:1
**ca** 306:25
**calculated** 254:20
**call** 2:17 12:18 34:11 47:20 67:2 81:12 113:25 114:7 153:9 155:23 156:1,2 164:15 207:14,18 218:2 248:12 294:2,4
**called** 120:4 161:10 182:10 216:5 223:9 224:14 230:21 238:5,16 242:11 278:16 278:21 279:10 279:15 296:11
**calling** 22:5 215:21 247:22
**calls** 14:4 78:23 82:12 168:8 170:9 171:10 207:17 259:16 259:19
**camera** 22:23
**canceled** 216:20
**capabilities** 135:9
**capacity** 191:2
**capital** 223:10 223:13,20
**capitalized** 255:8
**caps** 214:8 215:12
**capture** 252:14
**car** 274:13,14 275:6,12
**care** 123:1 163:13
**career** 181:15 181:16

**careful** 160:1
**case** 1:4 6:5 10:11 26:24 29:8 53:25 54:2 61:4 67:11 73:21 80:2 83:2,4,10 86:10 88:13,16 94:21 99:25 106:4,5 113:15 115:10 122:2,6 123:14 128:8 128:11 130:5 130:22 132:18 136:22 137:19 137:21,21,24 138:1 145:23 150:3 153:16 153:25 169:21 173:15 176:12 176:16 180:24 181:18,22 182:10,19 185:24 189:8 189:25 192:2 199:1 208:19 210:14,17 211:4,7,8 221:9 228:24 232:25 236:12 238:4,6,9,11,16 238:19,24 239:8,18,19,20 239:21 240:6 240:12,16,18 240:20,25 241:4,5,7 253:18,22 254:19 260:1 266:11,22 267:13 273:22 281:8,15 282:9 282:22,25 287:23 292:24 293:4 295:21 296:15 299:3 299:17 300:5,9 306:6 307:3 308:3
**cases** 61:23 83:18 86:16 87:14,25 118:25 140:2 143:8 181:19 181:23 182:1 240:18 281:12 285:8 295:12
**cash** 3:4 125:1 126:20 197:19 197:21 216:6 230:20,25 231:9,21 232:1 263:1,2 264:21 265:1,4 272:17
**categories** 17:4 92:24,25
**category** 235:16 246:21
**caught** 270:25
**cause** 6:15 53:9 71:24 267:11 267:12
**caused** 122:4,5
**causes** 252:14 252:19 282:25
**caution** 20:6
**cave** 8:9
**cc** 3:7 5:4 58:16
**cc'd** 213:21
**ccing** 194:7 246:2
**ccr** 9:8,8 10:3,3 305:3,4,17,17
**cell** 2:13,18 167:1,1 170:15
**certain** 6:14 31:5 77:15 122:13 131:7 180:18 191:2 204:13,14,14 219:16 220:7 256:5,12 258:6 259:12
**certainly** 16:25 38:8 57:24 122:10,18 139:5 147:4 254:8
**certificate** 305:1 308:11
**certification** 307:1 308:1
**certified** 6:14
**certify** 305:4
**cgotham** 8:6
**chain** 2:14 3:1 3:2,4,6,8,14,15 3:17,22,24 4:1 4:4,6,8,10,11 4:13,17,18,20 4:21,23 5:1,2,4 5:6 193:25 204:12,17 205:16,23 206:1 208:24 210:24 213:19 217:20,21 230:2 234:5,7 234:13,23 244:19 246:1 251:10 261:1 271:12
**chains** 204:22 204:24
**chair** 181:1,3,4 181:7
**chairman** 13:17
**challenge** 132:7 199:11 237:4
**challenging** 198:2
**chance** 156:13
**change** 104:15 144:18 247:24 248:22 306:13

306:14 308:8 309:3
**changed** 36:10
**changes** 36:3 246:22 249:6 306:12 307:7 308:7,9
**changing** 31:4 31:17 36:9
**chapter** 1:5 6:6 20:24 25:10 27:20 51:7,8 51:16 56:10 73:20 76:2,10 76:15 77:12 78:5 83:14 86:13 102:4 126:23 127:18 131:11 136:19 212:16 216:14 217:6 219:13 219:23 251:20 252:14,19 253:1,4 271:23 277:8 292:12 292:14 293:24 295:7,12
**characterizati...** 45:20
**characterize** 300:8
**charge** 30:1,4,6 32:16,20 33:1 33:4,6,9 34:19 83:25 96:20 250:2 263:6 281:18
**charged** 71:1 80:13
**chase** 271:17
**chats** 208:15
**check** 37:15 41:8 42:4,25 43:10,17,22 44:8 45:22,25
**checked** 91:7 96:21,23
**checking** 37:3
**checks** 294:16
**cheerleader** 124:1,4,14,18 127:6
**chief** 272:18 276:2
**choice** 209:7,23
**choose** 121:4
**chosen** 130:20
**chronological** 284:11
**church** 17:19
**circumstance** 33:12 118:5
**city** 1:2 6:2,13 6:17 7:7,22 8:10,11,16,21 12:3 20:22 41:9,12,16,19 41:23,23 179:20 183:4
**civil** 307:5 308:5
**claim** 102:8,10 102:14 160:19 175:17
**claiming** 195:2
**claims** 64:1 136:25 137:6 194:22 197:14 198:9,25 199:21 242:11 242:12,14,17 243:6
**clarification** 79:15 203:7 225:12 259:17
**clarifying** 84:25
**clash** 106:4
**class** 59:18
**clear** 37:12 48:4 49:1 81:15 106:12 143:7 176:6 226:2 227:1 239:17
**clearance** 47:17
**cleared** 32:20 33:7 47:4,8 296:14
**clearest** 29:16
**clearing** 33:6 293:23
**clearly** 242:16
**cleveland** 306:2
**client** 11:7 30:12 31:22,24 31:25 32:1 36:16,16 40:12 55:24 56:4 70:4 76:11 81:12 89:13 142:16,21 143:6 151:12 167:18,25 185:3 186:16 212:1 282:4 294:24 295:1 296:1
**clients** 30:15 31:7 35:21,23 36:1,2,8 42:7 45:25 46:18 77:16 89:23 92:21 144:4,8 150:8 281:11 289:9 294:7
**close** 58:5 129:2 138:20 209:19 210:3 216:12 233:25
**closed** 210:10
**closer** 190:18
**clothes** 148:22

**cloud** 239:11 239:13,14
**clue** 158:3
**coast** 284:25 285:7,17,20 287:19,25
**cocktail** 158:2
**code** 291:17 292:2
**cole** 2:4 7:4 10:15,15 11:24 12:12,17,21 13:5 14:7,25 15:6 20:11 22:24 23:2,8 23:12 24:7,9 26:1 28:15,21 28:25 29:3,22 36:23 39:11 40:14,20,21 48:2,6 51:1,12 52:12,13 53:1 57:9 58:1,8,24 59:3,9 61:18 61:25 62:13,20 63:1,25 64:8 64:14 66:9,18 68:5,20 69:1 69:14 71:7 74:12 76:7,14 76:25 77:5,19 78:12 79:3,12 79:18 81:2,15 81:20,21 82:2 82:6 84:8,10 84:15,22,25 85:3 92:22,25 93:3,4,22 96:4 96:11,21 97:3 97:10,13 99:19 100:10,13 103:2,4 105:21 108:3,24 109:8 112:25 115:23 116:3,13 120:19 124:8 125:16 132:15 133:22 134:4,6 136:4 137:11 138:8 140:12 142:25 143:5 143:10 144:13 144:24 146:10 147:2 149:10 149:13,25 151:1,4,7,16,21 152:2,17,20 163:11 171:2 175:15 177:12 177:22 178:6 180:7 181:17 188:19 196:22 197:1 223:8 225:16 227:23 265:11 266:7
**colin** 8:3 11:9 299:23
**collateral** 59:18 117:21 194:18 196:19 197:19 197:21 216:6 252:4,11 253:9 272:18
**collect** 168:15 168:17
**collected** 169:20 170:20 171:8 179:16
**collecting** 101:25 171:7 195:3
**collection** 170:17 298:10
**collections** 171:3 262:18 262:20,25
**colonial** 273:19 274:10,24
**color** 243:19
**combination** 240:24
**combined** 62:1 87:16
**come** 60:5 98:9 98:13 110:2,22 116:5 122:25 176:14 203:5,9 210:6 216:22 228:22 230:20 231:22 246:21 248:9 249:12 262:18 268:21 282:17 284:2
**comes** 35:7 104:9 182:12
**comfortable** 232:8 267:22 270:5
**coming** 59:3,9 85:6 110:19 122:21 199:2 264:2,4
**command** 275:16
**commenced** 10:7
**comment** 162:1 196:2
**comments** 4:22 34:14 214:3 227:24
**commission** 307:19 308:25 309:25
**committed** 77:17
**committee** 1:10 3:6 6:18 7:3 10:16,19,22 11:21 13:17 14:10 16:10,13 18:21 65:11,16 72:4,12,25 74:14 75:2,2,4 102:12 103:22

104:4 106:13 106:24 123:15 128:10 129:9 130:1,2,8,11,12 131:3,13 148:10 166:19 167:5,20 168:2 197:17 199:7 199:20 216:13 216:23 221:1 222:3 226:7,13 226:14 227:12 227:13,19 228:16 232:20 232:23 233:3 240:8 252:15 253:14 259:8 260:6 263:5 269:21 272:9 273:16 276:11 277:17 282:24 292:10 293:8
**committee's** 74:21 127:23 129:15 198:21 226:21 251:19 252:25
**common** 210:22 215:8 300:6,7
**commonly** 158:18
**communicate** 82:15 139:3 142:5 180:23
**communicated** 82:6,9,18,21 179:16 227:1 252:10
**communicating** 86:22 142:1,19 143:11 144:6
**communication** 81:17 82:15 133:12,14 138:14 141:9 143:13 149:23 218:12
**communicati...** 141:14 142:8 147:8 150:24 151:5,23,25 156:8 167:24 174:22
**companies** 20:24 28:3 30:18,19 43:19 67:8 130:14 212:20 301:13
**company** 67:18 70:7 118:20 121:22 125:4 175:20 222:6 228:12 265:13 266:2 267:8,9 270:2,3,4,24,25 279:10 302:20
**company's** 231:12 232:11
**compare** 249:15
**compares** 35:17
**comparing** 34:19
**comparison** 181:18
**compensation** 17:24 18:24 19:6,12
**complaining** 59:17
**complaint** 196:13
**complete** 55:10 167:3 231:8 248:23 272:19
**completed** 141:6 232:1 306:15
**completely** 42:10 157:9 215:18
**completing** 164:24
**complex** 160:2
**composition** 235:15
**concentrate** 126:17 160:25
**concentrating** 125:13
**concept** 127:16 136:12 215:7 222:8,21
**concern** 229:8 267:12
**concerned** 20:20,21 87:19 121:25 240:18 262:17 267:19
**concerns** 75:2 78:18 87:17 196:9,18 250:21 251:1 255:1,7,16,22 256:4
**concluded** 304:9
**concludes** 235:16
**conclusion** 73:1 73:4 98:9 199:5 210:6,14 256:24 269:20 271:3
**conclusions** 72:21
**condition** 157:17
**conduct** 73:6,7 122:9 123:13 191:17 192:6 192:10 197:12

232:10,15 241:12 256:5 259:2 270:2 282:20
**conducted** 130:15 191:13 191:21,24 230:25 236:2 241:19 242:19 257:21
**conducting** 216:24 225:19 241:24,25
**confident** 19:15 70:22 127:21 269:14,15 298:4
**confirm** 141:22 174:2 199:15 228:2 232:16 245:5
**conflict** 32:21 32:23 33:7,10 33:17,18,20,24 34:5,8,11,20 35:3 36:10,17 36:24 37:2,4 37:13,17,21 38:22,22 39:24 40:10,11,24 45:7,25 47:19 47:19 52:9,21 53:5,10 57:17 65:25 66:4,12 90:14 115:15 115:17 135:25 136:5,9,13,18 175:11 294:2,4 294:17,19,22 295:1,7 296:19
**conflicts** 32:18 32:19,23 33:2 33:4,7 37:5,15 38:11,13 40:5 40:6 41:4,8 42:1,4,25 43:7 43:9,17,21 44:8,9,20 45:22 46:1 47:5,17,18,22 48:4 293:24 294:19 295:11 296:14
**confused** 25:19 26:1 265:25
**connect** 169:24
**connected** 187:22
**connection** 180:6 182:20 185:4,16,23 187:6,8,16 188:8,12 189:24 196:25 208:7 213:7 218:12 220:16 266:8 269:5 272:11 275:25 279:9 298:20
**connections** 293:22
**consequences** 132:5
**consider** 54:21 90:9 107:10 114:4 137:2 214:21 224:16 292:22
**considered** 37:16,20 38:6 106:10,18 114:10 137:3 221:13
**considering** 211:15
**consistent** 60:8 93:18 110:11
**constantly** 73:19
**cont** 8:1 9:1
**contacted** 20:22
**contacts** 223:17
**contain** 30:21
**contained** 75:15 155:9 167:16 261:14
**content** 74:15
**contest** 131:20 131:21 132:2
**context** 100:24 297:1
**contingent** 107:18
**continue** 13:25 18:3 19:16 125:22 173:24 207:20 209:16 210:10 218:15 248:21 270:7,9 270:13 273:20 274:13,19 275:17
**continued** 138:6,9 275:3
**continues** 230:13 252:3 264:13,16
**continuing** 157:10 264:12
**continuously** 31:4,17
**contrary** 296:2
**control** 71:22 105:19 113:10 119:21 216:9 272:19
**controlling** 30:17
**conversation** 14:19,22 15:2 15:10 16:9,12 16:19 20:16 22:1 24:22 25:1,2,3,5 27:2 27:7,10,13

48:14,18,23 49:5,11 52:19 52:23 53:3 74:17,19,22,24 75:23 96:24 97:14 133:1,4 133:5 147:1 155:15 161:11 162:13 163:22 164:21,24 179:10 198:23 199:14 218:7 267:16,20 269:8,12 283:12
**conversations** 13:23 52:8 66:22 67:2 92:14 127:10 163:23 164:2 281:23 282:13
**convinced** 69:24 107:7 220:12 236:7 249:9
**copies** 28:22 154:1 298:6
**copy** 29:15,16 30:24 129:10 130:3 146:23 153:21 183:3 303:17
**copying** 139:9 146:1
**core** 28:4
**corner** 205:11 209:2
**correct** 12:6,7 13:8 18:25 21:10,16 23:22 23:25 25:8 26:9 28:3,14 29:11,24 31:23 32:6 34:1 35:11,16 39:19 39:22 41:21 42:2 43:2,3,11 44:24 46:24 47:1,2,9 49:10 50:22 56:4,16 56:19,21 57:11 57:13 60:15 61:1,24 62:4,5 68:2 70:8 71:5 72:19 75:12 76:13 77:4 79:5,11,20 80:3,5,19 82:8 82:11,20,23 85:22,25 86:9 86:11 90:1,3,5 91:18 95:16,16 95:21 96:10,12 97:16 99:8 101:5,18,22 103:25 105:10 105:23 106:1 107:25 108:22 110:1,18 111:18,21 112:2 113:4,6 117:1,12,17 119:4 120:10 120:17 121:2 121:13,19,24 123:7,21 124:17 126:8 131:15,22 132:19 134:14 135:15 138:6 139:10 140:6,8 140:23 141:16 141:21,24 143:20 144:5 145:6,9,15 146:2,9 150:10 150:12,13,16 150:17 154:16 155:4,11,25 156:16,22 157:5 159:4,8 159:23 160:5,7 160:10,14 162:6 163:18 163:21 164:5 164:18 165:2 165:22 166:9 168:22 169:25 171:20 172:10 172:25 173:7 173:23 174:9 175:25 177:5,8 177:11 180:10 180:11,14 181:5,6,20 182:22 183:14 183:17,20,21 184:3,16,19,22 184:25 185:6 185:19,20 186:20 187:4,5 194:23,24 195:13,22 198:7 201:7,8 202:12 203:16 203:18 204:15 204:16,22,24 205:18,21 207:15 208:5 209:10,18,20 211:8,10,17,19 211:20 212:14 212:17 214:1,2 215:13,14 216:7,11,15 217:10,13,14 219:3,4 221:13 221:20 223:11 224:6,13 225:17,19,24 226:2,5,15,16 227:4,10,17 231:17 234:15 236:19,24 237:5,24 238:11 241:5

241:13,14,17 241:18,22 242:2,3,6,15 243:20,21 244:3,4 249:3 250:10 251:11 251:12,16 252:23 253:6 253:11,14,17 253:22,25 254:4,10,23 255:5 256:6,13 256:14,16 257:2 261:3,19 261:20 266:10 267:6,13 268:17,18 270:18 271:14 271:20,21,25 273:2,22,24 274:1,21 275:1 275:8,19 277:24,25 281:13 282:16 282:19,22 283:4 284:21 284:22,25 285:6,8,9,18,21 285:24,25 286:2,3,18,21 287:1,6,14,19 288:6,20,21 289:4,6 290:18 291:6,7,14,23 291:24 292:13 293:13,17 296:8,24,25 297:23,24 298:16,17 300:11,14,15 300:17,21 301:2 302:17

**corrected** 100:5 100:21

**correction** 87:11

**corrections** 306:12 308:17

**correctly** 12:2 74:16

**corresponden...** 266:14

**cost** 96:1 101:15,16 238:20 247:6,8 264:6 282:1

**costs** 110:17 255:7 272:10

**counsel** 5:8,14 10:2,13 16:15 16:16 17:15 20:25,25 21:12 21:14,15,18 32:23 33:10,13 49:4,21,24 50:1,5,7,14,17 50:19 51:15,18 51:25 73:20,24 74:3 76:2,9,14 78:5 81:19,23 83:22 84:18 92:6,8,11 103:1 106:8,24 131:24 135:18 141:20 143:19 149:23 150:24 151:12,24,25 152:22 153:2 161:12 168:21 175:6,23 176:6 177:10 178:17 181:24 182:7 198:4,21,24 210:22,23 218:12 220:20 226:21 238:15 238:18 246:7 247:4 252:11 253:13 259:14 261:15,19 263:7 265:17 269:3 281:6 292:16,25 293:8,9 297:14 299:12 305:9 305:12

**counsel's** 292:10

**counted** 72:2 123:15

**county** 307:10 308:15

**couple** 28:12 49:8 92:19 120:7 156:9 178:11 181:21 226:25 272:6 282:14

**course** 53:11 189:7 220:22 231:24 275:18 277:18 290:1 290:15

**court** 1:1 6:1 6:14,16 10:12 11:17 76:3,6 80:16 94:18 97:19 141:15 185:19 186:15 186:23 189:4 189:11,16 225:5 241:17 250:14 265:5 265:23 269:5 289:13,17,24 290:21 301:23 307:7

**cover** 29:9 153:10

**covered** 153:6 280:20

**cpa** 158:11 302:7

**create** 52:21 238:16

**created** 39:9,18 53:5 240:13,21 240:21
**creative** 243:25 244:3
**credit** 5:1 7:11 7:12 9:4 11:6,7 59:17 218:18
**creditor** 102:5 102:9 206:13
**creditors** 1:11 6:19 7:3 10:17 10:20,23 11:21 45:25 46:3,4 65:11,16 72:3 72:11,25 101:25 102:12 103:22 104:4 106:13,23 123:15 127:23 128:10 129:9 129:14 130:1,2 130:8 131:13 148:10 166:19 167:5,20 168:2 197:17 198:20 198:24 199:7 199:20 203:4,5 203:8,11 210:11 216:23 219:14,15 221:1 222:3 226:7,13,14,21 227:12,12,19 228:9 232:20 232:22 233:2 240:7 252:15 253:13 259:8 269:21 272:9 273:16 276:11 277:17 282:23 296:6
**crime** 77:17
**criticize** 122:13
**criticized** 232:4
**cro** 104:25 105:18,22 106:3,5,6,17 110:12 135:12 213:3,8,13 214:25 215:7 215:17,22 216:1,5,7 217:13 224:14 224:14 272:25 273:4,7,17 274:13 275:17 275:22 276:4
**cross** 236:14 265:6
**curious** 39:14
**current** 21:12 150:22
**currently** 22:9
**cushman** 117:25 225:25 225:25 226:1
**cut** 125:2 126:20 143:16 264:17

**d**

**d** 2:1
**data** 3:8 4:12 4:14 116:16 117:4,10,13 146:8,11 159:20 240:8 240:12,18,20 240:21,23
**database** 34:24 169:16
**date** 25:25 26:20,22,22 38:25 39:15 52:15 63:11,11 82:4 135:7 150:14 160:20 160:23 169:16 169:22 185:6 185:10 190:19 193:14 266:23 291:5 306:8 307:3,9,19 308:3,13,25 309:20,25
**dated** 4:3 27:4 39:1,20 68:7 145:5 174:8 182:21 183:16 183:18 185:8 193:25 194:8 201:6,8 202:7 213:21,24 217:20 219:20 235:1 244:19 256:10 271:13 291:5
**dates** 169:15
**davis** 8:9 11:15 11:15 12:19 299:20,20 303:22
**day** 6:11 51:21 59:13 65:19,19 88:2 97:4 107:5 126:7 131:12 139:13 165:13 166:1 170:19,20 216:20 218:2,9 222:11 272:2 307:16 308:22 309:22
**day's** 107:6
**days** 25:12,14 26:11,18 91:3 141:9 156:9 173:21 202:19 271:24 272:7 277:10 306:18
**dca** 1:4,11 2:14 3:1,3,4,6,8 4:11 4:13,24 5:4 6:5 6:17,19 7:3 8:2

11:9,10 17:12 18:6,15,18 20:3,14,18 22:7 23:23 25:1,8,9,12,24 27:2,11,17 28:1,2 30:13 43:14 45:5 53:25 64:21 67:1,25 71:14 74:4,6,7,8 83:4 86:10,18 87:1 91:17 100:24 116:1,16 123:5 125:14 126:18 127:9,12 130:3 131:21,24 132:2 134:12 135:5 137:24 138:4 142:6,17 143:4 145:2,17 147:7 156:17 156:19 158:22 158:23,25 159:21 160:4,8 165:25 166:21 166:25 167:2,2 169:21 170:11 170:22 171:25 172:6,9,11 173:11,13,21 174:7 176:5,13 177:4 181:22 183:20 184:15 192:2 202:5 212:20 213:15 219:2 220:10 222:17 235:3 235:13 238:22 262:19,24 263:23 266:2,5 270:1,2,3,15 271:6,7 281:17 281:20 282:11 286:19 295:8 297:17,21 298:1,8,25 299:23 300:5 306:6 307:3 308:3

**dca's** 115:21

**dead** 276:16

**deal** 105:25 129:2 135:18 159:3 210:12 215:15,22 275:13

**dealing** 247:3

**deals** 19:21

**dealt** 168:9

**dear** 183:22 306:10

**deasley** 9:6

**death** 120:5 228:20

**debt** 101:3,7,9 101:17,20 102:7 103:18 103:19 283:2 283:14,16,23 300:7 301:11

**debtor** 38:5 53:15 55:20 57:1,5,23 61:4 61:21 62:6,6,7 62:14,15,15,22 63:14,19 64:1 65:4,14 70:3 70:11 73:9 76:20 77:10,16 78:1 79:11,12 79:17,18 87:15 93:5 94:10,16 96:13,25 98:13 102:3 104:3 105:23 108:9 126:23 127:18 130:8,13 182:25 183:1,5 187:16 188:8 188:21 189:25 190:14 191:2 197:7,13,13 198:5 199:8 200:8,11,17 203:6,9 211:15 211:19,22 212:8 216:10 217:8 221:2 223:15,18 228:10 236:6 237:3 238:18 240:24 242:24 242:25 258:6 258:10 263:5,7 264:5 266:10 266:12,25 267:15 269:4,7 275:3,13 276:13 277:3 284:2 289:15 289:19,23 290:20,23 291:22 293:24 302:2

**debtor's** 77:25 101:12,20 127:18 277:2 292:15

**debtors** 1:6 6:7 6:18 22:7 45:6 46:5,7,9,10,13 46:16,18 54:3 54:9,22,25 55:11,16 57:13 61:17 62:3 63:6 64:16,23 65:17,24 66:3 66:10 67:4 69:17,22,23,25 71:22 72:1,4 72:10,16,23 76:2,9,13,14,19 76:19,24 77:1 77:3,12 78:5 78:19,20 79:4

82:7,9,15,18
83:22 88:4,13
88:18,21 89:7
96:9 97:1
104:13,21,24
105:19 106:8
106:11 117:4
117:10,14
118:14 122:8
123:6 125:1
127:20 129:17
130:3,24
132:14 135:19
135:25 136:6
136:14,25
137:6,25
138:10 140:7
140:15 141:23
143:18,19,22
144:3 147:8,16
147:19,25
149:4 150:8,12
151:18 160:19
167:7 168:21
168:25 169:1,2
175:12 177:10
181:24 182:7
185:16 187:3
189:3,17
192:18,21
193:2 197:15
198:4,15,17
199:22 202:17
202:21 203:10
203:12,21
204:14 206:12
207:2 208:19
210:18,23,23
210:24 212:3,6
212:15 214:20
217:13 219:12
220:4,17,21,22
221:12,16,25
224:12,20
225:7 226:3,22
227:4,6,9,13
228:5 231:5,25
232:1,15,19
234:14 236:1,4
237:9,23 238:1
238:5,13,19
239:9,18 240:9
240:22,23
241:3,13,20
242:2,10 246:9
250:25 251:2
252:4,10
253:10,19
254:20 255:2,8
255:12,16,23
256:4,12,12
257:22 258:4
259:4,14 260:4
260:8 263:2,8
264:6 265:21
266:4 272:17
272:20 275:15
276:1,13 277:7
277:20 283:15
285:7 286:17
289:12,17
291:14 292:1
292:23 299:7
299:10,11,12
299:13 300:5,9
301:6
**decades** 5:10
**december**
42:16,24
183:16,18
185:2,5,8,9
188:7 191:3
**decent** 107:1
228:11
**decide** 36:22
73:2 199:2
**decided** 36:23
56:14 92:8
172:18
**decision** 56:5
81:22 92:9
99:13,17
104:20,24
105:7,9 106:11
108:4 110:14
113:24 114:5
115:18,19
131:19,21,23
132:7 212:8
213:12,15
220:3 280:6,9
**decisions**
104:12 105:2,5
105:23 108:21
109:10 113:8
113:16,20
114:15 115:5
135:9 221:3
**declaration**
2:23
**deed** 54:15
307:14 308:20
**deeds** 55:8
**deemed** 306:19
**deere** 286:1,5
286:22 288:15
**default** 192:21
**definition**
160:1 223:6
291:17
**degregorio**
194:8
**delete** 147:8,9
147:15,16,20
147:24 148:2,3
148:6,8 149:3
150:15 151:18
152:4,24
154:14,19
155:2,6 163:17
163:20 164:3,4
164:6,11,19
165:1,8,14,15
165:19,20
249:2

**deleted** 148:17
**deleting** 154:23 154:24
**deliver** 13:13
**demanded** 177:3
**department** 238:22 306:22
**departure** 279:3,9,15
**dependent** 95:21
**depends** 127:2
**deposed** 178:25
**deposition** 1:9 6:9 10:2,7,10 32:8 91:19 107:6 178:12 178:20 179:11 179:25 180:3 180:17,17 201:24 204:3 205:3 256:15 256:18,25 257:5,6,8 285:4 296:23 297:4 298:11 298:25 304:9 305:5,10 306:8 306:11 307:1,3 308:1,3
**depositions** 29:8 64:20 106:21 130:12 200:15,19 216:19,20 226:20 227:22 232:4 254:9,18 255:15,20 258:3,17
**describe** 42:12
**described** 105:24 223:3
**describes** 45:15
**describing** 135:11
**description** 2:11 3:21
**designate** 35:20
**detailed** 134:21
**details** 89:6 297:25
**determination** 55:20,23,25 56:2 284:1
**determine** 18:21,23 65:12 70:10 92:4 102:10 110:3 115:5 173:18 187:9 199:20 256:20 259:2 263:1,23 283:22 293:21 295:18 302:4
**determined** 237:9 283:9
**development** 52:9,21 53:7
**difference** 279:20,24 280:2
**different** 17:5 19:25 21:9 42:10 100:11 110:7 126:25 143:21 206:14 222:24
**differently** 34:10 41:13,19 152:12
**dig** 65:18
**diligence** 3:9 4:12,14 116:17
**dinsmore** 278:18
**dip** 3:4,7 5:1,4 23:18 60:16,19 126:22,23 127:1,2,3,5 215:1 218:20 223:21 224:24 225:6,8 231:14 264:3
**direct** 10:12 186:3 192:5,7 194:5 208:23
**directed** 71:14 139:5
**direction** 56:8 56:12 81:22 99:15 305:8
**directly** 226:17 286:23
**disagree** 24:9 24:11 45:14 56:3,6 87:9 161:25 164:10 164:13 176:12 180:21 187:21 188:2 260:15
**disagreeing** 176:9
**disagreement** 153:18
**disappear** 98:15
**disappointed** 16:1 90:5,6 280:8
**disaster** 268:20
**disbursements** 111:2 264:17
**disclose** 67:6 77:18 103:14 182:3 186:15 189:4 203:17 210:15
**disclosed** 186:23 189:9 210:21 245:19
**disclosure** 93:19 95:14 187:7 203:15

**discovering** 51:14
**discovery** 3:6 227:7,15,16
**discrepancies** 299:8
**discuss** 38:9 89:6 278:2,3 282:5,9
**discussed** 19:7 20:13 38:8 55:23 70:23 81:19 103:5 125:6 128:18 129:5 132:4 230:4 252:5 254:10 258:4 260:12
**discussing** 43:13 93:25 94:5 122:11 139:13 143:24 154:12 162:25 168:5 246:9 249:6
**discussion** 36:25 38:20 97:17,22 111:7 111:23 112:4 127:22 199:18 233:25 283:21
**discussions** 75:16,17 92:16 104:10 106:22 127:24,25 129:6 151:10 151:12 192:24 196:6 197:16 212:23 217:4,5 219:21 222:11 222:13
**disengaged** 143:25 144:2
**disinterested** 187:3,9
**dislike** 90:17
**dispute** 69:6 92:17,18
**disputing** 165:18
**distinction** 44:16 185:7
**distribution** 222:22
**district** 1:1 6:1 6:16 182:11
**diversion** 196:18
**diverted** 194:18
**division** 1:2 6:2 6:17
**docs** 55:19
**document** 29:7 50:9 54:20 56:24 58:18,20 84:14,15 85:12 94:8 98:24,25 112:8 183:18 185:15 188:14 237:19,20 291:4 297:19 298:17
**documents** 28:10 29:20 53:19 54:3,11 54:17 57:3 117:14 118:14 129:13 153:23 180:2 186:14 189:10 190:14 190:18,20 191:3 192:22 193:10,11 237:20 283:8 298:7
**docusign** 39:16
**doing** 27:18 41:10,17 45:19 65:21 88:18 125:9 138:12 157:8,11 170:2 176:13,14,19 178:4 196:1 197:17,20 198:24 231:13 258:2 265:25 271:5 277:3
**dollar** 102:22 110:20 161:14 245:3 257:16
**dollars** 101:21 199:12 263:8 263:24
**dots** 169:24
**double** 228:14
**doubt** 207:5,6 285:14
**download** 239:2,4
**draft** 34:10 200:11,23,23 254:5 270:19
**drafted** 80:5 270:19 293:25
**drafting** 132:17 186:1
**drafts** 31:3
**drapekin** 4:2 58:11 60:5,13 179:7 213:21 225:10
**draw** 18:2 195:16
**draws** 18:3
**drop** 245:10
**dual** 76:23
**due** 158:7,10 212:21 242:10 243:7 246:23 301:5,6
**duly** 11:20 305:5
**dundon** 260:5

**duplicate** 239:3
**durbin** 34:18 35:14,15 37:3 40:16,21 44:24 45:2,18,18 47:12 89:22 294:12 295:25 296:4,7,13
**duties** 47:21 70:25 76:3,11 76:16,19,20 77:6,10,13,15 77:19 78:6,9,9 78:10,11,12,14 139:19
**duty** 48:1,1,2 77:1,3,17 78:20 79:5 103:11,13

**e**

**e** 2:1,14,15,19 3:1,2,4,6,8,10 3:12,14,15,17 3:20,22,24 4:1 4:4,6,8,10,11 4:13,15,17,18 4:20,21,23 5:1 5:2,4,6 7:1,1 8:1,1 9:1,1 23:3,10 24:4,8 24:12,16,21 25:11,20 26:21 27:1,4 29:9 33:16 34:12,12 34:16,19 35:2 35:7 37:18,22 39:10 40:15,16 41:1,3,25 42:3 42:22 43:4,6 44:8,10,19,23 45:2,4,10,17,21 46:22 47:10,12 50:11 58:9,14 58:15,15,19,21 58:24 59:4,15 59:15,16,16,25 60:2,9,11 82:7 82:17,19,24 93:23,24,25 94:3,5,14 95:3 96:12 97:4,10 99:20 100:2,14 101:2,17 108:25 109:8 109:14,14 110:25 111:13 112:10,13,14 112:25 113:2 116:14,20,21 117:2 118:8,10 119:2 120:15 120:21,22,23 120:24,25 122:1 124:9 125:17,21 126:16 133:20 134:9,11,15,17 135:17 137:18 138:15,18 139:7,8,15,24 139:24,25 140:4,24 141:2 141:5,17 144:25 145:10 145:25 147:20 147:22 154:14 154:19,20,21 154:23 155:1 164:3,16 165:8 169:7 172:1,6 172:9,11,11 193:25 194:6 194:15 195:10 195:11,21 196:10 201:5 201:14 202:15 213:19,22,24 214:13 217:19 217:21 219:6 219:20 224:10 228:18 230:2,6 234:4,5,7 235:1,4,10,11 236:25 237:17 240:6 244:18 244:23 246:1,8 246:11,18 248:19,22 251:3,9,13 252:2,22 253:7 253:14,15 256:10 257:10 257:19 260:25 261:5,14,16,17 261:20 262:2 262:13 268:3 268:16 271:12 271:13 272:8 276:15,25 277:4 278:1 284:8,16 285:2 285:15 287:9 287:22 288:2,5 288:7 289:1,16 290:16 294:2 294:18 295:4,7 295:11 296:8 296:12,16 303:17,18,22 304:1,2
**earlier** 22:18 25:6,12,14 26:11,18 40:4 40:22 43:3 47:1 49:6 74:12 90:4 110:12 140:25 153:6 163:4 164:17 170:1 199:24 203:14 229:25 283:2 291:13,21 296:20
**early** 51:13 88:5 115:9

190:10 199:1 220:2 224:7 232:25
**easement** 54:16
**east** 7:21
**eastern** 182:11
**edited** 249:18
**edmundson** 71:12 208:9 265:17 270:24
**effect** 19:8,10 19:15,18 251:4
**effective** 13:7
**effort** 63:4 65:12 69:15 70:9 114:9 272:10
**efforts** 228:14
**either** 20:7 92:16 186:14 206:13 226:4 289:16 298:1
**elected** 272:25
**electronic** 39:13 117:13
**electronically** 5:14 39:6
**ellerman** 7:20 11:1,1
**email** 306:17
**emergency** 91:6 212:22
**emlawkc.com** 8:6
**employed** 138:3 149:3 150:11 167:7 293:6 305:9,12
**employee** 79:3 135:4 151:17 273:8 305:12
**employees** 195:4 204:15 219:16
**employment** 2:21 293:3,11
**enclosed** 306:11
**ended** 120:15 212:15
**ends** 40:16
**engage** 25:7 230:15
**engaged** 25:8 25:25 43:2 49:8 73:18 88:4 106:9 138:6,9 143:23
**engagement** 2:19,24 20:18 22:17 25:23,24 26:22 29:13,19 29:22 30:1 32:17,25 33:18 33:21,25 34:10 36:9 37:6 38:14,24 40:5 40:8,9,11 42:8 46:25 47:23 48:5,9,10,13 86:22 87:2 182:20,21,24 183:2,3,13 185:4 188:16 218:13 293:25 294:1 296:21 296:22 297:2
**engaging** 267:14
**enormous** 281:19
**ensure** 47:22 236:4 296:14
**enter** 136:3,14 289:13,18 290:21
**entered** 55:16 136:8,10 193:2 290:23 308:9
**enterer** 238:20
**entire** 136:21 181:15,16 194:1 204:7 245:11,14 307:5 308:5
**entities** 10:25 28:1,2 35:19 38:6 43:14 62:22 64:23 65:5,14,19 70:25 71:2,6,9 71:14,18 72:18 73:9 134:13 135:5,9 136:14 156:17,19 182:25 183:1,5 184:3,3,19,21 187:16,21,23 188:3,9,21 189:25 190:15 191:2 197:13 197:14 211:16 211:19,22 212:8,10 213:15 216:10 217:8 242:24 242:25 258:6 258:10,20 259:12 267:1 267:15 269:4,7 285:11 286:19 290:9 291:22 300:6,17,19,20 301:1
**entitled** 5:9 18:7,8
**entity** 27:3 57:12 61:21 63:14 64:1 158:4 186:24 197:7,9 200:3 200:8,12,18 268:9 300:18 301:1 302:14 302:15,16

**entry** 247:24 248:22
**equipment** 3:18 284:24 285:16,19,23 286:20 288:14 290:8 291:10
**eric** 106:25 222:4,5,8
**eric's** 222:21
**err** 93:19 95:13 203:15
**errata** 306:13 306:18 308:7 308:10,18 309:1
**erring** 96:5
**error** 102:15
**errors** 100:4,8 100:19 102:17 103:5
**essentially** 193:7 277:5 286:14 298:25
**establish** 52:13
**established** 150:9 173:20 205:23 296:7,9
**estate** 54:9,14 54:18,21,24 55:7 61:6,8,12 61:14,15,16,21 62:1,8,8,16 76:17 77:1,7 77:13 80:14 99:1 117:19,20 119:25 129:11 129:20 130:6 131:8 198:11 198:18 225:24 226:5 228:12 275:17
**estates** 61:20 77:20 78:21 198:10 199:22 202:18 203:13
**estella** 234:18
**et** 1:4 6:5,17 306:6 307:3 308:3
**evaluate** 122:12
**evaluated** 33:5
**evaluating** 32:17 33:2,3,4 120:2
**evaluators** 299:9
**evans** 8:4
**eve** 53:21
**event** 135:3 139:17,21,22 254:8
**eventually** 107:13,14 198:7
**everde** 121:5,8 121:9,12 122:2 229:2,17,18 230:9 233:7 236:17 237:1
**everybody** 28:22 112:9 113:1 207:17 254:5 278:2
**everyday** 187:23
**evidence** 194:22 259:20
**evident** 253:19
**evidentiary** 80:17
**exact** 129:21 193:14 245:17 289:3
**exactly** 106:25 188:13 195:25 265:25
**exam** 207:25 208:7,8,13
**examination** 2:4,5,6,7 11:23 177:25 280:16 299:25
**examine** 236:14 265:6
**examined** 6:10 11:20
**example** 229:20
**examples** 77:21
**exams** 93:6,9 210:7
**except** 179:10
**exchange** 23:10 156:7 165:24 217:20
**exchanged** 154:2 289:16
**exchanges** 166:11 170:5
**excitable** 223:24
**exclusive** 217:3 276:13 277:20
**excuse** 90:22 213:1
**executed** 201:19 293:3 308:10
**execution** 307:14 308:19
**executives** 281:20
**executors** 202:22
**exercise** 105:11 108:16 110:4
**exhibit** 2:10,12 2:14,15,17,19 2:20,23,24 3:1 3:2,4,6,8,10,12 3:14,15,17,21 3:22,24 4:1,3,4 4:6,8,10,11,13

4:15,17,18,20 4:21,21,23 5:1 5:2,4,6,9 22:20 23:2,9 29:4 30:20,21,21,25 31:1,2,3,4,12 31:17 32:3,5 32:11,14 33:1 38:24 39:18 40:13,14 43:5 46:23 58:4,9 59:4 68:4,5 69:2,4,8 70:6 70:13 71:21,24 73:11 74:15 75:9,15,24 84:3,10 89:20 93:21,22 97:2 97:3,10 99:18 99:19 103:6 108:23,24 116:12,14,19 120:18,19 121:1 124:7,8 125:15,16,17 134:5,6 139:7 144:23,24 145:25 153:4 153:21 155:9 183:6,10 184:6 184:11 193:21 193:24 194:6 195:1,9 201:2 201:5,24 202:4 205:1 207:21 213:16,18,18 217:16,19,23 219:1 223:8 224:11 229:25 234:2,3,4,11 235:8,22 239:25 240:2,4 243:10 244:13 244:14,18,24 245:21 246:1 251:7,9,9,14 256:8,10 260:23,25,25 261:8 264:12 266:15 268:1,3 271:11,11 278:24 279:1,1 284:5,11 296:2

**exhibits** 2:9 5:13,14 28:16 186:4 235:13 235:16 303:23 304:1,2,7

**exist** 30:25

**existed** 297:19

**existence** 31:13 32:11

**exists** 31:1 34:1 288:4

**exit** 83:10

**expect** 99:14

**expected** 228:12

**expedited** 303:18,24 304:3,5

**expediting** 303:23

**expenses** 125:2 126:19 273:7

**experience** 37:20 38:3,4 41:18,22 122:20

**experienced** 54:13

**expert** 236:12 238:1

**experts** 230:21 254:11,16

**expiration** 307:19 308:25 309:25

**explain** 212:1 265:5

**explained** 121:9,12 289:20

**explore** 25:7

**expressed** 127:11

**expressly** 10:5

**extension** 94:24

**extent** 50:12 62:24 63:1,5 66:25 80:21 81:11 98:20 142:8 143:16 160:3 247:16 274:23 288:24 288:25 302:6

**extracted** 169:16 298:15

**extreme** 67:5

**eye** 106:6,7 115:1,1 269:24

**f**

**face** 74:6

**facilities** 215:1

**facing** 156:24

**fact** 83:8 103:6 141:25 145:23 154:18 173:19 199:9,21 200:7 202:11 222:2 229:5 238:8 249:17 253:20 259:3 268:6 285:10 288:2 289:1 290:3 291:16,25

**factors** 114:4

**facts** 144:11 216:18 259:22 259:23

**factually** 53:17

**fair** 41:8 48:11 55:1 62:9,17 80:8 81:23 83:3 105:17

108:12 109:11 112:5,6 118:4 122:19 123:1 135:1 154:25 174:4 186:18 187:8 198:6,12 198:13 212:13 220:18 251:2 252:12 254:22 255:2 258:15 258:17 263:21 270:15 286:16 288:5,10 290:12 300:8 300:20
**fairlie** 7:5 10:21,21 12:18 106:20 199:15 240:7,11 268:4 269:9,12 303:25
**fairly** 62:13 126:19 236:7 256:19
**false** 67:22,24
**familiar** 23:12 58:19 67:16,18 67:19 85:9,13 93:23 99:24 118:17,21 121:8 134:8 174:17 258:24 278:15 291:18
**familiarity** 187:7
**family** 163:14 274:2
**fane** 7:6 10:15 10:18,21
**far** 20:20,21 88:25 195:17 240:17
**farm** 7:11,12 9:4 11:6,7 31:10,14 59:17 173:5,8,9 206:5,14,20,22 218:18 273:18 273:19,24,25 274:4,24
**farms** 60:14,24 63:14,20 64:2 64:16,23 65:13 65:25 66:4,11 66:19,23 71:25 72:9,16,23 145:3 157:3 159:12 163:25 184:7,22 196:22 197:1 202:5 222:23 282:16,22 283:3,17,23 291:21 292:1
**farnam** 7:14
**february** 24:15 26:2 27:4 28:11 39:1,2,7 39:15,19,20,21 40:1,7 46:23 47:3,8 48:10 48:19,22 49:9 51:22,25 52:7 52:15,17 53:1 53:9,20,21,25 54:8,23,25 57:1 59:12 60:1,9 86:3,24 88:5 109:15 129:3 136:12 167:6 168:22 168:23 182:21 190:8,8,10 193:6,13,25,25 194:9 195:22 196:7 213:21 213:24 217:20 219:20,21 224:19,20
**federal** 265:22 268:6
**fee** 79:25 80:10 80:17 92:17,18 246:20 247:1 247:11,22 248:6,11,15,15 249:10 250:3 271:6
**feel** 125:6 138:23
**fees** 18:5,7,11 18:15,18 80:10 80:12 101:11 132:21 197:8 272:10
**fell** 222:8
**felt** 232:8
**fiduciary** 77:1 77:3
**fight** 105:16 121:15 132:6 252:16 271:1
**fighting** 253:4
**fights** 122:5
**file** 56:10,18 88:10,11 95:1 95:13 102:8,8 102:10,13 158:5,10 167:18,22,24 168:1 185:17 250:20
**filed** 53:20,22 53:23,23,25 54:22 55:12 61:23 63:8,12 94:17,21 97:18 98:20 131:11 173:2,17 189:10 212:20 216:2 217:7,8 223:5 225:2,4 225:8 245:19 250:11,13

301:23
**files** 168:25 169:1,2
**filing** 27:20 48:15,20,23 49:17 54:2,8 55:9,14 83:10 88:5 91:6 140:14 189:6 211:14 212:15 212:25 214:22 220:2 241:20 242:21 246:23 301:13
**filings** 213:8
**fill** 167:11 168:14
**filters** 91:12
**final** 249:7 301:25
**finalized** 32:14
**finally** 156:24
**financial** 65:10 65:15,20 67:10 72:2,6,12,24 74:14,22 106:24 124:5 125:8 126:15 127:23 128:9 128:12,19,23 129:4,8,15 158:8,11 220:25,25 221:1,2,6,15,21 221:23 222:3 222:10,15 257:24 259:7 260:1,9,11,11 260:18 263:4,5 263:9,18 264:1 264:7 265:3,8 269:9,12 283:2 283:5,6,10,13 283:16,17 299:1,2,7 302:4
**financially** 305:13
**financials** 258:4
**financing** 218:21 223:15 223:22 225:7 264:3 275:12
**find** 53:18 128:4,12,22 129:4 154:22 168:10 169:3 201:15 215:8 223:14 237:3 306:11
**finding** 52:6
**findings** 269:5
**fine** 174:3 242:8 272:7 297:11
**finish** 58:25 103:1 140:11 247:6,9
**finished** 30:7 232:5
**finishing** 241:25
**fired** 138:3 165:25
**firm** 13:25 15:19 46:1 47:4,22 87:18 87:19,20 89:24 132:16 185:17 187:2 188:7,22 188:23 189:5,9 189:12,22 224:13 230:14 278:18 279:19 280:7 294:5 296:6
**firm's** 294:16
**first** 11:20 21:2 34:4,10 40:15 43:5 60:10 100:6,10,13 105:14 110:8 111:19 112:7 116:21 117:3,9 120:20,22,23 121:20,21 127:3 139:7 140:3 142:15 163:12 183:19 183:23 184:5 186:7 188:15 192:16 194:11 195:8,11,11 200:16 204:4 205:16 211:1,4 211:6 216:5 218:11,14,25 225:6,6 228:25 234:11,19 235:4,22 240:6 244:23,23 246:3 248:22 251:10,13,16 251:16 260:21 261:7,8,14,16 261:17 262:12 268:3 272:16 274:19 280:24 291:4 293:24 297:1,21 298:18
**fit** 24:5
**five** 202:19 233:16
**fix** 12:22 100:25
**fixed** 248:5,15 249:9 250:3
**flat** 248:14
**flca** 7:11 11:6
**flew** 67:7
**flip** 29:18 84:13 85:3 163:3
**florida** 91:3,5

**flow** 3:4 125:1 230:25 231:9 232:1 264:21 265:1,4
**flowing** 126:21
**flown** 91:3
**flows** 230:20 231:21
**flying** 91:8
**fml** 3:11 255:13 256:1 258:1,7 258:11 260:21
**focus** 8:8 11:15 12:20 65:10 67:2 69:24 72:8,15,20,24 74:12,13,18,25 75:3,9,10,13,18 96:24 124:13 126:11 155:12 201:7 204:15 221:2 224:5 229:21 230:24 231:22 234:14 240:9 242:5 255:15 256:6 256:13 257:14 257:20 258:5 258:18 259:8 260:2 263:12 263:18 283:21 284:2 287:4 299:20 301:16
**focus's** 124:18
**focusing** 125:10
**fodder** 148:13 148:15 164:12 165:16
**folks** 85:17
**follow** 50:6 72:20 99:14 125:16 154:17 156:8 161:4 162:12 173:18 181:21 196:1 199:19 226:10 256:5 257:21 259:2 263:1,11 266:8 280:19
**followed** 24:22 35:9 47:14 56:11 196:17 293:3,21 295:21
**following** 15:10 25:5 27:10 66:6 73:10 176:13 184:2 246:14 256:20 272:12
**follows** 11:22 118:9 215:2 219:7 234:23
**footnote** 56:25
**forbearance** 22:15 27:19,22 27:24 88:24 90:7 192:24 193:1,7 298:3
**forced** 250:7
**forecast** 3:4
**foregoing** 305:5 307:13 308:18
**form** 14:4 36:18 47:24 48:3 50:23 51:3 57:6,14 61:9,22 62:10 62:18,23 63:21 66:5,13 69:10 71:3 76:5,12 76:18 77:2,14 78:8,22 79:7 95:19 96:18 105:20 110:5 115:22,25 132:10 136:1 137:8 142:24 144:9 146:6,25 152:18 170:23 175:13 187:10 187:18,24 188:10 212:18 213:10 216:17 253:23 259:15 259:19 263:13 276:7 302:18
**formal** 16:6
**formally** 227:7
**formed** 152:25
**former** 19:19
**formula** 255:5
**fors** 301:6
**forth** 67:8 214:3 272:12 273:4 276:1 277:7
**forthcoming** 78:10
**forward** 44:19 44:23 88:9 106:24 119:2 145:10 147:4 165:15,19 212:6 218:16 219:1 249:16 250:2 260:22 268:16 306:15
**forwarded** 45:17
**forwarding** 174:21
**forwards** 234:12 277:22
**found** 31:6 49:7,14 53:2 55:18 98:22 100:8 102:17 128:19,23 268:6
**foundation** 62:11

**four** 5:10 87:25 194:1
**fourth** 230:9
**frame** 163:1
**fraud** 268:13 268:13
**fredrikson** 189:1
**free** 47:22 83:11 150:24 152:1 223:1,3 223:7 307:14 308:20
**freights** 257:9
**friday** 24:2,17 26:8,10,18,19 42:16,24 178:19 268:6 303:25
**friday's** 141:14
**friend** 17:19 78:16 279:7
**front** 23:3 29:3 84:3 134:7 168:6 169:14 183:7 186:5 193:23 217:16
**frontier** 7:11 7:11 9:4 10:25 11:6,6 22:15 27:20,22 49:1 51:14 52:3,3 52:19 53:3,14 54:4 57:3 63:15 64:20 65:17 67:6 72:3 83:9 88:8 88:13,22 90:6 90:10 106:1,2 106:3,4,14 118:5 119:11 119:21 122:3,5 123:16 128:5 128:10 129:9 129:14,22,22 129:25 130:7 130:10 131:3 131:13 158:9 159:3 178:5 190:14,16 192:16,22 193:3,6,10,12 196:14,17 197:10,24 198:2 199:6 206:15 211:7 211:14 212:21 212:24,25 213:2,8,11,14 214:20 215:23 215:25 216:13 216:24 218:12 220:25 224:6,9 224:24 225:4 225:18 226:9 226:15,17,17 227:1,7,14,17 228:4,7,24 229:1 231:13 231:16 232:4 233:6 236:3,9 236:16 251:1 251:20 252:3 252:10,11,25 253:9 255:1,7 255:12 259:7 260:5,19,22 263:6 264:11 272:9 273:17 276:10 283:4,8 283:17,24 298:3 300:10
**frontier's** 65:11 72:12 122:20 230:4 233:12 260:9 264:6,9 293:9
**fuck** 177:6
**full** 216:1 224:14 277:13
**fund** 18:3
**funds** 191:18 191:22 192:1 192:11 196:12 198:5 231:16 242:9 262:17 301:1
**further** 79:24 177:23 202:22 206:2 280:13 285:22 299:19 302:22 305:11
**future** 230:20 230:25 231:21 231:25 263:1
**fyi** 100:7

**g**

**gain** 14:17,21 15:12,18 117:4
**garden** 273:19 274:10
**gather** 169:12
**geared** 45:23
**general** 33:13 33:20 40:3 79:5 187:1 200:6
**generally** 174:20 300:12
**generate** 257:14
**generated** 129:11,18
**generically** 66:25 174:18 176:15
**getting** 25:8 47:11 50:1 92:13 148:9 228:7 286:25
**gift** 264:11
**give** 28:18 77:22 78:17 87:20 90:6 93:15,16

129:25 130:3 140:11 170:12 170:16 182:12 194:2 210:8 234:9 239:1 248:6 277:13
**given** 16:6 79:22 84:19 105:1,2 127:3 165:17 229:13
**gives** 62:14 110:13 159:5
**giving** 164:7 264:11
**glad** 264:20,25
**gladly** 177:14
**glassratner** 9:3
**global** 90:8 272:12
**gmail** 82:22 145:14 146:1 172:13
**go** 10:9 12:21 26:25 34:4 35:10 36:10 41:2 44:17 54:17 68:20 78:3 89:20 90:10 109:4 113:24 116:5 120:20 124:21 127:21 133:23 154:4 162:20 170:4 172:18 176:23 194:25 195:8 205:6,10 207:13 218:4 218:15,25 226:24 243:12 263:16,22 281:20 284:13 287:8
**god** 158:1
**goes** 34:17 35:3 44:8 217:17 230:18 294:4 294:11,12
**going** 12:20 19:16 21:22 22:18 25:15 28:17,25 29:1 31:22 34:17 36:7,15 37:1,2 49:3 52:24 54:12 57:1 62:7 64:9 66:17 68:15,16 68:21 81:11,13 81:22 86:16 90:24 101:12 101:24 102:3 108:14 110:9 110:10 114:10 116:7 122:19 124:23,25 125:13,25 126:18 127:9 128:4,4 129:12 131:6,8 149:14 149:19 151:6 151:14,19 153:18 155:12 156:19 157:12 160:11 161:13 162:16 165:13 165:15,19 170:17,19 174:13,19 176:5 177:15 177:17 178:5 182:16 184:11 186:8 188:2 193:20 194:5 198:21 199:3 199:10 202:24 204:25 205:4 208:12 210:7 210:18,24 212:1 213:2,17 215:17 216:4 216:25 217:5 220:6 222:4,22 222:25 224:16 224:21 226:10 228:8,9 229:14 231:9,10,12,20 233:17,19,24 234:1 236:7,10 236:11 237:14 239:3 240:1 244:12 246:20 247:5,15,21 248:3,8,10 249:13,16 250:1,1,18 252:18 260:24 267:24 269:22 278:10,25 284:4 288:7 294:4 299:17 302:12 303:4 303:14
**golf** 91:4,7
**good** 11:25 12:1 44:16 60:21 61:2,8 104:2,6 127:9 134:20 178:2 185:7 203:15 207:10 280:18 292:11
**goodnight** 154:14
**goofy** 250:8
**gotcha** 134:19
**gotham** 2:7 8:3 11:9,9 299:23 299:23 300:1,3 300:4 302:21
**gotten** 88:25
**governing** 106:19 107:3 107:23
**grand** 8:15
**great** 12:4 28:20 60:22

61:2 103:15 125:5,8,13 126:7,17 155:17,18,19 176:24 248:15
**green** 209:13
**grill** 125:22
**ground** 200:12 215:8
**groundwork** 109:9
**group** 8:8 11:16 41:4 42:1 43:7 44:9 44:10 72:8,15 72:21 74:13,18 75:9,14 299:21
**guardrail** 91:20
**guess** 56:14 81:24 149:1
**guided** 153:1
**guys** 24:3 109:22 133:20

**h**

**h** 3:20
**half** 80:7,8
**hall** 3:16 4:2,5 4:7 32:7 58:10 58:16 59:16 60:7 84:2 85:20,24 86:7 87:25 91:5,20 95:4 97:15 111:16 116:23 116:25 146:2 178:20,21,24 179:10 181:4 194:7,15,22 195:9 213:20 214:4 225:9 246:2 251:14 271:18 277:22 278:1 284:21 285:5 289:25 290:3,13
**hall's** 180:13 180:16 201:24 204:11 285:3 297:4
**hand** 28:17,25 29:1 125:20 204:25 205:11 209:2,9,11 213:17 234:1 244:12 251:8 260:24 278:25
**handed** 58:8 97:3 108:24 116:13 120:19 124:8
**handful** 92:16
**handing** 40:14 68:5 93:22 99:19 134:6 139:6 144:24 145:24
**handle** 28:21 86:8,15,19 87:18,23
**handled** 63:10 225:10
**handling** 87:20 159:8
**hands** 148:10
**happen** 110:9 115:11 119:6 128:20 148:24 211:2 226:19 276:22 279:4
**happened** 75:6 188:25 229:18
**happening** 195:15 196:3 215:18 302:5
**happy** 20:25 166:13 194:2 234:9
**hard** 171:1 174:16 278:4 303:17
**hardy** 8:15
**harris** 6:12 8:20
**harvest** 257:9
**hate** 52:24
**head** 75:21
**headed** 120:16
**heads** 250:7
**hear** 74:16 170:7 217:3
**heard** 64:25 65:4 121:20 145:22
**hearing** 80:17 80:20 121:21 132:18 135:13 204:18 207:4 208:18 210:4 268:20 271:24 271:25
**hearings** 204:19 205:24
**held** 192:16
**hell** 87:6,11
**help** 172:19 240:3,3
**helps** 131:17
**hey** 178:3 252:18
**higher** 122:16
**hilco** 118:1,17 118:18,19 120:1 121:4,23 122:2,3,15,20 225:19,22 228:22 229:7,9 229:22 234:5 234:13 236:2,8 236:16,21 254:11 299:9
**hilco's** 118:13 229:11 236:8 237:4,10,13,25 238:1

**hill** 4:10,20 31:9,14,18,20 53:18 55:18 56:11,22,25 57:5,10 59:19 59:23 60:3,24 61:11,13,15 62:21 63:13,17 63:20 64:1,15 64:22 65:4,13 65:24 66:3,11 66:19,21,23 67:4 71:25 72:9,16,22 145:2 146:5,8 146:23 157:8,9 157:13,15,16 157:18,19,21 158:8,12,23,24 159:2,11,20 160:4,7,13,18 161:5 162:8 163:24 164:9 164:22,25 175:5,23 176:2 176:5,13,19 184:6,22 186:21,23 196:22 197:1,3 197:11,14,23 197:24 198:1 198:15,17,25 199:22 200:4,7 200:12,18,24 202:2,5 282:16 282:22 283:3 283:14,17,23 291:21 292:1

**hire** 72:6 121:18 123:3,6 129:20 135:17 135:22 263:4

**hired** 24:2 26:8 26:17,20,23 122:3 220:24 221:2 228:11 228:24 238:3 266:2

**historical** 235:14 237:17

**historicals** 4:24

**hmm** 12:17 24:20 36:12 110:1,15 111:15 113:11 124:10 126:10 163:15 164:1 215:5 260:3 280:15

**hoeman** 3:23 23:13,16 24:1 223:10,10,11 223:12,13,14 223:20,21

**hoemancapital** 23:4,11

**hold** 34:18 222:5

**holdings** 268:8

**home** 91:8

**honest** 19:14 93:13 158:1 249:20 264:9

**honestly** 34:25 208:20

**honesty** 78:10 78:13

**honor** 154:18

**hope** 99:2 122:22 155:16 155:18,19 256:9 295:22

**hoped** 88:8 119:20

**hoping** 168:13 170:12,15

**horse** 127:17 127:19 128:2,6

**hour** 116:5

**hours** 6:11 204:6 247:19

**housed** 240:13

**human** 74:7 116:1

**hundred** 161:14 182:1 298:4

**hypothetical** 62:11 66:14 78:24 143:1 144:12 259:21

**i**

**idea** 14:6 17:13 34:21 103:3 107:1,9,11,12 127:19 157:8 180:1 189:23 207:8 223:5 229:3 247:6 249:14 250:9 250:18 256:1 302:2

**identification** 22:20 40:13 58:4 68:4 93:21 97:2 99:18 108:23 116:12 120:18 124:7 125:15 134:5 144:23 213:16 234:3 239:25 244:14 251:7 260:23 278:24

**identified** 17:16 37:2,5,7 252:5 253:10 255:22 274:25 291:11

**identifies** 117:24

**identify** 168:18 170:3,4 257:7 294:14

**identifying** 175:8
**idi** 93:9,10,13
**illegal** 104:6
**illinois** 37:9,11 38:20,20,21 295:14
**immediately** 94:23
**impact** 266:9
**impacted** 266:10
**impermissibly** 194:18
**implement** 221:8
**implemented** 105:9 221:15 260:20
**implications** 202:17 259:3
**imply** 254:15
**implying** 61:11
**important** 25:18 26:21 94:25 115:12 150:5 240:5 292:15
**imposition** 105:18
**impossible** 55:6 157:3,14
**impression** 166:22 198:19
**improper** 78:23 142:23 149:7 150:19 151:8,9 151:18 152:6,9 152:10,23 259:16,20,20
**improperly** 137:17
**improved** 125:11
**improvements** 99:7
**include** 35:20 84:22 98:21,23 134:18 165:3 165:10 219:16 220:7,7 245:6 245:6 273:5
**included** 27:25 28:3 31:14 45:2 306:13
**includes** 15:1 44:14 234:23 245:14 273:18
**including** 14:23 57:5 100:3 126:24 273:5 273:12 275:15
**income** 248:23
**incomplete** 62:10 66:13 143:1
**inconvenience** 246:20 247:1 247:11,22
**incorporated** 308:12
**incorrect** 95:17 283:9
**incorrectness** 95:21
**increase** 62:8
**incur** 197:8
**indebtedness** 49:2
**independent** 73:6,8,20 99:17 106:11 107:8 149:23 150:23 151:25 152:21 176:4 226:4 263:21 294:21 299:9 299:14
**independently** 131:8 297:16
**indicate** 219:5 256:25 288:23
**indicated** 179:13 180:17 193:9 199:19 225:18 226:12 228:20 236:20 237:1 250:6 256:18 258:18 259:25 266:7 283:3 298:14
**indicates** 195:14 201:14 218:17 235:13 277:5 285:16 285:22 288:3 288:18
**indicating** 279:23 306:13
**indirectly** 19:2
**individual** 35:12 40:22 50:5,7 51:25 61:20,20 73:12 73:13 88:1 168:3 174:13 184:25 185:14 223:9 279:14 292:25
**individually** 52:4 89:13 183:24 185:13 188:17
**individuals** 35:19 100:3,15 148:14 154:2 170:21 204:13
**inefficiencies** 220:15
**info** 58:6
**inform** 143:10 146:22
**informal** 16:8 227:16

**information** 15:3,18 20:7,9 56:4 80:22 81:12 93:14,16 94:25 103:14 126:15 161:24 199:11 200:24 203:11 206:11 210:7,9 228:8 228:10 230:3 231:8 232:6 235:14 237:16 237:18 238:17 238:21 239:2,4 239:5,7 240:5 240:23,25 241:5 259:9 294:8,10 298:15
**informed** 139:19 166:1 211:22 262:23
**informing** 141:18 238:12 253:8
**informs** 117:18
**initial** 93:5 118:13 261:5
**initially** 83:2 216:16
**input** 72:13 110:17 113:24
**inquire** 154:18
**inquiring** 143:12
**inquiry** 198:8
**insider** 159:6 159:11,22 160:2,5,6,8
**insiders** 273:5 273:12,18 274:22
**insinuating** 141:4
**insolvency** 181:13
**install** 272:18
**instance** 105:6 185:21 187:15 191:23,24 192:16 212:3 240:20
**instruct** 80:23 81:13 103:21 149:20 150:21 151:15 245:9
**instructed** 56:10 152:22
**instructions** 35:10
**insurance** 175:20
**integral** 108:8
**integrated** 220:14
**intend** 80:20 250:6
**intended** 161:18,21,23
**intending** 236:1
**intent** 81:16,18 82:1 165:14
**interchangea...** 154:22
**intercompanies** 302:14
**intercompany** 283:19 300:22 301:10 302:5
**interest** 53:5,10 73:14 78:20 127:11 135:25 136:5,9,13,18 157:7 158:23 158:24 160:3,4 163:24 175:11 221:16 222:21 273:24 274:3 274:24
**interested** 305:14
**interests** 164:21 292:23
**interfaced** 67:1
**interfere** 258:1 260:17
**interim** 272:17
**internally** 92:18
**interpretation** 105:8
**interrupt** 12:10
**intertwined** 151:23 292:23
**interviewing** 270:1
**interviews** 93:5
**introduced** 24:25
**invades** 149:11 151:11
**inventory** 117:19,21 120:2 123:2 160:12 164:8 225:20,21,22 226:5 228:17 235:15,15 246:23 247:18 247:19 254:2 254:10,21 255:17,23 256:5,20 257:15,22
**investigate** 63:13,19,25 65:7 69:15 202:17 267:12 269:4 283:16 299:2
**investigating** 17:11

**investigation** 63:17 73:7,8 75:14 191:13 191:18,21,25 192:6,10 197:2 197:12 198:25 282:21
**investment** 132:15
**investor** 128:4 128:12,19,22 128:24 129:5 129:12
**invoice** 243:24 245:4
**invoices** 242:1 243:5
**involve** 69:17 69:22,25
**involved** 18:18 54:25 74:19,22 79:25 83:14,15 83:17 87:15 93:5,7 104:12 111:7,23 112:4 119:1 159:11 176:16 181:19 181:23 183:4 203:19,23 211:4,6 233:6 241:15 242:19 281:22
**involvement** 88:14,22 204:3 204:9 233:12
**involving** 52:9 67:19 97:14 108:25 116:14 147:20,24 148:3 170:21 199:21
**irrelevant** 248:1
**issue** 67:19 79:23 143:23 251:15 252:24 253:5,21 255:18
**issues** 69:9 71:21 98:17 255:14,20 257:2,10,11,20 260:13,14,19
**item** 247:10
**items** 64:23 129:17 138:16 140:22 255:11 276:9

**j**

**j** 11:8
**janna** 44:21
**january** 22:18 24:17 42:20 80:17 218:22 224:12
**jessica** 98:2 194:8 201:15
**jill** 249:14
**job** 47:16,17,19 56:3,14 119:10 119:17 126:14 127:8 128:22 131:24 207:10 221:14,19 235:23,23 237:23,24,25 238:1,1 263:7 263:8 265:4 299:2
**john** 3:16 4:2,5 4:7 32:7 58:10 58:16 59:16 60:7 84:2 85:20,24 86:7 87:25 91:5,20 95:4 97:15 111:16 116:23 116:25 146:2 178:20 180:25 194:7 195:2,9 225:9 246:2 271:18 278:3 285:3 286:1,5 286:22 288:15 289:25 290:11 297:4
**join** 79:9 81:1 132:12 143:2 253:24
**joined** 79:1
**joint** 272:11
**josephine** 7:20 11:1
**journal** 279:3
**juanita** 5:6 75:21,24 104:25 110:10 110:13 113:20 115:1,2 116:15 119:3,5 120:25 125:7,8,10 127:22 207:22 234:22 236:18 243:20 261:18 267:17
**juanita's** 109:23 110:17 119:10
**judge** 268:6
**july** 169:17 170:18 171:4 179:16 284:16 289:16 298:15
**jump** 112:8 160:11 210:10
**june** 235:1 237:8

**k**

**k** 235:11,11
**kansas** 1:2 6:2 6:13,16 7:7,22 8:5,10,11,16,21 9:9 20:22 41:9

41:12,16,19,23 41:23 179:20 183:4
**kat** 191:8,10 192:15
**kc** 24:2
**keep** 25:19 101:13,14 125:25 209:13 220:24 269:24 301:13
**keeping** 100:20
**kentucky** 145:2 159:21 202:5
**kept** 93:1 294:17 295:1,2
**kickoff's** 124:22
**kill** 121:23
**kind** 38:10 130:24 189:4 216:12,18 218:11 221:24 223:21 227:7 231:20 232:11 239:19 249:4 254:24 259:2 262:25 263:11 276:21 303:16
**kinds** 122:4
**king** 9:3 11:10 138:14 139:9 139:12,19,25 141:7,12 142:6 142:9 143:12 146:22 147:1,5 148:11 217:12
**kiss** 120:5 228:20
**knew** 47:18 51:20,22 66:20 77:23 122:2,20 123:14 128:8 131:2,5,8 135:4,7 141:5 157:25 158:4 158:13 160:17 165:12 168:9 168:11 192:19 192:23 224:15 228:23 236:8 236:15 255:11 264:10 283:19
**know** 16:2 19:13 21:2,5 21:18 22:10,13 22:14 24:18,19 24:24 25:3,14 25:18 26:20 28:6 34:25 35:1,24 36:5,7 36:20,25 37:23 40:2 41:2,10 41:14,17,18,23 43:16 44:9,14 46:6 47:6,7 50:25 54:7,11 54:12 56:24 62:24 63:1,23 64:24 66:17 67:17,17,21,22 74:20,21,23 75:8,10,11 79:2,22 80:24 81:2 82:4,4 84:19 85:1 86:12,18,19 88:21,23 95:23 98:7 103:4,5,7 103:10,20 104:9 106:20 114:9 115:17 118:18 119:25 122:17 123:24 124:13 128:7 132:13 133:7 133:22 134:8 135:8,24 136:7 136:15,16 137:1,3,10,11 137:20 138:1,2 141:1 143:15 144:18 146:10 146:16,19 152:8,19 153:9 156:18 157:7 157:10,16,17 157:20,22,23 157:24 158:1 158:17,22 160:16 165:24 167:8,9 169:1 170:8,25 173:5 173:14,17 174:24 176:1,3 176:11 179:13 179:24 183:15 186:17 187:20 188:13,25 189:8,13 190:25 191:1,4 191:12,16 192:13,14,16 192:19,20,23 193:1,5,8,19 196:13,14 199:23 200:3 200:14,22,23 204:4,5,7,20 205:23 207:5 207:16,19 208:6,20 210:20,21 211:21 212:16 213:12 216:23 217:2,11 220:2 226:8 229:1 230:24 231:23 232:13,22 236:3,9 237:25 239:15 242:23 243:8 244:15 245:17 247:5 249:23,24 251:4,5 254:6 255:4,19 257:3

259:1,22 262:5 262:9 264:8,10 265:4 266:8,21 274:6 276:24 277:3,16,18,21 280:21 281:19 282:13 283:25 285:13,13 286:12 287:20 287:23 289:19 290:11,22,24 291:2,19 294:23,23,25 295:1,3,6,9,9 295:10,13,13 295:20,22,24 296:10,10,12 296:17 297:8 297:19,22 298:18 301:3 301:18 303:2
**knowing** 16:4 144:11
**knowledge** 106:15 176:4 180:12 186:13 186:22 189:20 189:23 221:24 232:9 245:10 255:22 286:9
**known** 229:21 294:18
**ks** 9:8 10:3 305:4,17
**kubota** 286:1,6 286:22 288:19 288:22
**kutak** 7:14 10:24 11:5 117:19 193:18
**kutakrock.com** 7:16,16
**kwok** 234:18 235:11

**l**

**l.l.p.** 8:15
**labeled** 84:16 85:24
**lacks** 62:11
**laid** 176:3
**land** 145:2 170:11 173:9 200:3,7 201:15 202:5
**landed** 91:4
**landlines** 166:21,23,25
**language** 262:13
**large** 121:22 182:1
**largely** 214:17
**largest** 181:23
**larry** 1:9 2:3,18 2:23 3:10,15 3:22 4:1,4,6,15 4:17 5:7 6:9 10:11 11:14,19 48:16 74:10 87:24 88:1 114:3 118:24 129:24 142:16 148:19 161:13 207:24 248:13 293:23 306:8 307:4,9 308:4 308:13 309:20
**late** 148:6
**laugh** 30:3
**laughed** 30:7
**laughing** 30:9
**law** 4:3 15:19 68:6 185:17 187:2 188:22 188:23 189:5,9 189:12,22 278:18 279:19
**lawyer** 15:1 34:7,9 38:3 48:2 56:15 70:25 77:6 78:14 92:18,18 115:5 135:17 136:18 178:14 257:25 260:11 292:6,11,12,14
**lawyers** 14:23 35:24 37:2 50:3 72:5 129:15 211:25 260:17 265:2
**lay** 109:9
**layer** 254:23 255:2
**lead** 93:8 95:11 97:8 104:2 132:1 204:4,5 207:8 228:7 229:1
**leads** 20:5
**learn** 28:8 60:3 74:24 98:13 160:21 265:6
**learned** 28:7 49:22 52:18 59:23 65:1,3 134:11 135:6 166:24 200:16 200:21 258:1 276:9 297:21 300:5
**learning** 53:8 268:24
**lease** 2:16 3:13 4:20 54:15,16 64:16 97:25 98:8,17,21,22 99:2,2 145:2 145:13,17,20 146:5,8,18,20 146:24 159:11 159:20,22 160:5 173:2,12 200:1,11,12,13 200:17,25

202:2,4 273:17 274:25 286:4 286:10,15 287:4,18,24 288:19,22,23 288:25,25 289:20,21 290:22 291:5
**leased** 3:18 99:5 173:10,11 284:23 285:19 285:23 290:8 300:19
**leases** 55:15 97:18,21,23,24 98:2,8 99:11 139:20 159:6,7 201:16 202:12 289:13 290:21 290:25 300:22
**leasing** 206:5 206:14,20,22 288:14
**leave** 154:15 155:2 165:9 199:10
**leaving** 198:20
**led** 31:5 41:17 96:19 163:21
**ledge** 119:7,11 119:19,23
**ledgers** 301:11
**left** 65:15 85:17 85:24 93:1 209:9,11 228:15 243:19 279:19 282:23
**legal** 67:13 142:11,20,23 143:3,4,5,9 144:14 306:1 309:1
**leighton** 8:9
**lender** 264:20 265:1
**length** 292:4
**lep** 85:4,20 90:20 91:24,25 153:7,11,12,25 154:4 156:10 163:3 164:14 166:3 167:17 171:15 174:1 174:10 243:12
**lep1** 84:16
**lep266** 84:16
**letter** 2:19,24 4:3 25:23,24 26:22 29:13,19 29:22 30:10,14 32:15 34:10 38:24 39:1,20 40:5,9,9,11 46:25 48:10,13 68:6,11 69:13 69:14 70:14,15 70:22 71:11 72:17 73:10 74:25 86:22 87:2 134:17,21 134:24 182:20 182:24 183:3 183:10,13 185:7,12 188:16 265:16 266:9,24 267:4 267:17 293:25 294:1 296:21 296:22 297:2 306:19
**letters** 183:2
**level** 101:9 268:12
**levi** 183:24 184:25
**lewis** 2:22,24 5:10 8:13 11:11 12:5 13:6,12,24 15:19 16:10,13 16:20 17:2,10 17:22,24 18:5 18:10,15 19:16 19:24 20:2,19 22:17 23:10 25:9 29:12 30:1,4,5,6,12 32:19 33:1,21 34:7,9,13,20 35:3 37:3 44:18 50:20,21 52:8,20 53:4 54:6 55:22 63:9 65:17 70:4 71:6 73:7 80:1,13 82:18 84:1 91:16 95:8,10 104:12 128:21 132:17 132:21 135:18 138:6,9 139:2 139:17 140:1 140:16,17,20 140:21 141:8 141:13,22,25 142:14,18,21 143:6,8,10 144:3,14,19 150:8 159:9 167:18,19,22 167:24 168:20 169:8 170:20 170:25 171:3 171:13 177:9 178:17 179:9 180:7,19 181:1 181:8 182:17 182:25 183:23 185:3,12,13,23 186:16,24 188:5,16,20 190:12,18 191:6,13 192:5 192:7,10 193:16 201:7 204:14 213:25

221:7,14,19 238:20,24 239:8 240:13 240:14,17,21 240:24 241:9 241:10 255:21 256:1 263:22 266:12 279:3,9 279:15,19 280:4,6 283:8 286:10 293:6 294:20 297:15 297:18,23 298:19 299:2 301:23
**license** 239:10
**lien** 192:17 232:17
**liens** 199:4 251:20 253:1
**lifeline** 23:17
**light** 256:3 267:10
**lighten** 113:19
**likely** 88:7 120:12 193:18 215:7
**limit** 54:18 78:3 209:25
**limited** 113:14
**line** 99:20 116:16 123:20 124:12 183:24 195:16 207:3 243:24 245:4 261:13,17,17 262:4 271:19 306:13 308:7 309:3
**lines** 202:1
**liquidating** 161:1
**lisa** 7:13 11:5 90:16,24 91:15 116:22,25 252:13 271:17
**lisa's** 219:6
**lisa.peters** 7:16
**list** 28:1,3 30:14,19 31:19 31:20 32:2 35:17,19,25 36:1,4,8 40:23 43:23 45:2 46:2,3,4,7 96:13 97:18,23 98:6,12 99:1,4 99:6,15 118:13 140:21 159:5 167:4 184:3 257:11 294:15 294:25 295:18 296:17,19 301:5
**listed** 34:15 38:1,2 42:12 44:6 45:8,9,12 45:13,20 46:7 46:14 56:25 89:21 90:2 98:19,23 99:2 99:11 293:22 296:4 308:7,17
**listen** 212:1 263:9 266:19
**listened** 221:21 257:6 263:17
**listing** 36:5 42:7 56:22 97:20 308:7
**lists** 43:22
**literally** 200:23
**litigation** 265:22 272:10
**little** 17:5 129:23 131:15 153:6 160:11 175:4 182:16 186:9 225:14 241:11
**live** 131:6
**llc** 2:22 6:12 8:2,13,20 11:12 13:6 202:5 268:8
**llcs** 36:6
**llp** 7:6,14 8:9
**load** 257:9
**loan** 28:10 31:6 53:19 54:3 55:19 57:3 60:16,19 126:22,23 127:3,4,5 190:14,18,20 191:3 192:22 193:10,11 223:18 224:25 225:8 283:8 289:18,24
**loans** 51:15 52:3,4,19 53:3 53:14,14 127:1
**locker** 148:13 148:15 164:12 165:16
**lodge** 81:11
**log** 239:20
**logical** 62:19 187:13
**logically** 26:16
**logs** 2:17 84:23 153:9 156:1
**long** 24:3 28:1 43:23 109:5 120:4 181:7,10 181:12 203:18 214:13 303:23
**longer** 5:9 12:5 135:4,8 168:21
**look** 39:3 41:1 43:20,25 46:6 46:15,15 61:25 71:24 72:4,5,8 72:15 75:20,22 103:9 120:20

129:12 139:7 156:1 169:10 174:12,14 175:14 183:19 194:1,2 198:4 201:2 202:3 209:11 214:12 217:15 222:1 223:6 229:16 229:24,24 233:10 234:8 234:19 235:7 239:19,20 245:20 256:8 256:19,25 263:7,22 264:12 266:14 266:17,23 269:10,13,16 271:10
**looked** 47:1 72:18,22 176:24 182:19 189:15 224:11 228:18 229:25 236:25 237:20 274:18
**looking** 85:19 86:1,13 91:24 120:21 206:3 276:18
**looks** 39:1,6,18 41:10 102:6 121:2 207:21 243:22
**loop** 216:12 233:25
**loosen** 113:19
**los** 182:10
**loses** 159:2
**loss** 122:6
**lost** 112:24
**lot** 51:5 113:17 125:5 131:1
**lou** 21:2,4,6,9 21:10 22:2 24:23 25:1,3,5 25:6 27:2,10 41:3 88:12 297:22,22,25
**louis** 5:9 9:10 21:8 41:13,20 41:24,24 43:6 182:1 183:14 280:22
**love** 222:8
**low** 122:4 228:22 229:9 229:12,13,15 236:21,21
**lower** 120:12 244:6
**lr** 3:24 44:1
**lunch** 116:6

**m**

**m** 23:12
**ma'am** 182:18 183:8 201:4 209:3 230:1 235:9 243:11 243:14 245:25 252:1 268:2
**madam** 306:10
**made** 55:22,25 64:17,18 99:12 99:16 104:25 105:3,4,5,7 114:2 115:18 129:19 130:5 131:20,21 132:6 143:7 176:6,10 189:5 220:3 222:12 227:24 257:25 258:6 267:5 282:7,10 283:25 307:7
**mail** 2:14,15,19 3:1,2,4,6,8,10 3:12,14,15,17 3:22,24 4:1,4,6 4:8,10,11,13,15 4:17,18,20,21 4:23 5:1,2,4,6 23:3,10 24:4,8 24:12,16,21 25:11,20 26:21 27:1,4 29:9 34:12,12,16,19 35:2,7 37:18 37:22 40:15,16 41:1,3,25 42:3 42:22 43:4,6 44:8,10,19,23 45:2,4,10,17,21 46:22 47:10,12 58:9,14,15,15 58:19,21,24 59:4,15,15,16 59:16,25 60:2 60:9,11 82:7 82:17,19,24 93:23,24 94:3 94:5,14 95:3 96:12 97:4 99:20 100:2,14 101:2,17 108:25 109:8 109:14,14 110:25 111:13 112:10,13,14 112:25 113:2 116:14,20,21 117:2 118:8,10 119:2 120:15 120:21,23,24 120:25 124:9 125:17,21 134:9,11,15,17 135:17 137:18 138:15,18 139:7,8,15,24 139:24,25 140:4,24 141:2

141:5,17 144:25 145:10 145:25 164:16 169:7 172:1,6 172:9,11,11 193:25 194:6 194:15 195:10 195:11,21 196:10 201:5 201:14 202:15 213:19,22,24 214:13 217:19 217:21 219:6 219:20 224:10 230:2,6 234:4 234:5,7 235:1 235:4,10 236:25 237:17 240:6 244:18 244:23 246:1,8 246:11,18 248:19,22 251:3,9,13 252:2,22 253:7 253:14,15 256:10 257:19 260:25 261:5 261:14,16,17 262:2,13 268:3 268:16 271:12 271:13 272:8 276:15,25 277:4 278:1 284:16 285:15 287:9 288:2,5 288:7 289:1 290:16 294:2 294:18 295:4,7 296:8,12,16

**mail's** 93:25

**mails** 50:11 97:10 120:22 122:1 126:16 133:20 147:20 147:22 154:14 154:19,20,21 154:23 155:1 164:3 165:8 228:18 235:11 284:8 285:2 287:22 289:16 295:11

**main** 6:12 8:10 8:20

**maintained** 61:17

**majority** 30:17

**make** 26:13,15 29:18 32:21 34:14 39:8 40:10 45:6 55:19 56:5 57:19 65:12 78:17 84:13 92:8 103:11 104:20 105:22 109:10 113:15 113:20 115:13 126:2,14 134:1 143:14,15 153:17 158:20 159:3 177:7 223:16,21 274:13 275:6 296:18

**maker** 106:11 212:8 213:15

**makes** 26:16 37:19 46:17 87:10 126:4 158:18 187:22 190:11 199:6 208:21 291:11

**making** 29:20 33:4 104:12 108:4 113:16 114:5 213:12 249:6

**manage** 270:7 270:9 271:4

**managed** 68:1

**management** 8:8 11:16 13:17 14:10 16:10,13 18:21 65:9 69:23 72:8,15,21 74:13,18 75:9 75:10,14 129:1 135:8 266:2 270:2,3,17,20 287:5 299:21

**manager** 184:19

**managerial** 108:20 110:13

**managers** 125:3

**managing** 87:25 266:25

**manpower** 87:21

**march** 204:7 224:20 243:22 244:19 250:16

**margin** 244:6

**mark** 3:23 7:4 10:15 12:1 23:16 26:24 223:11,12

**marked** 2:9 5:14 22:20,24 28:15,17 29:8 40:13 58:4 59:4 68:4 84:4 93:21 97:2 99:18 108:23 116:12 120:18 124:7 125:15 134:5 139:6 144:23 145:24 186:5 193:21 205:1 213:16 213:18 234:1,3 239:25 244:13 244:14 245:21

251:7 260:23 260:25 268:1 271:11 278:24
**market** 232:7 254:23 255:2
**marking** 240:2 251:9 279:1
**material** 110:20
**materialize** 157:2,15,17
**materializing** 163:24
**materials** 77:24
**matter** 32:8 43:1 56:9,18 73:18 83:13 84:1 209:7,24 229:6 236:17 236:21 238:25 244:20
**matters** 38:4 92:20 280:23 298:20
**mattingly** 278:16,21
**mcole** 7:8
**mean** 19:14 60:18 62:13 63:18 69:12 77:16 87:13,22 106:3 112:14 125:24 126:3 148:15 157:6 160:5,17 165:12 167:2 170:15 199:9 232:24 254:15 290:8,13 291:8 292:18 297:3
**meaning** 21:9 57:16 158:17
**meaningful** 113:21
**means** 57:17 63:23 121:8,9 126:5 132:13 152:8 164:4 188:7 239:13
**meant** 87:7 126:4 155:2 156:19 165:5 176:1 225:1 258:19 264:25 290:11
**mechanisms** 215:1 216:20
**meet** 89:5 179:19 180:18
**meeting** 4:9 60:6 70:15,19 70:22 99:21 155:23 178:19 195:4 203:3,4 203:4,8,21 204:8,8,9 210:5,11
**meetings** 99:25 203:1 204:12 210:16 260:12
**meghan** 6:13 9:8 10:3 305:3 305:17
**member** 5:10 274:3
**members** 36:6 103:22 104:3
**membership** 13:6
**memo** 32:21 33:17,18,20,24 34:5,8,11 35:3 36:10,17,24 37:2,17,21 39:24 40:6,7
**memorandum** 54:16 166:17
**memorized** 187:12
**mentally** 87:24
**mentioned** 33:17 49:14 106:21 133:25 137:21 147:14 188:18 232:15 297:20
**mentions** 253:3
**merely** 165:15 168:18 231:12 271:2
**mess** 175:24 176:2 270:11
**message** 13:14 82:10 137:22 147:21 150:14 152:3 153:1 154:12 162:19 165:24 166:11 166:24 170:5 171:21 206:16 234:23
**messages** 2:12 2:17 50:12 84:11 85:1,7 85:13,15,16,19 85:23 92:4 133:13 137:22 147:17,24 148:3,7,9 149:3 150:15 151:18 152:4 152:24 153:4,7 153:8,11,13,24 154:1,7,11 155:8 164:7 165:1,3,15,16 166:20 167:16 167:18 168:6 168:15,17 169:14,20 170:5,8,18,21 171:4,7,11,17 172:17 173:25 174:5 179:14

179:15 180:4 180:18 205:7 210:17 243:10 243:17,18,19 243:20 298:11
**met** 222:2 280:21,22
**method** 82:14
**mhoeman** 23:4 23:11
**micromanagi...** 113:21
**mid** 160:22,23 190:10
**middle** 44:20 51:7 60:10 100:16 194:16 234:17 262:11 268:4 271:1
**midwest** 306:17 309:1
**mike** 194:7 195:5 219:2
**miller** 2:6 7:19 11:3,3 280:17 281:1 293:19 293:20 297:6 297:15 299:18 304:2
**million** 101:16 103:12 158:9 182:1,2 262:19 262:24 263:8 263:24
**mind** 101:13,15 136:3,8,10,14 150:23 182:12 201:12 220:24
**mine** 42:18 84:21 90:19 217:17 269:16
**mine's** 84:20
**mineral** 54:17
**minnick** 6:14 9:8 10:3 305:3 305:17
**minor** 100:8 103:6,7,8,10
**minute** 101:10 160:24 234:8
**minutes** 165:11 175:4,16 233:16 288:9
**miraculously** 116:5
**mislead** 25:16
**mismanaged** 267:5,8
**mismanaging** 70:2,6 79:4
**missed** 97:9
**missouri** 1:1 6:1,13,16 7:7 7:22 8:11,16 8:21 9:9,10 10:12 76:22 182:11 279:2
**misstated** 242:7
**misstates** 96:7 216:18
**misstating** 282:19
**mizaur** 3:16 246:2,6 249:5 249:18
**mizaur's** 246:18
**mm** 12:17 24:20 36:12 110:1,15 111:15 113:11 124:10 126:10 163:15 164:1 215:5 260:3 280:15
**mo** 9:8 10:3 305:3,17
**modified** 270:21
**mom** 274:5
**moment** 91:12 194:2 226:18
**monday** 24:15 26:2,11 95:13 262:10 303:19
**monetary** 237:7
**money** 62:6 63:16 67:7 79:4 83:18 101:25 102:3 123:13 125:23 126:6,13 128:5 130:5,6,22,23 130:24 197:11 197:23 198:1,2 228:4 231:18 301:2 302:14
**monies** 65:21
**month** 43:3 258:11 259:5
**monthly** 36:3 140:15 301:22
**months** 258:12 258:16,19,20 259:11 268:21
**moore** 2:15 4:5 4:7 63:9 93:7 95:4,7,11,12 96:19 97:15 98:1 99:3 100:2,14,18 101:11 139:8 139:16,19,25 140:13 141:7 145:10,13,21 145:25 146:14 146:15,19 159:8 179:5 189:18 204:5 209:23 281:18 282:12 301:16 301:20,24 302:7

**moore's** 2:13 205:3,7 286:8
**moothart** 8:19 11:13,13 12:10 12:13,23 14:4 14:23 15:2 16:18 20:6 22:23 23:1,6 24:6 28:20,24 29:18 39:9 52:22 58:5,7 58:22 59:1,6 62:10 64:7 66:13 69:10 74:9 79:1,9 80:21,25 81:7 81:10,18,24 84:9,13,24 92:15,23 93:1 97:8,12 100:7 100:11 108:2 109:5 112:22 112:24 116:2,4 129:23 132:10 133:20 134:2 138:7 140:9 142:24 143:1,3 144:21 149:8 149:11,19 150:20 151:3,6 151:10,19,22 152:15 163:9 177:13,15 178:15 182:5,8 186:7 225:14 233:18 244:16 245:22 253:23 264:14 266:19 278:8 297:3,8 297:11 302:23 303:1,9,12,20 306:5
**morning** 11:25 12:1 161:10 172:13 205:17
**mortgage** 54:15
**motion** 91:6 131:10,20,21 132:2,8,22 135:14 173:3 185:22 186:15 202:20 212:22 217:6 225:2,7 271:22 272:11 277:14
**move** 88:9 161:8,17 172:19 208:10 208:15 210:14
**moved** 211:12 216:13 222:9 223:25
**moving** 208:3 212:21 249:16 250:2
**mullinix** 8:4
**multiple** 3:10 3:12 29:20 38:5 105:24 127:1

**n**

**n** 2:1 6:14 7:1 8:1 9:1,8 10:3 305:3,17
**name** 21:2,3,5 34:19 35:13 40:25 45:12 67:17 77:25 162:5,8 191:10 222:4 224:23 226:1 230:14 275:7,12 280:25 285:20 285:23 306:6 307:3,4,15 308:3,4,21
**names** 10:13 43:19 182:3
**nature** 42:8
**navigate** 175:6
**near** 70:16
**nearly** 5:10
**nebraska** 7:15
**necessarily** 53:15 122:10 150:5 151:11
**necessary** 221:4 231:8
**need** 5:7 26:25 36:16,21 100:4 100:20 105:12 106:10,12 109:23 113:8 113:21 120:8 121:18,18 122:8 126:17 129:12 136:17 172:2 175:5,23 210:9 215:8 220:11 239:14 247:16,18,20 252:19 256:20 261:15,18 262:9 266:14 267:19 282:7
**needed** 49:21 49:23 50:7 51:15 73:12,16 73:19 92:5 96:25 98:18,18 105:13 108:18 109:24 115:12 115:18 119:25 125:6,11 126:22 127:4 129:8 135:17 138:16 141:6 161:8,12 167:4 168:18 175:9 176:6 199:2 221:5,5 228:14 232:7 237:16

239:6 250:21 257:1 265:4 269:24 282:10 282:14,20
**needing** 38:10 119:11 121:21 124:1
**needs** 110:17 114:10 126:23 135:22 136:20 141:19 160:13 160:25 161:5 161:16 172:3 176:7 210:6
**negotiated** 88:10 276:11
**negotiating** 22:14 298:2
**negotiations** 107:7 216:24 277:2
**negotiator** 105:13 108:17
**neighborhood** 245:18
**neither** 289:12 305:9
**net** 2:16 3:13 202:2,4 264:21 265:1,4
**never** 14:19 16:6,9 20:13 32:1,14 83:6 85:12 101:24 104:2,9 106:6 106:12 108:15 108:15 118:25 119:13,16 128:19,23 136:8,9 147:1 147:13 165:14 166:23 211:2 222:9 226:6 227:6 228:3 232:2,5 240:12 246:20 248:8 254:3 260:17 266:3 270:5,23 276:9,22 278:20 283:11 283:12 299:11 299:12
**new** 36:10 106:17 166:13 246:21 250:5 272:18,25 273:3,7,17 274:13 275:16 275:22 276:2
**news** 60:21,22 61:2,3
**nick** 3:16 246:2 247:3,7
**night** 133:21 148:6 155:17 155:19 163:7
**non** 31:7 77:16 77:16
**nondebtor** 56:23 57:12 158:14,16 197:8
**nondisclosure** 95:14 96:5
**noon** 155:23
**normally** 238:15
**notarized** 306:14
**notary** 306:25 307:10,18 308:15,23 309:23
**note** 5:13 230:8 264:10 306:12
**notes** 194:15 218:20 235:2 257:8
**notice** 252:18
**notify** 47:16
**noting** 215:1
**november** 144:15
**number** 2:11 3:21 10:11 18:21,23 85:12 100:3 117:3 131:2,5 204:23 205:20 208:25 230:21 237:4 248:9 249:13 284:3 306:7,13
**numbered** 44:1
**numbers** 131:9 167:4,13 168:9 168:11,18 169:4,13 170:3 170:3,6,10,11 170:13 228:13 232:11 237:13 237:15 258:21 259:4 308:7
**numerous** 50:8 254:19

**o**

**o** 235:11
**o'clock** 124:22
**object** 14:4 36:18 47:24 48:3 50:23 51:3 57:6,14 61:9,22 62:10 62:18,23 63:21 66:5,13 69:10 71:3 76:5,12 76:18 77:2,14 78:8,22 79:7 80:21 81:7 95:19 96:18 102:7 105:20 110:5 115:22 115:25 132:10 136:1 137:8 142:24 144:9 146:6,25 149:8

149:19 150:20 151:14 152:18 170:23 175:13 187:10,18,24 188:10 212:18 213:10 216:17 253:23 259:15 259:19 263:13 302:18
**objection** 5:4 81:11 151:20
**objections** 134:2 251:19 252:25
**obligated** 79:19 79:21 95:18 283:4
**obligation** 32:21 79:23 158:12
**obligations** 53:16 131:25 301:5
**observe** 12:20
**obtain** 226:4 228:5 238:5,8 238:22 289:24 290:20
**obtained** 38:13 190:12 225:7
**obvious** 188:14
**obviously** 30:7 260:2 275:5
**occasion** 299:6
**occur** 71:20 115:12 131:1
**occurred** 199:19
**occurring** 172:17 196:11 196:11,15,15 269:6
**ocp** 275:15
**october** 138:24 139:17,21 145:5 160:22 160:23 176:18 177:9 202:7 306:4
**odd** 170:11
**offer** 122:7 131:7 277:10
**office** 4:3 7:20 9:9 24:2 41:9 41:12,13,16,19 41:20,20 63:9 68:6 93:7 96:19 183:4 203:12 210:8 210:16 247:5 301:20
**officer** 272:19 276:2
**offices** 60:6
**official** 1:10 6:18 7:3 10:16 10:19,22 11:21 307:15 308:21
**oh** 29:2 40:20 44:12 50:11 67:21 97:12 100:11 109:20 155:20 159:13 165:6 166:14 166:15,17 181:9 200:1 211:5 217:17 225:1 264:15 268:19 271:16 280:24 281:2
**ohio** 306:2
**okay** 12:4,8 13:9,11 14:9 14:16 15:16,24 16:8,18,22 17:3 19:1 20:5 21:6 22:13 23:17 24:5,9 24:15,21 25:6 26:1,4,10,12,14 26:17 27:1,6 27:15,25 28:4 28:24 29:21,25 30:12 31:12,20 31:24 32:2,10 32:13 33:23 35:1 36:1 40:19 41:15 42:25 43:25 44:8 45:1 46:2 46:19 48:12 49:16 50:9,21 51:12,19,24 52:6,17 54:6 54:13 56:17 58:7,14 59:1 59:22,25 60:3 60:16,21,21 61:18 62:3,20 65:7 68:10,19 69:4 70:1,9,19 70:24 72:20 74:18,21 75:3 75:5,8,17 76:9 77:5,11 79:25 81:20 85:3,19 86:7,21,25 87:5,8,17 90:4 90:9,12,23 91:24 92:7,22 93:3,12,25 94:13 97:12 99:14,24 100:2 100:12 109:7 109:13,21,22 110:19,24 111:5,24 112:2 112:3,11,16,18 112:20 113:5 113:12 114:9 114:13,17,18 115:4 116:20 117:8,15,24 118:8,12 119:2 119:18 120:15

121:3 126:1,5 130:21 131:19 133:11,16,19 134:4 135:16 136:4 138:5,18 140:21,24 141:12,25 149:13 151:3 151:10,19 152:7,20 153:5 153:16 154:17 154:25 155:5,8 155:15,21 156:4,7 159:1 159:17 162:2 163:22 165:7 167:23 168:20 169:10 170:19 171:2 172:16 173:12 174:4 176:17,22 178:22,24 179:2,4 180:2 182:14 183:6 183:16 185:10 185:11 186:13 191:11 194:4,5 194:13 195:8 198:8 201:1,23 202:10,14 203:2 204:10 204:20,21,25 205:5,9,14,15 206:2,24 207:13,17,20 208:11,15,22 209:1 211:11 211:13,18 213:24 214:7 214:12,24 216:9 217:6,11 217:15 218:5,6 218:15,25 220:1,16 221:10 223:20 224:18 225:21 226:10 227:6 228:17,25 229:4,8,24 230:2,13 233:15,18 234:11,25 235:1,21 236:20 237:8 237:22 238:4 238:12 239:16 239:24 240:10 240:15 241:3,7 241:11 242:12 242:18 243:16 243:17 244:12 244:25 246:6 246:17 248:18 248:21 250:4 250:10,24 251:6,13,25 252:21 253:12 253:18 254:8 256:8,18 257:19 258:25 261:4,22 262:8 262:15 263:10 265:10,16 266:6,16 267:4 267:10 272:5,8 272:16,24 273:15 275:5,9 275:25 276:17 277:22 278:7,9 278:20,23 279:6,8 280:12 280:24 281:2 281:11,22,25 281:25 282:4,9 282:15,18 283:1,15,22 284:4,20 285:10,15 286:9,13,19,24 287:3,13,17,21 287:24 288:2,7 288:13,18 289:11,23 290:7,13,19,24 291:3,13,16,20 292:4,9,18,22 293:2 294:20 295:4,10,16,20 296:20 297:15 297:20 298:6 298:10,14,18 298:22 300:12 300:16,25 301:4,12 302:9 302:21 303:1

**old** 154:15 155:2 165:9

**omaha** 7:15

**once** 106:15 225:4 250:22

**one's** 126:25

**ones** 154:15 155:3,5 165:9 165:10,20 169:5

**ongoing** 204:17 302:5

**open** 93:13 138:15 139:18 139:20 140:22 160:4

**operate** 19:16 41:12 125:3 157:11 270:13

**operated** 200:4 200:7,9

**operating** 18:13,16,17,20 19:7,9,14,17,21 41:19 66:21 140:15 285:11 300:18 301:22

**operations** 65:18 66:19,24 268:7 272:20

**opinion** 56:7,9 57:8 78:23 115:23 139:4 149:22 221:18 228:21,21,23 229:11,13 259:20 279:21 279:24 280:3
**opinions** 150:23
**opportunities** 132:6
**opportunity** 20:23 22:6 25:9 27:8,17 83:9 86:17 102:13 106:15 123:17 125:7 129:2 130:23 186:11 203:5,9 236:14 282:24
**opposed** 105:17 118:4 211:18 211:23 216:15
**opposing** 132:8 132:21
**opposite** 103:23 152:9
**opposition** 217:7
**option** 97:25 128:12,14 220:17,22 222:17 287:5
**options** 128:11 222:24 286:25 287:3
**oral** 38:18,22 133:5 270:21
**orally** 271:3,4
**order** 2:20 5:1 41:2 120:21 231:14 244:6 269:1 272:18 284:11
**ordinary** 273:6 275:18 290:1 290:15
**oregon** 5:8 73:14 261:15 261:19 265:13 268:19 270:6 270:11 285:11
**organized** 85:10
**original** 5:13 42:22 116:20 118:8 134:16 250:17 270:19
**originally** 31:22 134:21 158:5,7
**originate** 261:9 261:23
**originated** 234:13
**outbound** 257:9
**outcome** 305:14
**outdoor** 1:4,11 2:14 3:3,6,8 4:12,14,24 5:4 6:5,17,19 7:3 8:2 11:9,10 17:12 18:6,18 20:3,15,19 25:8,12 27:2 53:25 71:14 86:10 91:17 116:16 127:12 169:21 170:22 181:22 183:20 183:21 184:15 191:10 192:15 219:2 222:17 235:13 271:6,8 306:6 307:3 308:3
**outdoors** 3:1 30:13
**outlining** 162:14
**output** 239:19
**outside** 15:13 16:13,18 38:21 152:21 198:10
**outstanding** 242:1,10 243:2
**overseeing** 91:17
**owe** 76:3,11,16 77:1,3,6,12,15 77:20 78:6,10 78:14,20 79:4 95:22,23
**owed** 243:4 283:17,24 301:2
**owes** 62:6
**own** 49:4 51:15 51:17 61:13,21 98:14 99:6,16 122:9 123:18 128:16 130:20 136:17,20,22 157:19 197:18 230:19 238:2 241:3 292:5,11 292:15
**owned** 57:10 98:13 99:5 158:18 160:18 167:2 200:3,8 251:2 273:25 274:5,14 275:7 291:22 300:12
**owner** 38:5 51:20,20 57:23 71:12 104:22 136:20 187:21 188:3 267:7 300:13 302:16 302:20

**owners** 36:6 270:23
**ownership** 51:17 55:10 97:21 157:7 158:23,24 160:3 273:23 274:24 300:6
**owning** 99:1 300:18

**p**

**p** 7:1,1 8:1,1 9:1,1
**p.a.** 8:4
**p.m.** 58:23 86:3 116:11 149:15 149:18 154:9 156:13 160:25 163:1,7 176:18 177:18,21 233:20,23 243:23 278:11 278:14 303:5,8 303:15 304:10
**pacer** 180:5
**page** 2:2,11 3:21 29:9,12 39:3,4,18 40:15 41:3 42:21 43:5,25 46:13 58:15 60:10 91:25 100:6,10,13 109:13,19,20 112:7 116:21 120:24 134:8 154:8,13 163:4 163:9 166:10 167:10 171:19 172:16 176:23 183:19 184:5 184:11,12 194:6 195:1,1 195:8,11 202:3 205:10 207:14 207:20 213:19 217:22,23 219:1 234:11 234:17,20 235:7,22 237:18 240:6 243:16 244:23 246:3 251:10 251:14 260:15 261:5,7,8 262:12 268:3 271:12,15 284:10,14 287:9 291:4 306:13,15 308:7 309:3
**pages** 44:1 174:14 194:1
**paid** 65:21 67:10 125:24 126:4,6,12 189:14,21 193:12 196:7 221:22 231:18 243:24 245:10 246:21 247:21 248:3 263:24 264:1 274:20 275:18 286:25 302:14
**pains** 103:15
**pair** 148:18
**paisner** 8:9
**palm** 158:2
**pap** 279:11,12 279:13
**paperwork** 219:24
**paragraph** 111:5,19,22 117:9,18 118:12 194:16 235:17 252:3 268:5
**parcel** 173:9
**parish** 17:19
**parlance** 158:14 187:23
**parres** 1:9 2:3 2:18,23 3:10 3:16,23 4:1,5,7 4:15,17 5:7 6:9 10:11 11:14,19 11:25 12:3 13:5 17:18 23:2 30:23 48:16 54:21 58:8 59:22 64:14 69:1 87:24 88:1 93:4 114:3 116:13 118:24 139:12 142:15 142:16 148:19 151:9,13,16 177:23 178:2 233:24 278:16 280:18 299:22 300:2 306:8 307:4,9 308:4 308:13 309:20
**parres's** 293:23
**parsons** 249:22
**part** 18:11 44:9 47:21 48:1 61:5,7 70:24 93:11 108:8 109:8 119:10 123:10 127:24 128:1,6,6 129:5 156:21 156:22 162:2 170:1,4 189:19 198:3 212:25 250:24 251:16 258:3 285:3 301:15 308:9
**participate** 257:4

**participated** 203:19
**particular** 13:13 20:14 73:24 185:4 192:15 196:18 246:8 269:19 295:17
**particularly** 230:8
**parties** 31:5,5,9 31:18 32:4 34:15 35:23 36:4 40:24 42:11 43:22 45:3,7,9,12,14 45:20,21 51:9 64:21 76:24 78:15 106:6 107:19 129:6 166:21 168:9 210:11 260:7 271:4 283:11 283:20 289:22 294:7,8,9,15 296:5,18 305:10,13
**partner** 12:5 13:25 18:2,22 19:3 20:22 21:1 29:25 30:4,6 32:16 38:19 140:1 199:16 294:20
**partners** 19:19 19:22 279:21 279:25 280:3 295:10
**parts** 128:14 220:11,12 221:4,5
**party** 30:16 37:16,21 38:1 38:3,6 57:13 57:18,18,19 89:21 90:2 185:25 187:9 216:21 222:7,7 222:8 276:14 302:8
**passed** 218:18
**past** 249:4
**path** 207:8
**pay** 18:1,2 101:12 195:3 244:5 248:10 250:18 264:6,9 286:17 287:16 301:1
**paying** 265:9 286:20,22 299:1
**payment** 52:4 53:14 189:5 261:10,23 274:14 275:2,6 277:8
**payments** 189:9 273:12 273:18 274:25 286:15 290:25
**payroll** 4:10 195:18 196:6,6 262:17 273:5
**pays** 62:7 287:5
**pca** 7:12 11:7
**penalty** 281:12 282:5
**pendency** 104:11
**pending** 6:15 244:17
**people** 3:10,12 16:25 36:1 85:11 129:8 166:22 170:12 176:23 201:7 220:13
**percent** 80:11 104:22,22 125:2 247:12 255:25 267:7 298:4
**perfect** 101:16 102:11 103:12
**performing** 37:15
**period** 147:11 217:3 224:19 224:20 231:24 259:5 276:13 277:20
**perjury** 281:13 282:5
**permission** 109:24 219:6 289:10
**person** 40:22 133:2 179:19 187:9 211:3 239:12,22 241:2
**personal** 48:15 48:20,24 49:4 49:17,21 50:14 50:16,19 73:17 73:24 74:3 81:16 90:13,17 90:24 91:2 135:17,22 136:17,20,22 141:20 147:9 164:12 165:16 169:9,11 171:11 172:2,4 173:10 242:20 243:4 276:21 285:23 286:9 292:20
**personally** 34:6 54:5 67:9 73:23 89:8 91:11 92:10 127:13 142:6 171:5 185:11

190:13 191:17 191:20 192:4 196:16 200:14 221:13 233:4 241:8 257:21 259:1 276:6 281:22 282:12 302:3 307:11 308:15
**personnel** 256:12
**perspective** 67:13
**pertains** 272:25
**peters** 7:13 11:5,5 90:16 90:18 116:22 116:25 117:2 117:10 118:8 119:2 193:18 217:22 218:1,6 218:17 224:11 234:14 251:10 251:14 252:2 253:20 271:17 277:4 303:18
**petition** 80:1 190:19 291:11
**phone** 2:13,18 47:20 82:12 84:22 133:1,9 153:14 156:2 161:11 166:20 167:4,13 168:8 168:8,8,11 169:4,8,9,11,13 169:21 170:3,5 170:9,10 171:10,11 204:23 205:20 296:11 298:15 298:19 306:3
**phones** 167:1,1 170:15
**physically** 87:24
**pick** 47:20 148:22
**picked** 149:1 296:11
**picture** 148:17 155:13 157:9 164:16 166:7 166:12
**piece** 238:5
**pieces** 131:7
**pile** 266:15
**pink** 148:18,21 148:24,25
**place** 8:10 48:7 98:16 106:16 111:1,1 115:11 176:24 204:19 205:25 208:19 213:3,9 215:17 216:3,7 254:9 254:18 291:5 291:10
**plan** 88:5,7,10 128:7,13 129:5 131:14 177:2 216:24,25 223:2,5 272:21 276:11 277:1 301:12
**planned** 158:5
**planning** 12:18 81:5 100:25 179:24
**plantas** 67:16 67:20 69:9
**plausible** 156:6
**play** 216:21
**pleadings** 176:14 180:4
**please** 10:14 11:18 52:11 68:12 124:12 124:24 146:3 154:14 163:16 165:8 235:17 246:21 248:22 250:5 303:19 303:24 306:11 306:11
**point** 15:16 19:6 26:24 31:8 48:25 49:3 59:7 64:15,17 89:5 101:24 108:14 108:15,16 122:19 126:16 128:15 135:3 135:24 136:11 136:23 137:16 138:13 143:18 143:25 150:6,7 154:25 168:20 168:24 177:9 193:5,9 199:2 199:25 200:10 211:12,13 213:13 214:12 215:3,3,6 218:9 219:12 227:2 254:24 254:25 255:6 265:20 270:6 272:17,24 273:3,15 274:12 275:14 276:3 287:17 289:11,15,20
**pointed** 295:14
**pointing** 25:19
**points** 18:22,23 19:5,11 51:10 219:10 274:18 276:19
**pom** 124:21
**poms** 124:21
**poorly** 148:20
**portion** 204:8 283:14

**position** 13:16 88:10 108:20 110:13 113:9 127:4 227:18 263:1,2
**positive** 124:15 124:24,25 125:1 126:7,13
**possession** 223:15,18
**possibility** 38:9 48:15,19 49:17 53:11 137:2 222:6 223:18
**possible** 27:19 32:22 38:7 46:5 62:12 95:1 122:15 206:18 222:16 257:10,11
**possibly** 15:6 43:13 46:10,13 47:16 93:16 96:3
**post** 17:14 301:13
**postpetition** 248:4 288:23 289:3,5,8
**posturing** 252:13 253:20
**potential** 35:21 36:2,2 37:5,12 38:6,21 40:23 42:6,7 47:5 52:9,21 53:5 53:10 58:1 60:24 90:2 100:19 137:6 160:18 198:4,9 198:9 199:21 220:17,21 263:2 297:21
**potentially** 211:7
**power** 105:8,11 216:1
**powers** 110:4 277:13
**practice** 33:20 181:2,8 210:22
**practiced** 181:12
**practices** 40:3 268:7
**prebankruptcy** 83:8
**preliminary** 133:25 134:2
**preparation** 32:8 63:6 94:1 94:5,14 179:11 243:3,7
**prepare** 40:9 80:4 117:20 178:11,19 180:3
**prepared** 29:24 30:10 33:18,21 40:4,8 46:3 64:3 158:10 185:22 242:22 254:13 283:13 284:1
**preparing** 95:8 95:10 204:2 242:20
**prepetition** 242:11,12,14 242:16 243:2,6 248:11,16 249:10 250:19 251:22 290:4 291:6,8,12
**present** 9:2 66:4,12 82:1 91:19 178:21 230:19,25 231:20,25
**presented** 65:25 259:23 284:12
**president** 184:14
**presumably** 207:14 253:19
**presume** 257:7
**presuming** 288:10
**pretty** 20:16 180:24 212:12 228:6 229:21 267:22
**prevent** 115:15 216:2
**previous** 139:16 165:2 165:22 247:12
**previously** 2:9 5:14 28:15 29:8 84:4 139:6 145:24 164:11 186:5 186:24 193:21 205:1 224:12 236:9,16 241:19 245:21 251:21 267:25 271:11 279:10
**priest** 17:18
**primarily** 124:1 219:11 291:22
**primary** 29:25 30:6 83:21 185:25
**principal** 71:9 71:11,17 78:19 127:19 292:15
**print** 169:16 239:6,7
**printed** 134:7
**prior** 14:14 48:18 88:14 136:15 148:7

165:11 173:21 174:12 188:8 188:19 189:5,9 189:12,16,22 191:14 193:6 211:13 214:21 214:21 220:2 241:20 242:20 255:14,19,20 273:11 287:24 288:2 296:21 297:16,18
**priority** 192:17
**private** 112:10 112:14 113:2 148:9
**privilege** 81:13 149:12,20 150:21 151:12 151:15
**privileged** 80:22
**probability** 268:13
**probably** 17:19 33:3 43:18 87:7 121:14 124:5 161:14 178:14 186:8 213:6 290:14
**problem** 88:8 277:1
**problematic** 259:13
**problems** 175:5 175:7,10
**procedure** 307:5 308:5
**proceed** 212:2 292:24
**proceeding** 76:3,10,15 77:12 78:6
**proceedings** 188:21
**proceeds** 192:17 194:17 251:20 253:1
**process** 34:3 36:11 37:1 48:7 51:6 93:18 102:5,5 109:9,23 110:3 111:1,20 115:7 115:9,11,13 123:10 127:21 219:13,22 220:4,15,16 221:4,11,25 223:1 272:20 281:15 293:2,5 293:21,23 295:19,20
**produce** 166:20 170:9 171:13 226:22
**produced** 6:10 85:7 133:9,13 153:16,25 167:21 174:1 205:7 226:19
**producing** 134:3
**product** 67:7 89:3
**production** 85:14 306:15 306:17,22
**products** 279:11,12,13
**professional** 76:21 113:14
**professionals** 113:17 275:15 275:16,17
**progressed** 253:18
**prohibited** 197:18,20
**prohibition** 197:22
**prominent** 5:9
**promise** 178:7 226:22,23
**promised** 129:8 129:13 226:8
**pronouncing** 12:2
**proof** 102:8,10 102:13
**proper** 56:13 152:5,7,8,11,23 152:24
**properties** 275:4
**property** 97:21 97:25 98:8,12 98:14,15,19 99:5 129:21 160:17 171:12 171:14 285:11 300:18,19,20
**proposal** 3:14 223:21 271:20 275:25
**propose** 116:4 272:8 273:16
**proposed** 247:25 276:3 277:6,7
**proposing** 162:7
**propriety** 149:22
**protect** 162:4
**protected** 238:18
**protecting** 71:1 161:1 162:3
**prove** 195:15 196:3
**proven** 269:23
**provide** 20:8 123:16 142:20 142:23 153:23 194:21 203:10

211:25 224:24 226:14 227:3 227:13 247:7,8 259:8 276:20 294:3 297:25
**provided** 107:17 153:21 180:8 183:3 211:24 218:21 224:2,12,13 226:15 227:14 235:14 247:9 254:3 260:21 271:7 297:13 297:16 298:18 299:9 302:10
**provides** 18:20 172:12 287:3
**providing** 142:11 143:9 144:14 206:11
**provision** 19:20 248:23
**public** 182:5,6 182:9,9 307:10 307:18 308:15 308:23 309:23
**published** 232:3 279:2
**pull** 129:7
**purchase** 131:7
**purchased** 238:10,14
**purports** 146:5
**purpose** 5:5 45:3 93:12 248:5
**purposes** 37:21 45:22
**pursue** 27:9
**pursued** 52:3
**pursuing** 27:19 219:13 220:4
**purview** 286:8 294:12
**push** 114:18,21 120:8 209:19 215:7
**pushing** 113:12 210:3
**put** 88:10 98:16 106:16,24 124:6 142:9 162:4,18 167:17 169:5 209:25 213:3,9 215:17 216:21 220:6 222:23 231:14 239:5 239:18 241:4 247:18 252:17 261:9,23 276:1 281:3 291:5,10
**puts** 162:8 273:4
**putting** 103:12 220:10 240:25

**q**

**quarters** 86:2
**quash** 208:3,10
**question** 15:8 36:20 45:16,24 51:6,10 66:6 66:15 68:3 71:13 78:23 99:3 110:7 112:22 123:19 124:3 140:11 149:20,24 150:5,25 151:11 152:1 175:19 186:21 206:13 207:3 213:4 228:3,25 244:16 246:14 246:17 247:4 258:25 259:16 259:19 276:17 276:18 279:22 289:14 290:19 302:11 303:11 303:12
**questioned** 226:21 293:8 293:10
**questioning** 207:3
**questions** 68:15 68:16 139:16 177:23 178:4 178:11 180:8 181:17 188:19 196:21,23 197:1 203:6,10 206:12 210:19 225:16 227:23 246:18 254:19 255:4,12 258:5 259:24 265:10 265:12 266:6 280:14,19 281:7 292:10 299:3,21,24 302:9,22,24 303:3,9
**quick** 12:22 20:16 139:24 177:12
**quickly** 95:1 160:12 161:5,5 161:6,9,17
**quit** 171:25
**quote** 291:4
**quoting** 287:13

**r**

**r** 7:1 8:1 9:1 33:16,16 195:3 261:20 279:11 279:12,13
**raise** 71:21 78:21 79:5,19 128:5

**raised** 69:9 229:9 250:22 255:14,21
**ramifications** 132:4
**ran** 148:14
**rarely** 124:4
**rate** 250:22
**rather** 95:24 154:12 219:14
**reach** 103:21 104:3 167:9 175:19 218:11 223:12 230:14
**reached** 25:7 142:7 223:9,16 225:3 241:23 242:4
**reaching** 170:2
**read** 42:14 68:12,13,18 69:19 94:3 98:24,25 109:3 112:23 174:16 176:15 180:13 180:20 196:9 226:23 227:21 261:4 303:20 307:5,6,12 308:5,6,17
**reading** 58:18 58:20,25 59:1 69:8 109:2 117:7 204:11 218:3 251:24 288:5 290:16 306:19
**real** 12:22 54:9 54:14,18,21,24 55:7 65:14 97:21 98:8,19 99:1,5 117:19 117:20 119:25 123:16 129:11 129:20 130:6 131:7 139:24 225:24 226:5 228:12
**reality** 156:24
**realize** 217:4
**really** 20:12 29:15 39:14 50:6 88:15 95:22 113:8 114:14 129:19 137:10 144:18 155:1 166:18 176:11 197:7 220:5 239:3 240:4 249:13 258:24 266:3,8 270:5 276:17 284:13 302:11
**reask** 52:25 302:12
**reason** 12:14 15:25 16:2,4,6 16:8 24:11 25:16 108:1 130:14,17 180:9,21,22 220:1 228:13 279:8 306:14 308:8 309:3
**reasonable** 228:13 273:7
**reasonableness** 235:3,18 236:4
**reasons** 79:8 134:22
**recall** 17:21 21:23,24 27:13 27:14 32:7 33:19 34:2 37:25 39:23 47:11 49:6,11 49:19 50:2,4 52:1 60:20 64:6 66:22 69:4,9 70:18 70:19,21 74:25 75:7,23 94:2 94:20 96:14,15 99:9,11 107:2 114:20 120:5,8 123:9 125:25 126:2 131:10 134:10,25 138:19,22,25 176:9 181:9,11 182:23 188:24 190:5 192:12 193:14 195:25 196:1,8,20,23 197:4 202:14 204:9 206:14 206:15 208:12 211:21 214:23 223:23 224:2,4 225:9 227:5,5 233:14 238:12 247:23 249:19 249:21 255:10 256:17 258:8 258:18,23 265:11,18 267:22 269:18 269:25 273:11 273:14 274:9 279:7 281:9 282:2 286:4 292:7 298:11 299:4
**receipt** 73:10 306:18
**receivable** 192:17
**receive** 18:11 19:11 54:20 69:6 189:25 190:3 249:17 271:6 275:2
**received** 18:12 30:24 54:2,9 156:3 190:5,17 190:18,24

192:20 195:21 202:14 224:8,8 224:19 265:17 266:13,25 286:10 290:25
**receiver** 91:6 211:8,9,15,22 212:4,10,17,22 215:24,25 216:2,5 265:22 265:25 266:1 268:9,25 269:6 270:1,6,13,25
**receivership** 269:1
**receives** 18:5 302:16
**receiving** 68:10 69:4,14 191:15 268:24
**recently** 186:11
**recess** 13:2 64:11 68:23 116:9 149:16 177:19 233:21 278:12 303:6
**recirculate** 247:20
**recognize** 29:12 35:24 84:10 135:23
**recollection** 24:5,6,22 27:6 33:24 54:1
95:7 134:20,23 171:3 175:10 186:22 204:1 205:22 206:8 224:22 242:18 243:1 250:10 261:24 262:7 285:6
**recommend** 238:4 268:9
**recommended** 106:18
**recommending** 107:2
**reconciliation** 235:15
**record** 10:9,14 12:21,25 13:3 25:15 64:10,12 68:20,21,24 100:20 109:4,6 116:7,10 130:12 133:23 143:19 149:14 149:17 169:9 177:11,17,20 182:7 213:19 226:23 233:20 233:22 278:10 278:13 303:4,7 303:14 308:9
**recorded** 1:9 6:9 204:6
**recorder** 55:8
**records** 133:9 166:20 168:8 168:10 170:9 204:6 227:21 231:12 255:24 263:23
**recoveries** 251:21 253:1,4
**redacted** 92:5
**redactions** 92:3 92:9,14
**reduce** 53:15 62:7 272:10
**reduced** 305:8
**refer** 30:20 294:22
**reference** 184:6 214:6 284:23 306:7 307:2 308:2
**referenced** 52:15 90:4 155:13 164:17 195:4 307:11 308:15
**references** 111:20,22 214:16 268:5
**referencing** 41:15 111:10 140:25 175:7 233:8 235:10
**referred** 40:22 208:6
**referring** 23:6 35:2 54:12 56:24 58:22 69:13 79:22 86:10 100:9 124:2 139:15 142:13 147:23 148:5 154:21 183:11 188:13 206:9,21 236:17 247:2 261:13,25 262:14
**refers** 94:7 202:12
**reflect** 95:24
**reflected** 133:16 202:1 258:22
**reflects** 148:20
**refused** 78:1
**regard** 73:25 196:12,18 197:2 207:3 228:17 257:2 267:15
**regarding** 13:24 14:20 16:10,14,20 17:24 18:14 31:2 34:15 48:19 49:12,13

63:16 69:9 70:15 71:21 74:4 75:14,16 80:17 87:19 96:25 97:24 139:20 140:7 151:13 162:14 164:21,25 187:2 192:24 200:24 203:12 214:25 254:13 255:4,12 265:11 292:5 294:9 295:7,11 295:11 296:16
**regards** 74:1
**regularly** 290:4 290:7,8
**reimburse** 286:14
**reimbursed** 287:6
**reimbursement** 273:6
**reject** 159:6 173:18 195:17
**rejected** 107:11 159:7 173:5,13 173:19
**rejection** 173:2
**relate** 18:18
**related** 20:2 27:3 28:1,2 33:24 43:1 169:21 175:11 305:9
**relates** 32:25
**relating** 17:11 18:6 20:14 36:8 38:14 54:3,22 73:17 89:6 265:23
**relationship** 57:19,21 63:13 63:19 67:25 90:9
**relationships** 62:3,21,25 63:2,5
**relative** 305:11
**relay** 161:22,23
**relayed** 251:5
**relied** 189:18 259:6
**relieved** 255:9
**relocate** 247:16
**rely** 110:23
**relying** 260:8 295:17 296:13
**remaining** 246:22
**remark** 28:16
**remember** 68:10 101:14 102:4 106:25 196:5,16 215:23 247:13 257:20 262:6 279:23 281:3
**remind** 35:12
**remove** 215:18
**removed** 31:15 214:17 215:7
**renner** 8:4
**reorganization** 128:13 219:15 272:21
**reorganize** 128:11
**reorient** 131:16
**repeat** 52:11 79:8 164:25 175:22
**repetitive** 178:6
**rephrase** 52:25 293:7
**replace** 21:16 213:14
**replied** 125:21
**reply** 86:8 139:12
**report** 39:17 75:13 141:17 257:15 269:10 269:16,18 275:22,22
**reported** 302:6
**reporter** 6:14 11:17 307:7
**reporting** 140:4,13,17
**reports** 129:10 129:16 140:15 239:6 288:9 301:23 302:4
**repository** 117:14
**represent** 20:23 25:8,12 30:23 43:13 45:5 46:11,14 50:20,21 51:1 183:23 193:24 266:12 297:21
**representation** 42:13 84:12,17 89:10 153:15 153:20,22 185:14 188:6 220:23 231:5 250:24 265:21 295:8,17 297:17 298:1
**representations** 295:12
**representative** 11:8
**represented** 71:6 73:14 186:24 187:17 198:16 227:9 279:10
**representing** 10:25 22:9,13 25:10 77:12

143:17,21 185:16 191:2 231:24 232:14 240:7 298:8
**represents** 141:23
**reputation** 236:8
**request** 20:1 123:12 146:3 147:5 149:7 152:5,23 154:19 163:23 164:25 167:5 168:4,16 180:22 193:15 193:17 207:25 227:7 228:4 230:3 233:1 250:14 308:9 308:11
**requested** 80:10 123:20 146:23 163:19 166:19 214:20 227:16 245:4 245:11,14 263:12 289:12
**requesting** 213:8 227:8
**requests** 210:13
**require** 161:13 213:2
**required** 121:4 132:15 170:10 185:17 306:25
**requirement** 187:2 189:4
**requirements** 214:25
**reservations** 83:3,7
**reserved** 10:5
**residence** 173:10
**resign** 13:9,18 13:23 14:3,6 14:11,13,18 15:12,14,17,18 15:20 16:5 19:24 20:2 180:9,22 280:7
**resignation** 16:7,11,14,20 16:24 17:1,1 17:15,17 18:15 180:6
**resigned** 12:9 13:6 16:3 19:3 280:10
**resigning** 17:22
**resolution** 135:14 272:13
**resolve** 260:13
**resolved** 217:12
**resources** 132:16
**respect** 59:18
**respond** 98:6 112:7 114:13 121:17 123:17 141:12 162:5 175:3 177:6 215:12 219:6 235:21 240:11 262:8 295:14 296:8
**responded** 89:24 98:3 101:2 125:18 125:20 141:19 277:10 287:8 295:11,25 296:10
**responding** 99:9 120:25 290:14
**responds** 86:7 99:3 110:24 141:7 159:1 162:3 172:12 176:22 177:3 209:23 244:5 261:7 262:4,15 277:4 278:3 290:3
**response** 45:18 47:11 112:8 122:8 132:18 134:18 139:11 156:2 168:15 175:18 188:19 195:9,10 197:6 206:12 214:8 215:13 218:17 237:22 246:17 277:22 291:3 292:10
**responses** 294:13
**responsibilities** 76:23
**responsibility** 76:21,24
**responsible** 32:17 34:18 40:23 91:16 95:8,10 171:7 171:9,12
**restated** 256:21 257:1
**restructuring** 272:19 276:2 276:12
**result** 258:19
**resulting** 243:3
**retail** 222:22
**retain** 5:8 49:21 50:5 73:16 141:19 161:12 174:23 261:15,18

**retained** 5:14 20:25 21:13 24:17 25:12 43:13 117:19 136:12 185:18 187:3 199:5 241:12 242:14
**retainer** 161:13 161:15 189:21 190:1,3,13,24 191:7,14,22 192:14,21 193:12
**retaining** 188:20
**retention** 2:22 174:24 182:17 185:22,24 189:24 241:15 241:16 246:9 250:14
**return** 243:8
**returned** 306:18
**returns** 242:23 243:4
**revealed** 283:6
**revenues** 264:4
**reverse** 41:2 120:20 284:12
**review** 4:24 32:22 34:12,14 59:4,10 85:7 89:3 92:4 98:17 102:13 153:12 175:3 180:2 186:11 198:21 235:3 235:17 236:4 236:12 238:2 246:22 269:1 281:16 283:11 298:19 301:22 302:1,4 306:12 307:1 308:1
**reviewed** 59:11 69:1 158:11 179:2,4 180:4 186:1 190:13 283:7,8 293:25 298:7
**reviewing** 286:4 301:24
**reviews** 294:13
**revised** 214:4
**revisited** 220:21
**ribbon** 163:12
**rice** 2:22,24 5:10 8:13 11:11 12:5 13:6,12,24 15:19 16:10,13 16:20 17:2,10 17:22,24 18:5 18:10,15 19:16 19:24 20:2,19 22:17 23:10 25:10 29:12 30:1,4,5,6 32:19 33:1,21 34:7,9,13,21 35:3 37:3 44:18 50:20,21 52:8,20 53:4 54:6 55:22 63:9 65:18 70:4 71:6 73:7 80:1,13 82:18 84:1 91:16 95:8,10 104:12 132:17,21 135:18 138:6,9 139:2,17 140:1 140:16,18,20 141:8,13,22 142:1,14,18 143:8,11 144:14,20 150:8 159:9 167:18,19,22 167:24 168:21 169:8 170:20 170:25 171:3 171:13 177:10 178:18 179:10 180:7,19 181:1 181:8 182:17 182:25 183:23 185:3,12 186:16,24 188:16,20 190:12,18 191:6,13 192:5 192:7,10 193:16 201:7 204:14 213:25 221:7,14,19 238:20,24 239:8 240:13 240:14,17,21 240:24 241:9 241:10 255:21 256:1 263:22 266:12 279:3 279:10,16,19 280:4 283:8 286:10 293:6 294:20 297:16 297:18,23 298:19 301:23
**rice's** 30:12 128:21 140:22 142:21 143:6 144:3 185:13 185:23 188:6 280:6 299:2
**richard** 9:6
**rick** 13:15
**rick's** 13:16
**right** 13:7 19:13 23:21,24 24:3,13,23 25:13 26:5,8 28:1,5 29:23 39:15 40:25

41:2 43:10 44:10 46:17,23 51:20 52:4 54:16,17 55:2 55:13 56:15 57:10 61:8,21 62:22 66:19 69:22 70:2,7 71:2,18 76:4 76:17 80:2,6 80:18 82:7,19 84:24 85:16,21 85:24 86:1,8 86:21,23 87:7 88:14 90:18,21 90:21,25 91:2 91:7,17 93:6 94:1,3,18,23 95:15,18 97:15 97:19,23 99:7 100:25 101:4 101:19,23 105:3,21,25 106:19 107:11 107:19,24 108:21 110:14 110:17,25 111:20 112:1 112:10,17 113:10 114:11 114:16 117:11 117:14,16 118:6 119:3,8 119:12,19 120:5,9,16 121:1,18,23 122:1 123:3 124:1,9,19 126:9,22 128:20,24 129:18 131:11 131:20 133:21 135:5,9,13 138:10 139:3,9 139:14,23 140:2,7,15,18 140:22 141:10 141:15,20,23 142:2,12 143:18 144:1,8 145:3,11,14,21 146:1,5 147:5 149:4,23 150:4 150:9 151:22 153:7,14 154:15 155:6 155:10,13,17 155:24 156:5 156:15,22 157:4 158:6 159:3,7,18 160:19 161:6 161:19,24 162:5,17 163:6 163:17,20,25 164:4,9,17,22 165:11,21,25 166:8,14 168:21,25 170:7 171:18 172:2,14,24 173:3,6,16,17 173:22 175:24 177:4,7,10,23 190:9 191:9 194:16 197:9 200:21 203:21 205:11 207:9 207:18 209:2 218:2 228:5 229:19 234:16 234:24 236:22 237:11 241:21 243:19 244:7 246:4 258:13 260:6 261:2 264:14 267:1 274:7 277:19 279:11,16 299:24 300:23

**rights** 131:25

**rio** 67:16,20,25 69:9 265:11,12 265:23 266:11 267:5 268:8,25 270:10 271:6,7

**rise** 268:12

**road** 8:4

**rock** 7:14 10:24 11:5 193:18

**role** 115:4 123:25 124:18 198:3

**room** 3:8 4:12 4:14 7:21 55:3 55:7 116:16 117:5,11,13 131:1 146:9,11 148:13,15 159:20 164:12 165:16

**rough** 303:18 304:1,7

**rpr** 9:8 10:3 305:3,17

**rule** 187:6,7

**rules** 76:21 187:2 307:5 308:5

**run** 12:14 34:11 36:24 233:2

**running** 40:23 43:16

**ruskamp** 8:14 11:11,11 15:6 16:19 20:8 36:18 47:24 48:3 50:23 51:3 52:11 57:6,14 61:9 61:22 62:18,23 63:21 66:5 71:3 76:5,12 76:18 77:2,14 78:8,22 79:7

81:1 84:18 95:19 96:7,18 103:1 105:20 110:5 115:22 115:25 132:12 136:1 137:8 143:2 144:9 146:6,25 152:18 170:23 175:13 187:10 187:18,24 188:10 212:18 213:10 216:17 253:24 259:15 259:18 263:13 263:15 302:18 302:24 303:11 304:4,7
**ryan** 9:4 11:8 17:18 121:4

**s**

**s** 3:20 7:1 8:1 9:1 306:15 308:8,8 309:3
**safe** 193:17 278:20
**sale** 127:21 214:17,21 219:13,16 220:4,6,7,10,16 221:4,4 272:20
**sales** 65:8,13 126:19 219:22 221:11,24
**sam** 111:7,10 111:11,17,23 112:4 205:17
**samantha** 2:19 3:12 4:16,17 29:10 39:8 111:2,14,20 112:1 124:9 126:10 147:9 152:24 161:16 161:18,21,23 163:20 166:11 166:18 170:12 194:8 268:17 277:23 284:8 285:15 288:8
**sarah** 278:16 278:21
**satisfied** 238:2
**saw** 12:23 22:6 47:19 54:24 106:6 219:24 296:2 299:12
**saying** 19:18 26:10 44:12 91:15 100:18 101:2 114:14 119:10 140:1 143:3 151:7 155:16 159:25 175:4 188:3 235:17 243:25
**says** 24:4,8 42:18 43:9 103:8 111:6,25 113:3 118:13 120:6 121:3,14 121:16 124:20 124:24 126:3 140:3 146:4 156:23 159:13 161:7,20,25 162:23 167:11 169:16 171:19 183:22,24 184:2 185:5 194:23 201:18 201:19 207:24 209:7 215:2 220:5 237:19 245:3 251:17 251:18 252:24 253:7,8 261:15 261:18,20 262:6,16,19 264:20 268:12 275:20 277:12 285:1,19 286:24 287:2,7 287:15 288:24 290:7 291:4 298:17
**sbhlaw.com** 8:22
**sbwc** 287:14,16
**scale** 128:15
**scandalous** 77:24
**schaffer** 274:4 274:25
**schaffer's** 273:18
**schedule** 94:10 94:16 95:18,24 96:10,11 97:1 98:12,20,21 99:4 102:9 252:12
**scheduled** 80:16 102:6
**schedules** 63:7 63:8,12 64:3 94:1,6,15,20 95:9,11 96:4 97:18,20 100:5 100:21 102:2,4 102:12 103:13 103:16 189:10 189:16,19 238:17 240:9 252:5 253:10 281:6,8,12,16 281:21 282:1,5 282:6,11 284:2
**schuler** 7:5 10:18,18
**schwartzkopf** 5:7 75:24 104:25 105:8

108:4,20,25 109:10 110:3 110:24 111:19 113:7,13 114:13,22 115:5,16 116:15 119:3 120:11,25 121:10 127:6 207:22 228:19 228:21 230:5,7 230:13 233:7 234:6,12 235:2 235:12,22 237:1,23 243:20,23 244:5,19,24 245:9 261:1,7 262:3,8,15,23 264:13,16,25 277:23

**schwartzkopf's** 123:25

**schwope** 2:16 2:19 4:1,16,17 4:22 22:3,9 27:3,12,15,22 28:5,8 29:10 30:17 37:16 38:5,10 39:7,8 44:6 48:14,18 48:23 49:7 51:13 52:6,10 52:18 53:2,7,8 53:13 56:1 57:10 58:10,16 60:10 66:18,23 67:20 68:1 70:2,3,6,11,12 71:8,17 73:11 73:22 74:2,11 78:18 86:23 89:10,12,21 96:13 103:21 104:14,20 105:6,17 107:2 107:11,22 111:14,16 114:18,21 115:16,24 116:1 124:9,19 125:18,20 126:10 127:11 127:17,25 128:3,23 129:4 132:25 133:4 133:10,12,15 134:12 135:4 135:16 136:13 136:24 137:6 137:14,16 138:5,8 139:1 141:9,17,23 142:1,5,11,17 142:19,20,21 142:25 143:6,7 143:9 144:7,14 145:1,7,18,21 146:23 147:9 147:14 148:2 149:2 150:11 150:15 152:3 152:24 154:17 155:9,16 156:8 158:21,24 159:1 160:3,6 161:10 162:3 162:12,13 163:20,24 164:3,6,8,19 165:24,25 166:11 167:6 168:4 170:2 171:18,25 172:18 173:1 173:21,24 174:5,6,15,21 175:2,11 176:17,22 177:3 179:15 179:17,19 183:20,24 184:14,18,24 184:25 185:3 185:13,14 186:16 187:15 188:6,8,17 190:21 194:7,8 195:2,11,14,21 201:5,14 202:12 212:9 219:2,22 266:25 267:5 267:14 268:17 268:17 273:6 273:12,23 274:2,3,19,21 274:23 275:1,8 275:21 276:6 276:20 277:23 277:23 278:2 281:16 282:10 284:8,21,24 285:6,17,20 286:5,13,20 287:18,25 288:3 289:12 289:17 290:24 291:22 292:5 295:25 296:3 298:1,8 300:13 302:15

**schwope's** 53:15 71:21 115:20 134:22 146:1 147:5 175:18 196:2 196:10 242:20 243:4 268:7

**scott** 2:12,15 4:5,7 63:9 93:7 95:4,11,12 96:19 97:15 99:12,16 100:14 101:11 103:8 139:8,16

139:19 145:1 145:25 146:4 146:14,15,19 159:8 189:18 194:7 204:5 205:3,7 209:23 219:2 279:15 281:18,19 282:12 286:8 301:16,20,24 302:7
**screenshot** 175:2
**screenshots** 174:14,15,17
**scroll** 194:25 202:10 206:2 209:1
**scrutiny** 67:5
**se** 78:11
**seal** 307:15 308:21
**search** 167:4,13 168:19 199:3,6 199:7
**searches** 169:7 169:8,9 199:10 232:17,17 233:2
**searching** 169:3
**seasonal** 111:6 112:5 113:25 114:7
**second** 12:11 29:11 39:4 56:14 58:15 81:10 95:2 105:15 111:5 111:22 116:21 117:18 118:12 127:4 134:7 163:16 184:11 194:6,11,13,14 195:1 202:3 203:24 204:4 207:20 208:18 213:19 217:23 234:17 249:24 252:3 261:5 271:12,15 272:24 275:14 284:14
**seconds** 161:4 207:9
**secretary** 77:24
**section** 2:21
**see** 23:5,19 29:5,9 37:17 37:22 40:15,17 41:5 42:17,24 43:5,23 44:4,5 44:7,20 58:12 58:17 59:20 60:11 68:8 69:21 86:5 90:20 91:1,25 93:24 94:7,11 95:5 97:6,13 98:4 99:22 100:6,14,22 106:16 109:1 109:14,25 111:3,8,13 112:13 115:1 116:18,24 117:6,9,22 118:2,10,15 121:6 124:16 125:19 135:20 141:11 144:25 145:4 146:3 149:11 154:10 154:13 156:25 161:2 163:8 166:15 167:10 168:12 169:18 171:23 172:15 172:20 173:2 176:20,25 180:16 183:2 183:25 184:4,8 184:13,20 194:10,12,19 195:6,12,16,19 198:16 199:3 201:17,21 202:4,6,9,11 206:6,19 207:1 207:11 208:1,4 208:16 209:6 209:15,16,21 210:1 214:5,6 214:10,15,18 215:1,4,10,19 217:24 218:23 219:8,18 230:11,16,20 230:22 231:3 233:1 235:5,19 235:20,24 237:13,16 239:6 244:1,8 244:21 245:1,7 245:12 246:24 248:25 251:23 252:7 256:22 257:1,12,17 261:11,16,17 261:21 262:11 262:13,21 264:18,19,22 267:17 268:10 268:14,22 272:14,22 273:9,21 274:16 275:23 276:19 277:9 278:5 279:4 284:7,18 287:11 288:16 290:5 296:21 297:1 299:15
**seeing** 176:14
**seeking** 211:7 286:14

**seems** 43:3 62:13 99:5
**seen** 58:21 59:13 82:17,21 85:12 98:1 134:24 144:7 182:24 188:15 213:22 228:3 285:2,4 287:24
**selected** 276:4
**selecting** 183:23 276:3
**sell** 160:12 222:22
**selling** 65:4 128:14 158:2,2 222:6,17,18
**sells** 162:8
**send** 40:10,11 42:4 46:22 86:2 95:3 138:18 141:2 145:1,13 155:22 156:12 160:24 167:11 173:1 174:5 175:16 206:16 239:4,18 249:8 249:14,23 250:5 294:1,3 303:20
**sending** 27:1 41:7 77:24 145:16,17 153:1 173:22 234:22 257:19
**sends** 35:8 41:25 43:21 139:25 174:16 230:7 278:1 294:17
**sense** 26:13,15 26:16 37:19 39:8 46:17 87:10 126:2,4 129:20 130:5 190:11 199:6 208:21 232:11 257:25
**sent** 5:14 26:2 32:22 34:13 39:23 40:5,6 42:16 45:1 46:23 47:10 59:7,11 86:21 89:22 97:4,11 109:14 111:13 111:14 112:25 118:9 137:18 138:15 141:1,4 141:18 145:20 146:20 150:1 150:14 152:2 152:16 154:7 155:5 160:9 163:1,6 164:14 164:15 165:4 165:10,20 166:7 168:4,13 168:23 172:10 174:6,14 183:13 185:12 191:6 192:15 195:22 205:18 206:4 234:13 243:5 248:1 249:21,25 250:9 252:16 254:5 262:2 267:17 270:20 276:15,24 279:5,6 294:13 295:6 296:3,11 296:16 301:25
**sentence** 112:12 113:3 117:25 119:9 120:3 124:20 140:3 163:16 230:9,18 251:16,17
**sentences** 120:7
**separate** 17:3 49:23 50:1 61:17 204:12 239:10 300:6
**separated** 301:14
**separately** 61:17 153:10 238:8
**september** 1:12 6:10 10:9 18:1 18:3 104:16,19 106:9 107:14 107:15 129:1,3 135:7,10 136:24 137:7 138:13,20 139:13,18,22 144:15 148:5,6 150:1,7 152:3 154:8 155:22 156:12 159:24 161:11 163:2,7 165:23 171:21 172:17 173:1 174:9 201:6,8 201:13 202:15 202:19 267:2 271:13,25 272:4,5 273:11 276:15 277:5
**seriously** 259:14
**serve** 275:1,16 276:6,20
**served** 227:6
**services** 80:13 89:6 271:7 274:20
**set** 115:7 170:17 211:5 272:12 277:7 299:17

**sets** 214:3 260:1 263:24 299:1
**settlement** 3:14 271:19
**seven** 123:11 276:18
**seventh** 272:17
**several** 107:21 118:25 128:25 184:19,21 201:6 257:16 298:24
**severity** 79:23
**seyferth** 6:12 8:20
**shape** 276:7
**share** 44:21 75:4 130:11,13 228:8,9 239:14 240:18 250:6 294:4
**shared** 15:3 70:14,23 72:17 75:1,3 128:9 218:19 229:20 240:12
**shareholder** 30:18
**shareholders** 36:6
**sharing** 74:25 93:13
**shawnee** 8:5
**shb.com** 8:17
**sheet** 4:22 60:17,19 107:21 214:4 216:25 218:21 224:1,10,17 225:4 254:22 259:3 306:13 308:7,10,18 309:1
**sheets** 107:16 107:18 224:3,3 224:8,18 258:21,22 259:11 260:19
**shocked** 16:1 217:3
**shook** 8:15
**shopping** 230:10
**short** 34:23 64:7 106:17 116:2 278:8 303:1
**shorthand** 10:2
**shortly** 175:3
**shorts** 148:18 148:21,24
**shot** 86:4
**show** 124:21 133:10,14 211:3 240:1 267:24,24 283:13
**showed** 89:21 179:14 252:12 265:16 297:3
**showing** 279:8
**shown** 188:14 223:8 298:10 306:16
**shows** 23:9 257:15 288:25
**side** 78:15 85:16,17 90:21 93:19 95:13 96:5 98:19 99:1,2 203:15 209:9 210:17 210:24 236:11
**sign** 39:10,17 281:12 303:20
**signature** 10:5 30:16 39:11,13 40:12 184:12 185:8 305:17 306:14
**signed** 25:24 30:17 39:5,6 39:21 47:1 48:10,13 87:2 131:13 184:14 184:18,24 188:16 216:25 276:11,23 277:16 282:4 288:19 289:19 293:15 295:16 298:4 307:13 308:18
**significant** 65:21 83:17 122:6 132:14 132:16,17
**significantly** 65:5 122:21 126:20 282:15
**signing** 296:17 306:19
**signs** 257:16
**simeon** 213:20 225:10,13
**similar** 42:3,9 42:11 110:11 247:24 267:14
**simply** 113:19 206:24
**simultaneous** 15:4 25:21 79:14 81:8 102:24 297:9
**sincerely** 306:21
**sir** 29:1 38:16 48:6 74:5 76:7 82:13 83:5,23 84:6 91:16 122:12 127:14 166:5 169:6 171:16 284:6 284:15 306:10

**sit** 137:5 173:17 200:21 265:7 295:22
**sits** 149:22
**sitting** 44:13 55:5 80:9 81:5 152:21 157:23 186:13,22 188:5 189:20 196:5 233:5
**situation** 24:7 31:12 88:21
**six** 258:12,16 258:20
**size** 181:18 201:23
**skirt** 302:1
**slipped** 182:11
**slow** 129:23 140:9 225:14
**small** 169:16
**smart** 289:4,6,7
**software** 238:5 238:9,10,14,16 238:22 239:9,9 239:15,20 295:2
**sold** 64:23 221:6
**sole** 184:18
**solution** 90:8
**solutions** 306:1 309:1
**solve** 88:8
**somebody** 21:7 27:11 35:7 36:15,21 77:18 79:6,20 146:20 147:16 192:9 278:21 283:7
**someone's** 78:1
**soon** 49:22 91:4
**sorry** 12:23 13:21 39:7 40:20 59:2 66:1 71:16 78:22 97:9 100:12 102:16 109:18 137:23 144:15 155:20 164:16 166:14 166:15 217:17 218:16 245:22 250:12 264:15 280:24 293:19 300:3
**sought** 130:19 289:17
**sound** 156:5 190:9 234:16
**sounds** 21:6 73:3 187:13
**source** 191:14 191:18,21,25 192:11
**sources** 198:5
**south** 9:9
**speak** 27:11,15 89:9 144:19
**speakers** 15:4 25:21 79:14 81:8 102:24 297:9
**speaking** 14:16 32:7 69:23 174:20
**specific** 18:13 18:14 19:20 33:11,23 49:5 70:22 74:3 75:23 79:22 96:11 140:5 207:7 227:19 255:11 296:16
**specifically** 32:24 63:15 66:20 120:1 156:18 174:19 181:22,24 206:3 208:12 219:11 252:22 255:10 286:24 296:3 301:16
**specifics** 206:17
**speculation** 14:5
**spencer** 7:6 10:15,18,21
**spencerfane.c...** 7:8,9,9
**spend** 63:16 101:10 102:3 103:12 130:6,7 130:8,9 197:10 197:22,25 198:2 199:12
**spends** 101:11
**spent** 132:17 281:19
**spoke** 17:7,9 27:12 72:24 74:13 283:11
**spoken** 17:16 218:18 278:20 279:14
**spouse** 17:16
**spreadsheet** 246:19 247:7 247:10 248:5 249:6,7,18,22 249:23,24 250:5,7,8
**spring** 126:19
**st** 5:9 9:10 21:8 41:13,20,24,24 182:1 280:22
**staffing** 83:25
**stage** 264:2
**stake** 83:18
**stalking** 127:17 127:19 128:1,6

**stamp** 243:12
**stand** 80:9
**standards** 180:19
**start** 14:25 17:8 20:19 23:8 124:13,24 128:14 153:7 156:10 161:5 161:22 224:25 232:3
**started** 164:20 271:24 288:14
**starting** 100:7 154:14 155:2 164:3 165:9 174:5 205:15 213:19 268:4
**starts** 58:14,15 59:15,16 144:25 205:10 217:21 234:5 271:12
**state** 10:13 25:15 76:22,23 150:23 194:17 240:12 307:10 308:15
**stated** 130:13
**statement** 25:2 30:8 67:22,22 86:18 112:23 142:4 158:11 209:10 240:17 240:19 242:3 283:13 285:12 286:16 288:10 307:13,14 308:19,19
**statements** 158:8 283:3,5 283:6,10,18
**states** 1:1 6:1 6:15 7:18,20 11:2,3 78:16 93:15 203:12 210:8,12,15 230:9 261:8
**status** 49:12,13 174:24
**stay** 109:6 216:9 274:14
**steeplechase** 189:13 218:21 219:25
**stenographer** 5:15 9:7 15:4 25:21 79:14 81:8 102:24 203:7 225:12 253:2 259:17 293:18 297:9 303:16 304:5 305:1
**step** 34:4
**stephen** 40:16 40:21 44:23 45:1,24 294:12 296:4
**steps** 37:12 233:10 269:3
**steve** 4:2 34:18 35:14 58:10 60:13 89:22 213:20 225:10 296:10,13
**steven** 60:5
**stipulated** 10:1
**stipulation** 277:7
**stop** 81:10 103:17,19 105:2,9 172:6 172:8
**stopped** 30:5 273:13
**stored** 117:14
**straightforward** 62:14
**strange** 246:11
**street** 6:12 7:6 7:14,21 8:10 8:20
**strike** 22:8 50:17 137:14 152:13 295:5
**string** 23:7 40:15 45:2 58:9,15,24 59:16 94:14 99:20 108:25 109:14 116:14 116:22 120:21 139:8 235:4
**strong** 126:19 137:20
**structure** 42:8 55:10
**structures** 42:6
**struggle** 108:1
**stuck** 131:2,9
**study** 176:11
**stuff** 166:16
**subject** 2:14 3:1,2,4,6,8,10 3:14,17 4:8,10 4:11,13,18,20 4:22,23 5:1,2,4 5:7 14:20 32:25 74:1,3 94:10 99:20 116:15 123:1 124:12 160:18 244:20 246:10 261:13,16,17 262:4 271:19
**sublease** 287:14,15
**subleases** 291:1
**submitted** 80:1 123:10 185:23
**submitting** 189:16 287:4
**subscribed** 307:10 308:14 309:21

**subsection** 257:10
**subsequently** 28:7 31:15 255:9
**substance** 178:10
**sue** 177:7
**suffer** 122:5
**suggest** 50:3 94:13 207:14 221:24 230:19
**suggested** 139:22 142:7 222:16 259:10 289:2
**suggesting** 138:15
**suggestion** 106:23
**suggests** 85:22
**suite** 6:13 7:7 8:5,10,21 9:9 306:2
**sum** 220:13
**summarizing** 235:14
**summit** 224:23 225:4,8
**sunday** 124:22
**superior** 306:1
**supermajority** 300:13
**support** 128:13 172:19 194:22 236:7
**supported** 269:21
**supposed** 101:8 107:5 139:3 197:25 198:1 220:9 242:13
**sure** 15:10 17:6 21:22 29:19,20 32:21 33:4 34:1,9,25 40:10 45:6 48:7,25 49:14 50:11 52:5,12 54:24 64:8,19 66:9 68:13 70:14,21 75:11 78:17 84:14 86:8,14,19 87:22 95:2 103:11 113:15 114:25 115:13 116:3 126:14 127:22 134:1 143:14,15 153:17 159:6 160:23 173:6 178:13 180:25 190:22 202:21 202:25 213:23 223:16 224:24 232:24 240:2 251:3 255:25 262:1 269:8 289:15 295:22 296:18
**surprise** 135:1 146:15,21 229:4 273:14
**surrender** 177:4
**survive** 128:16
**suspect** 229:13
**suspected** 228:11
**swamped** 86:4
**swear** 11:18 36:3
**switch** 202:24
**sworn** 6:10 11:20 305:6 307:10,13 308:14,18 309:21
**system** 32:19 239:2,3

**t**

**t** 3:20
**table** 223:19
**take** 10:10 25:16 64:7 65:24 66:3,10 78:1 84:12,17 86:17 109:3 112:9 113:17 114:10 116:2,6 128:5 132:1 153:15,22 177:12 198:22 204:4 216:5 217:15 229:16 232:7 233:10 233:16 244:6 245:20 256:25 260:8 269:3 271:10 272:1 277:14 278:8 284:11 290:8 303:1,24
**taken** 1:10 10:2 31:19,21,23 128:25 153:13 204:5 259:13 305:7,11
**talk** 17:3 25:9 70:12 73:23 74:2,7 88:17 101:8 111:25 119:11 127:16 139:23 149:9 149:10 153:8 172:1,13 178:17 179:9 182:16 212:4 216:4 241:11 257:8,10 279:22
**talked** 16:25 66:18 108:19

110:12 119:6 119:19 125:17 128:25 132:24 133:1,2,10 137:19 178:14 179:14 216:19 232:24 255:15 279:20 281:25
**talking** 16:24 23:23 25:4 42:22 46:10 59:17 92:17 96:9 97:5 101:3,7,19 102:1,2 110:21 119:23 120:1 121:1 122:11 123:4,22 124:24 127:8 143:14 154:23 154:24 156:17 156:18 162:2 174:25 228:19 229:6 234:17 234:19 239:11 257:20,24 279:23
**talks** 127:18 244:24
**task** 67:12 132:8,13
**tasks** 140:5,13 140:16,18,19 140:22 141:1,6
**tax** 242:23 243:4,8 248:23
**taxes** 242:20 243:24 245:6 245:10,16
**team** 67:12 69:24 75:18 100:24 110:21 128:1 141:13 142:1,7 143:14 171:6
**teamed** 106:13
**teams** 70:15 124:6
**technically** 34:12
**telephone** 218:7
**tell** 14:2,7 22:8 24:1 25:4 26:22 32:13 49:16 50:6 51:17 60:13 73:22 74:2 92:15 95:12 103:17 104:1 113:7 125:7 126:3 136:20 137:16 142:3 145:13 147:7 151:7,8 161:18 161:21 162:16 162:23 164:8 171:25 193:15
212:2 236:12 237:14 238:13 246:18 247:8 248:21
**telling** 89:22 94:8 112:3 141:5,19 161:16 263:9 296:5
**tells** 87:1 98:1 99:4 110:25 121:3 172:18 251:14
**ten** 87:12,16 123:11 164:15 165:10 258:19 259:5,11 260:20
**tenure** 299:11
**term** 4:22 60:17,19 91:22 107:16,18,20 107:20 127:2,3 214:4 218:21 224:1,2,3,8,10 224:17,18 225:4 291:16
**terminated** 134:12 137:17 138:5,9 139:2 145:8 173:21 174:6 193:7
**terminating** 185:13
**termination** 4:19 134:22 141:18 172:11 185:12
**terms** 107:19 107:21 216:22 272:12 277:6
**test** 264:21 265:1,5
**testified** 40:4 91:20 146:16 146:19 154:6 180:7 199:24 203:14 228:18 237:12 281:5 282:15,18 283:1 291:13 291:20 292:4,9 296:20
**testifies** 11:22
**testifying** 210:25
**testimony** 49:6 77:6 78:23 92:12 96:8 180:13 193:11 221:10 229:10 258:23 259:1 281:9 282:2,19 299:4 305:5,6 307:6,7 308:6 308:9,12
**testing** 224:22

**text** 2:12,17 50:11 82:10 84:11 85:1,7 85:13,19 86:2 87:5 92:4 133:13 137:18 137:22,22 147:16,21,22 147:24 148:3,7 148:9 149:3 150:14,15 151:18 152:2,4 152:24 153:4,7 153:8,11,13,24 154:1,7,11,11 155:8,22 156:12 160:9 160:24 162:18 163:6 164:7,14 165:1,3,13,16 165:24 166:10 166:20 167:16 167:17 168:6 168:15,17 169:8,14,20 170:4,5,8,14,18 170:21 171:4,7 171:11,17,21 172:16 173:2 173:22,25 174:4 175:16 175:22 176:17 179:14,15,17 180:4,18 204:12,17,21 204:23 205:7 205:10,15,16 205:19,23 206:1,3,16,25 207:2,21 208:24 209:2,4 210:17,24 235:12 243:10 243:17,18,19 243:19 298:11

**texts** 85:10,10 90:21 133:17 147:10,15 151:13 154:23 154:24 155:2 162:25 163:17 163:20 164:4 164:11,15,20 167:21,21 168:3 169:10 173:24 176:4,6 206:3 209:11 243:18

**tgst** 87:6

**thank** 84:25 177:22,24 178:9 183:22 205:5 245:22 280:14,21 299:22 300:3 302:22 303:13

**thanks** 90:23 131:18 172:19 246:19 302:25

**thereto** 305:13

**thereunder** 19:16

**thing** 61:8 68:14 98:11 104:2,7 109:4 115:10 124:11 210:13 228:16 239:13 268:19

**things** 28:16 51:5 117:3 124:25 125:5 125:11,13 126:7,13,17 127:9 129:8 148:16 162:14 165:19 226:25 257:7 282:14

**think** 12:12,17 12:19,19 13:5 14:14 15:24 18:8 35:22 49:4 52:14 55:3,12 60:8 61:19,19 67:21 72:14 81:25 87:3,6 94:24 94:25 101:6 106:22 107:12 107:15 110:20 112:13 113:8 121:4,14 122:18 123:19 124:14 125:12 125:23 127:8 133:24 137:18 137:22 138:20 148:20 150:1,4 151:1 152:10 152:11 156:23 157:14 159:2,2 159:13,15 162:18 168:5 168:22 182:19 183:6 190:23 191:4,8,9 197:6 199:24 200:20 203:14 205:6 211:5 222:21 224:4 226:12 228:6 228:15,18,20 229:17,21 230:15 232:15 232:16 235:11 240:4 241:25 243:9 245:15 250:6 252:16 255:19 256:8 258:11 260:5 261:4 263:10 266:7,15,21,24 267:25 269:20 269:21 270:21 271:2 272:2 274:7,11 279:2 279:19 280:22

281:6,25 282:18 283:1 284:13 285:3 290:11 291:20 292:9,14 296:7 296:20 297:6 297:11,20 298:3,14 299:18 302:9 302:11
**thinking** 209:13
**thinks** 151:2 262:18
**third** 120:3 216:21 230:8 235:7 268:5 273:3 287:5
**thirty** 306:18
**thought** 107:1 110:8 115:19 119:18 122:16 125:10 126:12 127:7 137:20 138:1 152:19 158:7 167:1 170:10 225:1 226:16,18 250:16 254:5 289:25 302:7
**thoughts** 175:2 188:5 221:8
**thousand** 143:8 161:14
**thread** 112:24
**threat** 212:21
**threatening** 215:24
**three** 25:12,14 26:11,18 44:5 65:20 66:16 67:10 72:2,18 83:24 86:2,16 87:14 91:3 120:22 124:6 125:3 130:6 138:15 141:1,6 143:24 173:21 181:25 219:10 220:24 224:3,5 257:11 258:12 259:6 260:1,14 260:15 263:24 274:18 276:5,8 276:19 286:25 287:3 288:9 299:1
**tie** 148:25
**tight** 130:5
**till** 155:23
**tim** 11:15 299:20
**tim.davis** 8:12
**time** 14:15 16:17 24:3 28:6,12 31:13 36:5,9 37:25 43:12 48:8 49:12,20,25 50:13 59:7 60:1 64:15 66:8 86:14,17 86:21 88:2 89:6 90:7 95:24 101:20 103:18,19 106:9,9 109:3 118:17,21 122:19 126:18 132:17,24 133:3,10,11,14 134:24 135:3 135:21,24 136:5,11,23 137:4 138:13 140:10 142:10 147:14,15 150:6,7 152:4 152:16,17,19 163:1 167:6,22 168:20 172:3,8 176:5,7,9 177:22 181:10 188:15 190:12 191:25 192:14 192:20 197:11 199:18 202:16 202:21,22 204:6 208:9 209:25 211:1 218:16,16 222:14 224:19 224:20 225:6 226:3 227:8 229:12,23 230:15 231:4 231:23,24 232:14 241:23 248:1,16,20 249:4 250:2 255:11 259:5 260:21,22 266:13,18,24 269:25 277:19 280:14 281:20 294:21 298:23 299:22
**timeline** 246:16
**times** 50:8 66:16 105:25 114:25 130:6 143:8 172:5 290:17 298:24 300:25
**timing** 20:10 246:11
**timothy** 8:9
**titled** 274:14 275:6
**today** 10:8 11:7 21:24 44:13 53:24 55:5 58:21 59:3,9 80:9 81:5 85:6 98:3 137:5 152:21 157:23

177:3 178:12 186:14,22 188:5 189:21 195:5 196:5 206:8 233:6 281:5 282:15 285:2 292:4
**today's** 179:25
**todd** 8:14 11:11 16:17 178:21 302:23
**together** 103:13 124:6 125:9 186:9
**told** 17:25 25:6 34:22 49:23 63:15 73:19 75:1,4 80:19 81:16 88:23 91:5 103:24 120:8,11,14 121:22 124:13 135:21 142:4,5 142:6 146:12 147:9,14,15 161:12 162:16 162:18 172:3,5 172:8 176:7 179:1 197:10 221:7 226:19 236:18
**tom** 33:13
**tomorrow** 60:14 159:6 195:16
**took** 20:14 37:12 56:8 63:18 64:20 93:8 95:11 106:15 107:22 107:22 200:19 202:16 205:24 208:19 252:13 252:20 254:9 254:18 290:13
**top** 23:8,9 44:5 46:22 58:9,13 83:24 85:22 95:3 116:19 163:6 171:19 181:25 195:1 251:13
**topic** 202:24 207:25 269:19
**topics** 280:20
**tori's** 105:14 145:14
**torpy** 9:4 11:8
**tory** 2:16 3:18 4:1 22:3 27:3 27:12 28:5,8 30:17 37:16 39:7 44:6 56:1 57:10 58:10,16 60:10 67:20 68:1 73:19 74:11 78:18 86:23 89:21 96:13 104:14 105:13 106:5 107:7 108:17 108:17 111:16 114:25 115:1 115:20,24 116:1 124:13 125:9 132:25 133:4,10,15 135:6,21 136:13,21 141:9,14,23 142:5,8,17,19 142:20,21,25 143:6,7,9,11,14 144:14 145:1 146:1,3 156:13 158:21,24 160:3,6 161:10 161:18,22,24 163:24 164:8 171:18 172:3 173:11 175:8 175:11 179:15 183:20,22,24 184:14,18,24 184:25 185:3 185:13,14 186:16 187:15 188:6,17 194:7 194:12 209:10 212:7,9 213:11 213:14 216:4,7 219:2,5 220:14 222:2,12,12,15 224:15 242:20 242:25 243:4 262:17 267:8 268:17 270:3,7 270:9,12,15,24 273:6,23 274:2 274:3,15,19 275:1,11,21 276:6,8,20 285:19,23 286:14,25 287:5,14,15,18 287:25 288:11 289:21 296:3,4 300:13 302:15
**tory's** 148:8 164:21 195:10 243:7,24 245:6 245:10,15 275:6 292:22
**tos** 301:5
**total** 62:1
**totally** 150:5
**tough** 68:3 176:24
**tournament** 91:4
**toward** 208:23 209:4
**towards** 88:24 219:14
**tracking** 301:9

**traffic** 251:3
**tran** 303:17,22 304:1,2
**trans** 303:18
**transaction** 302:13,17
**transactions** 65:19 67:3,7 67:14 71:25 72:5,6,9,15,22 283:20 289:10 300:16 301:11 302:5
**transcribed** 10:4 307:7
**transcript** 5:14 179:2,7 204:11 303:16 306:11 306:12 307:5 307:12 308:5 308:11,17
**transcripts** 179:4
**treat** 78:16
**tree** 31:10,14 63:13,20 64:2 64:15,23 65:13 65:25 66:4,11 66:19,23 71:25 72:9,16,22 145:3 157:25 159:12 184:6 184:22 196:22 197:1 202:5 222:23 282:16 282:22 283:3 283:17,23 291:21 292:1
**trees** 65:4 158:2,3 184:15
**trial** 236:14
**trick** 266:22
**tried** 221:8 237:1,3 260:13
**trigger** 129:7
**trip** 179:20,21
**triple** 2:16 3:13 202:2,4
**trouble** 23:21
**troublesome** 83:11
**true** 25:16 61:12 73:2,5 153:22 231:6 240:16,19 267:3 283:9 285:12 291:25 292:12
**truly** 163:13
**truskamp** 8:17
**trust** 54:15 162:4 222:23 265:3
**trusted** 270:7
**trustee** 7:18,20 11:2,4 78:7,9 78:16 93:15 131:11 132:3 132:21 135:13 135:14,15 202:20 206:13 216:14 217:7 247:15 248:6 249:8 250:21 271:23 272:11 277:8,14
**trustee's** 203:12 210:8 210:13,16 247:5
**truth** 70:16 122:25
**truthful** 56:18
**try** 96:2 103:13 167:3 168:10 248:5,10 301:12,17
**trying** 28:16 82:3 109:9 110:2,8,21 113:19 115:15 168:18 169:12 169:24 174:22 202:20 240:5 249:9 252:14 252:17
**turn** 29:11 43:4 90:20 153:3 166:3 171:15 174:10 183:9 184:10 193:20 209:1 243:9 284:4,10
**turned** 29:4 91:7 266:1
**two** 17:4 51:9 60:9 67:8 80:6 80:7,8 92:23 92:25 106:6 128:11 129:8 141:9 148:14 181:25 182:4 183:2 188:15 209:8 210:16 224:4 258:10 270:23 277:10 289:21 296:23 299:24
**type** 211:25 289:10
**typewriting** 10:4 305:8
**typically** 42:12 72:5 75:11 289:9

**u**

**u.s.** 10:11 78:7 78:9 206:13 247:4,15 248:6 249:8 250:21
**u.s.c.** 2:21
**ucc** 199:3,6,7 232:17,17 233:1

**ultimately** 29:13 88:11 198:11 212:15 212:20 216:12 217:6 223:20 225:3 242:13 247:23 280:10
**unanimously** 14:10
**uncomfortable** 231:13
**under** 2:20 31:6 49:1 53:3 53:13 57:2 67:5 159:10 166:22 175:1 192:21 197:19 197:21,22 198:19 199:12 200:9 216:5 243:24 254:1 254:22 275:18 277:13 281:12 282:5 285:20 286:8 292:2 301:5 305:8
**undergo** 281:15
**underlying** 240:8 253:21
**understand** 17:8 21:13 24:3 29:16 34:3,20 42:14 45:24 55:10 57:9 63:5 64:15 66:16 70:5 76:25 80:16 83:9 85:15 88:12,15 89:12 91:22 93:12 110:9 111:10 113:18 115:8 136:23 149:2 174:21 187:1 189:12 204:18 221:10 227:14 229:10 239:12 241:1,6 266:1 271:9 281:4 300:4,24 301:15
**understanding** 12:4 14:12,17 14:21 15:12 17:10 19:4 22:4,16 47:4 55:15 64:22 65:23 66:2,10 67:13 113:23 114:1,4 132:20 139:1 180:12 185:21 191:5 200:6 203:23 231:21 233:5 242:22 250:13 264:24 290:10
**understood** 46:2,4 67:3 225:20 260:10 299:16
**undertake** 63:4 69:15 70:9
**undertaking** 132:14
**unencumbered** 251:21
**unexecuted** 202:12
**unfamiliar** 43:19
**unfortunate** 175:5 201:20
**unhappy** 21:11
**unit** 106:14
**united** 1:1 6:1 6:15 7:18,20 11:1,3 78:16 93:15 203:11 210:8,12,15
**universally** 228:6
**unlimited** 77:21
**unsecured** 1:10 6:19 7:3 10:16 10:19,22 11:21 65:10,16 72:3 72:11,25 101:3 101:7,9,17,20 101:24 102:7 102:12 103:18 103:19,22 104:4 106:13 106:23 123:15 127:23 128:10 129:9,14 130:1 130:1,7 131:13 148:10 166:19 167:5,20 168:2 197:16 198:20 198:24 199:7 199:20 216:23 221:1 222:3 226:7,13,14,21 227:11,12,19 228:9 232:20 232:22 233:2 240:7 252:15 253:13 259:7 269:21 272:9 273:16 276:10 277:17 282:23
**unsigned** 159:20 200:13 200:17,22 202:13
**unusual** 236:10
**update** 36:17
**updated** 4:24 43:17
**updates** 218:19
**updating** 43:9
**upload** 241:4

**ups** 181:21
**upside** 29:2
**usdoj.gov** 7:23
**use** 30:4 45:12 46:9 65:3 82:14 91:22 119:24 124:4 145:14 188:12 196:12 200:20 211:6 238:15 238:22 275:3 286:20 296:9
**used** 59:18 68:1 79:21 82:25 118:23,25 119:14 128:21 147:22 166:15 166:23,25 167:2 171:9 172:11 188:22 200:22 223:14 284:24 285:17
**uses** 147:21
**using** 45:11 171:25 172:6,9 195:3 285:21
**ust** 101:3,7,8 301:17
**utilize** 236:1
**utilized** 201:24 255:5 258:11
**utilizes** 187:8
**utilizing** 225:19 237:10 255:2
**utopian** 184:15

**v**

**v** 306:6 307:3 308:3
**vague** 69:10 132:10
**vaguely** 258:24
**valley** 4:10,20 31:9,14,18,20 53:18 55:18 56:11,22,25 57:5,9 59:19 59:23 60:3,14 60:24 61:11,13 61:15 62:21 63:13,17,20 64:1,15,22 65:4,13,24 66:3,11,19,20 66:23 67:4 71:25 72:9,16 72:22 145:2 146:5,8,23 157:3,8,9,12,15 157:16,17,19 157:21 158:8 158:12,23,24 159:2,11,20 160:4,7,13,18 161:5 162:8 163:24 164:9 164:21,25 175:5,23 176:1 176:5,13,19 184:6,22 186:21,23 196:21,25,25 197:2,11,14,23 197:24 198:1 198:15,17,25 199:22 200:4,7 200:12,18,24 202:1,5 282:16 282:22 283:3 283:14,17,23 291:21 292:1
**valuation** 119:24 122:5 123:1 251:15 252:18,25 253:6,21 254:1 254:9,12
**valuations** 229:9 246:23 257:23 299:8
**value** 102:22 122:16 127:20 230:19,25 231:21,25 232:12 251:1 254:20 257:16
**values** 255:17 256:5,20
**valuing** 255:23
**various** 166:20 190:14 271:13 300:16 301:6
**vendors** 286:1
**verde** 67:16,20 67:25 69:9 265:11,12,23 266:11 267:6 268:8,25 270:10 271:7,7
**verifying** 167:3
**veritext** 9:9 306:1,7 309:1
**veritext.com.** 306:17
**version** 174:16 241:4
**viable** 219:23 221:12 224:17
**vickie** 178:3 208:20 222:25 303:24
**victor** 175:8 176:4,10
**victoria** 7:13 10:24
**victoria.buter** 7:16
**video** 1:9 6:9
**videographer** 9:6 10:8 11:17 12:25 13:3 64:9,12 68:21 68:24 116:7,10 149:14,17 177:17,20 233:19,22

278:10,13 303:4,7,14
**view** 115:4 229:22 236:23
**viewed** 123:25
**views** 281:7
**virtually** 211:2
**vis** 268:8,8
**volvo** 274:13 275:6
**voted** 14:10

**w**

**w** 235:11
**wade** 21:4 22:2 22:5 24:23 25:1,3,5,6 27:2 27:10,21 41:3 41:25 43:6,16 45:13,16 46:3 88:12,17 89:5 89:9 183:14 191:1 295:24 297:22
**wade's** 45:10 45:20 89:13 296:22
**wait** 81:10 243:15
**waiting** 231:6 231:22,23 299:15
**waivable** 51:8 51:8
**waive** 51:9 242:14 248:16
**waived** 242:16 306:19
**waiver** 38:10
**waivers** 38:13 38:15,18,22
**wakefield** 118:1
**wakeman** 225:25,25 226:1
**walk** 293:2,5 293:20
**walked** 222:5
**walnut** 7:6
**walsh** 13:15,22 14:2,16,20,22 15:11,13,17 17:7,9 20:13
**want** 34:3 35:23 36:4 68:13 78:17 92:7 93:17 98:11 102:10 105:22 106:5 109:3 111:6 112:23 113:15 114:14 115:10 119:6 123:1 144:6 148:9,13 149:21 150:22 151:24 153:17 174:2,12 182:16 197:8 201:1 206:17 210:7,13 212:9 216:7 219:11 220:13 226:24 228:2 236:3 239:17 243:23 245:5 248:13 266:17,22,23 277:13 304:5
**wanted** 21:16 45:6 98:16 106:3 115:7,8 115:10,13 120:13 122:7 122:23,25 134:1 143:13 143:15 213:11 213:13,14 216:9 223:16 237:13 247:5 249:7,12 250:19 270:24 270:25 296:18
**wanting** 106:5
**wants** 111:23 112:3
**ware** 279:15,18 279:23
**waste** 101:20
**wasting** 103:17 103:19
**watching** 172:1
**water** 54:16 276:16
**way** 17:5 19:25 20:2 37:23 41:11 42:9 47:7 61:18,19 73:17 81:2 86:2 102:9 107:15 125:23 126:6,12 137:11 144:7 167:11 175:14 175:21 177:7 195:15 196:3 200:1,2 212:5 212:5 216:3 246:16 247:14 247:21 248:20 252:17 261:4 264:17 276:7
**ways** 122:13
**we've** 29:7 30:24 82:17,21 87:16 108:19 116:13 127:22 139:13 150:8 154:11,12 173:20 204:25 269:8,9 280:21
**weak** 137:21
**wear** 148:23
**wearing** 148:21
**wears** 148:19

**wednesday** 10:8 42:20
**week** 3:4 147:10 150:17 154:14 155:2,6 163:17 164:4 164:20 165:2,9 165:17,22 176:23 178:25 252:6
**week's** 148:7
**weekly** 67:6 260:12
**weeks** 22:18 28:12 49:8 183:3 188:15 296:23
**weigh** 113:9 114:14 115:6 196:14
**weird** 262:13
**went** 37:18,18 44:15 91:6,7 103:15 123:17 168:10 193:18 225:1 230:9 239:16,17 250:23 256:19 295:19
**west** 284:24 285:6,17,20 287:19,25
**western** 1:1 6:1 6:16 10:12 68:1 79:21 124:4 126:3 128:21 147:22 147:22 154:21 158:16 167:19 167:19 171:9 187:8 188:12 200:21,22 209:24 237:19 237:19 272:1 296:9
**wife** 16:21 57:20,21 148:17,22 173:11 273:25 274:11
**wife's** 162:5,8
**williams** 111:11,17 112:4 277:24
**wise** 201:23
**wish** 212:2
**wishing** 166:13
**withdraw** 77:18
**withdrawing** 19:21
**witness** 2:2 8:18 10:5 11:14,18 22:21 22:25 29:2,21 58:6 84:20 149:21 150:21 151:15 177:14 177:24 225:13 280:15 299:22 305:4,6 306:8 306:11 307:1,4 307:11 308:1,4 308:15
**witness's** 96:7
**witness’** 306:14
**word** 30:3 45:11,23 46:9 57:16 65:3
**worded** 213:6
**words** 14:9 26:7 77:8 90:19,23 91:2 119:13 120:5 236:6 289:3
**wore** 148:23
**work** 67:11 83:9 86:4 87:16 89:3 90:7,8 91:13 96:22,23 115:8 125:8 219:14 236:12 238:2 241:19 246:21 247:16,17,17 248:4,13,14,22 249:15 275:22 293:24
**worked** 21:7,10 24:2 248:4 250:2 301:16
**workers** 111:6 112:5 113:25 114:7
**working** 21:14 27:21,23 88:13 88:23 106:14 115:14 119:21 140:2,16,19 188:22 198:1 199:17 247:17 247:19 260:4,5 260:5 301:19
**workload** 113:20
**world** 160:2 167:14 216:3 223:17 239:12 247:14,21
**world's** 105:12 108:17
**worth** 62:16,17 95:23 107:6 220:12 252:4 252:12 253:10 282:6
**wrap** 138:11
**write** 120:4 124:12 287:4 287:14,15
**writes** 195:2 214:16,24 215:6
**writing** 50:10 50:14 142:9

270:13
**written** 38:15 124:11 133:12 133:14 199:25 270:22 287:18
**wrong** 90:5 95:1 170:1 201:9 236:13 239:22
**wrote** 24:13 289:2

**x**

**x** 2:1 3:20 173:5,8,9 199:12 273:19 273:24,25 274:24

**y**

**yeah** 23:1 24:14 39:14 46:12 59:1 84:9,22 85:1 89:25 92:15 103:2 112:23 112:24 114:24 120:7 122:23 126:25 127:3 130:18 146:18 149:11 156:22 162:20,22,24 182:8 213:6 222:19 225:23 233:17 250:8 261:21 280:22 281:2 297:8
**year** 166:13 189:6 243:8 258:19 259:5 259:12
**years** 87:12,16 181:14 260:20
**yep** 163:15 277:15
**yesterday** 173:3
**yikes** 289:5

**z**

**zach** 7:5 10:21 106:20 199:4 199:11,15,16 240:12 252:17 271:17
**zero** 46:1
**zeros** 44:2
**zfairlie** 7:9
**zillion** 222:24
**zoom** 12:11,14

**à**

**à** 268:8

Federal Rules of Civil Procedure

Rule 30

(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

(2) Changes Indicated in the Officer's Certificate. The officer must note in the certificate prescribed by Rule 30(f)(1) whether a review was requested and, if so, must attach any changes the deponent makes during the 30-day period.

DISCLAIMER: THE FOREGOING FEDERAL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF APRIL 1, 2019. PLEASE REFER TO THE APPLICABLE FEDERAL RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS

COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the foregoing transcript is a true, correct and complete transcript of the colloquies, questions and answers as submitted by the court reporter. Veritext Legal Solutions further represents that the attached exhibits, if any, are true, correct and complete documents as submitted by the court reporter and/or attorneys in relation to this deposition and that the documents were processed in accordance with our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining the confidentiality of client and witness information, in accordance with the regulations promulgated under the Health Insurance Portability and Accountability Act (HIPAA), as amended with respect to protected health information and the Gramm-Leach-Bliley Act, as amended, with respect to Personally Identifiable Information (PII). Physical transcripts and exhibits are managed under strict facility and personnel access controls. Electronic files of documents are stored in encrypted form and are transmitted in an encrypted

fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.